```
 1                                           Pages 1 - 33

 2                   UNITED STATES DISTRICT COURT

 3                  NORTHERN DISTRICT OF CALIFORNIA

 4     Before The Honorable Sallie Kim, Magistrate Judge

 5     UNITED STATES OF AMERICA,      ) No. 3:15-mj-70856-WHO-1(SK)
                                      )
 6          Plaintiff,               )
                                      )
 7        v.                          )
                                      )
 8     ADAM SHAFI                     )
                                      )
 9          Defendant.               )
       _____)
10                                        San Francisco, California
                                          Tuesday, December 22, 2015
11
                      TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL
12           ELECTRONIC SOUND RECORDING - FTR 2:10-2:48; 2:57-3:01

13     APPEARANCES:

14     For United States of America:

15                        U.S. Attorney's Office
                          White Collar Crime
16                        450 Golden Gate Avenue, 11th Floor
                          San Francisco, CA 94102
17     BY:                CANDACE KELLY, AUSA

18
       For Defendant:
19                        Joshua L. Dratel, PC
                          29 Broadway, Suite 1412
20                        New York, NY 10006
       BY:                JOSHUA LEWIS DRATEL, ESQ.
21
                          Law Office of Erik Levin
22                        2001 Stuart Street
                          Berkeley, CA 94703
23     BY:                ERIK B. LEVIN, ESQ.

24
       Transcribed by Kelly Polvi, Contract Transcriber, utilizing
25     court reporting and transcription hardware and software.
```

| | |
|---|---|
| 1 | **TUESDAY, DECEMBER 22, 2015**                    **2:10 P.M.** |
| 2 | P R O C E E D I N G S |
| 3 | ---oOo--- |
| 4 | **THE CLERK:**  Calling criminal matter 15-582, the |
| 5 | United States versus Adam Shafi. |
| 6 | **THE COURT:**  In the audience, you cannot communicate with |
| 7 | the defendant.  I just want to warn you now.  The court |
| 8 | security officer should have told you that, but I just want to |
| 9 | let you know again.  It's just disruptive; it's distracting. |
| 10 | Okay?  No waving; no talking.  Okay? |
| 11 | **MS. KELLY:**  Good afternoon, Your Honor, Candace Kelly on |
| 12 | behalf of the United States. |
| 13 | **THE COURT:**  Good afternoon. |
| 14 | **MR. DRATEL:**  Good afternoon, Your Honor, Joshua Dratel, |
| 15 | Erik Levin for Mr. Shafi, who's standing beside us. |
| 16 | **THE COURT:**  Thank you. |
| 17 | So I understand that we're on for a motion for release |
| 18 | from detention.  And first I will hear from the government and |
| 19 | then I'll hear from defense counsel. |
| 20 | **MS. KELLY:**  Your Honor, this is a presumption case and it |
| 21 | is a presumption case which means that the presumption is for |
| 22 | detention because it involves a crime involving terrorism. |
| 23 | And in this case it's material support of terrorism.  And |
| 24 | there are many ways to commit material support of terrorism. |
| 25 | It could be sending funds; it could be sending equipment. |

1       In this case, it's someone who is trying to -- was trying

2    to commit himself to the cause of Al-Nusrah Front.

3       And I think that it's important -- and I regret that I

4    did not include this in my papers -- to make sure it's clear

5    what Al-Nusrah Front is, which is, it is a designated terrorist

6    organization by the state department.

7       I think in this culture right now in this country there's

8    a lot of understanding of ISIS or ISIL and -- because they're

9    in the news more often.  But I think it's very important to be

10   clear that Al-Nusrah Front is al-Qaeda's affiliate in Syria.

11       And that was determined by al-Zawahiri, who is the

12   leader, emir of al-Quada, who designated Julani, who is the

13   emir of Al-Nusrah Front.  And as the Court may recall from the

14   papers, Julani is the emir whose two-hour interview the

15   defendant was listening to before he had a conversation with

16   his friend, S.K., about how he loved that emir and how he

17   believed in the emir's cause and his approach to jihad and

18   his --

19       And through the course of that, and using the defendant's

20   understanding -- as opposed to the government's understanding

21   of that organization, it's an organization that believes that

22   America is the enemy, and they are committed to creating a

23   place where it is ruled by Allah's rule and nothing else, and

24   that America is the enemy and they are --

25       As opposed to, as the defendant was very -- clearly had

1    studied this and was understanding the difference between ISIS

2    and Al-Nusrah Front through his conversation, ISIS -- which, by

3    the way, al-Zawahiri, who is the emir of al-Quada, ordered ISIS

4    to leave Syria and go back to Iraq because he had designated

5    Al-Nusrah Front as the affiliate of al-Quada in Syria.

6         That they do -- ISIS does have a more violent approach to

7    the same cause, which is America is the enemy and they're

8    fighting against that, and America -- Americans are all

9    infidels.

10        So I think it's important -- I pulled a couple of things

11   that government officials have said about Al-Nusrah Front in

12   terms of just making sure that it's clear that just because

13   ISIS is more popular in the media and may have more violence

14   that's a more violent approach, Al-Nusrah Front is just a more

15   selective approach.

