JOSHUA L. DRATEL
*Pro Hac Vice*
Law Offices of Joshua L. Dratel, P.C.
29 Broadway, Suite 1412
New York, New York 10006
T. 212-732-0707
F. 212-571-3792
jdratel@joshuadratel.com

ERIK B. LEVIN
CABN 208274
Law Office of Erik Levin
2001 Stuart Street
Berkeley, California 94703
T. 510-978-4778
F. 510-978-4422
erik@erikblevin.com

*Attorneys for Defendant Adam Shafi*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) NO. 15 Cr. 582 WHO |
| Plaintiff, | ) |
| | ) MOTION FOR RECONSIDERATION |
| v. | ) OF DETENTION ORDER |
| | ) |
| ADAM SHAFI, | ) Date:  February 18, 2016 |
| | ) Time: 1:30 p.m. |
| Defendant | ) |

This motion for reconsideration of defendant Adam Shafi's previous motion for pretrial release addresses the issue about which the Court expressed its concern during the January 14, 2016, hearing and in its subsequent January 14, 2016, Minute Order (Docket #41):  Mr. Shafi's conditions of confinement.

MOTION FOR RECONSIDERATION
OF DETENTION ORDER
15 CR 582 WHO

1

1    As detailed below, the January 29, 2016, submission from the Alameda County

2    Sheriff (Application of Nonparty Alameda County Sheriff's Office Regarding

3    Questions Concerning the Glenn E. Dyer Jail and the Confinement of Defendant Adam

4    Shafi, Docket #46) (hereinafter "the County") confirms that Mr. Shafi is in solitary

5    confinement – notwithstanding any linguistic spin attempted by the County – and that

6    circumstance is not going to change during the pendency of this case.

7    As the Court told the government during the January 14, 2016, hearing, that is

8    "not tenable," and, as a result, it is respectfully submitted that the Court should

9    reconsider its decision denying Mr. Shafi pretrial release, and grant him bail pursuant to

10   the stringent conditions proposed in Mr. Shafi's earlier application.

11   In its Minute Order, the Court invited Mr. Shafi's counsel "to schedule an earlier

12   hearing [than March 17, 2016] concerning the conditions of Mr. Shafi's confinement if

13   appropriate[,]" because, "[d]epending on the explanation [by the County] and further

14   pleadings of counsel, the Court may revisit the possibility of some alternative

15   confinement." *Id.*, at 2.

16   In addition, in order to provide the Court a greater degree of confidence in the

17   efficacy of those multifaceted conditions, this motion for reconsideration will also

18   provide evidence from the recorded telephone conversations that occurred the day *after*

19   Mr. Shafi was stopped by authorities at the San Francisco Airport, and which manifest

20   his clearly expressed intention *not* to make another attempt to travel overseas.

21

1  Accordingly, it is respectfully submitted that the County's "explanations" are

2 simply and completely inadequate to allay any of the Court's concerns about Mr.

3 Shafi's conditions of confinement.  Rather, the County's submission merely amplifies

4 those concerns, and make release on bail the only acceptable alternative.

5 **I.** ***The County's Submission Confirms That Mr. Shafi Is In Solitary***

6 ***Confinement, and That the County Will Not Alter Mr. Shafi's Conditions of Confinement.***

7  The County's submission, often defiant, frequently conclusory, and materially

8 self-contradictory, confirms that Mr. Shafi has since December 18, 2015, been subject

9 to solitary confinement that has been repeatedly reinstituted in a series of "reviews," and

10 which offers no prospect for change during the pendency of Mr. Shafi's case.

11  The County's submission is also entirely tone-deaf to the concerns expressed by

12 the Court in its January 14 2016, Minute Order (Docket # 41), and completely misses

13 the point of Mr. Shafi's request for relief:  not to compel the County to do anything, but

14 rather that because of the County's arbitrary treatment of Mr. Shafi, and its

15 intransigence that precludes the possibility for amelioration of Mr. Shafi's conditions of

16 confinement, pretrial release on bail is the only viable alternative.  In that context, the

17 County's submission makes Mr. Shafi's point convincingly.

18  **A.** ***Mr. Shafi Is In Solitary Confinement Regardless of the Nomenclature.***

19  In insisting that Mr. Shafi has erroneously described his detention status as

20 "solitary confinement," the County would take the Court through the looking glass,

21

MOTION FOR RECONSIDERATION   3
OF DETENTION ORDER
15 CR 582 WHO

insisting that a defendant who is confined by himself in a small cell 24 hours a day, except for one hour five days each week, when he is allowed out of his cell (but still alone) is *not* in "solitary confinement" because the County calls it something else: "administrative isolation." *See* County Submission, at 2 ("'administrative isolation' is not 'solitary confinement'"), citing the Declaration of Lieutenant Dan Brodie ("Brodie Declaration"), Administrative Lieutenant at Alameda County Sheriff's Office ("ACSO") and stationed at the Glenn E. Dyer Jail ("Glenn Dyer").[1]

According to the County, "[t]he major distinction between solitary confinement and Administrative Isolation is that the former is a housing assignment based on punishment, while the latter is a housing assignment based on classification." *Id*., at 4, *citing* Brodie Declaration. The County adds that "[i]n the case of Defendant, he was re-classified to the Administrative Isolation housing unit after both his criminal complaint and name became public." *Id.*[2]

That unavailing exercise in semantics has been dispositively repudiated by Judge Alex Kozinski, who, in an essay in the *Yale Law Journal*, noted that "[y]ou can call it

---

[1] *See* Lewis Carroll, *Alice's Adventures In Wonderland*, (1865) ("'[w]hen I use a word,' Humpty Dumpty said in a rather scornful tone, 'it means just what I choose it to mean – neither more nor less'").

