Pages 1 - 31

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK

UNITED STATES OF AMERICA,      )
                               )
            Plaintiff,         )
                               )
   vs.                         )  NO. CR
                               )
ADAM SHAFI,                    )
                               )  San Francisco, California
            Defendant.         )  Thursday
                               )  January 14, 2016
_____)  1:30 p.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          BRIAN STRETCH
                            Acting United States Attorney
                            450 Golden Gate Avenue
                            San Francisco, California  94102
                       **BY: JEFFREY L. SHIH, AUSA**


**For Defendant:**          JOSHUA L. DRATEL, PC
                            29 Broadway
                            Suite 1412
                            New York, New York 10006
                       **BY: JOSHUA LEWIS DRATEL, ESQ.**

                            LAW OFFICE OF ERIK LEVIN
                            2001 Stuart Street
                            Berkeley, California 94703
                       **BY: ERIK B. LEVIN, ESQ.**


**Also Present:**           **JOSH LIBBY**
                             - Pretrial Services


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                *Official Reporter - US District Court*
                *Computerized Transcription By Eclipse*

```
 1                    P R O C E E D I N G S
 2  JANUARY 14, 2016                              1:55 p.m.
 3          THE CLERK:  Calling Criminal Matter 15-582, USA
 4  versus Adam Shafi.
 5      Counsel, please come forward and state your appearance.
 6          MR. SHIH:  Good afternoon, your Honor.  Jeff Shih on
 7  behalf of the United States.
 8          THE COURT:  Mr. Shih.
 9          MR. DRATEL:  Good afternoon, your Honor.  Joshua
10  Dratel for Mr. Shafi, who is being brought out now, and Eric
11  Levin as well.
12          MR. LEVIN:  Good afternoon, your Honor.
13          THE COURT:  Good afternoon.
14          PRETRIAL SERVICES OFFICER:  Josh Libby, U.S.
15  Pretrial.  Good afternoon, your Honor.
16          THE COURT:  Good afternoon.
17      (Defendant present, in custody.)
18          THE COURT:  Mr. Shafi, good afternoon.
19          THE DEFENDANT:  Good afternoon, your Honor.
20          THE COURT:  All right.  So two things to do today, as
21  far as I'm concerned.  One is to address the status, status
22  conference.  Then the second to deal with the appeal on the
23  bail application.  So let's do the status first.
24      Mr. Shih put in his brief that this case warranted a
25  complex designation and that the defense seemed to agree, is
```

1   that --

2          **MR. DRATEL:**  Yes, your Honor.

3          **THE COURT:**  -- true?

4      Mr. Shih, what is the status of the DOJ review for the use

5   of the wiretap intercepts.

6          **MR. SHIH:**  The process is ongoing.  Essentially with

7   respect to the 11 calls -- or, rather, the nine calls in the

8   complaint, and the two additional calls at issue within the

9   detention proceeding, use has been granted with respect to

10  those.

11     The issue right now is, as this Court knows from wiretap

12  cases, very infrequently do you just have nine calls in a

13  wiretap.  So it's -- it's the process of going through and

14  getting the authority, both authority to use and, also, the

15  authority to declassify for us; not just affirmatively, but,

16  also, to meet our discovery obligations even if we're not going

17  to use such information.

18     So with respect to, you asked what is the status, we do

19  need to submit our approval for that; but with regard to that,

20  we have had several meetings, both internal -- several meetings

21  internally to discuss that with the appropriate channels, both

22  at the FBI and at the DOJ in order to do that.

23     In addition, we are in the process of making sure that the

24  defendant has all discovery that we can currently produce to

25  them.  In fact, I have some disks that I'm ready to produce to

1    the defense counsel today.

2        We have an updated protective order that I can hand up to

3    the Court.   And there may be some future amendments, but the

4    parties are working through and so we may file an amendment to

5    it to allow the defense counsel a little bit greater latitude

6    than the protective order currently requires, but this at least

7    allows us to produce what I have ready to produce to defense

8    counsel right now.

9        But I do -- you know, given the nature of the case, we do

10   foresee this being a more lengthy process than normal.   That

11   said, this is something that I will be extremely diligent and

12   forthcoming about to get defense counsel discovery that they

13   are entitled to in a timely manner and as early as I can.

14           **THE COURT:**   And without holding you today to any sort

15   of date, how long do you think it's going to take in order to

16   get the case ready for trial?

17           **MR. SHIH:**   Well, I think there's two steps to that.

18   I think the first step is getting the defense the discovery

19   that they are entitled to.   And then after that, there is the

20   issue of -- there may be quite a bit of litigation in this

21   case.

