DONNA R. ZIEGLER [SBN 142415]
County Counsel in and for the
County of Alameda
L. DAVID NEFOUSE [SBN 243417]
Deputy County Counsel
1221 Oak Street, Suite 450
Oakland, CA 94612
Tel: (510) 272-6700
Fax: (510) 272-5020
E-mail: david.nefouse@acgov.org

Attorneys for Nonparty Alameda County Sheriff's Office

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 15-cr-00582-WHO-1 |
| Plaintiff, | ) |
| | ) **REPLY BRIEF IN SUPPORT OF THE OF** |
| v. | ) **APPLICATION OF NONPARTY ALAMEDA** |
| | ) **COUNTY SHERIFF'S OFFICE REGARDING** |
| ADAM SHAFI, | ) **QUESTIONS CONCERNING THE GLENN E.** |
| | ) **DYER JAIL AND THE CONFINEMENT OF** |
| Defendant. | ) **DEFENDANT ADAM SHAFI** |
| | ) |
| | ) **Hearing Date: February 18, 2016** |
| | **Hearing Time: 1:30 p.m.** |

Nonparty Alameda County Sheriff's Office ("ACSO"), submits the following reply brief in support of its application concerning the Glenn E. Dyer Jail (the "Jail") (*see* Dkt. No. 46) and the confinement of Defendant Adam Shafi ("Defendant"), and in response to the "Motion for Reconsideration of Detention Order" filed by Defendant in response to ACSO's application (Dkt. No. 49).

1

**INTRODUCTION**

2     Defendant's Motion for Reconsideration of Detention Order (the "Response") is quite strong on

3  policy, politics, and opinions, but lacks in substance, facts, and any legal basis whatsoever.  Relying on a

4  law review article[1], hyperbole, quotes from a 19th century British novel, allusions, flamboyant

5  vocabulary, a newspaper op-ed, and case cites taken out of context, defense counsel would have the

6  Court believe:  Defendant is in solitary confinement; that the ACSO rubberstamped (and continues to do

7  so) the classification of Defendant without merit or proper consideration and/or review; that the County

8  is conspiring with the federal government to extricate privileged information from Defendant; and that

9  the ACSO's state and federally mandated grievance process is merely a "perfunctory" procedure that

10  serves no purpose.  Simply put, these insinuations, embellishments, and innuendo are not true.  Indeed,

11  the reality for Defendant and his counsel is just different from the actual facts and the law in this case.

12     Instead of attacking the straw man arguments put forward by Defendant and defense counsel,

13  ACSO will focus on the request of the Court – to provide a description and update on the conditions of

14  confinement for Defendant at the Jail.  As discussed in the Supplemental Declaration of Lt. Dan Brodie

15  ("Brodie Supp. Decl." or "Supplemental Declaration") the privileges and options for Defendant while

16  confined in Administrative Isolation allow for Defendant, his counsel, and any approved visitors more

17  than sufficient access and rights to not only prepare for his legal case, but also participate in and receive

18  services offered by the Jail.  *See* Brodie Supp. Decl. ¶¶ 13-17.  Moreover, as demonstrated by the

19  Supplemental Declaration, Defendant was not deprived of time out of his cell.  *Id.* at ¶¶ 18-22.  The

20  Supplemental Declaration clearly shows that Defendant has received all of his privileges as an inmate in

21  Administrative Isolation while confined at the Jail.

22     Defendant also challenges the periodic reviews conducted by the ACSO regarding the

23  classification of Defendant in Administrative Isolation, alleging – without any factual support – that the

24  reviews lack any "substantive" evaluation criteria.  *See* Response at 9-14.  Defendant insists that studies

25

26  [1] It goes without saying that the article has no binding authority over the Court.  And, it is unclear whether Defendant and his counsel are asking that Defendant be placed back in mainline custody, to be released on bail, or have a due process hearing.

27  ACSO understood that the focus of these papers was to address the allegations put forward by Defendant concerning his confinement at the Jail – not for Defendant to once again assert that administrative isolation equates with solitary

28  confinement, or re-litigate his bail motion.  In reviewing the record, ACSO submits that it is evident these issues (administration isolation v. solitary confinement, and bail) have already been addressed and resolved by the Court.

1    and newspaper articles related to solitary confinement should somehow dictate the review process for

2    classification concerning Administrative Isolation. *Id.* at 10-11. Once again, Defendant fails to tell the

3    entire story. First, the Court has only requested that ACSO update the Court on the status of

4    confinement for Defendant at the Jail and address the assertions put forward by Defendant and his

5    counsel. Thus, the classification of Defendant is not at issue. Second, the critical fact that Defendant is

6    being prosecuted for federal terrorism charges that are publicly known justified (and continues to

7    validate) his placement in Administrative Isolation. Defendant fails to delineate the importance of the

8    date when the charges were made public, the finding of contraband in his cell, and the subsequent move

9    to have Defendant placed in Administrative Isolation for his safety. Third, as further set out in the

10   Supplemental Declaration of Lt. Brodie, based on past experiences and in the opinion of ACSO – the

11   only entity mandated to operate and manage the Jail – there is a high safety risk for Defendant if he had

12   remained in mainline, protective custody. *See* Brodie Supp. Decl. ¶¶ 7, 11-12; *see also* Brodie Decl. ¶¶

13   7, 11-19, 35. ACSO cannot fathom why defense counsel would insist that ACSO put the safety of their

14   client at risk by suggesting he would be better off in mainline, protective custody.

