STEVEN G. KALAR
Federal Public Defender
Northern District of California
GALIA AMRAM
CARMEN A. SMARANDOIU
Assistants Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:  (415) 436-7700
Facsimile:  (415) 436-7706

Counsel for Defendant SHAFI

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 15–582 WHO |
| Plaintiff, | **DEFENDANT'S MOTION TO SUPPRESS, AND FOR A FRANKS HEARING AND DISCLOSURE OF FISA ORDERS, APPLICATIONS, AND RELATED MATERIALS** |
| v. | |
| ADAM  SHAFI, | |
| Defendant. | **Court:**        Courtroom 2, 17th Floor |
| | **Hearing Date:**   October 12, 2017 |
| | **Hearing Time:**   1:30 p.m. |

FISA MOTION
*SHAFI*, CR 15–582 WHO

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 2

BACKGROUND ............................................................................................................................. 3

I.   Case Background ...................................................................................................................... 3

II.  FISA's Framework ................................................................................................................... 5

ARGUMENT .................................................................................................................................. 7

I.   There Was No Probable Cause to Find that Mr. Shafi or Mr. Niazi Were Agents of a Foreign Power ........................................................................................................................... 8

  A.   The FISA Probable Cause Determinations Should Be Reviewed *De Novo* ....................... 8

  B.   There Was No Evidence that Mr. Shafi or Mr. Niazi Acted "for or on Behalf of" a Foreign Power ..................................................................................................................... 9

  C.   There Was No Evidence that Mr. Shafi or Mr. Niazi Knowingly Engaged in Any Prohibited Activities .......................................................................................................... 16

II.  The Required Certifications May Be Deficient ...................................................................... 18

  A.   Collection of "Foreign Intelligence Information" Was Not a "Significant Purpose" of the FISA Surveillance and Searches .................................................................................. 19

  B.   Normal Investigative Techniques Were Sufficient ............................................................ 21

  C.   The Timing of Surveillance or Searches May Have Been Improper ................................. 23

  D.   The Required Minimization Procedures Were Inadequate or Not Followed ................... 23

III. The FISA Applications May Have Included Intentional or Reckless Material Falsehoods or Omissions ........................................................................................................................... 24

IV.  In the Alternative, the Court Should Order Disclosure of the FISA Applications, Orders, and Related Materials ............................................................................................................. 26

  A.   Legal Framework ............................................................................................................... 27

  B.   FISA and the Constitution Require Disclosure ................................................................. 28

V.   FISA's "Significant Purpose" Test Is Unconstitutional ....................................................... 30

CONCLUSION ............................................................................................................................. 34

FISA MOTION
*SHAFI*, CR 15–582 WHO

i

# TABLE OF AUTHORITIES

**Federal Cases**

*Alderman v. United States,*
  394 U.S. 165 (1969) ................................................................... 29, 30

*Berger v. New York,*
  388 U.S. 41 (1967) ......................................................................... 32

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) ....................................................................... 15

*City of L.A. v. Patel,*
  135 S. Ct. 2443 (2015) .................................................................... 31

*Easley v. Cromartie,*
  532 U.S. 234 (2001) ....................................................................... 19

*Foreign Intelligence Surveillance Court,*
  218 F. Supp. 2d 620.......................................................................... 30

*Franks v. Delaware,*
  438 U.S. 154 (1978) ............................................................... 24, 25, 30

*In re All Matters Submitted to Foreign Intelligence Surveillance Court,* 218 F.
Supp. 2d 611, 620 (Foreign Intel. Surv. Ct. 2002) ......................................... 25, 30

*In re Grand Jury Proceedings of the Special April 2002 Grand Jury,*
  347 F.3d 197 (7th Cir. 2003) ................................................................ 8

*In re Kevork,*
  788 F.2d 566, 569(9th Cir. 1986) ........................................................... 2

*In re Sealed Case,*
  310 F.3d 717 ................................................................................ 2

*Joint Anti-Fascist Refugee Committee v. McGrath,*
  341 U.S.123 (1951) ......................................................................... 29

*Grubbs v. Sheakley Grp., Inc.,*
  807 F.3d 785 (6th Cir. 2015) ............................................................ 9, 10

*Hess v. Indiana,*
  414 U.S. 105 (1973) ........................................................................ 15

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) .......................................................................... 15

*Katz v. United States,*
  389 U.S. 347 ............................................................................ 32, 33

*Mannington Mills, Inc. v. Armstrong World Indus.,*
  218 F. Supp. 2d 594 (D. Del. 2002) ......................................................... 25

*Maryland v. Pringle,*
  540 U.S. 366 (2003) ......................................................................... 9

*Mayfield v. United States*,
  504 F. Supp. 2d 1023 (D. Or. 2007) ..................................................... 31, 33, 34

*Montejo v. Louisiana*,
  556 U.S. 778 (2009) ................................................................................. 30

*Scott v. United States*,
  436 U.S. 128 (1978) ................................................................................. 24

*United States v. Abu-Jihaad*,
  630 F.3d 102 (2d Cir. 2010) ................................................................. 9, 21

*United States v. Aziz*,
  No. 15-CR-309, 2017 WL 118253, (M.D. Pa. Jan. 12, 2017) ................. 8, 26, 31

*United States v. Abuhamra*,
  389 F.3d 309 (2d Cir. 2004) ................................................................... 29

*United States v. Ahmed*,
  No. 06–CR–147, 2009 U.S. Dist. LEXIS 120007, at *21–22 (N.D. Ga. Mar. 19,
  2009)................................................................................................... 9

*United States v. Badia*,
  827 F.2d 1458 (11th Cir. 1987) .............................................................. 34

*United States v. Belfield*,
  692 F.2d 141 (D.C. Cir. 1982) ............................................................. 5-6, 27

*United States v. Buck*,
  548 F.2d 871 (9th Cir. 1977) .................................................................. 33

*United States v. Cavanaugh*,
  807 F.3d 787 (2003) ................................................................................. 9

*United States v. Daoud*,
  755 F.3d 479 (7th Cir. 2014) ................................................................... 26

*United States v. DeLeon*,
  979 F.2d 761 (9th Cir. 1992) ..................................................................25

*United States v. Duggan*,
  743 F.2d 59 (2d Cir. 1984) ................................................................... 9, 34

*United States v. Elshiaway*,
  No. 16-CR-0009, 2017 WL 1048210 (D. Md. Mar. 20, 2017) ..................... 6, 24

*United States v. Hassan*,
  742 F.3d 104 (4th Cir. 2014) .................................................................... 8

*United States v. James Daniel Good Real Prop.*,
  510 U.S. 43 (1993) ............................................................................... 28-29

*United States v. Johnson*,
  952 F.2d 565 (1st Cir. 1991) ................................................................... 34

*United States v. Madori*,
  419 F.3d 159 (2d Cir. 2005) .................................................................... 29

*United States v. Pelton*,

FISA MOTION
*SHAFI*, CR 15–582 WHO

835 F.2d 1067 (4th Cir. 1987) ........................................................................ 34

*United States v. Stanert*,
  762 F.2d 775 (9th Cir.) .......................................................... 10-11, 11

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009) ................................................................ 27

*United States v. Tortorello*,
  480 F.2d 764 (2d Cir.) ................................................................ 24

*United States v. Truong Dinh Hung*,
  629 F.2d 908 (4th Cir. 1980) ................................................................ 31

*United States v. U.S. Dist. Court*,
  407 U.S. 297 (1972) (Keith) ................................................................ 32, 33

*Wong Sun v. United States*,
  371 U.S. 471 (1963) ................................................................ 2, 3, 4, 5

**Federal Statutes**
18 U.S.C. § 2339B ................................................................ 5, 15

18 U.S.C. § 2516 ................................................................ 22

18 U.S.C. § 2518 ................................................................ 22

18 U.S.C. § 3103a ................................................................ 22

50 U.S.C. § 25 ................................................................ 26

50 U.S.C. § 29 ................................................................ 26

50 U.S.C. § 1001…….. .. ................................................................ 23, 26

50 U.S.C. § 1801 ................................................................ passim

50 U.S.C. § 1804 ................................................................ passim

50 U.S.C. § 1805 ................................................................ passim

50 U.S.C. § 1806 ................................................................ passim

50 U.S.C. § 1821 ................................................................ 2, 6, 10, 23

50 U.S.C. § 1823(a) ................................................................ passim

50 U.S.C. § 1824 ................................................................ passim

50 U.S.C. § 1825 ................................................................ passim

50 U.S.C. § 1881 ................................................................ 24

50 U.S.C. § 3103a ................................................................ 22

50 U.S.C. § 3103a ................................................................ 22

50 U.S.C. § 6001 ........................................................................................ 14

50 U.S.C. §§ 24-25 .................................................................................... 26

50 U.S.C. §§ 704, 705 .......................................................................... 24, 26

**Other**

Bryan A. Garner, *Black's Law Dictionary* (10th ed. 2014) ........................ 13, 19

Elizabeth B. Bazan, CONG. RESEARCH SERV., RS2201, Intelligence Reform and Terrorism Prevention Act of 2004: "Lone Wolf" Amendment to the Foreign Intelligence Surveillance Act (Dec. 29, 2004) .................................................. 14

*In re Reauthorization Certifications and Related Procedures* (Foreign Intel. Surv. Ct., April 26, 2017)] ........................................................................ 26

Report to Congress on Implementation of Section 1001 of the USA PATRIOT Act ............................................................................................................ 26

DOJ Office of the Inspector General, Report to Congress on Implementation of Section 1001 of the USA PATRIOT Act at 24 (Mar. 8, 2006) .......................... 23

Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S. Rep. No. 94-755 (1976) ........................... 5

Commission on CIA Activities Within the United States, Report to the President (1975) ........................................................................................................ 5

**NOTICE OF MOTION TO SUPPRESS, AND FOR A FRANKS HEARING AND DISCLOSURE OF FISA ORDERS, APPLICATIONS, AND RELATED MATERIALS**

PLEASE TAKE NOTICE that on October 12, 2017 in the courtroom of the Honorable William H. Orrick, Defendant Adam Shafi will move this Court to suppress, and for a Franks hearing and disclosure of FISA orders, applications, and related materials. This motion is based on the First, Fifth and Sixth Amendments of the United States Constitution, all relevant case law and statutory authority, the following memorandum of points and authorities, and such argument as the Court will entertain at the motion hearing.

