# EXHIBIT A

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

SEALED
BY COURT ORDER

FILED
2014 DEC -2 P 3:08
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LB



In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Cell phone account 510-366-2789

)
)
)
)
)
)

Case No.

3  14  71492

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

T-Mobile, headquartered at 12920 SE 38th St Bellevue, Washington, as set forth in Attachment A2.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachments A2 and B2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2339B | Providing material support to a foreign terrorist organization and attempting and conspiring to do the same. |

The application is based on these facts:

See Affidavit of Special Agent Sara Dial.

☑ Continued on the attached sheet.

☑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet. Until further order of the Court.

Approved as to form:

*(signature)*

AUSA Candace Kelly

*Applicant's signature*

FBI Special Agent Sara Dial
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 12/2/2014

*Judge's signature*

City and state:  San Francisco, California

U.S. MAGISTRATE JUDGE LAUREL BEELER
*Printed name and title*

AS-00688

AS-00688

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT**

I, Sara Dial, having first been duly sworn, depose and state the following:

**INTRODUCTION AND AGENT BACKGROUND**

1.    I make this affidavit in support of applications for search warrants for information associated with:

   a.    cell phone account 520-665-1843 that is stored at premises owned, maintained, controlled, or operated by AT&T, a wireless provider headquartered at 208 S. Akard St, Dallas, Texas;

   b.    cell phone account 510-366-2789 that is stored at the premises owned, maintained, controlled, or operated by T-Mobile, a wireless provider headquartered at 12920 SE 38th St Bellevue, Washington; and

   c.    Email account zachary_niazi@yahoo.com that is stored at premises owned, maintained, controlled or operated by Yahoo! Inc. (hereinafter Yahoo!) at 701 First Avenue, Sunnyvale, California.

   d.    Email account reflexatron@gmail.com that is stored at premises owned, maintained, controlled or operated by Google at 1600 Amphitheatre Parkway, Mountain View, California 94043.

2.    The information to be searched is described in the following paragraphs and in Attachments A1 (AT&T), A2 (T-Mobile), A3 (Yahoo!), and A4 (Google).  This affidavit is made in support of applications for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require AT&T, T-Mobile, Yahoo!, and Google to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, and to disclose to the government copies of the

AS-00689

AS-00689

information further described in Section I of Attachments B1 (AT&T), B2 (T-Mobile), B3 (Yahoo!), and B4 (Google).  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachments B1 through B4.

3.    I am a Special Agent with the Federal Bureau of Investigation (FBI), and I am the case agent for this investigation.  I am an "investigative or law enforcement officer of the United States," within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code.

4.    I have been a Special Agent of the FBI since January 2013.  My training consisted of a 21 week FBI New Agents' class during which I received instruction on the various aspects of federal investigations.  I am currently assigned to the San Francisco Division, San Jose Resident Agency.  Prior to becoming a Special Agent, I was a commissioned officer in the United States Navy for five years, and then a Special Access Program Officer at the University of Texas, Austin, for three years.  As an FBI agent I have been the case agent for, or participated in, numerous investigations, including criminal and international counterterrorism investigations.

5.    As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

6.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

AS-00690

AS-00690

7.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 2339B (conspiring and attempting to provide and providing material support to a foreign terrorist organization) have been and continue to be committed by individuals using phone numbers 520-665-1843, 510-366-2789, and email accounts zachary_niazi@yahoo.com and reflexatron@gmail.com.  There is also probable cause to search the information described in Attachments A1 through A4 for evidence of these crimes as described in Attachments B1 through B4.

## LEGAL BACKGROUND

8.     Title 18, United States Code, Section 2339B makes it unlawful to "knowingly provide[] material support or resources to a foreign terrorist organization or attempt[] or conspire[] to do so."   In order to violate Section 2339B, a person "must have knowledge that the organization is a designated terrorist organization [as defined in subsection (g)(6)], that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

9.     As used in Section 2339B, the term "material support or resources" includes any "property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials." 18 U.S.C. §§ 2339A(b)(1) and

3

AS-00691

AS-00691

2339B(g)(4).

10.    As used in Section 2339B, the term "terrorist organization" means an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act. 18 U.S.C. § 2339B(g)(6).

