STEVEN G. KALAR
Federal Public Defender
HANNI M. FAKHOURY
GALIA AMRAM
CARMEN A. SMARANDOIU
Assistant Federal Public Defenders
1301 Clay Street, Suite 1350N
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:    (510) 637-3507
Email:        hanni_fakhoury@fd.org


Attorneys for ADAM SHAFI

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 15-582-WHO |
| Plaintiff, | |
| v. | DEFENDANT ADAM SHAFI'S REPLY TO UNITED STATES' OPPOSITION TO MOTION TO SUPPRESS, AND FOR A *FRANKS* HEARING AND DISCLOSURE OF FISA ORDERS, APPLICATIONS AND RELATED MATERIALS |
| ADAM SHAFI, | |
| Defendant. | |
| | Date:  October 12, 2017 |
| | Time: 1:30 p.m. |

## **TABLE OF CONTENTS**

INTRODUCTION.............................................................................................................. 1

ARGUMENT .................................................................................................................... 3

A.   The FISA Applications Were Not Supported by Probable Cause that Mr. Shafi Was an Agent of a Foreign Power. .................................................................................................. 3

    1.   This Court Should Review *De Novo*................................................................ 4

    2.   There Was No Probable Cause that Mr. Shafi or Mr. Niazi Were ISIL Agents................. 5

B.   The Required Certifications Were Deficient. ........................................................... 9

C.   The Required Minimization Procedures Were Inadequate or Disregarded. ................. 11

D.   The FISA Applications Recklessly Omitted Material Information. ............................ 12

E.   The Evidence Obtained or Derived from Electronic Surveillance and Physical Searches Conducted in Violation of FISA and the Constitution Should Be Suppressed............................ 16

    1.   The Good Faith Exception Does Not Apply to FISA. .................................... 16

    2.   Even if the Good Faith Exception Applied to FISA, the Government Has Failed to Carry its Burden that it Should Apply in Mr. Shafi's Case. .................................... 20

F.   The Court Should Order Disclosure of the FISA Applications, Orders and Related Materials. .. 22

G.   The Court Should Order the Government to Affirm or Deny the Existence of FAA and E.O. 12333 Evidence.......................................................................................................... 23

CONCLUSION ............................................................................................................... 25

1

## **TABLE OF AUTHORITIES**

2

### **Cases**

3    *ACLU Found. of S. Cal. v. Barr*, 952 F.2d 457 (D.C. Cir. 1991) ........................................ 17

4    *Alabama v. Bozeman*, 533 U.S. 146 (2001) ........................................................................ 17

5    *Alderman v. United States*, 394 U.S. 165 (1969) ................................................................ 18

6    *Baker v. Carr*, 369 U.S. 186 (1962) .................................................................................... 24

7    *Brandenburg v. Ohio*, 395 U.S. 444 (1969) .......................................................................... 8

8    *Chism v. Washington*, 661 F.3d 380 (9th Cir. 2011) ..................................................... 13, 16

9    *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ........................................................... 23

10   *Dodd v. United States*, 545 U.S. 353 (2005) ....................................................................... 19

11   *Elkins v. United States*, 364 U.S. 206 (1960) ..................................................................... 19

12   *Franks v. Delaware*, 438 U.S. 154 (1978) .................................................................... *passim*

13   *Hess v. Indiana*, 414 U.S. 105 (1973) ................................................................................... 8

14   *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ............................................... 8, 21

15   *Humanitarian Law Project v. Reno*, 205 F.3d 1130 (9th Cir. 2000) ............................... 8, 21

16   *In re All Matters Submitted to FISC*, 218 F. Supp.2d 611 (Foreign Intel. Surv. Ct. 2002) .................... 5

17   *In re Sealed Case*, 310 F.3d 717 (Foreign Int. Surv. Ct. Rev. 2002) ................................ 2, 4

18   *Marbury v. Madison*, 5 U.S. 137 (1803) ............................................................................. 25

19   *Miranda v. Anchondo*, 684 F.3d 844 (9th Cir. 2011) ......................................................... 17

20   *Satchell v. Cardwell*, 653 F.2d 408 (9th Cir. 1981) ........................................................... 14

21   *Scales v. United States*, 367 U.S. 203 (1961) ....................................................................... 8

22   *United State v. Kiser*, 716 F.2d 1268 (9th Cir. 1983) ......................................................... 13

23   *United States v. Alter*, 482 F.2d 1016 (9th Cir. 1973) ........................................................ 25

24   *United States v. Apple*, 915 F.2d 899 (4th Cir. 1990) ......................................................... 25

25   *United States v. Belfield*, 692 F.2d 141 (D.C. Cir. 1982) ............................................... 19, 22

26   *United States v. DeLeon*, 979 F.2d 761 (9th Cir. 1992) ...................................................... 13

27   *United States v. Duka*, 671 F.3d 329 (3d Cir. 2011) ........................................................... 17

28   *United States v. Garcia-Villalba*, 585 F.3d 1223 (9th Cir. 2009) ......................................... 3

1   *United States v. Jacobs,* 986 F.2d 1231 (8th Cir. 1993) ............................................... 16

2   *United States v. Kennedy*, 131 F.3d 1371 (10th Cir. 1997) ........................................... 13

3   *United States v. Kowalczyk*, 805 F.3d 847 (9th Cir. 2015) ............................................ 18

4   *United States v. Leon*, 468 U.S. 897 (1984).................................................... 18, 20, 22

5   *United States v. Mohamud*, 843 F.3d 420 (9th Cir. 2016) ............................................ 16

6   *United States v. Ning Wen*, 477 F.3d 896 (7th Cir. 2007)............................................. 17

7   *United States v. Nixon*, 418 U.S. 683 (1974) ................................................................ 24

8   *United States v. Palacios*, 556 F.2d 1359 (5th Cir. 1077) .............................................. 8

9   *United States v. Rivera*, 527 F.3d 891 (9th Cir. 2008)................................................... 11

10  *United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985) ............................................ 12, 15

11  *United States v. Underwood*, 725 F.3d 1076 (9th Cir. 2013)..................................... 20, 21

12  *United States v. Warsame*, 547 F.Supp.2d 982 (D. Minn. 2008)..................................... 4

13  *Wilson v. Russo,* 212 F.3d 781 (3d Cir. 2000) ............................................................. 16

14                                          **<u>Statutes</u>**

15  18 U.S.C. § 2339B .......................................................................................................... 8

16  18 U.S.C. § 2518 ............................................................................................... 3, 10, 11

17  18 U.S.C. § 3103a ......................................................................................................... 10

18  18 U.S.C. § 3504 ............................................................................................... 23, 24, 25

19  50 U.S.C. § 1801 ..................................................................................................... *passim*

20  50 U.S.C. § 1804 ............................................................................................... 2, 3, 10, 11

21  50 U.S.C. § 1805 ..................................................................................................... 3, 7, 9

22  50 U.S.C. § 1806 ..................................................................................................... *passim*

23  50 U.S.C. § 1821 ........................................................................................................... 12

24  50 U.S.C. § 1823 ........................................................................................................ 2, 3

25  50 U.S.C. § 1824 ..................................................................................................... 3, 7, 9

26  50 U.S.C. § 1825 ..................................................................................................... *passim*

27  50 U.S.C. § 1881 ........................................................................................................... 23

28  50 U.S.C. § 1881a ......................................................................................................... 19

50 U.S.C. § 1881e ................................................................................................. 23

## **Other Authorities**

H.R. Rep. No. 95-1283 (1978) ...................................................................... 6, 10, 18

Pub. L. 108-458, 108th Cong., 2d. Sess. 2004, § 6001, 118 Stat 3638, § 6001 ...................................... 7

S. Rep. No. 94-755 (1976) .................................................................................. 19

S. Rep. No. 95-604 (1978) ............................................................................... 6, 18

S. Rep. No. 95-701 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3973 ................................................ *passim*

## **INTRODUCTION**

In its opposition to Mr. Adam Shafi's motion to suppress, the government seems determined to accomplish two goals. *See* Dkt. 146, Defendant's Motion to Suppress, and For a *Franks* Hearing and Disclosure of FISA Orders, Applications, and Related Materials ("FISA Motion"); Dkt. 171, Government's Unclassified Memorandum in Opposition to Defendant's Motions ("Gov. Oppo.").

First, the government is determined to deny Mr. Shafi a meaningful opportunity to litigate his motions at all costs. To that end, the government filed a perfunctory claim of privilege stating that disclosure of the FISA materials or an adversary proceeding in this case "would," "could be expected to," or maybe "could" harm the national security—despite the fact that Mr. Shafi and Abdul Niazi had no knowing foreign connections and never engaged in any terrorism-related activities. *See* Dkt. No. 171-1 ("Declaration and Claim of Privilege") at 2-3. Even more egregiously, the government's publicly filed opposition is almost devoid of any facts regarding Mr. Shafi's case, although most—if not all—of those facts are *public*. The Court should refuse to allow the government, under the banner of "national security," to deny Mr. Shafi's right to litigate his own case and should order it to file a revised opposition that only redacts classified information.[1]

The government's second goal appears to be to persuade the Court to rubber-stamp the FISC's determination. In the government's view, FISA's standards of review are either toothless (such as to the required certifications) or, at most, highly deferential (as to the probable cause determination). The government also repeatedly suggests that the Court would be an outlier were it to grant any of Mr. Shafi's requests because courts uniformly deny similar requests. But no two cases are factually identical and because the government does not anchor its arguments in the facts of this case, this Court has the authority and duty to decide Mr. Shafi's case on its own merits.

