Volume 3

Pages 305 - 471

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )      NO. CR 15-582 WHO
                                )
Adam Shafi,                     )
                                )
            Defendant.          )
_____ )


                        San Francisco, California
                        Thursday, August 30, 2018

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:          United States Attorney's Office
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                  BY:  **S. WAQAR HASIB, ESQ.**
                       **ELISE LAPUNZINA, ESQ.**


For Defendant:          Office of the Federal Public Defender
                        1301 Clay Street, Suite 1350N
                        Oakland, CA  94612
                  BY:  **HANNI M. FAKHOURY, ESQ.**
                       **JEROME E. MATTHEWS, ESQ.**




Reported By:  Vicki Eastvold, RMR, CRR
              Official Reporter

# I N D E X

Thursday, August 30, 2018 - Volume 3

## E X H I B I T S

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| | | 314 | 3 |
| 47-49 | | 419 | 3 |
| 50 | | 431 | 3 |
| 68 | | 387 | 3 |
| 80 | | 383 | 3 |
| 95 | | 384 | 3 |
| 114 | | 321 | 3 |
| 120 | | 315 | 3 |
| 122 | | 319 | 3 |
| 127 | | 388 | 3 |
| 128 | | 384 | 3 |
| 129 | | 385 | 3 |
| 130 | | 386 | 3 |
| 132 | | 382 | 3 |
| 134 | | 388 | 3 |
| 135 | | 386 | 3 |
| 137 | | 405 | 3 |
| 138 | | 395 | 3 |
| 140 | | 466 | 3 |
| 141 | | 316 | 3 |
| 142 | | 318 | 3 |

| **PLAINTIFF'S WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **SUNG, MATTHEW (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 311 | 3 |
| Direct Examination resumed by Ms. LaPunzina | 311 | 3 |
| Cross-Examination by Mr. Matthews | 322 | 3 |
| **MILLER, JEFFREY** | | |
| (SWORN) | 331 | 3 |
| Direct Examination by Mr. Hasib | 332 | 3 |
| Cross-Examination by Mr. Fakhoury | 344 | 3 |
| **POSADAS, RONALD** | | |
| (SWORN) | 347 | 3 |
| Direct Examination by Mr. Hasib | 347 | 3 |
| **THIRUMALAINAMBI, RAJKUMAR** | | |
| (SWORN) | 354 | 3 |
| Direct Examination by Mr. Hasib | 355 | 3 |
| Cross-Examination by Mr. Fakhoury | 369 | 3 |
| **REINKE, CHRIS** | | |
| (SWORN) | 377 | 3 |
| Direct Examination by Mr. Hasib | 377 | 3 |

| | |
|---|---|
| 1 | **Thursday - August 30, 2018**                    **8:00 a.m.** |

2                    **P R O C E E D I N G S**

3                         **---oOo---**

4  (The following proceedings were held in open court, outside the

5  presence of the jury:)

6       **THE COURT:**  So good morning, everybody.  I came out

7  here to make a quick ruling for you and then I'll go away until

8  we're all ready to go.

9       And that is with respect to Exhibit 33 which is the

10  translation.  I'm going to allow the exhibit to be admitted.  I

11  found yesterday as I was listening to the recordings that it

12  mattered to me to be able to look at the definitions.  And if

13  the jury is doing the same in the jury room, I think having

14  access to that page just makes sense.  I think it is evidence.

15  I think it is the government's authorities.  I think we're

16  generally -- there's nothing specifically on point, obviously,

17  that either of you provided, but I think overall it will just

18  be better for the jury to have access to it.

19       **MR. MATTHEWS:**  Well, one point I'd like to make, Your

20  Honor.  And maybe this can be accomplished through some type of

21  cautionary instruction.  But you can't really tell by looking

22  at Exhibit 33 how many times those particular terms appear

23  anywhere in a record.  And I think in terms of the type of

24  emphasis that the government is making about the significance

25  of those terms, it might be appropriate at some point during

 1  the case to instruct the jury that these are just translations.

 2  It does not, you know, suggest that one term appears 20 times,

 3  as opposed to one time, as opposed to five times.

 4       THE COURT:  I think that's a great idea and I'll do

 5  that.  I'm happy to look at language if you want to give me

 6  language.  If you don't want to give me language, I will do

 7  that when I tell the jury that I'm admitting the document.  And

 8  I can wait on that if you want to give me language.

 9            MR. MATTHEWS:  Yeah.  That would be great.

10            MR. FAKHOURY:  Thank you, Your Honor.

11            THE COURT:  Okay.

12            MR. HASIB:  Your Honor, a similar issue may come up --

13  I guarantee it's going to come up today -- with respect to

14  Mr. Reinke's testimony and the timeline.  We've revised the

15  timeline significantly from the version that I think was filed

16  with the defendant's motion *in limine*.  So we've taken out a

17  lot of the extraneous stuff.  It's really much more simplified

18  and much shorter.

19       I've spoken with Mr. Fakhoury about it.  I understand

20  they're still going to object and say that it should be a

21  demonstrative only and not admitted into evidence.  The

22  government is going to oppose that.  I expect -- given Your

23  Honor's tentative rulings, Your Honor said you were inclined to

24  let it in only as demonstrative.  I expect that's the way it's

25  all going to play out today.  But the revised timeline is with

1    the clerk of the court if you want to take a look at it

2    beforehand.

3         THE COURT:  Okay.  All right.  Thank you.  And so

4    timing wise?  The case seems to be moving along with dispatch.

5         MR. HASIB:  Yeah, we're moving.  We think we

6    definitely reach Special Agent Reinke today.  He's a lengthy

7    witness.  We're going to get in -- we're going to play a good

8    chunk of the calls.  And I think the last time I looked, it was

9    about an hour and-a-half total of audio.  So there's a lot of

10   that.  We may finish with him today on direct.  It may spill

11   over until tomorrow.  We've got Dr. Vidino standing by just in

12   case, but that would be our last witness.

13        THE COURT:  Great.  Delighted.  All right.  I will now

14   leave and let you -- let everybody finish.  And get me when

15   everybody's ready.

16                  (Recess taken at 8:05 a.m.)

17               (Proceedings resumed at 8:10 a.m.)

18     (The following proceedings were heard in open court in the

19   presence of the jury:)

20        THE COURT:  All right.  Please be seated, everybody.

21   Good morning, ladies and gentlemen.  Thank you very much for

22   being here promptly.

23     We're still in the testimony of Special Agent Sung.  And

24   Ms. LaPunzina?

25

**MATTHEW SUNG**,

called as a witness for the Plaintiff, having been previously

duly sworn, testified further as follows:

**DIRECT EXAMINATION**  (Resumed)

BY MS. LaPUNZINA:

Q.    Good morning, Special Agent Sung.

A.    Good morning.

Q.    So I'd now like to draw your attention to July 3, 2015.

Were you involved in the searches at Adam Shafi's residence and

also of a white Prius located at his residence in Fremont,

California?

A.    I was.

Q.    What was your role that day?

A.    My role that day was the evidence custodian for the search

to be completed.

Q.    What does an evidence custodian do?

A.    So my duties as the evidence custodian was to maintain the

evidence recovery log.  And the evidence recovery log documents

all of the items that had been identified to be seized at the

search location.  This document also identifies each item,

provides a general description of each item, identifies the

individuals who found that particular item, and where they

found that item.

Q.    Would you please explain to us who decides which item is

going to be seized during a search?

1    **A.**    For the most part, each person who is assigned to that

2    search reviews the search warrant which identifies the items to

3    be seized.  And as that individual comes across an item that

4    meets the criteria identified in the search warrant, they can

5    make their own determination as to whether it's relevant to the

6    search.

7    **Q.**    And as the custodian, did you have an opportunity to walk

8    throughout the house and to also personally view the car that

9    day?

10   **A.**    Yes, I did.

11   **Q.**    And as custodian, does that mean that you on occasion

12   actually picked the items up and placed them into an evidence

13   bag as part of the search that day?

14   **A.**    For the most part it was the individual finder, whoever

15   located the item.  I would go accompany that individual to

16   visually confirm where that item was found and what that item

17   is.  I can't recall specifically if I bagged any particular

18   item.

19   **Q.**    In general terms, would you please tell us what items were

20   taken as evidence that day from both the house and the car?

21   **A.**    Yes.  Generally speaking, there were two laptops that were

22   seized.  One was a MacBook, one was an HP laptop.  There were

23   two cellular telephones.  There were three CD's.  Various

24   travel documents and financial documents.  There were several

25   notebooks in addition to that that were taken.  There was one

SUNG - DIRECT / LAPUNZINA

1   particular Bank of America withdrawal receipt that was taken

2   from the white Toyota Prius.  And there were a few different

3   items that I don't recall the full list.

4   **Q.**   Ms. Yee, if you could please pull up Exhibit 64-055.

5        Special Agent Sung, would you please tell us what this is?

6   **A.**   This is a Bank of America customer receipt which indicates

7   a withdrawal that took place on June 30 of 2015.  The

8   withdrawal amount is $2,400, and the remaining available

9   balance is $1,312.56.

10        **MS. LaPUNZINA:**  May I approach, Your Honor?

11        **THE COURT:**  You may.

12   **BY MS. LaPUNZINA:**

13   **Q.**   Showing you what's been marked as Exhibit No. 120.

14        **MR. MATTHEWS:**  Your Honor?

15        You said Exhibit 64 for the receipt?

16        **MS. LaPUNZINA:**  It's the picture.  64-065.

17        One moment, Your Honor.

18   **BY MS. LaPUNZINA:**

19   **Q.**   So -- sorry.  You have Exhibit No. 120 in front of you.

20   Will you please tell us what that is?

21   **A.**   This is a United States passport that belongs to Adam

22   Shafi.

23   **Q.**   Where was it found?

24   **A.**   This was found in Adam Shafi's room.

25   **Q.**   And did you retrieve it from the room after it was found?

**SUNG - DIRECT / LAPUNZINA**

1   **A.**   I did, yes.

2   **Q.**   Is this passport in the same condition now as it was when

3   it was found in Adam Shafi's room on July 3, 2015?

4   **A.**   It is.

5         **MS. LaPUNZINA:**  The government offers Exhibit No. 120

6   into evidence.

7         **MR. MATTHEWS:**  No objection, Your Honor.

8         **THE COURT:**  It's admitted.

9      (Trial Exhibit 120 received in evidence)

10  **BY MS. LaPUNZINA:**

11  **Q.**   Agent Sung if you could please take a look inside the

12  passport and let us know whether or not there are any country

13  stamps this is passport?

14  **A.**   There are.  I see four different stamps all indicating

15  Cairo, Egypt.  I see two additional stamps.  One is an entry

16  stamp into Istanbul, Turkey, dated August 16, 2014, and in

17  addition to that is an exit stamp which is dated August 17,

18  2014.

19         **MS. LaPUNZINA:**  Thank you.  May I approach again, Your

20  Honor?

21         **THE COURT:**  You may.

22  **BY MS. LaPUNZINA:**

23  **Q.**   Showing you what's been --

24      It needs to be marked as Exhibit No. 143.

25      This will be marked as Exhibit 143.

1          MS. LaPUNZINA:  May approach?

2          THE COURT:  You may.

3    BY MS. LaPUNZINA:

4    Q.   Would you please take a look at this exhibit and let us

5    know what it is?

6    A.   This is a printout of an electronic visa for entry into

7    the Republic of Turkey.

8    Q.   Where was this item found?

9    A.   This item was found in Adam Shafi's room.

10   Q.   Is this page in the same condition now as it was when it

11   was found?

12   A.   It is.

13         MS. LaPUNZINA:  The government offers Exhibit No. 143

14   into evidence.

15         MR. MATTHEWS:  No objection, counsel I just want to

16   note this doesn't appear on your listened independent.

17         THE COURT:  All right.  It's admitted.

18         (Trial Exhibit 120 received in evidence)

19   BY MS. LaPUNZINA:

20   Q.   Would you please tell us when the visa was issued?

21   A.   The visa is valid from the 1st of July, 2015, until the

22   27th of December of 2015.

23   Q.   And who is the visa issued to?

24   A.   It is issued to Adam Shafi.

25   Q.   And -- thank you.

1          MS. LaPUNZINA:  May I approach, Your Honor?

2          THE COURT:  You may.

3    BY MS. LaPUNZINA:

4    Q.   Showing you what's been marked as Government Exhibit 141.

5    If you could please take a look at this exhibit.

6          Do you recognize this?

7    A.   I do.

8    Q.   What is this, please?

9    A.   This is a portion of the -- a boarding pass for Royal

10   Jordanian Airlines indicating that the passenger is Adam Shafi.

11   It indicates a flight -- Royal Jordanian flight 508 from Cairo

12   to Amman.  And the date of the flight is the 16th of August.

13   Q.   Is this stub in the same condition now as it was when you

14   found it?

15   A.   It is.

16          MS. LaPUNZINA:  The government offers Exhibit No. 141

17   into evidence.

18          MR. MATTHEWS:  No objection.

19          THE COURT:  It's admitted.

20      (Trial Exhibit 141 received in evidence)

21   BY MS. LaPUNZINA:

22   Q.   Now showing --

23        Ms. Yee, if we could go to Exhibit No. 3, which is an

24   audio, and Exhibit No. 19, which is the corresponding

25   transcript.  This is a very short audio.

1          Agent Sung, are you familiar with Exhibit 3 and what's

2     been marked as Exhibit No. 19 which is a call between Adam

3     Shafi and Abul Qadar Niazi on March 11, 2015?

4     **A.**    I am familiar with it.

5     **Q.**    Have you listened to the recording?

6     **A.**    I have.

7     **Q.**    Who initiated this call?

8     **A.**    This call was initiated by Adam Shafi.

9               (Audio was played but not reported.)

10    **Q.**    So Agent Sung, that call was on March 11, 2015?

11    **A.**    Yes, it was.

12         **MS. LaPUNZINA:**  May I approach, Your Honor?

13         **THE COURT:**  You may.

14    **BY MS. LaPUNZINA:**

15    **Q.**    Showing you what's been marked as Exhibit No. 142 and

16    Exhibit No. 69 which the government offers into evidence as

17    self-authenticating business records from Milpitas Shooting

18    Range.

19         Would you please tell us what Exhibit 142 is?

20    **A.**    Exhibit 142 is a receipt from Target Masters West from

21    April 1, 2015.  It indicates some items related to shooting.

22    And the total amount for this receipt was $54.17.

23    **Q.**    Where did you find this receipt?

24    **A.**    This receipt was found in Adam Shafi's room.

25    **Q.**    Is this receipt in the same condition today as it was when

1    you found it?

2    **A.**   It is.

3          **MS. LaPUNZINA:**  The government offers Exhibit No. 142

4    into evidence.

5          **MR. MATTHEWS:**  No objection.

6          **THE COURT:**  It's admitted.

7          (Trial Exhibit 142 received in evidence)

8    **BY MS. LaPUNZINA:**

9    **Q.**   Are you familiar with the Milpitas Shooting Range, or

10   otherwise known as Target Master?

11   **A.**   I am.  It's an indoor shooting range that's located in

12   Milpitas, California, and it's open to the general public.

13   **Q.**   If you could please look at Exhibit No. 69 that's before

14   you.  Would you please tell us what that is?

15   **A.**   Exhibit 69 is a declaration of custodian of records from

16   Tiffany Pettit from the Milpitas Shooting Range.  And also it

17   is a gun rental questionnaire which indicates that Adam Shafi

18   and Saleem Karim were shooting that day.

19         **MS. LaPUNZINA:**  May I approach, Your Honor?

20         **THE COURT:**  You may.

21   **BY MS. LaPUNZINA:**

22   **Q.**   Showing you what's been marked as Exhibit No. 122.  Would

23   you please tell us what that is?

24   **A.**   Exhibit 122 is a receipt from Murat Turizm Seyahat, which

25   appears to be in Istanbul, Turkey.  The total amount for the

SUNG - DIRECT / LAPUNZINA

1   receipt is 7,064 Turkish lira.  And this receipt is dated

2   August 17, 2014.

3   **Q.**   Where was this receipt found?

4   **A.**   This receipt was found in Adam Shafi's room.

5   **Q.**   Is it in the same condition today as it was when it was

6   found on July 3, 2015?

7   **A.**   It is.

8          **MS. LaPUNZINA:**  Government offers Exhibit No. 122 into

9   evidence.

10         **MR. MATTHEWS:**  No objection.

11         **THE COURT:**  It's admitted.

12     (Trial Exhibit 122 received in evidence)

13  **BY MS. LaPUNZINA:**

14  **Q.**   Now Agent Sung, are you familiar with Exhibit No. 58 in

15  evidence?  And Exhibit 90 which is a CD; Exhibit 58, visitor

16  logs from Santa Clara Sheriff's Office?

17  **A.**   I am familiar with those.

18  **Q.**   And Exhibit No. 58 which I think you have in your

19  binder --

20  **A.**   Exhibit 58 is not in the binder.

21     (NOTE: document provided to the witness.)

22  **Q.**   If you could please tell us what this exhibit shows.

23  **A.**   This is a visitor log for inmate Armin Harcevic which

24  indicates that Adam Shafi visited Armin Harcevic on March 15,

25  2015.

SUNG - DIRECT / LAPUNZINA

1   Q.   Have you listened to Exhibit 90, which again is a

2   recording of the conversation that occurred on that date at the

3   Santa Clara Sheriff's Office?

4   A.   I have.

5   Q.   Will you please summarize that conversation?

6        MR. MATTHEWS:   Your Honor, if he wants to play it,

7   that's fine.   But summarizing it is inappropriate.

8        THE COURT:   Yeah, sustained.

9        MS. LaPUNZINA:   I'll move on for a minute to another

10  exhibit.

11  BY MS. LaPUNZINA:

12  Q.   Now, showing you what's been marked as Exhibit No. 114,

13  which is a map.   It's a three-page document, and I'm now

14  currently displaying the first page of that document.   Are you

15  familiar with all three pages of Exhibit No. 114?

16  A.   I am familiar.

17  Q.   Did you create these maps?

18  A.   I did.

19  Q.   Would you please tell us how you did that?

20  A.   All of these maps were created utilizing Google maps.   We

21  looked at nine specific locations that were of interest to us,

22  investigative interest to us, that were either identified by

23  locations that Adam Shafi had potentially been in or he had

24  searched for via Google maps or Google searches.   Once those

25  were identified, I zoomed in to areas where those locations

```
 1  were located in Google Maps.  And each of those locations were
 2  indicated electronically --
 3          MR. MATTHEWS:  Your Honor, hasn't been published yet.
 4          MS. LaPUNZINA:  It's not in evidence yet.  Thank you.
 5  BY MS. LaPUNZINA:
 6  Q.  I'm sorry.  If you could please continue explaining how
 7  you made the smaller ones?
 8  A.  Yes.  So the smaller ones are a zoom-in of these same
 9  locations.  And as they zoom in, Google Maps populates the name
10  of each location.  And that is, again, electronically generated
11  by the program.  And I placed the corresponding number next to
12  each of those locations within PowerPoint.
13          MS. LaPUNZINA:  The government offers Exhibit No. 114,
14  all three pages into evidence.
15          MR. MATTHEWS:  Your Honor, we renew our objection on
16  the grounds previously stated.
17          THE COURT:  All right.  And for the reasons previously
18  given, I'll overrule the objection and it's admitted.
19      (Trial Exhibit 114 received in evidence)
20          MS. LaPUNZINA:  Ms. Yee, if you could please display
21  Exhibit No. 114.
22  BY MS. LaPUNZINA:
23  Q.  So Agent Sung, this is the larger blowup map that we see
24  right now that's on display.
25      Ms. Yee, if you could go to the next page, please.
```

1      If you could please tell us what this page shows now in

2  comparison to the larger map?

3  **A.**   So this page shows four of the nine locations.  Urfa,

4  Turkey, which is number 1.  Number 3 is Ar Raqqah, Syria.

5  Number 4 is Jarabulus, Syria.  And number 9 is Kobane, Syria.

6  **Q.**   Ms. Yee, the next page.

7      And if you could please tell us.  This seems like an even

8  closer-up view?

9  **A.**   That is correct.  So this is a further zoom-in of the

10  location along the Turkish and Syrian border.  And it indicates

11  location ID's 2, 4 and 8.  No. 2 being Gaziantep Airport in

12  Turkey.  No. 4 is Jarabulus, Syria.  And number 8 is Karkamis

13  Sinir Kapisi in Turkey.

14  **Q.**   Are those numbers -- we see numbers on all three.  The

15  numbers stay the same for the locations, you just carried them

16  over onto the maps?

17  **A.**   That's correct.

18  **Q.**   All right.  One moment.

19      (Pause.)

20          **MS. LaPUNZINA:**  I have no further questions for this

21  witness, Your Honor.

22          **THE COURT:**  All right.

23                      **CROSS-EXAMINATION**

24  **BY MR. MATTHEWS:**

25  **Q.**   Morning.

**SUNG - CROSS / MATTHEWS**

1  **A.**  Morning.

2  **Q.**  You were not the primary case agent on this case, correct?

3  **A.**  I am not.

4  **Q.**  Let's go back to the beginning of your testimony and talk

5  about the surveillance that you conducted following Mr. Shafi

6  leaving the San Francisco Airport.

7      Now, you said you got on BART with him to make sure he got

8  home?

9  **A.**  That's correct.

10  **Q.**  Okay.  What do you mean when you say to make sure he got

11  home?  You wanted to make sure he went home?  Or you wanted to

12  make sure that he got home safely?

13  **A.**  So he stated that he was going back to his residence.  We

14  wanted to ensure that he was doing what he stated that he was

15  going to do.

16  **Q.**  And ultimately you did follow him to his car when he got

17  to the Fremont BART station and he got in his car.  And was

18  there another surveillance unit that picked him up to make sure

19  he got home?

20  **A.**  So my surveillance ended once he departed the train at the

21  Fremont station.  There were additional agents that were

22  searching for him at the other end.

23  **Q.**  You stayed in the same BART car with him during the

24  duration of the trip from San Francisco Airport to Fremont?

25  **A.**  That's correct.

1  Q.   BART cars have video cameras at the top.  Are you familiar

2  with that?

3  A.   I am.

4  Q.   Did you check and see whether any of the BART video was

5  captured during your particular trip?

6  A.   I did not.

7  Q.   Do you know whether anybody did?

8  A.   I do not know that.

9  Q.   When you got on the train with Mr. Shafi --

10      Well, let me ask this:  Prior to getting on the train with

11  Mr. Shafi that afternoon, had you been informed about the

12  content or scope of his questioning by your colleagues at the

13  San Francisco Airport?

14  A.   No, I was not.

15  Q.   Were you aware that he had been fasting during Ramadan at

16  the time that he got on the BART train?

17  A.   At the time I did not.

18  Q.   Do you know what Ramadan is?

19  A.   I'm familiar with Ramadan.

20  Q.   You know that during Ramadan that people of the Muslim

21  faith do not drink or eat at least during certain time periods.

22  A.   That is my understanding, yes.

23  Q.   Were you aware at the time that he got on the train that

24  he had been questioned for almost three hours by your

25  colleagues at the San Francisco Airport?

1    **A.**   I was not aware of that specific time frame, no.

2    **Q.**   Okay.  Now, you said that as part of your job at the time

3    the Shafi residence was searched was to take items of evidence

4    that were seized by other members of the search party and log

5    them and make sure that they were appropriately accounted for?

6    **A.**   That's correct.

7    **Q.**   Did you attend a briefing of any sort -- without telling

8    me the contents of the briefing in detail -- prior to the

9    search?

10   **A.**   Yes.

11   **Q.**   When was that briefing conducted?

12   **A.**   I believe it was the day before.

13   **Q.**   Okay.  And during the briefing, what kind of information

14   did you receive about what to search for?

15   **A.**   We were directed to read the search warrant and search for

16   items that met the criteria outlined within the search warrant.

17   **Q.**   Okay.  One of the criterias in the search warrant were

18   firearms and ammunitions and other types of weapons, is that

19   correct?

20   **A.**   That's correct.

21   **Q.**   And you didn't recover -- nobody recovered any firearms or

22   ammunitions at the premises, did they?

23   **A.**   We did not.

24   **Q.**   How about items that were related to military outfits or

25   clothing or the types of things somebody in the armed services

1  might have in their possession?  Do you remember getting a

2  briefing on searching for that?

3  **A.**  I recall that it was within the search warrant, but we

4  didn't discover anything of that specific nature.

5        So I will add to that that we did discover some items that

6  could be described as survival gear and camping equipment.

7  **Q.**  Yeah, I noticed that in, I think, one of the inventories

8  that was created.  Did you write that inventory yourself?

9  **A.**  I did, yes.

10  **Q.**  And camping equipment is also an appropriate way of

11  describing that, correct?

12  **A.**  It could be.  The term "survival" was utilized because

13  some of the items specifically said "survival" on them.

14  **Q.**  If I went out, let's say, into the Siberian desert with a

15  very, very heavy jacket and some boots, that would probably be

16  survival gear, too, wouldn't it?

17  **A.**  It could be, yes.

18  **Q.**  Doesn't need to be used for any military purpose, does it?