16        Just in the year -- because this was the fact that I was

17   able to pull from government sources -- the year 2011 to 2012,

18   Al-Nusrah Front had claimed responsibility for nearly 600

19   attacks.  And those included suicide attacks, small arms

20   attacks, IED attacks.  And just this year the director of the

21   National Counterterrorism Center was testifying before the

22   Senate Select Committee on Intelligence and he said that

23   Al-Nusrah Front was one of the most capable groups within Syria

24   and has mounted suicide, explosive, and firearms attacks

25   against regime and security targets across the country.  It has

1     also sought to provide limited public service and governments

2     to the local population and areas under its control.

3          So just as -- just to sort of set the stage in terms of

4     why this is a preponderance -- why this is a presumption case

5     and what Al-Nusrah Front is really all about, I wanted to make

6     sure that was on the record.

7          The government's position with respect to Mr. Shafi is

8     that there is far more than a preponderance of evidence --

9     which is the standard -- for risk of flight.  This is not a

10    situation where there's really a lot of doubt.  Because this

11    would be -- there's already been a dry run.

12         This family, who clearly understands the gravity of the

13    situation, given the facts of what's going on in Syria, if they

14    were fearing that their son was going to join a terrorism

15    group, which is what his father said to the U.S. Embassy

16    officials back in August of 2014 when he slipped away from

17    their family vacation, he went in immediately and said, "I am

18    afraid that he is being recruited, that he may be doing harm to

19    himself or others.  We need to find him quickly."  That is a

20    reaction of a father who is fearing for his son's safety,

21    whether it's at his own hands or at the hands of others, if

22    you're going into this situation in Turkey or Syria, which is a

23    violent, very dangerous situation.

24         So his father -- who clearly knew that this was not

25    someone who was just tired of living with his family, he went

1    to the embassy.  And he had serious concerns because he knew

2    what he was dealing with.  It's a father who had said that he

3    is very protective of his children.  He told the FBI that -- in

4    August of 2014, or September, when he was interviewed, that

5    every family member had a GPS tracking app on their phone so

6    they knew where they were at all times.

7         Which I think comes into play this year, when he went

8    to -- when his son went to the airport again.

9         So this is a family that knows, this is a father who

10   encouraged his son to go -- this is after he came back from the

11   first trip -- he encouraged him to go and visit a defendant who

12   was detained down in San Jose, Mr. Harcevic, who defense

13   counsel raised in his papers, because clearly he wanted him to

14   understand the consequences of engaging in this activity, which

15   is trying to go and join one of these groups.

16        Mr. Harcevic was incarcerated for the very same thing:

17   Material support -- not attempted, but he was charged with

18   material support by sending funds to a terrorist organization.

19        And the father, who was working with the FBI and talking

20   with the FBI over the months, said, "I'm not sure it did any

21   good."

22        So here's someone who has tried.  He has tried to help

23   him get education; he has tried to help him with employment.

24   His father has his own company.  I think his uncle also has a

25   company.  They try.  And they have a very strong -- it's very

1     clear they have a very strong network of the community and

2     friends and family members.  They weren't able to stop this.

3           And this is something that is driven not by -- you know,

4     we've seen a bunch of defendants charged with drug crimes

5     today.  They have a very different motivation for the crimes

6     that they commit.  And the amount of sureties and the amount of

7     money and their ties to the community are very important and

8     can be overcome by certain conditions that the Court can set.

9           We are dealing with someone who, if the Court has had a

10    opportunity to listen to his discussions about Julani, the emir

11    of Al-Nusrah Front, this is someone who is very committed, to

12    the point of saying he is content to die with them.

13          So leaving his family and perhaps having them lose their

14    house is not really going to change; it's not really changing

15    the circumstances that the family and he were faced with after

16    he came back in August of 2014.

17          So the circumstances are pretty much the same, less, of

18    course, at this point the FBI does not have the resources that

19    they have been expending on this case up until charging.

20          So, you know, obviously there are interceptive phone

21    calls that are in papers.  That's a pretty intrusive technique

22    that the FBI had at its disposal, which obviously, as a charged

23    defendant, they don't have that anymore.

24          Not to mention that I think that release is not something

25    that should be ended up being a burden on the FBI to keep the

1    community safe and to protect the national security.  That's

2    why they brought these charges to bear.

3         So I think that both through Mr. Shafi's words -- even if

4    the Court were to disregard the reason that he was leaving and

5    separate that from the question of his risk of flight, he wants

6    to leave the United States.

7         He told the FBI that -- when he was talking to them on

8    the -- at the airport on June 30th of this year, he didn't

9    admit where he was going to go, but his story, at the time,

10   was, "Oh, I want to leave.  I don't want to be in the

11   United States anymore.  I don't believe in the --

12        You know, he cited the gay marriage ruling that had just

13   come down.  He didn't want to live in the United States.  This

14   is someone who does not want to be living amongst -- as he

15   calls us, the kafir, the American infidels.  He wants to live

16   elsewhere.