[2] The County cites as dispositive its "accommodation" to Mr. Shafi "when ACSO allowed the Defendant to move to a different cell so he could look at the clock in order to know when to pray in accordance with his religion[,]" without any substantive alleviation of his conditions. *See* County Submission, at 4.

MOTION FOR RECONSIDERATION
OF DETENTION ORDER                    4
15 CR 582 WHO

administrative segregation or special housing or a long walk on a sandy beach.  But it will always be the box."  Alex Kozinski, *Worse than Death*, 125 YALE L.J. F. 230 (2016), available at <http://www.yalelawjournal.org/forum/worse-than-death> ("*Worse Than Death*").

As Judge Kozinski points out, "we hear remarkably little about what may be the most severe punishment of all:  solitary confinement.  Lurking in the shadows of the conversation about inhumane punishments are some 100,000 souls who spend 23 hours a day alone in a cell the size of a parking space."  *Id*.[3]

As a result, Judge Kozinski urges that "we should all be asking more questions about how prisoners get into solitary confinement, what 'life' is like once they get there, and how they can get out."  *Id*.  Judge Kozinski also cites Yale Law School's *The Liman Program's Time-In-Cell Report*, and its "shuddersome findings confirm what I have

---

[3]  The County claims as a material distinction the federal regulations that provide an inmate in solitary confinement one hour outside his cell five days each week.  Yet the government merely cites the regulation, and does not affirmatively state that Mr. Shafi has been afforded those five hours each – as those same regulations provide exceptions.  *See* County Submission, at 2, 5 [citing "Federal Performance Based Detention Standards, C.9.25 ("Inmates in special management units receive a minimum of one hour of exercise per day outside their cells, *five times per week*, unless security or safety considerations dictate otherwise. 4-ALDF-2A-64") (emphasis added by County)].  Indeed, the County has deprived Mr. Shafi of some of that time based on its policy with respect to visits.  For example, defense investigator Scott Dudek has reported to counsel that his visits to Mr. Shafi are treated as social visits and are therefore counted as time out of his cell (and therefore diminish that five-hour total per week accordingly).

1   long suspected:  Solitary confinement is just as bad as the death penalty, if not worse."

2   *Id*.

3         As a result, in comparing solitary confinement to capital punishment, Judge

4   Kozinski concludes that the former "merely swaps one type of death for another."  *Id*.

5   As Judge Kozinski explains,

6               man is a social animal.  The human mind craves interaction
            with other people, and being deprived of human
7               companionship is as damaging to the psyche as deprivation
            of food and water is to the body.  Psychologists now
8               understand that "much of who we are depends on our
            contact with other people, the social context in which we
9               function, and when you remove people from that context,
            they begin to lose their very sense of self."

10  *Id*., *citing* Maclyn Willigan, "What Solitary Confinement Does to the Human Brain,"

11  *Solitary Watch* (Aug. 4, 2014), available at <http://perma.cc/B5MB-F4LC>.

12        Judge Kozinski also mentioned Justice Anthony Kennedy's recent concurrence

13  in *Davis v. Ayala*, 135 S.Ct. 2187, *reh'g denied*, 136 S.Ct. 14 (2015), which noted that

14  "despite scholarly discussion and some commentary from other sources, the condition in

15  which prisoners are kept simply has not been a matter of sufficient public inquiry or

16  interest."  Judge Kozinski further pointed out that Justice Kennedy emphasized that

17  "consideration of these issues is needed" because "so stark an outcome [as solitary

18  confinement] ought not to be the result of society's simple unawareness or

19  indifference."  135 S.Ct. at 2209, *reh'g denied*, 136 S.Ct. 14 (2015).

20

21

MOTION FOR RECONSIDERATION                    6
OF DETENTION ORDER
15 CR 582 WHO

1    Similarly, only last week President Barack Obama, in an Op-Ed article published

2    in *The Washington Post*, announced executive actions designed to limit solitary

3    confinement in the federal prison system.  *See* Barack Obama, Op-Ed, "Why We Must

4    Rethink Solitary Confinement," *The Washington Post*, January 25, 2016, available at

5    <http://wapo.st/1ZONjUV>.

6    In that article, in which the President characterizes solitary confinement as "an

7    affront to our common humanity[,]" and which should be "[u]sed only as a measure of

8    last resort[,]" he explained that

9    > [r]esearch suggests that solitary confinement has the
10   > potential to lead to devastating, lasting psychological
     > consequences.  It has been linked to depression, alienation,
     > withdrawal, a reduced ability to interact with others and the
11   > potential for violent behavior.  Some studies indicate that it
     > can worsen existing mental illnesses and even trigger new
12   > ones.  Prisoners in solitary are more likely to commit
     > suicide, especially juveniles and people with mental
13   > illnesses.
     *Id.*

14

15   Judge Kozinski also reflected on the impact of solitary confinement:

16   > [g]iven these conditions, it should come as no surprise that
     > "incarceration in solitary cause[s] either severe exacerbation
     > or recurrence of preexisting illness, or the appearance of an
17   > acute mental illness in individuals who had previously been
     > free of any such illness."