22       And so in terms of -- I think your Honor's question may be

23   when could we potentially foresee going to trial on this case,

24   and I think right now it's a little bit --

25           **THE COURT:**   Too soon?

1            **MR. SHIH:**  -- too soon to say.

2         I have discussed it with defense counsel.  Given how we're

3    in -- in the sort of the beginning stages of the discovery

4    right now, what we were going to propose to the Court was to

5    set this out approximately 60 days for next status conference,

6    where at some point we could actually talk about setting down

7    some dates.

8         And, obviously, it's not a case where defense counsel and

9    I are not going to be talking.  We will be talking.  But we

10   don't want to have a case where, you know, if it comes to the

11   60 days and we're not ready to discuss substantively setting

12   some dates, what we may end up doing is filing a stipulation

13   and proposed order to set it out a little bit more.

14        So that's what we're contemplating and that's what we were

15   going to propose to the Court.  We had run past a date of

16   March 17th with your Courtroom Deputy, if that is -- if that

17   would be acceptable to the Court.

18            **THE COURT:**  And that's fine.

19        Mr. Dratel, what perspective do you have to share on these

20   topics?

21            **MR. DRATEL:**  I think that we concur in the sense that

22   it's too early to tell in terms of setting a firm schedule.

23   Obviously, one of the issues for us is the volume of calls.  We

24   don't know exactly what the time period is of the calls.

25        And, also, as an intelligence wiretap, as opposed to a

1  Title III, it's not a pertinent versus non-pertinent.  It takes

2  every call.  So when we do get them, we're going to have to go

3  through essentially the entirety of what conversations occur on

4  any particular day.

5       And the other part is that the litigation that's involved

6  in things that are usually either sealed or classified -- and

7  Mr. Shih and I have talked to this a little bit -- does involve

8  some unusual aspects to it.  So it would be good to get a

9  handle on the contours of the discovery before getting to that

10 stage.

11      But the other part is with a protective order -- in fact,

12 we signed the protective order today because we want to get the

13 process moving.  And based on the conversations with Mr. Shih,

14 he seems to be amenable to meeting some of our reservations

15 that I think will be done.  And then we can leave the Court out

16 of that and submit a modification to the Court with the

17 agreement of the parties rather than litigate it, so to move

18 that forward.

19      But, obviously, we do have an interest in moving forward.

20 We just -- that's why we're trying to get as much discovery as

21 early as possible so then when we come back on the 17th, we do

22 have a framework for something firmer than that.

23           **THE COURT:**  Okay, great.

24      So we'll have the next status on March 17th.

25           **MR. SHIH:**  With regard to time exclusion, would the

1   Court be amenable to excluding time based on both the

2   complexity of the case and, also, effective preparation of

3   counsel?

4           MR. DRATEL:  No objection, your Honor.

5           THE COURT:  All right.  Okay.  Yes.  And if you would

6   prepare the stipulation.  Oh, you've got it.

7           MR. SHIH:  Can I hand it up?

8           THE COURT:  Please do.

9           MR. SHIH:  It's not the order for the time exclusion,

10  but this is for the protective order.

11      (Whereupon document was tendered to the Court.)

12          MR. DRATEL:  Your Honor, would that be 1:30 on the

13  17th?

14          THE COURT:  Yes.

15          MR. SHIH:  There is also one housekeeping matter.  We

16  can take it up after the detention hearing or we can do it --

17  or the detention appeal or we can do it now.

18      The parties noticed that Mr. Dratel actually has somehow

19  been terminated off of the docket.  There was no motion --

20          THE COURT:  Congratulations.

21          MR. SHIH:  -- or anything like that.  So just to

22  bring that to the Clerk's attention.  I don't think -- I think

23  you're remaining in the case.

24          MR. DRATEL:  Yes, your Honor.  I think what happened

25  was there was a substitution of Mr. Levin for some prior

1   counsel and then they just wiped out everybody, including

2   myself.  I wasn't aware of it until I realized this week I

3   didn't get it Government's response on ECF.

4        So I'll have my office contact the clerks because they

5   have done so before when the case was in a sealed posture and I

6   got added to the case.  I think they will be able to figure it

7   out and get me back on board.

8           **THE COURT:**  Okay, good.

9        All right.  So the -- with respect to the appeal.  I have

10  read all the papers that were before Judge Kim.  So the

11  defendant's application for relief, the Government's

12  opposition.  I've read the defendant's supplemental motion.