15          Defendant further alleges that ACSO seized privileged materials from Defendant; however,

16   ACSO understands that the Court has not determined that those materials in question are in fact

17   "privileged", as contended by defense counsel. *See* Response at 14-16. In addition, Defendant

18   recklessly submits that none of his legal materials are "safe from seizure by jail officials and transfer to

19   the prosecution." *See* Response at 15:9. To the contrary, as stated by Lt. Brodie, Defendant has

20   received and has access to his legal materials, consistent with Jail policies. *See* Brodie Supp. Decl. ¶¶

21   14-15. Moreover, ACSO did not share any of the information taken with the prosecution. *See* Brodie

22   Decl. ¶ 9. Accordingly, these purported doomsday scenarios neither address the current state of

23   confinement of Defendant nor provide any evidence that ACSO has – or intends to – improperly seized

24   privileged materials from Defendant. *Id.* ¶ 9.

25          Additionally, defense counsel dismisses the County's concern for the mental health of their client

26   by attempting to frame a routine mental health interview as a blatant attempt to discover defense strategy

27   and privileged case information. *See* Response at 16-19. To be clear, CJMH personnel are neither

28   FBI/federal employees, nor ACSO employees. *See* Supplemental Declaration of Joan D. Cairns, ¶¶ 3-4;

1   Cairns Decl. ¶¶ 6-7. ACSO contracts with CJMH to provide mental health services at County jails. *See*

2   Brodie Supp. Decl. ¶ 23; Cairns Supp. Decl. ¶ 6. And, despite the representations of Messrs. Dratel and

3   Levin, no County representative denied that the visits ever occurred, but stated:  (1) they did not believe

4   federal or ACSO employees visited Defendant on December 31, 2015 (which is true); (2) that based on

5   the description from Defendant, ACSO believed (and ultimately confirmed) the visitors were employees

6   of the County CJMH staff (which is also true); and (3) that no one asked Defendant confidential

7   questions about his case (which is absolutely true). Defendant also contends that defense counsel should

8   have been present for the mental health interview, but cites no authority to sustain this claim.[2] *See*

9   Response at 18. Further, while defense counsel may posture and cast doubt as to the purpose of this

10  visit, this evaluation was not done to determine whether Defendant was competent to stand trial, but to

11  ascertain his mental health following the release of the charges and his classification in Administrative

12  Isolation. *See* Cairns Supp. Decl. ¶¶ 3, 5; Cairns Decl. ¶ 8. Any suggestion by defense counsel that the

13  County should abandon its concern for the mental health of individuals who are in County custody is

14  insulting to the inmates of the County as well as their friends and families, and to the community at

15  large, who remain committed to inmate health.

16         Finally, even though Defendant has not even utilized the Jail's grievance system and defense

17  counsel has offered no evidence to demonstrate any familiarity with the Jail's grievance process, defense

18  counsel feels confident enough to label it as "painfully slow, byzantine, and historically futile". *See*

19  Response at 19:8-9; Brodie Supp. Decl. ¶¶ 24-26. To exacerbate this point, defense counsel appears to

20  have cut and pasted from a prior, unrelated brief, referring to Defendant at one point as "Mr.

21  Ilegbameh"[3] (*see* Response at 21:3) and continuously citing non-binding (and unpersuasive) New York

22  authorities for nearly six (6) pages. *See* Response at 19-24. Yet neither Defendant nor defense counsel

23  proffer any proof that the grievance process at the Jail is in anyway deficient, and, as demonstrated

24  below, the California authorities cited by Defendant are inapposite. *See infra* at 8-10. Once again,

25

---

26  [2] The call by defense counsel for the County to release the interview notes would not only violate the Health Insurance
    Portability and Accountability Act ("HIPAA"), but also several state laws concerning confidentiality and patient privacy.

27  [3] Mr. Levin – co-counsel for Defendant in this matter – represented Mr. Alake Terry Ilegbameh in a matter in front of the
28  Central District of California, Case No. 2:13-cr-00201-MWF, regarding an individual who was convicted of committing
    immigration related felonies.

1   ACSO requests (as required by law) Defendant utilize the jail grievance process to resolve any alleged

2   issues he has while confined at the Jail.

3                                           ***

4          Rather than address the conditions of confinement of their client, defense counsel is once again

5   litigating their bail argument by attacking the County, contrary to the request by the Court. As such, the

6   County requests that the parties focus on the order of the Court (*see* Dkt. No. 41 at 1-2), and not go

7   down the rabbit hole as desired by Defendant and defense counsel.