**INTRODUCTION**

In an application for a Foreign Intelligence Surveillance Act ("FISA") order, the Government must demonstrate, among other things, probable cause to believe that the United States person targeted is an "agent of a foreign power." 50 U.S.C. §§ 1804(a)(3); 1805(a)(2); 1823(a)(3); 1824(a)(2). That means someone knowingly engaging in certain prohibited activities "for or on behalf of" a foreign power or helping or conspiring with another person to do so. *Id*. §§ 1801(b)(2); 1821(1).

At the time the Government made its FISA applications, it alleged that Adam Shafi and Abdul Niazi were agents of the Islamic State of Iraq and the Levant ("ISIL"). Discovery produced to date, however, shows that Mr. Shafi and Mr. Niazi had no connection whatsoever with ISIL or any other Foreign Terrorist Organization. As such, there was no probable cause that they acted for or on behalf of a FTO. The discovery further fails to establish probable cause that Mr. Shafi and Mr. Niazi knowingly engaged in any prohibited activities. *See id*. § 1801(b)(2). As FISA's legislative history makes clear, their mere travel to Turkey in August 2014 does not qualify as an activity in preparation of sabotage or international terrorism, *id*. § 1801(b)(2)(C), as the Government will likely argue. Accordingly, the FISA applications could not have been supported by probable cause to believe that Mr. Shafi or Mr. Niazi were agents of a foreign power.

For these and other reasons discussed below, Mr. Shafi moves to suppress all evidence obtained pursuant to or derived from FISA. *Wong Sun v. United States,* 371 U.S. 471 (1963) (holding that evidence seized during unlawful search cannot constitute proof against victim of search, and exclusionary prohibition extends to indirect as well as to direct products of such invasions.) In the alternative, he moves for a *Franks* hearing and for disclosure of the Government's FISA applications, the resulting orders, and related materials – including information about which evidence is obtained or derived from FISA surveillance/physical search – as required to accurately determine the legality of the FISA surveillance and searches, and as required by Due Process. *Id*. §§ 1806(f)-(g); 1825(g)-(h).

# BACKGROUND

## I. Case Background

Adam Shafi is a 24 year-old United States citizen.  He first came to the Government's attention in August 2014.  Govt's Opp'n to Mtn. to Dismiss [Docket No. 133] at 1:7-10 ("the FBI initiated its investigation of the defendant after he left his family in Cairo, Egypt, on August 16, 2014, and traveled on a one-way ticket to Istanbul, Turkey, which adjoins and is a common entry point into Syria"); Declaration of Galia Amram in Support of Motion to Suppress, and for a *Franks* Hearing and Disclosure of FISA Orders, Applications, and Related Materials ("Amram Decl."), Exhs. A and B. [AS-00693-94 ¶ 15; AS-00728-29 ¶ 15.]  At the time, he and his family were vacationing in Egypt.  *Id*.

The government's version of events is as follows:[1]  On August 17, 2014, Mr. Shafi's father reported his disappearance to the United States Embassy.  *Id*.  He explained that he was "afraid that Adam had been recruited and that it was important to find him quickly to prevent him from doing harm to himself or others at the directions of those who recruited him."  *Id*. [AS-00694 ¶ 16; AS-00729 ¶ 16.]  Mr. Shafi's father "suspected that [he] may have traveled to Syria, Iraq, Gaza, or some other area in the region to defend Muslims."  *Id*.  According to his father, Mr. Shafi "may have been following extreme imams online and . . . some of his high school friends were of the same mindset."  *Id*.  After he left the family, Mr. Shafi send a text message to his younger brother Ramsey saying that he had gone to "protect Muslims."  *Id*. [AS-00694 ¶ 15; AS-00729 ¶ 15.]

On August 18, Mr. Shafi's father notified the Embassy that Mr. Shafi had reunited with his family and they were planning to return to the United States.  *Id*. [AS-00694 ¶ 17; AS-00729 ¶ 17.]

---

[1] This statement of facts is drawn from the criminal complaint (Dkt. No. 1) as well as the affidavits in support of search warrants for the email and cell phone records for Mr. Shafi and Mr. Niazi, attached as Exhibits A and B to the Amram Decl.  Mr. Shafi's recitation of the assertions in those documents is not an admission of their truth. In fact there are a number of material omissions and misstatements that will be addressed in the *Franks* motion filed on August 3, 2017.

FISA MOTION
*SHAFI*, CR 15–582 WHO

On August 19, 2014, Customs and Border Patrol stopped and interviewed Abdul Niazi, a friend of Mr. Shafi's, at the San Francisco International Airport (SFO), upon his return from a trip to Istanbul, Turkey. *Id*. [AS-00694 ¶ 18; AS-00729 ¶ 18.]

On September 4, 2014, Mr. Shafi told FBI Special Agent Sara Dial that he and Mr. Niazi met up in Istanbul. *Id*. [AS-00694-95 ¶ 19; AS-00729-30 ¶ 19.] The purpose of their trip was to see the conditions of Syrian refugees and provide assistance. *Id*. They were in Istanbul for one or two days, then returned to Egypt and California, respectively. *Id*.

On September 22, 2014, the FBI received a call from an unidentified individual who claimed he was a friend of Mr. Niazi's brother Yusef. *Id*. [AS-00695 ¶ 20; AS-00730 ¶ 20.] The individual claimed that Yusef told him that Mr. Niazi "was going, or had just returned from a three day trip overseas to join 'ISIS.'" *Id*.

Several days later, FBI interviewed Mr. Niazi telephonically. He said that he and Mr. Shafi had bought one-way tickets to Turkey "with no 'blueprint' after that," but they decided to "return because Adam 'wasn't feeling it'." *Id*. [AS-00695 ¶ 21; AS-00730 ¶ 21.] Mr. Niazi wanted to go back and "finish what [he] started," clarifying that "he wants to finish his vacation," although he did not have specific plans at the time. *Id*. As of October 27, 2014, Mr. Niazi had a reservation for a trip to Turkey on December 15, 2014. *Id*. [AS-00696 ¶ 23; AS-00731 ¶ 23.]

In October 2014, Mr. Shafi's father contacted the FBI and stated that Mr. Shafi's ticket to Turkey had been bought by his friend Saleem Karim. *Id*. [AS-00695 ¶ 22; AS-00730 ¶ 22.]

On December 2, 2014, Special Agent Dial applied for two search warrants to gain access to information associated with Mr. Shafi's email address and telephone number ("the Google and T-Mobile search warrants"). She also applied for two search warrants to gain access to information associated with Mr. Niazi's email and cell phone number. The affidavits in support of the applications, which were almost identical to one another, alleged that Mr. Shafi and Mr. Niazi "conspired to travel to Turkey for the purpose of providing material support or resources to a foreign terrorist organization, namely by providing themselves to assist ISIL in Syria or Iraq." *Id*. [AS-00693 ¶ 14; AS-00728 ¶ 14.]

On December 6, 2014, an FBI surveillance team observed Mr. Shafi and his brothers involved in what the FBI described as "paramilitary style" training that included "calisthenics, running through the neighborhood and crawling through the mud at a park near their home." Dkt. No. 1 ¶ 25.  In the FBI's astute observation, Mr. Shafi "appeared to take the training more seriously than his younger brothers did."  *Id*.

On December 7, 2014, the unidentified friend of Mr. Niazi's brother Yusef called the FBI again and claimed that Yusef had told him that Mr. Niazi and Mr. Shafi went to Turkey in August "to meet a person" and join ISIL.  *Id*. ¶ 26.  Yusef allegedly described Mr. Niazi as "a 'new type of Muslim' who was an 'extremist' and not a 'traditionalist.'"  *Id*.

On July 3, 2015, Mr. Shafi was arrested after he attempted to board a flight to Turkey on June 30, 2015.  *See id*. ¶¶ 39-48.  Based on recorded telephonic conversations from June 2015, during which he discussed the al-Nusrah Front, Mr. Shafi was charged with one count of attempting to provide material support and resources to a foreign terrorist organization, namely the al-Nusrah Front, in violation of 18 U.S.C. § 2339B(a)(1).  *See* Dkt. Nos. 1, 15.

On June 10, 2016, the Government filed notice that it intends to offer into evidence, or otherwise use in this case, "information obtained or derived from electronic surveillance and physical search conducted pursuant to the Foreign Intelligence Surveillance Act of 1978 ('FISA'), as amended, 50 U.S.C. §§ 1801-1812 and 1821-1829."  Dkt. No. 84.

## II.  FISA's Framework

FISA was enacted to address federal domestic surveillance abuses that came to light during the 1960s and 70s, including surveillance, ostensibly for national security purposes, of Dr. Martin Luther King Jr., Vietnam War protestors, and other groups labeled "subversive." *See, e.g.*, Final Report of the Select Committee to Study Governmental Operations with Respect to Intelligence Activities, S. Rep. No. 94-755 (1976); Commission on CIA Activities Within the United States, Report to the President (1975) (commonly referred to as the "Rockefeller Commission Report").  *See also United States v. Belfield*, 692 F.2d 141, 145 (D.C. Cir. 1982) ("[r]esponding to post- Watergate concerns about the Executive's use of warrantless electronic surveillance, Congress, with the support of the Justice Department, acted

in 1978 to establish a regularized procedure for use in the foreign intelligence and counterintelligence field"). FISA was meant to balance civil liberties against the need for the federal government to gather intelligence on foreign governments and their agents. *See In re Kevork*, 788 F.2d 566, 569 (9th Cir. 1986) (citing S. Rep. No. 95-604(I) (1977)). To maintain this balance, it created the United States Foreign Intelligence Surveillance Court ("FISC"), composed of eleven Federal District Judges, and set in place a procedure by which the executive branch could seek an *ex parte* order from the FISC authorizing the use of physical searches and electronic surveillance within the United States. *See United States v. Elshiaway*, No. 16-CR-0009, 2017 WL 1048210, at *3 (D. Md. Mar. 20, 2017).