## "ISIL" -- A TERRORIST ORGANIZATION

11.    On October 15, 2004, the United States Secretary of State designated al-Qa'ida in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224.

12.    On May 15, 2014, the Secretary of State amended the designation of al-Qa'ida in Iraq ("AQI") as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the ISIL listing: the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. Although the group has never called itself "Al-Qaeda in Iraq ("AQI")," this name has frequently been used to describe it through its history.

13.    Based on my training and experience, I know that: (a) Sunni extremists, who are not citizens or residents of Syria and Iraq and others, are traveling to Syria and Iraq to join ISIL and commonly enter Syria by crossing the border from Turkey; (b) foreign fighters from Western countries are traveling to locations in Turkey, including Istanbul, and then traveling to towns closer to the border where they are brought into Syria to join ISIL; (c) Abu Bakr al-Baghdadi is

4

AS-00692

AS-00692

the current leader of ISIL; (d) ISIL is also frequently referred to as "ISIS"; and (e) the following

flag is affiliated with ISIL:



## PROBABLE CAUSE

14.    The FBI is conducting an investigation involving Abdul Qadar Zachary Khan

Niazi (hereinafter "Niazi"), Adam Shafi (hereinafter "Adam"), Saleem Karim, and others who

have travelled or conspired to travel to Turkey for the purpose of providing material support or

resources to a foreign terrorist organization, namely by providing themselves to assist ISIL in

Syria or Iraq.  Based on toll records, Niazi and Adam appear to be communicating using their

cellular telephones for voice and text or Short Message Service ("SMS") communications as

well as their email accounts.  The FBI believes that based on the information provided herein,

there is probable cause to believe that evidence and instrumentalities of their conspiracy to travel

for the purpose of supporting a foreign terrorist organization will be found in the cellular

telephone accounts and email accounts listed in paragraph 1, above.

**A.    Niazi and Adam's Travel to Turkey**

15.    On or about August 17, 2014, Salama Shafi ("Adam's Father") reported the

disappearance of his son, Adam to the U.S. Embassy in Cairo.  Adam's Father explained that his

family, including his two sons had traveled to Cairo Egypt for a family trip on July 17, 2014.[1]

---

[1] According to Adam's actual flight itinerary, they departed San Francisco International Airport on July 14, 2014
and arrived in Cairo on July 15, 2014.

5

AS-00693

AS-00693

On August 16, 2014, Adam disappeared without telling anyone in the family where he was going. According to Adam's Father and another relative of Adam's ("Relative 1"), after he disappeared, Adam sent a text message to Relative 1 that said that he had gone to "protect Muslims."

16.    Adam's Father explained that he was afraid that Adam had been recruited and that it was important to find him quickly to prevent him from doing harm to himself or others at the direction of those who recruited him. Adam's Father suspected that Adam may have traveled to Syria, Iraq, Gaza, or some other area in the region to defend Muslims. Adam's Father was also concerned that Adam may have been following extreme imams online and that some of his high school friends were of the same mindset.

17.    On or about August 18, 2014, Adam's Father notified the U.S. Embassy that Adam had reunited with his family and the family planned to return to the U.S on August 20, 2014.

18.    On or about August 19, 2014, Customs and Border Patrol (CBP) agents stopped and interviewed Niazi at San Francisco International Airport (SFO) upon his return from a trip to Istanbul, Turkey. Niazi was in possession of Adam's travel itinerary and his email address: reflexatron@gmail.com. During the interview, Niazi told the CBP agents that his email account is zachary_niazi@yahoo.com.

19.    On September 4, 2014, I interviewed Adam after he and his family returned to San Francisco, California. Adam stated that he left his family in Cairo and traveled to Istanbul, Turkey where met up with his friend Niazi. According to Airlines Reporting Corporation ("ARC") records, Adam's ticket from Cairo to Istanbul was on August 16, 2014. Adam explained that Niazi, who lives in California, flew to Istanbul, arriving the same day that Adam

6

AS-00694

AS-00694

arrived. Adam stated that the purpose of their travel was to see the condition of refugees from Syria and to provide assistance. Adam said that he and Niazi stayed in Istanbul for one or two days and then returned to Cairo and California respectively.