Here, that requires the Court to hold that (1) because Mr. Shafi and Mr. Niazi had no knowing connection whatsoever with ISIL or any other foreign power, there was no probable cause that they acted for or on behalf of ISIL or any other foreign power; (2) that their mere travel to Turkey, even if

---

[1] The Court should also require the government to provide an unredacted version of its Opposition to cleared defense counsel, or at the very least order the government to explain why its Opposition (as opposed to the classified exhibits) should not be provided to cleared defense counsel so that cleared defense counsel can actually file a meaningful reply.

1   the government establishes an alleged desire to join ISIL—a fact Mr. Shafi *does not* concede[2]—does

2   not qualify as an activity in preparation of sabotage or international terrorism or any other prohibited

3   activity; and (3) accordingly, the FISA applications could not have been supported by probable cause

4   to believe that Mr. Shafi or Mr. Niazi were agents of a foreign power. *See* 50 U.S.C. § 1801(b)(2).  As

5   a result, because neither Mr. Shafi or Mr. Niazi had any knowing connection whatsoever with ISIL, or

6   any other foreign power, the FISA applications could not have had as a significant purpose the

7   gathering of foreign intelligence information as defined in § 1801(e).  *See* 50 U.S.C. §§ 1804(a)(6)(A)-

8   (B); 1823(a)(6)(A)-(B).  Additionally, because the FISA applications likely omitted material

9   information tending to disprove that Mr. Shafi and Mr. Niazi supported, let alone wanted to join ISIL,

10   as well as other material information, the Court should hold a hearing pursuant to *Franks v. Delaware*,

11   438 U.S. 154 (1978).  *See* Dkt. 160, Motion to Suppress; Request for *Franks* hearing ("*Franks*

12   Motion") at 2-15.

13        Considering the weakness of the government's evidence that Mr. Shafi was an agent of a foreign

14   power, this Court may understandably wonder why the government sought the FISA orders.  The

15   answer may lie in the fact that the FISA surveillance began in December 2014, at the same time the

16   government sought criminal search warrants.  In other words, it seems clear at the time the government

17   sought the FISA warrant, it was pursuing a criminal case against Mr. Shafi and Mr. Niazi.  The

18   government, however, cannot use FISA to investigate a criminal case.[3]  *See* 50 U.S.C. §§

19   1804(a)(6)(A)-(B); 1823(a)(6)(A)-(B); *In re Sealed Case*, 310 F.3d 717, 735-36 (Foreign Int. Surv. Ct.

20   Rev. 2002) (FISA "excludes from the purpose of gaining foreign intelligence information a sole

21   objective of criminal prosecution," even for foreign intelligence crimes).  Instead, the government is

22

_____

23   [2]  As noted in Mr. Shafi's FISA motion, his statements of facts was drawn from the criminal complaint
     as well as the affidavits in support of the December 2014 search warrants for the email and cell phone
24   records for Mr. Shafi and Mr. Niazi.  *See* FISA Motion at 3, n. 1.  Mr. Shafi's recitation of the
     assertions in those documents is *not* an admission of their truth.  In fact, as discussed in his *Franks*
25   motion and as discussed below, those documents contain a number of material omissions and
     misstatements.  *See* Dkt. 160, Motion to Suppress; Request for *Franks* hearing ("*Franks* Motion").
26   Mr. Shafi's identification of certain omissions and misstatements is *not* an admission of the truth of
     those statements not specifically challenged.

27   [3] If the FISA applications are factually similar to the criminal warrants applications, it should give the
     Court additional pause as to whether FISA was improperly used to gain evidence in the criminal
28   investigation against Mr. Shafi.

1   supposed to use the procedures in Title III of the Omnibus Crime Control and Safe Streets Act of

2   1968, known as the Wiretap Act.  Title III, of course, requires probable cause of a crime, plus a robust

3   necessity requirement.  *See* 18 U.S.C. § 2518(3); *United States v. Garcia-Villalba*, 585 F.3d 1223,

4   1227 (9th Cir. 2009) (Under Title III, "aside from demonstrating probable cause, *see* 18 U.S.C. §

5   2518(3)(a), the government must prove necessity before it resorts to a wiretap. . . .  The purpose of the

6   necessity requirement is to ensure that wiretapping is not resorted to in situations where traditional

7   investigative techniques would suffice to expose the crime.") (internal quotations and citations

8   omitted).  The Court should therefore consider whether the government—unable to meet the standard

9   for a Title III warrant—used FISA as an end run around judicial scrutiny and the protections Title III

10  provides American citizens like Mr. Shafi.

11      This is not the only violation of FISA's statutory limitations on government surveillance here.

12  The government failed to comply with the statutory requirements for obtaining FISA evidence and

13  disseminating it to law enforcement, including, above all, a brazen disregard for the minimization

14  requirement.  For these reasons, the Court must suppress all evidence obtained pursuant to or derived

15  from the FISA orders.

16      Finally, the Court should order disclosure of the government's FISA applications, orders, and

17  related materials (including information about which evidence is obtained or derived from FISA

18  surveillance/physical search) as necessary to accurately determine the legality of the FISA surveillance

19  and searches, and as required by Due Process.

20                                    **ARGUMENT**

21  **A.    The FISA Applications Were Not Supported by Probable Cause that Mr. Shafi Was an
22          Agent of a Foreign Power.**

23      The FISC can authorize surveillance and physical searches if the government demonstrates there

24  is probable cause to believe the target is an "agent of a foreign power."  50 U.S.C. §§ 1804(a)(3);

25  1805(a)(2); 1823(a)(3); 1824(a)(2).  Looking at this issue *de novo*, the Court should find that the

26  government failed to carry its burden.

27

28

**1.      This Court Should Review *De Novo*.**

The government acknowledges that the majority of courts that have addressed this issue have decided that the FISC's probable cause determination is reviewed *de novo*.  Gov. Oppo. at 22-23.[4]  It nonetheless urges the Court to follow the minority of courts that have adopted the "due deference" standard applicable to search warrants issued under the Fourth Amendment, claiming the two areas are "analogous" and that a FISA order may be deemed a "warrant" since it is issued by a judicial officer and is based on a showing of probable cause.  *Id*.

The government's argument elevates form over substance.  A FISA order, even if one calls it a "warrant," is simply not a traditional Fourth Amendment warrant since it does not require probable cause of criminal activity, but only probable cause that the target is an agent of a foreign power.  *See In re Sealed Case*, 310 F.3d at 741-42 ("[A] FISA order may not be a 'warrant' contemplated by the Fourth Amendment. . . .  We do not decide the issue but note that to the extent a FISA order comes close to meeting Title III, that certainly bears on its reasonableness under the Fourth Amendment."); *United States v. Warsame*, 547 F.Supp.2d 982, 992 & n.10 (D. Minn. 2008) (noting "courts upholding constitutionality of FISA have done so not because a FISA order is a 'warrant,' but because the need for foreign intelligence justified an exception to the warrant requirement").  For this and many other reasons, FISA's statutory scheme and the Fourth Amendment are not analogous.

More importantly, because FISA surveillance is to be used for foreign intelligence investigations, not domestic criminal prosecutions, it makes sense that the FISC and Article III district courts would both review the probable cause determination anew.  The FISC's role is to ensure that the government's foreign intelligence investigations, while lawfully conducted, are not unnecessarily impeded and threats to national security are promptly and efficiently addressed, including by keeping FISA surveillance secret.  Article III courts, however, come into play only if the government decides to use FISA obtained or derived evidence at a criminal trial—a rare occurrence given that the vast majority of FISA orders are never used in court.

---

[4]  Highlighting the government's efforts to maintain secrecy and deny Mr. Shafi any meaningful opportunity to litigate his case, the government considers even the list of courts to have adopted *de novo* review to be classified.  *See* Gov. Oppo. at 21, n. 20.

1    In other words, Article III courts come into play at a most critical moment: when the federal

2    government has decided to bring its immense power and vast resources to bear upon someone it

3    charges with federal crimes.  At that most vulnerable moment, however, criminal defendants encounter

4    a formidable obstacle to their defense: the government's extraordinary power to deny them access to

5    FISA applications and orders by claiming that disclosure or an adversary hearing would harm the

6    national security.  *See* 50 U.S.C. § 1806(f).

7        Without access to the FISA materials, it is simply impossible for a defendant and his counsel to

8    expose all or even most deficiencies in the FISA process.  In order to ensure a criminal defendant's

9    rights are not completely illusory, then, Article III courts such as this one must have the right and the

10   obligation to review the FISA applications with a most searching eye to determine whether the

11   surveillance or physical search was "lawfully authorized or conducted."  50 U.S.C. § 1806(g).  In other

12   words, *de novo* review of the FISC's probable cause determination is crucial to prevent a criminal

13   defendant's rights from becoming irrelevant in criminal proceedings.