19  **A.**  It could or could not be.  I specifically used that term

20  because that term was on some of the items that were seized.

21  **Q.**  You said, I believe, during your direct testimony that the

22  scope of the search of the items seized was up to the

23  individual agent that took the property, correct?

24  **A.**  Generally speaking, yes.  But that decision could be made

25  in concert with the primary case agent, as well.

1  Q.   But you don't -- so it's, basically, up to the agent's

2  discretion in coordination with whoever was in charge of the

3  search, correct?

4  A.   Each of the agents that were at that site were familiar

5  with the search warrant.

6  Q.   So it's kind of subjective, in other words.  Some agent

7  might consider an item of evidentiary value, another agent

8  might say, I don't think this is within the scope of what we're

9  looking for.  Would that be a fair assessment?

10 A.   We use our judgment based on the criteria outlined at the

11 search warrant.  We make our decisions based on that.

12 Q.   Correct.  And that would be individual judgment of the

13 individual agent, correct?

14 A.   Correct.

15 Q.   Just by the way, do you speak Arabic?

16 A.   I do not.

17 Q.   Do you have any friends that speak Arabic?

18 A.   No.

19 Q.   Have you taken any classes in Arabic?

20 A.   No.

21 Q.   And you're familiar with the fact that a number of items,

22 such as notebooks and posters and pictures with Arabic

23 handwriting on it, were seized.  Correct?

24 A.   There were notebooks that were taken with a language that

25 I was not familiar with.

1    Q.   So the decision to seize those were, again, made by the

2    individual agents.  Correct?

3    A.   That's correct.  We did not know what that language was,

4    and we made the decision to seize those and have them

5    translated.  Because at the time we did not know for certain

6    whether or not they were relevant.

7    Q.   So somebody might have taken an item off the wall that in

8    English would translate to "home sweet home."  But that would

9    still be an item that would be taken because you had no idea

10   what it said.

11   A.   That's correct.  We didn't know what it said.

12   Q.   Let's change topics here for a moment.  Now, you said that

13   you were the one that created the map?

14   A.   That's correct.

15   Q.   Who directed you to create it?

16   A.   No one directed me to create it.  I think we decided that

17   it was something that could be helpful to understand these

18   locations that people might not be familiar with.

19   Q.   Okay.  And were you the person that decided to put the

20   little pinpoint locations and the numbers on the map?

21   A.   I decided to do that because I thought it would be the

22   best way to most accurately depict those locations as they were

23   generated by Google Maps.

24   Q.   So you don't know -- in other words, you weren't told by

25   somebody else.  This was something that you decided to do on

1   your own?

2   **A.**   The pins being generated were an idea that I had

3   originally determined was something that would be accurate.

4   **Q.**   And you haven't reviewed all of the searches in this case,

5   correct?  The Google searches that were conducted?

6   **A.**   I have not reviewed all of them, no.

7   **Q.**   Or the YouTube searches?

8   **A.**   No.  I have not reviewed all of the YouTube searches.

9   **Q.**   Or any of the other -- all the massive data that was

10  collected between supposedly Mr. Shafi and other parties

11  connected to this case?  You haven't reviewed every item of

12  evidence, have you?

13  **A.**   I have not.

14  **Q.**   The pins themselves don't necessarily reflect how often

15  something is turned up within the scope of that data, correct?

16  **A.**   The pins reflect items that were of investigative interest

17  to us.

18  **Q.**   And "investigative interest" means things that you were

19  told might be relevant to the case, correct?

20  **A.**   They were items that we thought were relevant to what we

21  suspected was a plan by Mr. Shafi to potentially travel to

22  Turkey and subsequently Syria.

23  **Q.**   Now, you don't know whether searches were conducted by

24  Mr. Shafi or anybody else to other countries such as Germany or

25  places in Europe.  Do you?

1  **A.**   Do I know that for certain?  No.

2  **Q.**   You don't know whether what was captured on this

3  particular map contains the entire search history that may have

4  been conducted on Mr. Shafi's computer, correct?

5  **A.**    It does not contain the entire search history.  And could

6  you please specify what you mean by other people that might

7  have searched?

8  **Q.**   Well, let me just restrict it to Mr. Shafi, okay?  Maybe

9  that was -- that was probably an inartfully worded question.

10      The point I'm trying to make, or trying to understand, is

11  whether or not every search for every country that Mr. Shafi or

12  anyone else on his computer may have searched for during the

13  course of your investigation, is not necessarily reflected on

14  this map (indicating.)  Isn't that correct?

15  **A.**   That's correct.  Items that we deemed irrelevant were not

16  depicted on that map.

17  **Q.**   Okay.

18      **MR. MATTHEWS:**  One moment, please, Your Honor.

19      (Pause.)

20      **MR. MATTHEWS:**  I have no further questions, Your

21  Honor.  Thank you.

22      **THE COURT:**  All right.  Any redirect?

23      **MS. LaPUNZINA:**  No, Your Honor.

24      **THE COURT:**  All right.  You're excused.  Thank you.

25      **THE WITNESS:**  Thank you, Your Honor.

 1                    (Witness excused.)

 2          **MR. HASIB:**  Your Honor, government calls Jeffrey

 3   Miller to the stand.

 4          (Pause.)

 5          **MR. HASIB:**  Mr. Miller's apparently --

 6          **THE COURT:**  He's coming shortly?

 7                          **<u>JEFFREY MILLER</u>,**

 8   called as a witness for the Plaintiff, having been duly sworn,

 9   testified as follows:

10          **MR. HASIB:**  Your Honor, in light of some of the

11   discrepancies we were having with the exhibit list, the defense

12   is requesting -- I think the government certainly agrees -- if

13   we could take a short break just to coordinate our exhibit

14   lists to make sure we have the right numbers so it goes a

15   little smoother.  Would that be amenable to the Court?

16          **THE COURT:**  Do you need to do that right now as

17   opposed at the usual break?

18          **MR. HASIB:**  I think we can do it at the break.

19          **THE COURT:**  You've got a witness here, so let's

20   proceed.

21          **THE CLERK:**  Adjust the microphone as you may need to,

22   then please state your full name and spell it for the court

23   reporter.

24          **THE WITNESS:**  Jeffrey Miller.  J-E-F-F-R-E-Y,

25   M-I-L-L-E-R.

1          <u>DIRECT EXAMINATION</u>

2    BY MR. HASIB:

3    Q.   Morning, Mr. Miller.  What do you do for a living?

4    A.   I'm a special agent with the Federal Bureau of

5    Investigation.

6    Q.   How long have you been a special agent with the Federal

7    Bureau of Investigation?

8    A.   Since May 23, 2010.

9    Q.   What did you do before that?

10   A.   I was a software developer and database administrator.

11   Q.   And what is your current title with the FBI?

12   A.   Special agent.

13   Q.   Are you assigned to a particular squad?

14   A.   I am.

15   Q.   What squad is that?

16   A.   A criminal computer intrusion squad.

17   Q.   Can you just describe generally what does that squad do?

18   A.   We investigate various hacking activity.

19   Q.   Have you received any particular training in order to

20   become a special agent?

21   A.   I did.

22   Q.   Can you describe that training?

23   A.   Sure.  It was a 21-week course at Quantico, Virginia.

24   Q.   Have you received any particular training with respect to

25   computers and digital devices?

**MILLER - DIRECT / HASIB**

1   **A.**   I have.

2   **Q.**   Can you describe that training for the jury, please?

3   **A.**   Sure.  I've tended SANS classes.  It's an industry

4   standard.  As well as other forensic classes provided by the

5   bureau.

6   **Q.**   What are SANS classes?

7   **A.**   They're industry standards.  They provide all kinds of

8   training covering various topics.

9   **Q.**   You mentioned you had taken some bureau-specific training?

10  **A.**   I have.

11  **Q.**   What are those bureau-specific trainings that you've taken

12  with respect to digital devices or electronic devices?

13  **A.**   Sure.  One course was a digital evidence extraction

14  technician.  And it covers imaging and extracting digital

15  evidence from various devices.

16  **Q.**   Okay.  You used a couple of terms there and I'd like you

17  to go into a little detail as to what those mean.  First, you

18  mentioned imaging digital devices.  What does that mean?

19  **A.**   That's taking and making a bit-for-bit copy of hard drives

20  or extracting data from cell phones.

21  **Q.**   The second term I wanted you to explain was extracting.

22  What does that mean?

23  **A.**   Removing digital items from electronic media.

24  **Q.**   Okay.  And can you describe how that process takes place

25  with respect to, let's say, for a cell phone.  The imaging and

**MILLER - DIRECT / HASIB**

1  extracting process.  Just generally in layman's terms how does

2  it work?

3  **A.**   Sure.  For a cell phone you would plug the cell phone in

4  using a USB capable to an approved machine, computer, and use

5  approved tools that walk you through various prompts to extract

6  data from cell phones.

7  **Q.**   And is that something that you learned in these FBI

8  special training courses?

9  **A.**   Yes.

10 **Q.**   And you mentioned you took a course on digital evidence

11 extraction.  How long was that course?

12 **A.**   I believe it was a two-week course.

13 **Q.**   Did you receive any sort of qualifications or

14 certifications as a result of taking that course?

15 **A.**   There were exams that were needed to pass in order to

16 succeed in the course.  And yes, I did.

17 **Q.**   And did you pass?

18 **A.**   I did.

19 **Q.**   And does that give you any particular title at FBI now

20 that you've passioned that course?

21 **A.**   DExT.

22 **Q.**   What does DExT stand for?

23 **A.**   Digital evidence extraction technician.  Sometimes called

24 digital evidence extraction.

25 **Q.**   As a result of having passed that course and being

1  certified as this digital evidence extraction technician, do

2  you have any additional responsibilities at the FBI besides

3  being a special agent?

4  **A.**   Yes, I do.

5  **Q.**   Could you describe those for the jury?

6  **A.**   Sure.  From time to time I'll be asked from various other

7  agents or FBI personnel to help extract digital evidence from

8  media seized during search warrants or via consent.

9  **Q.**   Are you familiar with a tool called Cellebrite?

10 **A.**   I am.

11 **Q.**   What is that?

12 **A.**   It's an FBI approved tool that is used to extract

13 information from cell phones.

14 **Q.**   And just generally speaking how do you use it in your

15 responsibilities as a digital extraction technician?

16 **A.**   Yes.  It's used to extract information from cell phones.

17 **Q.**   And what does it produce when you extract evidence from

18 cell phones?

19 **A.**   Sure.  It creates an image file that has a copy of all

20 information that was selected to be extracted from the device.

21 And reports can be generated.

22 **Q.**   Okay.  And those reports, what information appears on

23 those reports?

24 **A.**   It depends on the user that's reviewing the data.  It can

25 include images, videos, text messages, anything that was

MILLER - DIRECT / HASIB

1   extracted from the phone.

2   Q.   Okay.  And in your role as a digital evidence extraction

3   technician, do you produce those Cellebrite reports?

4   A.   I do not.  I allow the individuals to review the media.

5   I'm not familiar with the case, so I let the case agent review.

6   Q.   Explain that for a second.  So your role is simply to work

7   with the device?

8   A.   Correct.  To process the evidence and the digital evidence

9   and get it in a format where the case agent can review.

10  Q.   So the case agent comes and reviews a Cellebrite report

11  after that?

12  A.   Correct.  So we'll typically extract the evidence and burn

13  it to a blue ray disk or hard drive, and then we'll give that

14  copy to the case agent.

15  Q.   Okay.  Can I ask you, where sort of geographically are you

16  currently posted with the FBI?

17  A.   San Jose, California.

18  Q.   How long have you been there?

19  A.   I've been in San Jose since approximately April of 2011.

20  Q.   2011.  Were you posted to San Jose in July of 2015?

21  A.   I was.

22  Q.   And by that point had you taken this certification course

23  or certification training to be a DExT technician?

24  A.   I had.

25  Q.   And were you performing those digital extraction duties in

 1   addition to your special agent responsibilities at the time,

 2   July of 2015?

 3   **A.**   That's correct, I was.

 4   **Q.**   Were you working on July 10 through July 15 of 2015?

 5   **A.**   I was.

 6   **Q.**   Were you asked to perform any particular activities with

 7   respect to your function as a DExT technician?

 8   **A.**   Yes, I was.

 9   **Q.**   Could you describe those for the jury?

10   **A.**   Sure.  I was approached by Special Agent Sutter to provide

11   assistance in copying and imaging, I believe, three CD's, a USB

12   thumb drive, and extract data from a cell phone.

13   **Q.**   Let me ask you to focus on the cell phone.  Do you recall

14   what type of cell phone was it that you were asked to extract

15   data from?

16   **A.**   I believe it was a Samsung S4.

17   **Q.**   Did you know anything about the investigation or the case

18   that Agent Sutter was involved in?

19   **A.**   Very little.

20   **Q.**   So he just told you:  I have some devices, can you do your

21   thing?

22   **A.**   Yes.

23   **Q.**   And let me ask you again to focus in on the cell phone in

24   particular.  What did you do with that device as a result of

25   Agent Sutter's request?

1   **A.**   Sure.  I plugged it into the approved work station that

2   contained the Cellebrite software using a USB cable and walked

3   through the prompts in order to extract data from the phone.

4   **Q.**   The work station.  Can you just sort of help the jury

5   visualize it?  Is it like a stand-alone computer?

6   **A.**   It is.

7   **Q.**   When you plugged this Samsung Galaxy S4 cell phone into

8   this work station, what happened next?

9   **A.**   Typically, you'll have to change a few settings on the

10   phone for it to recognize with the computer, tell it not to

11   lock the lock screen.  And enable it -- typically, with a

12   Samsung, to enable debugging mode, which just allows the

13   computer to talk to the phone.

14   **Q.**   Is that "debugging mode"?

15   **A.**   Yes.

16   **Q.**   What is that?

17   **A.**   It's typically a developer setting on the phone that just

18   allows the computer to interface with the phone.

19   **Q.**   Now generally in your experience as a DExT technician,

20   when you receive a phone what condition is the phone in when

21   you get it?  Is it on?  Is it off?

22   **A.**   It depends.  Typically we prefer the phone to be off -- or

23   if it's on, in airplane mode -- so it cannot connect to a

24   network.

25   **Q.**   If you get a phone that's on and connecting to the

**MILLER - DIRECT / HASIB**

1   network, what do you do with it?

2   **A.**   Immediately put it in airplane mode.

3   **Q.**   Would that be noted in a report somewhere if you had to

4   change that setting on a phone?

5   **A.**   It would.

6   **Q.**   Let me ask you to focus again on the Samsung Galaxy S4

7   that you just described.  You said you plugged it into the work

8   station and you went through some prompts to change some

9   settings on the phone.  What happened next?

10  **A.**   We selected the various items to be extracted from the

11  phone and started the process.

12  **Q.**   And what's the process?

13  **A.**   You select whatever categories of evidence you like to

14  extract, whether it be images, text messages, videos.  And then

15  it's as easy as clicking "go" or "next."

16  **Q.**   How long does this process typically take?

17  **A.**   Depends on the size of the phone.  Could take an hour.

18  Could take several hours.

19  **Q.**   Anything unusual happen in the course of this particular

20  Samsung Galaxy S4 connection to the work station?

21  **A.**   The first time I attempted to extract data it did not

22  complete.

23  **Q.**   I'm sorry.  You may have to slow down.  Can you repeat

24  that answer?

25  **A.**   Sure.  So the first time I tried to extract data from the

**MILLER - DIRECT / HASIB**

1  phone it would not complete the process.

2  **Q.**   It did not complete the process?

3  **A.**   That's correct.

4  **Q.**   Did you receive any alert from the work station as to why

5  it did not complete the process?

6  **A.**   I don't believe I did on this one.  Usually there's a

7  generic error message that says "unable to communicate with

8  phone" is typically what you'll see.

9  **Q.**   In your experience as a DExT technician, is that something

10  that happens with any frequency.

11  **A.**   It happens from time to time, yes.

12  **Q.**   How many phones have you performed this kind of procedure

13  on over the course of your experience as a DExT technician?

14  **A.**   Numerous phones.  I couldn't put an exact number.

15  **Q.**   More than ten?

16  **A.**   Yes.

17  **Q.**   More than 100?

18  **A.**   No.

19  **Q.**   And how often does this sort of error message pop up, in

20  your experience?

21  **A.**   Every couple times or so.

22  **Q.**   What are some of the reasons, in your experience, why that

23  error message might pop up?

24  **A.**   It could be a bad cable, it could be a power interruption

25  with the work station, it could be a file on the phone that the

MILLER - DIRECT / HASIB

1  machine just doesn't recognize for some reason.  There are

2  various reasons why it just doesn't complete sometimes.

3  **Q.**   And is that something that you were trained on when you

4  became a DExT technician?

5  **A.**   It was mentioned.

6  **Q.**   And, generally speaking, when you get one of these error

7  messages -- I'll ask you specifically about the Samsung Galaxy

8  S4 in a second -- but generally when you get one of those

9  messages when you're conducting this procedure on these phones,

10 what do you do if the process doesn't complete?

11 **A.**   Sure.  You document that it -- first attempt did not

12 process accurately or completely.  And you attempt it again.

13 **Q.**   Okay.  So what did you do with respect to the Samsung

14 Galaxy S4 when you got the message that the process did not

15 complete?

16 **A.**   We documented that it did not complete and we attempted to

17 extract data again.

18 **Q.**   What happened the second time you did it?

19 **A.**   It completed.

20 **Q.**   How do you know it completes?

21 **A.**   It gives you a prompt at the end that the extraction has

22 been completed.

23 **Q.**   Now is there any way for you to determine whether, other

24 than getting that prompt, is there any way for you to determine

25 whether the process was actually complete or not?

1   **A.**   No.

2   **Q.**   Are you familiar with the term "hash values"?

3   **A.**   Yes.

4   **Q.**   Is there any way to use hash values to determine whether a

5   download or the Cellebrite process is complete?

6   **A.**   So unlike other digital evidence, with a phone it's

7   impossible to take a hash of the original value just because

8   whenever you power the phone on something changes in the

9   operating system.  So it's very difficult to get an initial

10  hash to compare to at the end.

11  **Q.**   Is that different from other electronic devices?

12  **A.**   Yes.

13  **Q.**   How so?

14  **A.**   A hard drive is in a solid state.  And so when it's

15  connected through a right blocker, no information can be

16  processed and changed on the original drive.

17  **Q.**   And you can't do that with a cell phone?

18  **A.**   No.

19  **Q.**   Okay.

20  **A.**   Not using Cellebrite, at least, in this work station.

21  **Q.**   So after the second go-around with Cellebrite and this

22  Samsung Galaxy S4, what did you get as a result, and what did

23  you do with that?

24  **A.**   There is a resulting image file that's created, and that

25  image file was burned to a blue ray.

1   **Q.**   An image file, is that like an electronic file on the work

2   station?

3   **A.**   It is.  Which then can be loaded into the software to be

4   reviewed at a later date.

5   **Q.**   Is there any particular software that's needed to view the

6   image file?

7   **A.**   Cellebrite software.

8   **Q.**   What did you do with the blue ray disk after it was loaded

9   on there?

10  **A.**   I believe I did not burn the blue ray disk.  I believe it

11  was a computer scientist that burned it.

12  **Q.**   Do you know who that was?

13  **A.**   I believe Rajkumar Thirumalainambi.

14  **Q.**   Thirumalainambi?

15  **A.**   Yes.  That's correct.

16  **Q.**   We're going to go to that in a second.  So you did not

17  actually create the blue ray disk of this device?

18  **A.**   I did not.

19  **Q.**   Was your role here simply to take the phone, plug it in,

20  make the process work?

21  **A.**   That's correct.

22          **MR. HASIB:**  I have no further questions -- is it

23  Special Agent Miller?

24          **THE WITNESS:**  Yes, it is.

25          **MR. HASIB:**  Special Agent Miller.

1          THE COURT:  All right.  Mr. Fakhoury.

2                    **CROSS-EXAMINATION**

3    **BY MR. FAKHOURY:**

4    **Q.**   Good morning, Special Agent Miller.

5    **A.**   Good morning.

6    **Q.**   Were you present when this cell phone was seized?

7    **A.**   I was not.

8    **Q.**   You were not part of the search party.

9    **A.**   I was not.

10   **Q.**   Now, you also testified about some other -- a digital

11   media that you were asked to image.  Do you remember that?

12   **A.**   I was -- I do, yes.

13   **Q.**   So there was three CD's, correct?

14   **A.**   I believe so, yes.

15   **Q.**   Was it also a USB drive?

16   **A.**   I believe so, yes.

17   **Q.**   Okay.  And the primary -- your primary testimony was about

18   a Samsung Galaxy cell phone, correct?

19   **A.**   Yes.

20   **Q.**   Okay.  Now, you testified that the first time you

21   attempted to extract data from the Galaxy cell phone that the

22   extraction process didn't work.  Do you remember that?

23   **A.**   I do.

24   **Q.**   And you testified that that happens from time to time.

25   **A.**   Correct.

MILLER - CROSS / FAKHOURY

1   Q.   And sometimes it's just a matter of unplugging it and

2   starting over again.  Correct?

3   A.   Correct.

4   Q.   And that's what you did here in this instance, right?

5   A.   That's correct.

6   Q.   You didn't change any settings on the phone or remove any

7   files from the phone or anything like that?

8   A.   I did not.

9   Q.   So just unplugged it, tried it again.

10  A.   Correct.

11  Q.   Okay.  Did you create any Cellebrite reports for any of

12  the other agents on this case?

13  A.   I did not.

14  Q.   You testified that within Cellebrite you can select which

15  items to extract out of the phone.

16  A.   Correct.

17  Q.   Which items did you extract from this Samsung phone?

18  A.   I don't remember off the top of my head.

19  Q.   Would it have been your normal practice to have extracted

20  as much as you possibly could?

21  A.   Yes.  It depends on the device and what options you can

22  select to extract data.

23  Q.   Okay.  And within Cellebrite, the options in terms of the

24  data you could select includes -- and you testified a little

25  bit about this -- but things like text messages, for example.

MILLER - CROSS / FAKHOURY

1  **A.**  Correct.

2  **Q.**  Audio files.

3  **A.**  Correct.

4  **Q.**  Video files.

5  **A.**  Correct.

6  **Q.**  Call logs.

7  **A.**  Potentially, yes.

8  **Q.**  And calendar entries.

9  **A.**  Yes.

10  **Q.**  And you would have -- obviously, the more you can extract

11  out of the phone the better for the other agents.  Correct?

12  **A.**  As long as it's within the scope of the search warrant,

13  yes.

14       **MR. FAKHOURY:**  Okay.  Can I have a minute, Your Honor?

15       **THE COURT:**  You may.

16  (Pause.)

17       **MR. FAKHOURY:**  I have nothing further.  Thank you.

18       **THE WITNESS:**  Thank you.

19       **THE COURT:**  All right.  Hold on, Mr. Miller.

20       **MR. HASIB:**  I have nothing further, Your Honor.

21       **THE WITNESS:**  Thank you very much.

22       **THE COURT:**  You're excused.

23            (Witness excused.)

24       **MR. HASIB:**  Your Honor, government calls Ronald

25  Posadas to the stand.

POSADAS - DIRECT / HASIB

1        **RONALD POSADAS**,

2   called as a witness for the Plaintiff, having been duly sworn,

3   testified as follows:

4           **THE CLERK:**  Be seated.  If you would please state your

5   full name and spell it for the court reporter.

6           **THE WITNESS:**  Ronald Posadas.  R-O-N-A-L-D,

7   P-O-S-A-D-A-S.

8                        **DIRECT EXAMINATION**

9   BY MR. HASIB:

10  **Q.**    Morning, sir.

11  **A.**    Morning.

12  **Q.**    What do you do for a living?

13  **A.**    I'm a police officer.

14  **Q.**    Where are you a police officer?

15  **A.**    With the city of Newark, California.

16  **Q.**    How long have you been a police officer with the city of

17  Newark?

18  **A.**    27 years.

19  **Q.**    And do you have any particular beat or responsibilities as

20  a Newark police officer?

21  **A.**    Currently, I'm assigned to the regional computer forensics

22  lab in Menlo Park.

23  **Q.**    What is the regional computer forensics lab in Menlo Park?

24  **A.**    It's a task force comprised of state, local, federal law

25  enforcement agencies.  We provide services for digital

1  evidence.  Processing of digital evidence, collection,

2  preservation, analysis.

3  **Q.**   And how long have you been in this posting with the

4  regional computer forensics lab?  Is that referred to as RCFL

5  as short?

6  **A.**   Yes.  It's actually the Silicon Valley Regional Computer

7  Forensics Lab.

8  **Q.**   How long have you been posted to this Silicon Valley RCFL?

9  **A.**   A little over eleven years.

10  **Q.**   Do you have a particular title there or --

11  **A.**   We're assigned there as task force officers.  They also

12  refer to us as forensic examiners.

13  **Q.**   So you're still officially with the Newark Police

14  Department, but you're at the Silicon Valley RCFL for the last

15  eleven years.

16  **A.**   Yes.

17  **Q.**   And what do you do over there at the RCFL?