17        And even if he were to -- so you can even separate the

18   fact that he was going to a terrorist organization in terms of

19   looking at the risk of flight.  This is someone who knows his

20   parents are keeping a very careful watchful eye on him, have a

21   GPS on him.  He lied to them and told them that he was going to

22   an interview at San Francisco State University when, in fact,

23   he was going to the airport.

24        And once again, if there's any doubt about whether or not

25   the parents were fully aware of his motivation and the

1    seriousness of the threat that he would leave the country to go

2    join a terrorist organization, somehow they knew -- even though

3    he had lied to them and told them he was going to an interview,

4    they knew that he was going to the airport.

5        They called his friend, which is evidenced by the phone

6    call with his friend after the -- after he left the airport,

7    who said, "Oh, yeah, your parents called; they think you left."

8        They talked to a relative, also in the complaint

9    affidavit.  And not only did they do that -- the agents

10   informed me that they had called the airport, they had called

11   Mr. Shafi, who was not responding to their calls, he was being

12   paged at SFO.

13       And their choice of trying to deal with this very serious

14   situation where I can only imagine that they feared that their

15   son was going off to do something where he very well may get

16   killed, was to call relatives in Egypt and ask them to go to

17   Istanbul and try to beat his flight so that they could

18   hopefully find him in the airport and stop him from leaving.

19       Now, that not only shows the way that they're dealing

20   with this very serious situation, it also shows an incredibly

21   strong tie to those family members in Egypt, that they believed

22   that they could call someone in Egypt, family members.

23       And granted, they're all -- the parents and uncles are

24   all dual US and Egyptian citizens.  If they believed that the

25   family members in Egypt were going to get on a plane and try to

1   stop this young man in Istanbul, that's a pretty serious,

2   strong connection to a foreign country that Mr. Shafi has.

3       Not to mention in the pretrial services report they

4   have -- this family has their own condo in Egypt.

5       So I think there's plenty of opportunities for him to

6   flee and plenty of motivation for him to flee.

7       He has said that, you know, "What am I going to do now?

8   Maybe I should just go to jail," when he was talking to his

9   relative after -- after he was stopped.

10      And in his view, you know, he had been -- this was -- he

11  had received a sign from Allah that he should go.  The sign was

12  if he found his passport, he was going to go.  And he found his

13  passport, his U.S. passport, and then apparently being stopped,

14  or having the FBI talk to him -- which he voluntarily talked to

15  them -- was evidently another sign that he wasn't going to go.

16      So how is he to join this fight?  How is he to support

17  this cause that he believes so strongly in this cause?  There

18  are lots of ways, and we've seen it in other cases.  There are

19  many ways to support these causes without traveling.

20      So it's either travel to join them or or do something

21  else.  And that's an unpredictable threat, that there's no way

22  that this family, despite clearly they have every intention of

23  trying to do the right thing, I mean, separate and apart from

24  not calling law enforcement when they think their son is

25  leaving and taking that responsibility into their own hands,

1    but they simply have demonstrated that they are not capable of

2    countering this really strong belief system.

3         So this is not about money.  It's not about greed.  It is

4    about a belief system, and it is about the fact that everyone

5    around him, Mr. Shafi, here in this country, is --

6         And by the way, there is a quote in the complaint that

7    says, "What am I going to do, live like everyone else here and

8    betray --

9         And it says unintelligible, but having listened to the

10   calls again it's betray "Muslims."

11        So that's how he feels about living in this country.

12        So there are not a lot of cases that come before this

13   Court where the motivation for the crime itself is to leave the

14   United States.

15        So what can be -- and, that, you know, he certainly has

16   not shown any respect for material wealth, which is very much

17   an American -- it's sort of quintessential America; right? --

18   is wealth and -- material wealth and houses.

19        So a number of people posting their houses may make them

20   more motivated to do what they can, but I don't think there's

21   any greater motivation than trying to stop your son from going

22   somewhere where you think he's going to die.

23        So posting -- they can post all of their many properties

24   and their rental properties and their Egyptian property.  I

25   don't think you could find a way to have his parents have a

1    higher motivation than they had.

2        And he certainly has shown that he doesn't have any

3    respect for law enforcement here, for the rules, and, most

4    importantly, for the American way of life.

5        So based on all of those things, I think he is both a

6    flight risk and a danger to the community.  Because if, for

7    some reason, he feels that all of the conditions that might be

8    imposed were to thwart his efforts to leave, although he has

9    talked about leaving through Mexico, or going through Egypt,

10   which is "hell-a disorganized," I think is -- to quote -- his

11   words, there are a lot of ways to get out of this country

12   without getting on a plane and without having a passport.

13       So with the right motivation, which I think this young

14   man has, I fear that there is either -- we're going to create a

15   dangerous situation by thwarting that and forcing him to live

16   amongst the kafir and betray Muslims, or we're going to create

17   such a huge incentive to carry out his ultimate plan, which is

18   to get to Al-Nusrah Front and join the fight, I don't think

19   that any of the conditions that have been proposed are

20   sufficient to counter those.

21       **THE COURT:**  Thank you, Ms. Kelly.

22       Mr. Dratel?

23       **MR. DRATEL:**  Thank you, Your Honor.