18

19   *Id.*, *citing* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L.

20   & Pol'y 325, 333 (2006).

21

MOTION FOR RECONSIDERATION          7
OF DETENTION ORDER
15 CR 582 WHO

1        Indeed, Judge Kozinski stated that "[t]he empirical literature on the effects of

2    solitary confinement is horrifying[,]" *id*. (footnote omitted), and "shows that prisoners

3    exposed to solitary confinement become verbally and physically aggressive;[]  develop

4    fantasy worlds and other paranoid psychoses;[]  and grow anxious, withdrawn, and

5    hopeless.[]"  *Id*.  (footnotes omitted).[4]

6        Also, dispelling the notion that the detrimental impact of isolation occurs only

7    after years of confinement, about a third of the responsive jurisdictions contained in the

8    Liman-ASCA 2014 National Survey indicated that a majority of prisoners were held in

9    administrative segregation for less than 90 continuous days, with another third reporting

10    that a majority were held in administrative segregation between six months and one

11    year.  Liman Report, at 28.  Indeed, the "Mandela Rules," as the United Nations

12    Standard Minimum Rules for the Treatment of Prisoners are known, define "prolonged

13    solitary confinement" as exceeding only "15 consecutive days."  *Id*., at 7.

14

15    [4]  Given the Pre-Trial Services Report's concern regarding Mr. Shafi's "depression coupled
with suicidal ideation" (Dkt. 35 at 8), the literature and statistics regarding the incidence of

16    suicide in the context of solitary confinement are deeply ominous in this case.  As Judge
Kozinski related,

17
            [o]ne early study found that nearly all of the prisoners in Maine's

18             isolation unit had either contemplated or attempted suicide.[]
            One attempted to swallow the glass from the light bulb in his

19             cell.[]  Another tried twice to hang himself with a sheet.[]  More
            recent data suggests that prisoners in solitary are five times more

20             likely to kill themselves than those in the general population.[]

    *Id*. (footnotes omitted).

21

Mr. Shafi's age – 22 – is also a factor.  The Liman-ASCA 2014 National Survey notes that various "correctional initiatives . . . policies; statutes and regulations; legislative reports and hearings," among other things strongly indicate that young people – "juveniles under the age of 21" – are particularly vulnerable to the effects of the isolation inherent in administrative segregation.  Liman Report, at 6.

In addition, as President Obama added in his Op-Ed, the adverse impact of solitary confinement endures:  "[t]hose who do make it out often have trouble holding down jobs, reuniting with family and becoming productive members of society."  *See also* "From Solitary to the Street," *The Marshall Project*, June 11, 2015, available at <https://www.themarshallproject.org/2015/06/11/from-solitary-to-the-street?utm_medium=s#.rMXkGO3fm> (describing the difficulties of resuming a normal life after extended solitary confinement).

Here, Mr. Shafi faces the same prospect, although in a far more critical and immediate context – indeed, imagine him making a decision whether to testify – his first authentic social encounter in months, before twelve strangers who would decide his future – after enduring pretrial confinement in isolation.

**B.** ***The County's "Periodic Review" Is a Formality That Ensures That Mr. Shafi Will Remain In Solitary Confinement for the Duration of the Pretrial Stage.***

The County's submission also establishes that the conditions of Mr. Shafi's pretrial confinement will not be changed.  Indeed, the County enumerates *seven* weekly

MOTION FOR RECONSIDERATION
OF DETENTION ORDER
15 CR 582 WHO

reviews in which Mr. Shafi's status has been reaffirmed without any hint of substantive

re-evaluation.  *See* Brody Declaration at ¶¶ 13-19.[5]  *See also* County Submission, at 3

("[f]ollowing numerous weekly reviews regarding the classification status of the

Defendant, Defendant continues to be held in Administrative Isolation for his safety,

with his last review being held on January 25, 2016"), *citing* Brodie Declaration.

According to the Brodie Declaration, the reason for the continued placement of

Mr. Shafi in isolation is a simple mantra: "[d]ue to the nature of his case staff

determined his placement in Administrative Isolation would Continue."  *See* Brodie

Declaration at ¶¶ 15, 17, 19.  Other conclusory, repeated rationales include the case's

"high profile" and Mr. Shafi's "safety."  *Id.*, at ¶¶ 13, 14, 19.[6]

This perfunctory "review" holds little if any hope for an adjustment of Mr.

Shafi's conditions pending trial.  In fact, Judge Kozinski commented in his essay that

"the 'process' afforded to those in solitary confinement seems paltry indeed."  *See*

*Worse Than Death*.  He added that "[t]he most important contribution of the [Liman]

---

[5]  An eighth such review presumably occurred this past Monday, February 1, 2016, after the County filed its submission.

[6]  Among the executive actions by President Obama concurrent with publication of his January 25, 2016, Op-Ed piece was a limitation of 60 days on solitary confinement as punishment for first offenses.  *See* Report and Recommendations Concerning the Use of Restrictive Housing, U.S. Department of Justice, January 25, 2016, available at <http://www.justice.gov/restrictivehousing>.  Here, Mr. Shafi's tenure in solitary will exceed 60 days, February 17, 2016, the day before the hearing on this motion.

MOTION FOR RECONSIDERATION                    10
OF DETENTION ORDER
15 CR 582 WHO

Time-In-Cell Report may be its finding that prison administrators have breathtaking latitude in imposing housing restrictions." *Id*.