13  I've read the transcript of the hearing below.  I've read the

14  detention order.  The defendant's motion for review and the

15  exhibits that were attached, the supplemental motion and

16  exhibits.  The Government's opposition.  I listened to all

17  of -- yesterday to the CD recordings.  And I've reviewed the

18  Pretrial Services report.

19       So the -- and I've particularly read the letters of the

20  family and friends of Mr. Shafi, and they describe a very

21  generous and idealistic and loving person.  And I appreciate

22  the people who wrote and the people who are here today.

23       And I recognize the family's willingness to be a surety

24  and to try to ensure compliance with the conditions and

25  those -- the various matters that have been offered are in

1  addition to a substantial amount for sureties:  No contact with

2  the people who Mr. Shafi was speaking with on the recordings, a

3  private guard, electronic monitoring, home confinement, strict

4  reporting to Pretrial, internet restrictions, religious

5  guidance and support, and mental health counseling.

6      So I see all of that and I understand all of that.  And at

7  the same time, the convictions that Mr. Shafi has have been

8  channeled, of late anyway, towards the Al Nusra Front and which

9  the United States Government has designated as a terrorist

10  organization.  And the communication -- the recordings include

11  some disturbing language and convictions that are very strongly

12  expressed with respect to the Al Nusra Front.  And there have

13  been two attempts by Mr. Shafi to leave his family, once when

14  he was in Egypt and the second time last summer.

15      And so I guess, Mr. Dratel, the issue that I am most

16  concerned about and I don't know that -- it's a hard one to

17  address, is the flight risk.  And given the concern of the

18  family from before, that's the thing that I'm most concerned

19  about.

20      And, Mr. Shih, I am -- you made very clear, and correctly

21  so, separating out the conditions of confinement from this

22  determination.  But I am concerned about the conditions of

23  confinement.

24      I am concerned about Mr. Shafi being in administrative

25  segregation over a long period of time.  I'm concerned about

1   the seizure of religious material and family photographs.  I'm

2   concerned about the intrusion into privileged materials that

3   was alleged.

4        And so I'm hoping that in addition to responding,

5   Mr. Dratel, that you will be addressing those issues, because

6   that's not a tenable situation.

7        So, Mr. Dratel, go ahead.

8             **MR. DRATEL:**  Thank you, your Honor.

9        And I'll address -- because I know the Court, obviously,

10  has looked at this and has focused on this particular issue, so

11  that's what I'll address, which is essentially how unusual this

12  case is in that context in terms of trying to -- in terms of

13  establishing conditions and imposing conditions that remove the

14  risk of flight sufficient to give the Court a comfort level.

15  And, also the concept -- that the benefit of the doubt should

16  go to the defendant in a bail context, even in a presumption

17  context, because bail is really the fault and detention not,

18  because it's the Government's burden.

19       So, but in terms of how unusual and unique this case is, I

20  look at it sort of from both sides, one is the affirmative

21  conditions that the Court can impose to limit and really

22  eliminate the possibility of Mr. Shafi leaving, which is,

23  again -- and the Court went through them.

24       And electronic monitoring on its own in the vast, vast

25  majority of cases, I don't even know of cases now where people

```
 1   are able to get away on electronic monitoring.  You add private
 2   security.  You add other types of restrictions, contact
 3   restrictions, all these things, it becomes a powerful,
 4   overwhelming, affirmative set of conditions imposed by the
 5   Court to prevent flight.
 6        The second part is, there are really three components.
 7   The second part is that he doesn't have the wherewithal to do
 8   it.  In other words, he can't live out there on his own.  His
 9   parents are his financial support.  His community is his
10   emotional support.  They are all here because they want to help
11   him fight through this case.  Not to flee.  But to fight
12   through this case.
13        They are aware of the nature of the charges and they are
14   here because of who he is.  And they know him better than a
15   series of conversations and/or a snippets from nine
16   conversations over the course of a month's time.  And we don't
17   even know what the full range of those conversations is.  Six
18   months.  Nine months.  We don't know.  So that's important.
19        The other part that's important is I think that in the
20   context of the family -- and I give the Government credit for
21   the argument, but I think it distorts the nature of what it is
22   because this is what also makes this case unusual, which is
23   that to take the family's very active efforts to keep Mr. Shafi
24   out of harm's way, turned around as if somehow they have failed
25   and that's why he shouldn't get bail.
```

1          **THE COURT:**  I don't think they failed at all and I

2     don't think that's what the Government was suggesting.

3          I think what the Government is suggesting and the thing

4     that is concerning is that Mr. Shafi found his way from Egypt

5     to Turkey when he was on a family vacation in Egypt and he just

6     left.  And it is very concerning that he told his family that

7     he was going to go study on whatever it was, June 30th, and

8     then -- and then went to the airport to go.