8                                       **ARGUMENT**

9   **I.      DEFENDANT'S RIGHTS IN ADMINISTRATIVE ISOLATION**

10          In its Application and the corresponding Brodie Declaration, ACSO set out an overview of the

11   Jail as well as a basic explanation of Administrative Isolation. *See* Brodie Decl. ¶¶ 5, 12, 20-25, 27-31.

12   The Supplemental Declaration of Lt. Dan Brodie provides more insights to what rights, privileges,

13   opportunities, and options that Defendant (and all other inmates assigned to this classification) has in

14   Administrative Isolation. *See* Brodie Supp. Decl. ¶¶ 13-14, 16-17. ACSO would be happy to explain

15   these in further detail to the Court or defense counsel. Moreover, the allegation by Defendant through

16   his investigator – Scott Dudek[4] – that ACSO has deprived Defendant of his time out of his cell is

17   patently false. *See* Response at 5 n.3. As demonstrated by the Supplemental Declaration and supporting

18   facts therein, Defendant has received his five (5) hours of weekly time since he was classified in

19   Administrative Isolation. *See* Brodie Supp. Decl. ¶¶ 18-22. In addition, Defendant himself has not

20   made any complaints to ACSO to date nor filed any grievances. *See* Brodie Supp. Decl. ¶¶ 24, 26. As

21   such, Defendant is receiving all of his rights and privileges at the Jail.

22   **II.     ACSO'S REVIEW OF CLASSIFICATION IS PROPER AND THOROUGH**

23          Defendant claims without any basis that ACSO does not substantively evaluate the classification

24   status of Defendant on weekly basis. *See* Response at 9-10. As set out in the Supplemental Declaration,

25

---

26   [4] Mr. Dudek was a former officer (Sergeant) with the Alameda County Sheriff's Office; however, it has been five (5) years

27   since he was employed by ACSO, and more than **twenty-three (23) years** since he worked at a county jail or in detention
     and corrections. *See* Brodie Supp. Decl., ¶ 27. Thus, any representations and reliance by Defendant and defense counsel

28   based on information provided to them by Mr. Dudek, about the current operations and management of the Jail are out of
     date, at best, and unreliable, with certainty. *See id.*

1  however, ACSO takes definitive steps and uses specific evaluation criteria when not only determining

2  classification initially, but also making any determination as to subsequent classification through weekly

3  and/or monthly reviews. *See* Brodie Supp. Decl. ¶¶ 8-13. Thus, the argument by defense counsel that

4  the decision to classify Defendant and maintain his status in Administrative Isolation as "perfunctory" is

5  misplaced. *See* Response at 10. Furthermore, ACSO and Lt. Brodie have set out the justifications for

6  maintaining Defendant in Administrative Isolation, which include past experiences, expertise, and the

7  general safety of Defendant. *See* Brodie Supp. Decl. ¶¶ 4, 7; Brodie Decl. ¶¶ 11, 13-18, 35. ACSO

8  cannot fathom why defense counsel wants to put the safety of their client at risk in this instance.

9      **III.**    **ACSO DOES NOT SEIZE PRIVILEGED OR CONFIDENTIAL MATERIALS**

10          Defendant apparently wishes to use this forum to not only re-litigate his bail motion, but also

11  assert that the materials seized from Defendant were "privileged" documents. *See* Response at 14-16. It

12  is the understanding of ACSO that no judicial determination by the Court as to the nature of these

13  documents has been made, thus Defendant's proclamations concerning an improper seizure of privileged

14  materials are premature. In addition, the implication that Defendant will be unable to prepare for trial at

15  the Jail based on this one, isolated incident is a baseless attack by defense counsel. *See* Response at

16  15:6-10. The Jail can accommodate Defendant and defense counsel, regardless of what classification

17  Defendant is assigned to by ACSO. *See* Brodie Supp. Decl. ¶¶ 13-16; *see also* Brodie Decl. ¶ 24.

18  ACSO also submits that it has not provided any documents to the prosecution (U.S. Attorney's Office);

19  the documents in question were turned over to the FBI. *See* Brodie Decl. ¶ 9. To date, Defendant is

20  aware of no issues where Defendant cannot get access to any legal materials. *See* Brodie Supp. Decl. ¶¶

21  14-15. Thus, any professed concerns by Defendant concerning his ability to prepare for trial while at the

22  Jail and housed in Administrative Isolation are inconsequential. *Id.*

23      **IV.**    **CJMH DID NOT SEEK PRIVILEGED INFORMATION FROM DEFENDANT NOR VIOLATE THE CONSTITUTIONAL RIGHTS OF DEFENDANT**

24

25          Without citing to a single case or legal authority, Defendant contends that the very fact CJMH

26  staff conducted a mental health interview of Defendant outside of the presence of defense counsel, after

27  the charges against Defendant were made public and Defendant was switched to Administrative

28  Isolation, violated the Fifth Amendment of the Constitution and CJMH staff sought privileged and/or

REPLY ISO APPLICATION OF ACSO RE THE GLENN DYER JAIL
CR 15-CR-00582-WHO  6

1  confidential information from Defendant. *See* Response at 16-19. Although CJMH manager Joan D.

2  Cairns submitted a declaration to clear up any confusion and address the accusations put forward by

3  Defendant, defense counsel insists – absent any legal basis – that the mental health interview should not

4  have taken place and that the County and/or U.S. government misrepresented the personnel involved

5  with the CJMH visit to defense counsel and the Court. *See* Response at 16-18.