To obtain an order from the FISC allowing surveillance or a physical search, the Government must comply with several requirements. As relevant here, and explained in more detail below, it must:

1. Demonstrate probable cause to believe that the target of the search is the "agent of a foreign power", and that the premises to be searched or facility to be surveilled is, or is about to be, owned or used by an agent of a foreign power. 50 U.S.C. §§ 1804(a)(3); 1805(a)(2); 1823(a)(3); 1824(a)(2).

2. Certify, among other things, that "a significant purpose of the [surveillance/search] is to obtain foreign intelligence information" and that "such information cannot reasonably be obtained by normal investigative techniques." *Id.* §§ 1804(a)(6)(B)-(C); 1823(a)(6)(B)-(C).

3. State minimization procedures that the FISC finds are designed to minimize the "acquisition and retention, and prohibit the dissemination, of nonpublically available information concerning unconsenting United States persons." *Id.* §§ 1801(h); 1804(a)(4); 1821(4); 1823(a)(4).

4. Return to the FISC to seek extensions of electronic surveillance or physical searches if the time period set out in the FISC's original order have passed. *Id.* §§ 1805(d); 1824(d).

If the Government intends to use information obtained or derived pursuant to a FISA order in a court case, it must give notice to the "aggrieved person" – that is, the target of the surveillance/search or any other person whose communications or activity were subject to the surveillance/search.[2]  *Id.* §§ 1801(k); 1806(c); 1821(2); 1825(d).  That person can then make a motion to suppress "on the grounds that . . . the information was unlawfully acquired; or . . . that the [surveillance/physical search] was not made in conformity with an order of authorization or approval."  *Id.* §§ 1806(e); 1825(f).  After such a motion is made, the Attorney General may then file an affidavit under oath saying that disclosure or an adversary hearing would harm the national security of the United States.  The district court then reviews "in camera and ex parte the application, order, and such other materials relating to the [surveillance/physical search] as may be necessary to determine whether the [surveillance/physical search] of the aggrieved person was lawfully authorized and conducted."  *Id.* §§ 1806(f); 1825(g).

When making this determination "the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the physical search, or may require the Attorney General to provide to the aggrieved person a summary of such materials, only where such disclosure is necessary to make an accurate determination of the legality of the [surveillance/physical search]."  *Id.*  Even if the court determines that the surveillance or search was lawful, it may order discovery or disclosure "to the extent that [D]ue [P]rocess requires."  *Id.* §§ 1806(g); 1825(h).

### ARGUMENT

Defense counsel cannot address any specific content or details of any of the FISA applications in this case because those applications have not been provided in discovery.  It goes without saying that the lack of access to this basic materials and information presents a significant impediment to any defendant's capacity to challenge FISA surveillance/physical search with much particularity.  Thus, the grounds for relief set forth below represent defense

---

[2] Thus, Mr. Shafi is an aggrieved person whether his conversations were recorded pursuant to a FISA warrant targeting himself or a FISA warrant targeting somebody else, such as Mr. Niazi.

FISA MOTION
*SHAFI*, CR 15–582 WHO

counsel's best estimation of the deficiencies in the FISA electronic surveillance/physical search in this case.[3]

While aggrieved criminal defendants, like Mr. Shafi, can move to suppress FISA-generated evidence, FISA allows the Attorney General to file an affidavit requesting in camera, ex parte review where "disclosure or an adversary hearing would harm the national security of the United States." *Id.* §§ 1806(f); 1825(g).  Here, although the defense has not been notified whether the Attorney General has submitted a § 1806(f) affidavit, it is assumed for purposes of this motion that the government has made such a filing, and the arguments presented below in favor of suppression are made in response to that filing and the government's position that ex parte proceedings are necessary.

**I.     There Was No Probable Cause to Find that Mr. Shafi or Mr. Niazi Were Agents of a Foreign Power**

**A.  The FISA Probable Cause Determinations Should Be Reviewed *De Novo***

Courts have held that a reviewing court is to conduct essentially the same review of the FISA application and associated materials that the FISC conducted upon receiving an application requesting a FISA order.  *See*, *e.g.*, *In re Grand Jury Proceedings of Special April 2002 Grand Jury*, 347 F.3d 197, 204-05 (7th Cir. 2003).

The FISA, however, only states that the Executive Branch's certifications are reviewed for clear error.  *See* 50 U.S.C. §§ 1805(a)(4); 1824(a)(4).  It does not provide the relevant standard of review for FISA probable cause determinations.  The Ninth Circuit has not addressed this issue.  However, the vast majority of courts, including the Fourth Circuit, have concluded that *de novo* review applies.  *See United States v. Hassan*, 742 F.3d 104, 138–39 (4th Cir. 2014); *United States v. Aziz*, No. 15-CR-309, 2017 WL 118253, *8 (M.D. Pa. Jan. 12, 2017) (collecting cases).

By contrast, a minority of courts, comprised almost exclusively by the Second Circuit and the district courts therein, have held that a standard deferential to the FISC is appropriate.

---

[3] As such, Mr. Shafi reserves the right to renew his motion if more information becomes available to him.

*See United States v. Abu-Jihaad*, 630 F.3d 102, 130 (2d Cir. 2010) (holding that "FISA warrant applications are subject to 'minimal scrutiny by the courts'") (quoting *United States v. Duggan*, 743 F.2d 59, 77 (2d Cir. 1984)); *United States v. Ahmed*, No. 06–CR–147, 2009 U.S. Dist. LEXIS 120007, at *21–22 (N.D. Ga. Mar. 19, 2009).  The Second Circuit's decision in *Abu-Jihaad*, however, appears to be based on a misreading of *Duggan*, where the court observed that FISA *certifications* are reviewed – both by the FISC and district courts – with 'minimal scrutiny.'" *Aziz*, 2017 WL 118253, *8 n. 7 (emphasis in original).

The Court should hold that *de novo* is the appropriate standard of review for FISA probable cause determinations.  As the *Aziz* court cogently observed, FISA's "statutory scheme requires the defendant and his counsel to place their trust singularly in the reviewing court.  If the Fourth Amendment is to retain meaning under such circumstances, it demands – at minimum – *de novo* review."  *Id.*  Accordingly, the Court should determine independently whether the FISA applications here were adequately supported by probable cause.

### B. There Was No Evidence that Mr. Shafi or Mr. Niazi Acted "for or on Behalf of" a Foreign Power

Before authorizing FISA surveillance/physical search, the FISC must find, inter alia, probable cause to believe that the target of the electronic surveillance/physical search is "a foreign power or an agent of a foreign power."  50 U.S.C. §§ 1805(a)(2)(A); 1824(a)(2).  It also requires probable cause to believe that the premises to be searched or facility to be surveilled is, or is about to be, owned or used by a foreign power or an agent of a foreign power.  *Id.*

The Supreme Court has reiterated the long-standing rule that criminal probable cause requires "a reasonable ground for belief of guilt," and that "the belief of guilt must be particularized with respect to the person to be searched or seized."  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  Under FISA, though, unlike a traditional warrant, the probable cause standard is directed not at the target's alleged commission of a crime, but at the target's alleged status as "a foreign power or an agent of a foreign power."  *See United States v. Cavanaugh*, 807 F.3d 787, 789-90 (9th Cir. 1987).

"Foreign power" is defined to include foreign governments, organizations or entities controlled by foreign governments, or groups engaged in certain activities. *Id.* §§ 1801(a); 1821(1). ISIL is a foreign power; Mr. Shafi and Mr. Niazi are clearly not.

Nor are they agents of a foreign power. That term is defined in § 1801(b). For U.S. citizens such as Mr. Shafi and Mr. Niazi to be deemed agents of a foreign power, they must knowingly engage in certain prohibited activities "for or on behalf of" a foreign power, or must have knowingly aided, abetted, or conspired with someone to engage in such prohibited activities "for or on behalf of" a foreign power. *Id*. § 1801(b)(2).

It seems likely that the FISC authorized the FISA electronic surveillance/physical search in this case sometime between August 17, 2014 (when Mr. Shafi reported his son's disappearance) and December 2, 2014 (the date the initial criminal process search warrants were sought.[4] *See* Amram Decl., Exhs. A, B (warrants for Mr. Shafi's email and cell phone records held by Google and T-Mobile, respectively). It also seems likely that the Government proffered the information in support of these search warrant applications in support of the FISA surveillance applications as well. Depending on the timing of the applications, the Government may have also proffered additional information, not included in the search warrant applications but referenced in the criminal complaint, such as evidence derived from the FBI surveillance of Mr. Shafi on December 6, 2014 and the December 7, 2014 call from the unidentified friend of Mr. Niazi's brother Yusef to the FBI.

Needless to say, the Government could not have proffered – and the Court cannot consider – any evidence that the Government obtained *pursuant to* the FISA surveillance/physical search or any other information it obtained *after* it submitted the FISA applications. *Cf. United States v. Stanert*, 762 F.2d 775, 778, *amended on other grounds*, 769 F.2d 1410 (9th Cir. 1985) ("In reviewing the validity of a search warrant, a court is limited to the information and circumstances contained within the four corners of the underlying

---

[4] In any event, it is Mr. Shafi's contention that *at all times* before the filing of the criminal complaint on July 6, 2015, the evidence failed to establish probable cause that he was an agent of a foreign power – either ISIL or the al-Nusrah Front – because he had *no connections whatsoever* with either organization and did not engage in any of the specified prohibited activities for or on behalf of either organization.