20.     On September 22, 2014, the FBI received a call on the public access line from an individual who said that he was a friend of Yusef Khan (hereinafter "Yusef"). The caller said that Yusef told him that his brother was going, or had just returned from a three day trip overseas to join "ISIS". The caller was interviewed by a Los Angeles based FBI agent on September 23, 2014, and stated that Yusef may also go by the last name Nazy or Nazi. Additional investigation on available databases revealed that Yusef's full name is Geoffrey Yusef Khan Niazi and he shares the same address of 4401 Central Ave. Apt. 8, Fremont, California with Niazi.

21.     On September 29, 2014, FBI San Francisco interviewed Niazi telephonically. Niazi stated that he and Adam had purchased one way tickets to Turkey with no "blueprint" after that. They decided to return because Adam "wasn't feeling it." Niazi explained that he feels "unfulfilled" and wants to go back "to finish what I started," possibly when his current school semester ends. When asked to clarify what he meant by "finish what I started," Niazi stated that he wants to finish his vacation. However, when pressed, Niazi did not specify what he wants to see or where he wants to go. Niazi asked if the FBI interviews would restrict or burden his future travel.

22.     On October 7, 2014, Adam's Father contacted the FBI to provide additional information. He said that Adam had given money to Adam's friend, Saleem Karim, who then purchased Adam's ticket to Istanbul while Adam was overseas. According to records obtained from ARC, Adam's ticket from Cairo, through Amman, Jordan, to Istanbul on Royal Jordanian airlines was purchased on July 19, 2014, with credit card number xxxxxxx3427 for $353.39.

7

AS-00695

AS-00695

23.    On October 27, 2014, the FBI received information from CBP that Niazi has a current and active reservation returning to Istanbul on December 15, 2014. This is the return leg of his trip from Istanbul to SFO on August 19, 2014.

24.    On October 30, 2014, I interviewed a current employee at Ohlone College in Fremont, who stated that Niazi attends Ohlone College. Open source searches showed that the 2014 fall semester at Ohlone College ends December 12, 2014.

B.    **Niazi and Adam's Use of the Telephone, SMS, and Email**

25.    The FBI reviewed records obtained from AT&T related to cellular phone number 520-665-1843. According to those records, this number is subscribed to Andrew Khan Niazi. Niazi also provided this number as his telephone number during a telephonic interview that I conducted of him on September 29, 2014.

26.    The FBI reviewed records obtained from T-Mobile related to cellular phone number 510-366-2789. According to those records, this number is subscribed to Seham Shafi. Additionally, Adam's Father and Adam both provided 510-366-2789 as Adam's phone number in interviews with me.

27.    The records from AT&T and T-Mobile included toll and short message service ("SMS") or text messaging transaction records through October 28, 2014, for the two phone numbers. These transaction records show that beginning on or about May 12, 2014, Niazi and Adam had telephone contact almost every week. At times they had multiple telephone contacts a day or week. One exception to this is during a period between July 14, 2014, and August 19, 2014. This period of time corresponds with the time that Adam was overseas on his family trip to Cairo and his trip to Istanbul with Niazi. The records also show that in addition to telephone calls, Niazi and Adam had contact via SMS or text messaging almost every week. At times they

8

AS-00696

AS-00696

had multiple SMS or text messaging contacts a day or week. Like the telephone contact, there is a gap in SMS communication between July 14, 2014, and August 27, 2014.

28.    Based on the telephone records, there is probable cause to believe that Niazi and Adam used telephone conversations and SMS or text messages to plan and coordinate their trip to Turkey in support of ISIL. Based on my training and experience, I believe that during those text and telephone conversations they may have discussed the motivation for or purpose of their trip as well as any other individuals who were involved with planning or participating in the trip, such as Saleem Karim, in addition to logistics. Further, Niazi's active return ticket to Turkey and their continued communication after their trip to Turkey indicates they may be continuing to communicate about travel to Turkey, Syria, or Iraq in support of ISIL.

29.    The FBI reviewed records obtained from Yahoo! Inc. for email address zachary_niazi@yahoo.com. These records confirmed that the subscriber for this email address is Zachary Niazi. The records also show that between July 2014, and October 2014, Niazi received two emails from Adam. Adam sent the first email on July 14, 2014, the day he departed the U.S. for Egypt and the second on July 24, 2014, while he was in Egypt. These two emails were sent during the time period when Niazi and Adam were not communicating by telephone or SMS.