14       The information that has come to light in the years since FISA's adoption—such as the

15   government's confession in 2000 that some 75 FISA applications related to major terrorism activity

16   contained "misstatements and omissions of material facts," prompting the FISC to bar one FBI agent

17   from appearing as a FISA affiant again—reinforce the need for vigilance on the part of reviewing

18   courts.  *See* FISA Motion at 25-26 (citing *In re All Matters Submitted to Foreign Intelligence*

19   *Surveillance Court*, 218 F. Supp.2d 611, 620-21 (Foreign Intel. Surv. Ct. 2002)).  The Court should

20   therefore join the majority of courts and review the FISC's probable cause determination in Mr.

21   Shafi's case *de novo*.

22       **2.    There Was No Probable Cause that Mr. Shafi or Mr. Niazi Were ISIL Agents.**

23       The FISA applications in Mr. Shafi's case were not supported by probable cause for two reasons.

24   First, absent any knowing connection whatsoever with ISIL, Mr. Shafi and Mr. Niazi could not be

25   deemed to act "for or on behalf of a foreign power" as defined in 50 U.S.C. § 1801(b)(2).  Second,

26   neither Mr. Shafi nor Mr. Niazi knowingly engaged in any prohibited activities, as merely traveling to

27   Turkey—even if the government were able to show they allegedly intended to join ISIL in Syria—

28   does not meet the statutory definition.  *See* FISA Motion at 9-18.  As the government's unclassified

1   opposition addresses only the first argument, Mr. Shafi will do the same and respectfully refers the

2   Court to his opening motion as to the second argument.  *See* FISA Motion at 16-18.

3        As for whether Mr. Shafi or Mr. Niazi were acting for or on behalf of a "foreign power," Mr.

4   Shafi has consistently argued that Congress clearly envisioned that, in order for a U.S. person to be

5   found an agent of a foreign power, the person must have, *at the very least*, a non-insignificant knowing

6   connection with that foreign power.  *See* FISA Motion at 13-14.  FISA's legislative history clearly

7   supports this straightforward reading of the statute.  As the government itself acknowledges, the Senate

8   Reports accompanying Senate Bill 1566 ("S. 1566") required a "knowing and substantial connection

9   with the foreign power for whom [the U.S. person] is working."  S. Rep. 95-701, 27 (1978), *reprinted*

10  *in* 1978 U.S.C.C.A.N. 3973, 3996; *see also* S. Rep. 95-604(I) (same); *see* Gov. Oppo. at 36, n. 25.

11       The government nonetheless argues that "the report accompanying the definitions that were

12  ultimately enacted and codified at subsection 1801(b)(2) mentions neither 'substantial' connections

13  nor 'principal-agent' relationships."  *See* Gov. Oppo. at 36 n.25 (citing H.R. Rep. 95-1283, pt. 1, at 39,

14  44).  That is both irrelevant and incorrect.  Mr. Shafi only argued that FISA contemplates that the U.S.

15  person have, at a minimum, a non-insignificant connection with a foreign power, a proposition that

16  H.R. Rep. 95-1283 clearly supports by requiring that the U.S. person have a "knowing connection with

17  the 'foreign power' for whom he is working."  H.R. Rep. 95-1283, pt. 1, at 44.  But even assuming that

18  the Court would have to choose between the competing views of the Senate and the House of

19  Representatives (which is not the case given Mr. Shafi's argument), the Court would have to choose

20  the Senate's view.  H.R. Rep. 95-1283 accompanied H.R. 7308, the companion bill to S. 1566.

21  However, Congress ultimately adopted S. 1566, not H.R. 7308 as the government incorrectly implies.

22  *See* Gov. Oppo. at 36 n. 25.[5]  Thus, the Senate's views—including its belief that a U.S. person must

23  have a "knowing and substantial connection with the foreign power for whom he is working"—must

24  prevail.  *See* S. Rep. 95-701 at 27, 1978 U.S.C.C.A.N. at 3996.

25

26  ───────────────

27  [5] *See* https://www.congress.gov/bill/95th-congress/senate-bill/1566/actions?q=%7B%22search%22%3A%5B%22s.+1566%22%5D%7D&r=1 (actions overview for S. 1566 showing bill signed into law on October 25, 1978); https://www.congress.gov/bill/95th-congress/house-bill/7308/actions?q=%7B%22search%22%3A%5B%22hr+7308%22%5D%7D&r=1

28  (actions overview for H.R. 7308 showing bill not signed).

1   Moreover, the government's efforts to sow confusion regarding FISA's legislative history cannot

2   disguise its utter failure to address a critical development in FISA's history: Congress's adoption, in

3   2004, of a "lone wolf" provision for *non-U.S. persons*.  *See* Pub. L. 108-458, 108th Cong., 2d. Sess.

4   2004, § 6001, 118 Stat 3638, § 6001.  Congress expanded the definition of "agent of a foreign power"

5   to include "any person other than a United States person who…engages in international terrorism or

6   activities in preparation therefore."  *See* 50 U.S.C. § 1801(b)(1)(C).  This "lone wolf" provision has no

7   requirement that the non-U.S. person have any knowing connection with a foreign power.  *See*

8   *generally* FISA Motion at 14-15.

9   Adoption of the *non-U.S. person* "lone wolf" provision in 2004 unequivocally demonstrates that

10   Congress never intended that U.S. persons be deemed foreign agents when they lack any knowing

11   connection whatsoever with a foreign power.  There is no dispute that Mr. Shafi and Mr. Niazi are

12   U.S. persons.  Because neither had any knowing connection with ISIL or any other foreign power,

13   their alleged unilateral desire to join ISIL cannot support a finding of probable cause that they were

14   ISIL agents under FISA.  That is true even if the U.S. person may be acting on inspiration derived

15   from the foreign power's mission or activities. Or, in the case of the information likely submitted to

16   the FISC here, notwithstanding the government's allegations that Mr. Shafi followed extreme imams

17   online, believed that Muslims are in danger and needed protection, and shared these views with Mr.

18   Niazi.  *See* Dkt. 146-1, Exh. A, Dec. 2, 2014 Affidavit of Sara Dial in Support of Search Warrant

19   Application ("Dial Affidavit") at ¶¶ 16-19.

20   The government's unclassified opposition does not address this argument, but only challenges

21   Mr. Shafi's further argument that, if the Court were to find him an agent of ISIL, it would be solely on

22   the basis of activities protected by the First Amendment, in violation of 50 U.S.C. §§ 1805(a)(2)(A);

23   1824(a)(2)(A).  *See* FISA Motion at 15-16 & n.10.  The government argues that "not all speech- or

24   advocacy-related activities falls within the protections of the First Amendment.  For instance,

25   conversations with co-conspirators merit no First Amendment protection because they are statements

26   made in furtherance of a conspiracy and are evidence of the participant's criminal intent."  Gov. Oppo.

27   at 37.

28

1   It is true that a "technical conspiracy, which is defined by its criminal purpose," is not

2   constitutionally protected, such that "all knowing association with the conspiracy is a proper subject

3   for criminal proscription as far as First Amendment liberties are concerned." *Scales v. United States*,

4   367 U.S. 203, 229 (1961). But here the government does *not* argue in its redacted opposition, let alone

5   show, that any of the statements referenced in the FISA applications were actually made as part of a

6   conspiracy. *See United States v. Palacios*, 556 F.2d 1359, 1365 (5th Cir. 1077) ("While acts lawful in

7   themselves lose that character when they become elements of a conspiracy, nevertheless the

8   prosecution must first prove the existence of a conspiracy in fact, and that the appellant knowingly

9   participated in it.").

10   The government cannot make this showing for a simple reason: there is no evidence whatsoever

11   to support it. Instead, what the government likely relies on are the allegations that Mr. Shafi shared

12   extremist views with other people. *See* Dial Affidavit at ¶ 16 ("Adam's father was also concerned that

13   Adam may have been following extreme imams online and that some of his high school friends were

14   of the same mindset."). Such activities, however, are clearly protected speech under the First

15   Amendment. In fact, an individual is free to "advocate[e] the goals of the foreign terrorist

16   organizations, espous[e] their views or even be[] members of such groups." *Humanitarian Law*

17   *Project v. Reno*, 205 F.3d 1130, 1134 (9th Cir. 2000) (stating that individuals "can do so without fear

18   of penalty right up to the line established by *Brandenburg v. Ohio*, 395 U.S. 444 (1969)); *see also*

19   *Holder v. Humanitarian Law Project* ("*HLP*"), 561 U.S. 1, 18 (2010) (holding that mere membership

20   in a designated foreign terrorist organization is not unlawful). Indeed, it is primarily because

21   "Congress has avoided any restriction on independent advocacy, or indeed any activities not directed

22   to, coordinated with, or controlled by foreign terrorist groups," that the Supreme Court has found the

23   material support of terrorism statute, 18 U.S.C. § 2339B, constitutional. *HLP*, 561 U.S. at 35-36.