18  **A.**   Again, our primary function is the collection,

19  preservation, analysis of digital media, computers, cell

20  phones, things of that nature.

21  **Q.**   Did you get any particular training in order to take on

22  this position?

23  **A.**   Yes.

24  **Q.**   Could you describe that?

25  **A.**   Well, the initial process is about an 18-month process

1   where you go through training, both classroom and on-the-job

2   training with a coach somebody who's already certified in the

3   field.  Once you're done with that, you go through the Federal

4   Bureau of Investigation's certification process where you have

5   to complete certain classes.  And after the 18 months, if

6   you've passed, then they certify you.

7   **Q.**   What kind of classes did you take with the FBI?

8   **A.**   They're relating to computer file systems.  How data's

9   stored on the computers.  Cell phones.  Things of that nature.

10  **Q.**   Were you working with the RCFL in this role as a forensic

11  examiner in July of 2015?

12  **A.**   Yes, I was.

13  **Q.**   Specifically, July 13 of 2015.

14  **A.**   Yes.

15  **Q.**   What did you do that day in your role as an RCFL forensic

16  examiner?

17  **A.**   I was -- the RCFL had received a request to assist the FBI

18  on the service of a search warrant.

19  **Q.**   And do you recall who that request came from?

20  **A.**   Special Agent --

21  **Q.**   Is it Nile Cassett?

22  **A.**   Cassett, yes.

23  **Q.**   What, if anything, did you do as a result of getting that

24  request?

25  **A.**   I was assigned -- there was two search locations that they

1    needed help with.  One in Fremont and one in Tracy.  I was

2    assigned to the Tracy site.

3    **Q.**   Do you recall where that Tracy site was?

4    **A.**   I remember the street name of Abbott Court.

5    **Q.**   Do you recall whose house it was?

6    **A.**   Saleem Karim, I believe is how you pronounce it.

7    **Q.**   And did you, in fact, participate in the search of that

8    location in Tracy at that day?

9    **A.**   Yes, I assisted.

10   **Q.**   And could you describe what you did that day at the house

11   in Tracy?

12   **A.**   Well, the agents that were assigned along with me served

13   the search warrant.  And once the residence was secured, they

14   went about their business of searching for the items they were

15   looking for.  And part of those items were cell phones or any

16   digital storage devices.

17   **Q.**   And if you know, were any cell phones or digital storage

18   devices recovered that day?

19   **A.**   Yes.

20   **Q.**   And did you have any role with recovering or handling

21   those items in any way?

22   **A.**   Yes, I did.

23   **Q.**   Can you describe what you did with respect to those

24   digital items that were recovered?

25   **A.**   So there was two items that I processed.  One was an LG

1    cell phone, and the other was -- I believe it was a Nook

2    tablet.  Kind of like a Kindle reader.

3    **Q.**  Let me ask you to focus in on the LG cell phone.  Where

4    was that device located in the house?

5    **A.**  It was located at the top -- it is a two-story house.  It

6    was located at the top of the stairway.  There was a -- I call

7    it an alcove area with some cabinets.  And it looked like there

8    was a bed roll there.  Looked like somebody was sleeping there.

9    In that area was like a little nook they were sleeping in.  And

10   the cell phone, from what I recall, was on one of the shelves

11   next to where that bed roll was.

12   **Q.**  Were you instructed by anyone to take any actions with

13   respect to those devices?

14   **A.**  Yes.

15   **Q.**  I'm sorry.  You mentioned the cell phone was there in that

16   upstairs area.  Where was the Nook, the Kindle device?

17   **A.**  It was in the same area.

18   **Q.**  And were you instructed to take any actions with respect

19   to the cell phone?

20   **A.**  Yes.  I was asked to extract the user data from the cell

21   phone.

22   **Q.**  Okay.  And what does that mean to extract user data from

23   the cell phone?

24   **A.**  Through software we can connect the cell phone to a PC

25   laptop.  And depending on what's supported for that particular

POSADAS - DIRECT / HASIB

1  make and model of cell phone, we can extract certain user data

2  off the phone.

3  **Q.**   So you had a PC with you?

4  **A.**   Yes.

5  **Q.**   And did you take this LG cell phone and connect it to that

6  PC?

7  **A.**   I did.

8  **Q.**   And what is the software on the PC that you use to connect

9  to the cell phone?

10 **A.**   Cellebrite is the company.  UFED 4PC was the specific

11 software that does the extractions.

12 **Q.**   What did you do with respect to this LG cell phone once

13 you plugged it into your PC?

14 **A.**   I collected the data off of it.

15 **Q.**   How do you do it?

16 **A.**   It's a software program.  When the cell phone's connected

17 and powered on, you look up the device through a list.  And if

18 it's supported, it will tell you what type of data it can

19 collect from it, and then you just initiate it.

20 **Q.**   Was this particular device supported?

21 **A.**   Yes.

22 **Q.**   What would you do if it wasn't supported?

23 **A.**   There's other alternatives.  There's other software out

24 there.  There's thousands of cell phones out there.  Some

25 manufacturers cover certain ones as far as the software

**POSADAS - DIRECT / HASIB**

1  companies go, and other companies support different phones.

2  All depends on what you have.

3  **Q.**   Were you able to use the software you had that day to

4  connect to that cell phone?

5  **A.**   Yes.

6  **Q.**   Did you conduct an extraction from the data from that

7  device?

8  **A.**   I did.

9  **Q.**   Were you able to tell whether the data extraction process

10  completed successfully?

11  **A.**   Yes.

12  **Q.**   How were you able to tell that?

13  **A.**   Well, for one, it didn't give me any feedback as far as

14  errors during the collection process.  And at the end you can

15  check the extraction files and they give you what's called an

16  MD5 hash for the extraction file.  And that hash is a

17  verification that it downloaded correctly.

18  **Q.**   Are you able to do MD5 hashes for cell phones, typically?

19  **A.**   For files that you download, yes.

20  **Q.**   And how about for devices, electronic devices?

21  **A.**   It typically goes with the files itself or the media item.

22  **Q.**   Now, you were able to successfully download data from the

23  LG cell phone that day?

24  **A.**   Yes.

25  **Q.**   You did it at the house?

POSADAS - DIRECT / HASIB

 1  **A.**   Yes.

 2  **Q.**   What, if anything, did you do with the data that you

 3  extracted?

 4  **A.**   Well, it's extracted onto an external hard drive.  And

 5  after it was complete it was provided to the case agent.

 6  **Q.**   Okay.  Did you provide it to the case agent?

 7  **A.**   Yes.

 8  **Q.**   Do you know -- if you know, do you know what he did with

 9  it?

10  **A.**   I'm not sure.

11        **MR. HASIB:**  No further questions for TFO Posadas, Your

12  Honor.

13        **THE COURT:**  All right.

14        **MR. FAKHOURY:**  No cross.  Thank you.

15        **THE COURT:**  Great.  Thank you.  You're excused.

16                    (Witness excused.)

17        **MR. HASIB:**  Your Honor, government calls Rajkumar

18  Thirumalainambi to the stand.

19                    <u>RAJKUMAR THIRUMALAINAMBI</u>,

20  called as a witness for the Plaintiff, having been duly sworn,

21  testified as follows:

22        **THE CLERK:**  Please be seated.  If you would please

23  state your full name and spell it for the court reporter.

24        **THE WITNESS:**  My name is Rajkumar Thirumalainambi.

25  R-A-J-K-U-M-A-R, Thirumalainambi,

THIRUMALAINAMBI - DIRECT / HASIB

1    T-H-I-R-U-M-A-L-A-I-N-A-M-B-I.

2                    **DIRECT EXAMINATION**

3    **BY MR. HASIB:**

4    **Q.**   Morning, sir.

5    **A.**   Good morning.

6    **Q.**   What do you currently do for a living?

7    **A.**   I'm working as a computer scientist for FBI.

8    **Q.**   And how long have you been a computer scientist with the

9    FBI?

10   **A.**   24th February 2013 onwards.

11   **Q.**   So about five years, give or take?

12   **A.**   That's correct.

13   **Q.**   What did you do before joining the FBI?

14   **A.**   I worked as a computer scientist at NASA Ames Research

15   Center from May 13, 2001, onwards.

16   **Q.**   Can you just describe your educational background a little

17   bit with respect to computer science?

18   **A.**   I did my Ph.D in computer science from University of

19   Auckland, New Zealand, and I did my post-doc at the UC Davis,

20   California.

21   **Q.**   What did you get your Ph.D. from University of Auckland in

22   New Zealand?

23   **A.**   I did my Ph.D. in cancer risk modeling.

24   **Q.**   When was that?

25   **A.**   In '99, September.

1  Q.   How long were you at UC Davis after that?

2  A.   From March '99 until May 21 of 2000.

3  Q.   And just generally speaking, in layman's terms, what was

4  the subject of your research there?

5  A.   I did my data analytics and data mining, along with the

6  artificial intelligence.

7  Q.   Sir, your title is computer scientist with the FBI?

8  A.   That's correct.

9  Q.   What are your job responsibilities as a computer scientist

10  with the FBI?

11  A.   I do most of the -- on computer forensics and log analysis

12  for the computer intrusion for the cyber crime squad at San

13  Jose RA.

14  Q.   Let me ask you to focus on the computer forensics part of

15  your job.  What do you do specifically with respect to computer

16  forensics as a computer scientist?

17  A.   As a computer scientist, I create exact digital copy of

18  the hard disks on iPhone data extraction and iPad.  Any mobile

19  devices I will be able to do the data extraction using the

20  FBI-approved tools.

21  Q.   FBI-approved tools?

22  A.   That's correct.

23  Q.   I'll ask you in a second about those FBI-approved tools.

24  You're currently posted, I think, you said to the San Jose RA?

25  A.   That's correct.

THIRUMALAINAMBI - DIRECT / HASIB

1   **Q.**   What does RA stand for?

2   **A.**   Resident agency.

3   **Q.**   Is that like a field office or a branch office?

4   **A.**   Field office.

5   **Q.**   And is that part of the San Francisco main office?

6   **A.**   That's correct.

7   **Q.**   And have you always been located there in San Jose while

8   you've been with the FBI?

9   **A.**   That's correct.

10  **Q.**   Okay.  Can you walk the jury through -- you just explained

11  what you do as -- as far as computer forensics goes, handling

12  hard disks and phones.  Can you walk the jury through generally

13  what you do when you receive a hard disk or -- well, let's

14  focus on cell phones.  What do you do when you receive a cell

15  phone?

16  **A.**   Okay.  Can I address first the computer hard disk?  Then I

17  can go for the cell phone --

18  **Q.**   Go for the hard disk first.

19  **A.**   -- since I brought the devices which normally I use.  This

20  is like a forensic major.  What it is used for, first initially

21  I'll be wiping a brand new hard disk.  Any new hard disk that I

22  am going to clone evidence to that one, I will be preparing

23  that hard disk.

24      So what do you mean by preparation of the hard disk?  I'll

25  be wiping a new hard disk and it will be completely empty.

1   There is no further or any other information in the wiped hard

2   disk.  Every byte or bit will be zero.

3   **Q.**   So is that the hard disk that you use to save data?

4   That's like the destination drive?

5   **A.**   That's correct.  Basically, it's a target.  So once I

6   connect -- here you can -- if you want to see it here, it is a

7   right block.  Right block means you will not be able to put any

8   information right to that.  Evidence.  It is completely

9   blocked.  It is only allowed to read that evidence on the

10  source drive.

11       So this one I used for any wiping of a new hard disk.

12  Once I prepare the wiped hard disk as my target, then I'll be

13  connecting a source drive to this one, like a hard disk as any

14  evidence if it comes to me.  Then I'll be able to connect the

15  right blocked site and the source target will be on my right

16  side.

17       So then this has a feature, too; clone it exactly the copy

18  of that one, or I can create a forensic image.  Cloning means

19  500 gig of a hard disk is here as source, 500 gig of target.

20  Then I can be able to make bit-to-bit copy.

21  **Q.**   Mr. Thirumalainambi, let me stop you there for a second.

22  In a few moments I'm going to ask you specifically just about

23  some cell phone -- some work that you did with respect to

24  forensics on cell phones.

25       So if you could focus on what it is that you do with

1  respect to cell phones, that would be, I think -- if you could

2  focus on that as opposed to laptops or hard drives.

3  **A.**   I created a new target drive that I may be able to store

4  the forensic images onto that one.  Before I use that one, I

5  had to wipe that hard disk, whether it is a new hard disk or

6  anything.  Then for the cell phone, as per the request, so I

7  will be using an approved, FBI approved, Cellebrite work

8  station which is available in my office.  So any cell phone or

9  mobile devices I'll be connecting to that one and I'll be able

10  to data extract from using that Cellebrite application.

11       So once I collected the data for processing, then I'll be

12  able to copy from that work station, too, the wiped hard drive,

13  and I'll be able to take that extracted data for the case agent

14  to review using OPWAN.

15  **Q.**   Okay.  I think you mentioned a couple of terms there.  I

16  want to go back.  You said FBI-approved tool Cellebrite?

17  **A.**   Yes.

18  **Q.**   What is that?

19  **A.**   Cellebrite application is an FBI-approved tool for

20  extracting data from any mobile devices.

21  **Q.**   Like a piece of software?

22  **A.**   It's a piece of software along with the work station.

23  **Q.**   And where is the work station -- without giving away too

24  many details, where is it physically?

25  **A.**   It is located at my area.  Specific area allocated for

1   that.

2   **Q.**   Does it do anything else?  Or is it just used for

3   Cellebrite?

4   **A.**   Just for mobile device only.

5   **Q.**   Do you use that work station frequently in the nature of

6   your work?

7   **A.**   That's correct.

8   **Q.**   And if you could just describe when an agent brings a cell

9   phone to you, you plug it in to that work station?

10  **A.**   Before I -- some occasions, that cell phone will be -- the

11  battery may be drained.  Normally, whatever the case agent

12  seizes a mobile device, they will normally put it into the

13  airplane mode.

14      So if the first and foremost I will check whether it is on

15  the airplane mode.  And I turn it on.  If it is powered off,

16  then I will try to turn on the cell phone before I try to plug

17  it in.  If it is not in the airplane mode, I may not be able to

18  do the data extraction.  I will stop there and I will tell to

19  the case agent, Hey, this is not in the airplane mode.

20  **Q.**   Why is it important for the phone to be in airplane mode

21  when you get it?

22  **A.**   If it is not in the airplane mode, it may be able to talk

23  to -- when I turn on that cell phone, it may be able to talk to

24  the nearest cell phone tower.  Which, in turn, remotely anyone

25  can wipe the data in that cell phone.  So what I want that cell

1  phone to be on the airplane mode before I do the data

2  extraction.

3  **Q.**   So you want it not to be talking to the networks at all.

4  **A.**   That's correct.

5  **Q.**   So once you confirm that a cell phone that you've received

6  from an agent is in airplane mode, then what do you do?

7  **A.**   Then I will be looking for the connectors.  We have set of

8  cables which can be used to connect that cell phone to that

9  work station.

10 **Q.**   Once you connect the cell phone, then what happens?

11 **A.**   Then the Cellebrite application be able to see the model

12 of that cell phone, as well as it automatically detects what

13 type of manufacturer and what model number.

14     If the Cellebrite application couldn't recognize that one,

15 then I can look back normally that model and that make of that

16 cell phone will be there, then I will be able to directly punch

17 that information into that work station.  Then it automatically

18 detects that one.

19 **Q.**   So once Cellebrite detects what kind of phone you've got,

20 then what happens?

21 **A.**   So it automatically will ask me, Can I do the extraction?

22 It automatically extracts all the information from that cell

23 phone.  It saves to that work station.

24 **Q.**   It saves to that work station?

25 **A.**   Yes.

**THIRUMALAINAMBI - DIRECT / HASIB**

1  **Q.**  What do you do once it's extracted on the work station?

2  **A.**  Then I will be able to make a copy as per the case agent

3  request, whether I can make a DVD or blue ray disk.  Difference

4  on the size of the extraction.  So then I will make a copy to

5  them.  Then I will give a copy and check into the evidence.

6  **Q.**  Do you participate at all in the actual review of evidence

7  or looking through the phone to look for items?

8  **A.**  Not really.  My part -- my role is only the data

9  extraction.  Once the case agent reviews, and if they want to

10  create a report, then I will make a copy of the report into a

11  DVD or CD.

12      So, basically, my role as a computer scientist is creation

13  of that one, extraction of the data using the Cellebrite, then

14  the case agent has to review.  Then final report, if they are

15  preparing a final report.  Then I'll make a copy of that report

16  to DVD or CD and give it to them as evidence.

17  **Q.**  Were you working in your capacity as a forensic scientist

18  -- I'm sorry -- as a computer scientist at FBI in July of 2015?

19  **A.**  Yes.

20  **Q.**  Specifically, were you working from July 10 to July 15 of

21  2015?

22  **A.**  Yes, I was.

23  **Q.**  Do you recall being asked to perform any particular

24  services or actions in your role as a computer scientist that

25  -- during that time period?

THIRUMALAINAMBI - DIRECT / HASIB

1   **A.**   Yes.

2   **Q.**   Can you describe what you were asked to do?

3   **A.**   I was requested by the case agent to create a forensic

4   image and process using AD lab from our San Jose OPWAN.

5   **Q.**   You were asked to process -- I missed the word there.

6   Asked to process what?

7   **A.**   The AD lab is the data area of our forensic review the

8   case agent can be reviewing, or they can do a search that

9   forensic image using that AD lab software which is located in

10   our network in the OPWAN network.

11   **Q.**   What is OPWAN network?

12   **A.**   Operational wide-area network.

13   **Q.**   Okay.  Is that sort of FBI's computer --

14   **A.**   Part of the FBI's entire forensic network -- forensic

15   analysis network.

16   **Q.**   So you were asked by case agents to perform some forensic

17   extraction and put the images on this network.

18   **A.**   OPWAN.

19   **Q.**   OPWAN network.

20   **A.**   So that they can review it.

21   **Q.**   So that they can review it.  Okay.  Do you recall what

22   particular devices you were asked to work on during that time

23   frame?

24   **A.**   I have cell phone, I have a hard disk, then I had a

25   MacBook.  I have around six or seven items they have requested.

1  But I was helped my Jeff Miller, another special agent, during

2  that evidence processing aspect.

3  **Q.**   So you were working with Jeffrey Miller?

4  **A.**   Yes.

5  **Q.**   Okay.  Let me ask you to focus in specifically.  Do you

6  recall doing any work on a Samsung Galaxy S4?

7  **A.**   Yes, I did it.

8  **Q.**   Can you tell the jury what you did with respect to that

9  Samsung Galaxy S4?

10  **A.**   So I copied that image, data extraction was done by Jeff

11  Miller, and it has been stored on derivative hard disk.  From

12  there, I copied to that OPWAN.  OPWAN I processed using AD lab.

13  And then the case agent was able to review it.

14  **Q.**   So you took the image that you found on a hard drive and

15  essentially moved it?

16  **A.**   To OPWAN, yes.

17  **Q.**   Was there any way to tell whether what you moved from one

18  place to another was identical?

19  **A.**   Yes.  So how I can verify is the MD5 of that extracted

20  image, and the copied image, will be matching by MD5 hashing

21  algorithm.

22  **Q.**   Okay.  Hold on a second.  You said "MD5."  What is that?

23  **A.**   There is a mechanism in which the entirety of the content

24  of any hard disk or any digital content can be verified with

25  MD5 hash algorithm.

1  **Q.**   Is it like a fingerprint?

2  **A.**   It is similar to your fingerprint.   It has an alphanumeric

3  characters of X amount of length.

4  **Q.**   So you were able to compare the fingerprints for what you

5  found --

6  **A.**   -- on the hard disk to the OPWAN, whatever the copied

7  content.

8  **Q.**   And did they match?

9  **A.**   Here the question for us is in the cell phone we will not

10  be able to get at the MD5 hash.   The reason is there are a lot

11  of variables on that data extraction using Cellebrite.   Whereas

12  in a hard disk environment, you will be able to see that match.

13  So in that case, I haven't verified that MD5 hash for cell

14  phone data extraction to that one.

15  **Q.**   Okay.   So you can verify using the thumbprint for hard

16  drives, but not for the cell phone.

17  **A.**   Not for the cell phone.   That is not the usual practice.

18  **Q.**   Can you explain to the jury why you can't do that

19  verification for cell phones that you can do for hard drives?

20  **A.**   When I have a hard drive -- let me consider this one as a

21  hard drive which had been given as in evidence.   This hard

22  drive cannot be modified by any of the applications.   Only I

23  will be using is a read-only device.

24       Whereas in a cell phone environment, the question is there

25  are a lot of application.   When I turn on that cell phone, a

1  lot of applications are running.  And even though it is on the

2  airplane mode, internally that applications are running.  So it

3  will be reading and writing some data to that -- whatever the

4  storage mechanism in that cell phone.

5      That is the reason we cannot do an MD5 hash.  Even I tried

6  to get an MD5 hash in one similar instance; after five minutes

7  later if I get an MD5 it will be different.  That is the reason

8  we don't want to go into MD5 hashing on phone or any mobile

9  device.

10  **Q.**  So your job here was essentially to take the image --

11  **A.**  The data extraction.

12  **Q.**  -- from what Special Agent Jeffrey Miller did and put it

13  on the FBI network.

14  **A.**  That's correct.

15  **Q.**  Did you perform a similar function with respect to an LG

16  cell phone?

17  **A.**  I don't recall.

18  **Q.**  Is there anything that would help you recall?

19  **A.**  If I can see my report, then I may be able to see what I

20  exactly performed.

21      **MR. HASIB:**  I notice, actually, it's about 9:30.

22      **THE COURT:**  I was waiting to see if you were wrapping

23  up quickly or whether this would be a good time for a break.

24      **MR. HASIB:**  There's not a whole lot more, but if now's

25  a good time.

1    **THE COURT:**  Ladies and gentlemen, we'll take our first

2    break of the morning.  15 minutes.  We'll be back at 10 of.

3    Please remember the admonitions.

4                    (Recess taken at 9:35 a.m.)

5                 (Proceedings resumed at 9:50 a.m.)

6    **THE COURT:**  All right.  Please be seated, everybody.

7    Ask Mr. Hasib, please continue.

8    **BY MR. HASIB:**

9    **Q.**   Mr. Thirumalainambi, before the break we had talked about

10   a Samsung Galaxy S4, and then we started to talk about an LG

11   cell phone.  And you said you couldn't quite remember.

12        During the break did you review any documents to help

13   refresh your recollection?

14   **A.**   Yes.

15   **Q.**   And as a result of that review, do you now recall

16   performing any forensic work on an LG cell phone during that

17   time period, July of 2015?

18   **A.**   No, I haven't performed any forensic work.  I copied from

19   that 1B11 --

20   **Q.**   What is 1B11?

21   **A.**   So, basically, that the evidence numbering system in

22   bureau.  So that image from that cell phone has been done by my

23   colleague and it has been saved on that 1B11, which I have

24   copied from 1B11 to OPWAN.

25   **Q.**   And again, OPWAN is the bureau's network?

THIRUMALAINAMBI - DIRECT / HASIB

1    **A.**    Network.    Forensic networks.    So the case agent can review

2    that.

3    **Q.**    So your job with respect to that LG phone was again to

4    sort of copy an image from one place and put it somewhere else.

5    **A.**    Correct.

6    **Q.**    And can you describe how that process worked of moving it

7    from one place to another?

8    **A.**    So normally what I do is Windows -- of our operation

9    network is a Windows operating system.    So you can use drag and

10    drop any folder or the file system from a source drive to OPWAN

11    network.    But the question in this case I was -- I encountered

12    error during the copying.

13    **Q.**    You were going to use Windows drag and drop to move the

14    file from one place to another?

15    **A.**    Correct.

16    **Q.**    But you encountered an error?

17    **A.**    Yes.

18    **Q.**    What was the error that you encountered?

19    **A.**    So normally Windows operating system has your file naming

20    convention, period, and then three-digit extension.    Sometimes

21    the file-naming convention may be more than 128 characters;

22    then Windows operating system cannot copy that files from one

23    location to another location.

24        So that is the reason I have used in this circumstance

25    robocopy from the command line so that you will be able to

THIRUMALAINAMBI - CROSS / FAKHOURY

1  transfer from the file name length up to five total characters

2  you'll be able to copy from one location to another location.

3  **Q.**   So your initial attempt failed because the file name was

4  too long?

5  **A.**   That's correct.

6  **Q.**   Then used another --

7  **A.**   The robocopy tool which is available from the OPWAN.   On

8  the command line prompt I am able to copy from that one and a

9  log will also be created during the copying process.

10         **MR. HASIB:**   Your Honor, no further questions for

11 Mr. Thirumalainambi.

12         **THE COURT:**   All right.   Mr. Fakhoury?

13         **MR. FAKHOURY:**   I have a few questions.   If I could

14 just have one second.

15         **THE COURT:**   Take your time.

16      Well, don't take your time but --

17         **MR. FAKHOURY:**   No, very quick.

18                        <u>**CROSS-EXAMINATION**</u>

19 BY MR. FAKHOURY:

20 **Q.**   Good morning, sir.