24       I know the Court has read the submission, so I'm not

25   going to --

1     THE COURT:  I've read everything.

2     MR. DRATEL:  Yes.

3     THE COURT:  And I've listened to the tapes as well.

4     MR. DRATEL:  Right.  And I understand that, Your Honor.

5  So what I'm going to do is address -- and if I repeat anything

6  in there, it's really in the context of papers that were not

7  addressed in our papers.

8     THE COURT:  Okay.

9     MR. DRATEL:  In other words, the government's papers,

10 pretrial services report, and the supplemental papers that we

11 filed yesterday.

12     And just as a threshold matter, the statutory framework

13 and case law deciding it -- interpreting it, the facts of the

14 case are probably the least important in terms of presumption

15 of innocence and not trying the case right now when we are just

16 getting in the case and the government's had, essentially, more

17 than a year of investigation involving this case.

18     So -- but I will discuss those things as they implicate

19 the important issues and the issues that the Court obviously

20 has to address, which is risk of flight --

21     THE COURT:  Mm-hm.

22     MR. DRATEL:  -- and danger to the community.

23     So with respect to the pretrial services report, to get

24 to that first, the pretrial services report concludes that

25 there are conditions that could resolve the issue of risk of

1    flight.

2         And we agree, obviously -- and just so that we're clear

3    on a couple of things that the government said today, the

4    intervention by family in Egypt proves the exact opposite:

5    That he does not have refugee agent to avoid this case.  They

6    are fully aligned with the family here in the United States to

7    keep him here.  So that's not a solution.  So it proves the

8    exact opposite than what it government would claim it does.

9         Second, with respect to the pretrial services position on

10   dangerousness, which is that there are conditions, but they

11   feel that there are mental health issues, potentially, that

12   they want evaluated and then want -- prior to addressing it on

13   the merits.

14        And I think that that's a little backward in the sense of

15   how bail works.  First of all, the statute, 3142(c)(1)(B)(x) --

16   10 -- one of the conditions is mental health counseling as a

17   condition of bail.  The Court can order that as a condition of

18   release.  And we encourage the Court to do that.  If that's --

19   and the other part is if the mental health issue is the only

20   thing that's an impediment to a conclusion that there are

21   conditions, not only that will not only resolve risk of flight

22   but also dangerousness to the community.  And if that's an

23   impediment to release, then order release pending that

24   evaluation, not order detention pending that evaluation.  Set

25   the conditions of release.

1    We don't think it's necessary, based on the nature of the

2    statute and all the other factors that we'll go through, but it

3    really is the opposite.  You should be ordering release pending

4    that evaluation.  We think the evaluation will come after, as a

5    component of the pretrial release.

6    The other part of the aspect of the mental health

7    equation is that the dangerousness aspect of this requires

8    clear and convincing evidence.  And that one paragraph of the

9    interview with Mr. Shafi is not clear and convincing evidence

10   of anything.  That he considered suicide once or twice or

11   occasionally, he never had a plan to do it, never attempted it.

12   It's not evidence.  It's not clear and convincing evidence.

13   Not only that, it's contradicted by all of the other

14   evidence.  This is someone without any violence in his history.

15   Literally, he would not hurt a fly.  You've read the letters,

16   that cousins say -- friends say, "That's your cousin who

17   wouldn't let us kill the bee.  He didn't want to dissect an

18   insect in class.  He was allowed to take photographs instead."

19   So in terms of context of dangerousness, the government

20   had him under surveillance from the time he returned.  He

21   submitted to interviews.  He cooperated.  He doesn't have a

22   criminal record.

23   So all of these factors have not evidenced a single

24   violent incident, violent plan, or anything like that.

25   Even as to the airport.  Even at the airport.  They said

1    he was arrested without incident at his home.

2        THE COURT:  Mr. Dratel, would you like to discuss the

3    comments that were made in the tape-recordings?  Because I did

4    listen to them, and I'm assuming that you listened to them as

5    well.

6        MR. DRATEL:  Oh, yeah, I have.

7        THE COURT:  There were some discussions about violence in

8    the tape-recordings.  Killing people.  Gallons of blood.  It's

9    very disturbing.

10       MR. DRATEL:  Well, you know, some of this stuff, which

11   is -- in terms of blood and all that, I think is about -- you

12   know, there are certain -- there are certain rhetoric.

13       First of all, this country has elevated the concept of

14   violent rhetoric to presidential campaigns.  And to use that as

15   a basis for denying bail I think would not be appropriate under

16   the statute or the Unruh standard.  People always talk about

17   things that they are never going to do.  And they may say,

18   under conditions of anger or frustration, all sorts of things.

19       But it's what they do, if it's violent, that counts.  And

20   I don't think there's a single person who's come into court in

21   any context and been either convicted or punished because of

22   what they say.

23       And so in the context --

24       THE COURT:  I don't actually think that's accurate,

25   Mr. Dratel.  I think there are some situations in which people

1    can be criminally convicted for comments.  For example, threats

2    can be -- constitute criminal conduct, so.

3         MR. DRATEL:  But we don't have those kinds of threats

4    here.  Those are very specific threats against very specific

5    people and we don't have those here.