As a result, according to Judge Kozinski, "the general story is about what you'd expect: It's easy to get into solitary and hard to get out." *Id*. (footnote omitted). *See also* Aymann Ismail and Leon Neyfakh, "Doing Time In Solitary Is Unimaginably Hard.  Getting Out Might Be Harder," *Slate.com*, February 3, 2016, available at <http://www.slate.com/articles/news_and_politics/crime/2016/02/is_solitary_confinement_torture_former_inmates_on_life_in_isolation.html>

Here, the "periodic review" process undertaken by the County confirms that conclusion.  Moreover, the County's failure to provide any prospect of alteration of Mr. Shafi's conditions ignores entirely the Court's admonition that "if defense counsel has accurately portrayed" the conditions of Mr. Shafi's confinement, "some of what has been described is not acceptable and such a limited ability to interact with others does not seem tenable for the duration of a fairly lengthy anticipated pretrial period."  Minute Order, at 1 (Docket #41).

The County's Submission also takes contradictory positions with respect to the reason for placing Mr. Shafi in isolation – yet neither excuse is supported by the record. For instance, according to the County, after Mr. Shafi's December 17, 2106, arraignment, "the federal criminal charges against Defendant became public and were picked up by the local and national media."  County Submission, at 3 (citation omitted).

Subsequently, "[o]n 18 December 18, 2015, based on further review and the high profile media coverage of his case (and other factors, including items found within his cell during a routine search), the classification unit at the Jail determined it would be in the best interest of Defendant's safety to be reclassified to "Administrative Isolation" *due to the risk of Defendant being assaulted due to the nature of his case as it became public information among other inmates in mainline custody.*"  *Id.* (emphasis added). *See also* Brodie Declaration, at ¶ 11.

Explaining that decision, the County maintains that "[t]his was done to protect the Defendant – not as punishment, nor discrimination[,]" and that quite often the ACSO utilizes Administrative Isolation to protect inmates while awaiting trial in jail." *Id.*, at 4.

Nevertheless, the County's actions were without any foundation.  Mr. Shafi had been at Glenn Dyer for six months already, and the inmate population was well aware of the charges against him in the Complaint.  Nor does the County cite a single threat directed at Mr. Shafi.

Indeed, the County notes that the day of the arraignment

> ACSO staff met with Defendant and advised him of their concern for his safety because of the media release of information concerning his case, including his identity. Defendant told ACSO staff he did not want to be moved, and Defendant was advised to speak to a deputy if he felt threatened or the situation changed.

County Submission, at 3.  *See also* Brodie Declaration, at ¶ 7.

MOTION FOR RECONSIDERATION
OF DETENTION ORDER
15 CR 582 WHO

12

1    The County adds that "[i]n further support of re-classifying Defendant to

2    Administrative Isolation, contraband was found in Defendant's cell during a routine

3    search, the nature of which further justified the need to move Defendant into

4    Administrative Isolation." *Id*., *citing* Brodie Declaration, at ¶ 9.

5         Yet the Brodie Declaration fails to identify *any* contraband discovered in Mr.

6    Shafi's cell.  Nor has Mr. Shafi been charged with or disciplined for any such infraction.

7    Indeed, the entirety of the cited paragraph from the Brodie Declaration reads as follows:

8         [d]uring the search of Mr. Shafi's cell, a deputy located a
     notepad containing writings and drawings, which to the

9         deputy, based on this deputy's training and experience,
     appeared to support terrorism.  Copies of these drawings

10        were retained in Mr. Shafi's classification file the original
     notebook was confiscated and later turned over to the FBI.

11   Brodie Declaration, at ¶ 9.

12

13        Neither the FBI nor the County have made any further or specific allegations

14   with respect to those materials seized from Mr. Shafi because *they do not in any way*

15   "support terrorism."  Nor have those documents been cited as the continuing basis for

16   keeping Mr. Shafi in solitary confinement (as established by the Brodie Declarations

17   descriptions of the outcome of the sequential weekly "periodic reviews").  Thus, the

18   documents seized from Mr. Shafi are a red herring with respect to his continued

19   placement in solitary confinement.

20        Thus, the County relied on two contrived rationales to place Mr. Shafi in solitary

21   confinement, and has reflexively reimposed that status based on the assertion that it is

MOTION FOR RECONSIDERATION                        13
OF DETENTION ORDER
15 CR 582 WHO

1   for Mr. Shafi's safety.  Yet the notion that isolation is required to protect Mr. Shafi is

2   not only a canard, but constitutes an extreme sanction that punishes Mr. Shafi for being

3   a potential victim.  As *The Washington Post* declared in an Editorial supporting

4   President Obama's Op-Ed (and executive action) regarding solitary confinement (which

5   the Editorial describes as "this most barbaric of practices"), while "some prisoners are

6   in solitary for their own protection[,] . . . [t]hey should not be punished for being at

7   risk."  "Obama Right to Limit Solitary Confinement," *The Washington Post*, January

8   26, 2016, available at <https://shar.es/14XOd5>.

9           **C.**     **The County's Seizure of Mr. Shafi's Privileged Materials.**

10        In its submission, at 5, the County inexplicably claims that "no privileged

11   materials were seized from [Mr. Shafi's] cell . . ."  *See also* Brodie Declaration, at ¶ 10

12   (to his knowledge "none of Mr. Shafi's legal documents have been confiscated . . .").