9          And the statements that Mister -- there is a long way

10    between now and the time of trial, but the statements that are

11    in the recordings show a really deep conviction that is

12    concerning --

13          **MR. DRATEL:**  I understand, your Honor.

14          **THE COURT:**  -- to the Government and to me.

15          And when I'm looking at making this determination, I -- I

16    don't want you to try to turn this on the family.

17          **MR. DRATEL:**  No, I --

18          **THE COURT:**  Because the family, I think, and the

19    community, I have nothing but the greatest respect for the

20    support that they are showing.

21          **MR. DRATEL:**  And, your Honor, that was sort of my

22    point in the sense that the family's efforts beforehand can't

23    be a reason now to say:  Well, nothing can hold him.  Because

24    the Court has the authority to do so in a way that is effective

25    and proves effective in cases.  And what you have, in addition

1   to that is what I'm saying, is a family that is fully committed

2   to enforce those conditions in a way that we don't have in

3   every case.

4        And this really is an unusual case of a family

5   involvement.  And oftentimes families are -- you know, they

6   benefit from criminal activity or they enable it in other ways.

7   And here we have the exact opposite from an entire community of

8   people.

9        And the first trip, Egypt to Turkey.  He can't get to

10  Egypt now.  He can't get away because he will be in his house

11  with belt and suspenders, the way the Court can set it up.  The

12  way we've proposed it.

13       He can't get to the airport to fly.  He can't get

14  somewhere without travel documents where he could get -- he

15  can't get away -- it's proven effective in so many cases and

16  the -- all of these other factors, the family, the community,

17  the full range of conditions that the Court can -- that the

18  Court can impose can eliminate the risk of flight.

19       And so the -- just to talk about the nature of the

20  charges, is that we don't -- while there are strong convictions

21  expressed, we don't believe that they meet the standard of the

22  statute, the conduct.

23       And that's another part, is that words are one thing,

24  conduct is another.  And travel was made to Turkey, but he

25  didn't join a group there.  He came home after two days.  He

1   stayed in the airport, a home to refugees.

2        So, and even what the Government alleges in the complaint

3   about conversations, he declined to go.  There is a section

4   where -- in Paragraph 32 it says:  Then you didn't want to go,

5   the other person to the conversation says.

6        So conduct did is really the issue here, as opposed to an

7   expression or language that's isolated from conversations that

8   we haven't seen the full range of and that, I think,

9   will portray a very different intention, a very different set

10  of objectives for Mr. Shafi, and not to join a terrorism group.

11  Not to commit violence.

12       His whole history is -- and, you know, the family unit is

13  a strong unit and I understand what has happened, but the fact

14  is the moral situation part is a very important aspect here.

15  The family is going to be putting up its home, and the bond

16  will be beyond that amount, I assume, you know, in terms of

17  security.  It's just a portion of what the bond would be.  And

18  he -- he knows what the consequences would be.  And he's not

19  going to do that.

20       One thing that the conversations also establish is his

21  involvement in his family and he's not going to turn that down.

22       You know, he -- it's interesting, though.  The

23  conversations after the airport are interesting because there

24  is a resignation that he's not going and he never tries.  It's

25  a three-day period before he's arrested, where the Government

1   has him under 24-hour surveillance, as it notes in the

2   complaint -- not the complaint, in the Government's papers.

3   They now have 24-hour surveillance and there is not a single

4   scintilla of any evidence that there is any plan, any

5   intention, and -- any resuscitation of an intention to go.  And

6   that part is done.

7       And what he has to do now is concentrate on this case

8   because regardless of what's in the papers with respect to

9   discussions, there was never a plea offered by us to anything.

10  I mean, we never -- like I said, I don't think these -- these

11  conversations and conduct meets the standard of the statute and

12  I think to a certain extent, except with getting online to --

13  and even afterwards he's not arrested.

14      You know, the Government could arrest someone and write a

15  complaint afterwards.  They don't need to write a complaint to

16  arrest someone if they believe a crime is committed.  So we

17  have this long period of surveillance.  And the level of

18  surveillance is reviewing the family trash, reviewing the

19  family phone records, reviewing the family financial records.

20  All this stuff happened before and there is nothing in there

21  that goes to the offense.

22      And so I think with all of that, I think that there are

23  conditions that the Court -- and, you know, the conditions of

24  confinement that the Court -- you know, I don't know how, as a

25  lawyer, to be responsible in this way, where I have a client

1   who is in custody and the facility takes his private papers

2   that are privileged, that are actually memoranda to counsel and

3   to the investigator, takes them and shows them to the FBI and

4   doesn't return them.  They haven't returned yet.  This happened

5   December 23rd and he doesn't have them back yet.  How is he

6   going to prepare this case like that?  How am I supposed to

7   tell him:  No, go ahead, it's okay.  When he's at the mercy of

8   someone coming in and doing that again.