6        First, and once again, CJMH did not seek privileged and/or confidential information from

7  Defendant. *See* Cairns Supp. Decl. ¶ 4; Cairns Decl. ¶¶ 7-8. Second, the CJMH staff did not share any

8  information obtained from the interview of Defendant with any law enforcement agencies– including

9  ACSO and the FBI – or the prosecution. *See* Cairns Supp. Decl ¶¶ 4, 7. Third, CJMH staff members

10 are not federal or Jail employees; CJMH staff members are a part of another County agency, separate

11 and distinct from ACSO. *See* Cairns Supp. Decl. ¶ 6; Brode Supp. Decl. ¶ 23. Fourth, the reason why

12 Defendant was not interviewed by CJMH prior to December 31, 2015 was because he was not placed in

13 Administrative Isolation until December 18, 2015, and prior to that he had not previously requested to

14 see a mental health specialist. *See* Cairns Supp. Decl. ¶ 5. Had Defendant wished to see a member of

15 CJMH staff prior to that time, ACSO would have worked with Defendant to make that available to him.

16 Fifth, as CJMH was not interviewing Defendant in order to determine if he was competent to stand trial

17 (*see id.* at ¶¶ 3, 5), no Court order (as asserted by Defendant – *see* Response at 18:11-12) was necessary.

18 Sixth, CJMH did not interview Defendant at the request of any with who works for the federal

19 government. *See* Cairns Supp. Decl. ¶ 7.

20       Finally, any intimation by defense counsel that the County should preclude or limit its practice of

21 monitoring the mental health of inmates at its county jails shows a patent misunderstanding of the

22 modern day jail population and lack of empathy for inmates, their friends and families, and the

23 community at large. The County and ACSO strive to address the mental health issues of all inmates in

24 need of treatment. To that end, ACSO and CJMH will continue to work together for the benefit of

25 inmates in need of mental health treatment at the Jail.

26 **V.   ACSO'S GRIEVANCE PROCESS CAN ADDRESS THE CONCERNS OF
       DEFENDANT AND DEFENSE COUNSEL**

27

28       To date, Defendant has not filed a grievance or message request related to his classification with

1 ACSO. *See* Brodie Supp. Decl. ¶¶ 24, 26. Despite this fact and the fact that Defendant has offered no
2 actual evidence about the grievance process at the Jail, defense counsel insists that the grievance system
3 at the Jail is "painfully slow, byzantine, and historically futile". *See* Response at 19:8-9. Instead of
4 citing to a specific incident involving the Defendant or providing any examples to sustain their
5 conclusory allegations, defense counsel cites to a medley of nonbinding Second Circuit cases that are
6 neither persuasive nor on point.

7      In *United States v. Lopez*, 327 F. Supp. 2d 138, 139-141 (D. Puerto Rico 2004), a pre-trial
8 detainee was facing a death penalty prosecution, and the Puerto Rican jail had a policy to isolate inmates
9 facing those charges in segregated housing. The court in that matter found there was no justification in
10 isolating those individuals on that basis alone, and that it amounted to a punishment for no reason. *Id.* at
11 140, 143. Here, in contrast to *Lopez*, Defendant faces publicly known federal terrorism charges and the
12 classification was assigned because of his safety as well as contraband found within his cell. *See* Brodie
13 Decl. ¶¶ 7-11. Indeed, until the terrorism charges were made public and the contraband was discovered,
14 Defendant was housed in mainline, protective custody. *Id.* at ¶¶ 6-7. Furthermore, the Jail does not
15 have a blanket policy, as did the Puerto Rican jail, to assign all individuals facing federal terrorism
16 charges to Administrative Isolation. In addition, the court in *Lopez* determined that the classification of
17 the inmate was punitive in nature. 327 F. Supp. 2d at 139. In the instant case, as ACSO has stated
18 repeatedly, Defendant was set in Administrative Isolation for his safety, not as a punishment. *See*
19 Brodie Decl. ¶¶ 7, 11-19, 35; Brodie Supp. Decl. ¶¶ 4-12.

20      The court in *United States v. Basciano*, 369 F. Supp. 2d 344, 349 (E.D.N.Y. 2005) determined
21 that the inmate did not abide by the inmate grievance process because he was provided no explanation
22 regarding the reasons for his segregation as was required by jail policy. ACSO, unlike the jail
23 authorities in *Basciano*, has informed Defendant, defense counsel, and the Court about the reasons for
24 Defendant's classification. *See* Brodie Decl. ¶ 7. In addition, unlike the present matter, the issue
25 surrounding the safety of the inmate was not at stake in *Basciano*.[5] *See* Brodie Decl. ¶¶ 11-19, 35;

26
27 [5] Defendant cites to the seminal United States Supreme Court case of *Bell v. Wolfish*, 441 U.S. 520 (1979) and the Ninth Court of Appeals case of *Mitchell v. Dupnik*, 75 F.3d 517 (9th Cir. 1996) in asserting that Defendant is entitled to a due process hearing. *See* Response at 20. To date, neither Defendant nor his counsel has made that request with the Court. This
28 point is further demonstrated by the title of Defendant's response – "Motion for Reconsideration of Detention Order". ACSO submits that the instant motions and briefing are not to hold a due process hearing. To the extent the Court wishes to do so,

1    Brodie Supp. Decl. ¶¶ 4-12. In further contrast to *Basciano*, here, ACSO officials found what they

2    deemed to be precluded contraband in Defendant's cell, which also sustained their decision to place

3    Defendant in Administrative Isolation. *See* Brodie Decl., ¶¶ 8-11; Brodie Supp. Decl. ¶ 5. As such, the

4    holding in *Basciano* is inapposite to the instant case.