FISA MOTION
*SHAFI*, CR 15–582 WHO

affidavit."). Similarly, the Court cannot consider any evidence that the Government did not actually include in its FISA application, even though it was within the Government's knowledge at the time. *Id.*

Mr. Shafi respectfully submits that the information the government proffered in support of its FISA applications fails to establish probable cause that he or Mr. Niazi were agents of a foreign power, *i.e.* ISIL.[5]  Rather, that information establishes only that Mr. Shafi and Mr. Niazi traveled to Turkey in August 2014, but neither acted "for or on behalf" of ISIL.  In fact, the two young men had no connections with ISIL whatsoever: they were not in contact with any ISIL operatives or affiliates either before or after their trip to Turkey; they had not prearranged to meet with any ISIL operatives or affiliates in Turkey or elsewhere and actually lacked any information regarding such individuals; they had not contributed or attempted to contribute money, information, or any other material support to ISIL; and they had not pledged allegiance to ISIL.[6]

The Government may argue, relying on Mr. Shafi's father's statements to the U.S. Embassy in Cairo and the statements of the unidentified friend of Mr. Niazi's brother Yusef, that the evidence established probable cause that Mr. Shafi had been recruited by ISIL and traveled to Turkey with the intent of meeting with an ISIL operative or affiliate and joining ISIL operations.  That would be an inaccurate portrayal of the evidence.

As noted above, on August 17, 2014, Mr. Shafi's father told the U.S. Embassy in Cairo that "he was afraid that Adam had been recruited and that it was important to find him quickly to prevent him from doing harm to himself or others at the direction of those who recruited him.  Adam's Father suspected that Adam may have traveled to Syria, Iraq, Gaza, or some other area in the region to defend Muslims."  Amram Decl., Exhs. A, B [AS-00694 ¶ 16, AS-

---

[5] As noted *supra*, at the time the government applied for the search warrants and the FISA warrants in December 2014, it claimed that Mr. Shafi attempted to provide material support to ISIL. *See* Amram Decl., Exhs. A, B.

[6] Mr. Shafi does not argue that unilaterally pledging allegiance to ISIL (not as part of an ISIL-sponsored ceremony) would make one an agent of ISIL for purposes of FISA.  He only wishes to emphasize the utter lack of connection between himself and Mr. Niazi and ISIL.

FISA MOTION
*SHAFI*, CR 15–582 WHO

00729 ¶ 16].  After Mr. Shafi left the family, his younger brother Ramsey allegedly received a text from him that said he had gone to "protect Muslims."  *Id.* [AS-00728 ¶ 15; AS-00694 ¶ 15].

Mr. Shafi's father's speculation that he had been "recruited" does not establish probable cause that he was an agent of ISIL.  At most, it establishes probable cause that Mr. Shafi had become radicalized – that is, had adopted a radical Muslim ideology.  Indeed, Mr. Shafi's father expressed concern that Mr. Shafi "was always grieving about what is happening to Muslims," "may have been following extreme imams online," and also had "high school friends [who] were of the same mindset."  *Id.* [AS-00694 ¶¶ 15, 16; AS-00729 ¶¶ 15, 16].  But adopting a radical ideology, even one espoused by a terrorist organization, does not make one into an agent *absent any connection whatsoever* with that organization.  That remains so even when one is moved into action by that ideology, such as Mr. Shafi's travel to Turkey out of an alleged desire to "protect Muslims."[7]

The Government may argue that Mr. Shafi and Mr. Niazi did have ISIL connections because the unidentified friend of Mr. Niazi's brother Yusef claimed that, according to Yusef, Mr. Niazi and Mr. Shafi went to Turkey "to meet a person" and join ISIL.  Dkt. No. 1 ¶ 26.  There are obvious reliability issues with this claim: it is vague, based on multiple levels of hearsay, and lacks corroboration despite the fact that Mr. Shafi was subject to intense surveillance, electronic and physical.  But even assuming that this person existed, it would improper for the Court to speculate that he was an ISIL operative or affiliate absent  any information whatsoever about him: no name or other identifying information, no information about his background or occupation, no information about the reason for and purpose of the meeting.  Speculation about a person whose very existence is doubtful cannot count as the requisite connection necessary to deem one an agent of a foreign power. [8]

---

[7] Moreover, the government did not accurately portray Mr. Shafi's statements, as will be discussed in the *Franks* motion.

[8] Moreover, the government also did not accurately portray the evidence concerning this unidentified individual, as will be discussed in the *Franks* motion.

FISA MOTION
*SHAFI*, CR 15–582 WHO

Even if Mr. Shafi and Mr. Niazi traveled to Turkey with the goal to eventually go to Syria or other country in the region and join ISIL, as the unidentified caller claimed, their *unilateral* desire to do so does not make them agents of ISIL – an organization with which they had no connection whatsoever, for which they never did anything, and which never benefited from any of their actions.  This is clear from the plain meaning of the phrases "agent" and "for or on behalf of", both of which suggest, at the very minimum, a significant enough relationship to allow the inference that the agent's actions may be imputed to the principal.  *See* Bryan A. Garner, *Black's Law Dictionary* (10th ed. 2014) (defining "agent," as relevant here, as "[s]omeone who is authorized to act for or in place of another; a representative <a professional athlete's agent>"); *id*. ("*on behalf of* means 'in the name of, on the part of, as the agent or representative of.'").  It is also clear from the history of FISA.

Congress clearly envisioned that, in order for a U.S. person to be found an agent of a foreign power, the person must have, *at the very least*, a non-insignificant connection with that foreign power.  The Senate Judiciary Committee and Senate Intelligence Committee emphasized that the relationship involve a "substantial connection with the foreign power for whom [the agent] is working," raising to the level of a "principal-agent relationship under which the alleged agent has undertaken to provide services for his foreign principal."  *See* S. Rep. 95-701(1978), 1978 U.S.C.C.A.N. 3973, 3996 ("[A]ny person targeted for surveillance under [§ 1801(b)(2)(C)][9] must be shown to have a *knowing and substantial connection with the foreign power for whom he is working*.  In the case of terrorism, it is anticipated that in most cases this connection will be shown to exist with a foreign-based terrorist group.  The person must be *clearly* and knowingly acting for or on behalf of the foreign power itself.") (emphasis added); *id*. at 3993 (§ 1801(b)(2)(B) "allows surveillance of any person, including a U.S. person, who pursuant to the direction of an intelligence service or network of a foreign power knowingly engages in any other clandestine intelligence activities for or on behalf of such foreign power, which activities involve or are about to involve a violation of the criminal

---

[9] For ease of reference, Mr. Shafi uses the current citations for FISA, and not the citations for the version enacted in 1978.

FISA MOTION
*SHAFI*, CR 15–582 WHO

statutes of the united states.  Under this standard the person must not only have *a knowing and substantial connection with the foreign power*, but he also must be acting pursuant to the direction of a foreign intelligence service or network.") (emphasis added); S. Rep. 95-604(I) (§ 1801(b)(2)(C) "allows surveillance of any person, including a United States citizen or permanent resident alien, who is knowingly engaged in clandestine intelligence activities for or on behalf of a foreign power, which activities involve or will involve a violation of the criminal statutes of the United States.  Under this standard the person to be surveilled must be shown to have a *knowing and substantial connection with the foreign power for whom he is working. There must be a principal-agent relationship under which the alleged agent has undertaken to provide services for his foreign principal*.") (emphasis added).  The House of Representatives Intelligence Committee did not quantify the connection, but nonetheless emphasized the need for a "knowing connection" significant enough to amount to a working relationship with the foreign power.  H.R. Rep. 95-1283 (1978), at 44 ("[A]ny person targeted for surveillance under [§ 1801(b)(2)(C)] must be shown to have a *knowing connection with the 'foreign power' for whom he is working*.  In the case of terrorism, it is anticipated that in most cases this connection will be shown to exist with a foreign-based terrorist group.").

In other words, Congress did *not* envision that a U.S. person be deemed an agent of a foreign power based merely on a minimal connection with that foreign power.  It also did *not* envision that a U.S. person be deemed an agent of a foreign power absent any connection whatsoever with that foreign power, based merely on the U.S. person's *unilateral* actions, even if inspired by or intended to benefit that foreign power.

The FISA's evolution confirms this understanding.  In 2004, the FISA was broadened by Section 6001 of the Intelligence Reform and Terrorism Prevention Act, Pub. L. 108-458. That Act added a "lone wolf" provision to FISA, expanding the definition of "agent of a foreign power" to include *non*-U.S. persons who engaged in or prepared for acts of international terrorism, even if acting *without* connection to any terrorist organization.  50 U.S.C. § 1801(b)(1)(C); *see also* Elizabeth B. Bazan, CONG. RESEARCH SERV., RS2201, Intelligence Reform and Terrorism Prevention Act of 2004: "Lone Wolf" Amendment to the

Foreign Intelligence Surveillance Act (Dec. 29, 2004), *available at*

https://fas.org/irp/crs/RS22011.pdf ("An applicant for a FISA court order using this definition

of 'agent of a foreign power' need not provide facts and circumstances justifying a belief that

the target of the electronic surveillance or physical search is connected to a foreign nation,

foreign group, or international terrorist organization.  Nor does the Foreign Intelligence

Surveillance Court (FISC), in granting such an application, have to find probable cause, based

on the facts submitted by the applicant, to believe that such a connection to a foreign nation,

foreign group, or international terrorist group exists in order to find probable cause to believe

that the target of the electronic surveillance or physical search is a foreign power or an agent of

a foreign power.")  But – consistent with the legislative history discussed above -- FISA does

not and never has encompassed a "lone wolf" U.S. person provision.  Because Mr. Shafi and

Mr. Naizi are both U.S. citizens who had no connection whatsoever with ISIL, their mere

alleged desire to join ISIL does not support probable cause to believe that they were agents of a

foreign power.