30.    As mentioned previously, Adam's ticket was purchased after he left the U.S. on July 19, 2014, and Niazi had a copy of Adam's email travel itinerary and his email address when he was stopped by CBP officers on August 19, 2014. Based on the foregoing facts, there is probable cause to believe that Niazi and Adam used their email accounts to plan and execute their travel to Turkey in an effort to provide material support to a foreign terrorist organization. Based on my training and experience, I believe that they may have discussed the motivation for or purpose of their trip as well as any other individuals who were involved with planning or

9

AS-00697

AS-00697

participating in the trip, such as Saleem Karim, in addition to logistics.

## WIRELESS SERVICE PROVIDERS AT&T AND T-MOBILE

31.    On November 13, 2014, I sent a letter to AT&T pursuant to Title 18, United States Code, Section 2703(f) requesting that all SMS and text messages, histories, and contact lists on account 520-665-1843 be maintained.

32.    On November 14, 2014, an FBI agent sent a letter to T-Mobile pursuant to Title 18, United States Code, Section 2703(f) requesting that all SMS and text messages, histories, and contact lists on account 510-366-2789 be maintained.

33.    In my training and experience, I have learned that AT&T and T-Mobile are companies that provide cellular telephone access to the general public, and that stored electronic communications, including retrieved and unretrieved voicemail, text, and multimedia messages for AT&T and T-Mobile subscribers may be located on the computers of AT&T and T-Mobile, respectively. Further, I am aware that computers located at AT&T and T-Mobile contain information and other stored electronic communications belonging to unrelated third parties.

34.    Wireless phone providers often provide their subscribers with voicemail services. In general, a provider will store voicemail messages on behalf of a particular subscriber until the subscriber deletes the voicemail. If the subscriber does not delete the message, the message may remain in the system of AT&T or T-Mobile for weeks or months.

35.    Among the services commonly offered by wireless phone providers is the capacity to send short text or multimedia messages (photos, audio, or video) from one subscriber's phone or wireless device to another phone or wireless device via one or more wireless providers. This service is often referred to as "Short Message Service" ("SMS") or "Multimedia Messaging Service" ("MMS"), and is often referred to generically as "text

10

messaging" or "wireless messaging." Based on my knowledge and experience, I believe that stored electronic communications, including SMS and MMS messages that have been sent or received by subscribers, may be stored by AT&T and T-Mobile for short periods incident to and following their transmission. In addition, providers occasionally retain printouts from original storage of text messages for a particular subscriber's account.

36. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

37. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which "cell towers" (i.e., antenna towers covering specific geographic areas) received a radio signal from the cellular device and thereby transmitted or received the communication in question.

38. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique

11

AS-00699

AS-00699

identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

39.    Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

40.    In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support

12

AS-00700
AS-00700

services, as well records of any actions taken by the provider or user as a result of the communications.

## EMAIL PROVIDERS YAHOO! AND GOOGLE

41.    On October 7, 2014, an FBI agent sent a letter to Yahoo! pursuant to Title 18, United States Code, Section 2703(f) requesting that all e-mail, histories, buddy lists, profiles, subscriber information, method of payment and detailed billing logs on account zachary_niazi@yahoo.com be maintained.

42.    On October 9, 2014, an FBI agent sent a letter to Google pursuant to Title 18, United States Code, Section 2703(f) requesting that all e-mail, histories, buddy lists, profiles, subscriber information, method of payment and detailed billing logs on account reflexatron@gmail.com be maintained.

43.    In general, an email that is sent to a Yahoo! or Google (hereinafter collectively referred to as "the Email Providers") subscriber is stored in the subscriber's "mail box" on the Email Providers' servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on the Email Providers' servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Email Providers' servers for a certain period of time.