24   An individual, in fact, is also free to advocate violence. "[T]he constitutional guarantees of free

25   speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law

26   violation except where such advocacy is directed to inciting or producing imminent lawless action and

27   is likely to incite or produce such action." *Brandenburg*, 395 U.S. at 447; *see also Hess v. Indiana*,

28   414 U.S. 105, 108 (1973) (The First Amendment protects "advocacy of illegal action at some

indefinite future time").  Consistent with these basic principles, FISA is not intended to allow searches and surveillance based only on "pure advocacy of the commission of terrorist acts."  S. Rep. No. 95-701 at 28, 1978 U.S.C.C.A.N. at 3997.  Such advocacy is protected by the First Amendment and "would not, in and of itself, be sufficient to establish probable cause that an individual may be preparing for the commission of such acts."  *Id.*

In conclusion, the government's efforts to recast constitutionally protected statements as co-conspirator statements lacks both factual and legal support.  Thus, given the lack of any contact whatsoever with ISIL or any other foreign power, the FISC's finding that Mr. Shafi was an agent of a foreign power rested solely on the basis of activities protected by the First Amendment, in violation of his constitutional rights and FISA's statutory requirements.  *See* 50 U.S.C. §§ 1805(a)(2)(A); 1824(a)(2)(A).  Therefore, the FISA orders lacked probable cause, were improperly issued and should be suppressed.

## B.   The Required Certifications Were Deficient.

Mr. Shafi does not have access to the government's arguments in relation to the required certifications under FISA as they have deemed the entire discussion of the issue "classified."  *See* Gov. Oppo. at 38.  As such, Mr. Shafi cannot respond to those arguments.  Nonetheless, he wishes to emphasize three points.

First, in its overview of the district court's review of FISC orders, the government spends an inordinate amount of space citing irrelevant cases before finally acknowledging that, when the target of a FISA order is a U.S. person—such as Mr. Shafi—FISA clearly provides that certifications are reviewed for clear error.  *See* 50 U.S.C. §§ 1805(a)(4); 1824(a)(4); *see also* Gov. Opp. at 23-26.  This standard applies here and, while deferential, it is not toothless, as the government would like the Court to believe.  The Court should therefore scrutinize the certifications in this case with a searching eye to ensure they are not "clearly erroneous."  *Id.*

Second, when the target is a U.S. person, the certification that a "significant purpose" of the FISA surveillance or physical search is to obtain "foreign intelligence information" requires a showing that a measurable purpose of the FISA surveillance or physical search is obtaining information "necessary" to the United States' ability to protect against certain enumerated threats.  *See* 50 U.S.C.

1    §§ 1801(e); 1804(a)(6)(A)-(B).  As Mr. Shafi has already explained, Congress envisioned the

2    "necessary" standard to limit FISA's reach in the case of U.S. persons to information that is important

3    and required, and for which there is a significant degree of need—not information that is merely useful

4    or convenient to the stated goals.  *See* FISA Motion at 19-21.  As Mr. Shafi and Mr. Niazi had no

5    knowing connections whatsoever with ISIL or any other foreign power, there could not have been any

6    reason to believe that their surveillance or search of any physical premises associated with them would

7    yield any information necessary to the United States' ability to protect against any threats *by ISIL or*

8    *an ISIL agent*, *see* 50 U.S.C. §§ 1801(e)(1)(A)-(C), nor any information necessary to the United States'

9    national defense or security, or the conduct of its foreign affairs, 50 U.S.C. §§ 1801(e)(2)(A)-(B).[6]

10   Accordingly, the certification that a significant purpose of the FISA surveillance or physical search in

11   Mr. Shafi's case was obtaining foreign intelligence information was clearly erroneous.

12        Finally, as Mr. Shafi has previously explained, the government could have reasonably obtained

13   the same information it obtained via FISA orders by applying for a Title III wiretap and an 18 U.S.C §

14   3103a search warrant.  Both include delayed notification procedures and, accordingly, would have

15   allowed the government to continue their investigation unimpeded and in secret, just like the FISA

16   orders did.  *See* 18 U.S.C. §§ 2518(8)(d); 3103a(b).

17        Instead, it appears that the Government simply avoided applying for them because it could not

18   make the requisite showing of probable cause of criminal activity—especially had the government

19   included all relevant statements and omitted numerous misstatements, as argued in Mr. Shafi's *Franks*

20   motion and incorporated in his FISA motion.  *See* FISA Motion at 25; *Franks* Motion at 9-18.  The

21   government likely also sought to avoid Title III's robust necessity requirement, which requires that the

22   government explain in "case-specific detail," not "conclusory language" or "generalized statements

23   that would be true of any . . . investigation," that "normal investigative procedures have been tried and

---

25   [6] *See* H.R Rep. 95-1283 at 49 ("Paragraph (e)(2) . . . also requires that the information sought involve

26   information with respect to foreign powers or territories, and would therefore not include information solely about the views or planned statements or activities of Members of Congress, executive branch officials, or private citizens concerning the foreign affairs or national defense of the United States.  It

27   is anticipated that the types of 'foreign intelligence information' defined in subparagraph (e)(1)(A) and (e)(2)(A) and (B) will be the types most often sought when an electronic surveillance is instituted

28   against a foreign power as defined in section 101(a)(1)-(3) and (5), or against most foreign power agents as defined in section 101(b)(1)(A)").

DEFENDANT'S REPLY TO UNITED STATES' OPPOSITION TO FISA MOTIONS
*United States v. Shafi*, CR 15-582-WHO

1    have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," as 18 U.S.C.

2    § 2518 requires.  *United States v. Rivera*, 527 F.3d 891, 899-900 (9th Cir. 2008).  Relatedly, the

3    government also likely sought to avoid the very probing Ninth Circuit review of the necessity

4    requirement under Title III, as opposed to the deferential, "clearly erroneous" standard applicable

5    under FISA when a US person is involved.  *See id.* at 898 ("In reviewing a district court's denial of a

6    motion to suppress where that motion asserts lack of necessity for a wiretap, we review *de novo*

7    whether an application for a wiretap order is supported by a full and complete statement of the facts in

8    compliance with 18 U.S.C. § 2518(1)(c). . . .  Next, we review for abuse of discretion the issuing

9    judge's conclusion that the wiretap was necessary.") (internal citations omitted).

10       In sum, the government cannot escape the glaring omissions in its certification.  In addition to its

11   lack of probable cause concerning Mr. Shafi and Mr. Niazi being agents of ISIL, it could not certify

12   that the FISA surveillance was "necessary" to obtain "foreign intelligence information."  But if, as the

13   government claims, it did have probable cause, then it could not satisfy FISA's requirement that "such

14   information cannot reasonably be obtained by normal investigative techniques" because a Title III

15   wiretap was available.  *See* 50 U.S.C. § 1804(a)(6)(C).  Thus, the certifications were clearly erroneous.

16   **C.    The Required Minimization Procedures Were Inadequate or Disregarded.**

17       In his opening motion, Mr. Shafi urged the Court to review the Classified Declaration of Galia

18   Amram to judge whether the minimization procedures were properly followed.  *See* FISA Motion at

19   23-24; *see* Dkt. 150, Notice of Under Seal Ex Parte Filing Pursuant to Protective Order.

20       The government concedes, as it should, that suppression is appropriate when there has been a

21   complete disregard for the minimization procedures.  *See* Gov. Opp. at 32-33; *see also* S. Rep. No. 95-

22   701, at 39–40, 1978 U.S.C.C.A.N. at 4008-09 ("In assessing the minimization effort, the court's role is

23   to determine whether 'on the whole, the agents have shown a high regard for the right of privacy and

24   have done all they reasonably could to avoid unnecessary intrusion.' Absent a charge that the

25   minimization procedures have been disregarded completely, the test of compliance is 'whether a good

26   faith effort to minimize was attempted.'").

27       The Court should again read the classified Amram motion and declaration and decide for itself if

28   the government had any regard for the minimization requirements, much less acted in good-faith in

1   Mr. Shafi's case.  The answer is categorically "no."  Because the government completely disregarded

2   the minimization procedures here, the Court should suppress all FISA obtained or derived evidence.[7]

3   **D.    The FISA Applications Recklessly Omitted Material Information.**

4          In *Franks,* the Supreme Court held that evidence may be suppressed when obtained pursuant to a

5   search warrant affidavit containing false statements that undermined probable cause. 438 U.S. at 155-

6   56.  Under *Franks,* a defendant is entitled to an evidentiary hearing where she makes a substantial

7   preliminary showing that (1) a false statement was intentionally or recklessly included in a search

8   warrant application and (2) the false statement was material to the finding of probable cause.  *Id*.  If,

9   after a hearing, the defendant demonstrates the intentional or reckless falsity by a preponderance of the

10  evidence, the reviewing court must set the false statements to one side and determine whether the

11  remaining information is sufficient to establish probable cause.  *Id.* at 156.  If not, the warrant must be

12  voided and the fruits of any search or seizure performed pursuant to the warrant must be suppressed.

13  *Id.*

14         *Franks* applies equally to "deliberate or reckless *omissions* of fact which tend to mislead."