21 **A.**   Good morning.

22 **Q.**   A few very brief questions.   You were testifying about the

23 need to put a cell phone in airplane mode so that it doesn't

24 communicate with a network before the image can be created.

25 **A.**   Correct.

1  Q.   And you do that for every cell phone that is seized.

2  A.   Whenever I get cell phones coming to my data extraction

3  process, I will make sure that is step number one.

4  Q.   All right.

5  A.   Without airplane mode, I will not go further processing.

6  Q.   Okay.  Now, you testified -- excuse me.  You testified

7  that there were about six or seven different electronic items

8  that you were asked to process in this case.  Do you recall

9  that?

10  A.   Yes.

11  Q.   Okay.  Do you recall what the six or seven items were?  We

12  don't need the specific number or -- evidence number.  But do

13  you recall like how many cell phones was it?

14  A.   Can I see the report, if you don't mind?

15  Q.   Sure.

16        MR. FAKHOURY:  May I approach, Your Honor?

17        THE COURT:  You may.

18        THE WITNESS:  Thank you, sir.

19  BY MR. FAKHOURY:

20  Q.   Sure.  Why don't you just take a look at that.  And when

21  your memory's been refreshed, let me know and I'll come back

22  and I'll collect the report.

23  A.   Can I -- if you don't mind, can I see that email which the

24  special agent has sent to me?  The initial request?

25  Q.   Sure.

1       **MR. FAKHOURY:**  May I approach again, Your Honor?

2       **THE COURT:**  You may.

3    BY MR. FAKHOURY:

4    Q.  I'll show you what's been marked as Trial Exhibit 102.  Is

5    that the email you were talking about?

6    A.  Yes.  This is the first -- the special agent has send that

7    email for me to go through the forensic processing.

8    Q.  Okay.  Okay.  I don't want you to read the email.  I just

9    want you to take a look at it and make sure you remember.  And

10   then let me know once you remember which -- or, how many

11   devices and which -- what kinds of devices you were asked to

12   analyze.

13   A.  So a couple of cell phones, right?  One B6 and one B4.

14   And a laptop, one B8.  MacBook, I remember.  The hard disk

15   also.

16   Q.  Okay.  Let me come back and collect those items for you.

17      So to just make the record clear, it was two cell phones

18   and one MacBook.

19   A.  That, plus a hard drive and a memory stick.

20   Q.  Okay.

21   A.  And CD's, as well.

22   Q.  Okay.  Great.  Now, you were the agent who created the

23   forensic image of the MacBook, right?

24   A.  I am the computer scientist.

25   Q.  I'm sorry.  You were the computer scientist who created

1    the image of the MacBook.

2    **A.**    Correct.

3    **Q.**    Once the image is created, you testified that the image is

4    placed into an AD lab.

5    **A.**    AD lab.

6    **Q.**    AD lab.  I'm sorry.  That allows other agents to access

7    the image and the data on that image and run reports or

8    analysis of the data it had seized.  Do I have that right?

9    **A.**    I will make very clear.

10   **Q.**    Sure.

11   **A.**    So when I copy to the AD lab, specifically the case

12   agent -- and very specific who is assigned to that case -- will

13   alone be allowed to review that forensic image.  Not everyone

14   in our area can not look at that one.  So it's very clearly

15   marked.  And specific permissions, access permissions, are

16   given to that, only to the case agents related to that case.

17   **Q.**    Okay.

18   **A.**    And they can alone do the search or generate the report.

19   **Q.**    Got it.  Thank you for clarifying that.

20   **A.**    Yes.

21   **Q.**    And you took the image you created of the MacBook and put

22   it in AD lab.

23   **A.**    Correct.

24   **Q.**    And you did that in 2015.  Right?

25   **A.**    That's correct.

**THIRUMALAINAMBI - CROSS / FAKHOURY**

1  **Q.**  Now, that image stays in AD lab until when?  Until the

2  case is closed?  Do you know?

3  **A.**  The case agent has to give me the instruction when to

4  remove our archive or remove from OPWAN.  It is at the

5  discretion of the case agent, not myself or anyone.

6  **Q.**  Got it.  Now, in your experience, usually -- and correct

7  me if I'm wrong -- usually that image will stay in AD lab until

8  the case is -- until the case agent informs you, Hey, the case

9  is closed.  Or, You can get rid of that image.  Has that been

10  your experience?

11  **A.**  That's pretty much correct.

12  **Q.**  Okay.  Do you recall Agent Reinke asking you in

13  January 2018 to take a look at the image of the MacBook that

14  was in AD lab?

15  **A.**  Yes.  I remember.  I don't know the exact time frame, but

16  he came back and asked me that question, yes.

17  **Q.**  Okay.  And you recall that he specifically wanted you to

18  look for any indication that the hard drive on the MacBook had

19  been formatted or erased between July and October of 2014.  Do

20  you remember that?

21  **A.**  That's correct.

22  **Q.**  Okay.  And did you do that analysis for him?

23  **A.**  I sat right next to him and explaining him so what are the

24  facts if there is a wipe or anything will be done.  So I sat

25  right next to him and explaining the situation.

1   **Q.**   Okay.  And now a MacBook -- that's an Apple computer,

2   right?

3   **A.**   That's correct.

4   **Q.**   And when you sat there and you explained it to him you,

5   your analysis -- and you can correct me if I'm wrong -- you

6   took a look at several log files on that MacBook.  Do you

7   recall that?

8   **A.**   I have to read my report, if you don't mind.

9   **Q.**   Sure.

10          **MR. FAKHOURY:**  May I approach, Your Honor.

11          **THE COURT:**  You may.

12          **THE WITNESS:**  Thank you.

13   **BY MR. FAKHOURY:**

14   **Q.**   So I'm handing you what's been marked as Exhibit 106.

15   Again, don't -- why don't you take a look at that report and

16   let me know when you've had a chance to review it and your

17   memory is refreshed.

18   **A.**   Yes.

19   **Q.**   Okay.  Your memory's refreshed?

20   **A.**   Yes.

21   **Q.**   Okay.  I'm going to come collect that report.  If you need

22   it again I'll bring it back to you.

23   **A.**   Sure.  Thank you.

24   **Q.**   Sure.  Thank you.

25          So, again, just to pick up where we left off, you took a

1  look at several log files on the Apple MacBook, correct?

2  **A.**   I looked at it, yes.

3  **Q.**   Okay.  You looked at the --

4  **A.**   Specifically, I was trying to put that Apple setup, then

5  that will be whenever the operating system boots it will be

6  checking for that.

7  **Q.**   Okay.  And your analysis showed that that file, that Apple

8  setup file, was created on October 26, 2014, correct?

9  **A.**   Whatever I wrote in that time stamp is exactly correct.

10 **Q.**   All right.  Let me ask you another question.  You took a

11 look at the bash history file.  Do you recall that?

12 **A.**   Correct.

13 **Q.**   Now, you're a computer scientist.  You have more computer

14 knowledge than anybody else in this courtroom.  So just so that

15 we're all on the same page, a bash history file -- and correct

16 me if I'm wrong -- but that's a file that is a history of the

17 user's, or computer user's, terminal commands.  Is that

18 correct?

19 **A.**   Correct.

20 **Q.**   Again so we're all on the same page, a terminal is sort of

21 like a little screen that pops up on a MacBook where you can

22 type in commands and the computer will attempt to execute those

23 commands.

24 **A.**   Yes.

25 **Q.**   If somebody wanted to reformat or erase the data on their

1    hard drive, they could open up that terminal command and type

2    in a specific command to erase a hard drive, correct?

3    A.    Yes, they can do that.

4    Q.    And if a user did that, that bash history file would show

5    that formatting or erasing of the hard drive; that a command to

6    have the hard drive erased or reformatted was inputted into the

7    terminal command.  Is that correct?

8    A.    Normally it keeps track of all the commands used by the

9    user.

10   Q.    Okay.  Now, you took a look at the bash history file on

11   that MacBook computer, right?

12   A.    I looked at it, yes.

13   Q.    And there was no -- any indication that the format command

14   was used to wipe or erase that hard drive on the MacBook.

15   A.    I haven't seen any command.  I wrote it in that report, as

16   well.

17   Q.    Okay.  Great.

18         MR. FAKHOURY:  I don't have anything further, Your

19   Honor.  Thank you.

20         THE COURT:  All right.  Mr. Hasib, anything further?

21         MR. HASIB:  No, Your Honor.

22         THE COURT:  All right.  Thank you very much.  You're

23   excused.

24                        (Witness excused.)

25         MR. HASIB:  Your Honor, government calls Special Agent

1    Chris Reinke to the stand.

2                          __CHRIS REINKE__,

3    called as a witness for the Plaintiff, having been duly sworn,

4    testified as follows:

5            **THE CLERK:**  If you would state your full name and

6    spell it for the court reporter.

7            **THE WITNESS:**  Sure.  Chris Reinke.  R-E-I-N-K-E.

8                       __DIRECT EXAMINATION__

9    BY MR. HASIB:

10   **Q.**   Mr. Reinke, what do you do for a living?

11   **A.**   I'm a special agent with the FBI.

12   **Q.**   Where are you currently posted?

13   **A.**   I'm currently posted at the FBI field office in

14   Minneapolis, and the Rapid City, South Dakota, resident agency.

15   **Q.**   Have you been temporarily assigned here to San Francisco?

16   **A.**   I have.

17   **Q.**   Why is that?

18   **A.**   Well, I just recently left FBI San Francisco earlier this

19   month and moved my family to South Dakota.

20   **Q.**   So are you back here for this trial?

21   **A.**   Correct.

22   **Q.**   How long have you been an FBI agent?

23   **A.**   FBI agent since October 19, 2014.

24   **Q.**   What did you do before becoming an FBI agent?

25   **A.**   Before I joined the FBI I was a marine infantry officer

1    for eight years from 2005 to 2013.

2    **Q.**   What was -- what kind of duties did you perform as a

3    marine officer?

4    **A.**   Sequentially, my first couple years in I did deployments

5    to Southeast Asia and the Middle East.  After that I was

6    stationed in Bahrain, which is a country off the coast of Saudi

7    Arabia and the Persian Gulf where I was second in command of a

8    120-member antiterrorism team.  Then following that, I was an

9    associate professor of naval science at a couple of

10   institutions at Worcester, Massachusetts, as well as Yale

11   University.

12   **Q.**   Special Agent Reinke, you mentioned you were a second in

13   command of an antiterrorism team.  Can you tell the jury what

14   that entailed?

15   **A.**   Sure.  So the antiterrorism team in Bahrain, our primary

16   responsibility was ensuring the defense of vital national

17   assets in the Middle East, which primarily means consulates and

18   embassies.  Or if an embassy or consulate was threatened, or

19   any kind of security issues, we would be able to respond within

20   six hours.

21   **Q.**   Did you receive any particular training in order to have

22   that position as an antiterrorism marine official?

23   **A.**   Yes.

24   **Q.**   Can you describe that training that you received?

25   **A.**   Sure.  I went through a two-week course on antiterrorism

1    officer's course.  I went through a security manager's course

2    and a physical security officer's course.

3    **Q.**   And can you describe after leaving the Marines and joining

4    the FBI, did you receive any particular training in terms of

5    becoming an FBI agent?

6    **A.**   Sure.  So when I joined the FBI in October 2014, I went

7    through an approximately six months of the basic agent training

8    in Quantico, Virginia.  And also I went through some specific

9    counterterrorism training.

10   **Q.**   What was the specific counterterrorism training that you

11   went through with the FBI?

12   **A.**   So I went to a two-week course in northern Virginia, which

13   is the counterterrorism investigative operations course.

14   **Q.**   And what was entailed in that course?

15   **A.**   We talked about various foreign terrorist organizations,

16   the leaders therein.  We discussed terrorist ideologies,

17   various historical terrorist operations, and more current ones.

18   And just how to investigate a counterterrorism case.

19   **Q.**   What were some of the foreign terrorist organizations that

20   were part of your training at that FBI course?

21   **A.**   The most popular ones would be al-Qaeda, ISIS, and

22   al-Nusrah Front.

23   **Q.**   Special Agent Reinke, how long were you in the San Jose

24   office?

25   **A.**   So after completing my initial training in Quantico,

1   Virginia, I moved out to San Jose in March of 2015.  So

2   approximately three and-a-half years.

3   Q.   Okay.  And while you were in San Jose were you assigned to

4   a particular squad?

5   A.   I was.

6   Q.   What squad was that?

7   A.   I was on squad CT6, which stands for counterterrorism

8   squad number 6.

9   Q.   And what were your duties on squad counterterrorism 6, or

10  CT6.  What did you do?

11  A.   We conducted national security investigations that had to

12  do with international terrorism.

13  Q.   Were you assigned to an investigation involving an

14  individual named Adam Shafi?

15  A.   I was.

16  Q.   Could you describe your role in that investigation from

17  the beginning and if there was any progression after that?

18  A.   Sure.  Initially when I joined the squad I supported the

19  other agents.  I was a newer agent so I was kind of helping

20  them out and assisting them with analysis or any investigative

21  steps they may have wanted to have taken.

22      The case agent for Mr. Shafi's investigation transferred

23  out of our squad in approximately May or June 2017.  At that

24  point, my supervisor assigned the investigation to me.  And so

25  I became the case agent, again, in approximately May or

1    June 2017 up until the present.

2    **Q.**    So you're still the case agent.

3    **A.**    Correct.

4    **Q.**    Special Agent Reinke, have you prepared a timeline summary

5    of certain events that took place in this case?

6    **A.**    I have.

7    **Q.**    And could you just -- we'll go into it in more perhaps

8    excruciating detail in a moment.  But can you just describe

9    generally what is the -- what is that timeline summary?

10    **A.**    Sure.  So, obviously, there was lots of things that

11    happened with this investigation.  And to make it easier and a

12    little bit easier to digest, I wanted to include something that

13    took it sequentially from beginning to end starting in 2014.  I

14    populated the timeline with particular items of interest to the

15    investigation, primarily coming from business records that were

16    received, search warrant returns, or actions that were either

17    observed or heard from Mr. Shafi.

18    **Q.**    You mentioned business records a moment ago.  So are there

19    business records mentioned in your timeline?

20    **A.**    There are.

21    **Q.**    Okay.  I'd like to ask you about some records that you've

22    reviewed, specific business records that you've reviewed as

23    part of this investigation.

24          Did you review records from Bank of America?

25    **A.**    I did.

**REINKE - DIRECT / HASIB**

1  Q.   If you could turn -- there's a binder in front of you.  If

2  you could turn to what's marked as Government Exhibit 132.

3  A.   Okay.

4  Q.   What are those in Exhibit 132?

5  A.   These are business records from Bank of America.

6  Q.   Do you recognize them?

7  A.   I do.

8  Q.   How do you recognize them?

9  A.   Because I've seen them before, but they also say "Bank of

10  America, Bank Officer and/or Custodian of Records."

11  Q.   Are those records that you've reviewed as part of your

12  investigation?

13  A.   They are.

14       MR. HASIB:   Your Honor, I'd offer Government Exhibit

15  132 into evidence.  It's actually a self-authenticating

16  business record.

17       THE COURT:   Is there any objection?

18       MR. FAKHOURY:   No, Your Honor.

19       THE COURT:   All right.  It's admitted.

20       (Trial Exhibit 132 received in evidence)

21  BY MR. HASIB:

22  Q.   Special Agent Reinke, did you review records from --

23  actually, let me go back for a second.  The Bank of America

24  records, do they pertain to a particular individual?

25  A.   They do.  They pertain to an Adam Shafi.

REINKE - DIRECT / HASIB

1    Q.   Now let's move on to the next one.  Government Exhibit 80.

2    If you could turn to that in your binder.

3    A.   Is that 8-0?

4    Q.   8-0.

5    A.   Okay.

6    Q.   What are those in Government Exhibit 80?

7    A.   These are Wells Fargo business records that pertain to a

8    Mr. Saleem Karim.

9    Q.   Do you recognize those Wells Fargo business records?

10   A.   I do.

11   Q.   Did you review them as part of your investigation?

12   A.   I have.

13          MR. HASIB:  Your Honor, I'd offer Government Exhibit

14   80 into evidence as a self-authenticating business record.

15          MR. FAKHOURY:  No objection, Your Honor.

16          THE COURT:  It's admitted.

17      (Trial Exhibit 80 received in evidence)

18   BY MR. HASIB:

19   Q.   Can you turn to Government Exhibit 95.

20   A.   Okay.

21   Q.   What is Government Exhibit 95?

22   A.   These are various American Express bank statements and

23   bank records that pertain to Adam Shafi.

24   Q.   And are those records that you've reviewed as part of your

25   investigation in this case?

REINKE - DIRECT / HASIB

```
 1   A.   They are.
 2            MR. HASIB:  Offer Government Exhibit 95 into evidence
 3   Your Honor.
 4            MR. FAKHOURY:  No objection.
 5            THE COURT:  It's admitted.
 6       (Trial Exhibit 95 received in evidence)
 7   BY MR. HASIB:
 8   Q.   Let's have you look at some travel records, travel
 9   business records.  Did you obtain a lot of travel records as
10   part of your investigation?
11   A.   I did.
12   Q.   Let me ask you to look at Government Exhibit 128.
13            MR. FAKHOURY:  What was that exhibit number?
14            MR. HASIB:  128.  1-2-8.
15            THE WITNESS:  Okay.
16   BY MR. HASIB:
17   Q.   What is Exhibit 128?
18   A.   These are business -- travel business records from United
19   Airlines that pertain to Mr. Saleem Karim.
20   Q.   And did you review those as part of your investigation?
21   A.   I did.
22            MR. HASIB:  Offer 128 into evidence, Your Honor.
23            MR. FAKHOURY:  No objection.
24            THE COURT:  Admitted.
25       (Trial Exhibit 128 received in evidence)
```

**BY MR. HASIB:**

**Q.**    Next if you could turn to Government Exhibit 129.  What are those records?

**A.**    These appear to be Turkish Airline records.

**Q.**    Do you recognize them?

**A.**    I do.

**Q.**    Are those records that you reviewed over the course of this investigation?

**A.**    They are.

        **MR. HASIB:**  Offer 129 into evidence, Your Honor.

        **MR. FAKHOURY:**  No objection.

        **THE COURT:**  Admitted.

    (Trial Exhibit 129 received in evidence)

**BY MR. HASIB:**

**Q.**    And the next one should hopefully be 130.

**A.**    Okay.

**Q.**    What are those?

**A.**    These are business records from American Airlines.

**Q.**    Do you recognize them?

**A.**    I do.

**Q.**    And do they pertain to a particular individual?

**A.**    They are related to a Mr. Abdul Qadar Niazi.

**Q.**    Did you review those records as part of this investigation?

**A.**    I did.

1          MR. HASIB:  Offer 130 into evidence, Your Honor.

2          MR. FAKHOURY:  No objection.

3          THE COURT:  Admitted.

4      (Trial Exhibit 130 received in evidence)

5  BY MR. HASIB:

6  Q.  Just a couple more.  135.  If you could look at that,

7  Special Agent Reinke.

8  A.  Okay.

9  Q.  What are those?

10 A.  These are business records from British Airways and they

11 pertain to Mr. Niazi.

12 Q.  And did you review those records as part of this

13 investigation?

14 A.  I did.

15         MR. HASIB:  Offer 135 into evidence, Your Honor.

16         MR. FAKHOURY:  No objection.

17         THE COURT:  It's admitted.

18     (Trial Exhibit 135 received in evidence)

19 BY MR. HASIB:

20 Q.  And sorry to make you turn back, but it's Government

21 Exhibit 68.

22 A.  Bear with me.  You said 6-8?

23 Q.  6-8.

24 A.  Okay.

25 Q.  What are those?

REINKE - DIRECT / HASIB

1   **A.**   These are business records from Royal Jordanian Airlines

2   and they pertain to Mr. Shafi.

3   **Q.**   Do you recognize them as records you've reviewed over the

4   course of the investigation?

5   **A.**   I do.

6         **MR. HASIB:**   Offer Government Exhibit 68 into evidence,

7   Your Honor.

8         **MR. FAKHOURY:**   No objection.

9         **THE COURT:**   It's admitted.

10       (Trial Exhibit 68 received in evidence)

11   **BY MR. HASIB:**

12   **Q.**   And two more.   Government Exhibit 127.

13   **A.**   Okay.

14   **Q.**   And do you recognize those?

15   **A.**   These are business records from Student Universe.

16   **Q.**   What's Student Universe?

17   **A.**   This is an online travel booking site that's geared

18   towards students.

19   **Q.**   Do you recognize those records?

20   **A.**   I do.

21   **Q.**   Did you review them over the course of your investigation?

22   **A.**   I have.

23   **Q.**   Do they pertain to any particular individuals?

24   **A.**   They pertain to both Mr. Karim and Mr. Niazi.

25         **MR. HASIB:**   Government offers Exhibit 127 into

 1   evidence, Your Honor.

 2           **MR. FAKHOURY:**  No objection.

 3           **THE COURT:**  It's admitted.

 4       (Trial Exhibit 127 received in evidence)

 5   **BY MR. HASIB:**

 6   **Q.**   Lastly for the travel records, Special Agent Reinke, would

 7   you look at Government Exhibit 134.   134.

 8   **A.**   Okay.

 9   **Q.**   What is that?

10   **A.**   These are business records from CheapoAir.

11   **Q.**   And do you know what CheapoAir is?

12   **A.**   It's an online travel booking site that offers, I think,

13   low cost fares.

14   **Q.**   Do those records pertain to a particular individual?

15   **A.**   Yes.  They pertain to Mr. Karim and to Mr. Shafi.

16   **Q.**   And did you review those records as part of your

17   investigation?

18   **A.**   I have.

19           **MR. HASIB:**  Government offers 134 into evidence, Your

20   Honor.

21           **MR. FAKHOURY:**  No objection.

22           **THE COURT:**  It's admitted.

23       (Trial Exhibit 134 received in evidence)

24   **BY MR. HASIB:**

25   **Q.**   Okay.  Special Agent Reinke, you've been sitting here

1  throughout the trial, is that right?

2  **A.**    That's correct.

3  **Q.**    And have you heard the testimony of the witnesses who have

4  appeared here before the Court?

5  **A.**    I have.

6  **Q.**    And have you listened to calls that took place in this

7  investigation?

8  **A.**    I have.

9  **Q.**    In particular, have you listened to calls marked Exhibits

10  -- Government Exhibits 1 through 15 that are in evidence?

11  **A.**    I have.

12  **Q.**    And have you reviewed transcripts accompanying those

13  calls?

14  **A.**    I have.

15  **Q.**    Have you reviewed any internet search histories as part of

16  this case?

17  **A.**    I have.

18  **Q.**    Can you just generally describe -- and we'll get into them

19  in more detail in a moment -- but just generally describe what

20  kind of internet search histories you've reviewed as part of

21  this case?

22  **A.**    Sure.  I reviewed internet search histories for Google as

23  they relate to reflexatron@gmail.com and also internet search

24  histories from YouTube as also they relate to

25  reflexatron@gmail.com.

1    **Q.**   Have you reviewed emails as part of your investigation?

2    **A.**   I have.

3    **Q.**   What emails have you reviewed as part of this

4    investigation?

5    **A.**   Emails that pertain to reflexatron@gmail.com.

6    **Q.**   Did you -- a moment ago you testified that you created a

7    timeline, a summary timeline in this case.  If you could turn

8    to Government Exhibit 118 that's in front of you.

9         **MR. HASIB:**  Actually, if I may approach the witness

10   since he may be flipping back and forth a little bit.

11        **THE COURT:**  All right.

12        **MR. HASIB:**  I'm going to put an extra copy of

13   Government Exhibit 118 in front of you.

14   **BY MR. HASIB:**

15   **Q.**   What's Government Exhibit 118?

16   **A.**   This is the timeline of the investigation that we

17   referenced earlier.

18   **Q.**   And that's the one that you created?

19   **A.**   That's correct.

20   **Q.**   Okay.  And how did you -- first of all, just describe what

21   is on this timeline?  What's in the first column?

22   **A.**   The first column is the date of the evidence or the record

23   or the action or phone call or other investigative item of

24   interest.

25   **Q.**   Then what's in the second column of that spreadsheet?

1   **A.**   The second column is a brief description of what that is.

2   **Q.**   You created this spreadsheet?

3   **A.**   I did.

4   **Q.**   So where the brief description is written, are those your

5   interpretations of what happened?

6   **A.**   They are.

7         **MR. HASIB:**  Your Honor, I'd offer Government Exhibit

8   118 in to evidence.

9         **THE COURT:**  All right.  This is a matter that we've

10  discussed before, Mr. Fakhoury?

11        **MR. FAKHOURY:**  It is, Your Honor.  And it's our view

12  that it should just be a demonstrative and not admitted as an

13  actual substantive exhibit.

14     I'm happy to be heard further if the Court wants to.

15        **THE COURT:**  I don't need you to say anything further.

16  I sustained the objection, so the document will be a

17  demonstrative and not admitted into evidence.

18        **MR. HASIB:**  Understood, Your Honor.  May I publish it

19  to the jury?  I have extra copies here.