6         THE COURT:  I'm concerned about the threats here and the

7    tape-recordings that I heard.

8         MR. DRATEL:  Well, Your Honor, first of all, some of the

9    language, rhetorical, is religious language.  And there's an

10   article that came out very recently, so which -- they

11   interviewed people, and they gave them verses, scriptural

12   verses that have violence in them, and almost everyone thought

13   they were from the Koran.  They were all from the Bible.

14        THE COURT:  There are definitely people who believe the

15   Bible who also are violent.

16        MR. DRATEL:  No, no, that's not what I'm talking about.

17        THE COURT:  I'm not saying it's because of the Koran.

18        MR. DRATEL:  Religious rhetoric, which is what a lot of

19   these things are -- we talk about spilling blood and all that.

20   It's all religious rhetoric, which doesn't necessarily

21   translate to actual conduct.  And it hasn't translated to

22   actual conduct.

23        (Indiscernible) on the tapes when they said -- when he

24   says -- I mean, when he says "Even if I were to do that, even

25   if that was my intention," why is that not dispositive?  Why,

1    when he says, "Why would they think that?  It doesn't make

2    sense."  Why is that not dispositive?

3        You can't parse it out in a way that makes it one or the

4    other.  The tapes are ambiguous; there's a lot of ambivalence;

5    there's a lot of going back and forth.

6        They said -- there's cases say he didn't go to Al-Nusrah

7    Front, even in Turkey, they're claiming.  The government's

8    claiming that's what it means.  So how is that not a more

9    powerful indication?

10       Also, in terms of threats, there is no violence.  The

11   government left him alone for all this time.  The government

12   had these conversation.  They listened to them in real time.

13   This is an intelligence wire tape.  This is not -- they're all

14   in English.  This is an intelligence wiretap.  They listen to

15   them ongoing.

16       The government, at 4:00 o'clock that day, knows he's

17   going to be on a plane.  They don't go until the passenger

18   says, "Oh, because -- you know, he's acting funny."  That's

19   when the FBI shows up.

20       So the government itself didn't see danger in any of

21   these comments.  They did not act.  That is the ultimate proof

22   that they are not to be seen as a clear and convincing evidence

23   of danger.  Because all the government needed was probable

24   cause.  And they couldn't even get that far, based on all of

25   those statements in all of the tapes.

1    Again, also the court is full of family and friends.  In

2   terms of -- and particularly in the context of risk of danger

3   and even risk of flight, it goes to both of these, you know.

4    And also, also, the other -- the other part of this is

5   we've had six months of a very controlled experiment as to what

6   he is like.  There's not a single incident in jail.

7    And that raises another issue, which is really, to me,

8   outrageous.  That all of a sudden, when this case now becomes

9   public and we have a bail hearing, he's in solitary

10  confinement, brought in in shackles, which I think is

11  outrageous --

12    **THE COURT:**  So, Mr. Dratel, just to let you know, the

13  conditions of confinement are separate from the bail

14  consideration.  So I'm trying to keep focused on risk of flight

15  and danger to the community.

16    I understand your outrage about that, but I'm going to

17  try to put that aside.

18    I can guess, I can guess -- I thought about that.

19  Because I realized how upset, you know, Mr. Shafi and his

20  family probably were when that happened.

21    My guess, without any other information, is that once the

22  information became public, the correctional officials

23  probably --

24    **MR. DRATEL:**  No.

25    **THE COURT:**  -- wanted to separate him out --

1      **MR. DRATEL:**  No.

2      **THE COURT:**  -- for his own safety.

3      **MR. DRATEL:**  No, they didn't, Your Honor.

4      **THE COURT:**  That's my guess.

5      **MR. DRATEL:**  They didn't.

6      **THE COURT:**  Okay.

7      **MR. DRATEL:**  I'll tell you why.  For two reasons.  One is

8   they asked him, and he said no.

9      **THE COURT:**  It's not up to him.

10     **MR. DRATEL:**  But I can give you the second part too, the

11  second part too.

12     There was an incident involving something public about

13  terrorism months ago, while he was already in.  They took him

14  for a day.  Didn't change his uniform, didn't shackle him.

15  That was protective custody.

16     This is not protective custody.  This is onerous.

17     **THE COURT:**  Oh, no.  I'm talking about when the complaint

18  wasn't sealed and the press got wind of this and it was

19  actually in the local papers.  That timing seemed to coincide

20  with Mr. Shafi's placement into solitary confinement.

21  That's my guess.  I could be wrong.

22     **MR. DRATEL:**  That isn't a basis for it.  And they did it

23  before when there was a situation where they thought there

24  might be danger to him.  They put him in protective custody for

25  a day.

1        But also, for the reason that it's relevant to bail, is

2    that it's impossible to prepare a case with someone in solitary

3    confinement.  I've done it too often.  It is not possible.

4    They took his legal papers.  This is something where he's going

5    to be at the mercy of the most arbitrary and capricious

6    authority that is going to interfere demonstrably with three

7    things:  Our ability to get to see him on a regular basis in a

8    way that makes sense; second is his ability to independently

9    review everything and prepare; and third is the affects of

10   solitary confinement are demonstrably deleterious to everyone

11   who goes through it.