13   Again, though, that contention is categorically refuted by the facts.

14        In response to that patently ludicrous claim, the defense will submit to the Court

15   *ex parte in camera* and under seal material seized from Mr. Shafi's cell and produced by

16   the government January 26, 2016.  Documents Bates-stamped FILTER 00002 through

17   FILTER 00009, constitute Mr. Shafi's handwritten notes *regarding the intercepted*

18   *telephone conversations*, a subject matter unmistakably obvious from even the most

19   cursory review.  Yet those documents were seized from Mr. Shafi's cell and provided to

20   the FBI agents involved in this case, compounding the problem and the County's

21

1  remarkable insensitivity to Mr. Shafi's rights.  *See* County Submission, at 5 n. 6

2  ("ACSO understands that these materials are with the federal government at this time");

3  Brodie Declaration, at ¶ 9 (copies of documents seized from Mr. Shafi "were retained in

4  Mr. Shafi's classification file the original notebook was confiscated and later turned

5  over to the FBI").

6       Moreover, the County's failure to acknowledge the privileged nature of those

7  documents is profoundly disturbing because it signifies that none of Mr. Shafi's

8  privileged documents as the case unfolds, and he assists in preparation of his defense,

9  are safe from seizure by jail officials and transfer to the prosecution.  That, for practical

10  purposes, eliminates Mr. Shafi's participation in preparing his defense to the Indictment.

11       In an effort to deflect attention from its conduct, the County creates a straw man,

12  arguing that "there was no agreement or understanding with the federal government to

13  gain access to Defendant's legal materials."  County Submission, at 5, *citing* Brodie

14  Declaration at ¶ 10 and Dkt. No. 38; Dkt. No. 38-1 (the government's January 12, 2016,

15  response to Mr. Shafi's bail application).

16       Yet the objection is not directed at any "advance agreement" of the County's

17  intention, but rather that Mr. Shafi's *notes about the evidence in this case* were provided

18  to the prosecution.  Again, the County's unwillingness to acknowledge the problem

19  provides ample danger that future similar incursions will occur (or, in the alternative,

20

21

1    that Mr. Shafi will abandon participating in the preparation of his defense for fear of

2    such seizure and disclosure to the prosecutors).

3         **D.**    ***The Interviews of Mr. Shafi By County Mental Health Personnel.***

4         In his January 8, 2016, motion for pretrial release (Docket #35), Mr. Shafi noted

5    the visits to his cell by two persons who asked him a series of questions, including some

6    directed at the facts of the case.  *See id.*, at 17-18.  In its January 13, 2016, opposition

7    (Docket # 38), the government responded as follows:

8              [t]he FBI's subsequent inquiry of the Glenn Dyer Detention
             Facility confirmed that the visitors were not from the
9              prosecution team (and further indicated that they were not
             from the Glenn Dyer Detention Facility).

10   *Id.*, at 7.  *See also* January 11, 2016 Declaration of FBI Special Agent Christopher

11   Monika (Exhibit 1 to the government's January 13, 2016, opposition, Docket # 38-1), at

12   ¶ 5(c) ("[r]egarding the visit by the two persons claiming to be medical professionals,

13   these visitors were not from either the [Glenn Dyer] Facility or the FBI").[7]

14        Subsequently, during the January 19, 2016, conference call between defense

15   counsel,[8] Assistant United States Attorney Jeffrey Shih, and several representatives of

16   the County, those County officials' – who, as demonstrated by the government's

17

18   _____

19   [7]  After receiving the government's response, Mr. Shafi's counsel asked AUSA Shih for the
     identity of the visitors, and the County's mental health professional practice (*i.e.*, whether it
     was conducted by contractors).

20   [8]  Both Joshua L. Dratel, Esq., and Erik B. Levin, Esq., were on the call on Mr. Shafi's behalf.

21

     MOTION FOR RECONSIDERATION              16
     OF DETENTION ORDER
     15 CR 582 WHO

January 13, 2016, opposition, had been on notice of the visits since early January –

initial reaction was to deny that such visits occurred (based on abstract protocols, *i.e.*,

that visitors would not be brought to an inmate's cell to conduct any type of interview)

and strongly suggested that Mr. Shafi had invented the encounter altogether.

Yet the County in its submission has been forced to concede not only that the

visit (and subsequent visits) occurred, but that it was conducted by County personnel.

*See* Declaration of Joan D. Cairns, LMFT ("Cairns Declaration") the Behavioral Health

Care Manager at Criminal Justice Mental Health ("CJMH"), employed by the County of

Alameda in its Behavioral Health Care Services ("BHCS") division.

As the County Submission finally admits, "[o]n December 31,2015, two (2)

CJMH medical professionals visited Defendant to do a mental health assessment on

Defendant. []  Defendant was assessed due to the high profile of his case, and the fact

that he has no prior criminal record."  *Id*., at 6, *citing* Cairns Declaration.[9]

Missing from that admission is any explanation why that assessment occurred *six*

*months* after Mr. Shafi was first incarcerated – when the nature of his case and his lack

of prior criminal record were sufficiently evident.  Also, the County contends, in its

submission at 6, that "there is nothing in the CJMH notes that discuss the criminal

charges related to Defendant's case."

---

[9]  In his Declaration, Lieutenant Brodie claims that he was first "made aware" of the visits
January 19, 2016.  *See* Brodie Declaration, at ¶ 32.