9        And everybody has -- you know, the Court has authority,

10   but we know what happens in prisons; that it happens on a

11   realtime basis and we don't know what's going to happen.

12        So I think that all of that combined is sufficient, and

13   that the Government has aren't met its burden because it's

14   still the Government's burden.  And in this case, given all of

15   these factors and, you know, all of the elements that go toward

16   eliminating the risk of flight.  I think in a real world

17   situation where the default position is release, that we've

18   gone as far as we can go and it's -- what I mean by that is

19   unless you have a crystal ball that says it can't happen, but I

20   don't think -- it's not going to happen.

21        What I'm saying is besides that, we have done -- all those

22   conditions do everything to do that and do it sufficiently.

23        Thank you, your Honor.

24        **THE COURT:**  Mr. Shih.

25        **MR. SHIH:**  Yes, your Honor.

1       I'm going to start with the conditions of confinement,

2    which your Honor highlighted that you would like the Government

3    to address.

4            **THE COURT:**  Okay.

5            **MR. SHIH:**  I think we made it clear in our papers

6    that at least the prosecution team is not directing or

7    participating in that.

8            That said, I gather by the Court's question that you do

9    have concerns about essentially is this happening and is there

10   a justification for it, et cetera.  And to that end in the

11   context of the -- these -- the litigation on detention, I did

12   contact County Counsel for Alameda County.  They are the ones

13   that essentially represent the Alameda County Sheriff's Office

14   that runs the Glenn Dyer detention facility.  They do have a --

15   and I highlighted for them the pages of the defendant's brief

16   in which they allege that the segregation, the searches, the

17   interviews are happening as a violation of his rights.

18           So they are aware of that.  I spoke to them about it.

19   They know about this bail slash detention hearing.

20           And we know that the issue of bail and detention are

21   separate from the issue of conditions of confinement.  But one

22   of the things that they told me is they said that they were

23   willing, ready and able and they actually wanted to be heard if

24   there was some type of motion on conditions of confinement.

25           And to further that end, right before the hearing started

1    today, I spoke with defense counsel and I said:  Maybe a first

2    step in that is for me to put county counsel and defense

3    counsel in touch with one another because county counsel is

4    actually -- first of all, they are the ones that represent the

5    detention facility, the ones that decide what their standard

6    procedures are, to decide to execute their standard procedures

7    in the searches and in the administrative segregation.

8         And then, secondly, the conditions of confinement are not

9    something that the prosecution team -- we would rather not be

10   involved in that, as I think the Court may or may not

11   understand.

12        I mean, yes, we do want the defendant detained, but as far

13   as whether or not he is in administrative segregation or the

14   general -- the general population, we realize that that's not

15   our role.  And so that's why I spoke to defense counsel before

16   the hearing started and told him that I would put the two of

17   them in touch.

18        If there is additional litigation, I understand county

19   counsel is willing to appear and speak on their behalf and give

20   an explanation of essentially what happened and what the

21   justification was and if there need to be any remedial

22   measures, at least be heard on what those might be.

23        So I don't know if that -- at least that provides the

24   Court with a little bit more information on that.

25        But moving on to the issue of detention.  I wanted to

1   respond to a couple of -- a couple of different points.

2         Number one.  It's come up in the briefing, as well as the

3   investigation, when the defendant and his family were

4   interviewed that the defendant was going over to Turkey to

5   check on the refugees.  And I think that listening to the

6   recordings, the recordings contain evidence that's quite

7   contrary to that, where he's talking about the mirror of the

8   Al Nusra Front.  And I think that the Court -- I can see that

9   the Court heard those in its statements about the convictions

10  that were expressed on the recordings.  There is nothing in

11  there about that was the reason why he was going to Turkey.

12        The conduct of not telling his parents everything, that's

13  inconsistent with going over there to check on refugees.  The

14  purchase of one-way tickets.  The discussion with family member

15  right after June 30th where they were laughing about how the

16  FBI asked a very straightforward question of whether or not the

17  defendant was going over to join a terrorist organization and

18  the analogy that they discussed was:  It's as if you were doing

19  something extremely illegal and a cop pulls you over and says,

20  "I just want to talk."

21        There is no incredulousness of they can't -- the FBI can't

22  get it through their heads that I'm just going over there to

23  visit refugees.