5        Defendant's reliance on *United States v. Gotti*, 755 F. Supp. 1159 (E.D.N.Y. 1991) is misplaced.

6    To start, the jail officials in *Gotti* placed the inmates in segregation while they spent over one (1) month

7    determining their classification. *Id.* at 1164. Here, unlike *Gotti*, Defendant was placed in and remained

8    in mainline, protective custody until his case became public and contraband was discovered. *See* Brodie

9    Decl. ¶¶ 7-11. And, similar to *Lopez*, in *Gotti* the court found the inmates were placed in segregation

10   solely based on the nature of their charges (*see* 755 F. Supp. at 1164); here, as noted *supra* at 8,

11   Defendant was placed in Administrative Isolation for his safety and the fact that contraband was

12   discovered. *See* Brodie Decl. ¶¶ 7-11; Brodie Supp. Decl. ¶¶ 5, 7. Additionally, the court in *Gotti* took

13   issue with what it believed to be the "subjective" rationale of jail officials of what was in the detainees'

14   minds in order to segregate the inmates, without any specific reasons or objective basis to do so. 755 F.

15   Supp. at 1164. In the present case, ACSO has provided specific reasons (safety, allegations made

16   public, contraband discovered) and also used objective reasoning based on past experiences to determine

17   the classification of Defendant. *See* Brodie Supp. Decl. ¶¶ 5-7; *see also* Brodie Decl. ¶¶ 7-11, 35. It

18   should also be noted that in *Gotti* no claim was made that administrative remedies were required to be

19   exhausted as a pre-condition to the Court's jurisdiction. Here, ACSO insists that Defendant must

20   exhaust his administrative remedies. *See* Application at 7-8. Thus, aside from not being binding on the

21   Court, *Gotti* is also unpersuasive.[6]

22   _____

23   however, ACSO requests an opportunity to submit supplemental briefing to address that specific issue.

     In *Wolfish*, the Supreme Court ultimately held that: (1) the confinement of two inmates in individual rooms originally
24   intended for single occupancy did not deny due process; (2) a rule prohibiting inmates from receiving hardcover books that
     were not mailed directly from publishers, book clubs, or bookstores did not violate the First Amendment; (3) a prohibition
25   against inmates' receipt of packages of food and personal items from outside the institution did not deny due process; (4) a
     requirement that pretrial detainees remain outside their rooms during routine "shake-down" inspections by prison officials
26   did not violate the Fourth Amendment, and (5) the practice of conducting visual body-cavity searches of inmates following
     contact visits did not violate the Fourth Amendment. In *Mitchell*, the Ninth Circuit determined, among other items not
27   relevant here, that a jail regulation on cell searches did not create protected interest in inmate being present during search of
     legal papers, since all of his possessions were already subject to inspection at any time and for any or no reason. 75 F.3d at
28   522-23.

     [6] The *Gotti* decision is not cited to nor relied on by any Ninth Circuit authority.

Subsequent decisions in the Eastern District of New York have called into doubt the holding in *Gotti*. For instance, in *United States v. Khan*, 540 F.Supp.2d 344, 349-50, 352-53 (E.D.N.Y. 2007), where an inmate sought release from administrative segregation, the court determined the inmate needed to exhaust his administrative remedies prior to seeking judicial intervention, and where the nature of the charges were not the sole basis to place a pretrial detainee in administrative segregation, the classification of the inmate was not a punishment under *Wolfish*. *See also United States v. McTier*, 2006 WL 2707622, at *4 (E.D.N.Y. July 20, 2006) (distinguishing *Gotti* and noting that a pretrial detainee should exhaust administrative remedies prior to challenging his classification at a jail); *United States v. Arnaout*, 2002 WL 31744654, at *2 (N.D.Ill. Dec. 6, 2002) (not following *Gotti*, and holding that absent any evidence that the conditions of confinement interfere with his right to counsel, defendant could only challenge his placement in administrative detention through a civil action).