Finally, any other conclusion would have serious First Amendment implications under

the facts of the case.  Absent any actual connection with ISIL operatives or affiliates, the only

evidence presumably linking Mr. Shafi to ISIL is his alleged "following [of] extreme imams

online," his belief that Muslims are in danger and need protection, and sharing his views with a

similarly-minded high school friend.  FISA, however, explicitly states that a U.S. citizen may

not be deemed an agent of a foreign power on the basis of activities protected by the First

Amendment.  50 U.S.C. §§ 1805(a)(2)(A); 1824(a)(2)(A).  Mr. Shafi's interests may be

disturbing, but his activities are protected speech and expression.  *See Holder v. Humanitarian

Law Project*, 561 U.S. 1, 25 (2010) (noting that plaintiffs challenging 18 U.S.C. § 2339B – the

material support for terrorism statute that Mr. Shafi is charged with violating – "may say

anything they wish on any topic" and "may speak and write freely about [designated terrorist

organizations].").[10]

---

[10]  Relatedly, even speech advocating violence could not form, by itself, the basis for a FISA warrant.  "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such

In conclusion, given the lack of any connection whatsoever between Mr. Shafi or Mr. Niazi and ISIL as well as the First Amendment concerns discussed above, the Court should hold that the FISA applications failed to establish that Mr. Shafi or Mr. Niazi were agents of ISIL.

**C.  There Was No Evidence that Mr. Shafi or Mr. Niazi Knowingly Engaged in Any Prohibited Activities**

Probable cause that a U.S. person was acting for or on behalf of a foreign power does not suffice to establish probable cause that a U.S. person was an agent of a foreign power.  50 U.S.C. § 1801(b)(2).  In addition, the FISA applications must establish probable cause that such a person knowingly engaged in one or more prohibited activities: "clandestine intelligence gathering," § 1801(b)(2)(A); other clandestine intelligence activities, if done "pursuant to the direction of an intelligence service or network of a foreign power," § 1801(b)(2)(B); "sabotage or international terrorism, or activities that are in preparation therefor," § 1801(b)(2)(C); entering the United States under a false or fraudulent identity or, while in the United States, assuming a false or fraudulent identity, § 1801(b)(2)(D); and aiding or abetting, or conspiring with another person to engage in the activities described above, § 1801(b)(2)(E).

Under the facts of the case, Mr. Shafi anticipates that the Government may argue that there was probable cause to believe that he and Mr. Niazi engaged in activities in preparation of sabotage or international terrorism, or aided or abetted, or conspired to engage in such activities.  The Court should reject the argument.  All the evidence available to the FISC established was that Mr. Shafi and Mr. Niazi traveled to Turkey.[11]  Even if Turkey was a transit

---

advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969); *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (The First Amendment protects "advocacy of illegal action at some indefinite future time").  The legislative history of FISA also makes clear that the statute was not intended to allow searches and surveillance based only on "pure advocacy of the commission of terrorist acts."  S. Rep. No. 95-701 at 28.  Such advocacy is protected by the First Amendment and "would not, in and of itself, be sufficient to establish probable cause that an individual may be preparing for the commission of such acts."  *Id.*

[11] The Government may also argue that, prior to that travel, Mr. Niazi had researched "entry points" between Turkey and Syria.  *See* Docket No. 1 ¶ 23.  Given that the Government applied for a search warrant for Mr. Niazi's email records on December 2, 2014, it is highly unlikely

FISA MOTION
*SHAFI*, CR 15–582 WHO

country in their inchoate plan to eventually go to Syria or another country and join ISIL, their travel to Turkey was not in preparation of sabotage or international terrorism in the meaning of FISA. That is because, absent any connection whatsoever to ISIL, their act of traveling to Turkey was too many steps removed and too remote from whatever hypothetical acts of sabotage or international terrorism Mr. Shafi or Mr. Niazi might have committed had they followed through on their alleged plan to join ISIL.

Indeed, FISA's legislative history makes clear that, while the term "preparation" does not require evidence of preparation for one specific terrorist act, it only encompasses activities "supportive of acts of serious violence" such as "purchase or surreptitious importation into the United States of explosives, planning for assassinations, or financing of or training for such activities." *See* S. Rep. 95-701, 1978 U.S.C.C.A.N. at 3995-96; H.R. Rep. 95-1283 at 42-43. The term could also "reasonably be interpreted to cover providing the personnel, training, funding, or other means for the commission of acts of terrorism, rather than one particular bombing." *Id.*

Mr. Shafi's and Mr. Niazi's travel to Turkey is unlike any of these activities, all of which are closely connected with the planned acts of terrorism. Rather, it was merely a first step in a series of other steps that they would have had to take to reach ISIL (let alone actually engage in acts of sabotage or international terrorism on behalf of ISIL), the most important of which were actually crossing in Syria and acquiring those connections and means that would have actually allowed them to reach ISIL territory *and* be accepted by ISIL. In short, absent any ISIL connection, Mr. Shafi's and Mr. Niazi's travel to Turkey was too many steps removed from their alleged ultimate goal of joining ISIL to qualify as an activity in preparation of sabotage or international terrorism.

Furthermore, FISA's legislative history explicitly warned that FISA applications not be granted "solely on the basis of information that someone might commit acts of terrorism or sabotage in the distant future." *See* S. Rep. 95-701, 1978 U.S.C.C.A.N. at 3995-96; H.R. Rep.

---

that this information was available to the Government (and, therefore, to the FISC) at the time of its FISA applications. In any event, the evidence does not change Mr. Shafi's argument.

FISA MOTION
*SHAFI*, CR 15–582 WHO

95-1283 at 43.  Rather, "[t]here must be a showing that the person is currently engaged in activities which are in preparation for the commission of such acts."  H.R. Rep. 95-1283 at 43. Here, however, the acts of terrorism or sabotage were purely speculative.  Mr. Shafi's and Mr. Niazi's travel to Turkey, therefore, was also too remote to qualify as an activity in preparation of sabotage or international terrorism.

For the same reasons, even if Mr. Shafi and Mr. Niazi aided and abetted each other and conspired to travel to Turkey with the alleged eventual goal of attempting to join ISIL, it was not a prohibited activity given that they did not aid and abet, or conspire to engage in, an activity in preparation of sabotage or international terrorism.

Nor can the Government argue that Mr. Shafi engaged in activities in preparation of sabotage or international terrorism based on his alleged "paramilitary-style" training in his Fremont neighborhood, which consisted of "calisthenics, running through the neighborhood and crawling through the mud at a park near [his] home."  Dkt. No. 1 ¶ 25.  Mr. Shafi takes issue with the Government's inflammatory and unwarranted characterization of this fitness regimen as "paramilitary-style" training, when similar exercise happens in boot camp fitness programs around the country every single day.  More importantly, such fitness regimen is too unspecific and too attenuated from any potential acts of sabotage or terrorism to count as preparatory activities in the meaning of FISA – especially here, where such acts of sabotage or terrorism were purely speculative.

In short, the Government's evidence failed to demonstrate probable cause that Mr. Shafi or Mr. Niazi were agents of a foreign power as required by § 1801(b)(2).  Accordingly, the Court should hold that the FISA applications were improperly granted and grant Mr. Shafi's motion and order that all evidence obtained or derived pursuant to FISA be suppressed.

**II.  The Required Certifications May Be Deficient**

FISA requires a designated high-level executive branch official to make several certifications in a FISA application.  50 U.S.C. §§ 1804(a)(6); 1823(a)(6).  The Court reviews these certifications for clear error.  *Id*. §§ 1805(a)(4); 1824(a)(4).  Under the "clear error" standard of review, "a reviewing court must ask 'whether, on the entire evidence,' it is 'left

with the definite and firm conviction that a mistake has been committed.'" *Easley v. Cromartie*, 532 U.S. 234, 242 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

### A. Collection of "Foreign Intelligence Information" Was Not a "Significant Purpose" of the FISA Surveillance and Searches

In particular, the executive branch official must certify that he "deems the information sought to be foreign intelligence information" that "a significant purpose of the [search/surveillance] is to obtain foreign intelligence information." 50 U.S.C. §§ 1804(a)(6)(A)-(B); 1823(a)(6)(A)-(B). An application for a physical search must also contain a statement of facts and circumstances justifying the belief that "the premises or property to be searched contains foreign intelligence information." *Id.* § 1823(a)(3)(B).

Foreign intelligence information, as concerning Mr. Shafi or Mr. Niazi, means information that is "*necessary* to . . . the ability of the United States to protect against" a number of threats, including potential attacks of a foreign power, sabotage, international terrorism, or the proliferation of weapons of mass destruction by a foreign power, or clandestine intelligence activity by an intelligence service of a foreign power. *Id.* § 1801(e)(1) (emphasis added). It also includes information "with respect to a foreign power or foreign territory that . . . is *necessary* to" the national defense or security of the United States or the conduct of the foreign affairs of the United States. *Id.* § 1801(e)(2) (emphasis added).[12]

"Necessary" means that information sought is needed to or required for – and not merely desirable or useful to – national security. *See Black's Law Dictionary* (defining "necessary" as "1. That is needed for some purpose or reason; essential <three elements necessary to meet standing requirements>. 2. That must exist or happen and cannot be avoided; inevitable <necessary evil>."). FISA's legislative history confirms that Congress envisioned foreign intelligence information be limited to information that is "both important and required," and not merely "useful or convenient," to national security. *See* S. Rep. 95-701, 1978

---

[12] This is the relevant standard when the target of the FISA surveillance/search is a United States person. A lower standard applies when the evidence concerns a non-United States person. *See id.* § 1801(e)(1).