44.    In my training and experience, I have learned that the Email Providers provide a variety of on-line services, including electronic mail ("email") access, to the public. The Email Providers allow subscribers to obtain email accounts at the domain names yahoo.com and gmail.com, respectively, like the email accounts listed in Attachments A3 and A4. Subscribers obtain an account by registering with the Email Providers. During the registration process, the Email Providers ask subscribers to provide basic personal information. Therefore, the computers

13

AS-00701

AS-00701

of the Email Providers are likely to contain stored electronic communications (including

retrieved and unretrieved email for the Email Providers' subscribers) and information concerning

subscribers and their use of the Email Providers' services, such as account access information,

email transaction information, and account application information. In my training and

experience, such information may constitute evidence of the crimes under investigation because

the information can be used to identify the account's user or users.

45.    In my training and experience, email providers generally ask their subscribers to

provide certain personal identifying information when registering for an email account. Such

information can include the subscriber's full name, physical address, telephone numbers and

other identifiers, alternative email addresses, and, for paying subscribers, means and source of

payment (including any credit or bank account number). In my training and experience, such

information may constitute evidence of the crimes under investigation because the information

can be used to identify the account's user or users. Based on my training and my experience, I

know that even if subscribers insert false information to conceal their identity, I know that this

information often provides clues to their identity, location or illicit activities.

46.    In my training and experience, email providers typically retain certain

transactional information about the creation and use of each account on their systems. This

information can include the date on which the account was created, the length of service, records

of log-in (i.e., session) times and durations, the types of service utilized, the status of the account

(including whether the account is inactive or closed), the methods used to connect to the account

(such as logging into the account via the provider's website), and other log files that reflect usage

of the account. In addition, email providers often have records of the Internet Protocol address

("IP address") used to register the account and the IP addresses associated with particular logins

14

AS-00702

AS-00702

to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

47. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

48. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account along with the time and date. By

15

AS-00703

AS-00703

determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

49.     I anticipate executing these warrants under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require AT&T, T-Mobile, Yahoo!, and Google to disclose to the government copies of the records and other information (including the content of communications) particularly described in Sections II of Attachments B1 through B4. Upon receipt of the information described in Sections II of the Attachments, government-authorized persons will review that information to locate the items described in Sections III of Attachments B1 through B4.

## CONCLUSION

50.     Based on the forgoing, I request that the Court issue the proposed search warrants.

51.     This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) &

16

AS-00704

AS-00704

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

52.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## REQUEST FOR SEALING AND NON-DISCLOSURE

53.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents except that the FBI should be allowed to serve these warrants on AT&T, T-Mobile, Yahoo!, and Google and to share the results of the search with other law enforcement and intelligence agencies, including foreign law enforcement and intelligence agencies, for use in investigation and prosecution.

//

//

//

//

//

//

//

//

//

//

17

AS-00705

AS-00705

54.    Furthermore, notification of the existence of the warrant may give targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, or notify confederates and may seriously jeopardize the criminal investigation.  Accordingly, I further request, pursuant to 18 U.S.C. §§ 2705 and 2703(b)(1)(A), that the Court order AT&T, T-Mobile, Yahoo!, and Google not to notify the subscribers and/or customers of the accounts listed in Attachments A1 through A4 or any other entity (except as necessary to execute the search) of this search warrant until further order of the Court.

Respectfully submitted,

Sara Dial
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____, 2014

LAUREL BEELER
UNITED STATES MAGISTRATE JUDGE

18

AS-00706

AS-00706

## ATTACHMENT A2

### Property to Be Searched

This warrant applies to information associated with telephone number 510-366-2789 that is stored at premises owned, maintained, controlled, or operated by T-Mobile, a wireless provider headquartered at 12920 SE 38th St Bellevue, Washington.

1

AS-00707

AS-00707

## ATTACHMENT B2

### Particular Things to be Seized

**I.    SEARCH PROCEDURE**

A.    In order to ensure that agents search only those email accounts and/or files described in Attachments A2 and B2, this affidavit and application for search warrant seek authorization to permit employees of T-Mobile to assist agents in the execution of this warrant.  To further ensure that agents executing this warrant search only those computer accounts and/or files described in Attachments A2 and B2, the following procedures will be implemented:

1.    The agent executing the warrant shall serve the warrant upon T-Mobile offices at the location specified in the warrant;