15  *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985) (emphasis added).  "By reporting less than

16  the total story, an affiant can manipulate the inferences a magistrate will draw. To allow a magistrate

17  to be misled in such a manner could denude the probable cause requirement of all real meaning." *Id.*

18

19  _____

20  [7] In the alternative, Mr. Shafi moves for suppression of those specific communications that should
    have been minimized, but were not.  The government concedes that such communications must be

21  suppressed. Gov. Oppo. at 33.  Nonetheless, it claims that FISA does not require minimization of
    information that is or "may be" "evidence of a crime."  *Id*.  That is incorrect.  FISA allows "for the

22  *retention and dissemination* of information that is evidence of a crime which has been, is being, or is
    about to be committed and that is to be retained or disseminated for law enforcement purposes."  50

23  U.S.C. §§ 1801(h)(3); 1821(4)(c) (emphasis added).  By its terms, this provision only applies to (1)
    retention and dissemination, not *acquisition*; and (2) information whose status as "evidence of a crime"

24  is evident at the time of the acquisition, not information that "may be" evidence of a crime at some
    unspecified time in the future, as the government suggests.  Thus, even information that "is evidence

25  of a crime" must be suppressed when it was unlawfully *acquired.  See* S. Rep. 95-701, 61; 1978
    U.S.C.C.A.N. at 4030 ("The implication that such criminal evidence be acquired incidentally logically

26  connotes that it must be acquired lawfully.  This requires that there be a good faith effort to minimize.
    Thus for example, if monitoring agents choose to disregard the minimization standards and thereby

27  acquire evidence of a crime against an overheard party whose conversation properly should have been
    minimized, that evidence would be acquired in violation of this chapter and would properly be

28  suppressed if offered at any official proceeding.").

1    (emphasis added).  In the case of such intentional or reckless omissions, the court must review the

2    warrant application "with the omitted information included" and determine whether the application

3    would still establish probable cause.  *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992).

4    Finally, "[t]he effect of misrepresentations and omissions on the existence of probable cause is to be

5    considered cumulatively."  *United State v. Kiser*, 716 F.2d 1268, 1274 (9th Cir. 1983).

6         As explained in his separately filed *Franks* motion and reply to the government's opposition to

7    that motion, Mr. Shafi met his burden under *Franks*.  Because it is likely the government provided

8    essentially the same materials in support of both the Google and T-Mobile search warrants and the

9    FISA applications, he incorporated his arguments in support of his *Franks* motion as to the Google and

10   T-Mobile search warrants—and subsequent warrants—into his *Franks* arguments concerning the FISA

11   applications.  *See* FISA Motion at 25-26; *see also* Dkt. 178, Reply to United States' Opposition to

12   Motion to Suppress and for *Franks* Hearing ("*Franks* Reply") at 5.  Attached to Mr. Shafi's *Franks*

13   motion was competent evidence demonstrating that Agent Dial[8] failed to include critical statements

14   made to her by Mr. Niazi and Mr. Shafi's father, Salama Shafi, as well as critical information

15   pertaining to the credibility of Mr. Niazi's brother Yusuf.  *See Franks* Motion at 9-14.  Taken together,

16   these omissions contradict and undermine Agent Dial's conclusion that Mr. Shafi supported ISIL and

17   traveled to Turkey with the intent to join ISIL.  *See id*. at 15-18.

18        First, Agent Dial failed to include statements made by Mr. Niazi on September 29, 2014.  *See*

19   *Franks* Motion at 2-3, 9-10; *Franks* Reply at 6-7.  According to the FBI 302 Report of that interview,

20   Mr. Niazi told Agent Dial directly he had no intention to go to Syria.  Amram *Franks* Decl., Exh. C

21   [AS-00008-09].  Second, he told Agent Dial he had no intention to fight.  *Id*. Third, he told Agent Dial

22

23   ────────────────

[8] It is irrelevant whether the FISA affiant was Agent Dial or a different government official.  *See*
24   *DeLeon*, 979 F.2d at 763-64 (holding that "[a] deliberate or reckless omission by a government official
     who is not the affiant can be the basis for a *Franks* suppression" and that the government cannot
25   insulate itself from a *Franks* violation by claiming the warrant affiant himself was not personally
     aware of the omitted facts).  Furthermore, the rule of *DeLeon* does not distinguish between
26   "government officials" who work for different government entities.  *See*, *e.g.*, *Chism v. Washington*,
     661 F.3d 380, 392 (9th Cir. 2011) (following *DeLeon* and permitting *Franks* claim where arrest
27   warrant affiant was deputy prosecuting attorney and officials who omitted material facts were
     Washington State Police officers); *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997)
28   (citing *De Leon* and agreeing that *Franks* claim directed at DEA agent's search warrant affidavit could
     be based on omissions by Albuquerque Police detective).

DEFENDANT'S REPLY TO UNITED STATES' OPPOSITION TO FISA MOTIONS
*United States v. Shafi*, CR 15-582-WHO

1 that he believed ISIS "had nothing to do with Islam" and "Muslims don't kill innocent people," a

2 critique of ISIS widely shared around the world. *Id*. These omitted statements undermined the

3 government's theory that Mr. Niazi—and by extension, Mr. Shafi—supported, let alone intended to

4 join, ISIL at the time of their trip to Turkey.

5      Second, Agent Dial omitted several exculpatory facts the government learned from Salama Shafi

6 on September 4, 2014. Those include the fact (1) Mr. Shafi went to Turkey to see the plight of Syrian

7 refugees; (2) Mr. Shafi had no interest in going back to Turkey or anywhere else; (3) Mr. Shafi had no

8 contact with anyone overseas before he travelled to Turkey or thereafter; and (4) Mr. Shafi had active

9 plans to resume his schooling in the near future. *See Franks* Motion at 3-5, 10-12; *Franks* Reply at 7-

10 7; Amram *Franks* Decl. Exh. E [AS-00003-04]. The affidavit also omitted crucial information about

11 Salama's reasons for calling the U.S. Embassy, including Salama's explanation that he did not actually

12 believe Mr. Shafi intended to join a terrorist organization but "felt he had to use eye catching language

13 to get someone's attention." Amram *Franks* Decl. Exh. E [AS-00003-04]. Including these statements

14 in the applications would have significantly undermined the government's showing of probable cause

15 because it confirmed that Mr. Shafi had no knowing connections with ISIL and tended to show that he

16 did not go to Turkey with the intent to join ISIL.

17      Finally, Agent Dial omitted significant detail about Yusuf Niazi, who had allegedly told a friend

18 who later called the FBI that his brother had gone to, or was about to go to, Turkey to meet a person

19 and join ISIL. Agent Dial failed to explain that Yusuf had a criminal record, had active restraining

20 orders against him, had been fired from a job, had been accused of threatening and stalking a former

21 girlfriend, did not get along with his brother Abdul, and was thought to be an unstable and violent

22 individual. *Franks* Motion at 5-8, 12-14; *Franks* Reply at 9-11. This information was crucial because

23 the informant had no personal direct knowledge about how Yusuf learned this information, or whether

24 it even true. It was therefore incumbent on the government to independently corroborate Yusuf's

25 credibility and the veracity of his claims that Mr. Niazi went to Turkey with the intent to join ISIL.

26 *See*, *e.g.*, *Satchell v. Cardwell*, 653 F.2d 408, 411 (9th Cir. 1981) ("A tip must contain sufficient

27 information to permit an independent determination that the informant is reliable and his information

28 was based on more than casual rumor.").

1    This was particularly important considering that Mr. Niazi expressly told Agent Dial that he was

2  not going to Turkey to join ISIS, and expressed disgust about ISIS itself.  *See Franks* Amram Decl.,

3  Exh. C [AS-00008-09].  Since there were conflicting statements about the purpose of Mr. Niazi's trip,

4  giving the FISC the "total story" about Yusuf's troubled and violent background and his strained

5  relationship with his brother and family—rising to criminal threats, a restraining order and a criminal

6  conviction for violating that restraining order—would have caused the court to be skeptical about the

7  reliability of his alleged claims.  *See Stanert*, 762 F.2d at 781.  This omitted information was therefore

8  material.

9    In conclusion, the omissions, both individually and cumulatively, were material to the probable

10  cause determination.  The claim that Mr. Shafi and Mr. Niazi traveled to Turkey intending to join ISIL

11  was potent, the kind of claim designed to give the appearance of a bona fide foreign intelligence

12  investigation when no evidence actually supports a foreign connection, and to prime a judge such that

13  he or she would be more inclined to overlook deficiencies in the FISA applications.  The omissions

14  likely present in the FISC affidavits therefore undermine the entire premise for the FISA applications

15  and, indeed, the FBI's entire investigation.  They also destroy any potential claim (already very weak)

16  that Mr. Shafi or Mr. Niazi had any knowing connection with ISIL or ISIL operatives.  Finally, they

17  destroy any potential claim (again, already very weak) that Mr. Shafi or Mr. Niazi's travel to Turkey

18  was an act in preparation of sabotage or international terrorism on behalf of ISIL.  For these reasons,

19  had the omitted information been included in the FISA applications, no FISA orders would have issued

20  because the government would have indisputably lacked probable cause that Mr. Shafi or Mr. Niazi

21  were an agent of ISIL.[9]

22    Finally, "[a]t this stage, all that is required is that the defendant make a substantial showing that

23  the affiant intentionally or recklessly [misstated facts or] omitted facts required to prevent technically

24  true statements in the affidavit from being misleading."  *Stanert*, 762 F.2d at 781.  Mr. Shafi met his

25  burden.  "The most commonsense evidence that [Agent Dial] acted with at least a reckless disregard

26  for the truth is that the omissions and false statements contained in the affidavit were all facts that were

---

28  [9]  As Mr. Shafi has argued in his opening motion, his travel to Turkey was not such an act *even if* he did it with the desire to join ISIL. *See* FISA Motion at 16-18.