20        **THE COURT:**  Yes.  I was assuming that you were going

21  to be displaying it on the screen as opposed to having the jury

22  have specific copies of it.

23        **MR. HASIB:**  So I thought about that, and we're

24  actually going to be using the screen to put up exhibits fairly

25  frequently corresponding to what's on the timeline.  And it may

1   be easier to have the physical timelines in one's hand -- and a

2   copy for the Court -- if that helps.

3           THE COURT:  Well, I've got one.  So that's okay.

4       Ladies and gentlemen, you will not be retaining these

5   copies.  They're going to be handed out to you and then they'll

6   be retrieved at the end of the testimony of Agent Reinke.

7           MR. FAKHOURY:  Your Honor, there's one other issue

8   with respect to the timeline.  There's one specific entry that

9   we're going to be seeking a limiting instruction on.

10          THE COURT:  Well, why don't we go over to the side.

11      (The following proceedings were heard at the sidebar:)

12          MR. FAKHOURY:  Your Honor, it's on page 8 and it's the

13  entry for April 15, April 18, 2015.  It's a text message

14  exchange between Mr. Shafi and another individual who's

15  identified as SA.  We know him as Sheersha Aryobi.  He is not a

16  co-conspirator.

17      And it's our view that -- Mr. Hasib and I had gone back

18  and forth about this yesterday -- that obviously Mr. Shafi's

19  statement as a party opponent admission is an admission, but

20  SA's statement at the beginning is hearsay.

21      He indicated to me he's not offering it for the truth of

22  the matter asserted, so I would ask for a limiting instruction

23  if and when Agent Reinke testifies about this item.  Or, I

24  guess -- I mean, even if he doesn't testify about it

25  specifically but that this specific item be given a limiting

```
 1   instruction.

 2           THE COURT:  I will do that.

 3           MR. HASIB:  That's absolutely fine.  With that may I

 4   --

 5           THE COURT:  Yes.

 6       (The following proceedings were heard in open court:)

 7   BY MR. HASIB:

 8   Q.   Special Agent Reinke, you have the timeline in front of

 9   you?

10   A.   I do.

11           THE COURT:  Hang on just a second.  Make sure all the

12   jurors have --

13       (Pause.)

14           THE COURT:  All right.  Please go ahead.

15   BY MR. HASIB:

16   Q.   Special Agent Reinke, you have your timeline in front of

17   you?

18   A.   I do.

19   Q.   Again, the first column there, that's the date of the

20   particular event that was of interest to you?

21   A.   That's correct.

22   Q.   And the second column where it says "action," is that your

23   description of the event that occurred?

24   A.   It is.

25   Q.   Let's start with the first row.  What did you indicate
```

1    there in that first row?

2    **A.**    So on January 7, 2014, reflexatron@gmail.com conducted a

3    YouTube searches for al-Shabaab, al-Qaeda, and al-Qaeda

4    interview.

5    **Q.**    Okay.  How is it that you came to obtain that information

6    about YouTube searches on al-Shabaab, al-Qaeda, and al-Qaeda

7    interview?

8    **A.**    I served a search warrant on Google in the summer of 2017.

9    And once I received those returns, I was able to analyze those

10   records.

11   **Q.**    Okay.  So you got search warrant returns from Google

12   containing Google and YouTube search histories?

13   **A.**    That's correct.

14   **Q.**    Are those the Google and YouTube search histories that a

15   Google custodian came here and testified about a couple of days

16   ago?

17   **A.**    That is what Mr. Ho discussed.

18   **Q.**    Now, let me ask you to turn to Government Exhibit 138 in

19   your binder there.  Do you recognize Government Exhibit 138?

20   **A.**    I do.  I created it.

21   **Q.**    You created it?  What is it?

22   **A.**    It is -- it's an Excel spreadsheet of the YouTube search

23   results for reflexatron@gmail.com.

24   **Q.**    And how did you create it?

25   **A.**    So when I received the search warrant returns from Google,

1  the returns came -- the YouTube search results, they came in a

2  text file.  And a text file is kind of unwieldy and not very

3  fun to read or manage.  And so I opened Excel and I imported

4  that data into Excel.  And it allowed -- it produced this and

5  it allowed me to -- it broke up different entries by date and

6  made it easier to digest.

7  **Q.**  Okay.

8       **MR. HASIB:**  Your Honor, I'd offer Government Exhibit

9  138 into evidence.

10       **MR. FAKHOURY:**  No objection.

11       **THE COURT:**  It's admitted.

12    (Trial Exhibit 138 received in evidence)

13       **MR. HASIB:**  Ma'am clerk, if I may ask, there are three

14  yellow arrows on the screen that I think one of us may have

15  inadvertently put up there.

16       **THE WITNESS:**  I think that was me.

17       **MR. HASIB:**  Ms. Yee, if you could pull up Government

18  Exhibit 138-035.  And if you could zoom in on the top -- the

19  top third there.  Little higher.  There we go.

20  **BY MR. HASIB:**

21  **Q.**  Okay.  Special Agent Reinke, looking at that zoomed-in

22  portion of Government Exhibit 138-035, can you just point out

23  where the YouTube searches for al-Shabaab, al-Qaeda and

24  al-Qaeda interview are?

25  **A.**  Sure.  For al-Shabaab, if you look at the second row from

1    the top, 1450, you'll see a search query for al-Shabaab.  If

2    you look at the 1449 right above that, you'll find a query of

3    al-Qaeda.  And al-Qaeda interview might be on the next page.

4    **Q.**   Ms. Yee, if you pull up Exhibit 138-034 and zoom in on the

5    bottom third of that page.  All the way at the bottom.  That's

6    good.

7        Do you see where the searches for al-Qaeda interview are?

8    **A.**   I do.  Row 1447, second from the bottom, a query was made

9    for al-Qaeda interview by reflexatron@gmail.com.

10   **Q.**   Okay.  And this is a chart that you created using the data

11   from YouTube?

12   **A.**   Yes.

13   **Q.**   And is that how you put that information into your

14   timeline?

15   **A.**   It is.

16   **Q.**   Is there a date listed for those searches?

17   **A.**   For those searches it was January 7, 2014.

18   **Q.**   And is there a time listed there for when those searches

19   took place?

20   **A.**   Sure.  It has the time, and then it says UTC.  UTC stands

21   for Universal Time Coordinated, which is --

22   **Q.**   What's UTC?

23   **A.**   UTC is the global standard for time keeping so that all

24   clocks around the world are synchronized.

25   **Q.**   Is it kind of like Greenwich Mean Time?

1   **A.**   Yes.

2   **Q.**   What's the difference between San Francisco local time and

3   UTC?

4   **A.**   So here in San Francisco we are on -- in Fremont,

5   California -- we're on Pacific Standard Time which is seven

6   hours before -- or sorry -- seven hours after UTC.

7   **Q.**   And as you've reviewed a lot of these YouTube searches and

8   Google searches and telephone calls, have you encountered date

9   stamps with the UTC time zone used?

10   **A.**   I have.

11   **Q.**   And over the course of your investigation, have you also

12   seen some date stamps with the local time zone used?

13   **A.**   I have.

14   **Q.**   How did you -- when you were creating your timeline, was

15   there any system that you used to differentiate whether to use

16   UTC or local time?

17   **A.**   I tried to stay consistent as possible with the records on

18   the timeline.  And for the YouTube and Google search queries, I

19   used UTC.  And for the phone calls, text messages, actions, I

20   tried to use local time.

21   **Q.**   Special Agent Reinke, the next entry on your timeline, if

22   you could explain what that is.

23   **A.**   Yes.  On January 10, 2014, there was a Bank of America

24   record that reflected $100 donation to Islamic Relief.

25   **Q.**   And did you obtain bank records as part of your

1   investigation?

2   **A.**   I did.

3   **Q.**   Ms. Yee, if you could put Government Exhibit 132-005 on

4   the screen which is in evidence.  And zoom in on the middle

5   portion there.

6       Special Agent Reinke, can you just identify for the jury

7   where this $100 donation to Islamic Relief is on that exhibit?

8   **A.**   Sure.  So in the middle of the page underneath Withdrawals

9   and Other subtractions, You could see there was a check card

10  transaction for $100 for Islamic Relief London on January 10,

11  2014.

12  **Q.**   Were you able to determine whose bank account was this?

13  **A.**   Yes.  This is Mr. Shafi's.

14  **Q.**   Okay.

15      **MR. HASIB:**  Your Honor, I assure you I'm not going to

16  go through each line individually, but the first few it may

17  help to explain the basis of the timeline.

18  **Q.**   There are then -- on your timeline, there's a reference to

19  a YouTube search on January 24, 2014.  What is that?

20  **A.**   Correct.  On January 24, 2014, reflexatron@gmail.com

21  conducted a YouTube search for:  Oh, mother of the martyr, do

22  not cry.  And:  The blood of the martyrs in on our neck (sic).

23  **Q.**   Now were you able to tell from the YouTube searches

24  whether -- from the YouTube searches -- whether any videos or

25  websites were actually visited?

1  **A.**   No.

2  **Q.**   So the YouTube searches just show you what was searched

3  for on YouTube?

4  **A.**   The universe of the YouTube search records was restricted

5  to what was queried by reflexatron@gmail.com.

6  **Q.**   And the YouTube search here on January 24, 2014, is that

7  also reflected on the YouTube search history spreadsheet that

8  you just looked at a moment ago?

9  **A.**   It is.

10 **Q.**   Moving along to March 24, 2014.  What's the next item on

11 your list there?

12 **A.**   On March 24, 2014, there was a donation of $10 from an

13 AMEX account, American Express, to the Hidaya Foundation.

14 **Q.**   Have you done any research as to what the Hidaya

15 Foundation is?

16 **A.**   Yes.  It's a non-profit located in Santa Clara that

17 provides resources towards people around the world.  It's also

18 a vessel for individuals to perform (*Arabic*), or charity.

19 **Q.**   (*Arabic*).  Is that the Arabic word for charity?

20 **A.**   It is.

21 **Q.**   Special Agent Reinke, do you speak Arabic?

22 **A.**   I do not.

23 **Q.**   Are you familiar with some Arabic terms like (*Arabic*)?

24 **A.**   Yes.

25 **Q.**   How is it that you're familiar with the terms?

1   **A.**   Just the various trainings I've been through both in the

2   Marine Corps and the FBI.

3   **Q.**   Did you mention you were posted in Bahrain at some point?

4   **A.**   Correct.

5   **Q.**   Ms. Yee, if you could pull up Government Exhibit 95-027

6   which is in evidence.  If you could zoom in on the bottom third

7   of that page, Ms. Yee.

8       Special Agent, could you identify for the jury where is

9   this item on your timeline depicted on that exhibit?

10  **A.**   Second row from the bottom, you'll see the March 24, 2014,

11  entry for the American Express account which is controlled and

12  owned by Mr. Shafi, for $10 to the Hidaya Foundation.

13  **Q.**   I think you just said it; that's an American Express

14  account that has the name Adam Shafi on it?

15  **A.**   Correct.

16  **Q.**   Special Agent Reinke, looking back at your timeline, there

17  are several items from -- let's see -- March 25 to April 23,

18  2014.  Can you just describe for the jury what is on your

19  timeline for those dates?

20  **A.**   Sure.  These are various YouTube searches that were

21  conducted by reflexatron@gmail.com.  On March 25

22  reflexatron@gmail.com searched for:  What do I have to do

23  before I die, Islam.  On April 5 reflexatron@gmail.com searched

24  YouTube for:  Anwar a-Awlaki, *The Hereafter Series*.

25  **Q.**   There's an X2 right after that.  What does the X2

1    indicate?

2    **A.**    That denotes two times.   There are two entries for that

3    date for the same query.

4    **Q.**    So would that mean that in the YouTube search spreadsheet

5    did you see this search listed twice on Anwar al-Awlaki, *The*

6    *Hereafter Series*?

7    **A.**    I did.

8    **Q.**    Go ahead.   March 6, 2014.

9    **A.**    April 6, 2014, there was another YouTube search for Anwar

10   al-Awlaki, *The Hereafter Series*.   On April 18, 2014, there were

11   YouTube searches for *The Hereafter Series* which was done twice.

12   And al-Qaeda.   On April 19, 2014, there were YouTube searches

13   conducted for *The Hereafter Series* 7, and that was done twice.

14   And on April 24, 2014, there were YouTube searches for ISIS.

15   ISIS Syria, twice.   And the *emir* of al-Qaeda.

16        There were also YouTube searches conducted by

17   reflexatron@gmail.com that were not done in English.   They were

18   done in Arabic.   And the translated search terms that were used

19   on April 23, 2014, by reflexatron@gmail.com were for Abu Bakr

20   al-Baghdadi.   And that was done twice.   For ISIS, that was done

21   twice.   For the *emir* of ISIS, that was done four times.   And

22   for the speech *emir* ISIS.   That was also done four times.

23   **Q.**    Special Agent Reinke, do you know who is Anwar al-Awlaki?

24   **A.**    I do.

25   **Q.**    Who is that person?

1  A.   He's a prominent Islamic cleric who had connections to the

2  9/11 hijackers.  He rose in prominence in the late 0s, early

3  2010, 2011.  He was an American born of Yemeni decent.

4  Q.   Let me stop you there.  How is it you're familiar with

5  that person?

6  A.   Just my various trainings in the FBI and the Marine Corps

7  and my experiences.

8  Q.   And are you familiar with something affiliated with Anwar

9  al-Awlaki called *The Hereafter Series*?

10 A.   Correct.  So Anwar al-Awlaki spoke fluent English and

11 fluent Arabic, which was very popular in the west.  And his

12 *Hereafter Series* discusses the afterlife as it pertains to the

13 Islamic faith.

14 Q.   Have you actually listened to any Anwar al-Awlaki

15 recordings recently?

16 A.   I have.

17 Q.   Have you listened to the *Hereafter Series* recently?

18 A.   I have.

19 Q.   How is it that that you listened to *The Hereafter Series*

20 recently?

21 A.   They were found on the Samsung Galaxy S4 cell phone that

22 was retrieved on July 4, 2015, at Mr. Shafi's residence.

23 Q.   And there's another name there.  Abu Bakr al-Baghdadi.

24 Are you familiar with that name through your experience as a

25 Marine and FBI agent?

1    **A.**    Abu Bakr al-Baghdadi is the current leader of ISIS.

2         **MR. HASIB:**  And let me put -- I think we now have

3    multiple easels.  Government 33, Your Honor.  Put it back up in

4    front of the jury.

5    **Q.**    The word "*emir*" is on Government Exhibit 33.  What is the

6    translation of "*emir*"?

7    **A.**    According to Ms. Marian Linda Butros, the literal

8    translation of "*emir*" is prince.

9    **Q.**    Did you work with Ms. Butros in the preparation of this

10   timeline?

11   **A.**    I did.

12   **Q.**    Did you work with her in the preparation of -- or, your

13   review of the Google spreadsheets and the YouTube spreadsheets?

14   **A.**    I did.

15   **Q.**    And you were here for her testimony a couple days ago?

16   **A.**    That's correct.

17   **Q.**    All right.  April 24, 2014, what's your entry in your

18   timeline that day?

19   **A.**    On April 24, 2014, reflexatron@gmail.com conducted Google

20   searches for Anwar al-Awlaki lectures twice; and Anwar

21   al-Awlaki lectures download free, three times.

22   Reflexatron@gmail.com also visited a site that is -- the

23   description of it in the URL is Anwar al-Awlaki audio archive.

24   **Q.**    Now, are these records different from the YouTube searches

25   that you just read about in your timeline?

**A.**    They are.

**Q.**    How are they different?

**A.**    Because these are records from the Google searches.

**Q.**    And how are those two things different?  The YouTube searches from the Google searches?

**A.**    The Google searches pertain to queries that were done by reflexatron@gmail.com from the Google home page, or via the Google search bar.

**Q.**    Did you -- I think you already mentioned this.  Did you get Google search histories in addition to YouTube search histories?

**A.**    I did.  From the same search warrant.

**Q.**    And did you make a similar chart to the Google search histories that you did for the YouTube search histories?

**A.**    I did.

**Q.**    If you could flip to Exhibit 137 in your binder.  It's a bit of a beast of an exhibit with 236 pages.  But do you recognize that spreadsheet?

**A.**    I do.

**Q.**    How do you recognize it?

**A.**    Similar to the YouTube search records, I made it.

**Q.**    And how did you make it?

**A.**    Similar to the YouTube search records.  When I received the Google search records from Google, they were in a text file.  And, again, it was very hard to read and distinguish

1 between different dates and different queries that were made.

2 And so I use Excel, and I imported it into Excel so it broke up

3 the different entries and made it much more easier to analyze

4 and to read.

5       **MR. HASIB:**  Your Honor, government offers Government

6 Exhibit 137 into evidence.

7       **MR. FAKHOURY:**  No objection.

8       **THE COURT:**  It's admitted.

9    (Trial Exhibit 137 received in evidence)

10       **MR. HASIB:**  And, Your Honor, if I may publish

11 Government Exhibit 137-203.

12    And, Ms. Yee, if you could focus in on the middle portion

13 of that page.

14    That's good.  137-203.  There we go.

15 **BY MR. HASIB:**

16 **Q.**  If you could just identify for the jury where in this

17 chart are the searches that are reflected in your timeline for

18 Anwar al-Awlaki lectures and Anwar al-Awlaki lectures, download

19 free?

20 **A.**  The Anwar al-Awlaki lectures, one of them is on 8259.

21 It's kind of in the middle there.  There is a -- the Anwar

22 al-Awlaki lectures, download free, is a little bit above that.

23 That is row 8256.  A little further above that there's another

24 one for the Anwar al-Awlaki lectures download free, row 8250.

25 **Q.**  And do you see in that Google spreadsheet chart some of

REINKE - DIRECT / HASIB

1  the columns say "searched for" while some of them say

2  "visited"?

3  **A.**  I do.

4  **Q.**  And does that have any significance for you?

5  **A.**  It does.

6  **Q.**  What is the significance -- what is the difference between

7  those two?

8  **A.**  Well, harkening back to Mr. Ho's testimony, and my

9  experience, the "searched for" means that the

10  reflexatron@gmail.com account typed in those characters and hit

11  enter and then received results.  And for "visited" that means

12  reflexatron@gmail.com, once it received those results, it would

13  have clicked on one of those URLs.  One level down, I guess.

14  **Q.**  Now, are you able to determine whether someone stayed for

15  a long time on a particular page?

16  **A.**  No.

17  **Q.**  Is there anything in there that would suggest that the

18  page was left open for days or weeks or anything of that

19  nature?

20  **A.**  No.

21  **Q.**  So this just shows that a site was visited.  That's it.

22  **A.**  The exact time that it was visited, yes.

23  **Q.**  Let's turn back to your timeline.  There are several

24  YouTube and Google searches from -- let's see.  We just did

25  April 24.

1      Let's go from April 25 to the following page, May 12,

2   2014.  Could you just describe what's in those items on your

3   timeline from April 25 to May 12, 2014?

4   **A.**    Sure.  So on April 25, 2014, reflexatron@gmail.com

5   conducted YouTube searches for *emir*, al-Qaeda, and that was

6   done twice.  Zawahiri, ISIS, four times.  And YouTube searches

7   were conducted in Arabic for *emir* of al-Qaeda, speech of *emir*

8   al-Qaeda twice.  And speech of al-Qaeda.

9   **Q.**    Okay.  How about the 26th?

10  **A.**    The next day, on the 26th, reflexatron@gmail.com conducted

11  YouTube searches for Zawahiri, ISA.  Anwar al-Awlaki *The*

12  *Hereafter Series*.  Anwar al-Awlaki hitlist twice.  Zawahiri

13  interview twice.

14  **Q.**    Let me stop there for a second.  The first item you said

15  was Zawahiri, ISA.

16  **A.**    Correct.

17  **Q.**    And it says ISI there.  Did you -- how did you create the

18  entries in this spreadsheet?

19  **A.**    So they're in between quotes, and so I lifted them

20  directly from the either YouTube or Google search results.  So

21  whatever was in the results is going to be on the timeline.

22  **Q.**    Okay.  Go ahead and continue.  April 27, 2014.

23  **A.**    April 27, 2014, there were -- reflexatron@gmail.com

24  conducted YouTube searches of Zawahiri interview, and *jihad*

25  ISIS.  On May 10, 2014, the reflexatron account conducted

1   Google searches for *The Hereafter Series* download, *jihad*, and

2   it also visited a website that appears to have lectures from

3   Anwar al-Awlaki *The Hereafter*.

4        On May 12, 2014, reflexatron@gmail.com conducted YouTube

5   searches for join ISIS Syria, twice.  And I think that was the

6   last day that you had asked.

7   **Q.**   That is the last day I had asked.  Before we go any

8   further, Special Agent Reinke, do these items that you've put

9   on your timeline reflect the entirety of the Google searches

10  and YouTube searches that took place over that period of time

11  in the spreadsheets?

12  **A.**   They do not.

13  **Q.**   How much other stuff is there that's not on your timeline

14  for this time period?

15  **A.**   For this time period -- I mean, I could opine on the

16  number of search queries done each day, but numerous.

17  **Q.**   There's a lot of stuff in between some of these searches

18  on various occasions.

19  **A.**   Correct.

20  **Q.**   Turning to April 13, 2014, there's something slightly

21  different in that entry on your timeline.  What's -- what

22  occurs on that date?

23  **A.**   So on May 13, 2014, there was a Google Maps search for

24  directions to Urfa, Turkey.  And that was done four times.

25  **Q.**   Thank you for correcting me.  I did it again.  That's

1    May 13, 2014.

2        Have you reviewed a map that is in evidence, Government

3    Exhibit 114?

4    **A.**    I have.

5    **Q.**    And is that -- is Urfa displayed on that map?

6    **A.**    Can't really see it from here, but based on my memory, I

7    believe it is.

8    **Q.**    (Indicating)?

9    **A.**    Yes, it is.

10    **Q.**    Where is Urfa on the map, Government Exhibit 114?

11    **A.**    It's the -- it's denoted by the number 1, and it is in the

12    southeast corner of Turkey, approximately 60 kilometers from

13    the Turkey-Syria border.

14    **Q.**    How do you know it's approximately 60 kilometers from the

15    border?

16    **A.**    I did a Google search and did the same query.

17    **Q.**    If you could walk through the next item.  Is there --

18    there are a couple of entries on April 14, 2014.  What's the

19    first one?

20    **A.**    On May 14, 2014, there are YouTube searches conducted by

21    reflexatron@gmail.com.  And the first one that you had asked

22    about is for join ISIS, Syria.

23    **Q.**    I'm just checking to see if you're paying attention,

24    Special Agent Reinke.

25        May 14, 2014, can you describe the al-Nusrah Front

1  designation.  What is that?

2  **A.**  So, yes.  On the next day -- sorry -- the same day, but

3  the next row down, May 14, 2014, that is the day that the

4  Department of State, which is abbreviated with DOS -- or, not

5  abbreviated, but the acronym DOS -- that's the day that they

6  published their designation of al-Nusrah Front as a foreign

7  terrorist organization, which is denoted by the acronym FTO, in

8  Syria.

9      **MR. HASIB:**  Your Honor, at this time I'd like to move

10  into evidence a stipulation that the parties have agreed

11  regarding the designation of a foreign terrorist organization.

12      **THE COURT:**  All right.

13      **MR. HASIB:**  Hand that to the clerk.

14      **THE COURT:**  Do you want me to read this to the jury?

15      **MR. HASIB:**  If I may, Your Honor, I'd like to read it

16  to the jury.

17      **MR. FAKHOURY:**  I think reading it is fine, Your Honor.

18      **THE COURT:**  It seems like the appropriate thing to do.

19      Ladies and gentlemen, the parties have stipulated, and you

20  don't need further evidence with respect to this stipulation.

21      At all times relevant to the indictment, the al-Nusrah

22  Front, also known as *Jabhat al-Nusrah*, also known as *Jabhet*

23  *al-Nusrah*, also known as the Victory Front, also known as

24  al-Nusrah Front for the People of the Levant, also known as

25  al-Nusrah Front in Lebanon, also known as Support Front for the

1  People of the Levant, also known as *Jabhat al-Nusrah li-Ahl*

2  *al-Sham min Mujahedi al-Sham fi Sahat al-Jihad* was a designated

3  foreign terrorist organization under Section 219 of the

4  Immigration Nationality Act, and was a specially-designated

5  global terrorist entity under Section 1(b) of Executive Order

6  13224.  The stipulation's accepted.

7          **MR. HASIB:**  Thank you, Your Honor.

8  **BY MR. HASIB:**

9  **Q.**  Okay.  May 17, 2014, Special Agent Reinke, the next entry

10  in your timeline, what is indicated there?

11  **A.**  So on May 17, 2014, the Galaxy cell phone controlled by

12  Mr. Shafi downloaded *The Constants of Jihad* lecture, which is a

13  series of six audio files on to his phone.

14  **Q.**  Did you review a forensic image of that Galaxy S4?

15  **A.**  I did.

16  **Q.**  And did you -- were any other FBI employees with you as

17  you conducted that review?