12        We put in a lot of the literature, and it's -- it's

13   incontrovertible.

14        And what you have is someone who doesn't deserve to be

15   there, who's going to be there -- really should be out on bail.

16   That's what I'm saying.  It's going to interfere -- it's going

17   to continue to interfere with our ability to prepare the case.

18        So I think it is relevant in the sense that that's what

19   the solution is going to be for the government to try to make

20   the case more difficult.  I think the solution for a case where

21   even pretrial says there are conditions, then I think there are

22   conditions.  And certainly there are -- the issue that we're

23   facing is really not about whether there are conditions, it's

24   whether there are no conditions that would assure the Court.

25        So it's really reversed.  And it's still the

1       (indiscernible), it a presumption case.  It's still the

2       government's burden.

3            So in the context of --

4       **MS. KELLY:**  Your Honor, I'm sorry to interrupt, but I

5       actually -- if the Court is interested, I can, just on the

6       question of the --

7       **THE COURT:**  The solitary confinement.

8       **MS. KELLY:**  -- the solitary confinement, I do have --

9       **THE COURT:**  Please.

10      **MS. KELLY:**  -- information on that.

11      **THE COURT:**  Please.

12      **MS. KELLY:**  Which is that the case agent who is not in

13      court today, another agent on the case, is here, was contacted

14      by the prison -- Glenn Dyer, and they informed the case agent

15      that they had, on their own -- and they have every -- you know,

16      right and reason to -- they had done a search of Mr. Shafi's

17      cell when he was out of the cell.  They had found papers that

18      they thought were of concern.  They called the national

19      security expert, the agent, and during that conversation they

20      told the agent that when the case became public there were

21      people -- there were other inmates on the floor who had made

22      comments.

23           And one that I remember that was repeated to me -- and

24      again, this is from the Glenn Dyer deputy to the case agent to

25      me, so if something's lost -- but the comment was, "Not all

1        federal prisoners are patriots."

2            And based on that comment -- and Glenn Dyer, as you know,

3        is a local facility which has some federal prisoners -- they

4        thought -- they decided to put him in administrative

5        segregation for his own safety.

6            And that is my understanding of how that happened.

7            And I don't know -- it is not up to me and it is not up

8        to the FBI as to how long that lasts.  But that's just to

9        clarify what the circumstances were that led to those events.

10           **THE COURT:**  And just so I can understand, there's no such

11       thing as solitary confinement at Glenn Dyer; it's just

12       administrative segregation.  I've been there.  I've actually

13       physically toured the facility and I understand what the

14       different levels of security are.

15           So I think the term "solitary confinement" is incorrect.

16       I think administrative segregation, for a number of reasons,

17       people who are kept at Glenn Dyer jail are separated out into

18       administrative segregation, sometimes for their safety,

19       sometimes for other reasons.

20           I do understand that if it's a problem in having --

21       presenting a criminal defense, that you can come back to me and

22       we can talk about it.  Because I don't want that to happen in

23       any way, shape, or form.

24           But I think the term "solitary confinement" is probably a

25       misnomer in this situation.

1      So I wasn't sure where Mr. Shafi was being held, but if

2   it's Glenn Dyer I am familiar with that facility and I

3   understand what the administrative segregation is.  It's

4   different.  It's different.

5      **MR. DRATEL:**  Well, also, Your Honor, probably the greater

6   violation is the search of his cell, the reading of his

7   privileged papers, and then sharing it with case agents.

8      We'll get to that at a different time.  That's not for

9   today.

10     **THE COURT:**  Okay.  So can I ask -- Ms. Kelly, can I ask

11  you a question about the tape-recordings?  The people who

12  Mr. Shafi is recorded talking to are not identified in the

13  tape-recording.

14     **MR. DRATEL:**  Right.

15     **THE COURT:**  Is that public information or is that sealed

16  information.

17     **MS. KELLY:**  At this time, Your Honor, they are only

18  identified in the complaint affidavit -- in the public record.

19  They are only identified as -- by their initials, S.K. and A.N.

20     **THE COURT:**  Okay.  And Mr. Dratel, let me ask you a

21  question.  Have the sureties heard the tape-recordings?

22     **MR. DRATEL:**  They are familiar with what's in the

23  complaint.  The tape-recordings were under a protective order

24  until very recently.  But if you wanted them to listen to them,

25  they could listen to them.

1   **THE COURT:**  I just wanted to see if they had.

2   **MR. DRATEL:**  It's really not about that.  It's really

3   about what are the conditions that will assure that the Court's

4   concerns will be met and --

5   **THE COURT:**  Let me tell you what one of my concerns is.

6   It appears from the tape-recordings that there are other people

7   that Mr. Shafi is close to, perhaps even related to, very close

8   to.  If he's released, those people who expressed the same

9   belief system that he did about leaving this country and

10  joining ANF, I don't know how to identify them and keep them

11  away from Mr. Shafi.

12      And that's actually one of my biggest concerns, from

13  listening to the tapes, is that there seem to be several people

14  who shared the same belief system.  I don't know if they're

15  still around; I don't know who they are.