MOTION FOR RECONSIDERATION                          17
OF DETENTION ORDER
15 CR 582 WHO

1    Of course, that could very well be the case only because Mr. Shafi refused to

2    answer questions about the case.  Also, tellingly absent from the County's submission is

3    any averment from the persons who conducted the interview.  Indeed, the Cairns

4    Declaration relies only on the CJMH form, and the interviewers' notes, rather than any

5    affirmative declaration from them that no such questions were asked.

6        Moreover, contradictorily, the County, in its submission at 6 (*see also* Cairns

7    Declaration, at ¶8), concedes that questions are usually asked with respect to the

8    inmate's understanding of the charges against him.  However, any questions about the

9    case and charges posed to a 22-year old in the absence of counsel threaten to

10   compromise his Fifth Amend constitutional rights against self-incrimination.  Also,

11   evaluations of competency are exclusively for the court to direct, 18 U.S.C. §4241, *et*

12   *seq.*, and not the province of *ad hoc* institutional inquiry by a detention facility.

13       The County's abject lack of responsiveness with respect to this issue, including a

14   wholesale disingenuous dodge in its first response to the prosecution (which was

15   submitted to the Court), and a later obfuscatory stonewall to defense counsel during the

16   subsequent conference call, is most troubling because, again, it demonstrates the

17   County's perception that it is not accountable even to the Court.

18       In the context of the County's other responses – with respect to the nature of Mr.

19   Shafi's confinement and the seizure of his legal materials – Mr. Shafi cannot have any

20   confidence that either his conditions of confinement will ever be evaluated on the

21

MOTION FOR RECONSIDERATION                  18
OF DETENTION ORDER
15 CR 582 WHO

1    genuine merits, or that the confidential nature of his communications or constitutional

2    rights against uncounseled and/or compelled statements will be respected while he is in

3    pretrial confinement.

4        **E.**     ***The County's Insistence That Mr. Shafi Exhaust His
                     Administrative Remedies Through the Interminable and Futile
5                    Grievance Process Only Reinforces the Need for Bail for Mr. Shafi.***

6            In citing exhaustion requirements, and the provisions of the Prison Litigation

7    Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), the County again fails to recognize the

8    issue presented herein.  *See* County Submission, at 2, 7-8.  The painfully slow,

9    byzantine, and historically futile nature of the prison administrative grievance system,

10   particularly as it relates to challenging placement in solitary confinement, *see, e.g.,*

11   **ante**, at 10-11, only strengthens Mr. Shafi's request for relief:  that pretrial release is the

12   proper alternative.

13           By its terms, the PLRA bars federal court actions under 42 U.S.C. § 1983 or

14   federal laws. 42 U.S.C. § 1997e(a). Mr. Shafi is not bringing a federal court action; he is

15   asking this Court to exercise its discretion to set conditions of release under 18 U.S.C. §

16   3142. At issue in this case is whether the pretrial detention conditions imposed upon Mr.

17   Shafi constitute punishment, violating his due process rights under the Fifth

18   Amendment. Moreover, if not remedied, the punitive conditions may surely impact Mr.

19   Shafi's fundamental constitutional rights to a vigorous defense by an independent

20   attorney under the Sixth Amendment, and ultimately his right to a fair trial.  *See United*

21

MOTION FOR RECONSIDERATION                    19
OF DETENTION ORDER
15 CR 582 WHO

*States v. Lopez*, 327 F. Supp. 2d 138, 143-44 (D. Puerto Rico 2004) (noting real mental and psychiatric impact upon humans subjected to social isolation).

However, even assuming *arguendo* exhaustion were a relevant issue, it would not be in this case, as the County has amply demonstrated that exhaustion of remedies would be futile, *see, e.g.,* **ante**, at 9-11. A court may excuse the PLRA exhaustion requirements if pursuing the administrative process would be futile. *See United States v. Basciano*, 369 F. Supp.2d 344, 348 (E.D.N.Y. 2005).

"A person lawfully committed to pretrial detention has not been adjudged guilty of any crime." *Bell v. Wolfish*, 441 U.S. 520, 536-37 (1979) (noting that the due process clause prohibits punishing individuals before a formal adjudication of guilt). Indeed, a pretrial detainee who is placed in segregation as punishment has a right to a due process hearing. *See Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996). In evaluating whether conditions of confinement amount to punishment or are merely inherent incidents of confinement, the Supreme Court has directed that "absent a showing of an expressed intent to punish on the part of detention facility officials, the decision generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Bell*, 441 U.S. at 538, *quoting Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963). Where administrative detention is

MOTION FOR RECONSIDERATION
OF DETENTION ORDER
15 CR 582 WHO

20

imposed based on the nature of the charges against an inmate, such detention is punitive. *See United States v. Gotti,* 755 F.Supp. 1159, 1164 (E.D.N.Y.1991).

The County has, at times, suggested that it placed Mr. Ilegbameh in isolation because of the high profile nature of the case. *See* **ante** at 11-12. "Prison authorities are not afforded unbridled discretion' because the detainee is either notorious or newsworthy or both." *United States v. Gotti,* 755 F.Supp 1159, 1164 (E.D.N.Y. 1991) (quoting *Boudin v. Thomas,* 533 F.Supp. 786, 791 (S.D.N.Y. 1982)). In fact, this same justification was offered by the New York Metropolitan Correction Center (but soundly rejected by the court) to justify the solitary confinement of John Gotti, the head of the Gambino crime family. *Gotti,* 755 F. Supp. at 1161-62, 1164-65.