24        So I think the claim that he's over there to check on the

25  refugees is undercut by the evidence before the Court.

```
 1        The second thing that I wanted to address was how in the
 2   three-day period after the second attempt on June 30th, how he
 3   never -- he never tried.
 4        And because your Honor listened to the recordings, you
 5   probably -- there were -- I think there were two or three calls
 6   on the same day as when he tried to make the attempt.  He
 7   was -- he was -- on June 30th he was leaving.  And as part of
 8   that, he did question:  Maybe I was wrong to go.  Maybe this
 9   shouldn't have happened.  That's why the FBI showed up.
10        The last call that was included on July 1st, this is the
11   very next day, and he's talking with one of his confidants,
12   S.K.  And in that recording he discusses -- and this addresses
13   the argument about moral suasion and his parents as well.  He's
14   discussing how his parents are getting destroyed and how he
15   feels bad about that.  And he discusses that at minute 30, and
16   minute 41:15.
17        But after he discusses those things, at about the hour
18   mark that's where he what's a statement of:  I wonder how much
19   evidence the FBI would need before putting me in custody.
20        Acknowledge after that at minute 1:10 and 1:19, this --
21   the S.K. and the defendant begin discussing how they can bring
22   a nice camera so they can make the representation to their
23   parents that they are just going to go over there to document
24   stuff.
25        And at minute 1:19 the defendant states:  How can you ever
```

1    be happy if you don't do anything?

2         So this is a day after his second attempt on June 30th was

3    foiled.  He has acknowledged the effect that he is having on

4    his parents in this call and, yet, he's already contemplating

5    going on a trip when S.K. discusses how he might be going two

6    months later.

7         So that -- that's the -- I'm going to move on to the next

8    point.  The next point that I'd like to discuss is the

9    financial dependence on his parents.

10        In the recordings he discusses with his confidants, there

11   is a lot of updating about:  Do you have enough money?  How

12   much money do you have right now?  And essentially he doesn't

13   need -- the amount that he needs in order to get over there on

14   a flight, his plane ticket is roughly about $1,000.  You're not

15   talking about tens of thousands of dollars.  And when he goes,

16   he doesn't have that much money.  So it's not just to purchase

17   the ticket.  He doesn't need that much.

18        And I think one of the things to think about is there

19   are -- unfortunately, there are others out there that lend

20   monetary support that don't go on their own.

21        I mean, one of the examples of that is cited by the

22   defendant and that's the case of Armin Harcevic, right?  He has

23   been charged and what he was charged for in that indictment was

24   one -- was essentially -- I mean, he joined the conspiracy, but

25   the one overt act is contributing $1,500, which would be --

1  which would have been enough to finance the defendant getting

2  over there.

3       Moving on to the next point.  As far as him not being able

4  to get -- without a passport, not being able to flee.  I think

5  that is undercut by the recordings again, where he has

6  discussed how he would attempt to get around the no fly list,

7  going through Greece, getting on a boat.  There is discussions

8  about how even though Mexico City is far away, how he can get

9  down there.

10      And I think the Court probably understands while there is

11  border port checkpoint to get into the United States from

12  Mexico, there is no check on a regular basis to leave the

13  United States to get into Mexico.

14      He has stated on the recordings how he will do what it

15  takes.  He's not worried about the FBI.  If he -- once he knows

16  what he wants to do, he's going to get it done.

17      It's the convictions that are also evidenced in some of

18  the letters, how -- not in the context of what he is charged

19  with, but how he is a very focused individual and how if -- if

20  he puts his mind to something, how he'll get it done.

21      And I think with respect to flight, it's not just fleeing

22  internationally.  At least I tried to make the point in our

23  papers, that it's not just a question of a potential flight

24  internationally posing a danger to where the Al Nusra Front

25  operates.

1          His conviction and his statements of spilling some gallons

2    of blood before he meets Allah.  That -- one of the things that

3    is scary is that that doesn't necessarily require his flight

4    from the United States.  So that is part of our argument as

5    well.

6          Going through -- I think the question that you asked

7    Mr. Dratel was to focus -- well, you said one of the main

8    things that you were -- that the Court was concerned about was

9    flight.  And to -- I think one of the things to think about is

10   the resolve that he has demonstrated that is before the Court

11   that he's not going to be deterred.  And the Government's

12   argument is both one of flight and danger, but the Court has

13   highlighted flight.

14         So the defendant has demonstrated this resolve that he

15   won't be deterred in several different ways.

16         Number one, he's indicated through his -- through the

17   recorded phone calls that he's not taking direction from what

18   the U.S. laws say.  He's not taking direction from what the FBI

19   says.  And he's not taking direction from what his parents

20   repeatedly tried to counsel him not to do.  In fact, he's

21   taking direction from a belief that the United States is

22   100 percent the biggest enemy by far on the earth.  Right?