In the Ninth Circuit[7], placement in a type of administrative segregation, without more, does not constitute cruel and unusual punishment in violation of the Eighth Amendment. *See Anderson v. County of Kern*, 45 F.3d 1310, 1315-16 (9th Cir.1995); *see also May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (mere placement in administrative segregation not enough to state a claim). Furthermore, the hardship associated with administrative segregation, such as the loss of recreational and rehabilitative programs or confinement to one's cell for a lengthy period of time, is also not so severe as to violate the due process clause. *See Toussaint v. McCarthy*, 801 F.2d 1080, 1091-92 (9th Cir.1986) (*abrogated in part*). Courts should also exercise restraint when reviewing management decisions taken by jail administrators regarding the safety of inmates. *See Griffin v. Gomez*, 741 F.3d 10, 20-21 (9th Cir. 2014) (determining that federal court orders improperly impeded the state's ability to run and manage prisons regarding the classification on an inmate). As for exhausting administrative remedies, courts should not read "futility or other exceptions" into interpreting § 1997e(a). *See Booth v. Churner*, 532 U.S. 731,

---

[7] Defendant also cites to the Ninth Circuit cases of *Pierce v. County of Orange*, 526 F.3d 1190 (9th Cir. 2008) and *Way v. County of Ventura*, 445 F.3d 1157 (9th Cir. 2006) in asserting that the Court should not defer to ACSO officials regarding the security and safety of inmates at the Jail. *See* Response at 21-22. In addition to addressing Americans with Disability Act issues (not present here), *Pierce* found that when an inmate in administrative segregation only received 90 minutes of exercise per week, it violated his due process rights. 526 F.3d at 1211-12. The Court also noted the time should be five (5) hours at a minimum. *Id.* at 1212. Here, as noted in the Brodie Declaration, Defendant receives five (5) hours of time outside of his cell per week. *See* Brodie Decl. ¶ 22; Brodie Supp. Decl. ¶¶ 18-22. *Way* was a § 1983 civil action regarding a strip search, and in no way discussed administrative segregation or the grievance process.

1    741, n.6 (2001).

2       In sum, the decision by ACSO to classify Defendant in Administrative Isolation for his safety

3 after his charges were made public; based on the expertise and experience of ACSO; and based on the

4 contraband found within his cell, did not deprive Defendant of any rights.  In addition, Defendant must

5 exhaust his administrative remedies prior to challenging his classification status with the Court.

6                          **CONCLUSION**

7       For the foregoing reasons, ACSO requests that the Court find that allegations made in

8 Defendant's papers as unfounded.  And, ACSO further requests that the Court instruct Defendant to

9 utilize the grievance process at the Jail as set forth above.[8]

10 Respectfully submitted,

11 DATED:       February 11, 2016       OFFICE OF THE COUNTY COUNSEL
                                            COUNTY OF ALAMEDA

12

13                                          By     /s/ L. David Nefouse

14                                          L. DAVID NEFOUSE
                                           Deputy County Counsel

15                                            1221 Oak Street, Suite 450
                                           Oakland, CA 94612

16                                            Tel: (510) 272-6700
                                           Fax: (510) 272-5020

17                                            E-mail: david.nefouse@acgov.org
                                           *Attorneys for Nonparty Alameda County Sheriff's Office*

18

19

20

21

22

23

24

25

26

27

28

---

[8] To the extent the Court wishes to discuss matters in more detail that concern the health, classification, and/or related confidential materials of Defendant, or to the extent the Court wishes to discuss Jail security procedures in more detail, ACSO requests that the Court clear the Courtroom of all non-legal and non-Court administrative individuals.

REPLY ISO APPLICATION OF ACSO RE THE GLENN DYER JAIL
CR 15-CR-00582-WHO   11

## CERTIFICATE OF SERVICE

I, Rakia Grant-Smith, declare:

I am employed in the County of Alameda, over the age of 18 years and not a party to this action. My business address is 1221 Oak Street, Suite 450, Oakland, CA 94612.

On this day, I served true and correct copies of the following documents:

**REPLY BRIEF IN SUPPORT OF THE OF APPLICATION OF NONPARTY ALAMEDA COUNTY SHERIFF'S OFFICE REGARDING QUESTIONS CONCERNING THE GLENN E. DYER JAIL AND THE CONFINEMENT OF DEFENDANT ADAM SHAFI**

BY CM/ECF NOTICE OF ELECTRONIC FILING:

I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on February 11, 2016, at Oakland, California.

/s/ Rakia Grant-Smith

RAKIA GRANT-SMITH
Civil Legal Secretary

1

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF CALIFORNIA

3   SAN FRANCISCO DIVISION

4

5   UNITED STATES                                    )   CASE NO. 15-CR-00582-WHO-1
                                                     )
6            Plaintiff,                               )
                                                     )
7   v.                                               )   SUPPLEMENTAL DECLARATION OF
                                                     )   LIEUTENANT DAN BRODIE, ALAMEDA
8   ADAM SHAFI                                        )   COUNTY SHERIFF'S OFFICE
                                                     )
9            Defendant.                               )
                                                     )
10  _____             )

11       I, **Dan Brodie**, declare as follows:

12  1.  I am an Administrative Lieutenant, employed by the Alameda County Sheriff's Office ("ACSO"), and stationed at

13      the Glenn E. Dyer Jail (the "Jail"), in Oakland, California.

14  2.  I have worked for the ACSO for 16 years.  I have held the position of Lieutenant at the Jail for four (4) months.

15  3.  My duties and responsibilities at the Jail include the oversight of operations and support services facilitated at the

16      Jail.  Since I have been employed at the Jail at my current position, I have come to understand the intricate

17      operations required to manage the Administrative Isolation housing unit in compliance with federal and state

18      mandates while maintaining the safety and security of staff and inmates.