FISA MOTION
*SHAFI*, CR 15–582 WHO

U.S.C.C.A.N. at 4000 (explaining that "the Committee has dropped the distinction between 'necessary' and 'essential 'in the standard. The difference between the two terms is marginal, and using a single term has advantages of clarity and consistency."); *see id.* ("Where the term 'necessary' is used, the committee intends to require more than a showing that the information would be useful or convenient.  The committee intends to require *a showing that the information is both important and required*.  The use of this standard is intended to mandate that *a significant need be demonstrated* by those seeking the surveillance.") (emphasis added); H.R. Rep. 95-1283 at 47 (same); S. Rep. 95-604(I) ("Most importantly, all five subparagraphs set out standards establishing a nexus between the information sought and the desired end. . . . The use of these standards is intended by the committee to mandate that *a significant degree of need be demonstrated* by those seeking the surveillance.") (emphasis added).

Mr. Shafi respectfully submits that the evidence proffered by the Government does not and cannot demonstrate that a significant purpose for its FISA applications was to obtain foreign intelligence information, i.e. information that was "necessary" or "important and required" to national security.  Because that evidence showed that Mr. Shafi and Mr. Niazi had no connection whatsoever with ISIL or any other terrorist organization, there was absolutely no reason to believe that electronic surveillance of either of them or a physical search of any premises associated with them would yield information important and required to the national security, such as intelligence about ISIL terrorist plans, location of important ISIL operatives, ISIL assets, ISIL strategy, etc.

At the most, the information could have been "useful or convenient," in the sense that it could have provided insight into what motivates young Americans to embrace radical Islam and could contribute indirectly to national security by offering clues about how to counteract radical propaganda.  Such tenuous relationship to national security, however, is not what Congress contemplated.  *See* S. REP. 95-701, 1978 U.S.C.C.A.N. at 4000 ("For example, it is often contended that a counterintelligence officer or intelligence analyst, if not the policy-maker himself, must have every possible bit of information about a subject because it might prove an important piece of the larger picture. In that sense, any information relating to the

specified purposes might be called 'necessary' but such a reading is clearly not intended."); H.R. Rep. 95-1283 at 47 (same); S. Rep. 95-604(I) (same).

Relatedly, because Mr. Shafi and Mr. Niazi had no connection whatsoever with ISIL, it simply cannot be that a "significant purpose" of the FISA surveillance/ physical search sought here was the gathering of foreign intelligence information. The government must "have a measurable foreign intelligence purpose, other than just criminal prosecution of even foreign intelligence crimes" when it seeks a FISA order. *Abu-Jihaad*, 630 F.3d at 128 ("Indeed, the FISA Review Court has ruled that the significant purpose requirement specifically 'excludes from the purpose of gaining foreign intelligence information a sole objective of criminal prosecution,' even for foreign intelligence crimes.") (quoting *In re Sealed Case*, 310 F.3d 717, 735 (Foreign Int. Surv. Ct. Rev. 2002)). Because surveilling Mr. Shafi or Mr. Niazi or searching any premises associated with them could not have yielded any information necessary to national security, necessarily then the surveillance/physical search could not have had as a "significant purpose" the gathering of foreign intelligence information, but merely building a criminal case against the two young men.

Accordingly, because the Government's evidence in support of its FISA application could not have established that it had a measurable foreign intelligence purpose and that the information sought was necessary to national security, the Court should hold that the certifications in the FISA applications were clearly erroneous.

### B. Normal Investigative Techniques Were Sufficient

A designated executive branch official must also certify that the information sought under the FISA application "cannot reasonably be obtained by normal investigative techniques." 50 U.S.C. §§ 1804(a)(6)(C); 1823(a)(6)(C). Here, for example, the Government obtained warrants for Mr. Shafi's and Mr. Niazi's cell phone and email records. The Government's employment of such "normal" techniques shows that the Government could reasonably have obtained the same information without appealing to the highly secretive and controversial FISA application process.

FISA MOTION
*SHAFI*, CR 15–582 WHO

21

More specifically, the Government could have applied for a physical search warrant under 18 U.S.C. § 3103a, a provision of the Patriot Act, which allows for the surreptitious search of one's home *without* contemporaneous notice of the execution of the warrant if the magistrate court finds "reasonable cause to believe that providing immediate notification of the execution of the warrant may have an adverse result." 18 U.S.C. § 3103a(b)(1). Notification of the execution of the warrant may be delayed for up to 30 days or until "a later date certain if the facts of the case justify a longer period of delay," *id*. § 3103a(b)(3), and may be extended repeatedly "for good cause shown," with each additional delay "limited to periods of 90 days or less, unless the facts of the case justify a longer period of delay." *Id*. § 3103a(c).

Similarly, the Government could have applied for a Title III wiretap, which allows for the interception of wire, oral, or electronic communications if there is probable cause that the targeted individual is committing, has committed, or is about to commit certain enumerated offenses (terrorism offenses among them, *see* 18 U.S.C. § 2516) and "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3). Notably, although initially the court may not authorize the interception for more than 30 days, repeated extensions for up to 30 days are permissible if the statutory requirements are met. *See id*. § 2518(3). Finally, the Government may delay providing the target with the required inventory for up to 90 days after interception concluded, which may be postponed "on ex parte showing of good cause . . . ." *See id*. § 2518(8).

In conclusion, the Government could have reasonably obtained the same information it obtained via FISA surveillance/physical search by applying for a Title III wiretap and a § 3103a search warrant. Due to their delayed notification procedures, both mechanisms would have allowed the Government to continue their investigation unimpeded and in secret, just like the FISA warrants did. Instead, it appears that the Government simply avoided applying for them because it could not make the requisite showing of probable cause of criminal activity. Accordingly, the Court should hold that the certification that the evidence sought under FISA

FISA MOTION
*SHAFI*, CR 15–582 WHO

22

could not reasonably have been obtained by normal investigative techniques was clearly erroneous.

### C. The Timing of Surveillance or Searches May Have Been Improper

Under §§ 1805(d) and 1824(d), FISA orders cover surveillance and searches only for a limited period of time.  The Government must return to the FISC for an extension.  *Id.*  Mr. Shafi asks that the Court review all FISA orders to ensure that surveillance and searches were not done out of time, as the DOJ has previously reported non-compliance with FISA date restrictions.  *See* DOJ Office of the Inspector General, Report to Congress on Implementation of Section 1001 of the USA PATRIOT Act at 24 (Mar. 8, 2006), *available at* https://oig.justice.gov/special/s0603/index.htm ("[P]ossible violations generally related to 'over-collection' and 'overruns.' . . . An 'overrun' refers to investigative activity conducted outside the time period of the FISC order or outside the authorized period of investigative activity, which may involve the collection of unauthorized information.  In some instances, agents may have reported to FBI-OGC a possible violation involving both an overrun and an over-collection.").

### D. The Required Minimization Procedures Were Inadequate or Not Followed

Every FISA application must contain a statement of the Government's "proposed minimization procedures." 50 U.S.C. §§ 1804(a)(4); 1823(a)(4).  These procedures are to be, among other things: "reasonably designed in light of the purpose and technique of the particular [surveillance/physical search], to minimize the acquisition and retention, and prohibit the dissemination, of nonpublicly available information concerning unconsenting United States persons consistent with the need of the United States to obtain, produce, and disseminate foreign intelligence information."  *Id.* §§ 1801(h)(1); 1821(4). Mr. Shafi asks the Court to review the minimization procedures set out in the FISA applications to determine their adequacy.

In addition, the Court should review the Classified Declaration of Galia Amram In Support Of June 8, 2017 FISA/FAA/E.O. 12333 Motions ("Classified Amram Decl.") to judge whether the minimization procedures were properly followed. *See id.* §§ 1806(e)(2);

1825(f)(1)(B); *Elshiaway*, 2017 WL 1048210, at *11 ("In order to examine whether the electronic surveillance was lawfully conducted, the reviewing court must determine whether the government followed the relevant minimization procedures as to information acquired pursuant to FISA.  In reviewing the adequacy of minimization efforts, the court must make an 'objective assessment of the [agents'] actions in light of the facts and circumstances confronting [them] at the time.'") (quoting *Scott v. United States*, 436 U.S. 128, 136 (1978)). "In assessing the minimization effort, the court's role is to determine whether 'on the whole, the agents have shown a high regard for the right of privacy and have, done all they reasonably could to avoid unnecessary intrusion.'"  S. Rep. No. 95-604(I) (quoting *United States v. Tortorello*, 480 F.2d 764, 784 (2d Cir. 1973), *cert. denied* 414 U.S. 886 (1973)).

The Government often has not followed FISA minimization procedures.  A FISC opinion made public in redacted form recently reveals that the Government failed to comply with applicable minimization procedures on eighty-five percent of the queries it made during recent months on United States persons targeted under FISA sections 704 and 705(b) (50 U.S.C. §§ 1881c and 1881d(b)).  *In re Reauthorization Certifications and Related Procedures* (Foreign Intel. Surv. Ct., April 26, 2017) at 82.[13]  As the FISC notes, "a non-compliance rate of 85% raises substantial questions," *id*., making the Court's review here all the more crucial.

In conclusion, the FISA certifications in Mr. Shafi's case were clearly erroneous in at least two respects.  The Court should accordingly grant the motion and order that the evidence resulting from the FISA orders be suppressed.

### III. The FISA Applications May Have Included Intentional or Reckless Material Falsehoods or Omissions

If the Court declines to order suppression, Mr. Shafi requests that it hold a *Franks* hearing to determine if false statements or omissions in the application were knowingly or recklessly made.  *Franks v. Delaware*, 438 U.S. 154 (1978).  As the Supreme Court held in *Franks*, "where the defendant makes a substantial preliminary showing that a false statement

---

[13] *Available at*:
https://www.dni.gov/files/documents/icotr/51117/2016_Cert_Fisc_Memo_Opin_Order_Apr_2 07.pdf.