2.    The agent executing this warrant shall permit T-Mobile as custodians of the files described in Attachments A2 and B2, to locate the files, copy them onto removable electronic storage media or print them out as paper copies, and deliver the copies to the agent, who need not be present during this process.  T-Mobile employees will create an exact duplicate of the computer accounts and files described in Attachments A2 and B2;

3.    T-Mobile employees will provide the exact duplicate in electronic form of the accounts and files described in Attachments A2 and B2 and all information stored in those accounts and files to law enforcement agents;

4.    Law enforcement personnel will thereafter review the information stored in the accounts and files received from T-Mobile employees and then identify and copy the information contained in those accounts and files which are authorized to be further copied by this search warrant as specified in Attachment B2; and

1

AS-00708
AS-00708

5.  Law enforcement personnel will then seal the original duplicate of the accounts and files received from T-Mobile employees and will not further review the original duplicate absent an order of the Court.

B.    Pursuant to Title 18, United States Code, Section 2703(b)(1)(A), T-Mobile., is hereby prohibited from notifying the subscriber and/or customer of the account listed in Attachment A2 or any other unauthorized person, of the search warrant.

C.    The Department of Justice and the Federal Bureau of Investigation shall not be prohibited from sharing information obtained from this warrant with other law enforcement and intelligence agencies, including foreign law enforcement and intelligence agencies, for use in investigation and prosecution.

## II.    INFORMATION TO BE COPIED AND DISCLOSED BY T-MOBILE

To the extent that the information described in Attachment A1 is within the possession, custody, or control of T-Mobile, including any messages, records, files, logs, or information that have been deleted but are still available to T-Mobile or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), T-Mobile is required to disclose the following information to the government for the account or identifier listed in Attachment A2:

a.  All voice mail, text, and multimedia messages stored and presently contained in, or on behalf of the account or identifier;

b.  All existing printouts from original storage of all of the text messages described above;

c.  All transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times

2

AS-00709
AS-00709

of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and/or locations used from **May 1, 2014** to present;

d.  All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message;

e.  All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

f.  Detailed billing records, showing all billable calls including outgoing digits, from **May 1, 2014** to present;

g.  All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number), from **May 1, 2014** to present;

h.  Incoming and outgoing telephone numbers, from **May 1, 2014** to present;

i.  All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

3

AS-00710

AS-00710

j.   All records pertaining to communications between T-Mobile and any person regarding the account or identifier, including contacts with support services and records of actions taken.

4

AS-00711

AS-00711

## III.    INFORMATION TO BE FURTHER SEIZED BY LAW ENFORCEMENT PERSONNEL

All information described above in Section II that constitutes fruits, evidence, and/or instrumentalities of violations of Title 18, United States Code, Sections 371 and 2339B since May 1, 2014, including, for the account or identifier listed on Attachment A1, information pertaining to the following matters:

    a.   Islamic State of Iraq and the Levant ("ISIL"), the Islamic State of Iraq and al-Sham ("ISIS"), the Islamic State of Iraq and Syria ("ISIS"), ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, Al-Furqan Establishment for Media Production, Al-Qaeda in Iraq ("AQI"), Jam'at al Tawhid wa'al-Jihad, Abu Bakr al-Baghdadi.

    b.   Images associated with ISIS or ISIL including, but not limited to its flag:



    c.   The commission of acts of violence overseas including justifications for such conduct.

    d.   Engaging in fighting or support of terrorism and/or terrorist organizations, including jihad, terrorism, martyrdom, weapons or physical training, training to engage in combat or other violence.

    e.   The encouragement or recruitment of others to engage in violence or join a group engaging in violence or violent jihad.

5

AS-00712

AS-00712

f.  Discussion, advice, or consultation regarding travel to Turkey, Syria, or Iraq.

g.  Past or planned travel to Turkey, Syria, or Iraq including sources of payment for such travel.

h.  The identity of the person(s) who communicated with the user ID or phone number about matters relating to (a) through (g) above, including records that help reveal their whereabouts.

i.  The location of the account holder to include travel records, frequent flyer account numbers, correspondence with travel agencies and others regarding past or future travel plans, including passport/visa information and country-specific permissions requested or obtained,

j.  All of the records and information described in Sections II(c) through (j) above.

6

AS-00713

AS-00713