1  within [Agent Dial's] personal knowledge." *Chism*, 661 F.3d at 388.  Furthermore, she acted

2  recklessly because she withheld facts "that 'any reasonable person would have known that this was the

3  kind of thing the judge would wish to know.'"  *Wilson v. Russo,* 212 F.3d 781, 788 (3d Cir. 2000)

4  (quoting *United States v. Jacobs,* 986 F.2d 1231, 1235 (8th Cir. 1993)).

5       Therefore, Mr. Shafi has made a "substantial showing" that the FISA applications contained

6  reckless omissions material to the probable cause findings.  Accordingly, the Court should hold an

7  evidentiary hearing.

8  **E.   The Evidence Obtained or Derived from Electronic Surveillance and Physical Searches**

9  **Conducted in Violation of FISA and the Constitution Should Be Suppressed.**

10      If the search was unlawful, the government contends that the good faith exception to the

11  exclusionary rule would prevent suppression.  Gov. Oppo. at 26-27.  However, FISA *mandates*

12  suppression for unlawful surveillance or searches.  In any event, the good faith exception cannot save

13  the deficient FISA orders at issue here.

14      **1.   The Good Faith Exception Does Not Apply to FISA.**

15      FISA provides that, if the surveillance or physical search was "not lawfully authorized or

16  conducted," the evidence "obtained or derived from" it "*shall*" be suppressed.  50 U.S.C. §§ 1806(g);

17  1825(h) (emphasis added).  The government utterly ignores this statutory directive.  Instead, it claims,

18  without offering any independent argument of its own, that "[n]umerous courts have stated that the

19  good faith exception applies to FISA evidence" and invites the Court to do the same.  Gov. Oppo. at 26

20  (citing four cases).

21      The Ninth Circuit appears to agree that, in sections 1806(g) and 1825(h), FISA provides for

22  automatic suppression for statutory violations rendering the surveillance or physical search "not

23  lawfully authorized or conducted."  *See United States v. Mohamud*, 843 F.3d 420, 436 (9th Cir. 2016)

24  (noting that, unlike sections 1806(g) and 1825(h), "Congress has not mandated suppression as a

25  remedy for late disclosure of a FISA notice," which "strongly suggest[s] that automatic suppression is

26  not a required remedy for a delayed FISA disclosure.")  On the other hand, the Ninth Circuit has left

27  open the question whether the good faith exception might apply to constitutional challenges to a FISA

28  order.  *See id.* at 438 n.20 ("we do not reach the question of whether the good faith exception to the

1  exclusionary rule provides an independent basis to affirm the district court's denial of Mohamud's

2  [Fourth Amendment] motion to suppress.").[10]  Absent clear guidance from the Ninth Circuit, however,

3  the Court should decline the government's invitation to blindly follow other district courts and hold

4  instead that the good faith exception is incompatible with FISA's statutory framework.

5       FISA's language and legislative history strongly militate against engrafting the good-faith

6  exception into FISA.  Sections 1806(g) and 1825(h) provide that, if the surveillance or physical search

7  was "not lawfully authorized or conducted," the court "shall, in accordance with the requirements of

8  law, suppress the evidence."  The Constitution is "law" for FISA purposes and constitutional

9  challenges fall within the scope of suppression motions under 50 U.S.C. § 1806(g).  *See ACLU Found.*

10 *of S. Cal. v. Barr*, 952 F.2d 457, 465 (D.C. Cir. 1991) ("When a district court conducts a § 1806(f)

11 review, its task is not simply to decide whether the surveillance complied with FISA. Section 1806(f)

12 requires the court to decide whether the surveillance was 'lawfully authorized and conducted.' The

13 Constitution is law. Once the Attorney General invokes § 1806(f), the respondents named in that

14 proceeding therefore must present not only their statutory but also their constitutional claims for

15 decision.").  Accordingly, surveillance conducted in violation of FISA or in violation of the

16 Constitution is not "lawfully authorized or conducted" within the meaning of the statute.

17 Furthermore, "[t]he word 'shall' is ordinarily the language of command."  *Alabama v. Bozeman*, 533

18 U.S. 146, 153 (2001) (internal quotation marks omitted).  FISA is thus clear on its face and does not

19 provide for any exception from suppression, be it for statutory or constitutional violations.  *See*

20 *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2011) ("The preeminent canon of statutory

21 interpretation requires us to presume that [the] legislature says in a statute what it means and means in

22 a statute what it says there.") (quotations and citation omitted)).

23

24 _____

25 [10] In fact, the only two appellate courts to have addressed the issue have both merely suggested that the good faith exception applies to *constitutional* challenges.  *See United States v. Duka*, 671 F.3d 329,

26 346 (3d Cir. 2011) (after holding that "FISA's 'significant purpose' test satisfies the Fourth Amendment," stating in dicta that, even were FISA's "significant purpose" unconstitutional, the good

27 faith exception would not require suppression if the officers reasonably relied on FISA in seeking the surveillance orders); *United States v. Ning Wen*, 477 F.3d 896, 897-99 (7th Cir. 2007) (distinguishing

28 between suppression under FISA and the Fourth Amendment and holding that the good faith exception applies to constitutionally-deficient surveillance orders issued in reliance on FISA).

1     That courts must suppress evidence "in accordance with the requirements of law" does not imply

2     that Congress contemplated exceptions from the suppression mandate in sections 1806(g) and 1825(h).

3     Rather, the language plainly states that the suppression itself must be "in accordance with the

4     requirements of law."  In other words, while suppression is the only available remedy under sections

5     1806(g) and 1825(h), its implementation has to be "in accordance with the requirements of law."

6     Indeed, FISA's legislative history makes clear that the "in accordance with the requirements of law"

7     language pertained to the *procedural* aspects of suppression.  Of particular concern to Congress were

8     the procedures to be used to ensure, as a practical matter, that a suppression order be given full effect.

9     That included directing the government "to surrender to the defendant all the records of the

10    surveillance in its possession in order for the defendant to make an intelligent motion on the question

11    of taint," as mandated by the Supreme Court's decision in *Alderman v. United States*, 394 U.S. 165

12    (1969).  *See* S. Rep. 95-701 at 65, 1978 U.S.C.C.A.N. at 4034.[11]

13    Furthermore, had Congress wanted FISA's exclusionary rule to be commensurate with the

14    Fourth Amendment exclusionary rule, it would have done so explicitly.  Thus, as the discussion of the

15    Supreme Court's decision in *Alderman* shows, Congress was keenly aware of the intense debate

16    surrounding the exclusionary rule in the years leading to FISA's adoption.  Yet Congress decided to

17    mandate suppression under FISA, thus clearly indicating that it meant to extend it beyond the

18    constitutional minimum.  *See United States v. Kowalczyk*, 805 F.3d 847, 857 (9th Cir. 2015)

19    (construing "shall" regarding the statutory right to counsel to extend beyond the constitutional

20    minimum to avoid rendering the language superfluous).

21    Finally, the good faith exception was borne out of a lengthy discussion on the social costs and

22    benefits of the exclusionary rule.  *See United States v. Leon*, 468 U.S. 897, 906–13 (1984).  The

23    Supreme Court explained "[t]he Fourth Amendment contains no provision expressly precluding the

---

[11] Congress explained that "[t]he committee has chosen the general phrase 'in accordance with the requirements of law' to deal with the problem of what procedures are to be followed in those cases where the trial court determines that the surveillance was unlawfully authorized or conducted.  The evidence obtained would not, of course, be admissible during the trial.  But beyond this, in the case of an illegal surveillance, the government is constitutionally mandated to surrender to the defendant all the records of the surveillance in its possession in order for the defendant to make an intelligent motion on the question of taint." *See* S. Rep. 95-701 at 65, 1978 U.S.C.C.A.N. at 4034 (discussing *Alderman*); *see also* H.R. Rep. 95-1283 at 93 (same); S. Rep. 95-604(I) n. 68 (same).

1    use of evidence obtained in violation of its commands," and that the exclusionary rule developed as "a

2    judicially created remedy designed to safeguard Fourth Amendment rights . . . ."  *Id*. at 906 (internal

3    quotations omitted).  Because the exclusionary rule is a *judicial* remedy, it is within the judiciary's

4    province to determine when the rule applies.  *See id*. at 906–07 (explaining that the question before the

5    Supreme Court was for it to determine when the rule applies by "weighing the costs and benefits").

6    Accordingly, it is subject to judicial modification based on social utility analysis.

7         In contrast, the law governing FISA surveillance and physical searches is codified in a

8    comprehensive statutory scheme providing explicit requirements, procedures, and protections.  FISA

9    was enacted to address federal domestic surveillance abuses that came to light during the 1960s and

10   70s, including surveillance, ostensibly for national security purposes, of Dr. Martin Luther King Jr.,

11   Vietnam War protestors, and other groups labeled "subversive."  *See*, *e.g.*, Final Report of the Select

12   Committee to Study Governmental Operations with Respect to Intelligence Activities, S. Rep. No. 94-

13   755 (1976); Commission on CIA Activities Within the United States, Report to the President (1975);

14   *United States v. Belfield*, 692 F.2d 141, 145 (D.C. Cir. 1982).  Thus, with FISA Congress already

15   balanced the social costs and benefits of suppression and decided that suppression is the sole remedy

16   for both statutory and constitutional violations.  Indeed, one way for Congress to ensure the civil

17   liberties abuses that prompted the enactment of FISA would not reoccur was to include the automatic

18   suppression penalty provisions in sections 1806(g) and 1825(h).[12]  *Cf. Elkins v. United States*, 364 U.S.