18  **A.**  At times there were.  There were multiple reviews.

19  **Q.**  Was Rajkumar Thirumalainambi part of that review process?

20  **A.**  Yes.

21  **Q.**  And did he provide you at some point with access to that

22  forensic image?

23  **A.**  He did.

24  **Q.**  Now, when you reviewed that forensic image of the Samsung

25  Galaxy S4, did you check to see if there were any audio files

1   on that device?

2   **A.**   I did.

3   **Q.**   And did you see files labeled *The Constants of Jihad*?

4   **A.**   I did.

5   **Q.**   And is that what's reflected on your timeline?

6   **A.**   It is.

7   **Q.**   Have you had an opportunity to open those audio files?

8   **A.**   I have.

9   **Q.**   Did you listen to them at all?

10  **A.**   I did.

11  **Q.**   What's on them?

12        **MR. FAKHOURY:**  Objection.  Hearsay.  Cell phone's not

13  in evidence.

14        **MR. HASIB:**  Your Honor, I'll come back to that.

15        **THE COURT:**  Yeah.  Is that in evidence?

16        **MR. HASIB:**  It will be in a moment.

17        **THE COURT:**  Sustained.

18        **MR. HASIB:**  I'll come back to it.

19  BY MR. HASIB:

20  **Q.**   Special Agent Reinke, moving along, what's the next item

21  on your timeline?

22  **A.**   On May 21, 2014, reflexatron@gmail.com conducted YouTube

23  searches in Arabic for *Jabhat al-Nusrah*, and that was done

24  twice.

25  **Q.**   And how about June 5, 2014.  What's that?

1  **A.**   On June 5, 2014, Mr. Shafi purchased a plane ticket to

2  Cairo, Egypt, with his American Express card.

3  **Q.**   And let me just go back to the last entry, the May 21

4  entry.  *Jabhat al-Nusrah*, is that a term that you're familiar

5  with?

6  **A.**   It is.

7  **Q.**   How are you familiar with that term?

8  **A.**   I've seen it before.  And it's the full Arabic name for

9  the foreign terrorist organization we refer to here in English

10  as the al-Nusrah Front.  It's a similar name.

11  **Q.**   Is that one of the names that's included in the foreign

12  terrorist organization designation that was just read into

13  evidence?

14  **A.**   It was just read by the judge, yes.

15  **Q.**   June 5, 2014, I think you mentioned there's a purchase of

16  a Cairo ticket?

17  **A.**   That's correct.

18  **Q.**   How do you know there was a purchase on June 5?

19  **A.**   Because I reviewed the bank records.

20  **Q.**   Ms. Yee, if you could pull up Government Exhibit 095-42.

21  And if you could zero in on the middle portion where that

22  yellow check mark is, Ms. Yee.

23       What is reflected on the middle portion of that page

24  there?

25  **A.**   That is the itinerary for the plane flight for Mr. Shafi

1    from San Francisco to Cairo via Frankfurt, on Lufthansa.

2    **Q.**   And does the receipt there indicate who the passenger is?

3    **A.**   It does.  It says Mr. Adam Shafi.

4    **Q.**   And are these Mr. Shafi's American Express records that

5    are already in evidence?

6    **A.**   They are.

7    **Q.**   Special Agent Reinke, there are then several searches on

8    your timeline I wonder if you could walk the jury through.

9         June 13, 2014, all the way to June 30.  The middle portion

10   of that page.

11   **A.**   On June 13, 2014, reflexatron@gmail.com conducted a

12   YouTube search for Anwar al-Awlaki *bida*.  The next day,

13   June 14, 2014, the reflexatron account conducted a YouTube

14   again for Anwar al-Awlaki *bida*.  On June 17, 2014,

15   reflexatron@gmail.com conducted YouTube searches for ISIS, and

16   that was done six times.  That same day reflexatron@gmail.com

17   also conducted Google searches for Anwar al-Awlaki, and that

18   was done twice.  Anwar al-Awlaki lectures.  And the gmail

19   account also visited a website that has lectures from Anwar

20   al-Awlaki that pertain to the life of Mohammad.  On June 28,

21   2014, reflexatron@gmail.com conducted YouTube searches for

22   *nashid* Abu Bakr al-Baghdadi.

23   **Q.**   Let me stop you there for a second, Special Agent Reinke.

24   Were you here in court when Ms. Butros, the FBI linguist,

25   testified?

1    **A.**    I was.

2    **Q.**    Have you reviewed a telephone call between Abul Qadar

3    Niazi and Adam Shafi that was played in court marked as

4    Government Exhibit 1?

5    **A.**    Yes.

6    **Q.**    And was there reference in that call to *nashid* Abu Bakr

7    al-Baghdadi?

8    **A.**    There was.

9    **Q.**    If you could continue to June 30, 2014.

10   **A.**    June 30, 2014, reflexatron@gmail.com conducted Google

11   searches for Anwar al-Awlaki lectures, enjoy Islami; Anwar

12   al-Awlaki lectures, enjoy Islam, and that was done twice.  The

13   reflexatron account also went to a website that has lectures

14   from Anwar al-Awlaki, and another website, a different website,

15   that also has audio lectures from Anwar al-Awlaki.

16   **Q.**    And what's the next entry in your timeline there, July 3,

17   2014?

18   **A.**    On July 3, 2014, Mr. Shafi spent $2,156.84 at an Apple

19   store in Walnut Creek.

20   **Q.**    Ms. Yee, if we could pull up -- I think it's the same

21   exhibit -- 95-052.  If you could zero in on the middle portion

22   of that page again.

23       Could you just identify to the jury again where are those

24   purchases that you just described that are on your timeline?

25   **A.**    Sure.  So in the middle, on July 3, 2014, there are

1    back-to-back entries for Apple store 14 for $1,078.42.

2    **Q.**   Special Agent Reinke, could you walk the jury through the

3    entries on your timeline for the bottom portion of that page,

4    7-9, July 9, through July 12, 2014.

5    **A.**   Sure.  So on July 9, 2014, reflexatron@gmail.com conducted

6    Google searches for Urfa, Turkey; Van, Turkey; airport Turkey;

7    airport Turkey; Gaziantep airport, Turkey.  On July 11, 2014,

8    reflexatron@gmail.com conducted YouTube searches for Syria and

9    join ISIS Syria twice.  And then finally on July 12, 2014,

10   reflexatron@gmail.com conducted YouTube searches for *nashid* Abu

11   Bakr al-Baghdadi, *jihad* (*Arabic*) ISIS; *jihad nashid* ISIS.  And

12   Google searches for Gaziantep airport, Turkey; directions to

13   Gaziantep airport, Turkey, twice; directions to Ar Raqqah,

14   Syria; directions to Jarabulus, Aleppo governorate, Syria.

15   **Q.**   And we've got Trial Exhibit 114 now up on the screens

16   which is in front of you.  I'll -- you got them, as well.

17   There were several places that you just mentioned in those

18   Google searches.  Could you just identify -- let's walk

19   through.  Urfa, Turkey.  Where is that indicated on the map in

20   Government Exhibit 114?

21   **A.**   It's indicated by the number 1.  It's in the southeast

22   corner, as I previously stated, approximately 60 kilometers

23   from the Syrian border.

24   **Q.**   How about Gaziantep airport, Turkey.  Is that indicated on

25   the map?

**A.**    It's denoted by the number 2.  It's a close large city to the Syrian border.

**Q.**    And how about there's mention in the Google searches of Ar Raqqah, Syria.  Where is that indicated on this map?

**A.**    That's number 3 on the map, and it is in the north central portion of Syria close to the Turkish border.

**Q.**    How about Jarabulus, Syria.

**A.**    Jarabulus, or "Jarabulus," Syria is denoted by number 4. And it is in, again, north central Syria.  It's a border town on the Syrian-Turkish border.

**Q.**    Again, were you present for the testimony of FBI linguist, Linda Butros?

**A.**    I was.

**Q.**    Do you recall her testifying about a reference to *Halab* in Arabic, or Aleppo?

**A.**    I do.

**Q.**    Is that a city that was referred to in one of the calls that was played in court when she was testifying?

**A.**    It was.

**Q.**    Special Agent Reinke, what's the next item on your timeline?

**A.**    So on July 13, 2014, reflexatron@gmail.com emailed Mr. Karim a packing list for a backpacking trip.  And he emailed it to him twice.

**Q.**    Now, as part of this case, did you obtain emails from

1  Google for particular email accounts in this case?

2  **A.**   I did.

3  **Q.**   Was one of those email accounts reflexatron@gmail.com?

4  **A.**   It was.

5  **Q.**   And when the -- were you here when the Google custodian

6  testified yesterday, Mr. Ho?

7  **A.**   I was.

8  **Q.**   And did he explain about the use of hash values to

9  identify whether the items that were produced by Google were

10  identical to the items that were in the possession of the FBI?

11  **A.**   He did.

12  **Q.**   And if you could turn to Government Exhibit 47, 48 and 49

13  in your binder there in front of you.  What are those?  47, 48

14  and 49.

15  **A.**   Bear with me here.

16       These are three emails that were sent by Mr. Shafi.

17  **Q.**   And do you recognize them as emails that were sent from

18  that reflexatron@gmail account that you reviewed?

19  **A.**   I do.

20  **Q.**   And that the Google custodian testified about?

21  **A.**   I do.

22  **Q.**   Have you reviewed the Google records to ensure those

23  records -- that those emails are in the Google response?

24  **A.**   I did.

25       **MR. HASIB:**  Your Honor, I'd offer Government Exhibits

1    47, 48 and 49 into evidence.

2           **MR. FAKHOURY:**  No objection.

3           **THE COURT:**  They're admitted.

4       (Trial Exhibits 47-49 received in evidence)

5    **BY MR. HASIB:**

6    **Q.**   Okay.  Ms. Yee, if you could pull up Government Exhibit

7    47-001 and if you could zoom in a little bit so it's a little

8    more legible.

9        On the whole thing, actually, Ms. Yee.

10       That will work for now.

11       Could you just indicate what's in this portion that's on

12   sort of the bottom two-thirds of the exhibit there?

13   **A.**   So this is not the email that was sent originally by

14   Mr. Shafi that I'm referring to on my timeline.  This is part

15   of it.  It's the original email that was sent by Mr. Shafi via

16   reflexatron@gmail.com to a Noah Shafi, and another email

17   address.  And it has a list of items that would be used for a

18   packing trip, as he calls it.

19   **Q.**   Now that we've gone back up to the top of that exhibit,

20   what's reflected on the top of that exhibit?

21   **A.**   That is the rest of the information for the email that I'm

22   actually referring to in my timeline which was a forwarded

23   email from reflexatron@gmail.com to a karim_saleem@hotmail.com

24   on July 13, 2014, at 12:53 p.m.

25   **Q.**   And in the "from" line of the email there, is there a name

1   associated with reflexatron@gmail.com?

2   **A.**   There is.

3   **Q.**   What's the name there?

4   **A.**   Adam Shafi.

5   **Q.**   Let's turn to, Ms. Yee, if you could -- actually -- sorry.

6   If you could bring that one back up.  47-001.  If you could

7   zoom in on the top portion.  Right there.  That's good.  Thank

8   you.

9        Special Agent Reinke, what's the date and time of that

10  email, 47-001?

11  **A.**   July 13, 2014, 12:53 p.m.

12  **Q.**   Now, Ms. Yee, if we could go to Government Exhibit 48-001.

13       And if you could zoom in from the top there, Ms. Yee.

14       Thank you.  That's perfect.

15       What's depicted in this exhibit, 48-001?

16  **A.**   It's virtually the same email, it's just not forwarded.

17  And the short kind of preamble to the previous forwarded email

18  has been removed.  So it just contains the items you would need

19  for a backpacking trip.

20  **Q.**   Did you compare these two emails at any point?

21  **A.**   I did.

22  **Q.**   Did you go line by line and figure out whether each item

23  from 2013 was listed in 2014?

24  **A.**   I did.

25  **Q.**   Are they identical?

REINKE - DIRECT / HASIB

1   **A.**   They are.

2   **Q.**   And I think you mentioned it.  Who is this email from and

3   to?

4   **A.**   This is from reflexatron@gmail.com to

5   karim_saleem@hotmail.com.

6   **Q.**   And at what time is this email sent?

7   **A.**   Three minutes after the email we just talked about at

8   12:56 p.m. on July 13, 2014.

9   **Q.**   Ms. Yee, if you could pull up 49-001.  And if you could

10  zoom in on -- yeah.  Same portion.  Thank you.

11      Special Agent Reinke, what's depicted in this Exhibit

12  49-001?

13  **A.**   It is an email from reflexatron@gmail.com to

14  zachary_niazi@yahoo.com.

15  **Q.**   What is the date on this email?

16  **A.**   August 2, 2014, at 5:02 p.m.

17  **Q.**   I think you just mentioned it's sent to

18  zachary_niazi@yahoo.com?

19  **A.**   That's correct.

20  **Q.**   What's in the forwarded message portion there at the

21  bottom half of the email?

22  **A.**   It's the same email that we had just seen.  And it's been

23  forwarded to zachary_niazi@yahoo.com.

24  **Q.**   Now, the forwarded portion there says 9:56 p m.  Do you

25  have any explanation as to why it says 9:56 p.m.?

1   **A.**   Would be due to the time difference from where the emails

2   were sent.

3   **Q.**   Okay.  Ms. Yee, if you could pull up --

4        Special Agent Reinke, you've gone through these Google

5   histories and search histories and reviewed the evidence in

6   this case.  Have you seen evidence of Adam Shafi going on --

7   or, doing searches for things relating to backpacking and

8   camping?

9   **A.**   I have.

10  **Q.**   Have there been discussions about trips to national parks

11  in the United States?

12  **A.**   There have been.

13  **Q.**   Yosemite?

14  **A.**   Yosemite, Death Valley, amongst others.

15  **Q.**   Special Agent Reinke, what's the next item on your

16  timeline after July 3 -- July 13, 2014?

17  **A.**   So it says July 17, 2014, travels to Cairo, Egypt, with

18  parent and siblings.

19  **Q.**   How did you come up with that date?

20  **A.**   That was derived from Mr. Salama Shafi's interview with

21  the legal attaché, Special Agent Simon Maher, in Egypt on

22  August 17, 2014.  He gave him that date.

23  **Q.**   Is that the interview that state department official

24  Johnny Ceballos-Rivera testified about here in court?

25  **A.**   It is.

**REINKE - DIRECT / HASIB**

1   **Q.**   So you took that date and put that into your timeline?

2   **A.**   I took that date.  The date of travel was July 14 into

3   July 15, which is reflected in the bank records and the travel

4   records.

5   **Q.**   Okay.  So the date of travel and the bank records shows

6   July 14, but you took the date that the father said that they

7   had arrived in Cairo.

8   **A.**   Correct.

9   **Q.**   What's the next entry on your timeline?

10  **A.**   On July 18, 2014, Mr. Karim purchased two electronic visas

11  for Turkey for $20 each utilizing his Wells Fargo checking

12  account.

13  **Q.**   Special Agent Reinke, showing you Exhibit 80-20 which is

14  in evidence.

15      Ms. Yee, if you could pull that up.  And if you could zoom

16  in on the portion of the content there.

17      What is this record that we're looking at?  80-20?

18  **A.**   These would be the Wells Fargo records for Mr. Karim.

19  **Q.**   Okay.  And if you could just identify where in this bank

20  record there are e-visa purchases for Turkey?

21  **A.**   Near the top on July 18 there's back-to-back debit card

22  purchases for an e-visa Turkey, Ankara, for $20 each.

23  **Q.**   Who does this bank account belong to, the records

24  indicate?

25  **A.**   Mr. Karim.

1    Q.    Turning to July 19, 2014, what's the next item on your

2    timeline?

3    A.    On July 19, 2014, reflexatron@gmail.com conducted YouTube

4    searches in Arabic for ISIS and al-Furqan.  Also on that date

5    reflexatron@gmail.com forwarded an email confirming an

6    itinerary from CheapoAir.com to Mr. Niazi.  And that email had

7    originated from Mr. Karim previously.  And the subject of the

8    email has to do with Mr. Shafi's flight on August 16 from

9    Cairo, Egypt, to Istanbul, Turkey.

10   Q.    Have you obtained records from CheapoAir, Special Agent

11   Reinke?

12   A.    I have.

13   Q.    And turning to Government Exhibit 134-004, which is in

14   evidence.

15        Ms. Yee, if you could pull that up.

16        What is -- Ms. Yee, if you could zoom in on that.

17        What does Exhibit 134-004 depict?

18   A.    It depicts a Royal Jordanian flight that departs from

19   Cairo, Egypt, on August 16, 2014, to Istanbul, Turkey, later

20   that same day.  And it goes through Amman, Jordan.

21   Q.    Ms. Yee, if you could go to the previous page.  So that

22   would be 134-003.  If you could zoom in on sort of the middle

23   portion of that page.  Thank you.

24        Could you walk the jury through what this page reflects?

25   A.    It reflects that the traveler on that Royal Jordanian

1  flight on August 16 was Adam Shafi and that the itinerary was

2  emailed to a karim_saleem@hotmail.com.

3  **Q.**   And if you could go to 134-005, Ms. Yee.

4       What does that page show?

5  **A.**   Looks like this shows the purchase and the cost for the

6  plane flight for August 16, 2014, via CheapoAir.

7  **Q.**   And 134-008, Ms. Yee.  If you could zoom in on the middle

8  portion there of that page after the second blue line.  That's

9  perfect right there.

10      Special Agent Reinke, underneath where it says "Charge

11  authorization, your electronic signature copy," what does that

12  exhibit read?

13  **A.**   It says:  I, Saleem Karim, agree to pay a total amount of

14  $392.48 via credit card number that ends in 3427 for the above

15  confirmed itinerary.

16  **Q.**   Now, Special Agent Reinke, did you review any bank records

17  confirming whether this transaction took place?

18  **A.**   I did.

19  **Q.**   Ms. Yee, if we could go back to Government Exhibit 80-20

20  which is the Wells Fargo record we were just looking at.  And

21  if you could zoom in again on the middle portion of that page.

22      Would you identify for the jury where on that page you saw

23  records confirming the CheapoAir transaction?

24  **A.**   It's near the top one-third for July 21, and it's a check

25  card purchase for Royal Jordan 512743 for the amount of

 1    $353.39.

 2    **Q.**    And then are there some additional charges there to

 3    CheapoAir.com?

 4    **A.**    There are.

 5    **Q.**    Were you able to identify what those charges were?

 6    **A.**    Miscellaneous expenses.  It wasn't apparent from the

 7    records what those were for.

 8                **THE COURT:**  Mr. Hasib, is this a good time to take a

 9    break?

10                **MR. HASIB:**  Great time, Your Honor.

11                **THE COURT:**  Okay.  Ladies and gentlemen, we'll take

12    our second break.  We'll be back at about 11:32 or so.  Please

13    remember the admonitions.

14    (The following proceedings were held in open court, outside the

15    presence of the jury:)

16                **THE COURT:**  You here for a reason, Mr. Fakhoury?

17                **MR. FAKHOURY:**  I wanted to put something on the

18    record, Your Honor.  I just want to renew -- I know we briefed

19    this and dealt with this pre-trial, but just to renew our

20    objection to the 2014 trip.

21          And I would also point out that I think at this point this

22    is becoming extremely cumulative and repetitive.  And so I

23    would ask again, just to make a record, that I would renew our

24    objection to the evidence concerning the 2014 trip.  And I

25    would add that I think it's appropriate when the jury comes

1    back that they get a limiting instruction concerning that trip.

2    That was something we had discussed previously, that they be

3    given a limiting instruction as to the permissible purposes of

4    considering details of the 2014 trip.

5         And so I think this is an appropriate time for them to be

6    instructed that Mr. Shafi's not on trial for the 2014 trip and

7    that they can only consider it for limited purposes.

8              THE COURT:  All right.  Mr. Hasib?

9              MR. HASIB:  Your Honor ruled on the admissibility of

10   the 2014 evidence, and I think Your Honor's familiar, very

11   familiar, with the evidence at this point and recognizes why

12   it's important to illustrate the actions that were taken in

13   2015.

14        As far as limiting instruction goes, I don't think I have

15   any objection to that.  Seems nobody's hiding from the fact

16   Mr. Shafi's charged only with the 2015 event.

17             THE COURT:  So I think what I'll do is I'll remind

18   them that the indictment in this case is -- concerns a time

19   from June 15 to June 30 of 2015.

20             MR. FAKHOURY:  I think the limiting instruction should

21   also make clear that Mr. Shafi's accused of attempting to join

22   al-Nusrah Front, not ISIS.  And again, this is something that

23   we raised.  And so far, they've heard an hour of testimony

24   about ISIS, and one line about al-Nusrah Front.  And it's

25   painting a very unduly prejudicial picture of the scene in the

1    jury's mind.

2       I think, again -- I know the Court's already ruled on

3    this, but this is exactly why we objected to this evidence

4    coming in in the first place.  It's repetitive, it's

5    overwhelming.  All these jurors know who ISIS is.  I think

6    there was two on the entire panel who knew what al-Nusrah Front

7    is.  And all they've heard so far for an hour is what ISIS is.

8       So I think the limiting instruction should be more than

9    just June 2015.  It would be also that this is a case where the

10   government's accused Mr. Shafi of attempting to join al-Nusrah

11   Front.  And so they can consider this evidence concerning the

12   2014 trip and other related evidence around that time to the

13   extent it sheds, you know, limited insight under the

14   permissible bases of 404(b) as to whether Mr. Shafi had the

15   intent or committed a substantial step toward joining al-Nusrah

16   Front in June 2015.

17      But I do think it's important that we give the jury some

18   guidance on how to consider this evidence.  Otherwise, it's

19   completely unduly prejudicial to Mr. Shafi.

20          **THE COURT:**  All right.  I hear your objection.  I will

21   give a limiting instruction.  I'm not going to go the extent to

22   which I think you were just describing, Mr. Fakhoury.  But I

23   will give a limiting instruction.

24          **MR. FAKHOURY:**  Thank you, Your Honor.

25          **THE COURT:**  Thank you.

1        We'll be in recess.

2                    (Recess taken at 11:21 a.m.)

3                 (Proceedings resumed at 11:37 a.m.)

4        (The following proceedings were heard in open court in the

5    presence of the jury:)

6           **THE COURT:**  All right.  Please be seated, everybody.

7        Ladies and gentlemen, as we go further into this testimony

8    I thought I'd just remind you that the offense that's charged

9    in this case involves Mr. Shafi's attempt, alleged attempt, to

10   provide material support to the al-Nusrah Front between June 15

11   and June 30 of 2015 and not what -- why he went to Turkey in

12   2014.  Evidence of what he did or said prior to June 15, 2015,

13   is relevant to the extent that you determine it's related to

14   the offense that's charged.

15       So I just wanted to remind you of that.

16       Mr. Hasib, please go ahead.

17          **MR. HASIB:**  Thank you, Your Honor.

18   **BY MR. HASIB:**

19   **Q.**  Special Agent Reinke, I think we left off on August 2,

20   2014, on your timeline.  There's an entry there for:  Emails AN

21   packing list.  Is that one of the backpack emails that we just

22   looked at a moment ago in Government Exhibit 49?

23   **A.**  It is.

24   **Q.**  What's the next entry on your timeline?

25   **A.**  On August 6, 2014, reflexatron@gmail.com conducted YouTube

1   search for crossing Syrian border illegally.

2   **Q.**   Now, on August 9, 2014, is there an entry on your chart

3   for some emails about a flight itinerary?

4   **A.**   Yes.  On August 9, 2014, the emails associated with

5   Mr. Shafi, Mr. Niazi, and Mr. Karim all received a copy of the

6   flight itinerary for Mr. Niazi for an August 16, 2014, flight

7   from SFO to Istanbul, Turkey.

8   **Q.**   Now, Special Agent Reinke, if you could turn to Government

9   Exhibit 50 in your binder in front of you.

10       Do you recognize that?

11  **A.**   I do.

12  **Q.**   What is it?

13  **A.**   These are the records from Student Universe.

14  **Q.**   And are those emails?

15  **A.**   They are.

16  **Q.**   And have you reviewed the emails that you obtained from

17  the Google search warrant productions on the

18  reflexatron@gmail.com account to determine whether this email

19  is included in there?

20  **A.**   So, yeah.  Correction.  This is not business records.

21  These are emails from Student Universe to the email addresses

22  associated with Mr. Niazi, Mr. Shafi and Mr. Karim.

23       **MR. HASIB:**  Your Honor, if I may offer Government

24  Exhibit 50 into evidence.

25       **MR. FAKHOURY:**  I apologize, Your Honor.

 1           No objection.

 2                **THE COURT:**  Okay.  Admitted.

 3           (Trial Exhibit 50 received in evidence)

 4                **MR. HASIB:**  Ms. Yee, if I may publish 50-001 to the

 5      jury.  And if you could zoom in on the very top portion, Ms.

 6      Yee.  The top, top, top portion.  Top half, let's say.

 7           There you go.  That's perfect.

 8      **BY MR. HASIB:**

 9      **Q.**   You indicated a moment ago.  Who are the -- who's the

10      sender of this email?