16  **MR. DRATEL:**  Two of them are not family members, so that

17  is an issue that --

18  **THE COURT:**  But one of them is.

19  **MR. DRATEL:**  -- we're not going to have to worry about.

20      I understand.  But also, the point is that he is going to

21  be -- if the Court were to impose these conditions, under home

22  confinement we could have a chaperon, an adult chaperon.  The

23  family is willing to commit full time, either Mr. Shafi or

24  Mrs. Shafi.  His father and his mother will be there every

25  minute of the day, every second with him.

1       And, you know, the government making that the family was

2    in -- we're not asking that the family is.  Pretrial services

3    is.  This is something that we do all the time.  We don't leave

4    people in the custody of their families if we want to impose

5    strict conditions.  Those home confinement, electronic

6    monitoring, Internet access restrictions, strict reporting by

7    telephone, custodianship, those are all elements that are done

8    by the court, not by the family.

9       Nobody's asking the family to be the ultimate

10   responsibility.  The responsibility is the system to impose

11   those conditions.  I think they're all available.

12       THE COURT:  I think my concern -- I think my concern is

13   that there are other people living in the home --

14       MR. DRATEL:  We'll resolve that, Your Honor.

15       THE COURT:  -- that he would be living --

16       MR. DRATEL:  I prefer --

17       Your Honor, there are reasons why it's hard to do that on

18   the public record.  And it has to do with --

19       THE COURT:  Would you like to seal the courtroom and have

20   a more candid discussion?

21       MR. DRATEL:  If --

22       THE COURT:  Ms. Kelly, how do you feel about that?

23       MS. KELLY:  With respect to this one individual, I think

24   that at this point the case is unsealed and the public has a

25   right to know.

1        And I think that the other thing is, as the Court has

2    pointed out, there are, you know, numerous letters which were

3    all written before anyone could even have read the complaint.

4    And certainly the sureties perhaps, between last Thursday when

5    the complaint was unsealed and their interview with pretrial,

6    have been able to see it.

7        But they're all very close, you know.  They're uncles and

8    aunts.  So I think that it is very important that this case

9    remain public.

10        At the same time, the government, for the same reason

11    that we used vague terms as "relative" and initials, the

12    Court -- the government has a concern about the safety, and I

13    don't think it's appropriate to name those individuals.

14    **THE COURT:**  Mm-hm.  And is defense counsel aware of the

15    identities or --

16    **MR. DRATEL:**  Yes.

17    **THE COURT:**  Okay.

18    **MR. DRATEL:**  But also, Your Honor, I had a technical

19    issue with it, which apparently is not the case, so I just

20    resolved that.  So.

21    **THE COURT:**  Okay.

22    **MR. DRATEL:**  But if the Court -- I mean, it's a -- if the

23    Court wants that family member to live somewhere else, we'll do

24    that.  There are other family members, there are aunts, uncles,

25    cousins.  That can be done.  That can all be -- I mean, this is

1   a -- as the prosecutor laid out, this is a family that wants

2   this to work.  They're willing to do anything.  And the Court

3   can impose almost anything.

4       THE COURT:  Okay.  So this is what I'm going to do.  I'm

5   going to take a short break for ten minutes and I'll come back

6   and the court will be in recess and then we'll come back and

7   I'll (indiscernible.)

8       MR. DRATEL:  Thank you.

9       THE COURT:  Thank you.

10      MR. DRATEL:  Your Honor, may I just add one thing -- I

11  apologize --

12      THE COURT:  Yes.

13      MR. DRATEL:  -- with respect to something in the

14  government's papers that I didn't get a chance to address,

15  which is the issue of the case in Missouri, the Harcevic case?

16      THE COURT:  Mm-hm.

17      MR. DRATEL:  The Harcevic situation is an example of

18  working.  He's out on bond, home confinement, it's all working.

19  The other defendant --

20      THE COURT:  Just so I understand, the government said

21  that he had not tried to actually leave the country to join any

22  groups.

23      MR. DRATEL:  He sent money for a violent act.

24      THE COURT:  He physically did not try to leave the

25  country.

1     MR. DRATEL:  Right.  But I don't know that it was a --

2     that the issue is just risk of flight.  Because risk of flight,

3     pretrial services says, should not be an issue here.  I think

4     there are conditions that will resolve it.

5         THE COURT:  I think pretrial services, as I read it, said

6     there was a risk of flight and they were concerned.

7         MR. DRATEL:  Well, it says -- it says although pretrial

8     services believes that a combination of conditions may possibly

9     be fashioned and it talks about mental health.  So.

10        But the other part is that the person who the government

11    raises, Rosage [phonetic], in that case, had -- you know, the

12    reason for denying bail in that case were quite different in

13    that he had been -- he had prior assault arrest, he had been

14    sentenced for 60 days and three of probation, he was sentenced

15    to a year, after violating the probation, he had a domestic

16    violence charge, he violated the order of protection in that

17    domestic violence case, he's used an alias, has a history of

18    failing to appear in court, has violated prior -- I'm reading

19    now from actually the opinion by the magistrate judge.