In rejecting Gotti's administrative detention, the district court noted "since the defendants have been in custody they have committed no act or omission which suggests that they pose 'a serious threat to life, property, self, staff, or other inmates, or to the security or orderly running of the institution[.]'" *Id., quoting Bell*, 441 U.S. at 538. Accordingly, "[t]he inevitable and erroneous conclusion to be reached from that stated reason [i.e., the nature of the charge] is that every defendant indicted for murder or witness tampering should be placed in administrative detention." *Id.* at 1165. If allowed to impose onerous conditions of confinement based solely upon the nature of the charge, detainees, like Mr. Shafi are left "completely vulnerable to arbitrary governmental action." *Id.* at 1164. Blind deference to "bare invocation[s] of security

MOTION FOR RECONSIDERATION
OF DETENTION ORDER
15 CR 582 WHO

21

1    concerns" should not and cannot be condoned. *See Pierce v. County of Orange*, 526

2    F.3d 1190, 1211 (9th Cir. 2008). *See also Way v. County of Ventura*, 445 F.3d 1157,

3    1161 (9th Cir. 2006) ("In effect, they ask us to take security implications on faith. This

4    we cannot do.")

5           Even if there was evidence to support the County's apparent belief that security

6    risks warrant more restrictive conditions of confinement, the "ultimate question is

7    whether the [County's] chosen means – [e.g.,] the indefinite and solitary confinement of

8    [Mr. Shafi] pending a trial that is unlikely to go forward for at least [many months] – is

9    reasonably related to its goal" of preventing any perceived harm to the institution or to

10   Mr. Shafi. *United States v. Basciano*, 369 F. Supp.2d 344 (E.D.N.Y. 2005); *Bell v.*

11   *Wolfish*, 441 U.S. at 538.  It is not.

12          In *Basciano*, the New York Metropolitan Correction Center sought to detain

13   Basciano, the reputed head of the Bonnano crime family, in isolation pending trial, as it

14   had in *Gotti*, only this time it had an "indisputably legitimate" reason:  to prevent him

15   from continuing to operate the Bonnano crime family.  *Basciano*, 369 F. Supp.2d at

16   351.  The court found the objective to be legitimate because the Bonnano crime family

17   "has been proven at trial before . . .[the court] to be a violent criminal enterprise . . . that

18   . . . has not hesitated to order murders to consolidate its own hold on power, to protect

19   the organization's profits, or to avoid prosecution by government authorities." *Id.*

20   Nevertheless, the court directed that Basciano be released from administrative isolation

21

MOTION FOR RECONSIDERATION                    22
OF DETENTION ORDER
15 CR 582 WHO

after finding that "the government [had] not made a sufficient showing that Basciano was engaged in planning acts of violence *while* in pre-trial detention." *Id.* at 352 (emphasis added). The court reasoned, "[w]ithout that nexus to the institutional needs of the BOP or to the purposes of the Bail Reform Act, there is little or nothing that distinguishes Mr. Basciano from the hundreds of individuals in pre-trial detention who are accused of having committed violent acts *before* they were detained." *Id.*

Finally, the County's insistence on notice and an opportunity to be heard continue to miss the point entirely: Mr. Shafi does not seek to compel the County; rather, he seeks the alternative of pretrial release precisely because the County has demonstrated it will not change his classification, and is incapable of acknowledging incontrovertible facts (*i.e.*, that Mr. Shafi is in solitary confinement, that the County seized privileged materials, and that he was visited by persons who failed to identify themselves properly and conducted an inappropriate interview regarding the case).[10] In any event, the County has been on notice since early January 2016, as evidenced by the government's January 12, 2016, opposition (Docket # 38) to Mr. Shafi's application for bail, and nothing prohibits the County from appearing in court to explain itself.

Thus, the County's response to the Court's concerns, and its persistent defensiveness in the face of unavoidable facts, merely aggravates the problems

---

[10]  Also, the County's indignant invocation of "due process" is curious because that is a right that protects litigants from the *government*, and not vice versa.

1    presented by Mr. Shafi's conditions of confinement, again invoking the capriciousness

2    of *Alice's Adventures In Wonderland*: "sentence first – verdict later."  Here, the only

3    means of avoiding that injustice is pretrial release for Mr. Shafi pursuant to the very

4    strict conditions proposed, and any others the Court sees fit to impose.

5    **II.     *The Intercepted Recorded July 1, 2015, Telephone Conversation***

6             In its January 14, 2016, Minute Order, in determining that Mr. Shafi constituted a

7    risk of flight, the Court referenced the recorded intercepted telephone conversations.

8    Among those conversations, the government cited passages from the July 1, 2015,

9    conversation – the day *after* Mr. Shafi attempted to fly to Turkey, and two days before

10   his arrest – between Mr. Shafi and "S.K."

11            Yet that conversation also contains categorical expressions by Mr. Shafi that he

12   will not again attempt to leave the U.S.  For example,

13   ●    at 11:20 in the conversation, Mr. Shafi states "For the whole time I was
          there [at the airport], I was like Allah if this is right for me let it happen, if
14        it's not, then don't let it happen. . . .   That's what happened so I got a very
          clear . . .  I'm 100% sure that I'm not supposed to go there at all, like now
15        there's no doubt in my heart, I don't even want to go anymore;"[11]

16   ●    at 14:20 in the conversation, when S.K. asks Mr. Shafi, "You're just
          gonna stay here?" Mr. Shafi answers, "What else am I gonna do? What
17        am I gonna do?"