23   That's what's driving him.

24         Number two.  He's demonstrated that there hasn't been an

25   effective deterrence.  As this Court has noted, that he has --

this was his second try.  The first time he went to Turkey, he
got away.  The second time he was contacted by law enforcement.
And there is evidence that he was already contemplating
possibly doing a third.  And that was one day after his -- his
attempt on June 30th was filed.  So it wasn't had an effect
three times.

Number three.  He's demonstrated a contempt in what he has
stated on his recorded phone calls.  He views -- when he was
stopped on June 30th, one of the things that he said was:  You
know, what am I going to do here?  I can't just live in the
community here.  I would rather be in jail.  Living in the
community here would be like -- would be betraying Muslims.
Right?  That's a contempt for the -- the way of life here.

He's demonstrated a contempt for United States law
enforcement in stating -- in making several statements
regarding the FBI.  And he's also made statements about how the
way of life in the United States -- how he doesn't want to live
life here and how he believes that the wrath of God will come
down on the United States.

Number four.  He's -- with the second attempt he's
demonstrated unpredictability that he's willing to work on his
own.  And that's even with FBI's investigation, the parents'
monitoring.  That's with -- you know, he didn't even tell his
confidants, A.N. and S.K.

And the way that he explained him going on June 30th was

1   he just decided if he saw -- if he found his passport, he would

2   go.  That would be it.  That's all he needed.  There wasn't

3   much planning involved.  There wasn't much coordination

4   involved.

5        The next point with regard to how he's not going to be

6   deterred for him, he's stated repeatedly:  Obstacles are not a

7   big deal.  The recording on June 2nd talking about going

8   through Mexico, a boat through Greece.  How Egypt is "hella

9   disorganized," in his words.

10       June 4th talks about Mexico City International Airport.

11       July 1st, and this -- I think I'm repeating myself:  If I

12  know what I need to do, I'm going to do whatever.  I don't

13  really care what it takes.  And if I need to leave the country

14  I will just take a boat, whatever.  It's no big deal.

15       He's demonstrated that he's willing to hide what he's

16  going to be doing; hiding from his parents, family and friends.

17  The letters indicate that he has -- I would submit to the Court

18  hidden these things from many of them.

19       He has told the FBI, he's claimed that he -- he has made

20  this claim in the interviews to them that he was just going

21  there for -- to look at the refugees.

22       In the recorded phone calls he's demonstrated, you know,

23  when they talk about Abraham Lincoln, they are almost mocking

24  "Why would you be honest?" in response to his question.

25       And, lastly, with respect to his resolve, why he will not

1    be deterred, how the conditions of -- how there are no

2    reasonable set of conditions.  He's demonstrated that nothing

3    really is going to persuade him or nothing was going to

4    persuade him not to leave and to go forth on his convictions.

5    His family tried.  His friends tried.  He was willing to leave

6    them both behind on a one-way ticket.  He was willing to leave

7    all of his -- any of his possessions.  He was willing to leave

8    the United States, which has been his home his entire life.

9        I understand that cuts both ways in the weighing of

10   detention, but he was willing to leave everything behind.

11       And perhaps most seriously, he was -- he was willing to

12   leave his life behind, as in he was willing to die.  This is --

13   this is why -- this is why there is no reasonable set of

14   conditions.

15       So with that, your Honor, unless the Court has any

16   questions, the Government would submit that their -- the United

17   States would submit that we've more than met our burden with

18   respect to the factors of 3142(g).

19       There is a presumption in this case.  We do submit he

20   should be detained based on risk of flight and danger to the

21   community, as there is no reasonable set of conditions that can

22   mitigate those risks.

23            **THE COURT:**  Mr. Dratel.

24            **MR. DRATEL:**  Thank you, your Honor.

25       Just as a preliminary, some of the calls, particularly the

July 1st call, we don't have.  So we only got nine.  They are
using 11.

      It's very difficult for us to talk about context, talk
about the specifics of them not having heard them.  And even
the ones that we have heard, the Government today has gone far
beyond what's actually in the conversation to really theorize
its case and interpret based on -- so, for example, there is no
expression anywhere that he said, "I'm going to Turkey to join
Al Nusra."  There is no expression anywhere that says that.

      They are putting together a jigsaw puzzle that has four
pieces and it's a picture of a horse.

      **THE COURT:**  Just remember I did listen to everything.
So you don't have to argue to me what's in those tapes.

      **MR. DRATEL:**  Okay.  Thank you, your Honor.

      But, also -- and, you know, what's in those calls is a lot
of talk about refugees and concern for people on a humanitarian
level that in retrospect when you think about where we were
before June of 2014, there were a lot of people paying
attention to it.  So the frustration level on that point is
valid.