19  4.  As noted in my previous declaration, Mr. Adam Shafi is being held under Federal charges related to terrorism and is

20      currently housed in a cell, by himself, in what is known as "Administrative Isolation," for his safety, after his case

21      became public in the media.  This was also supported by the finding of contraband in his cell, as I noted in my

22      previous declaration.   Mr. Shafi was not placed in Administrative Isolation as a punishment.

23  5.  The Sergeant of Classification noted Mr. Shafi was reclassified to Administrative Isolation due to his charges,

24      Providing Material Support or Resources to Designated Foreign Terrorist Organizations - 18 USC 2339 B, going

25      public on various media sites including NBC Bay Area, which posted an 18 page download to the criminal

26      complaint outlining numerous details online. In addition, as mentioned in my previous declaration, a random

27      shakedown was conducted which included Mr. Shafi's cell when he was living in "General Population" where a

28      deputy discovered a notepad containing writings and drawings, which to the deputy, based on this deputy's training

DECLARATION OF LIEUTENANT DAN BRODIE
15-CR-00582-WHO-1

1   and experience, appeared to support terrorism.  Fear for his safety was of the utmost concern, as well as the safety of

2   the facility, and Mr. Shafi was reclassified to Administrative Isolation.

3   6.   Another inmate is currently in custody for similar charges and is also classified in Administrative Isolation for his

4   safety, based on the exposure associated with that particular case as well.

5   7.   Based on Sheriff's Office research and analysis of similar cases involving inmates like Mr. Shafi awaiting trial, as

6   well as Sheriff's experience and expertise in operating and managing the Jail, and consistent with Sheriff's Office

7   policy and procedures, the Sheriff's Office sincerely believes there is a grave risk to the safety of Mr. Shafi if he is

8   classified in mainline custody.

9   8.   Per policy inmates placed in "Administrative Isolation" will have their status reviewed every seven (7) days for the

10   first two (2) months, and at least every thirty (30) days thereafter.  This review entails a member of the classification

11   unit speaking with Mr. Shafi to ascertain how he is doing; reviewing any grievances the inmate may have filed;

12   review of any disciplinary reports; briefings by staff who interact with and oversee the inmate; and if he has any

13   concerns and a review of Mr. Shafi's classification file to determine if Mr. Shafi is eligible to be reclassified to a

14   different housing unit or status.

15   9.   In my previous declaration I summarized his reclassification reviews up to January 25, 2016.

16   10.   Since that declaration classification staff members have met with Mr. Shafi on two (2) more occasions for a

17   reclassification review.

18   11.   On February 1, 2016, classification staff met with Mr. Shafi who told staff he did not have any questions, comments,

19   or concerns.  Housing floor staff had nothing to report and classification determined Mr. Shafi would remain in

20   Administrative Isolation for his safety.

21   12.   The following Monday, February 8, 2016, classification staff met with Mr. Shafi again for a reclassification review.

22   Mr. Shafi was inside his cell at this time and classification deputies noted Mr. Shafi said he was good and did not

23   have any questions or concerns.  Housing floor staff did not note any issues, and classification determined Mr. Shafi

24   would remain in Administrative Isolation for his safety, due to the high profile case, which would result in other

25   inmates discovering the charges against Mr. Shafi.

26   13.   Per Policy and Procedure, inmates in Administrative Isolation inmates will continue to have access to programs and

27   programs and services including, but not limited to:  educational services, commissary, library services, social

28   services, counseling services, religious guidance, and recreational programs, as long as access to these programs do

DECLARATION OF LIEUTENANT DAN BRODIE
15-CR-00582-WHO-1

2

1    not pose a threat to the health, safety, security of staff or to the facility. Mr. Shafi is eligible for all of these services.

2    14. Per Policy and Procedure Administrative Isolation inmates shall have access to both personal legal materials and

3    available legal reference materials.

4    15. Per staff in inmate services, Mr. Shafi has filed no Legal Research Requests or Legal Copy requests with inmate

5    services. Classification staff note they are not aware of any restrictions or access issues regarding Mr. Shafi's legal

6    materials. For the record, no other documents have been seized from Mr. Shafi. To the extent he has other legal

7    materials at the Jail, he may continue to review those per Jail Policy and Procedure.

8    16. Correspondence and visiting privileges are also continued while in Administrative Isolation.

9    17. Administrative Isolation inmates continue to have visitation with the public and visitation with legal counsel.

10    18. Contrary to comments on page 5 of Mr. Shafi's Motion For Reconsideration Of Detention Order, visits are not

11    counted as "time outside cell" and do not diminish from the one hour/five days per week time outside the cell as

12    described in my previous declaration.

13    19. I checked the logs of time spent outside his cell for Mr. Shafi for the last two weeks. During the week of January 24

14    to January 30, Mr. Shafi received five (5) hours outside his cell consisting of four (4) hours within the housing pod

15    area and 1 (one) on the recreation yard.