FISA MOTION
*SHAFI*, CR 15–582 WHO

knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* at 155–56. The *Franks* principles apply to omissions as well as false statements. *See*, *e.g.*, *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992).

All FISA applications must set out "a statement of the facts and circumstances relied upon by the applicant to justify his belief that (A) the target of the [electronic surveillance/ physical search] is a foreign power or an agent of a foreign power." 50 U.S.C. §§ 1804(a)(3); 1823(a)(3). It is Mr. Shafi's belief that the FISA applications in his case knowingly or recklessly included material falsehoods or omitted material information. Mr. Shafi will identify and discuss those falsehoods and omissions in his upcoming *Franks* motion challenging the December 2, 2014 search warrants for his cell phone and email records, which motion and supporting arguments he incorporates by reference.

Mr. Shafi also directs the Court's attention to history: in September 2000, the Government confessed that some 75 FISA applications related to major terrorist activity contained "misstatements and omissions of material facts," concerning such topics as whether the target of FISA surveillance was under criminal investigation, whether overlapping criminal and intelligence investigations were being appropriately compartmentalized in terms of information-sharing, and the prior relationship between the FBI and the FISA target. *See In re All Matters Submitted to Foreign Intelligence Surveillance Court*, 218 F. Supp. 2d 611, 620 (Foreign Intel. Surv. Ct. 2002), *rev'd on other grounds sub nom.*, *In re Sealed Case*, 310 F.3d 717. That disclosure led the FISC to bar one FBI agent from ever appearing before the court again as a FISA affiant. *Id*. The Government reported similar misstatements in another series of FISA applications in March 2001. *Id.* at 621.

Nor were those problems isolated or resolved by those revelations. Instead, they proved persistent. The 2006 DOJ Report mentioned above stated that the FBI found apparent violations of its own wiretapping and other intelligence-gathering procedures more than 100 times in the preceding two years, and problems appear to have grown more frequent in some

crucial respects.  *See* Report to Congress on Implementation of Section 1001 of the USA PATRIOT Act at 24.  The report characterized some violations as "significant," including wiretaps that were much broader in scope than authorized by a court ("over-collection"), and others that continued for weeks and months longer than authorized ("overruns").  *Id*. at 24-25.  FISA-related over-collection violations constituted 69% of the reported violations in 2005, an increase from 48% in 2004.  *See id*. at 29. The total percentage of FISA-related violations rose from 71% to 78% from 2004 to 2005, *id*. at 29, although the amount of time "over-collection" and "overruns" were permitted to continue before the violations were recognized or corrected decreased from 2004 to 2005.  *Id*. at 25.

Finally, as discussed above, a recently issued FISC opinion also shows the National Security Agency's failure to comply with applicable minimization procedures on eighty-five percent of the queries it made during recent months on United States persons targeted under FISA sections 704 and 705(b).  *See In re Reauthorization Certifications and Related Procedures* (Foreign Intel. Surv. Ct., April 26, 2017) at 82.

This history shows that *Franks* issues deserve the Court's utmost attention.  The Court must also be sensitive to the fact that Mr. Shafi's efforts to make a *Franks* preliminary showing are hampered by the fact that he "must endeavor to establish the falsity of statements that the law does not allow him to see."  *Aziz*, 2017 WL 118253, at *6.  "*Franks* cannot operate in the FISA context as it does in the ordinary criminal case. To pretend otherwise does a disservice to the defendant and to the integrity of the judiciary. . . .  Yet, *Franks* serves as an indispensable check on potential abuses of the warrant process, and means must be found to keep *Franks* from becoming a dead letter in the FISA context."  *United States v. Daoud*, 755 F.3d 479, 486 (7th Cir. 2014) (Rovner, J. concurring).  Under the circumstances of this case and for the reasons to be discussed in Mr. Shafi's separate *Franks* motion challenging the Google and T-Mobile search warrants, a *Franks* hearing is justified.

**IV.  In the Alternative, the Court Should Order Disclosure of the FISA Applications, Orders, and Related Materials**

## A.  Legal Framework

If the Court does not order suppression of all FISA materials, it should also disclose the FISA applications, warrants, and other relevant materials to the defense.

In determining whether a FISA surveillance/physical search "was lawfully authorized and conducted," the Court "may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the [surveillance/physical search] . . . only where such disclosure is necessary to make an accurate determination of the legality of the [surveillance/physical search]."  50 U.S.C. §§ 1806(f); 1825(g).  If this Court "determines that the [surveillance/physical search] was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that [D]ue [P]rocess requires discovery or disclosure."  *Id*. §§ 1806(g); 1825(h).

True, "disclosure is the exception and 'ex parte, in camera determination is the rule.'" *United States v. Stewart*, 590 F.3d 93, 129 (2d Cir. 2009) (quoting *Duggan*, 743 F.2d at 78).  But "[t]he need to disclose materials to defense counsel may arise if the judge determines there to be 'potential irregularities such as possible misrepresentation of fact, vague identification of the persons to be surveilled or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order.'"  *Id*. (quoting *Duggan*, 743 F.2d at 78).

Indeed, Congress intended that courts order disclosure where, as here, "the court's initial review of the application, order, and fruits of the surveillance indicates that the question of legality may be complicated by factors such as 'indications of possible misrepresentation of fact[.]'" *Belfield*, 692 F.2d at 147 (quoting S. Rep. No. 95–701).  Courts have been reluctant to order disclosure, however, perhaps deferring to the Government after the Attorney General has filed an affidavit – as it has in every FISA case we know of – stating that disclosure would "harm the national security of the United States."  50 U.S.C. §§ 1806(f); 1825(g).  But Congress clearly did not contemplate such deference.  It could have forbidden disclosure in every case in which the Attorney General filed an affidavit.  Instead, it directed courts to make their own determination about when disclosure is appropriate and what disclosure is warranted,

allowing judges to decide to make "portions" or "summar[ies]" of materials available under "appropriate security measures and protective orders." *Id.*

Congress wanted courts to "strik[e] a reasonable balance between an entirely in camera proceeding which might adversely affect the defendant's ability to defend himself and mandatory disclosure, which might occasionally result in the wholesale revelation of sensitive foreign intelligence information." S. Rep. No. 95-604. In certain cases, such a balance may result in difficult decisions for the Government. S. Rep. No. 95-701, 1978 U.S.C.C.A.N. at 4034 ("Cases may arise, of course, where the court believes that disclosure is necessary to make an accurate determination of legality, but the Government argues that to do so, even given the court's broad discretionary power to [excise] certain sensitive portions, would damage the national security. In such situations the Government must choose – either disclose the material or forgo the use of the surveillance-based evidence.").

### B. FISA and the Constitution Require Disclosure

In a case such as this, where there are many potential grounds for suppression and extensive discovery materials with which the Court is unfamiliar, it is impossible to "make an accurate determination of the legality" of the surveillance and the physical search without the informed participation of defense counsel. 50 U.S.C. §§ 1806(f); 1825(g). As such, Mr. Shafi has satisfied the statutory standard for disclosure. Defense counsel Galia Amram possesses security clearance and has reviewed Classified Information Procedures Act ("CIPA") materials produced in this case. This Court can order disclosure to Ms. Amram (and not to Mr. Shafi) pursuant to a protective order.

Independently, Mr. Shafi has a constitutional entitlement to disclosure of the FISA materials under the Fourth, Fifth, and Sixth Amendments. As to Fifth Amendment Due Process and Sixth Amendment fair trial rights, ex parte proceedings impair the integrity of the adversary process and the criminal justice system. As the Supreme Court has recognized, "'[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it.'" *United*

*States v. James Daniel Good Real Property*, 510 U.S. 43, 55 (1993) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., concurring)). *See also United States v. Madori*, 419 F.3d 159, 171 (2d Cir. 2005) (closed proceedings "are fraught with the potential of abuse and, absent compelling necessity, must be avoided"). "Particularly where liberty is at stake, Due Process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other." *United States v. Abuhamra*, 389 F.3d 309, 322-23 (2d Cir. 2004).

As to Fourth Amendment concerns, Mr. Shafi is entitled to litigate the lawfulness of searches that produce evidence introduced to prove his guilt. In the Fourth Amendment context, including in relationship to electronic surveillance, the Supreme Court has rejected the use of ex parte proceedings on grounds that apply equally here. In *Alderman v. United States*, 394 U.S. 165 (1969), the Court addressed the procedures to be followed in determining whether government eavesdropping in violation of the Fourth Amendment contributed to the government's case against the defendants. The Court rejected the government's suggestion that the district court make that determination in camera and/or ex parte. In ordering disclosure of improperly recorded conversations, the Court explained:

> "[a]dversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny that the Fourth Amendment exclusionary rule demands."

394 U.S. at 184.

The same considerations recommend against ex parte procedures in the FISA context. Indeed, the lack of any authentic adversary proceedings in FISA litigation more than likely accounts for the government's successful record in defending FISA and FISA-generated evidence. After all, denying an adversary access to the facts constitutes an advantage as powerful and insurmountable as exists in litigation. As the FISA Court itself has acknowledged, for example, without adversarial proceedings, systematic executive branch misconduct – including submission of FISA applications with "erroneous statements" and

"omissions of material facts" – went entirely undetected by the courts until the Court directed that the Department of Justice review FISA applications and submit a report to the FISC. *See In re All Matters Submitted to the Foreign Intelligence Surveillance Court*, 218 F. Supp.2d at 620-21.[14]

This Court's review in camera is also not a substitute for defense counsel's participation. As the Supreme Court recognized in *Alderman*, "[i]n our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." 394 U.S. at 184; *see also Franks*, 438 U.S. at 169 (permitting adversarial proceeding on showing of intentional falsehood in warrant affidavit because the magistrate who approves a warrant ex parte "has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations"). As such, the ex parte proceedings also violate a defendant's Sixth Amendment right to counsel. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) ("[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all "critical" stages of the criminal proceedings.").