19   206, 217 (1960) ("The [exclusionary] rule is calculated to prevent, not to repair.  Its purpose is to

20   deter—to compel respect for the constitutional guaranty in the only effectively available way—by

21   removing the incentive to disregard it.").

22        Courts, of course, have no authority to "rewrite the statute that Congress has enacted."  *Dodd v.*

23   *United States*, 545 U.S. 353, 359 (2005).  "When the statute's language is plain, the sole function of

24   the courts—at least where the disposition required by the text is not absurd—is to enforce it according

25   to its terms."  *Id*. (internal quotations and alterations omitted).  Here, Congress has plainly spoken.

26   _____

27   [12]  The increasingly numerous reports of problems in the FISA process and the revelation of bulk
     warrantless surveillance programs under 50 U.S.C. § 1881a (also known as the "FAA" or "Section

28   702" surveillance), reinforce the continued need for suppression as a deterrent measure to ensure
     compliance with FISA and the Constitution. *See* FISA Motion at 24-26.

DEFENDANT'S REPLY TO UNITED STATES' OPPOSITION TO FISA MOTIONS
*United States v. Shafi*, CR 15-582-WHO

1   The Court, therefore, has no authority to ignore Congress's considered wish and should reject the

2   government's attempt to engraft a good-faith exception on FISA's suppression mandate.

3        **2.      Even if the Good Faith Exception Applied to FISA, the Government Has Failed to
             Carry its Burden that it Should Apply in Mr. Shafi's Case.**

4

5        The government bears the "burden of demonstrating good faith." *United States v. Underwood*,

6   725 F.3d 1076, 1085 (9th Cir. 2013).  Even if the good faith exception applies to FISA, the

7   government cannot satisfy this burden.

8        The Supreme Court identified four situations that *per se* fail to satisfy the good faith exception:

9   (1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the

10  issuing judge; (2) where the judge "wholly abandoned his judicial role"; (3) where the affidavit is "so

11  lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable";

12  and (4) where the warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be

13  searched or the things to be seized—that the executing officers cannot reasonably presume it to be

14  valid." *Leon*, 468 U.S. at 923 (internal quotations omitted).  "If any of these four situations apply . . .

15  [courts] need not inquire further and can conclude that the good faith exception to the exclusionary

16  rule does not apply." *Underwood*, 725 F.3d at 1085.  "Thus, in these four circumstances, including the

17  circumstance of a bare bones affidavit, the officer can never have a reasonable ground for believing the

18  warrant had probable cause." *Id.* at 1087.

19       Because the government has refused to disclose the FISA applications and orders to Mr. Shafi

20  forcing him to litigate blindly, he is again left to rely exclusively on the Court's review to ensure that

21  the applications and orders are not "so facially deficient . . . that the executing officers cannot

22  reasonably presume [them] to be valid." *Leon*, 468 U.S. at 923.  Mr. Shafi, however, respectfully

23  submits that the other circumstances contemplated by *Leon* exist and defeat any claim of good faith.

24       First, as explained at length above, the FISA applications omitted material information that

25  tended to demonstrate that Mr. Shafi and Mr. Niazi did not support ISIL and did not travel to Turkey

26  in August 2014 with the intent to join ISIL, as the applications incorrectly stated, therefore

27  undermining any potential claim that they were agents of ISIL.  A *Franks* violation, of course, is

28  incompatible with the good faith exception.  *See Leon*, 468 U.S. at 914, n.12 ("Indeed, it would be an

1    unthinkable imposition upon [the magistrate's] authority if a warrant affidavit, revealed after the fact

2    to contain a deliberately or recklessly false statement, were to stand beyond impeachment.") (internal

3    quotations omitted).

4        Second, the FISA applications were "so lacking in indicia of probable cause as to render official

5    belief in its existence entirely unreasonable." *Id.* at 923.  An affidavit is "so lacking in indicia of

6    probable cause" when "it fails to provide a colorable argument for probable cause." *Underwood*, 725

7    F.3d at 1085.  "A colorable argument is made when thoughtful and competent judges could disagree

8    that probable cause does not exist." *Id.* (internal quotations omitted).

9        As explained earlier, probable cause under FISA requires that a U.S person be an agent of a

10   foreign power, which requires, at a minimum, that the target have a non-insignificant connection with

11   a foreign power.  Furthermore, the target must knowingly engage or aid, abet, or conspire with another

12   to engage in certain prohibited activities for or on behalf of a foreign power.  Mr. Shafi, however, had

13   no connection whatsoever to ISIL or any other foreign power.  Under these stark facts, which leave no

14   room for nuances, balancing acts, and subjective interpretations, "thoughtful and competent judges"

15   would agree that Mr. Shafi did not act for or on behalf of a foreign power and simply could not have

16   qualified as an agent of ISIL.  *Underwood*, 725 F.3d at 1085.

17       Mr. Shafi also did not engage in any prohibited activities.  The mere act of traveling to Turkey,

18   even with the alleged desire to join ISIL in Syria, does not constitute an act in preparation of sabotage

19   or international terrorism.  *See* FISA Motion at 16-18.  In fact, even joining a foreign terrorist

20   organization ("FTO") is lawful, protected activity.  *HLP*, 561 U.S. at 18; *see also Humanitarian Law*

21   *Project*, 205 F.3d at 1134.  Furthermore, the evidence proffered in support of the *Franks* motions

22   dispels the notion that Mr. Shafi traveled to Turkey with such intent.  *See Franks* Motion at 2-5, 9-12,

23   *Franks* Reply at 6-7.  The FISA applications therefore provide *no* factual basis for the conclusion that

24   Mr. Shafi engaged in prohibited activities.  Therefore, reasonable judges would agree that he could not

25   have qualified as an agent of ISIL.

26       Finally, because a U.S. person must both act for or on behalf of a foreign power *and* engage in

27   certain prohibited activities to be deemed an "agent of a foreign power," either deficiency in itself

28   suffices to defeat the government's claim of good faith.  Considered together, however, they also

1    suggest that the FISA court failed to "perform [its] neutral and detached function" and served "merely

2    as a rubber stamp" for the government.  *Leon*, 468 U.S. at 914.  Thus, oversight as to both indicates

3    that the FISA court "wholly abandoned [its] judicial role."  *Id*. at 923.

4          In conclusion, good faith is not an exception from FISA's suppression mandate.  Even if it were,

5    however, the government's conclusory assertions failed to carry its burden to prove that the good faith

6    exception applied here.

7    **F.     The Court Should Order Disclosure of the FISA Applications, Orders and Related**
     **Materials.**

8

9          If the Court does not order suppression of the FISA materials, it should disclose the FISA

10   applications, orders, and all relevant materials to him in order to further supplement his motion to

11   suppress.  The government opposes the request, arguing that the FISA materials are "presented in a

12   well-organized and straightforward manner that will allow the Court to make its determination of the

13   lawfulness of the FISA collection without input from defense counsel."  Gov. Oppo. at 42.  Not true.

14         Congress has intended that courts order disclosure where "the court's initial review of the

15   application, order, and fruits of the surveillance indicates that the question of legality may be

16   complicated by factors such as 'indications of possible misrepresentation of fact.'"  *Belfield*, 692 F.2d

17   at 147 (quoting S. Rep. No. 95-701, 64, 1978 U.S.C.C.A.N. at 4033).  Mr. Shafi's case presents this

18   precise situation.

19         Mr. Shafi has consistently argued that there is no evidence of any connection whatsoever

20   between him or Mr. Niazi, and ISIL or any other foreign power.  If the government claims Mr. Shafi is

21   factually wrong, it should be required to prove why.[13]  In that case, defense counsel's input would be

22   critical to help the Court decide at the very least the following issues:

23

24   _____

25   [13] It bears remembering that Mr. Shafi filed a motion for a bill of particulars asking for the factual

26   basis for the government's claim that Mr. Shafi had a connection to Al-Nusra. *See* Dkt. 153, Motion
     for Bill of Particulars.  The government responded with no facts at all showing any contact whatsoever

27   between Mr. Shafi and Al-Nusra, ISIL, or any other foreign terrorist organization or foreign power.
     Instead, the government essentially conceded the lack of contact and argued that as a matter of law,

28   there need not be contact because Mr. Shafi was charged with attempt. *See* Dkt. 159, United States
     Opposition to Defendant's Motion for a Bill of Particulars at 12-17.

- Whether whatever connections existed were "knowing," as required for a U.S. person to be deemed an agent of a foreign power, *see* 50 U.S.C. § 1801(b)(2);

- Assess the quantity and quality of the connections and determine whether they rise to the level of a non-insignificant connection to ISIL;

- Assess the impact of the omitted information regarding Mr. Niazi, Salama Shafi and Yusuf Niazi, on the probable cause finding, *see Franks* Motion at 2-18; *Franks* Reply at 13-14;

- Determine whether the omissions concerning Mr. Niazi, Salama Shafi and Yusuf Niazi were intentional or reckless, as required under *Franks*; *see Franks* Motion at 9-14; *Franks* Reply at 11-13.