11      **A.**   The customer service at studentuniverse.com.

12      **Q.**   Who are the recipients?

13      **A.**   Zachary_niazi@yahoo.com, reflexatron@gmail.com, and

14      karim_saleem@hotmail.com.

15      **Q.**   At the bottom of that portion that's zoomed in there, is

16      there an indication as to what -- does this email from Student

17      Universe pertain to a particular itinerary?

18      **A.**   It pertains to the itinerary of Mr. Niazi.

19      **Q.**   And, Ms. Yee, if you could go down to the bottom half of

20      that page.

21           Are there some flights there indicating a flight leaving

22      San Francisco, going through Chicago and LHR, and arriving at

23      IST?

24      **A.**   Correct.

25      **Q.**   And if you know what does IST stand for?

1   **A.**    IST is Istanbul.

2   **Q.**    Is that the airport code for Istanbul?

3   **A.**    Correct.

4   **Q.**    Turning to your timeline October 11 through October 14,

5   were there some Google searches and YouTube searches there?

6   **A.**    There were.  On August 11, 2014, the reflexatron@gmail

7   account searched Royal Jordanian Cairo office and visited a

8   website that was the yellow pages for Royal Jordanian.  On

9   August 14 reflexatron@gmail.com conducted YouTube searches for

10  crossing Syrian border illegally, three times; getting to ISIS

11  from Turkey; crossing Syrian border; and crossing

12  Syrian-Turkish border.

13  **Q.**    Special Agent Reinke, is there then an entry on your

14  timeline regarding some CheapoAir emails?

15  **A.**    There is.  On August 15 CheapoAir emailed Mr. Shafi his

16  flight itinerary for August 16, the next day from Cairo, Egypt,

17  to Istanbul, Turkey.

18  **Q.**    Are those the records that we just looked at a few moments

19  ago on Royal Jordanian Airlines?

20  **A.**    They are.

21  **Q.**    Special Agent Reinke, have you recovered any travel

22  records confirming whether any of these trips that we've looked

23  at those far -- any of these itineraries -- actually took

24  place?

25  **A.**    I have.

1    Q.   Let's look first at records -- as I'm looking at the entry

2    for August 16, 2014, there on your timeline -- well, first of

3    all, what's described in your timeline entry for August 16,

4    2014?

5    A.   So August 16, 2014, is the day that Mr. Shafi traveled

6    from Cairo, Egypt, to Istanbul, Turkey.   That same day,

7    Mr. Niazi traveled from San Francisco to Istanbul, Turkey.   And

8    that same day Mr. Karim was scheduled to travel from San

9    Francisco to Istanbul, Turkey, but did not.

10   Q.   Okay.   Let's take each one of those in turn.   Did you

11   obtain any records from Royal Jordanian Airlines relating to

12   Adam Shafi?

13   A.   I did.

14   Q.   Ms. Yee, if you could pull up Exhibit 68-003 and zoom in

15   on the top one-third of that.   Actually, if you could go up a

16   little bit.   Up a little more.   That's perfect.

17        It's not the most legible record, but, Mr. Reinke, do you

18   recognize that?

19   A.   I do.

20   Q.   What does it depict?

21   A.   It depicts the flight records for Mr. Shafi.

22   Q.   How do you know it's for Mr. Shafi?

23   A.   It says "pax name, Shafi, Adam," in the center halfway up.

24   Q.   And let's take a look now at, Ms. Yee, Government Exhibit

25   130-002, which is in evidence.   And if you could rotate it

1   clockwise, I guess, and zoom in on the top half there.

2       What are these records?

3   **A.**   These are records from American Airlines regarding

4   Mr. Niazi's travel on August 15 and 16.

5   **Q.**   Now, do these records indicate whether Mr. Niazi actually

6   flew on American Airlines?

7   **A.**   They do reflect that; that did he not fly on American

8   Airlines.

9   **Q.**   Did it reflect whether he made it to Istanbul?

10  **A.**   They do.

11  **Q.**   How do they do that?

12  **A.**   If you look at the flight number near the top, flight

13  information, the second column says "flight."  It says "KL606"

14  and "KL1613."  That's shorthand for KLM, which is a Dutch

15  airline that is a part -- global partner with American

16  Airlines.

17  **Q.**   Do these records indicate whether that flight on KLM was

18  actually taken?

19  **A.**   They do.

20  **Q.**   So essentially, do they show Mr. Karim was booked off of

21  American Airlines and onto KLM?

22  **A.**   That's correct.

23  **Q.**   Now, Ms. Yee, if you could pull up Government Exhibit

24  128-002.  If you could zoom in on just the bottom square here

25  (indicating).  The bottom left-hand square.  That's perfect.

1        What are these records?

2  **A.**   These are the United flight records for Mr. Karim.

3  **Q.**   And you mentioned a moment ago on your timeline that your

4  review of the evidence indicated that Saleem Karim had a ticket

5  but did not get on the plane.  How is that documented in this

6  email?

7  **A.**   So there's the two --

8  **Q.**   I mean, in this business record, not email.

9  **A.**   There are the two columns.  If you look at the left

10  column, going from the bottom, looks like the sixth line up, it

11  says, "RMKS, 16 August, no value due to non-ref no show."

12  **Q.**   That's at the bottom left-hand side of that page there?

13  **A.**   That's correct.

14  **Q.**   Did you, Special Agent Reinke, obtain any travel records

15  indicating whether there were any return trips from Istanbul?

16  **A.**   I did.

17  **Q.**   Ms. Yee, showing you Government Exhibit 135 -- sorry.

18  Mr. Reinke, showing you Government Exhibit 135-002.

19        Ms. Yee, if you could zoom in on the top half of that

20  page.

21        Special Agent Reinke, what are these records?

22  **A.**   These are the flight records from British Airways as they

23  pertain to Mr. Niazi.

24  **Q.**   Starting at the top there, that spreadsheet at the top,

25  what does it show?

1  **A.**   It shows that Mr. Niazi had a flight on 18 August 2014

2  that left Istanbul, went through London Heathrow Airport and

3  landed in San Francisco on the same day.  And that there was

4  also a flight booked for 15 December 2014 from -- at New York

5  JFK Airport to London Heathrow.

6  **Q.**   After where it says London Heathrow and San Francisco, and

7  London Heathrow in the middle of that page, do you see where it

8  says "check-in status"?

9  **A.**   I do.

10 **Q.**   Are there notations there "CAC" and "CNA"?

11 **A.**   There are.

12 **Q.**   Do the records explain what that means?  CAC and CNA?

13 **A.**   They do.  So CAC means checked in and boarded.  CNA means

14 did not travel.

15      So based on these records, it would appear that Mr. Niazi

16 checked in and boarded on the flight 18 August 2014 from

17 Istanbul to San Francisco, and did not travel on the 15

18 December 2014 flight from New York to London.

19 **Q.**   Does this business record indicate how much the ticket

20 cost?

21 **A.**   It does.

22 **Q.**   Ms. Yee, if you could zoom in on the bottom left-hand of

23 that exhibit, 135-002.

24      How much did this ticket cost?

25 **A.**   According to these records, it's 5,866 of Turkish lira.

**REINKE - DIRECT / HASIB**

1  **Q.**   So TRY, that's Turkish lira?

2  **A.**   Correct.

3  **Q.**   Did you do any research on how much 5,800 Turkish lira was

4  worth back in 2014?

5  **A.**   I did.

6  **Q.**   How much was it worth, approximately, in dollars?

7  **A.**   Based on a currency rate calculator that I utilized, that

8  reflected the rates in August of 2014 what's equivalent to

9  roughly $2,500 USD.

10 **Q.**   And who was this flight for?

11 **A.**   This was for Mr. Niazi.

12 **Q.**   Were you here for the testimony of border protection

13 officer, Johnny Castillo?

14 **A.**   I was.

15 **Q.**   And did he testify as to what date he encountered Abul

16 Qadar Niazi at San Francisco Airport?

17 **A.**   He did.

18 **Q.**   What date did he testify that Niazi landed at SFO?

19 **A.**   August 18, 2014.

20 **Q.**   Is that consistent with the business records we just saw?

21 **A.**   It is.

22 **Q.**   Special Agent Reinke, were you able to determine how that

23 ticket on British Airways was paid for?

24 **A.**   I was.

25 **Q.**   What did you -- what did you learn?

1   **A.**   I learned that it was paid via Murat Turizm Seyahat, and

2   it was purchased via Mr. Shafi's American Express card.

3   **Q.**   There was a charge to Murat Turizm on Mr. Shafi's American

4   Express card?

5   **A.**   That's correct.

6   **Q.**   Could you pull up Government Exhibit 95-069 which is in

7   evidence.  If you could zoom in -- yeah.  Right there.

8        Special Agent Reinke, can you describe what this exhibit

9   depicts?

10  **A.**   Sure.  So on the top line there under the detail section

11  for Adam Shafi, it says:  8-17-14, Murat Turizm Seyahat,

12  Istanbul, and it was for the amount of 7,064 new Turkish lira,

13  which is equivalent to $3,294.78.

14  **Q.**   Now, that's more than the number that you just saw on the

15  British Airways records, is that correct?

16  **A.**   That's correct.

17  **Q.**   What's the difference?

18  **A.**   Approximately $700, $600.

19  **Q.**   After you convert it from lira into dollars?

20  **A.**   That's correct.

21  **Q.**   Did you do any research as to how much a one-way flight

22  from Istanbul to Cairo costs on the day of travel?

23  **A.**   Not on the day of travel in 2014 because I wasn't able to

24  find those records.  But if someone were to purchase a one-way

25  ticket in Istanbul and wish to travel that exact same day to

REINKE - DIRECT / HASIB

1   Cairo, via Kayak, I saw ticket prices that ranged from $300 to

2   $800.

3   **Q.**   Did you find any travel records documenting Adam Shafi's

4   return from Istanbul to Cairo?

5   **A.**   I did not.

6   **Q.**   Did you look?

7   **A.**   We did.  I did.

8   **Q.**   Can you describe for the jury where you looked?  How did

9   you try to find out if he returned?

10  **A.**   We served subpoenas on various airlines, to include

11  Turkish Airlines.  We also contacted various international

12  airlines, to include Egypt Air.  And were not successful in

13  getting records back that reflected him traveling on that date.

14  **Q.**   Special Agent Reinke, turning back to the timeline,

15  there's several entries there for August 17, 2014.  Directing

16  your attention to the last three lines of your timeline.  Can

17  you just walk the jury through what's in that timeline there?

18  **A.**   On August 17, 2014, Mr. Shafi visited the Hagia Sophia and

19  the Blue Mosque in Istanbul.

20  **Q.**   What are you basing that on?

21  **A.**   We recovered images on his Samsung S4 cell phone.

22  **Q.**   What do those images show?

23  **A.**   Tourist photographs at those locations -- what appear to

24  be those locations.

25  **Q.**   Were there any date stamps on those photos?

1   **A.**   There were.

2   **Q.**   What were the date stamps?

3   **A.**   August 17, 2014.

4   **Q.**   The next couple lines on your timeline?

5   **A.**   Also that same day at some undetermined time there was a

6   text, or communication, sent from Mr. Ramsey Shafi to Mr. Adam

7   Shafi which stated:  Tell Mom and Dad I'm going to protect

8   Muslims.

9   **Q.**   And was that based on your review of the testimony of

10  State Department Officer Johnny Ceballos-Rivera?

11  **A.**   It is.

12  **Q.**   If you turn to the -- go ahead and turn to the next page

13  of the timeline, page 4, and walk the jury through the next few

14  entries there up to August 20, 2014.

15  **A.**   Sure.  So on that same day, Mr. Salama Shafi went to the

16  Cairo embassy in Egypt and reported his son, Mr. Adam Shafi, as

17  missing.  On 8-18-2014, Mr. Niazi returned to the United States

18  to SFO and was interviewed by CBP Officer Johnny Castillo at

19  SFO.

20          That same day, August 18, Mr. Salama Shafi reached back

21  out to U.S. Embassy personnel and informed them Mr. Adam Shafi

22  had returned to Cairo from Istanbul.  And on August 20, 2014,

23  the Shafi family returned from Cairo to SFO, during which

24  Mr. Shafi was interviewed by CBP Officer Mon at SFO.  And

25  during that interview he stated that his cell phone had been

1  lost in Cairo, Egypt.

2  **Q.**   And were you here for the testimony of Officer Mon?

3  **A.**   I was.

4  **Q.**   If you could just walk there now from August 22, 2014, all

5  the way to October 16, 2014.  There are several Google searches

6  and YouTube searches.  Could you just walk the jury through

7  what is listed in those entries from August 22 to October 16?

8  **A.**   So on August 22, reflexatron@gmail.com conducted a Google

9  search for how to format hard drive; how to format hard drive

10  Mac, twice; and how to restore a Mac with a password.

11      The reflexatron account also went to a Lifehacker website

12  with an article entitled "How to Erase and Format a Hard

13  Drive."

14      On September 13, 2014, reflexatron@gmail.com conducted

15  YouTube searches for ISIS twice.  On September 18, reflexatron

16  conducted YouTube searches for ISIS atrocity; ISIS kills

17  children; ISIS Hamza Yusuf, twice.

18      On September 20, reflexatron@gmail.com conducted Google

19  searches for Taliban twice; Taliban territory map; Taliban

20  territory map 2014; and FBI three times.

21      On September 30, reflexatron@gmail.com conducted a Google

22  search for Turkey.  The reflexatron account also conducted

23  Google Map searches for Karkamis Sinir Kapisi, which is a

24  Turkish border crossing station on the Syrian border, twice;

25  and Ziraat Bankasa Karkam Azubesi, which is a bank in Karkamis,

1   Turkey, twice.

2   **Q.**   Let me stop you there for a second.

3        Ms. Yee, could you pull up 114-003 which is in evidence.

4        Special Agent Reinke, looking at this map that's in

5   evidence, you just mentioned some names there.  Karkamis Sinir

6   Kapisi.  Is that reflected on this map anywhere?

7   **A.**   It is.

8   **Q.**   What is this a map of, 114-003?

9   **A.**   This is essentially a map of southeast Turkey and north

10  central Syria, and the border between the two countries.

11  **Q.**   And is that a zoomed-in version of the larger map of

12  Exhibit 114?

13  **A.**   It is.

14  **Q.**   I think you just mentioned it Karkamis Sinir Kapisi.  Is

15  that number 4 on the map?

16  **A.**   No, it is not.  It is number 8 on the map.

17  **Q.**   Number 8 on the map?

18  **A.**   Correct.

19  **Q.**   Now, Ziraat Bankasa Karkam Azubesi that is listed on your

20  timeline, you listed on your timeline it's a bank or finance

21  facility in Karkamis, Turkey.  How did you find that out?

22  **A.**   According to Google, it appears to be like a chain of

23  banks in Turkey that's located in various Turkish cities.  This

24  particular branch in Karkamis is labeled Karkam Azubesi.  I

25  also looked at an image from Google Maps of where that facility

1   is located, and it is approximately 200 meters from the border

2   with Syria.

3   **Q.**   I think I stopped you on September 30, 2014.  Could you

4   continue going all the way to October 16 of 2014?

5   **A.**   On October 1, 2014, reflexatron@gmail.com conducted Google

6   searches for Islamic State twice.  On October 8 reflexatron

7   conducted a Google search of Kobane, Aleppo Governorate, Syria.

8   And on October 16, 2014, reflexatron conducted a Google search

9   for:  Help Syria and Islamic Relief.  Reflexatron also went to

10   the website irusa.org, which is Islamic Relief, which is a

11   nonprofit.  It's their U.S. based website.

12   **Q.**   There are a couple of what appear to be financial

13   transactions there on your timeline.  What are those?

14   **A.**   So on October 20, 2014, Mr. Shafi sent $175 in two

15   separate transactions to Islamic Relief via his Bank of America

16   account.  And on October 23, 2014, Mr. Shafi spent $1,306.91 at

17   an Apple store in Santa Clara charged to his American Express

18   card.

19   **Q.**   I may have neglected to ask you.  The next entry,

20   December 9, also listed financial transaction.  What is that?

21   **A.**   On December 9, 2014, Mr. Shafi donated $20 to the Islamic

22   Center of Bboise via his American Express card.

23   **Q.**   Were you able to figure out what "Islamic Center of

24   Bboise" is?

25   **A.**   I googled it, and I'm pretty sure its Boise, Idaho.  I

1  think it was just a typo on American Express bank records.

2  **Q.**   So did you, in making your timeline, did you review the

3  actual bank records?

4  **A.**   I did.

5  **Q.**   And confirm that these transactions occurred?

6  **A.**   I did.

7  **Q.**   Are those the Bank of America and American Express records

8  that we looked at a little earlier?

9  **A.**   They are.

10  **Q.**   The statement on the American Express receipt, does it

11  read "Bboise"?

12  **A.**   It does.

13  **Q.**   Let's move to 2015.  July 3, 2015, what's depicted in the

14  last line of your chart there?

15  **A.**   On that date, there was a phone call between Mr. Niazi and

16  Mr. Shafi where Mr. Niazi asks Mr. Shafi for the name of a

17  *nashid* that they had been listening to.  And Mr. Shafi replies:

18  Oh, our sheikh, al-Baghdadi.

19  **Q.**   You used the word *nashid*.  Your timeline indicates song.

20  Were you here for the testimony of Ms. Butros?

21  **A.**   Yes.

22  **Q.**   When she explained that a *nashid* can be a type of song or

23  hymn or anthem or --

24  **A.**   Correct.

25  **Q.**   All right.  If you could walk us through -- there's a lot

1    of searches on January 20, 2015.  What's going on in that

2    entry?

3    A.   On January 20, 2015, reflexatron conducted Google searches

4    for Nazhron, three times; Yemen territorial map; Yemen

5    territorial map 2014, twice.  Reflexatron also viewed various

6    images from a Wikipedia page regarding the al-Qaeda insurgency

7    in Yemen.  A couple of different pages regarding Yemen.  A

8    Wikipedia page on -- another Wikipedia page on al-Qaeda

9    insurgency in Yemen; the Yemen conflict map from

10   September 2012; an image from the Somalia war map al-Shabaab

11   2013; the Wikipedia page for Islamic State of Iraq and the

12   Levant, which is another name for ISIS.  And a web page for

13   Paris attacks, al-Qaeda in Yemen, terrorist group

14   investigation.  And WTO new member 2014 map.

15   Q.   There's an entry on January 25, 2015.  What is that?

16   A.   The first one is a text.

17        MR. FAKHOURY:  Objection, Your Honor.  That's hearsay

18   with respect to the response by Niazi.

19        THE COURT:  So true.

20        So ladies and gentlemen, there will be a couple of

21   entries, and I'm sure that I'll be reminded as they come up.

22   But the statements of Mr. Shafi that are attributed to

23   Mr. Shafi are admissions.  The statements of other people are

24   hearsay.  They're not offered for the truth.  They are offered

25   to put the conversation into context.

**BY MR. HASIB:**

**Q.**   Special Agent Reinke, before you read that entry, could you take a look at Government Exhibit 139 in front of you?

**A.**   Okay.

**Q.**   Do you recognize that?

**A.**   I do.

**Q.**   What is it?

**A.**   It is a portion of the Cellebrite report for Mr. Shafi's Galaxy S4 cell phone.

**Q.**   And how is that report created?  Or at least the portion of the report, how is that created?

**A.**   This was created by myself.  I chopped off some of the extraneous pages from the report.

**Q.**   And what's on that report?  What does it depict?

**A.**   At the top of it the first page depicts a few GPS coordinates which relate to locations where pictures were taken.  They also primarily relate to text messages that were sent to or from Mr. Shafi's cell phone.

**Q.**   Roughly 182 odd pages of text messages?

**A.**   That's correct.

          **MR. HASIB:**  Your Honor, I'd offer Government Exhibit 139 into evidence.

          **MR. FAKHOURY:**  I make the same objection with respect to anything on there that's from a witness or person other than Mr. Shafi.  I also add that if this is an excerpt of the

1   report, I would ask that the entire report be --

2       If we're going to --

3       Could we go sidebar?

4           **THE COURT:**  Sure.

5       (The following proceedings were heard at the sidebar:)

6           **MR. FAKHOURY:**  Well, I don't have a good way to do

7   this, but the report is hearsay.  It's public -- it's a police

8   report.  It's essentially a public record of a police report.

9   And those are not admissible.

10      The government in their case in chief, and so shouldn't

11  come in that way.  If they want to get in Mr. Shafi's

12  statements, obviously can't object to that.  But to the extent

13  they want to get in anything else and they want to get in any

14  statements made by individuals other than Shafi, that's

15  hearsay, and I would ask for a limiting instruction.

16          **THE COURT:**  What are you suggesting we do with the

17  document itself?

18          **MR. FAKHOURY:**  I mean, I think he could use it to

19  refresh his recollection.  Like, he can refer to it.  Explain

20  text messages were sent back and forth.  And he can use it to

21  testify as to the timeline.  I don't think the whole report

22  should be admitted into evidence.  The whole -- whether it's

23  excerpt or the whole report.

24          **MR. HASIB:**  It's not the whole report we're offering

25  into evidence.  It's the portions of the text messages we're

1  offering into evidence.

2      With respect to Mr. Fakhoury's argument that this is a

3  police report, it's not a police report.  It's the evidence of

4  what was on the phone.  Only other way to bring that in is to

5  bring the phone here and have Special Agent Reinke flip through

6  it.  And I believe, Mr. -- I believe we no longer have the

7  phone.  I think it's been returned to the defense.

8          **MR. FAKHOURY:**  I'm not sure.

9          **THE COURT:**  Okay.  So with respect to the way that

10 you're going to use it with Mr. Reinke, are you going to be

11 just referring to the specific communications that are on the

12 -- his timeline?

13         **MR. HASIB:**  That's correct.  Yes, Your Honor.  So

14 every text message we read will be on his timeline.  Not other

15 ones.

16         **THE COURT:**  It sounds to me like the defense -- that I

17 would -- the defense would be satisfied if I gave a limiting

18 instruction with respect to the statements of people other than

19 Mr. Shafi.  And then we can look at the document itself, the

20 underlying document, and make a determination as to whether

21 that comes in.  And if so, how.

22         **MR. FAKHOURY:**  I think that's a good way to handle it

23 so we don't drag things out, delay things too much.  We could

24 take up the admission of the report later.  I don't have a

25 problem with Agent Reinke using the report to refresh his

recollection or to explain, you know, where things came from,

where things in the timeline came from.  It's more the issue of

whether we're going to admit -- what will go back into the jury

room.  And we can think about it and come up with a way that

satisfies us.

THE COURT:  Okay.  We'll hold off on the admission and

we'll proceed to --

MR. HASIB:  He may refer to --

THE COURT:  He may refer to his timeline.

MR. FAKHOURY:  Your Honor, there's one other thing.  I

wanted to also put on the record with respect to the limiting

instruction that the Court gave concerning 2014.  Your Honor

used the language that the jury should only consider it for

related matters.  Something to that --

THE COURT:  To the extent they found it was related.

MR. FAKHOURY:  Yes.  And we would ask that we get --

the Court give a limiting instruction that's tied to the

specific purpose for which the evidence was used.  So there's a

model instruction -- actually have it if I can grab it.  One

second.

THE COURT:  Uh-huh.

(Pause.)

MR. FAKHOURY:  This is the Ninth Circuit pattern

instruction of 4.3 and it lays out specifically -- you know,

these are in brackets for the Court to -- obviously, whichever

1    one is relevant to the case.

2        I think here it would be intent.  And, you know, whichever

3    other ones.  Potentially, preparation.  So we would just ask

4    that the limiting instruction track the model instruction.

5        **MR. HASIB:**  Your Honor, I think you ruled on this.  We

6    made multiple arguments about why this was relevant.  And there

7    was argument this was part and parcel of the 2015 events.

8    That's why Your Honor let it in.

9        The other argument we made is if Your Honor decided it

10    wasn't relevant to prove 2015, if it was part of the same

11    story, I think Your Honor used.  Then we said in the

12    alternative it's 404(b) argument.  But I think Your Honor was

13    clear this is part and parcel of the same conduct.

14        **THE COURT:**  Well, what I think I was clear about was

15    that's your theory of the case, which I -- I thought was

16    appropriate for you to be able to do it.  And naturally thought

17    my instruction was better than this.  But I'll think about

18    this.  Maybe I'll do something tomorrow.

19        (The following proceedings were heard in open court:)

20        **THE COURT:**  Ladies and gentlemen, as I said before,

21    statements that Special Agent Reinke is going to refer to from

22    Mr. Shafi are admissible as admissions.  And statements that

23    are from people other than Mr. Shafi are not offered for the

24    truth.  They're offered for the context of the conversation.

25

REINKE - DIRECT / HASIB

1    BY MR. HASIB:

2    Q.    Special Agent Reinke, if you could turn to page 096 of

3    Exhibit 139 in front of you.

4    A.    Okay.

5    Q.    And does that page depict the text messages that are

6    referred to in your timeline?

7    A.    They do.

8    Q.    Towards the bottom?  Bottom end of that page?

9    A.    Yeah.  I looked at the wrong number.  I'm good now.  They

10   do.