20        So it's a very different situation.  We think Harcevic is

21    a far more -- is far more cognate for this in terms of where

22    the bail statute ought to come out.

23        THE COURT:  Okay.

24        MR. DRATEL:  Thank you.

25        THE COURT:  All right.  So we're going to take a short

1    recess and we'll be back in ten minutes.  Okay?

2         **MR. DRATEL:**  Thank you.

3         **MS. KELLY:**  Thank you, Your Honor.

4         (Recess from 2:48 P.M. to 2:57 P.M.)

5         **THE CLERK:**  We are back on the record in the matter of

6    United States versus Adam Shafi.  15 CR 582.

7         **UNIDENTIFIED MALE SPEAKER:**  If I could have just one

8    minute.  Let me find Mr. --

9         **THE COURT:**  That's no problem.  Okay.

10        (Brief pause.)

11        **THE COURT:**  We're back on the record in the matter of

12   Adam Shafi.  And this is Case No. 15-cr-00582-WHO.

13        And thank you for being patient with me.  I did go back

14   and think very seriously about, you know, whether or not I

15   could impose any conditions that would mitigate the risk of

16   flight and also danger to the community.  And I've come to the

17   conclusion that I cannot.  I think the risk of flight is

18   actually what I'm most concerned about.  And one of the reasons

19   is that there are other individuals who have been talking to

20   Mr. Shafi about also going to the Middle East and joining ANF,

21   and I don't have any control over those people, I don't know

22   who they are, I don't have a way of making sure they're not

23   working with him, once he is released, to have him leave the

24   country.

25        And I know there are some mitigating factors that can be

1    put into case, and he has a loving family who is doing

2    everything they can, and I'm very sorry for them because I know

3    that they're trying very hard.

4         But I think in this situation, given the unknowns, it is

5    too difficult.  I can't impose conditions that would mitigate

6    the flight of risk.  And because this is a presumption case, I

7    think that the defendant, you know, the government has shown

8    there was a risk of flight and that I don't believe there are

9    any conditions that can be placed to reduce that.

10        And so Ms. Kelly, can you prepare a proposed order for

11   me?

12        **MS. KELLY:**  I will, Your Honor.

13        **THE COURT:**  All right.  Thank you.  And do we need to set

14   a date before the district judge, Wanda?

15        **MS. KELLY:**  We do, Your Honor.

16        **THE CLERK:**  I believe so, yes.

17        **THE COURT:**  This is in front of Judge Orrick?

18        **THE CLERK:**  It's Judge Orrick.

19        **MR. DRATEL:**  Yes.

20        **MS. KELLY:**  Your Honor, the parties spoke before court

21   and I know that Mr. Dratel, who is -- comes in for New York for

22   these appearances, has asked -- and the government has no

23   objection -- to, if the Court -- if Judge Orrick's calendar is

24   available, January 14th.

25        And we also agree that there is a basis for exclusion of

1    time for whatever period of time for effective preparation of

2    counsel.

3         **THE COURT:**  Okay.  Why don't you fill out the paperwork

4    also, then.

5         **MS. KELLY:**  We have done that, Your Honor.

6         **THE CLERK:**  Yes.  January 14th at 1:30.

7         **MS. KELLY:**  I'll just enter that date, Your Honor, and

8    then ask -- or Mr. Dratel has already (indiscernible.)

9         **THE COURT:**  Signed it.  Okay.  Thank you.

10        And I will also tell you, Mr. Dratel, that if you were

11   concerned about your inability to get access to your client or

12   inability for him to review legal papers, you can bring that

13   issue before me, I'll discuss it with the US Marshal and make

14   sure that he gets additional -- gets the right assistance.

15        But I want to assure you he is not in solitary

16   confinement.  Administrative segregation is very different from

17   solitary confinement.  I'm familiar with the issues regarding

18   solitary confinement and I agree that long term solitary

19   confinement is not good for people's mental health, although it

20   may be necessary in some circumstances.  But that's not what

21   Mr. Shafi is placed in right now.

22        So I just want to make sure that you have a clear

23   understanding of that because I understand you're not from this

24   area and you don't know the Glenn Dyer facility.

25        **MR. DRATEL:**  Yes.  Thank you, Your Honor.

1        THE COURT:  Okay.  Thank you.

2        MS. KELLY:  Thank you, Your Honor.

3        THE CLERK:  All right.  Court is in recess.

4        THE MARSHAL:  Remanded?

5        THE CLERK:  Yes.

6        THE COURT:  The defendant is remanded to the custody of

7    the US Marshal.

8        (Proceedings adjourned at 3:01 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## <u>CERTIFICATE OF CONTRACT TRANSCRIBER</u>

I, Kelly Polvi, CSR, RMR, FCRR, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further, that I am not financially nor otherwise interested in the outcome of the action.

Dated December 24, 2015.

_____
Kelly Polvi, CSR #6389, RMR, FCRR
Contract Transcriber


*Kelly Polvi, CSR, RMR, FCRR*
*P.O. Box 1427*
*Alameda, CA 94501*
*(503) 779-7406; kpolvi@comcast.net*