18   ●    at 15:55 in the conversation, Mr. Shafi states, "After this it was like, I just
          have no idea what to do now, I don't think I should have done that. . . I

19

20   ─────────────────────────────

     [11]  "Allah" is simply the Arabic (and therefore Islamic) word for God.

21

MOTION FOR RECONSIDERATION                24
OF DETENTION ORDER
15 CR 582 WHO

don't really care about the FBI . . . He [Mr. Shafi's father] was like, how can we trust you anymore;"

- at 25:29 in the conversation, Mr. Shafi states "Dude my blood pressure the whole time since I bought the ticket was so freakin' high it was unbelievable, it was so high . . . my blood pressure went down when the FBI called me and I was actually way more relaxed."  When asked by S.K. why he tried to travel, Mr. Shafi answered, "'Cuz I thought that if I found it [his passport] then that means I need to go, *I don't think I was right, I don't think I was right,* I think I'm just going crazy cuz I don't know what to do."  (Emphasis added);

- at 28:05 in the conversation, Mr. Shafi states, "I was wrong, I was wrong to go . . . I don't know what I was thinking, that's definitely, it's definitely completely erased it, I don't even want to think about it, I guess it had to happen for me to stop thinking about it;"

- at 29:47 in the conversation, Mr. Shafi tells S.K. that "The reason I'm, I'm not iffy about going with you because of FBI, because of my parents, they'd freakin' get destroyed so much, my dad's blood pressure, I think I would have killed him if I'd stayed longer, he only knew for a couple hours, he's like had to take so much medicine, damn if I go my parents are gonna freakin die, I just don't know what the freakin hell to do, I'm so confused;"  and

- at 40:42 in the conversation, Mr. Shafi, in the context of discussing travel, states "I'm not gonna just do anything like that anymore, it's gonna freakin' kill them, they have to know from now on."[12]

Thus, the July 1, 2016, conversation includes several expressions by Mr. Shafi

that not only provide evidence that he had decided not to attempt further travel, but that

---

[12]  At 41:30 in the conversation, Mr. Shafi and S.K. also discuss their parents' lack of understanding of their distress regarding the refugee situation in Turkey – with S.K. noting Mr. Shafi's parents' good intentions with respect to attempting to distract Mr. Shafi and reduce his stress by taking him to Disneyland – and discuss planning a hiking trip to Yosemite National Park in order to relax.

1  the prospect of his parents' suffering (which would be amplified manifold if Mr. Shafi

2  absconded from pretrial release) exerts more than sufficient moral suasion to keep Mr.

3  Shafi from traveling if he is granted bail (particularly in conjunction with the conditions

4  Mr. Shafi has proposed).

5      In that context, Mr. Shafi proposes for the Court's consideration an additional

6  component to that comprehensive package.  Daniel Koehler, Director of the German

7  Institute on Radicalization and De-radicalization Studies ("GIRDS"),[13] and who has

8  recently been appointed by Senior U.S. District Judge Michael Davis (District of

9  Minnesota) as an expert regarding deradicalization options in cases involving

10  allegations of material support for terrorism, has agreed to design, implement, and

11  supervise a program for Mr. Shafi should he be released on bail.[14]

12      Such a program would involve techniques and aspects that have been effective in

13  Mr. Koehler's experience, and would include elements directed at decreasing

14  commitment by offering credible alternatives and lowering the perceived invested costs

15  of involvement.  One such element would be access to Islamic mentors to foster

16  understanding and critical thinking as well as education regarding different

17

18  _____

[13]  Information about Mr. Koehler and GIRDS is available at <www.girds.org>.

19

[14]  Mr. Shafi's agreement to participate in such a program does not constitute any admission of

20  any illegal or other conduct charged in the Indictment.  Rather, it is designed to address the
Court's expressed concern regarding certain statements made by Mr. Shafi during the course of
the intercepted telephone conversations.

21

interpretations of Islam.  The program would be intensive, financed by Mr. Shafi's parents, and include religious, social, educational, and psychological mentoring. Monitoring and reporting requirements would also exist, and could be coordinated with Pre-Trial Services supervision.

## Conclusion

Accordingly, for all the reasons set forth above, as well as those set forth in the previous papers filed by Mr. Shafi in support of his application for pretrial release, it is respectfully submitted that Mr. Shafi should be granted bail.


DATED:        February 4, 2016

                                         */s/Joshua L. Dratel*
                                         JOSHUA L. DRATEL

                                         ERIK B. LEVIN

                                         *Attorneys for Defendant Adam Shafi*

MOTION FOR RECONSIDERATION                 27
OF DETENTION ORDER
15 CR 582 WHO

1

**Certificate of Service**

2       I hereby certify that on February 4, 2016, I filed the foregoing **Motion for**

3   **Reconsideration of Detention Order** with the Clerk of the United States District Court

4   for the Northern District of California by using the CM/ECF system.

5       I declare under penalty of perjury that the foregoing is true and correct.

6   Executed on February 4, 2016.

7                                       *s/Erik B. Levin*
                                        Erik B. Levin, Esq.
8

9

10

11

12

13

14

15

16

17

18

19

20

21