      But I want to go back to the risk of flight issues.  That
is really what the Court has focused on.  What the Government
hasn't said is how is he going to do it?  You've got electronic
monitor.  You've got home confinement.  You've got a private
security force.  You've got chaperones from the family and even

1   from the community, if the Court wants to.

2       I mean, we get it not so much that he needs additional

3   chaperones for that purpose, but just to show you the

4   confidence that the community has that this is a person that

5   should be out on bail and he will not run.

6       So, but it's also, how is he going to?  He has no money.

7   He has no documents.  He has no assistance from people who he

8   might rely on.

9           THE COURT:  I know all of this, Mr. Dratel.

10          MR. DRATEL:  All right.  Sorry.

11      And, also --

12          THE COURT:  What I'm interested in, if there is a new

13  argument or response that you wanted to make to Mr. Shih, I'm

14  happy to hear it.

15          MR. DRATEL:  Okay.  Here is what it is.  We didn't

16  talk about -- in my initial presentation is some the stuff

17  about the conditions of confinement.

18      You know, they talk about the facility.  I mean, they sent

19  two people in to him.  We don't even know yet who they are.

20  The Government doesn't even tell us who they are.  Two people

21  came in and started talking to him about the facts of this

22  case.  And he first declined to speak with them.  He said:  I

23  don't want to speak to them.  They came to his cell.

24      So they are not outsiders.  They are not people that just

25  wander into the facility.  They are not social visitors.  So

1  I've no confidence in that regard.

2      Oh, and we will take the Government up on it, but -- I

3  hope it's academic, but the point being that, you know, I would

4  take the Government up on it.

5      But the other part is, well, we talked about even at the

6  beginning of this proceeding is the time, the time it's going

7  to take to get this case to trial.  In fact, I don't know that

8  they have the facility where he is right now that he's going to

9  be able to review these recordings and then make notes and not

10  have them taken from him.  And make notes.  I don't even know

11  if they have the facility to do it even on a computer or

12  anything.

13      This is a very, very difficult case to prepare in that

14  regard because of the nature of the evidence and, also, because

15  of the restrictions on the way we can use it and the time that

16  it's going to take to get there.

17      And, also, we're not trying the case now.  That's the

18  least important part of the Court's consideration under the

19  case law.  I just -- I don't want him sentenced before we try

20  the case.

21      Thank you, your Honor.

22          **THE COURT:**  All right.  Thank you.

23      So I'm going to affirm what Judge Kim determined.

24  Mr. Shafi, I do think you're a flight risk.  I think you have

25  the commitment and resolve, at least as shown in those

1  recordings, to do anything that you can to leave this country.

2      And there is -- I appreciate all of the conditions that

3  your family is willing to put up in that regard, but it's just

4  not sufficient in light of the recordings.

5      So I am -- I'm going to deny the appeal and affirm that

6  determination.

7      Mr. Shafi, I am concerned about the conditions and while I

8  understand the prosecution is dealing with the prosecution and

9  the sheriff needs to deal with the conditions of confinement.

10  That's not good enough for me.  And I don't -- I want to have a

11  very complete explanation as to -- after Mr. Dratel and County

12  Counsel have met-and-conferred, over what those conditions of

13  confinement will be.

14      Administrative segregation where Mr. Shafi is out of the

15  cell one hour every two days is not at first blush something

16  that seems tenable for a very long period of time.

17      Mr. Shafi has a community of family and friends.  I want

18  to get a complete picture of what his confinement is going to

19  be like.

20      And I do think that there are so many of the alternatives

21  Mr. Dratel has outlined is not totally out of the question if

22  the Government is unable to provide a reasonable pretrial

23  detention for Mr. Shafi.

24      So I will hear about that, I'm sure, later on after you've

25  met.  But I want you to, Mr. Shih, convey that concern, okay?

1          **MR. SHIH:**  I understand, your Honor.

2          **THE COURT:**  All right.  So we have -- Mr. Shafi, we

3   have a hearing set in about 60 days.  Mr. Dratel, if you want

4   to come back before then with respect to detention issues, I am

5   here.

6          **MR. DRATEL:**  Thank you, your Honor.

7          **THE COURT:**  On Thursday afternoons, all right?

8          **MR. DRATEL:**  Thank you.

9          **THE COURT:**  All right.  Thank you very much.

10          **MR. SHIH:**  Thank you, your Honor.

11      (Proceedings adjourned.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Debra L. Pas_
_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Thursday, February 11, 2016