16    20. During the week of January 31 to February 7 Mr. Shafi received 6 (six) hours outside his cell, consisting of five (5)

17    hours within the housing pod and one (1) on the recreation yard.

18    21. As of the writing of this declaration I confirmed Mr. Shafi has received three (3) hours of time outside his cell so far

19    this week on Monday, Tuesday, and Wednesday, and is scheduled to come out for another hour today, Thursday.

20    22. I have confirmed with housing floor staff at the Jail that Mr. Shafi will continue to receive all of his five (5) weekly

21    hours of time outside of his cell.

22    23. Inmates in custody at our facilities have access to mental health services through Criminal Justice Mental Health

23    (CJMH), through the Alameda County Behavioral Health Services Agency. CJMH employees are not acting as

24    "agents" of the Sheriff's Office nor are they employees of the Sheriff's Office or the Jail. They are committed to the

25    mental health and well-being of all inmates in custody.

26    24. As of the writing of this Declaration I am not aware of any grievances, consistent with the Prison Litigation Reform

27    Act ("PLRA"), filed by Mr. Shafi through the established grievance procedure at the Jail, especially to note he has

28    not attempted to grieve his housing status or issues with access to legal materials.

DECLARATION OF LIEUTENANT DAN BRODIE
15-CR-00582-WHO-1

25. The Sheriff's Office has a clear Policy and Procedure for inmate grievances, detailing the submission process, tracking numbers, a timeline for responding, appeals process, and other procedures.

26. Mr. Shafi has also not filed any "Message Requests" to classification with regard to his status.  Nor have his attorneys requested information about the grievance process.

27. Scott Dudek used to work with the Alameda County Sheriff's Office but retired in 2011 as a Sergeant.  At the time of his retirement he was not assigned to the jails. Per Human Resources he was last assigned to the Detentions and Corrections division, of which the Jail is a unit within, in 1993. Thus, it has been approximately twenty three (23) years since he was assigned to work in the County jails.

28. Again, the Sheriff's Office welcomes the Court to contact the Jail if it has additional questions, or if the Court wishes to tour the facility.


I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge and belief. Executed this 11th day of February, 2016.

/s/

**Dan Brodie**
**Lieutenant**
**Alameda County Sheriff's Office**

DECLARATION OF LIEUTENANT DAN BRODIE
15-CR-00582-WHO-1

4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES | CASE NO. 15-CR-00582-WHO-1 |
| Plaintiff, | |
| v. | SUPPLEMENTAL DECLARATION OF **JOAN D. CAIRNS, LMFT** |
| ADAM SHAFI | |
| Defendant. | |

I, **JOAN D. CAIRNS** declare as follows:

1. I am the Behavioral Health Care Manager at Criminal Justice Mental Health, ("CJMH") employed by the County of Alameda in its Behavioral Health Care Services division ("BHCS"). The statements in this Declaration are of my own personal knowledge, except for those matters stated on information and belief, which I believe to be true. If called as a witness, I could and would testify competently thereto.

2. I understand that counsel for Defendant Adam Shafi took issue with some of the statements in my January 29, 2016 declaration in this matter. This Supplemental Declaration addresses those issues.

3. First, I would like to reiterate that the purpose of CJMH meetings with inmates such as Adam Shafi is to assess their mental status and substance abuse and mental health history. Our psychiatrists and clinicians assess inmate's emotional reactions to incarceration and the inmate's outlook. They look for indications of suicidal or homicidal thoughts or plans. To the extent they inquire about the reasons for an inmate's incarceration, it is solely for the purpose of assessing the inmate's mental status. CJMH is not concerned with – and does not inquire into – the details of a particular inmate's case.

4. Second, the conversations CJMH staff has with inmates are highly confidential. The content of these conversations and any notes or materials reflecting that content are protected from disclosure in some cases even to the inmate. We do not discuss or disclose the content of our conversations with

1   inmates with law enforcement (including the Sheriff's Office) or prosecutors except where an inmate

2   has made a threat sufficient to warrant a *Tarasoff* warning.  It is because of the highly confidential

3   nature of these communications that CJMH did not provide statements from the psychiatrist or clinician

4   that met with Shafi – absent a court order or consent from Mr. Shafi, neither could share any information

5   relating to their meetings with and assessment of Shafi.

6       5.   Third, I understand that Shafi's counsel expressed concern about the delay in assessing his

7   mental status.  CJMH initiated its assessment once Shafi was placed in administrative segregation.

8   Those assessments will continue monthly until he is removed from administrative segregation.

9       6.   Fourth, CJMH is a separate and distinct County entity from the Alameda County Sheriff's

10   Office.  We contract with the Sheriff's Office to provide mental health services at the jails.

11       7.   Finally, CJMH staff did not interview Mr. Shafi at the request of the federal government or share

12   anything with the federal government.

13       I declare under penalty of perjury under the laws of the state of California that the foregoing is

14   true and correct to the best of my knowledge and belief.

15       Executed this 9 day of February 2016 in San José California.

16

17       /s/ Joan Cairns

18       Joan Cairns, LMFT
         Behavioral Health Care Manager
         Alameda County Behavioral Health Care

19

20

21

22

23

24

25

26

27

28