In light of the above constitutional concerns, §§ 1806 and 1825 and the disclosure they authorize assume significantly greater meaning and importance in evaluating the validity of FISA applications. Accordingly, either under §§ 1806(f) and 1825(g), §§1806(g) and 1825(h), and/or the Due Process clause, disclosure of the FISA materials is authorized and appropriate in this case.

## V.  FISA's "Significant Purpose" Test Is Unconstitutional

Finally, even assuming that the FISA applications here met all statutory requirements,

---

[14] Relatedly, the DOJ Inspector General's report only became possible due to the publication of documents released to Electronic Privacy Information Center in Freedom of Information Act litigation. That publication prompted the DOJ to use those and other documents as a basis for the report. In preparing the report the DOJ reviewed only those 108 instances in which the FBI itself reported violations to the Intelligence Oversight Board—a four-member Executive Branch body that ordinarily does not submit its reports to Congress.

FISA MOTION
*SHAFI*, CR 15–582 WHO

suppression would still be required because FISA itself – and more specifically, its "significant purpose test" – is unconstitutional.[15]

Prior to the enactment of FISA, and for the first twenty-five (25) years of its existence, the "primary purpose" for surveillance or searches was required to be intelligence gathering with respect to a "foreign power" or an "agent of a foreign power." *United States v. Truong Dinh Hung*, 629 F.2d 908, 912-13 (4th Cir. 1980); 50 U.S.C. § 1805(a)(3) (2000).

However, in October 2001, through the Patriot Act, Congress amended the language of FISA and changed the language requiring that "the purpose" of the search or surveillance to be the acquisition of foreign intelligence information, to requiring that such acquisition be "a significant purpose." 50 U.S.C. §§ 1804(a)(7)(B), 1823(a)(7)(B) (as amended by Pub.L. 107-56, Title II, § 218, Oct. 26, 2001).  These Patriot Act amendments dramatically expanded the class of investigations in which FISA is available to the government, and have enabled the government to conduct surveillance to gather evidence for use in a criminal case without a traditional warrant – so long as the government can state that there is a "significant purpose" in gathering foreign intelligence.  Thus, while FISA set out to reduce the probable cause requirement only for national security intelligence gathering, a consequence – intended or not – of the Patriot Act has been that the Executive Branch may now "bypass the Fourth Amendment" to gather evidence for a criminal prosecution.  *See Mayfield v. United States*, 504 F. Supp. 2d 1023, 1036-37 (D. Ore. 2007) (holding FISA as amended to be unconstitutional), *vacated and remanded on other grounds*, 599 F.3d 964 (9th Cir. 2010) (plaintiff lacked standing due to settlement agreement with government).

---

[15]     Mr. Shafi makes both a facial and an as-applied challenge.  As noted above, he argues that the Government's primary purpose was building a criminal case against him and that the Government lacked even a significant foreign security purpose in applying for the FISA surveillance/physical search.  Therefore, FISA is unconstitutional as applied to him.

Facial challenges are permitted in the Fourth Amendment context.  *See City of Los Angeles v. Patel*, 135 S.Ct. 2443, 2449 (2015).  While various courts have found that the reduced "significant purpose" standard is constitutional, *see Aziz*, 2017 WL 118253, * 8, neither the Ninth Circuit nor the Supreme Court have yet addressed the issue.

In 1967, the Supreme Court held that a New York statute authorizing electronic surveillance violated the Fourth Amendment because: (1) "it did not requir[e] the belief that any particular offense has been or is being committed; nor that the 'property' sought, the conversations, be particularly described;" (2) it failed to limit the duration of the surveillance to impose sufficiently stringent requirements on renewals of the authorization; and (3) the statute "has no requirement for notice as do conventional warrants, nor does it overcome this defect by requiring some showing of special facts." *Berger v. New York*, 388 U.S. 41, 58–60 (1967). The Court specifically rejected the state's argument that Fourth Amendment requirements should be relaxed because the surveillance statute was essential in its fight against organized crime and noted that "[f]ew threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Id*. at 62-63.

Subsequently, the Supreme Court in *Katz v. United States*, 389 U.S. 347 (1967), held that the Fourth Amendment's probable cause and warrant requirements apply to electronic surveillance. In a footnote, however, the Supreme Court expressly deferred deciding whether the Fourth Amendment requires prior judicial authorization of surveillance in cases involving national security. *Id*. at 358 n. 23. Four years later, the Supreme Court revisited the issue in *United States v. United States District Court*, 407 U.S. 297 (1972) (*Keith*). That case arose from the prosecution of three citizens who were allegedly conspiring to bomb a CIA office in Ann Arbor, Michigan. *Id*. at 299. While the Supreme Court recognized both the Executive Branch's interest in protecting national security and the value of electronic surveillance in detecting security threats, the Court nonetheless noted:

> There is understandably, a deep-seated uneasiness and apprehension that this [surveillance] capability will be used to intrude upon cherished privacy of law-abiding citizens. We look to the Bill of Rights to safeguard this privacy. Though physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, its broader spirit now shields private speech from unreasonable surveillance.

*Id*. at 312-13.

The Supreme Court also rejected the Executive Branch's arguments that "internal security matters are too subtle and complex for judicial evaluation" and that "prior judicial

FISA MOTION
*SHAFI*, CR 15–582 WHO

approval will fracture the secrecy essential to official intelligence gathering." *Id*. at 320. Significantly, the Supreme Court expressly rejected the Executive Branch's argument that exceptions to the Fourth Amendment warrant requirement should be recognized for domestic security surveillance and held that the decision to conduct electronic surveillance cannot be left to the discretion of law enforcement officials:

> These Fourth Amendment freedoms cannot properly be guaranteed if domestic security surveillance may be conducted solely within the discretion of the Executive Branch. The Fourth Amendment does not contemplate the executive officers of Government as neutral and disinterested magistrates. Their duty and responsibility are to enforce the laws, to investigate, and to prosecute. But those charged with this investigative and prosecutorial duty should not be the sole judges of when to utilize constitutionally sensitive means in pursuing their tasks. The historical judgment, which the Fourth Amendment accepts, is that unreviewed executive discretion may yield too readily to pressures to obtain incriminating evidence and overlook potential invasions of privacy and protected speech.

*Id*. at 316-17.  Finally, the Supreme Court noted the differences between surveillance for criminal investigative purposes and surveillance for intelligence purposes.  The Court noted the "potential distinctions between Title III criminal surveillance and those involving domestic security," and suggested that Congress "may wish to consider protective standards for the latter which differ from those already prescribed for specified crimes in Title III."  *Id*. at 322.

Thus, the decisions in *Katz* and *Keith* drew a line between surveillance conducted by law enforcement officials to investigate crime—which requires a traditional warrant based on probable cause—and surveillance conducted by intelligence officials to obtain foreign intelligence information.

Indeed, after *Keith*, and prior to the enactment of FISA, numerous federal appellate courts recognized our Nation's interest in security and affirmed warrantless surveillance authorized within the Executive Branch, because the purpose of the surveillance was foreign intelligence gathering.  *See Mayfield*, 504 F.Supp.2d at 1038.  The Ninth Circuit was among those courts.  *See United States v. Buck*, 548 F.2d 871 (9th Cir. 1977) ("Foreign security wiretaps are a recognized exception to the general warrant requirement and disclosure of wiretaps not involving illegal surveillance is within the trial court's discretion.").

FISA MOTION
*SHAFI*, CR 15–582 WHO

Similarly, after Congress passed FISA and before the Patriot Act amendments, numerous courts have upheld FISA surveillance and physical searches because the primary purpose of the surveillance/physical search was foreign intelligence gathering. *See*, *e.g.*, *United States v. Pelton*, 835 F.2d 1067, 1075-76 (4th Cir. 1987); *United States v. Badia*, 827 F.2d 1458, 1464 (11th Cir. 1987); *Duggan*, 743 F.2d at 78. *See also United States v. Johnson*, 952 F.2d 565, 572 (1st Cir. 1991) (stating that "the investigation of criminal activity cannot be the primary purpose of the surveillance," and that FISA may "not be used as an end-run around the Fourth Amendment's prohibition of warrantless searches").

As this history makes clear, the non-criminal, primary purpose standard was essential to the cases upholding FISA's constitutionality. Yet the Patriot Act did away with it and replaced it with the watered-down significant purpose standard. Consequently, "for the first time in our Nation's history, the [G]overnment can conduct surveillance to gather evidence for use in a criminal case without a traditional warrant, as long as it presents a non-reviewable assertion that it also has a significant interest in the targeted person for foreign intelligence purposes." *Mayfield*, 504 F.Supp.2d at 1036.

By replacing the "primary purpose" test with the "significant purpose" test, the Patriot Act had eliminated a fundamental piece of the foundation upholding FISA's constitutionality. *Katz*'s and *Keith*'s lesson, however, is that unless the Government's sole or primary purpose is the gathering of foreign intelligence, the Fourth Amendment trumps the intelligence gathering exception. Accordingly, FISA's significant purpose test is unconstitutional.

## CONCLUSION

For the aforementioned reasons, Mr. Shafi respectfully requests that the Court order suppression of all evidence obtained or derived pursuant to FISA because FISA's "significant purpose" standard is unconstitutional; because there was no probable cause to believe Mr. Shafi was an agent of a foreign power; and because the required certifications were clearly erroneous.

In the alternative, the Court should conduct a *Franks* hearing to determine if the FISA applications contained intentional or reckless material falsehoods or omissions and order the

FISA MOTION
*SHAFI*, CR 15–582 WHO

disclosure of FISA materials to security-cleared defense counsel because they are necessary to determine the legality of the FISA searches and surveillance.

Respectfully submitted,

Dated    June 8, 2017

STEVEN G. KALAR
Federal Public Defender
Northern District of California

/S
GALIA AMRAM
Assistant Federal Public Defender