In short, Mr. Shafi has shown with particularity and competent evidence that "disclose is necessary to make an accurate determination of the legality" of the surveillance and physical searches at issue in his case.  50 U.S.C. §§ 1806(f); 1825(g).  The Court should therefore disclose the FISA applications, orders, and all relevant materials to him.

## G.   The Court Should Order the Government to Affirm or Deny the Existence of FAA and E.O. 12333 Evidence.

Finally, Mr. Shafi asked the Court to order the government to confirm or deny the existence of evidence obtained, or derived, from surveillance initiated under the FISA Amendments Act ("FAA") and Executive Order 12333.  *See* Dkt. 148, Motion for Notice of and Discovery About the Use of Surveillance Pursuant to the FISA Amendments Act, 50 U.S.C. 1881, and Federal Executive Order 12333 ("FAA/EO12333 Motion").  The statutes themselves require notice before evidence derived from such surveillance can be used against a criminal defendant.  *See* 50 U.S.C. §§ 1806(c), 1806(e), 1881e(a).  The Supreme Court has also found notice is required.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 421 (2013) (noting "if the Government were to prosecute one of respondent-attorney's foreign clients using § 1881a-authorized surveillance, the Government would be required to make a disclosure").  Mr. Shafi's motion also pointed to the Fourth and Fifth Amendment, the Due Process Clause, various Rules of Criminal Procedure, and 18 U.S.C. § 3504, which requires the government to

1   affirm or deny an allegation that evidence was obtained by the exploitation of an unlawful act. *See*

2   FAA/EO12333 Motion at 9-10.

3        Despite the weighty legal authorities compelling notice of how this evidence was obtained, Mr.

4   Shafi pointed to the government's sordid history of failing to disclose FAA and E.O. 12333

5   surveillance to courts. This history includes falsely telling the Supreme Court in *Clapper* that

6   prosecutors were revealing the use of this surveillance, when in fact they were not. *See* FAA/EO12333

7   Motion at 9-10.

8        In response, the government does not actually confirm or deny the use of FAA or E.O. 12333

9   derived evidence in Mr. Shafi's case. The government first claims its discovery obligations are limited

10   and "there is no rule of discovery that requires the government to provide a defendant with a clear,

11   concise narrative regarding the origins of the criminal investigation that led to his arrest." Gov. Oppo.

12   at 47. In support, the government cites cases interpreting a prosecutor's duty to produce information in

13   a case file under its *Brady* obligations. But those cases are irrelevant here as Mr. Shafi is not asking

14   for access to the government's case file, but rather a specific item supported by specific statutory (and

15   constitutional) authority: confirmation or denial of the use of evidence obtained or derived from E.O.

16   12333 or the FAA.

17        The government goes on, circularly, to say that it "has complied" with its discovery obligations

18   to provide notice pursuant to the FISA statute. Gov. Oppo. at 46. It then claims, however, that

19   disclosure of FISA evidence in a criminal proceeding is limited, and argues that the requirement in 18

20   U.S.C. § 3504 that the government affirm or deny the defense's claims does not apply because no

21   "unlawful act" has occurred as the FISA evidence was lawfully obtained pursuant to orders of the

22   FISC. *Id.* at 50.

23        This last contention is perhaps the government's most galling argument. It is not for the

24   Executive Branch to decide if there has been an "unlawful act;" that is the purview of the judiciary. As

25   the Supreme Court has stated, "[d]eciding…whether the action of [another branch of government]

26   exceeds whatever authority has been committed, is itself a delicate exercise in constitutional

27   interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution. *United*

28   *States v. Nixon*, 418 U.S. 683, 704 (1974) (quoting *Baker v. Carr*, 369 U.S. 186, 211 (1962))

1  (quotations omitted); *see also Nixon*, 418 U.S. at 705 ("it is the province and duty of this Court 'to say

2  what the law is'") (quoting *Marbury v. Madison*, 5 U.S. 137, 178 (1803)).

3      All Mr. Shafi needs to show to invoke 18 U.S.C. § 3504's protections, and trigger this Court's

4  review, is a colorable basis of the unlawful act.  Considering the information in the Classified Amram

5  Declaration, as well as the extensive information Mr. Shafi provided in his opening motion on the

6  NSA's widespread collection and retention of American citizen information under the FAA and E.O.

7  12333—none of which the government responded to—Mr. Shafi has shown a "colorable basis" of an

8  unlawful act.

9      The Court should therefore order the government to confirm or deny the use of FAA or E.O

10 12333 surveillance.  It should be required to state that any denial is based on the absence of such

11 surveillance and queries of FAA or E.O. 12333 databases in the Government's investigation of Mr.

12 Shafi, and *not* upon the government's own determinations of relevancy, attenuation, or whether or not

13 any evidence was "derived from" the FAA or E.O. 12333.  Furthermore, the Court should specify that

14 the government affirm that its response be "based on inquiries to the relevant government agencies and

15 requests for searches of agency files" and be "amplified to the point of showing that those responding

16 were in a position, by firsthand knowledge or through inquiry, reasonably to ascertain whether or not

17 relevant illegal activities took place." *United States v. Apple*, 915 F.2d 899, 905 (4th Cir. 1990)

18 (quotation marks and citation omitted); *see also United States v. Alter*, 482 F.2d 1016, 1027 (9th Cir.

19 1973) (finding government's response to a § 3504 claim insufficient because it was conclusory, failed

20 to clearly identify all governmental agencies involved in the surveillance, and failed to identify the

21 date ranges of the surveillance).

22                              **<u>CONCLUSION</u>**

23     This Court has several legal challenges it must resolve in this case.  Those challenges have taken

24 different formats but have one overarching theme: what is the legal significance of the fact that there

25 was no contact between Mr. Shafi and a foreign terrorist organization.  The government's uniform

26 response has been that lack of contact with a FTO is legally irrelevant in an attempt case.  But that

27 position cannot stand here.  FISA, with its profound implications on privacy and the Fourth

28

1    Amendment, was explicitly created to limit surveillance to only U.S. persons acting as agents of

2    foreign powers.

3            Adam Shafi is not, was not, and has never been, an agent of a foreign power.  Whatever one may

4    think of the admittedly horrible things Mr. Shafi said on the FISA recordings that form the crux of the

5    government's case, ultimately at this stage—three years after this investigation began—the

6    government still cannot show Mr. Shafi was an agent of a foreign power.  This bears repeating: after

7    three years, five search warrants, seven seized and searched electronic devices, and almost 1,500

8    intercepted and recorded phone calls, the government cannot produce one single piece of

9    communication or coordination between Mr. Shafi and a foreign power.  Not one single call, text,

10   email, message or tweet.

11           The ultimate question this Court must then answer is why did the government go to the FISC in

12   the first place?  There was approximately five months between when Mr. Shafi first came to the

13   attention of the FBI and when the government recorded his first call pursuant to the FISA order.

14   During those five months, the FBI was robustly investigating Mr. Shafi, sending agents to interview

15   witnesses, drafting applications for search warrants, and obtaining records from a variety of sources.

16   The FBI clearly wanted to listen to Mr. Shafi's phone calls.  Yet despite having an active criminal

17   investigation, the FBI did not go to this Court and ask it to sign off on a Title III wiretap application.

18   Instead, it submitted misleading affidavits to the magistrate for his phone and email records, and likely

19   used those same misleading affidavits before the FISC in order to secretly wiretap Mr. Shafi's phone.

20           This Court cannot allow this to stand.  The government should not be permitted in the middle of

21   a criminal investigation to bypass the specified procedures available to the government for obtaining a

22   wiretap from this Court, and turn instead to the FISC.  The government has gone to great lengths to

23   ensure this Court is aware that only one district judge has granted defense access to FISA applications,

24   a decision that was overturned on appeal.  But that is a symptom of the problem; having long operated

25   with no adverse consequences for its mistakes and abuses, the government trusted it could simply go

26   directly to the deferential FISC without evidence that Mr. Shafi was an agent of a foreign power and

27   for the primary purpose of obtaining evidence in a criminal prosecution.

28

1   Ultimately, this Court must decide what limits there are to FISA surveillance.  If the

2   government's showing here is enough—that a young Muslim American citizen critical of the United

3   States who travels to Istanbul is an "agent of a foreign power" under FISA—than the number of

4   individuals subject to surveillance will increase, and the constitutional and statutory limits intended to

5   prevent the government from abusing its surveillance powers, will be rendered meaningless.  This

6   Court should suppress the FISA evidence or, at a minimum, order a *Franks* hearing and disclosure of

7   the FISA orders, applications, affidavits and compel the government to confirm or deny the existence

8   of surveillance initiated under the FAA or E.O. 12333.

9

10                                                          Respectfully submitted,

11

12   DATED:       September 28, 2017                         STEVEN G. KALAR
                                                            Federal Public Defender
13

14                                                                 /S/
                                                            HANNI M. FAKHOURY
15                                                          GALIA AMRAM
                                                            CARMEN A. SMARANDOIU
16                                                          Assistant Federal Public Defenders

17

18

19

20

21

22

23

24

25

26

27

28