11   Q.    If you could just refresh your recollection to yourself as

12   to what that conversation was and who it was between.

13   A.    So the conversation is between Mr. Shafi and Mr. Niazi.

14   Q.    How do you know that?

15   A.    I recognize the telephone number.

16   Q.    And does it indicate whether messages were sent or

17   received?

18   A.    It does.

19   Q.    And what is the conversation -- what did Mr. Shafi say in

20   response to Mr. Niazi?

21   A.    So Mr. Shafi says to Mr. Niazi:  Just trying to get $$.

22   And then he sends a subsequent text that says: "and cut out."

23   Q.    And what is Mr. Niazi's response?

24   A.    He responds:  *Inshallah*.

25   Q.    And does Mr. Shafi respond to that?

1   **A.**   He also responds:   *Inshallah.*

2   **Q.**   What does Mr. Shafi say as a result?

3   **A.**   He says:  A.k.a. Hawaii.

4   **Q.**   Do they both send text messages to each other after that?

5   **A.**   They both send LOL text messages to each other.

6   **Q.**   LOL?

7   **A.**   Correct.

8   **Q.**   Is there a date and time for those text messages?

9   **A.**   There is.

10  **Q.**   Does the date and time reflect the time, or at least the

11  date, on your timeline?

12  **A.**   It does.

13  **Q.**   The timeline indicates January 25, 2015.  Your review of

14  these text messages from the Samsung Galaxy S4, what date is

15  listed there?

16  **A.**   January 26, 2015.

17  **Q.**   Is this one of those situations that you were speaking

18  about earlier where your timeline indicates the -- your

19  timeline indicates the local time that something happened, but

20  the evidence that you reviewed indicates the UTC, or the

21  universal time coordinates?

22  **A.**   It does.  So the records say 5:33 a.m. on the 26th.  And

23  if you were to go back seven hours from that, you would get

24  local time which would be 10:33 on the 25th, which is reflected

25  on the timeline.

1    Q.    Okay.  Special Agent Reinke, would you walk the jury

2    through the next few entries on your timeline from January 25,

3    2015, to January 29, 2015?

4    A.    On January 25, 2015, reflexatron@gmail.com conducted a

5    Google search for Burlingame, Syria, donate.  The next day on

6    the 26th of January, reflexatron searches for Syria, Syrian

7    woman, and Syrian mother, twice.  Reflexatron account also

8    views images related to christianaid.org which has images

9    reflected from Gaza or the Middle East crises.  There's an

10   image regarding Syrian refugee mothers in Lebanon.

11   Q.    Let me cut you off there.  Fair to say there's several

12   searches relating to refugees and refugee crises?

13   A.    Yes, every one of them.

14   Q.    And the remaining searches on that page, they related to

15   the Syrian civil war and the Istanbul airport and Istanbul

16   refugees?

17   A.    Correct.

18          MR. FAKHOURY:  I know we're trying to speed things up,

19   but there should be a question, not testimony.

20          THE COURT:  Generally true, but overruled.

21   BY MR. HASIB:

22   Q.    Now, Special Agent Reinke, the next date on your timeline,

23   what date is that?

24   A.    February 15, 2015.

25   Q.    And what have you described that occurred on that date?

REINKE - DIRECT / HASIB

1   A.   It's a phone call between Mr. Niazi and Mr. Shafi.

2   Q.   And were you here when that telephone call was played in

3   court?

4   A.   I was.

5   Q.   Was that Government Exhibit 2?

6   A.   It was.

7   Q.   And did Linda Butros testify about some of the Arabic

8   words in that call?

9   A.   She did.

10  Q.   Now, let me ask you to turn to -- let's see --

11  February 26, 2015, in your timeline, is there another entry for

12  some text messages?

13  A.   There is.

14  Q.   Let me ask you.  Are there entries in Government Exhibit

15  139 relating to these text messages?

16  A.   There are.

17  Q.   And who are these text messages between?

18  A.   They're between Mr. Shafi and Mr. Niazi.

19  Q.   Let me ask you to turn to trial Exhibit 139-110.  And

20  looking there at the line that's labeled 1566.

21  A.   Okay.

22  Q.   Is there a text message there sent by Mr. -- by the user

23  of that Samsung Galaxy?

24  A.   There is.

25  Q.   And what does the text message that's sent from that phone

**REINKE - DIRECT / HASIB**

1  read?

2  **A.**   It's a text message from Mr. Shafi to Mr. Niazi and it

3  says:   *(Arabic)*.   Some Palestinian brothers put their homes as

4  ransom for Armin so he can be on house arrest until the trial

5  is over.

6  **Q.**   Do you know who Armin is referring to?

7  **A.**   Yes.

8  **Q.**   Who is Armin referring to?

9  **A.**   Armin Harcevic.

10  **Q.**   Let me direct your attention to March 15 of 2015 at the

11  bottom of your timeline there.   What's your entry for March 15

12  of 2015?

13  **A.**   So on March 15, 2015, that is the day that Mr. Shafi

14  visited Armin Harcevic in the Santa Clara County Detention

15  Facility.

16  **Q.**   Were you here in court this morning when Special Agent

17  Matt Sung testified?

18  **A.**   I was.

19  **Q.**   Did you hear reference to those -- to that jail visit?

20  **A.**   I did.

21  **Q.**   And how about were you here when Santa Clara County Deputy

22  Sheriff Reggie Sato testified?

23  **A.**   I was.

24  **Q.**   Did he also testify about that visit on March 15?

25  **A.**   He did.

1  **Q.**    Is that how you got that entry on this timeline?

2  **A.**    That's correct.

3  **Q.**    If you could just summarize the Google searches there on

4  March 12 and March 13 of 2015.

5  **A.**    Which day was that?

6  **Q.**    March 12 and March 13 of 2015.  The bottom portion of page

7  6 on your timeline.

8  **A.**    On March 12, reflexatron@gmail.com conducted Google

9  searches for Armin Harcevic twice.  Reflexatron also visited a

10  website that was entitled "Utica Man Charged with Supporting

11  Terrorists," twice.  Another website that was entitled "Three

12  St. Louis County Suspects Charged with Supporting ISIS

13  Terrorists."

14  **Q.**    What's the next set of searches on March 12 for?

15  **A.**    Also on March 12 there were Google searches for Tracy gun

16  range, twice; and age limit for gun range, California.

17  Reflexatron also visited a couple -- looks like three

18  gun-related websites in Tracy or regarding the minimum age to

19  purchase and possess guns.

20  **Q.**    And turning to page 7 of your timeline, can you summarize

21  your description of the Google searches on March 17 and

22  March 24 of 2015?

23  **A.**    On March 17, 2015, reflexatron@gmail.com conducted Google

24  searches for train from California to Alaska, twice; directions

25  to Alaska; Canod (*phonetic*) train routes; Russia train route

1    map, four times; and military vest, five times.  Reflexatron

2    also visited a number of websites that relate to train

3    schedules, train routes in Alaska, California, Russia.  There's

4    an Afghanistan website.  And a website that appears to be

5    selling a new SWAT black Army CS tactical vest, military.

6    Q.   The following day are there some searches for a gun range?

7    A.   There are.  On March 24, 2015, reflexatron conducted

8    searches for Milpitas gun range and hunting rifles and also

9    went to a website for Target Masters Milpitas via Yelp, and a

10   Bass Pro website that was -- had rifles.

11   Q.   Now, on March 26, 2015, did you review text messages from

12   the Samsung Galaxy S4 --

13   A.   I did.

14   Q.   -- related to that date?

15   A.   I did.

16   Q.   And did you see any text messages sent on that date by the

17   user of that phone?

18   A.   I do.

19   Q.   Directing your attention to trial Exhibit 139-118.  If you

20   could turn to that in front of you.

21   A.   Okay.

22   Q.   And directing your attention to row 1810.

23   A.   Okay.

24   Q.   Does that relate to the entry on your timeline?

25   A.   It does.

1  **Q.**   And what is the text message that's -- that was on the

2  phone that day?

3  **A.**   The text is from Mr. Shafi to Mr. Niazi's cell phone, and

4  the content of the text is:  The prophet said he has nothing to

5  do with those who live amongst *kuffar*.

6  **Q.**   Turning to April 1, 2015, what's the next entry on your

7  timeline?

8  **A.**   April 1, 2015, Mr. Shafi went to a shooting range with

9  Mr. Karim in Milpitas, California.

10  **Q.**   And what's -- how did you determine that?

11  **A.**   We obtained records from Target Masters, the range they

12  went to, and we also found receipts in Mr. Shafi's residence on

13  July 3, the date of this search warrant.

14  **Q.**   And were those items that were offered into evidence

15  earlier today?

16  **A.**   They were.

17  **Q.**   Ms. Yee, can you pull up 69-002 which is in evidence?

18      Is that one of the documents that you used to create your

19  timeline?

20  **A.**   It is.

21  **Q.**   And what does it show?

22  **A.**   It's a gun rental questionnaire from Target Masters, and

23  it was filled out by Mr. Shafi and attested to by Mr. Karim on

24  April 1, 2015.

25  **Q.**   Okay.  Turning to April 15 through April 18 of 2015.  Is

**REINKE - DIRECT / HASIB**

1   there an entry on your timeline for those dates?

2   **A.**   There is.

3         **THE COURT:**   Ladies and gentlemen, let me remind you

4   with this entry of what I've just said the last two times I've

5   opened my mouth.   Which is that the things that Mr. Shafi says

6   are admissions.   The things that are said by the other party

7   are not offered for the truth and the only provide context for

8   what Mr. Shafi says.

9   **BY MR. HASIB:**

10  **Q.**   Special Agent Reinke, directing you to Trial Exhibit

11  139-133.   The top of that page and the next several entries

12  from the Samsung Galaxy S4.   How did you develop the summary

13  that you have in your timeline for these text messages?

14  **A.**   I just combined the texts from the 8756 number and

15  Mr. Shafi's phone number.

16  **Q.**   And what do those texts say?

17  **A.**   The first text from the 8756 number states:   I heard if

18  your mother doesn't allow you and doesn't give you permission

19  to go to *jihad*, you won't die as a martyr.

20  **Q.**   Are there additional texts from that number?

21  **A.**   There are.

22  **Q.**   And what are those -- what are those texts?

23  **A.**   On this page?

24  **Q.**   On the following page, Exhibit 139-134.

25        **MR. FAKHOURY:**   Your Honor, I would object to the

 1   extent he's testifying for -- is it -- or, the questions

 2   intended to elicit anything outside of what's in the summary.

 3           THE COURT:  I -- I would sustain that.  I don't think

 4   they have been, but --

 5           MR. HASIB:  I haven't, either, Your Honor.

 6           MR. FAKHOURY:  But just out of an abundance of

 7   caution.

 8   BY MR. HASIB:

 9   Q.   Special Agent Reinke, directing your attention to Trial

10   Exhibit 139-134, how does that text message conversation

11   continue?

12   A.   The 8756 number texted Mr. Shafi and says:  Did you get my

13   text?

14           MR. FAKHOURY:  Objection.  That's exactly what I

15   was --

16   BY MR. HASIB:

17   Q.   Let me ask you to go down a couple lines to line 2272,

18   Mr. Reinke.

19   A.   2272?

20   Q.   Line 2272 on Trial Exhibit 134.

21   A.   The text states:  Has your mother accepted for you to go

22   to *jihad*?  And Hafez Siddiqui said by you helping the Muslims

23   in Syria, it's not an Islamic war, it's a political war.

24   Q.   Is there a response from the user of the Samsung Galaxy?

25   A.   There is.  I'm trying to locate it.

1    **Q.**   Directing your attention to trial Exhibit 139-135, lines

2    2314.

3    **A.**   Mr. Shafi responds:  What you're saying is true in certain

4    situations such as if the *jihad* is offensive, not defensive.

5    And the *ummah* has security, safety and a home, and your mom

6    needs you to take care of her.  But not now when the *ummah* is

7    being massacred and we are expelled from our homes, forced to

8    live under rule of the enemies of *Allah*.

9    **Q.**   Let me ask you to go down to line 2317.  Is there another

10   text message sent to that 8756 number from the Samsung Galaxy?

11   **A.**   There is.  And it states:  We're not even allowed to live

12   with the *kuffar* in the first place.

13   **Q.**   And how about line 2319 of that exhibit?  Is there another

14   text message sent from the Samsung Galaxy to that number?

15   **A.**   There is.  And it states:  Especially when 40 percent of

16   the taxes we pay go to killing our brothers and sisters.

17   **Q.**   Special Agent Reinke, is there a YouTube search on

18   April 16, 2015?

19   **A.**   There is.

20   **Q.**   What occurred on that date?

21   **A.**   On that date reflexatron@gmail.com conducted a YouTube

22   search in Arabic for death rather than humiliation.

23   **Q.**   And there are some entries on your timeline for text

24   messages after that.  Based on your review of these text

25   message records, who is sending these text messages on your

1  timeline?

2  **A.**   Mr. Shafi.

3  **Q.**   And what are those text messages?

4  **A.**   The April 16, 2015, he texts Mr. Karim:  It's not that I

5  don't -- wasn't -- get married, it's that I want to go a

6  million times more.

7  **Q.**   And is there a following -- a text a few days later?

8  **A.**   There is.  On April 19, 2015, there's a text from

9  Mr. Shafi to Mr. Niazi that says:  Dude, just saw Sheikh Anwar

10  in my dream and he gave me very specific orders.

11  **Q.**   What happens a few days after that, April 25, 2015?

12  **A.**   On April 25, 2015, reflexatron@gmail.com conducts YouTube

13  searches for how to cross borders illegally; cross Saudi

14  borders illegally, twice; and Turkish border crossing, three

15  times.

16  **Q.**   And the text conversation with Niazi from April 19, does

17  that continue a few days later?

18  **A.**   It does.

19  **Q.**   Is there an entry for that on April 26, 2015, in your

20  timeline?

21  **A.**   There is.

22  **Q.**   What is that entry?

23  **A.**   There was a text exchange with Mr. Niazi.  Mr. Niazi texts

24  Mr. Shafi:  And who was that guy that you seen in your dream?

25  And Mr. Shafi responds:  Anwar al-Awlaki.

1    **Q.**    And again, these descriptions in your timeline are based

2    on your review of the evidence of text messages recovered in

3    this investigation?

4    **A.**    That's correct.

5    **Q.**    Would you walk the jury through the next several days --

6    let's see -- let's start at April 28, 2015.  If you could just

7    summarize going up to May 10, 2015, what's in those -- what's

8    in those entries in your timeline?

9    **A.**    On April 28, 2015, reflexatron@gmail.com conducted a

10    Google search for flight to Egypt; and also went to a website,

11    cheap flights Egypt.  On May 2, 2015, reflexatron Google

12    searched for countries which require a visa, twice; which

13    countries require a visa for U.S. citizens; and flight to

14    Germany.

15        Reflexatron also visited the website -- Wikipedia website

16    for visa requirements for U.S. citizens; for a TripAdvisor web

17    page for Germany cheap discount air fare; and a cheap flights

18    to Germany web page.

19        On May 3, 2015, reflexatron@gmail.com conducted a YouTube

20    search in Arabic for Oh, people of Syria, three times; the

21    anthem for safety, twice.  And on May 10, 2015,

22    reflexatron@gmail.com conducted a Google search for killing

23    Muslims; and visited a website that had an image of Christian

24    killing innocent Muslim child.

25    **Q.**    Let me ask you to skip the next entry for a moment, May

 1    10, 2015, and go down through the rest of that page.  Could you

 2    describe the rest of the Google searches and YouTube searches

 3    that you reviewed as part of your investigation?

 4    **A.**    Sure.  So on May 13, 2015, reflexatron Google searched for

 5    flight to Egypt.  Reflexatron also went to a cheap flights

 6    Egypt web page.  On May 25, 2015, reflexatron conducted a

 7    YouTube search in Arabic for the *takfiris*; reasons for

 8    apostasy; and *takfir*.

 9    **Q.**    Let me just stop you there for a second.  *Takfir*, is that

10    a word that you've seen in this investigation?

11    **A.**    It is.

12    **Q.**    And is that a word that you've seen on the chart prepared

13    by Ms. Linda Butros?

14    **A.**    It is.

15    **Q.**    What does *takfir* translate to in English?

16    **A.**    I can't read it from here, but essentially *takfir* is a

17    Muslim --

18            **MR. FAKHOURY:**  I object.  It should be the

19    translation.

20            **THE COURT:**  I agree.

21    **BY MR. HASIB:**

22    **Q.**    What is the translation that Ms. Butros indicated on

23    Government Exhibit 33 for *takfir*?

24    **A.**    So *takfir* is when one Muslim states that another Muslim is

25    a heretic or nonbeliever.

**Q.**   And if you could continue through -- let's see.  That was

May 25, 2015.  If you could continue down to June 2, 2015.

**A.**   On May 29, 2015, reflexatron conducted Google searches in

Arabic for *takfir*, twice.  On that same day conducted YouTube

searches for mujahidin Myanmar.  On that same day, conducted a

Google search for SFO to Istanbul; and went to a Kayak site

that had flights from Istanbul.  From SFO to Istanbul.

On May 31, 2015, reflexatron conducted Google searches for

Istanbul, Turkey; directions to Istanbul, Turkey; and

directions to Gaziantep, Turkey.  And on June 2, 2015,

reflexatron conducted searches for SSSS; San Jose to

Sacramento; San Jose to Sacramento flight; and went to the

Wikipedia entry for Secondary Security Screening Selection,

twice.

**Q.**   I heard the pages turning, but can we just go back for a

moment to the entry that we skipped.  May 10, 2015.  You

indicated there's an image.  What does -- what does that refer

to on your timeline?

**A.**   Correct.  So on May 10, 2015, there was an image created

on Mr. Shafi's Galaxy S4 cell phone which was entitled "*Shaheed*

Status:  Pending."

**Q.**   If you could turn in your book there to Exhibit 140.  What

is that?

**A.**   That's the picture I was referring to.

**Q.**   And how is it you came to obtain that image?

1  **A.**    I located it on Mr. Shafi's cell phone.

2  **Q.**    And do you recognize that to be a true and accurate copy

3  of the image that you saw on Mr. Shafi's cell phone?

4  **A.**    I do.

5           **MR. HASIB:**   I'd offer Exhibit 140 into evidence.

6           **THE COURT:**   Any objection?

7           **MR. FAKHOURY:**   No, Your Honor.

8           **THE COURT:**   It's admitted.

9       (Trial Exhibit 140 received in evidence)

10           **MR. HASIB:**   May I display, publish, Government's

11  Exhibit 140, Ms. Yee, to the jury.

12  **BY MR. HASIB:**

13  **Q.**    What is that image?

14  **A.**    This is the image from his cell phone.   It shows *Shaheed*

15  Status:   Pending.   According to Ms. Butros, *shaheed* stands for

16  martyr.

17  **Q.**    Does your review of the phone indicate what date that

18  image was saved on the phone?

19  **A.**    It did.

20  **Q.**    What date was that?

21  **A.**    May 10, 2015.

22  **Q.**    Is that why you have that listed as that date on your

23  timeline?

24  **A.**    That's correct.

25  **Q.**    Now let's go over to June 2, 2015.   There are some

1  telephone calls coming up that I would like you to listen to if

2  you could get them queued up, but don't play them just yet.

3      First let me ask you about June 2, 2015.  Is there a

4  financial transaction noted on your timeline?

5  **A.**    There is.

6  **Q.**    And what is the transaction that occurred?

7  **A.**    So on May 2, 2015, Mr. Shafi donated $100 in two separate

8  transactions to Islamic Relief through his Bank of America

9  account.

10          **THE COURT:**  That June 2?

11          **MR. HASIB:**  June 2, 2015.

12  **BY MR. HASIB:**

13  **Q.**    And is that based on your review of Bank of America

14  records?

15  **A.**    It is.

16  **Q.**    Is there a bank statement indicating that this payment was

17  made?

18  **A.**    There is.

19  **Q.**    Is that in Government Exhibit 132 that's in evidence?

20  **A.**    Yes.

21  **Q.**    Okay.  June 2, 2015, what is noted on your timeline?

22  **A.**    There was a phone call with Mr. Karim about the SSSS, the

23  no-fly list, and traveling through Mexico, or taking a cruise

24  to Greece as long as we get to Egypt.

25  **Q.**    Ms. Lamparelli, if you could put the transcript for that

1    call.

2         **MR. HASIB:**  This is Government Exhibit 4, Your Honor,

3    the audio in evidence.  And the transcript is Government

4    Exhibit 20.

5         And, Ms. Yee, if you could play clip 1 from that.

6              (Audio was played but not reported.)

7    **Q.**   Special Agent Reinke, is that the call that's reflected on

8    your timeline on June 2, 2015?

9    **A.**   It is.

10   **Q.**   Special Agent Reinke, returning to your timeline, were

11   there some Google searches shortly after that call?

12   **A.**   There were.

13   **Q.**   What were those Google searches for?

14   **A.**   On June 4, 2015, reflexatron@gmail.com conducted Google

15   searches for Mexicali, Mexico; Mexico City, Mexico; airport;

16   *Puerto Peñasco* International Airport; and *Puerto Peñasco*,

17   Mexico; and *Puerto Peñasco* International Airport.

18   **Q.**   Special Agent Reinke, on your timeline what's the next

19   entry after those Google searches?

20   **A.**   On June 5, 2015, Mr. Shafi conducted a phone call with

21   Mr. Karim about traveling through an international airport in

22   Mexico.  Mr. Shafi talks about the point of going is not just

23   to go there and die, but to go to a country more friendly to

24   Muslims.

25   **Q.**   Ms. Lamparelli, if you could put the transcript of

 1  Government Exhibit 21 on the screen.

 2      And, Ms. Yee, before you push play --

 3          **MR. HASIB:**  Your Honor, this is about a four-minute

 4  clip we're about to play.

 5          **THE COURT:**  Okay.

 6          **MR. HASIB:**  Go ahead, Ms. Yee.  From Government

 7  Exhibit 5.

 8              (Audio was played but not reported.)

 9  **BY MR. HASIB:**

10  **Q.**   Special Agent Reinke, turning to -- turning back to June 5

11  on your timeline, after that call are there some YouTube

12  searches on June 5, 2015?

13  **A.**   There are.

14  **Q.**   And what were those YouTube searches for?

15  **A.**   So on June 5, 2015, reflexatron@gmail.com conducted a

16  YouTube search in Arabic for special interview with the *emir* of

17  *Jabhat al-Nusrah*, and that was done four times.

18  **Q.**   And was there a call later that day or early the next day

19  between the defendant and Mr. Karim?

20  **A.**   Yes.  Soon after those searches were conducted, there was

21  a phone call between Mr. Shafi and Mr. Karim that describes the

22  Al Jazeera interview with the *emir* of *Jabhat al-Nusrah*.  During

23  that phone call, Mr. Shafi states he loves the *Jabhat al-Nusrah*

24  *emir* ten times.  He also states he wants or is willing to die

25  with them for those guys, five times.

1   **Q.**   Ms. Yee, if you could pull up -- this should be Government

2   Exhibit 6 from the beginning, clip 1.   And the transcript is

3   Government Exhibit 22.

4        **MR. HASIB:**   Your Honor, this is a long call.   It's

5   going to take us certainly to the -- well, it will probably

6   take us to 1:00.   I'm sorry.   It's 12:45 now.   It's definitely

7   going to take us to 1:00 and will take us into tomorrow.

8        **THE COURT:**   Okay.

9        **MR. HASIB:**   Ms. Yee, if you could play that call from

10   the beginning.

11             (Audio was played but not reported.)

12   **Q.**   There's a reference there to *daish*.   Is this one of the

13   terms that FBI linguist, Linda Butros, testified about?

14   **A.**   It is.

15   **Q.**   What is *daish*?

16   **A.**   *Daish* is the Arabic word for ISIS.

17             (Audio was played but not reported.)

18        **MR. HASIB:**   Your Honor, it's 1:00.

19        **THE COURT:**   Ladies and gentlemen, please remember the

20   admonition.   This case is going well speed-wise and there's

21   still a lot of evidence to come.   So keep an open mind, follow

22   the admonitions.   Don't do any research.   The issues are

23   interesting, but it's very important that all that you learn

24   about this case comes from the witness stand, comes from the

25   documents.   And then once it's time for you to deliberate, you

1  can talk through all of the various issues that have come up.

2  But not until then.

3      With that, have a good evening.  I'll look forward to

4  seeing you tomorrow morning.  And thank you for being as prompt

5  as you have been.

6      Yes, and please leave the statements behind.  Timelines.

7      (The jury exiting the courtroom.)

8          **THE COURT:**  All right.  We'll be in recess.  Let me

9  know if we need to be here early.

10          **MR. HASIB:**  Thank you, Your Honor.

11          **MR. FAKHOURY:**  Thank you, Your Honor.

12      (Court adjourned at 1:01 p.m.)

13                      ---oOo---

**CERTIFICATE OF REPORTER**

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Tuesday, October 16, 2018

_____ /s/Vicki Eastvold_____

Vicki Eastvold, RMR, CRR
U.S. Court Reporter