Volume 6

Pages 753 - 897

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )        NO. CR 15-582 WHO
                                )
Adam Shafi,                     )
                                )
            Defendant.          )
_____)

                        San Francisco, California
                        Wednesday, September 5, 2018

                 TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          United States Attorney's Office
                        450 Golden Gate Avenue
                        San Francisco, California  94102
                   BY:  S. WAQAR HASIB, ESQ.
                        ELISE LAPUNZINA, ESQ.


For Defendant:          Office of the Federal Public Defender
                        1301 Clay Street, Suite 1350N
                        Oakland, CA  94612
                   BY:  HANNI M. FAKHOURY, ESQ.
                        JEROME E. MATTHEWS, ESQ.




Reported By:  Vicki Eastvold, RMR, CRR
              Official Reporter

**<u>I N D E X</u>**

Wednesday, September 5, 2018 - Volume 6

|  | **<u>PAGE</u>** | **<u>VOL.</u>** |
|---|---|---|
| **<u>DEFENDANT'S WITNESS</u>** | **<u>PAGE</u>** | **<u>VOL.</u>** |
| **SAGEMAN, MARC (RESUMING)** | | |
| (PREVIOUSLY SWORN) | 764 | 6 |
| Cross-Examination by Mr. Hasib | 764 | 6 |
| Redirect Examination by Mr. Fakhoury | 793 | 6 |
| Jury Instructions | 798 | 6 |
| Closing Argument by Mr. Hasib | 812 | 6 |
| Jury Instructions | 892 | 6 |

| | |
|---|---|
| 1 | **Wednesday - September 5, 2018**                    **7:33 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | (The following proceedings were held in open court, outside the |
| 5 | presence of the jury:) |
| 6 | **THE COURT:**  All right.  We got the proposed final jury |
| 7 | instructions.  Did you have any conversations with the |
| 8 | government after that?  Is there anything that -- |
| 9 | **MR. FAKHOURY:**  I don't believe so, Your Honor.  So I |
| 10 | haven't had a conversation.  I don't think there's anything |
| 11 | really to discuss.  I think we've laid out our views on the |
| 12 | instructions.  I did look through what was filed on ECF.  I |
| 13 | think it matches what we discussed in court.  So obviously we |
| 14 | maintain our objections, but we don't have any issue that what |
| 15 | was filed accurately reflects what we had discussed in court. |
| 16 | **THE COURT:**  All right.  So if that's the case, there |
| 17 | are just a couple of things. |
| 18 | One, on page 1, which is the duties of the jury to find |
| 19 | facts and follow the law, did you not think that we were going |
| 20 | to be discussing this this morning? |
| 21 | **MR. FAKHOURY:**  It's my fault for not bringing a copy. |
| 22 | I'll make sure there's one available in the next ten minutes. |
| 23 | **THE COURT:**  There's very little that I wanted to go |
| 24 | over, but on line 12 after "the community."  Period after |
| 25 | "community."  I'm going to add a sentence that says:  You must |

1    avoid bias, conscious or unconscious, period.

2         MR. FAKHOURY:  That's fine with us.  Thank you,

3    Your Honor.

4         THE COURT:  Then I guess I was interested on page 23,

5    which is the jury instruction on material support or resources.

6    My understanding from the defense yesterday was, although they

7    wanted to change it in other ways, they were suggesting to take

8    the notion that there is more than one individual involved in

9    this case out of that instruction.  And I didn't know whether

10   the government had had a reason for not doing that or whether I

11   misunderstood what the defense was suggesting.

12        MS. LaPUNZINA:  Oversight on my part if I missed it.

13        THE COURT:  I didn't agree to it one way or another,

14   but I thought that -- I thought you were going to have a

15   conversation about it.  That's --

16        MR. FAKHOURY:  We did not have a conversation about

17   it.  If the government -- if there's no issue with it, I think

18   there's no dispute that this case involves Mr. Shafi just

19   providing himself.  So if we can -- I think we would -- we

20   would request that that language --

21        THE COURT:  So I think we could delete, then, on line

22   -- between 8 and 9 -- "or more individuals which may include."

23   Let's see.  Actually, delete starting at "one or more

24   individuals which may include himself."  So that the sentence

25   would read:  The defendant can be convicted for attempting to

1    provide material support or resources in the form of personnel.

2    If you find that the defendant has knowingly attempted to

3    provide himself to work under the al-Nusrah Front's direction

4    or control.

5        Does that --

6        MR. FAKHOURY:  That's fine with us.  My one -- I would

7    add perhaps at the end of the first paragraph where it says

8    "here the government has alleged that the material support or

9    resources was personnel," I would suggest maybe we add a comma,

10   "specifically himself."  Then I think your addition would tie

11   that into that introductory part.

12       THE COURT:  Is there any reason not to do that,

13   Ms. LaPunzina?

14       MS. LaPUNZINA:  I think that's fine, Your Honor.

15       THE COURT:  I think that makes it clearer.  Okay.  So

16   we'll make those changes.

17       And then what I do, after I read the instructions and I

18   show them -- or, Ms. Davis puts them on the Elmo so that

19   they're shown to the jury -- after I get to the First Amendment

20   then I will show them what the verdict form looks like so that

21   they have that.  And then I'll stop and give the duty to

22   deliberate and those instructions after.

23       MR. FAKHOURY:  That's fine, Your Honor.  Thank you.

24       THE COURT:  And then speaking of the verdict form, do

25   you have a clean copy of that to provide?  If you would.

1      **MS. LaPUNZINA:**  We will.  Yes, Your Honor.  I have a

2   clean copy but it has the ECF marking.  So I'll provide a clean

3   one.

4      **THE COURT:**  That would be great.  And if you could do

5   that maybe --

6      **MS. LaPUNZINA:**  Quickly.

7      **THE COURT:**  That would be great.  And I think those

8   were the only things I had on my mind.

9      Is there anything else we ought to talk about now?

10     **MR. FAKHOURY:**  I don't believe so, Your Honor, on our

11  part.

12     **MR. MATTHEWS:**  I don't think so.

13     **THE COURT:**  Mr. Hasib is coming up here.

14     **MR. HASIB:**  Just to get to the microphone.  Your

15  Honor, some of the agents who testified wanted to know if it

16  was okay to come in and watch the closings later this

17  afternoon.

18     **THE COURT:**  I think anybody can come watch the

19  closing.

20     **MR. FAKHOURY:**  We have no problem with that.

21     **THE COURT:**  Okay.  So as we said yesterday, we'll

22  finish up with the testimony, we'll take a break for about half

23  an hour.  Before -- after we -- before we start the closing,

24  we'll bring in the juror who was concerned about that -- who

25  raised that one issue.  Then we'll do the closings.

**PROCEEDINGS**

1    Instructions and closings.  Then move on.

2              **MR. MATTHEWS:**  Thank you.

3              **MR. FAKHOURY:**  Thank you, Your Honor.

4              **MS. LaPUNZINA:**  Thank you.

5                        (Recess taken at 7:39 a.m.)

6                        (Proceedings resumed at 8:00 a.m.)

7              **MR. FAKHOURY:**  Your Honor, there was one issue that we

8    forgot to mention at 7:30 that we wanted to address just before

9    the jury comes in.

10       And we had mentioned at the beginning of the case that we

11   were going to seek -- ask the Court to take judicial notice of

12   the day that *Obergefell versus Hodges* was decided.  And that's

13   motivated because there's been actually quite a bit of

14   testimony about Mr. Shafi's statements about wanting to leave

15   the United States in part because of the -- I think it's been

16   referred to as recent Supreme Court decision about gay

17   marriage.

18       So we wanted to have the Court take judicial notice of the

19   date of that decision, which is very close in time to the acts

20   charged here.

21       So it's my understanding the government wants some

22   additional items taken judicial notice of.  I think it's the

23   date of a Ninth Circuit case from 2013.  I can let

24   Ms. LaPunzina speak to that.  And I just wanted to put on the

25   record we don't dispute that's the day that case was decided,

1    but we don't think that there needs to be judicial notice of

2    that because there's been no evidence about the nuances between

3    what the Ninth Circuit had held in 2013 and what the Supreme

4    Court had held in 2015.

5            **MS. LaPUNZINA:**  That is correct.  The government would

6    ask the Court take judicial notice of the fact that on June 28,

7    2013, the Ninth Circuit Court of Appeals decision in *Perry*

8    *versus Brown* went into effect.  *Perry versus Brown* held that

9    Proposition 8, California's ban on same-sex marriage, was

10   unconstitutional.

11           We feel that it's necessary to do that because there has

12   been testimony relating to Mr. Shafi's reaction to the Supreme

13   Court ruling; but the backdrop to all of that is that same-sex

14   marriage was actually lawful in California, his state of

15   residence, for a period of time prior to that.

16           The Supreme Court's ruling did not come out of nowhere,

17   wasn't in a vacuum; it came in the broader context of

18   litigation across the United States.  And particularly in

19   California same-sex marriage had in fact been found -- the ban

20   on same-sex marriage was found unconstitutional.

21           We think it's important to have the full context before

22   the jury if they're going to hear one argument about one court

23   decision, that they understand the history of same sex marriage

24   within California which is obviously where he was living that

25   entire time.

1    **THE COURT:**  So you're not arguing that Mr. Shafi knew

2    about the course of the litigation on same sex marriage over

3    time.  You're just -- are you?

4    **MS. LaPUNZINA:**  Your Honor, the evidence has been with

5    respect to the Supreme Court ruling, I believe.  I can't say

6    for certain what he knew or did not know.  But it was widely

7    publicized in California.  Proposition 8 was in the news all

8    the time, and certainly California was at the forefront of

9    authorizing same sex marriage.  So I think it's certainly

10   reasonable to assume that he was aware of the other litigation,

11   and that the Supreme Court ruling came as a result of

12   litigation across the states relating to this issue.

13   **THE COURT:**  So specifically what would you like me to

14   take judicial notice of?  The date of *Perry*?

15   **MS. LaPUNZINA:**  Yes, Your Honor.

16   **MR. FAKHOURY:**  And Your Honor, one other thing I

17   wanted to add that just occurred to me.  And this is not my

18   area of expertise.  But I have a recollection that actually

19   *Perry* went to the Supreme Court.  That the Supreme Court

20   accepted a *certiorari* on that case on the issue of -- and

21   ultimately decided it had no -- there was no standing.  Because

22   if the Court remembers, that was a case brought against the

23   state of California.  The state of California decided not to

24   defend the decision.  And when it went up to the Supreme Court

25   the issue was whether voters who had put the ballot measure for

1   Proposition 8 had standing to defend state law when the state

2   chose not to defend it.  And the Supreme Court, I believe on

3   the same day it decided *Windsor*, which was a few days before it

4   decided *Obergefell*, my recollection -- I could be wrong about

5   this -- but my recollection is they ultimately found in *Perry*

6   there was no standing.  That's why *Obergefell* became sort of

7   the lead case on same sex marriage.

8        In any event, I think we're very far afield what the

9   evidence in the case is.  And the only reason we're asking for

10  the instruction is because there's been discussion of the

11  Supreme Court decision around gay marriage specifically by

12  several of the government's witnesses.  And so that's why we're

13  asking for -- just to put context so the jury understands when

14  they're talking about -- when they've heard testimony about a

15  Supreme Court decision, the decision in question is *Obergefell*

16  decided on June 26, 2015, which is obviously four days before

17  the incident at SFO.

18       **THE COURT:**  Well, I think it's appropriate, I suppose,

19  to put into context that *Obergefell* didn't come out of the

20  blue.  I don't know how persuasive an argument it is.  But I

21  shouldn't be putting myself in that seat.

22       So in order for the government to try to put *Obergefell*

23  into the context of other things that were going on, I will

24  take judicial notice of the date of *Perry*.

25       So what date is that?  And have I provided the date?  Did

1  we do that first thing with *Obergefell*?  Or do we have to do

2  that as well?

3      **MR. FAKHOURY:**  We have not gotten into it.  I was

4  thinking we could -- Dr. Sageman's our last witness.  I was

5  thinking we could have the judicial notice be taken after his

6  testimony is done.  And we would rest at that point.

7      **THE COURT:**  We'll do both dates.  So the date of *Perry*

8  without adornment, and the date of *Obergefell*.

9      **MS. LaPUNZINA:**  The date, Your Honor, is June 28,

10  2013.

11      **THE COURT:**  So then are you going to be describing for

12  the jury the nuances of the Ninth Circuit and the state law

13  decisions, and make this case into a case involving gay

14  marriage as opposed to material support?

15      **MS. LaPUNZINA:**  No, Your Honor.  That's not our

16  intention.

17      **THE COURT:**  Okay.  And then what was the date of

18  *Obergefell*?

19      **MR. FAKHOURY:**  June 26, 2015.

20      **THE COURT:**  All right.  So we'll do that at the --

21  when you ask me to.

22      **MR. FAKHOURY:**  Thank you, Your Honor.

23      **MS. LaPUNZINA:**  Thank you.

24      **THE COURT:**  So I have the final instructions here

25  slightly revised with -- in the 1st instruction and the 23rd

 1  instruction.  I'll give this to you now so that you can look

 2  just to see whether there's anything else that needs to happen.

 3      And get the jury.

 4          MR. FAKHOURY:  Thank you, Your Honor.

 5          MS. LaPUNZINA:  Thank you.

 6      (Proceedings were heard in the presence of the jury:)

 7          THE COURT:  All right.  Please be seated, everybody.

 8  Good morning, ladies and gentlemen.  Thank you, again, for

 9  being prompt.  We're ready to go with the cross-examination of

10  Dr. Sageman.

11      Mr. Hasib.

12          MR. HASIB:  Thank you, Your Honor.

13                      **MARC SAGEMAN**,

14  called as a witness for the Defendant, having been previously

15  duly sworn, testified further as follows:

16                      **CROSS-EXAMINATION**

17  BY MR. HASIB:

18  **Q.**  My name is Waqar Hasib.  I represent the United States

19  government in this case.  Good morning.

20  **A.**  Good morning.

21  **Q.**  Dr. Sageman, you and I, we spoke a little bit briefly this

22  morning, right?  Before court?  Just exchanging pleasantries?

23  **A.**  Yes.

24  **Q.**  And we spoke a little bit I think it was yesterday morning

25  as well just introducing ourselves to each other?

SAGEMAN - CROSS / HASIB

1   **A.**   Yes.

2   **Q.**   And other than that, Dr. Sageman, you and I have never

3   spoken together, right?

4   **A.**   I have never seen you before.

5   **Q.**   Dr. Sageman, yesterday I think you testified about the

6   fees that you're getting paid in this case.  Do you recall

7   testifying that you were getting paid $300 an hour?

8   **A.**   That's correct, yes.

9   **Q.**   And about how much have you put in so far?

10  **A.**   I don't know.  About 50 hours.  70 hours.  I don't know.

11  **Q.**   And over the course of this case, at the end of the day

12  when everything's done, how much do you expect to be paid as a

13  result of your work in this case?

14  **A.**   I don't know.  $20,000.

15  **Q.**   Dr. Sageman, let me ask you a couple of questions.

16  Yesterday you talked about your -- I have to say very

17  interesting background.  You mentioned you worked in

18  Afghanistan for several years, right?  Afghanistan and

19  Pakistan?

20  **A.**   Pakistan for three years, Afghanistan about four months.

21  **Q.**   And you described that as it was sort of the James Bond

22  kind of lifestyle, is that right?

23  **A.**   That was my first version, yes.  I went back to

24  Afghanistan 2012-2013, and there I was a political officer for

25  the U.S. Armed Forces.  ISAF.

1  Q.   So the first time around back in -- what was it?  The mid

2  '80s?  That was when you were leading the James Bond lifestyle.

3  A.   That's right.  1986 to 1989 when I was young.

4  Q.   And you testified yesterday that you also did some work

5  for the Secret Service at some point?

6  A.   Yes.  In 2006-2007.

7  Q.   2006-2007.  You testified yesterday that your job was to

8  protect the President?

9  A.   Part of it, yes.

10 Q.   And you weren't -- you weren't carrying a firearm, were

11 you?

12 A.   No.  I was trying to be the brain trust.

13 Q.   You were trying to be the brain trust.

14 A.   Yes.

15 Q.   How were you trying to be the brain trust of the Secret

16 Service?

17 A.   Trying to understand how groups try to attack the

18 President or head of state.  So I looked at attacks against

19 head of states in foreign countries and attacks against head of

20 states in this country, as well.  And attacks by groups as

21 opposed to lone individuals.  Secret Service is very good at

22 protecting the President against a lone gunman now, but they're

23 not as good against groups.  So we're trying to figure out a

24 way to protect the President against groups.

25 Q.   That was 2007-2008, that was President Bush?

1    **A.**    That's correct.

2    **Q.**    And so your work with the Secret Service, you were sort of

3    a researcher, a scholar?

4    **A.**    I was a consultant to -- I think it was called JTAC, which

5    is a joint -- no, it wasn't JTAC.  I forgot exactly.  But it's

6    a think tank within the Secret Service that gives direction and

7    research for the rest of the organization.

8    **Q.**    So it was a think tank for the Secret Service.  That's

9    what you were doing?

10   **A.**    Well, I was working directly -- working directly for the

11   deputy director, I guess, for intelligence.

12   **Q.**    Did you make policy recommendations, that kind of thing?

13   **A.**    No.  Just trying to figure out how to counter attacks.

14   And also trying to anticipate -- when President Bush, for

15   instance, went to Germany there were, I guess, two potential

16   attacks that we were monitoring.  And we, basically, helped

17   arrest those individuals.

18   **Q.**    How did you help?

19   **A.**    I'm sorry?

20   **Q.**    How did you help?  How did you help?  With the arrest of

21   those individuals?

22   **A.**    I wasn't on the ground, nor were any American forces

23   there.  But we were monitoring.  Were in constant communication

24   with the Germans and the Danes.

25   **Q.**    Dr. Sageman, I've got, as you've noted, I've got all four

1    of your books here.  Are there additional books?

2    **A.**    One coming out in about two months.

3    **Q.**    So we've got -- let's see.  *Misunderstanding Terrorism*.

4    This is one of the more recent ones, right?

5    **A.**    That's correct, yes.

6    **Q.**    And then this is your first one, *Understanding Terror*

7    *Networks*?

8    **A.**    That's correct.

9    **Q.**    This is the one I think yesterday you said was one of the

10    most cited books in the field of terrorism, right?

11    **A.**    Yeah.  About 3,400 citations.

12    **Q.**    3,400 citations?

13    **A.**    Yes.

14    **Q.**    You keep track of that?

15    **A.**    No.  I just checked in case you were going to ask me.  So

16    I checked this morning.

17    **Q.**    That's a lot.  3,400.

18    **A.**    Yeah.  I was surprised.

19    **Q.**    And this one is *Leaderless Jihad*.  This one was, what?

20    About 2008?

21    **A.**    That's correct, yes.  And this is one of your more recent

22    ones, as well?

23    **Q.**    And this is on of your more recent ones, as well, right?

24    *Turning to Political Violence*?

25    **A.**    That's correct, yes.

1  **Q.**  Let me ask you some questions about some of these books.

2  Let's start with *Leaderless Jihad*.  Let me ask you.  This book,

3  at least initially, there was some discussion about an

4  allegation of plagiarism involved with this book, is that

5  right?

6  **A.**  Yes.

7  **Q.**  That was ultimately -- you rejected that allegation,

8  right?

9  **A.**  That's correct.

10  **Q.**  Okay.  So what you've got in this book, these are -- these

11  of your words (indicating.)

12  **A.**  Absolutely.

13  **Q.**  Okay.  And if they're not your words, then they are cited

14  appropriately, right?

15  **A.**  Yes.

16  **Q.**  And you cite -- you're an eminent scholar.  You cite to

17  reliable sources, right?

18  **A.**  Yes.  But the bibliography of that book and the references

19  are not accurate.

20  **Q.**  Not accurate?

21  **A.**  And I think that's why some people mentioned that it could

22  be plagiarism.  I mean, I mentioned them in the text, but

23  somebody switched the bibliography.  I don't want to blame my

24  wife, but --

25  **Q.**  You know this is being taken down in the record?

1  **A.**   I know.  And she's probably going to order them.  And so

2  the bibliography is not really accurate there.  But in the text

3  I do -- for instance, several scholars I refer to them by name

4  in the text, but somehow they are missing from the

5  bibliography.

6  **Q.**   Well, if scholars are mentioned here in the bibliography,

7  these are people that you checked up on and you read their work

8  and you cited to them.

9  **A.**   That's correct, yes.

10 **Q.**   And you wouldn't cite scholars who you don't think are

11 reliable, right?

12 **A.**   Well, I mean, sometimes I cite them because I disagree

13 with them and sometimes I cite them as we agree.

14 **Q.**   Let me ask you --

15     **MR. HASIB:**  May I approach, Your Honor?  Actually, I

16 can use the Elmo if we can limit it just to Dr. Sageman and

17 myself, if that's easier.

18     **THE COURT:**  Either way you want to do this is fine.

19     Is it possible to do that, Ms. Davis?

20     **THE CLERK:**  I can take the jury off.  Counsel table

21 will see it.

22     **MR. FAKHOURY:**  I've seen it.  Whatever's convenient.

23     **MR. HASIB:**  And if I could have the Elmo, please.

24 **BY MR. HASIB:**

25 **Q.**   Pardon the sticky notes.  Dr. Sageman, that's -- does that

1    appear to be the bibliography of your book *Leaderless Jihad*?

2    **A.**   Yes.

3    **Q.**   And at the bottom there is there a citation to a Lorenzo

4    Vidino?

5    **A.**   Yes.  And I apologized to Lorenzo yesterday.  He mentioned

6    it to me.  And I wasn't aware.  But it's a bad spelling error.

7    **Q.**   So you misspelled his name, but that's a citation to

8    Dr. Lorenzo Vidino.

9    **A.**   Yes.  That's Lorenzo's.

10   **Q.**   Who you met yesterday.

11   **A.**   Yes.  We've known each other for 12 years.

12   **Q.**   And by the way, actually, that brings up a point.  You've

13   testified previously in cases where Dr. Vidino also testified,

14   right?

15   **A.**   Yes.  One other case that comes to mind, yes.

16   **Q.**   And you've met him in professional situations other than

17   in court?

18   **A.**   Yes.  Yes.  In foreign countries, as well.  And I met his

19   kids, his previous wife.

20   **Q.**   You guys friends?

21   **A.**   We don't meet enough to really be friends, but we're on

22   very friendly terms.

23   **Q.**   You move in the same professional circles.

24   **A.**   Right.

25   **Q.**   Let me ask you about *Leaderless Jihad* a little bit.  Let's

1    see.  First of all, this was written in --

2    **A.**   It was published in 2008.

3    **Q.**   Published 2008 by University of Pennsylvania Press.

4    **A.**   Yes.  It's written the year before.  It takes about nine

5    months to publish.

6    **Q.**   So you wrote it in 2007, publish in 2008?

7    **A.**   Yes.

8    **Q.**   Either way, this is long before the birth of al-Nusrah, is

9    that right?

10   **A.**   Oh, yes.

11   **Q.**   And before the birth of ISIS or *Daish*?

12   **A.**   Before the birth of ISIS.  I mean, at that time it was --

13   well, they had many names.  Al-Qaeda in Iraq, it was Zarkawi

14   Organization.  Zarkawi is spelled Z-A-R-K-A-W-I.  I think

15   Zarkawi was killed when I was writing this book.

16   **Q.**   And fair to say the depth of your experience in this field

17   comes a lot from your experiences in Pakistan and Afghanistan

18   in the '80s, right?

19   **A.**   Well, I was on the terrorist side at that time, I guess,

20   so I had some different expertise from most counterterrorist

21   experts.  I was on both sides.

22   **Q.**   9/11, of course, was a seminal event for the entire world

23   and for people in the world of terrorism, as well.  Right?

24   **A.**   Very much so, yes.

25   **Q.**   Al-Qaeda was the focus of your research, right?

1   **A.**   For the first book and the second book, yes.

2   **Q.**   Let me ask you.  Let me see if I can summarize what --

3   some of what you're saying in this book.  Is it essentially

4   that al-Qaeda did not have -- it was not a top-down

5   organization.  It was more of a bottom-up phenomenon.  Is that

6   right?

7   **A.**   Well, it was both.  And as we're getting better in terms

8   of counterterrorism, we're able to counter the top-down portion

9   of it, so the bottom-up became more prominent.  And's that's

10  why it was moving toward a state of leaderless *jihad*.

11  **Q.**   So you're saying in this book it's the bottom up that we

12  got to be paying attention to, not so much the top down?

13  **A.**   In the future, that's where it's leading towards.  So

14  homegrown terrorism that we have now, unfortunately.  So I was

15  prescient by about ten years.

16  **Q.**   You foresaw things by ten years.  Is that what you're

17  saying?

18  **A.**   Well, I saw the trend, yes.

19  **Q.**   And I think one of the things that you wrote about in some

20  depth in this book was the fact that as you saw it there were

21  no real sort of formal al-Qaeda recruiters going around trying

22  to spot the next big terrorist talent.  Right?

23  **A.**   Yes.  That's correct.

24  **Q.**   It's not like, you know, a football team going out to

25  scout new players.  There was no al-Qaeda recruiter heading out

1   to see who their next pick is going to be.

2   **A.**   That's correct.  And I think I made the same argument in

3   my first book.

4   **Q.**   And that's the theme that runs throughout a lot of your

5   books, actually, right?  That there's no sort of formal

6   recruitment mechanism.

7   **A.**   Yes.  I mean, in a sense, it's a much more difficult

8   situation to assess and to detect potential terrorists.

9   **Q.**   Yet, despite that lack of a formal recruitment mechanism,

10  you would agree with me, would you not, that some people do

11  still end turning, as you say, to political violence, right?

12  **A.**   Absolutely.

13  **Q.**   Let me ask you a little bit about -- let's see.  This is

14  your first book, *Understanding Terror Networks*.  So this one

15  goes back even further away from al-Nusrah and ISIS.  This was

16  written in --

17  **A.**   2003, and published 2004.

18  **Q.**   2003, and published 2004.  This is even further from the

19  birth of al-Nusrah, right?

20  **A.**   That's correct.

21  **Q.**   You write a great deal in this one about the -- sort of

22  the origins of what I think at the time -- you may have changed

23  your terminology -- but at the time you were calling it the

24  global *Salafi jihad*?

25  **A.**   That's correct.

1   **Q.**   What's the term that you used now?

2   **A.**   The global neo *jihad*.

3   **Q.**   Global neo *jihad*.

4   **A.**   Yes.

5   **Q.**   What's the difference?

6   **A.**   Well, a lot of my Muslim friends told me that this was not

7   *jihad*.   That *jihad* is very much a moral war.   It's a just war.

8   And there are a lot of rules.   You can't really kill civilians,

9   you can't kill innocent people.

10      And I agree with them, and so I stopped calling it *jihad*.

11   But if I don't really call it *jihad*, nobody really understand

12   what I'm talking about.

13      So I'm a little stuck.   And I, basically, decide to call

14   neo *jihad*.   It's an ugly term, but nobody yet -- I've been

15   challenging people.   I say, Give me another term.   I don't like

16   it.   But that's what I'm stuck with.

17   **Q.**   It's your term.   You came up with it, right?

18   **A.**   Yes.   But it's an ugly neologism.   I realize it doesn't

19   flow smoothly from the tongue.

20   **Q.**   Let me ask you about some of the things you wrote in this

21   book.   You write about the origins of the global *Salafi jihad*,

22   or global neo *jihad*, and you write specifically about some of

23   the roots of this movement in Egypt.   Do you recall writing

24   that?

25   **A.**   Yes.

SAGEMAN - CROSS / HASIB

1   Q.   And writing at some length about a man named Ayman

2   al-Zawahiri?

3   A.   Yes.

4   Q.   Who is that person?

5   A.   Well, he was a physician who became radical and became

6   involved with what's called the *al jihad* group in Egypt.  And

7   was arrested during -- right after the crackdown when they

8   killed the Egyptian President.  And he was released from prison

9   in 1984, went to Peshawar, and in Peshawar met Osama bin Laden.

10  Q.   Peshawar, that's your old stomping grounds, right?  In

11  Pakistan?

12  A.   That's correct, yes.  I did not meet them personally.

13  Q.   I was not suggesting that you did.

14  A.   And when bin Laden formed al-Qaeda, he invited -- he

15  cooperated with Zawahiri.  And then in about 2000, ten years

16  later, there was a merger between the *al jihad* group of Egypt

17  and al-Qaeda.  And Zawahiri became the deputy, became the

18  number two man in al-Qaeda.

19  Q.   So he was bin Laden's number two.

20  A.   That's correct.

21  Q.   And now that bin Laden is no longer, where is Ayman

22  al-Zawahiri?

23  A.   He's now the leader of al-Qaeda.

24  Q.   In your book you wrote at some length about sort of the

25  upbringing of Zawahiri and how he sort of found himself on what

1    I think you would say this path of turning to political

2    violence, right?

3    **A.**   Right.

4    **Q.**   Let me just read you a passage.  Again, just for the

5    attorneys and Dr. Sageman.

6        You write:  Key person in this analysis is Ayman

7    al-Zawahiri, the leader of the EIJ and the deputy of al-Qaeda.

8        And then you continue down.  You describe at an early age

9    he was strongly influenced by the writings of Syed Qutb.  And

10   in 1966 he and his brother and three high school friends made a

11   secret pact to oppose the Nasser regime along the lines,

12   advocated by Qytb.  Nasser, who is that?

13   **A.**   Gamal Abdel Nasser, who was --

14   **Q.**   Secular leader of Egypt at that time?

15   **A.**   In 1960s, yes.  And then he died in late '60s and was

16   replaced by Anwar Sadat.

17   **Q.**   Then you write that:  In 1966 Zawahiri, his brother, and

18   three high school friends made a secret pact to oppose the

19   Nasser regime.  The formation of such clandestine groups among

20   high school friends searching for a cause to give meaning to

21   their young lives is a common phenomenon.  Usually these groups

22   are unconnected to a larger movement and fade over time as

23   people grow up and get on with their lives.

24        **MR. FAKHOURY:**  Your Honor, I'm sorry to interrupt.

25   This is hearsay.  If he wants to impeach him with a prior

1  inconsistent statement, there's a procedure to do that.  I

2  don't see the relevance of this or the relevance of reading his

3  book into the record.

4      **THE COURT:**  It's sustained.  Ask a question based on

5  that passage.

6  **BY MR. HASIB:**

7  **Q.**  Dr. Sageman, you wrote that groups of high school friends

8  sometimes searching for meaning for their lives will

9  occasionally become connected to a larger movement.  Isn't that

10 right?

11 **A.**  It could.

12 **Q.**  In this case that you're writing about in your book, that

13 group of high school friends ended up being one of the -- one

14 of them ended up being the number two of al-Qaeda.  Right?

15 **A.**  And the number one.

16 **Q.**  And his roots came from that original group and that

17 upbringing and that secret pact he had amongst his friends back

18 in 1966, right?

19 **A.**  Yes.  Now, I wrote that, but I don't know if it's true.

20     **MR. HASIB:**  Your Honor, I --

21     **THE COURT:**  Yes.  Stick to the questions, please.

22 **BY MR. HASIB:**

23 **Q.**  And Dr. Sageman, one of the other things that you wrote

24 about in this book is some of the things that will cause people

25 perhaps to make that turn to political violence, isn't that

**SAGEMAN - CROSS / HASIB**

1   right?

2   **A.**   Yes.

3   **Q.**   And one of those things you wrote was mystical experiences

4   or dreams that demonstrate the existence of god and reinforce

5   one's radical ideas.  Isn't that right?

6   **A.**   Yeah.  That's what I wrote at that time.

7   **Q.**   In fact, you wrote about a famous incident where in 2001

8   Osama bin Laden said that he had banned the reporting of dreams

9   of airplanes flying into buildings prior to September 11 for

10   fear of revealing the September 11 plot.  Isn't that right?

11   **A.**   Yes.  That's what I write.

12   **Q.**   So that was an example of a dream being used in sort of

13   the radicalization process, right?

14   **A.**   Yeah.  I don't believe that anymore.  But at that time I

15   did.

16   **Q.**   You don't believe that dreams play a part of the process?

17   **A.**   No, I think dreams are important in terms of trying to

18   make sense of your own life and things around you, but I don't

19   really think that they play an important role in the turn to

20   political violence.  That is not my latest mechanism as you

21   know from reading my last two books.

22   **Q.**   Let me ask you about -- let's go to -- this one was much

23   more recently, right?   *Misunderstanding Terror*?

24   **A.**   2016 yes.

25   **Q.**   2016 (indicating.)  And this one also focuses largely on

1  al-Qaeda, right?

2  **A.**   Yes.

3  **Q.**   In fact, there's nary a mention of al-Nusrah in this book,

4  right?

5  **A.**   No.  Because the database on which I was basing it on

6  ended in 2011.

7  **Q.**   And that was before the rise of al-Nusrah, right?

8  **A.**   That's correct, yes.

9  **Q.**   So this was based mainly on people other than al-Nusrah.

10  Al-Qaeda and other groups.  Right?

11  **A.**   They're part of the global neo *jihad*.

12  **Q.**   The global neo *jihad*, which at that time did not include

13  al-Nusrah for you.

14  **A.**   Because it wasn't -- it hadn't emerged yet, but now it

15  does.

16  **Q.**   And in this book you talked again about some of the things

17  that can lead someone to make that turn to political violence.

18  Right?

19  **A.**   Yes.

20  **Q.**   And actually, before we get there, this is another book in

21  the bibliography where you indicate that you had cited

22  Dr. Vidino.  Is that right?

23  **A.**   And spelled it correctly.

24  **Q.**   And spelled it correctly, too.  "Home-grown *Jihadism* in

25  Italy:  Birth, Development and Radicalization Dynamics" by

SAGEMAN - CROSS / HASIB

1    Lorenzo Vidino, 2014.  Is that right?

2    **A.**    Yes.

3    **Q.**    And that was something that you cited to in your book?

4    **A.**    Yes.

5    **Q.**    Now let me ask you.  You describe at some length some of

6    the things that can cause someone to turn to radicalism.  And

7    you describe, for example, that when someone takes on what you

8    describe as a martial social identity, they start acting a

9    little differently, right?

10   **A.**    Yes.

11   **Q.**    What does that martial social identity mean?

12   **A.**    You identify as a soldier defending your community which

13   is attacked.

14   **Q.**    So it's essentially thinking of yourself as a fighter?

15   **A.**    Yes.

16   **Q.**    And one of the things that you describe in the book is

17   indicative of this turn is practicing martial arts, getting

18   weapons, and taking target practice to improve skills, is that

19   right?

20   **A.**    Yes.  Those are some of the indicators of what you think

21   of yourself; namely, as a soldier.  You train as a soldier.

22   **Q.**    So as you say here, these are the kinds of activities that

23   would reinforce that sort of soldier image, the martial social

24   identity?

25   **A.**    Yeah.  There may be.  Yes, correct.

1  **Q.**   And then this book, this is also quite recent, right?
2  *Turning to Political Violence*?

3  **A.**   Yes.  This came out last year.

4  **Q.**   This one -- correct me if I'm wrong -- this is more of
5  sort of a historical analysis, right?

6  **A.**   Well, this is the elaboration of my theory and
7  illustrating it with what people would call terrorist group
8  from the French Revolution to World War I.

9  **Q.**   French Revolution, anarchy in the 1900s, World War I.
10  These are the examples you cite to in this book.

11  **A.**   That's correct.

12  **Q.**   But there's no mention of al-Nusrah in this book, either,
13  is there?

14  **A.**   No.  But towards the end, if you look at the appendix,
15  it's part of the 34 Campaigns of Political Violence.  And it's
16  part of the global neo *jihad*.

17  **Q.**   It's in the appendix.

18  **A.**   Correct.  The annex.

19  **Q.**   The annex.  Dr. Sageman, you mentioned this a moment ago,
20  you've testified before in some terrorism trials, right?

21  **A.**   I'm sorry?

22  **Q.**   You've testified previously in some terrorism-related
23  trials?

24  **A.**   Yes.

25  **Q.**   And that's not the extent of your expert testimony.

1   You've testified a lot as an expert, right?

2   **A.**   Yeah.  A dozen times.  And at large commission, like the

3   9/11 Commission, the Beslan Commission in Russia.  Saudi

4   Arabia.

5   **Q.**   How about in non-terrorism contexts?  Have you testified

6   as an expert?

7   **A.**   Yes.

8   **Q.**   How many times?

9   **A.**   20 times.

10  **Q.**   And what were those kind of cases?

11  **A.**   Forensic psychiatrist.  So I testify in terms of criminal

12  responsibility.  And in civil cases, in terms of damages in

13  tort lawsuits.

14  **Q.**   So fair to say you're an expert in the -- a few different

15  fields.

16  **A.**   Yeah, I guess so.

17  **Q.**   And, in fact, you've written some articles, haven't you,

18  about being an expert witness?

19  **A.**   In a forensic psychiatry setting, yes.

20  **Q.**   And one of them is about finding the right expert witness

21  for a particular case?

22  **A.**   It was mostly about the admissibility of expert evidence

23  and what kind of expert --

24  **Q.**   And another one was about challenging expert witnesses at

25  trial?

SAGEMAN - CROSS / HASIB

1    **A.**    Yes.

2    **Q.**    So --

3    **A.**    Helping lawyers cross-examine experts like me.

4    **Q.**    I've read that one.

5    **A.**    Thank you.

6    **Q.**    So you're kind of sort of an expert on experts, in a way,

7    right?

8    **A.**    Well, I read a lot.

9    **Q.**    You read a lot.  Let me ask you about -- let's go back to

10   your testimony on terrorism trials.  Do you recall testifying

11   in -- oh, heck, where was this?  Riverside.  Riverside,

12   California.  That's the Central District of California, I

13   think, in 2012.

14   **A.**    Sohiel Kabir case?

15   **Q.**    The Sohiel Kabir case.  Exactly.  Sohiel Kabir, you recall

16   testifying in that case?

17   **A.**    Yes.

18   **Q.**    And the name Anwar al-Awlaki came up with some frequency

19   in that case, right?

20   **A.**    Yes, I think so.

21   **Q.**    And, in fact, it came up during your cross-examination by

22   the government prosecutor in that case, right?

23   **A.**    I usually -- it fades out of my memory.  I try to forget

24   it.

25   **Q.**    Do you recall testifying that in -- after approximately

1  2008 many of the cases involving terrorism and involved in your

2  research had connections to Anwar al-Awlaki?

3  **A.**    Yes.  As Vidino mentioned, in the English-speaking world.

4  **Q.**    In the English-speaking world many of the cases that are

5  the subject of your research had connections to this person,

6  Anwar al-Awlaki.

7  **A.**    Yes.  My research also extend to the French, to the Danes.

8  And they don't hear al-Awlaki.  And in this country, defendants

9  who are Uzbeks don't listen to al-Awlaki either.

10  **Q.**    I'm sorry.  Defendant's who are --

11  **A.**    Uzbeks.

12  **Q.**    Uzbeks.  From Uzbekistan.

13  **A.**    Correct.

14  **Q.**    How about other defendants?

15  **A.**    Most English speakers, yes.  And not just English speakers

16  who are arrested on terrorism charges, but a lot of Muslims

17  listen to al-Awlaki, especially his historical lectures.

18  **Q.**    Because -- you were here for Dr. Vidino's testimony,

19  right?

20  **A.**    Yes.

21  **Q.**    Dr. Vidino explained that there are lectures that Anwar

22  al-Awlaki has given that are about totally innocuous topics,

23  right?

24  **A.**    Yeah.  I mean, I learned a lot.  I listened to his

25  lecture.  I learned a lot from al-Awlaki, yes.

1    **Q.**   But there are also lectures of al-Awlaki's that are

2    certainly not so innocuous, right?

3    **A.**   Yes.  He was arrested in 2006, and then released from

4    prison 2008.  After his release from prison, he became much

5    more radical in his lectures, like the "Constants on the Path

6    of *Jihad*" is definitely a series of *jihadi* lectures.

7    **Q.**   So the "Constants on the Path of *Jihad*," that was one of

8    the lectures, in your opinion, in your experience as an expert,

9    that is one of the more radical lectures by Anwar al-Awlaki?

10   **A.**   Yes.  He's advocating *jihad* in those six lectures, I

11   think.

12   **Q.**   Dr. Sageman, let me ask you.  Your testimony yesterday was

13   that -- if I heard you correctly -- the defendant in your

14   opinion had radicalized but had not taken the turn to political

15   violence, is that right?

16   **A.**   I said he had radical ideas.  And so, you know, I'm not

17   going to dispute, even though I don't use the term

18   "radicalize," I would not dispute the fact that he was

19   politicized and he acquired ideas that are contrary to ordinary

20   Americans, mainstream ideas.  So, yes, I would agree that he

21   was radical in that sense.

22   **Q.**   Okay.  And the fact that a person goes to, for example,

23   target practice, is that not indicative of someone who is

24   starting to take on that martial social identity of the

25   soldier?

1   **A.**   If he does that frequently, perhaps, I would be more

2   worried.   But that is something that I look for.   And as you

3   had a chance of looking at my outline, you saw that I underline

4   each time he actually went to target practice.   I saw it about

5   three or four times at most.

6   **Q.**   So that was something that jumped out at you.   Something

7   that --

8   **A.**   Yes.

9   **Q.**   -- you need to be paying attention to.

10   **A.**   Yes.   So it raised my index of suspicion.

11   **Q.**   How about saying on the phone that one wants to spill

12   gallons of blood before going to *Allah*?

13   **A.**   Well, that depends on the context.   I mean, that context

14   that was not *jihadi*.   It was more trying to share the suffering

15   of his fellow Muslims.   And as I said, you know, people become

16   politicized by identifying with victims of your own community,

17   and I think that's what he meant.   So that did not really worry

18   me as much as going to target practice, for instance.

19   **Q.**   So the comment about wanting to spill gallons of blood did

20   not worry you because of context.   And in your opinion, that

21   was more about suffering than about taking on a martial

22   identity, is that right?

23   **A.**   That was the first step of my process.   Namely, the

24   acquisition of a politicized social identity.   But community of

25   people having a politicized social identity form a political

1  protest community.  And that community is still nonviolent.

2  **Q.**   How about the telephone call in which -- wanting to go

3  somewhere where the defendant could kill fricking American

4  soldiers.  How did that work into your analysis?  Is that also

5  suffering?

6  **A.**   I'm sorry?

7  **Q.**   Was that also part of the suffering analysis?

8  **A.**   No, that was in relation to Burma.  And I think that he

9  had just seen a video of a Muslim being cut up in pieces.  And

10  he was so outraged by it that he wanted to do something.  And

11  this is his way of speaking.

12      You know, it tells when -- you know, his father is not

13  happy with him:  He's going to slaughter me like a goat.  His

14  speech pattern, his figures of speech, are very exaggerated.

15  **Q.**   It's just an exaggerated figure of speech.

16  **A.**   So I looked at that, I looked at the context.  And, you

17  know, I said, Okay, so what is he going to do?  And then I

18  think he talks about Burma a little bit later on again in other

19  conversations, and then he drops it.  And there's nothing in

20  furtherance after that.

21      So, you know, you have to monitor what people say.  You

22  have to look at the totality of the discovery material not just

23  the 17 --

24  **Q.**   Look at the totality of the circumstances.  Is that what

25  you're saying?

1  **A.**   Absolutely.  Absolutely.

2  **Q.**   Let me ask you about -- there's an article that you wrote

3  entitled "The Stagnation in Terrorism Research."  Do you recall

4  that article?

5  **A.**   Yes.  In 2014.

6  **Q.**   2014.  And that article was -- I don't want to use the

7  word "controversial," but it generated some discussion, right?

8  In the academic community?

9  **A.**   Yes.  I mean, this was one of those -- you know, lead

10  article.  And then they had five scholars commenting on it.

11  And then I could reply to them.

12  **Q.**   So it's part of an ongoing debate that you had?

13  **A.**   That's right, yes.

14  **Q.**   And one of the things that you did in this article is you

15  were pretty critical of what you refer to here as the IC, or

16  the intelligence community, right?

17  **A.**   And the academic community.  I was critical of both

18  communities, yes.

19  **Q.**   And, in fact, you -- if I can find your sort of pithy

20  summary -- you wrote:  We have a system of terrorism research

21  in which intelligence analysts know everything but understand

22  nothing, while academics understand everything but know

23  nothing.

24  **A.**   Yes.

25  **Q.**   And your beef there was sort of give academics more access

1  to the information that's in the intelligence community --

2  **A.**   Right.

3  **Q.**   -- and then we can understand everything.

4  **A.**   Yeah.  Like the discovery material, for instance.

5  **Q.**   But as is, the intelligence community could not understand

6  everything even though they had access to all the information.

7  **A.**   That's correct.  They don't have the methodological

8  background that academics do and can't really analyze it

9  correctly.

10 **Q.**   And one of the things that you said the intelligence

11 community was having a problem analyzing correctly was -- you

12 write at some length about false alarms or false positives?

13 **A.**   That's correct, yes.

14 **Q.**   And you wrote about things that might seem to be of

15 interest to the intelligence community, which in fact lead to

16 no further sort of concern from a law enforcement perspective.

17 Is that right?

18 **A.**   I'm sorry.  Could you repeat that?  I lost you in the

19 middle.

20 **Q.**   Things that may initially seem of interest to the

21 intelligence community that end up leading to no cases on

22 terrorism.

23 **A.**   Right.

24 **Q.**   And then there are other factors that you said the

25 intelligence community was missing that should be alarming to

1   them.  Right?

2   **A.**   Yes.

3   **Q.**   And do you recall writing that one of those factors that

4   you thought the intelligence community was missing out on

5   potentially was parents reporting their children to the

6   intelligence community.

7   **A.**   Yes.  At that time I thought that -- there was several

8   cases where parents reported their children.  I'm thinking

9   about the Underwear Bomber case, for instance, in 2009.

10  December 2009.  This Nigerian who actually plotted with

11  al-Awlaki from Yemen and came to the United States wearing a

12  bomb in his underwear.  He tried to light it up, but it didn't

13  work out.  And was arrested and pled guilty eventually in this

14  country.

15      And that shook me quite a bit.  And I said, Well, you

16  know, I would have paid far more attention to this case because

17  the father went out of his way to denounce his son.  And I

18  think that the intelligence community completely ignored it.

19  And it was on the pure luck that the airplane was not

20  destroyed.  However --

21  **Q.**   So --

22  **A.**   However --

23      Yes?

24      **THE COURT:**  Dr. Sageman, just stick with the question

25  that you've got.  And you can be redirected by Mr. Fakhoury if

```
 1    he needs it.

 2              THE WITNESS:  But I need to say --

 3              THE COURT:  I think you answered the question.

 4              THE WITNESS:  I don't think so.  That was the first

 5    part of the answer.

 6         Fine.

 7              MR. FAKHOURY:  Your Honor, before we go any further

 8    can we have a sidebar.

 9              THE COURT:  Yes.

10         (The following proceedings were heard at the sidebar:)

11              MR. FAKHOURY:  This line of inquiry is starting to get

12    into the statements that Salama Shafi made at the U.S. Embassy

13    around his -- around Mr. Shafi, his concerns about

14    radicalization.

15         We have filed a motion in limine about those statements.

16    And my understanding is the Court agreed to admit them just to

17    show the initiation of the investigation and not for the truth

18    of the matter asserted.

19         So if the inquiry with Dr. Sageman goes into the substance

20    of whatever's reported at the U.S. Embassy or the concerns that

21    Salama Shafi had, we're going outside the scope of what the

22    Court allowed those statements to come in for.  So I don't

23    think this line of questioning is appropriate.

24              MR. HASIB:  I'm almost at the end.  I think I have

25    maybe one more question.  It's not going to go into the
```

1   substance of anything Salama Shafi said at the embassy.

2          THE COURT:  All right.  Let's see that it doesn't.

3          MR. HASIB:  Okay.

4      (The following proceedings were heard in open court:)

5          THE COURT:  Go ahead, Mr. Hasib.

6   BY MR. HASIB:

7   Q.   So Dr. Sageman, a parent reporting a child to the

8   intelligence community, that would be a red flag for you?

9   A.   That was in 2014.  It no longer is the case.

10         MR. HASIB:  Thank you, Your Honor.  No further

11  questions.

12         THE COURT:  All right.

13                  <u>**REDIRECT EXAMINATION**</u>

14  BY MR. FAKHOURY:

15  Q.   Good morning, Dr. Sageman.

16  A.   Good morning.

17  Q.   Mr. Hasib was asking a couple questions about opinions or

18  theories you had maybe in 2004, 2005, 2006, and how those have

19  changed.

20      Is it common for theories or opinions to change over time?

21  A.   Well, the more I study things the more I learn.  And some

22  things that I believed ten years ago I don't believe anymore

23  because I know far more.  The facts came in, you know.  Since

24  the last ten years I've started interviewing terrorists, which

25  I did not do before in 2004, 2008, my first two books.  Most of

SAGEMAN - REDIRECT / FAKHOURY

 1   the interviews really happened the last seven years.  So as I

 2   learned more, I changed my theories accordingly.

 3   **Q.**   Okay.  Now Mr. Hasib also asked you about the idea

 4   somebody who does not have a formal recruitment process can

 5   still turn to political violence.  Do you recall that question

 6   he asked you?

 7   **A.**   Yes.  And I think that's actually, unfortunately, the

 8   norm.  It's probably more frequent than the other one.

 9   **Q.**   Okay.  Now, based on your review of the evidence in this

10   case concerning Mr. Shafi, do you have an opinion about whether

11   Mr. Shafi was likely to engage in political violence?

12   **A.**   Yes, I do.

13   **Q.**   And what is that opinion?

14   **A.**   That he was not likely to engage in violence because he

15   did not think of himself as a soldier defending his community.

16   **Q.**   In your review of the evidence in this case, did you see

17   any indication that Mr. Shafi had gone through any sort of

18   recruitment process?

19   **A.**   No.

20   **Q.**   Now, Mr. Hasib asked you some questions about an

21   individual named Zawahiri and asked you some questions about

22   how high school friends could be connected to a -- to larger

23   political movement.  Do you have an opinion about whether

24   Mr. Shafi was connected to such a movement?

25   **A.**   No, he wasn't.

1   **Q.**   And why is that?

2   **A.**   He just talked with his two friends about the political

3   situation in Syria, about other things concerning Muslims.  But

4   he wasn't part of a larger community in which he was, for

5   instance, distributing videos to other people, being active in

6   the larger political protest community.  It was really confined

7   to his two friends and himself.

8   **Q.**   Mr. Hasib asked you some questions about a concept that

9   you've identified as martial social identity.  And you

10  testified that frequent target practice would be more

11  suspicious, right?

12  **A.**   Yes.

13  **Q.**   Would one visit to a target practice facility, or one time

14  going shooting with guns, would that be the frequent kind of

15  target practice you'd be concerned with?

16  **A.**   It depends where.  I mean, in Europe, it's very unusual.

17  So that -- I would be concerned.  But in the United States

18  where people have guns and go to target practice all the time,

19  I'm much less concerned about it.

20          **MR. FAKHOURY:**  Can I have one minute, Your Honor.

21          **THE COURT:**  You may.

22      (Pause.)

23          **MR. FAKHOURY:**  I have no further questions.  Thank

24  you.

25          **THE COURT:**  All right.  Mr. Hasib, anything further?

PROCEEDINGS

1           MR. HASIB:  Nothing further from the government, Your

2    Honor.

3           THE COURT:  All right.  Thank you, Dr. Sageman.  You

4    can step down.

5                        (Witness excused.)

6           THE COURT:  Mr. Fakhoury.

7           MR. FAKHOURY:  Your Honor, at this time we would ask

8    for the judicial notice that we had discussed earlier.  And we

9    have no further witnesses after that.

10          THE COURT:  All right.  And so the -- I will take

11   notice of the following dates of, first, the *Obergefell*

12   decision, which was the Supreme Court gay marriage decision,

13   was on June 26, 2015.  And the Ninth Circuit, which is the

14   Court of Appeals that the federal cases go up to, made its

15   decision in *Perry versus Schwarzenegger* on June 28, 2013.

16      And so no further facts need to be established with

17   respect to that and you can -- you'll consider that as you

18   will.

19          MR. FAKHOURY:  With that, Your Honor, we rest and we

20   would also renew our motion that we made at sidebar, as well.

21          THE COURT:  Okay.  Thank you.

22      Mr. Hasib?

23          MR. HASIB:  Your Honor, the government rests.  We have

24   no rebuttal witness.

25          THE COURT:  So ladies and gentlemen, that is the end

1    of the evidence.  And so the next thing that's going to happen

2    is that I'll give you instructions and we'll go into closing

3    arguments.  And we will do that in -- starting at 9:30.

4        So we'll take a half an hour break, then we'll move into

5    the instructions after that.  We'll be in recess.

6        (The jury exiting the courtroom.)

7        **THE COURT:**  All right.  So we'll be in recess.  I'll

8    come back at about 9:25.  We'll bring the juror.  And tell me

9    if there's anything wrong in the instructions at that point.

10        **MR. FAKHOURY:**  Thank you, Your Honor.

11        **MR. HASIB:**  Thank you, Your Honor.

12        **THE COURT:**  Thank you.

13                (Recess taken at 9:01 a.m.)

14            (Proceedings resumed at 9:28 a.m.)

15        (The following proceedings were heard at the sidebar:)

16        **THE COURT:**  Hi.  So I just wanted to check again with

17    you at the end of the evidence.  You heard the references to

18    Burma during the course of the trial.  Is there anything that

19    you've heard that makes you think that you couldn't be a fair

20    and impartial juror in this case?

21        **THE JUROR:**  No, I don't think so, Your Honor.  I was

22    mostly concerned something might come up which would elicit

23    strong emotional reaction on my part, and that wasn't the case.

24        **THE COURT:**  So I'm satisfied.  Good.  And so we'll

25    just proceed in just a couple minutes.  Thanks very much.

1    (The following proceedings were heard in open court:)

2         **THE COURT:**  All right.  Is everybody ready for the

3    jury?

4         **MR. FAKHOURY:**  Yes, Your Honor.

5         **MR. MATTHEWS:**  Yes.

6         **THE COURT:**  I think what I'll do between the opening

7    and -- the close of the government and the defense, I'll do a

8    five-minute break and then we'll just proceed.

9         **MR. MATTHEWS:**  That's fine, Your Honor.

10        **MR. FAKHOURY:**  Thank you.

11    (The following proceedings were heard in open court in the

12    presence of the jury:)

13                       **JURY INSTRUCTIONS**

14        **THE COURT:**  All right.  Please be seated, everybody.

15    Members of the jury, now that you've heard all the evidence

16    it's my duty to instruct you on the law that applies to this

17    case.  A copy of these instructions will be available to you in

18    the jury room for you to consult.

19        It's your duty to weigh and to evaluate all the evidence

20    received in the case and, in that process, to decide the facts.

21    It's also your duty apply the law as I give it to you to the

22    facts as you find them, whether you agree with the law or not.

23        You must decide the case solely on the evidence and the

24    law.  Do not allow personal likes or dislikes, sympathy,

25    prejudice, fear, or public opinion to influence you.  You

should also not be influenced by any person's race, color, religion, national ancestry, gender, sexual orientation, profession, occupation, economic circumstances or position in life or in the community.  You must avoid bias, conscious or unconscious.  You will recall that you took an oath promising to do so at the beginning of the case.

You must follow all these instructions and not single out some and ignore others.  They're all important.  Please do not read into these instructions, or into anything that I may have said or done, any suggestion as to what verdict you should return.  That's a matter entirely up to you.

The indictment is not evidence.  The defendant has pleaded not guilty to the charge.  The defendant is presumed to be innocent unless and until the government proves the defendant guilty beyond a reasonable doubt.  In addition, the defendant does not have to testify or present any evidence.  The defendant does not have to prove innocence.  The government has the burden of proving every element of the charge beyond a reasonable doubt.

A defendant in a criminal case has a constitutional right not to testify.  In arriving at your verdict the law prohibits you from considering in any manner that the defendant did not testify.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty.  It is not required

1    that the government prove guilt beyond all possible doubt.

2    A reasonable doubt is doubt based upon reason and common

3    sense and is not based merely on speculation.  It may arise

4    from a careful and impartial consideration of all the evidence

5    or from lack of evidence.

6    If after a careful and impartial consideration of all the

7    evidence you are not convinced beyond a reasonable doubt that

8    the defendant is guilty, it is your duty to find the defendant

9    not guilty.  On the other hand, if after a careful and

10   impartial consideration of all the evidence you are convinced

11   beyond a reasonable doubt that the defendant is guilty, it is

12   your duty to find the defendant guilty.  The evidence you are

13   to consider in deciding what the facts are consists of the

14   sworn testimony of any witness, the exhibits received in

15   evidence, and any facts to which the parties have agreed.

16   In reaching your verdict you may consider only the

17   testimony and exhibits received in evidence.  The following

18   things are not evidence.  And you may not consider them in

19   deciding what the facts are:

20   Questions, statements, objections and arguments by the

21   lawyers are not evidence.  The lawyers are not witnesses.

22   Although you must consider a lawyer's questions to understand

23   the answers of a witness, the lawyer's questions are not

24   evidence.  Similarly, what the lawyers have said in their

25   opening statements, will say in their closing arguments, and at

1   other times is intended to help you interpret the evidence but

2   it is not evidence.  If the facts as you remember them differ

3   from the way the lawyers state them, your memory of them

4   controls.

5        Number two, any testimony that I've excluded, stricken or

6   instructed you to disregard is not evidence.  In addition, some

7   evidence was received only for a limited purpose.  When I have

8   instructed you to consider certain evidence in a limited way,

9   you must do so.

10       And number three, anything you may have seen or heard when

11  the Court was not in session is not evidence.  You are to

12  decide the case solely on the evidence received at trial.

13       Evidence may be direct or circumstantial.  Direct evidence

14  is direct proof of a fact such as testimony by a witness about

15  what that witness personally saw or heard or did.

16  Circumstantial evidence is indirect evidence.  That is, it is

17  proof of one or more facts from which you can find another

18  fact.  You're to consider both direct and circumstantial

19  evidence.  Either can be used to prove any fact.  The law makes

20  no distinction between the weight to be given to either direct

21  or circumstantial evidence.  It's for you to decide how much

22  weight to give to any evidence.

23       In deciding the facts in this case you may have to decide

24  which testimony to believe and which testimony not to believe.

25  You may believe everything a witness says, or part of it, or

1    none of it.  In considering the testimony of any witness you

2    may take into account the opportunity and ability of the

3    witness to see or hear or know the things testified to.  The

4    witness's memory.  The witness's manner while testifying.  The

5    witness's interest in the outcome of the case, if any.  The

6    witness's bias or prejudice, if any.  Whether other evidence

7    contradicted the witness's testimony.  The reasonableness of

8    the witness's testimony in light of all the evidence.  And any

9    other factors that bear on believability.

10        Sometimes a witness may say something that is not

11   consistent with something else he or she said.  Sometimes

12   different witnesses will give different versions of what

13   happened.  People often forget things or make mistakes in what

14   they remember.  Also, two people may see the same event but

15   remember it differently.  You may consider these differences,

16   but do not decide the testimony is untrue just because it

17   differs from other testimony.

18        However, if you decide that a witness has deliberately

19   testified untruthfully about something important, you may

20   choose not to believe anything that witness said.  On the other

21   hand, if you think the witness testified untruthfully about

22   some things but told the truth about others, you may accept the

23   part you think is true and ignore the rest.

24        The weight of the evidence as to a fact does not

25   necessarily depend on the number of witnesses who testify.

What's important is how believable the witnesses were and how much weight you think their testimony deserves.

You are here only to determine whether the defendant is guilty or not guilty of the charge in the indictment.  The defendant is not on trial for any conduct or offense not charged in the indictment.

The indictment charges that the offense alleged was committed on or about a certain date.  Although it's necessary for the government to prove beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged in the indictment, it's not necessary for the government to prove that the offense was committed precisely on the date charged.

You have heard testimony that the defendant made a statement.  It's for you to decide whether the defendant made the statement and, if so, how much weight to give to it.  In making those decisions you should consider all the evidence about the statement, including the circumstances under which the defendant may have made it.

The parties have agreed to certain facts that have been stated to you.  Those facts are now conclusively established.

I have decided to accept as proved certain facts relating to the dates of court rulings on the legalization of gay marriage, even though no evidence was presented on this point, because those facts are of such common knowledge.  You may

1    accept these facts as true, but you are not required to do so.

2        You have heard recordings that have been received in

3    evidence.  Each of you was given a transcript of the recording

4    to help you identify speakers and as a guide to help you listen

5    to the recording.  However, bear in mind that the recording is

6    the evidence, not transcript.  If you heard something different

7    from what appears on the transcript, what you heard is

8    controlling.

9        You have heard recordings that contained words in the

10   Arabic language.  A summary of the English translation of the

11   Arabic words has been admitted into evidence.

12       Although some of you may know the Arabic language, it's

13   important that all jurors consider the same evidence.  The

14   translation is the evidence, not the foreign language spoken in

15   the recording.  Therefore, you must accept the English

16   translation contained in the exhibit and disregard any

17   different meaning of the non-English words.

18       You have heard evidence that was received for a limited

19   purpose.  I instruct you that this evidence is admitted only

20   for the limited purpose.  And, therefore, you must consider it

21   only for that limited purpose and not for any other purpose.

22       You have heard the testimony from Lorenzo Vidino and Marc

23   Sageman who testified to opinions and the reasons for their

24   opinions.  This opinion testimony is allowed because of the

25   education or the experience of these witnesses.  Such opinion

1    testimony should be judged like any other testimony.  You may

2    accept it or reject it and give it as much weight as you think

3    it deserves considering the witness's education and experience,

4    the reasons given for their opinions, and all of the other

5    evidence in this case.

6        You have heard evidence that the defendant committed other

7    acts not charged here.  You may consider this evidence only for

8    its bearing, if any, on the question of the defendant's intent,

9    motive, opportunity, preparation, plan, knowledge, absence of

10   mistake, absence of accident, and for no other purpose.

11       During the trial certain charts and summaries were shown

12   to you in order to help explain the evidence in the case.

13   These charts and summaries were not admitted into evidence and

14   will not go into the jury room with you.  They're not

15   themselves evidence or proof of any facts.  If they do not

16   correctly reflect the facts or figures shown by the evidence in

17   the case, you should disregard these charts and summaries and

18   determine the facts from the underlying evidence.

19       Certain charts and summaries have been admitted into

20   evidence.  Charts and summaries are only as good as the

21   underlying supporting material.  You should, therefore, give

22   them only such weight as you think the underlying material

23   deserves.

24       The defendant is charged in the indictment with attempting

25   to provide material support or resources to a foreign terrorist

1  organization.  In order for the defendant to be found guilty of

2  that charge, the government must prove each of the following

3  elements beyond a reasonable doubt:

4      First, beginning no later than June 2015 through on or

5  about June 30, 2015, the defendant intended to commit the crime

6  of providing material support or resources to a foreign

7  terrorist organization; namely the al-Nusrah Front.  And

8  second, the defendant did something that was a substantial step

9  toward committing the crime and that strongly corroborated the

10  defendant's intent to commit the crime.

11      Mere preparation is not a substantial step toward

12  committing the crime.  To constitute a substantial step, a

13  defendant's act or actions must demonstrate that the crime will

14  take place unless interrupted by independent circumstances.

15      You do not need to agree unanimously as to which

16  particular act or actions constituted a substantial step toward

17  the commission of a crime.

18      So that you understand that the crime that the defendant

19  is charged with attempting, I will now instruct you about the

20  crime of providing material support or resources to a foreign

21  terrorist organization.

22      The elements of that offense are:  First, the defendant

23  provided material support or resources.  Second, the defendant

24  provided this support or resources to the al-Nusrah Front.

25  Third, the defendant acted knowingly.  Fourth, the defendant

knew that the al-Nusrah Front was either a designated foreign
terrorist organization, or had engaged or was engaging in
terrorist activity, or had engaged or was engaging in
terrorism.  Fifth, at least one of the following is true:  The
defendant is a national of the United States or an alien
lawfully admitted for permanent residence in the United States,
or the offense occurred in whole or in part within the
United States, or the offense occurred in or affects interstate
or foreign commerce.

     With respect to the first element, the government must
prove beyond a reasonable doubt that in attempting to provide
material support or resources, the defendant intended to do so.
Here, the government has alleged that the material support or
resources was personnel; specifically, himself.  The term
"personnel" means one or more persons, which can include the
defendant's own person.  The defendant can be convicted for
attempting to provide material support or resources in the form
of personnel if you find that the defendant has knowingly
attempted to provide himself to work under the al-Nusrah
Front's direction or control.

     However, the defendant cannot be convicted if he attempted
to work entirely independently of the al-Nusrah Front to
advance its goals and objectives, or if he merely intended to
associate with the al-Nusrah Front or persons connected to the
al-Nusrah Front without placing himself under their direction,

1    coordination or control.

2        The second element you must find beyond a reasonable doubt

3    is that Mr. Shafi attempted to provide these resources to a

4    foreign terrorist organization; namely, the al-Nusrah Front.

5    The term "foreign terrorist organization" has a particular

6    meaning under this statute.  In order for an organization to

7    qualify as a foreign terrorist organization, the organization

8    must have been designated as such by the Secretary of State

9    through a process established by law.

10       I instruct you that the al-Nusrah Front has been

11   designated a foreign terrorist organization by the Secretary of

12   State and was so designated by the Secretary of State

13   throughout the period covered by the indictment.

14       You must also find that the defendant acted knowingly.  An

15   act is done knowingly if the defendant is aware of the act and

16   does not act through ignorance, mistake or accident.  The

17   government is not required to prove that the defendant knew

18   that his acts or omissions were unlawful.  You may consider

19   evidence of the defendant's words, acts or omissions along with

20   all the other evidence in deciding whether the defendant acted

21   knowingly.

22       You must also find beyond a reasonable doubt is that in

23   attempting to provide material support or resources to the

24   al-Nusrah Front, the defendant did so knowingly and

25   intentionally.  I've already defined the term "knowingly" for

1   you.  For this element to be satisfied, the government must

2   prove that the defendant knew one of the following three

3   things:

4        One, that the al-Nusrah Front had been designated by the

5   Secretary of State as a foreign terrorist organization.  Or,

6   two, that the al-Nusrah Front engaged in terrorist activity.

7   Or, three, that the al-Nusrah Front engaged in terrorism.

8        For these purposes, the term "terrorist activity" means

9   any of the following:

10       Hijacking or sabotage of an aircraft, vessel, vehicle,

11  train or other conveyance.  Or, seizing, detaining or

12  threatening to kill, injure, or further detain another person

13  to compel or coerce some third-party, including a government,

14  to do or abstain from doing some act.  Or, a violent attack

15  upon a representative, officer, employee, or agent of a

16  government or international organization or upon the liberty of

17  such a person.  Or, assassination.  Or, use of any biological

18  or chemical agent or nuclear weapon or device or explosive,

19  firearm, or other weapon or dangerous devices, other than for

20  mere personal monetary gain, with intent to endanger directly

21  or indirectly the safety of one or more individuals, or to

22  cause substantial damage to property.  Or, a threat, attempt or

23  conspiracy to do any of the foregoing.

24       A person or organization is engaged in terrorist activity

25  where it commits, prepares or plans terrorist activity.  Or,

1  incites someone to commit terrorist activity under

2  circumstances indicating an intention to cause death or serious

3  bodily injury.  Or, gathers information on potential targets

4  for terrorist activity.  Or, solicits funds or other things of

5  value for terrorist activity or for a foreign terrorist

6  organization.  Or, solicits any individual to commit terrorist

7  activity or join a foreign terrorist organization.  Or, commits

8  an act the person knows or reasonably should know affords

9  material support, including a safe house, transportation,

10  communications, funds, false documentation, weapons,

11  explosives, training, or other support, for the commission of

12  terrorist activity or to someone who has committed or plans to

13  commit terrorist activity, or to a foreign terrorist

14  organization.

15      For these purposes the term "terrorism" means

16  premeditated, politically-motivated violence perpetrated

17  against non-combatant targets by sub-national groups or

18  clandestine agents.

19      I turn your attention now to the First Amendment to the

20  United States Constitution which establishes certain rights

21  which accrue to the defendant.

22      The First Amendment provides, in part, that Congress shall

23  make no law respecting an establishment of religion, or

24  prohibiting the free exercise thereof, or abridging the freedom

25  of speech, or of the press, or of the right of the people to be

1    peaceably assembled.  The right of freedom of speech and to

2    engage in peaceful assembly extends to one's religion and one's

3    politics.  These rights do not include providing or attempting

4    to provide material support to an organization which is engaged

5    in terrorism or terrorist activity.

6         Ladies and gentlemen, those are the instructions that I'm

7    going to give you before the argument of the lawyers.  The one

8    thing I want to show you is the verdict form that you will

9    ultimately be asked to render.  And I'll also tell you that

10   during the closing statements what happens is the government

11   will go first, then the defense will go, and then the

12   government gets to conclude.  And after that, I'll have a few

13   more instructions for you and then you may go deliberate.

14        So here's the verdict form that you'll be asked to render.

15   We, the jury, in the above-entitled case, unanimously find the

16   defendant, Adam Shafi -- and then you will either check the box

17   of "not guilty" or "guilty" of the charged offense, attempting

18   to provide material support or resources, specifically

19   personnel, to a designated foreign terrorist organization, the

20   al-Nusrah Front, in violation of Title 18, United States Code,

21   Section 2339B(a)(1).  Then the foreperson whom you will choose

22   will sign it and date it and it will be returned.  And I'll

23   tell you a little bit more about that at the end of the

24   instructions.

25        So with that, Mr. Hasib.

| | |
|---|---|
| 1 | <u>**CLOSING ARGUMENT**</u> |
| 2 | **MR. HASIB:**  Members of the jury, whose words are |
| 3 | these?  Whose words are these:  We are going to go even if we |
| 4 | die on the way.  I'm going to go there, man.  I have to be with |
| 5 | that guy, man. |
| 6 | (Audio was played but not reported.) |
| 7 | **MR. HASIB:**  Whose words are they?  Whose words are |
| 8 | these:  And I honestly -- I don't know what's going to happen |
| 9 | in the future, but I'm -- I'm completely content with dying |
| 10 | with those guys.  Whoever kills us, I don't care.  I'm |
| 11 | completely content with that. |
| 12 | Whose words are those? |
| 13 | (Audio was played but not reported.) |
| 14 | **MR. HASIB:**  Whose words are they?  They're not my |
| 15 | words.  They're not the words of the FBI.  They're not the |
| 16 | words of Abdul Qadar Niazi.  They're not the words of Saleem |
| 17 | Karim.  Those are the words of the defendant, Adam Shafi. |
| 18 | Those, members of the jury, are the words of a man who had |
| 19 | found his purpose.  He had found his calling in life.  He had |
| 20 | found his destiny.  Those are the words of a man who is ready |
| 21 | to join the al-Nusrah Front, ready to support the al-Nusrah |
| 22 | Front, ready to fly to Turkey and then cross into Syria to work |
| 23 | with the al-Nusrah Front, ready to live with the al-Nusrah |
| 24 | Front; and as you have now heard, ready to die with the |
| 25 | al-Nusrah Front. |

1    Those are the words of the defendant, Adam Shafi.

2        Now, you've heard, what?  Six days worth of testimony,

3   right?  And you just had a lot of law read to you.  You've

4   taken in a lot.  You've listened.  You've seen exhibits.

5   There's a lot that's happened in the last six days.  But

6   really, this whole case, it can be boiled down to one very

7   simple question:  Why was Adam Shafi getting on that plane?

8   June 30, 2015, Turkish Airlines flight, ready to leave for

9   Istanbul.  They're paging.  They're calling his name:  Adam

10  Shafi, please come to the gate agent.

11       It all comes down to one simple question.  Why was he

12  getting on that plane?  That's it.

13       If you think that he was getting on that plane to go and

14  lead a pious Muslim life in another country, and that's it,

15  then go into that jury room and acquit.  Find him not guilty.

16  If you think that he was getting on that plane because he was

17  horrified by the evils of gay marriage and he wanted to move to

18  a country where that was not possible, if you think that's why

19  he was getting on that plane and that's it, then he's not

20  guilty.  Go in there and vote not guilty.

21       Those things may well have been true.  He may have been

22  getting on a plane to go move to another country, to escape an

23  overbearing father, to escape gay marriage, to go lead a pious

24  Muslim life.  All of those things may well be true.  But they

25  do not erase the incontrovertible fact of what he said on those

1   calls.  And that is how you know -- how you know -- that above

2   all else the reason Adam Shafi was getting on that plane was to

3   go to Syria and join the al-Nusrah Front.  To join them, to

4   support them, to work with them, to live with them, and to die

5   with them.  That is why he was getting on that plane.  That is

6   what the law very specifically says you cannot do.  And that is

7   what you must find him guilty of.

8       I just mentioned the law.  Let's talk a little bit about

9   the law.  You heard a lot from His Honor just now.  And just so

10  we're crystal clear, anything that I say about the law -- or

11  for that matter anything the defense attorneys say about the

12  law -- doesn't matter.  The law in this case comes from one

13  place and one place only (indicating), from Judge Orrick.  So

14  what he said, that's what counts.  Anything that I say that

15  would differ from that -- hopefully nothing differs -- but

16  anything you hear that's different you go with what he says.

17      Now, with that in mind, we walked through the nature of

18  the charge here a little bit.  Let's walk through it one more

19  time.  The defendant here is charged with attempting to provide

20  material support and resources, in other words personnel, in

21  other words himself, to a foreign terrorist organization,

22  specifically the al-Nusrah Front.  Attempting to provide

23  himself to the al-Nusrah Front.  That's what the charge here

24  is.

25      Now, we saw a moment ago when Judge Orrick was reading you

1    the instructions he talked about attempt.  Now attempt is a

2    word -- as you can well imagine it's got some very important

3    legal significance.  And you heard about what those elements or

4    building blocks of an attempt charge are.  You saw there were

5    two of them.

6        Go back to your instructions.  You'll see there are two

7    elements that the government has to prove beyond a reasonable

8    doubt in order to show that someone is guilty of an attempt.

9    For this case in particular, we'd have to show that in the time

10   frame that Judge Orrick read -- in June of 2015 -- the

11   defendant intended to commit the crime of providing material

12   support or resources, i.e., personnel, i.e., himself, to the

13   al-Nusrah Front.  That's element number one.

14       Element number 2 is that he did something that was a

15   substantial step.  We'll talk in a moment about what a

16   substantial step is.  But those are the two elements of

17   attempt.

18       Now, Judge Orrick walked you through that first term that

19   is in bold face there, providing material support or resources,

20   personnel, himself.  You saw that there were five sort of sub

21   elements of that offense.  Let's walk through those again,

22   because providing material support and resources it's not

23   something that maybe is intuitive unless you happen to be a

24   lawyer or keenly attuned to the world of terrorism.  It's not

25   something that's maybe natural to you.

1          If this was a case of attempted bank robbery, everybody

2     knows what a bank robbery is.  Person walks into a bank, sticks

3     the gun out, says, Give me the money, gets the money, and walks

4     out.  That's the bank robbery.  Providing material support and

5     resources, that's a little more nuanced, so let's walk it one

6     more time.

7          As Judge Orrick read to you, there are five sort of sub

8     elements of material support or resources.  Number one, the

9     defendant provided material support or resources, or personnel.

10    Provided that support to a foreign terrorist organization;

11    here, the al-Nusrah Front.  Number three, the defendant acted

12    knowingly.  Number four, the defendant knew that the al-Nusrah

13    Front was a designated foreign terrorist organization or

14    engaged in terrorist activity.  And number five, at least one

15    of the following is true, and Judge Orrick read you a list of

16    three possible ways to satisfy that fifth element.  He said if

17    the defendant is a U.S. citizen; or if the offense occurred in

18    whole or in part in the United States; and I actually removed

19    the third one.  It said if the acts was involved in interstate

20    or foreign commerce.  You'll see in a moment why I removed that

21    third one.

22         But that in a nutshell is the offense of providing

23    material support.  That is what it is alleged that the

24    defendant attempted to do.  Did he intend to provide material

25    support or resources in the form of himself?  And did he intend

 1   to provide that to the al-Nusrah Front?  That's what you're
 2   looking for.
 3        Now, the second element of attempt -- remember, there's
 4   two elements of an attempt.  The first part is did he intend to
 5   commit this crime providing material support?  And the second
 6   part is, did he take a substantial step?  Did he do something?
 7   And it means more than just doing something.  It means was he
 8   going all the way?  Was he going to do it but for being
 9   interrupted?
10        Substantial step is not just sitting in your room and
11   thinking, Maybe I'll join al-Nusrah Front.  That's not enough.
12   Substantial step is not doing research on the al-Nusrah Front
13   on the internet.  Nowhere near enough.  Was he going to go all
14   the way but for some intervening circumstance?  Was he stopped?
15   Would he have gotten there if he hadn't been stopped?  That's
16   what we're looking for for substantial step.  So it's
17   substantial.
18        All right.  That's the law in a nutshell.  And like I
19   said, don't take my word for it, don't take their word for it
20   (indicating), take his word for it (indicating.)  Whatever he
21   says, that's the law.
22        So let's shift gears a little bit.  Talked about the law,
23   let's now turn to the facts.  The evidence.  The testimony.
24   All the stuff that you heard over the last six days, all the
25   witnesses.  All the documents you looked at.  All the

1    recordings you heard.

2         And let me give you, before we dive deep into it, let me

3    give you a couple of -- well, sort of some housekeeping bits of

4    advice.  Number one, you saw the judge was talking about charts

5    and summaries, some of which have been entered into evidence

6    and some of which have not.  Let me tell you right now one of

7    the charts and summaries that you will not have -- you will not

8    have when you go back to that jury room -- is the one that I

9    know you were all flipping through when Special Agent Reinke

10   testified.  His timeline.  You will not have that with you when

11   you go back into the jury room.  So this is your opportunity if

12   you want to take notes, jot down exhibit numbers, dates.  This

13   is your opportunity to do that because you will not have his

14   timeline back there.

15        You also -- at the beginning of this case I told you

16   you're going to hear a lot of evidence but it really comes down

17   to the calls.  Comes down to the audio that you heard.  You

18   heard, in particular, 15 calls.  And here's a quick chart

19   summarizing those 15 calls, the witness through which you heard

20   those calls, and a quick summary of what those calls were

21   about.

22        Government Exhibit No. 1.  That was the first call that

23   you heard.  The Arabic linguist, Linda Butros, testified about

24   a call where Abul Qadar Niazi calls Adam Shafi and they talk

25   about the (*Arabic*) of (*Arabic*).  And they go back and forth a

1    little bit about how to spell (*Arabic*) in Arabic and English.

2    That was Government Exhibit No. 1.  That was a call on

3    January 2, 2015.

4         You also heard Government Exhibit 2, which was a call on

5    February 14, 2015.  That was another call between the defendant

6    and Abul Qadar Niazi.  And that was another call that you

7    heard -- I think it was the first day you were here through

8    Arabic linguist, Linda Butros.  That was a call where the

9    defendant and Abul Qadar Niazi talk about meeting up in Egypt

10   and then laugh about:  Just like we did last summer.  And they

11   talk about a Bosnian man who's imprisoned by the FBI.

12        The third call you heard was March 10, 2015.  That call

13   you heard from Special Agent Matt Sung.  That was a call where

14   the defendant and Abdul Qadar Niazi talked about a shooting

15   range.

16        Calls number four and five were the first two calls you

17   heard through Special Agent Chris Reinke.  Those were in June

18   of 2015.  In those calls you heard references to Mexico and

19   going to airports in Mexico City.

20        Then there's Government Exhibit 6.  Government Exhibit 6,

21   June 5, 2015, at 2:41 a.m.  That's the call.  That's the one

22   that you heard about an hour's worth of it almost nonstop.

23   That's the one.  That's the one where you hear the defendant

24   talking about Mohammad al-Joulani, talking about al-Nusra

25   Front, talking about how much he's in love with that guy.

1    That's the call.  Exhibit No. 6.

2        Government Exhibit No. 7 was a call between defendant and

3    Saleem Karim on June 8.  You heard from both the Arabic

4    linguist, Linda Butros, and Chris Reinke about a dream that the

5    defendant had in which he got married, left his wife in *Halab*,

6    or Aleppo.  You heard on cross-examination Special Agent Reinke

7    played some calls about Death Valley and Yosemite and going

8    camping and things of that nature.

9        Exhibit No. 8, a call to Saleem Karim, it's a short call,

10   June 15, 2015.  The defendant says he needs to spill a couple

11   gallons of blood for *Allah*.

12       Exhibit No. 9, June 17, you heard this call through the

13   Arabic linguist, Ms. Linda Butros.  That's the call where the

14   defendant and his friend, Saleem Karim, talk about they're

15   jealous about a man who died in Syria.

16       Government Exhibit No. 10 is the Burma call.  You'll hear

17   about that in a moment.  It's June 23.  Another call on

18   June 23, Government Exhibit 11, the defendant asks his friend,

19   Saleem Karim, how long are they going to have to delay?  You

20   heard that through Special Agent Chris Reinke.

21       Government Exhibit 12, June 26, 2015.  This is a three-way

22   call.  You heard the defendant talking to his buddy, Saleem

23   Karim, and you heard Abdul Qadar Niazi in the background.  And

24   the defendant was unsure about when they're all going to have

25   enough.

1          The last three calls you heard through Special Agent Matt

2     Sung.  Those are the calls that you heard occurred after the

3     incident at the airport, June 30, 2015, and one call on June 1,

4     2015.  Those are the two calls on the BART train.  First the

5     defendant calls his brother, talks about being stopped at the

6     airport.  Then he calls his buddy, Abdul Qadar Niazi.  Again

7     talks about being stopped at the airport.  And finally, there's

8     a long call on July 1, 2015, where he talks to Saleem Karim

9     about what happened the previous day.

10         So those are your 15 calls that you've heard evidence

11    about.

12         So those are my two housekeeping issues.  Number one,

13    you're not going to get the timeline.  And number two, those

14    are your 15 calls you heard and are in evidence.

15         So let's dive into some of the facts and how the facts in

16    this case fit the law that you just heard.

17         And Special Agent Reinke, if you could put up the two

18    enlarged charts there of the attempt and material support

19    statutes.

20         So you'll notice that of these elements that are building

21    blocks of the law that you need to look at -- there are quite a

22    few -- there's really not much argument about at all.  For

23    example, look at the bottom of that second charge, material

24    support or resources.  The fifth element the government has to

25    show that at least one of the following is true:  The defendant

1    is a U.S. citizen or the offense occurred in whole or in part

2    in the United States.

3         Well, when you go back to the jury room you will have this

4    (indicating), Government Exhibit 120.  Take a look through it.

5    See whose name is on it.  See whose photograph is on it.  Take

6    a look at some of the passport stamps.  You'll have this

7    (indicating.)

8         There's really no dispute about the fact that this offense

9    occurred in whole or in part in the United States.  Almost all

10   the testimony that you heard about June 30 was -- all of the

11   testimony you heard about June 30 happened right here in the

12   bay area, right?  San Francisco, Fremont, SFO.  So that fifth

13   element.  There's not much dispute about that.

14        How about the fourth element?  Defendant knew that

15   al-Nusrah Front was a designated foreign terrorist organization

16   or engaged in terrorist activity.

17        Well, recall when Special Agent Reinke was on the stand

18   the parties read into evidence a stipulation.  Actually, I

19   think the judge read into evidence the stipulation.  And the

20   stipulation was essentially that the parties agree that the

21   al-Nusrah Front is a designated foreign terrorist organization.

22   They are listed.  They are a bad group.  You cannot join them.

23   That's what that stipulation was about.

24        As for the defendant knowing that the al-Nusrah Front was

25   a designated foreign terrorist organization.  Well, recall you

1   had Dr. Vidino on the stand yesterday.  Dr. Vidino talked about

2   this lengthy interview on Al Jazeera where the interviewer --

3   it's kind of like -- he said it was like putting it on CNN or

4   Frontline or something like that.  The interview with Mohammad

5   al-Joulani and how it looked all official and stuff.  Flag, and

6   sort of legitimized Mohammad al-Joulani and al-Nusrah Front.

7        And in the course of that discussion, you heard Dr. Vidino

8   tell you that one of things they talked about frequently in

9   that interview was they asked al-Joulani:  What do you think

10  about the fact that the U.S. has designated you as a foreign

11  terrorist organization?

12       And that came up repeatedly in their interview.  And you

13  know from having listened to that call on June 5 how intently

14  the defendant watched that interview because he recites it in

15  great detail to his buddy, Saleem Karim.  You watched that

16  interview closely.  You know it.  So remember what Dr. Vidino

17  told you about that interview on Al Jazeera.  They talk about

18  al-Nusrah Front being a designated foreign terrorist

19  organization.

20       Recall also that in that late night phone with Saleem

21  Karim the defendant talks about how al-Joulani couldn't show

22  his face on TV.  And how the interviewer asked him, How come I

23  can't see your face?  How come we've disguised you?  There was

24  a discussion there about, well, Joulani can't let anyone know

25  what he looks like because the CIA might blow him up.

1    What is that?  Knowledge that someone is a designated

2  foreign terrorist organization, or knowledge that someone is

3  part of a designated foreign terrorist organization.  Why else

4  is the CIA trying to blow him up?

5    So that's -- the first three elements there -- I'm

6  sorry -- the last three elements there of the material support

7  statute, there's kind of not much disagreement about.

8    Defendant acted knowingly.  Did you hear any evidence that

9  he was planning on heading to Cancun and mistakenly bought a

10  ticket to Istanbul?  This is not a case about mistake or

11  accident.  He knew where he was going.  I don't think you'll

12  hear any evidence that this was some mistake, he didn't really

13  mean to go to Turkey after all and cross into Syria.

14    So the first three elements there there's not going to be

15  much disagreement about.  What it comes down to is those first

16  two elements of material support combined with the attempt.

17  Did the defendant attempt to provide material support,

18  personnel, and did he attempt to provide it to the al-Nusrah

19  Front?

20    And remember what Judge Orrick told you about the meaning

21  of the word "personnel."  It means a person.  It means a body.

22  But it also means a body provided with a very specific purpose.

23  A person who is going to be under the direction or control of

24  that terrorist organization.  Mere association is not enough.

25  Go back to that instruction.  Mere association is not enough.

1   And acting independently of the foreign terrorist organization

2   is also not enough.  Those are legal activities.  Going and

3   hanging out with people from al-Nusrah Front might be

4   distasteful to you, but that's totally legal.

5        Researchers, Dr. Vidino, Dr. Sageman, they go and talk to

6   terrorists all the time, right?  They both testified about

7   that.  That's association with a terrorist, but that's not

8   illegal.  Mere association not enough.

9        Independently working to achieve an organization's goals,

10  not enough.  You have to intend to place yourself under the

11  direction or control of the organization.  That is what you

12  need.  Personnel being provided under the direction or control

13  of the organization.

14       That's a lot of legalese.  But those two elements,

15  everything I just said, it can be, again, really boiled down to

16  one simple question that you can ask yourselves when you go

17  back in there.  Why was he getting on that plane?  That's what

18  this is about.  If he was getting on that plane to put himself

19  under the direction and control of the al-Nusrah Front, that's

20  material support.

21       Let's walk through the evidence.  Let's dive in a little

22  deeper about how you know what the defendant's purpose was when

23  he was getting on that plane?  How do you get inside his head?

24  Obviously, you're not mind readers.  How do you get inside

25  someone's head and figure out what they're intending to do?

1        Well, you can listen to what they say on the phone.

2   That's a good place to start.  You already heard a couple of

3   clips from that June 5 phone call, that late night phone call

4   with Saleem Karim, about how defendant was completely content

5   dying with al-Nusrah.

6        Let's hear the first couple of minutes of that call just

7   to refresh your recollections how it all starts, how they get

8   into this conversation.

9               (Audio was played but not reported.)

10       **MR. HASIB:**  That's Government Exhibit 6 at the

11   beginning to about three minutes in.  I love that guy so much.

12   That's the first time you heard the voice of Adam Shafi saying

13   that, and you would hear that no fewer than nine additional

14   times over the course of that call how much he loves Mohammad

15   al-Joulani.

16       I'm not going to play further clips from this call.  You

17   can, of course, request to hear additional parts of it when

18   you're back in the jury room.  But you all heard it the first

19   time.  You remember it.  You remember hearing how much he's in

20   love with Mohammad al-Joulani, how enamored he was with the

21   al-Nusrah Front, how they had found the right way to fight in

22   Syria.  ISIS, those guys, they're street thugs; but al-Nusrah,

23   they're kind of like the thinking man's terrorist group.  They

24   don't go out and fight people just because.  They fight when

25   they are called to fight.  Random acts of violence, that's not

1   their thing.

2   Do you remember, now that you've refreshed your memories

3   about this call, remember Dr. Vidino's testimony about the

4   al-Nusrah Front, where it comes from?  It's an offshoot of

5   al-Qaeda.  It's an offshoot -- it's -- they all come out of the

6   same pot.  All of these groups.  But al-Nusrah, that's the sort

7   of refined one.  They're seeking legitimacy.  That's why we're

8   putting their leader up on Al Jazeera television so they can

9   get that sort of facade of officialness.  Really what they're

10  doing is they're fighting just like everyone else.  But it's

11  that officialness, it's that refined nature.  Listen to that

12  call.  That's what draws Adam Shafi to al-Nusrah.

13  He and Saleem Karim, they're both horrified by ISIS.  And

14  rightly so.  But al-Nusrah, those guys are different.  Those

15  guys are better.

16  You also heard in this call, this June 5 call, one of the

17  reasons why Adam Shafi became so intent joining al-Nusrah in

18  2015 is because of his previous trip in 2014.  Recall you heard

19  a whole lot of evidence about the 2014 trip, the failed

20  attempt.  Adam Shafi and Abdul Qadar Niazi and Saleem Karim,

21  they all plan flights, they plan to land in Istanbul on the

22  same day in 2014.  August of 2014.

23  Shafi flies from Cairo.  Has Karim buy his ticket for him.

24  Flies on Royal Jordanian.  Abdul Qadar Niazi buys a ticket on

25  American.  Ends up flying through Amsterdam, but makes it to

1    Istanbul.  Saleem Karim books himself a ticket, too, on United.

2    And you'll have all the flight records back there with you.

3    They're all in evidence.  Saleem Karim buys himself a ticket,

4    but bails out at the last minute.

5         So it's the two of them, Abdul Qadar Niazi and Adam Shafi,

6    in Istanbul in 2014.  And you hear in this call, this call a

7    few months later, June 2015, you hear some of what happened

8    there in Istanbul.

9                   (Audio was played but not reported.)

10        **MR. HASIB:**  Yeah, yeah, that's probably what it was.

11   But *subhan Allah* -- and you'll have that translation chart back

12   there with you -- means praise God.  Was that guy who was going

13   to take us to *Jabhat al-Nusrah*.  Yeah, Karim replies.  And

14   then:  You didn't want to go.  Shafi says:  Yeah.

15        That's why you heard all that evidence about the 2014

16   trip, members of the jury.  Adam Shafi's not charged with doing

17   anything in 2014.  But does it illustrate what he was trying to

18   do in 2015?  Absolutely.  Absolutely.  He missed the boat the

19   first time, he wasn't going to miss it again.

20        That call, members of the jury -- that June 5 late night

21   call between Adam Shafi and Saleem Karim -- that alone tells

22   you why Adam Shafi was getting on that airplane.  That alone

23   gives you the window into his mind.  The determination, the

24   conviction.

25        But there's more.  There's lots more.

1    You've got the statements that Adam Shafi made to law

2    enforcement at the airport.  June 13 -- June 30, 2015, at the

3    airport you heard from two witnesses, Special Agent Glen

4    Bartolomei, he was -- he had some big framed glasses -- and

5    Special Agent Mark Mauro testified right after him.  That was,

6    I think, the first or second day you were here.  And they told

7    you about the scene at the gate.  Gate G97.  They told you

8    about Adam Shafi's name being called over the intercom.  They

9    told you about going up to Adam Shafi while he was in line

10   getting ready to get on that flight.  They asked him, Would you

11   step aside, please?  And he did.  And they took him to the

12   interview room.  And they talked with him a little bit about

13   what's he doing?  Where's he going?  Why's he going there?

14   And at one point you heard -- another agent who showed up,

15   Special Agent Chris Monika.  At one point you heard the agents

16   straight up asked him:  Are you going to Turkey to cross into

17   Syria and join *Jabhat al-Nusrah*, or ISIS, or some other foreign

18   terrorist organization?  And what did Adam Shafi say?  He said,

19   No.  Well, that was a lie.  That was a lie.

20   How do you know that?  Well, for starters, it wasn't the

21   first time that Adam Shafi had lied to law enforcement about

22   his travels.  Go back to 2014.  You had those Customs and

23   Border Patrol officers stopping Adam Shafi and Abdul Qadar

24   Niazi at the airport and talking to them.  Why did you go to

25   Turkey?  What are you doing there?  And Adam Shafi on that

1    first occasion when he's talking to Officer Mon says -- he says

2    he went to Turkey, visited mosques, he was concerned about the

3    refugees, and he said he lost his phone.  He lost his phone in

4    Cairo.  That's what he tells Officer Mon.

5        That wasn't true back in 2014.  How do you know?  Because

6    Special Agent Reinke testified that he's looked at Adam Shafi's

7    phone, and he's seen pictures from 2014 from the Blue Mosque

8    and the Hagia Sophia.  So Adam Shafi lied to Officer Mon in

9    2014.  And then when the agents asked him in 2015, Why are you

10   going to Turkey?  Are you going to cross into Syria?  He lied

11   again.  He said, No.

12       How else do you know that Shafi was lying?  Well, he told

13   the agents that he was concerned about the direction of

14   politics in the country, and he specifically mentioned the

15   recent -- well, then recent Supreme Court ruling legalizing gay

16   marriage.  And that's why he wanted to leave.

17       Well, if that's why he was leaving the country, how come

18   he's not googling about gay marriage?  How come he's not

19   googling the decision?  How come he's not googling which

20   countries is gay marriage legal?  Which countries is gay

21   marriage prohibited?

22       For that matter, he tells the agents he wanted to go and

23   live in a country with like-minded people.  Like-minded

24   Muslims.  Why go to Turkey?  You've heard no evidence he speaks

25   Turkish.  Why go to Turkey, of all places?  How about Saudi

1   Arabia?  They speak Arabic in Saudi Arabia.  You heard the

2   defense investigator went and met Adam Shafi's family in Cairo.

3   He's got family in Saudi Arabia, he's got family in Mecca, the

4   holiest of holy cities in Islam.  He's got family there.  Why

5   not get on a plane and go to Saudi if you're that intent on

6   going to lead a pious Muslim life.  There's no place that's

7   more conservative Muslim than Saudi Arabia.

8        No, he lied.  Those weren't the reasons he was going to

9   Turkey.  Not to escape gay marriage, not to lead a pious Muslim

10  life.  He lied.  He lied to hide his intent.  His intent was to

11  go to Turkey, to cross into Syria, to join the al-Nusrah Front.

12       What's the best evidence?  Well, it comes from the calls.

13  It all comes down to the calls.  Adam Shafi on the way home

14  he's intercepted at the airport by Special Agent Glen

15  Bartolomei.  They interview him, his flight takes off.  They

16  walk him to the BART station, they put him on the BART train,

17  and he starts making calls.

18       His first call is to his brother.

19            (Audio was played but not reported.)

20       **MR. HASIB:**  I can't go anywhere else.  I can't fight

21  or nothing.  Are those the words of someone fleeing gay

22  marriage?  Are those the words of someone wanting to lead a

23  pious Muslim life?  No.  Those are the words of someone who

24  wanted to go and join the fight.  I can't fight or nothing.

25  Those are the words of a man who was going to join the

1   al-Nusrah Front.  To go join the fight.

2        And he says something interesting here.  He says, I'd

3   rather just be in jail, bro.  Which brings us to a man you

4   heard a little bit about, and it came in through a bunch of

5   different witnesses so it may not have made much sense to you

6   at the time.  It brings us to a man named Armin Harcevic.

7        You heard a little bit about Armin Harcevic.  You heard,

8   for example, when Ms. Butros, the Arabic linguist, was

9   testifying.  We played some calls through her.  One of the

10  calls you heard was Government Exhibit 2 dated February 15,

11  2015.  You heard a clip, it was about three-minute clip from

12  five minutes, 49 seconds, to about 8 minutes, 49 seconds.

13       And you heard Adam Shafi talking about how there was a

14  Bosnian brother.  Bosnian brother had been collecting clothes

15  and doing charity and had been picked up by the FBI and had

16  been put in jail for sending clothes and that charity to

17  *Dawlah*, is the phrase they use on the call.  *Dawlah*, you heard,

18  is a shorthand way of referring to the Islamic state.  And you

19  heard in that call Adam Shafi was seething at the FBI.  He was

20  upset.  How could this Bosnian brother who was doing so much

21  good, how could the FBI just pick him up and put him in jail?

22       You then heard there was a Santa Clara deputy sheriff, I

23  think he was, who came and testified that, in fact, about a

24  month after this call, Government Exhibit 2, on March 15, 2015,

25  someone at the Santa Clara County Jail named Armin Harcevic

1    received a visitor.  You heard that the visitor was Adam Shafi.

2    And then there's this a few days before Adam Shafi's flight to

3    Turkey.

4         Ms. Lamparelli, if you could hit the next slide.

5         You'll have this in evidence after you go back.  These are

6    the text messages Special Agent Reinke testified about and that

7    you then you saw briefly -- yesterday morning, it was.

8    Government Exhibit 144-010.

9         And you heard Special Agent Reinke testify that these were

10   text messages pulled from the phone of Adam Shafi and where it

11   said "sent," that indicated that the person using that phone

12   had sent a message.  And where it said "inbox," that was the

13   reply.

14        If you read through those text messages on June 20, 2015,

15   ten days -- ten days -- before he heads to the airport, tries

16   to fly to Turkey, Adam Shafi sends a message:  Dude, Armin is

17   still in jail.  What the hell are we doing?  The reply comes

18   back:  What can we do?  A couple of lines later Mr. Shafi says:

19   IDK, but this isn't right.  How can I enjoy anything while he's

20   locked up in a cage?  The reader replies:  I don't enjoy

21   anything.  And Shafi says:  Me, too.  And it continues.

22        Shafi says:  Dude he's in a freaking cage.  We have to do

23   something.  Honestly, sometimes feel like if there's really

24   nothing I can do, I'd just rather be with him in the cage.  At

25   least he won't be alone.

1    The recipient says:  You think they would put you in the
2    same cage, LOL?  The reply:  Even if it's not the same cage, at
3    least I'll be going through what he's going through instead of
4    just eating my fancy meals and sleeping in my fancy house while
5    he's in a cage.  If there's nothing I can do, then that's what
6    I should do IA.  That would make me feel better, dying like
7    that, instead of like this.
8        The recipient of those text messages, out of nowhere, kind
9    of randomly blurts out:  Burma.  The reply:  That works, too.
10   Burma.
11       This series of text messages, this may well have been the
12   last straw.  This may have been what tipped Adam Shafi over the
13   edge to go and finally commit and make that flight, make that
14   purchase to buy that ticket.
15       But the reference to Burma brings us to something else.
16   You see, person on the other end of these text messages is kind
17   of trying to change the subject.  Let's talk about something
18   else.  How about Burma?
19       Special Agent Reinke told you that based on his
20   investigation and his work with Arabic linguists, these text
21   messages were with Saleem Karim.  There's a phone call where
22   Saleem Karim and Adam Shafi talk about Burma.  So clearly, it
23   had been a topic of discussion and Mr. Shafi had given it some
24   thought.  And in this phone call that you're about to hear
25   Mr. Shafi tells his friend, Karim:  Burma's not going to work.

1   They'd have to learn Burmese.  They'd have to learn Burmese.

2   And Karim replies:  I'm sure we'll find some people who know

3   English in Burma.  But that's not enough for Adam Shafi.  We

4   would have to learn Burmese.  And then there's this:

5                    (Audio was played but not reported.)

6        **MR. HASIB:**  I really wanted to kill some, like,

7   fricking people that were, ah, like, supporting America or --

8   or American soldiers or something.

9        Are those the words of a man who's upset about gay

10   marriage?  Are those the words of someone just looking to lead

11   a peaceful Islamic life?  No.  Those are not words of peace.

12   Those are words of death and fighting and killing.

13        There's more.  There's more evidence demonstrating to you

14   why Adam Shafi was getting on that plane.  You have, for

15   example, the searches in his Google history.  You have his

16   YouTube history back there.  Go through it.  There's a lot

17   there.  A lot of it is innocuous.  A lot of it is stuff that

18   you would expect a young man to be searching for on the

19   internet.  Directions to the local gym, classes on coding, what

20   time prayers are that day.

21        But a lot of it is not so innocuous.  You heard about his

22   searches of places like Gaziantep in Turkey.  And Urfa and Ar

23   Raqqah in Syria.

24        And you saw this map over and over again where some of

25   those places are highlighted from his Google search history,

1  from his YouTube search history, and from places that he

2  traveled.  Sharm al-Sheikh, Cairo.

3      But take a look at that Turkish-Syrian border there right

4  in the second third of the page towards the right.  Look at all

5  those places.  That's what he's looking for.  That's where he

6  wants to go.  Why else is he looking for Karkamis Sinir Kapisi,

7  Turkey?  You heard Special Agent Reinke testify it's a border

8  town on the Turkish-Syrian border.  You heard how he looked

9  up -- another Google search that Mr. Shafi had in his search

10  history for a bank that was located just a couple hundred yards

11  from the border.  Why else is Mr. Shafi doing those searches if

12  his intent was not to cross into Syria and join a terrorist

13  organization?  Why else is he looking for all these border

14  crossings?

15      You also have the visit to the gun range.  You saw the

16  receipts from the visit to the gun range in April of 2015 that

17  were recovered from Mr. Shafi's residence.  And you heard the

18  defense expert this morning, Dr. Sageman, talking about how,

19  yeah, looking for target practice that's something he'd be

20  concerned with.  He hemmed and hawed a little bit.  If it was

21  Europe, that might be more of interest to him.  There's far

22  fewer guns in Europe than there are in this country.  There's

23  less enthusiasm for going to a shooting range.  But he said it.

24  Going to a shooting range, what was something that caught his

25  attention.  He even said, Yeah, that's one of the things I

1    underlined in my notes there.

2         What else have you got?  Next slide.

3         You've got the ticket that he bought.  The ticket itself.

4    This is the Turkish Airlines records that Special Agent Reinke

5    testified about.  Up on the top there, highlighted in yellow,

6    you can see, first of all, passenger name, pax name, Shafi,

7    Adam.  And then in yellow, issued on 20150629.  Issued on the

8    day before he went to the airport.  The day before.

9         Why is that interesting?  Go back to that 2014 trip.  He

10   didn't want anyone to know he was going from Turkey -- from

11   Cairo to Istanbul.  Right?  So he has his buddy, Saleem Karim,

12   buy his ticket for him.  That way anyone who might be looking

13   at his credit card statements -- say, a concerned parent --

14   wouldn't see a charge.  Same MO here in 2015.  Buys the ticket

15   the day before travel.  No one's going to know.  By the time

16   they find out it's going to be too late.  He's gone to Turkey

17   and crossed into Syria.

18        How else do you know what Adam Shafi's intent was when he

19   was getting on that plane?  How else?  You have the reactions

20   of his family members.

21        Mother, father, there's a reference to an uncle.  Uncle

22   Usama.  You have their reactions.  They know Adam Shafi better

23   than anyone.

24              (Audio was played but not reported.)

25         MR. HASIB:  Why would parents have a prearranged plan

1    to send a family member thousands of miles away to an airport

2    in Istanbul to go and intercept their son?  And not let him out

3    of the airport?  Why would they have that plan?  Because they

4    knew, members of the jury.  They knew their son better than

5    anybody.  And parents know.  Right?  Some parents have a sixth

6    sense.  These parents, they had a sixth, a seventh, and an

7    eighth.  They knew.  And they wanted to stop him.  They did

8    everything they could to stop him.

9         My mother used to tell me she had eyes in the back of her

10   head.  And that's how she knew when I was getting myself into

11   trouble.  And parents know even more when their kids are

12   getting into trouble, they know even more when their kids are

13   about to put themselves in physical danger.  That sets the

14   alarm bells going off like only a parent would know.  That's

15   how you know what Adam Shafi was planning on doing when he got

16   on that plane.  That's how you know.

17        One more reason why you know what his intent was when he

18   got on that plane, and it's perhaps the most compelling one.

19        This call that you just heard, Government Exhibit 13, this

20   is June 30, 2015, on the BART train home from the airport.  The

21   next call you're about to hear is July 1, 2015.  It's

22   Government Exhibit 15.  It's the following day.  And it's a

23   long conversation between Adam Shafi and who else?  His buddy,

24   Saleem Karim.  The guy that he woke up in the middle of the

25   night to say:  I just watched a two-hour interview with

1   Mohammad al-Joulani.  I'm so excited.

2       Who else would he call?  The following day, July 1, 2015,

3   he calls Karim.  And Karim -- recall when you heard this with

4   Special Agent Matt Sung who was on the stand when you heard

5   this call the first time, Karim -- he's upset.  He's upset with

6   Adam Shafi.  He's upset for a bunch of reasons.  He's upset

7   because Adam Shafi went without him.  And the three of them had

8   been talking about going back together.  He's also upset

9   because his friend betrayed him.  It's not so much the fact

10  that Adam Shafi went out him, it's the fact that Adam Shafi

11  didn't tell him he was going.

12      But then you will hear Karim's upset because as he tells

13  Adam Shafi, You went for all the wrong reasons.  And you will

14  hear Adam Shafi agree with him and say, Yeah, it was wrong.  It

15  was wrong.

16              (Audio was played but not reported.)

17      **MR. HASIB:**  Look at what Karim is telling him:  You

18  were wrong.  Not for the reasons the *kuffar* say.  Remember,

19  you'll have that Arabic translation chart back in the jury

20  room.  *Kuffar*, nonbelievers.  Adam says, Yeah, I was wrong.  I

21  was wrong to go.

22      What is that, members of the jury?  What is that?  It's a

23  confession:  I was wrong.  I knew getting on that plane was

24  wrong.

25      That's how you know -- that's how you know -- what he

1    intended to do when he got on that plane it was not to go and

2    lead a pious Muslim life.  It was not to go, upset as he may

3    have been about gay marriage, it was not for that.  It was not

4    to escape his father or mother.  Those may well have been

5    reasons that were running through his head, but the reason he

6    wanted to go was the reason that he knew it was wrong to go

7    for.  You know it's wrong, so did he.

8        Let's go back to the charts for a minute.  There's two

9    elements of attempt, right?  There's intending to commit the

10   crime of providing material support or resources, and then

11   there's the second part.  The substantial step.  Let's talk a

12   little bit about that, and then I promise I'm done talking.

13       Substantial step.  Remember, mere preparation is not

14   enough.  You got to be going.  You got to be there but for some

15   intervening circumstance.  Something's got to stop you from

16   completing what you've got to do.  That's a substantial step.

17       Members of the jury, when you go to the airport, you're

18   getting on a flight, you're checking your bags, you get your

19   boarding pass, you're a little nervous; I'm late, got to make

20   my flight.  You say goodbye to your friends, your loved ones,

21   and then you go through security.  Right?  Mentally, in your

22   heads, that's kind of the point of no return.  Once you get

23   through TSA, taking off your shoes, and opening up your laptop

24   and all that stuff, once you get through there, Ah, I made it.

25   The gate's right there.  I can make my flight.  Mentally,

1    that's the point of no return.

2        He got further than that.  Right?  He made it to the gate.

3    The plane is sitting there.  They're calling people to come up

4    to the gate, including him.  He doesn't respond.  We'll get to

5    that in a second.  People are lining up to get on the plane.

6    And who lines up?  Adam Shafi.

7        Why?  Because he was getting on that plane.  Nothing was

8    going to stop him.  Nothing was going to stop him.  Even a call

9    over the intercom:  Adam Shafi, please report to the gate.

10   Adam Shafi, please report to the gate agent.  That didn't stop

11   him.  Why?

12       Because you heard in that call on his way home he thought

13   that was his parents.  That his parents had figured it out and

14   that they were calling -- remember, sixth, seventh and eighth

15   sense.  Those parents, they knew they had to stop him and he

16   didn't want to let them stop him.  So what did he do?  Nothing.

17   He ignored it.  He got in line and started taking step after

18   step after step to the jetway.  He was going to get on that

19   plane.  But for the quick thinking Special Agent Glen

20   Bartolomei and Mark Mauro, but for their interception at the

21   airport, he was going to get on that plane.

22       There was a search at Adam Shafi's house a couple days

23   after the incident at the airport.  There was a lot of talk

24   about laptops and computers.  And you heard from Special Agent

25   Mike Mansuy talked about, Here's what I saw in the house,

1  here's what I recovered.  And he talked about an Apple laptop

2  that he opened up to see whether it was on or not.  And there

3  was something on the screen.  And he showed you what it was

4  that was on the screen.

5      It was this.  It was an email to info.SFO:  Hello, I

6  recently had booked a ticket to Istanbul.  After checking in,

7  getting in line to board the plane the -- after checking in and

8  getting in line to board the plane, the FBI told me I looked

9  suspicious and refused to allow me to board the plane.  I

10 demand a refund for my ticket.

11      What does that show you?  He was getting on that plane.

12 The reason he didn't -- he doesn't say, Well, I had second

13 thoughts, decided I didn't want to use my ticket.  He doesn't

14 say that.  What's his reason for not getting on the plane?  The

15 FBI.  That is the only reason.  His parents couldn't stop him.

16 His own parents couldn't stop.  It took FBI acts to stop from

17 getting on that plane.  He was going.  He had taken that

18 substantial step.  There was no question about it.

19      And he talks about it with his brother on the ride home.

20 He talks about it with Saleem Karim the following day.  He

21 says:  I was about to board the plane and then the FBI agents,

22 like three of them, came to me and then they just pulled out

23 their badges and they're like:  Come with us, sir.  I was about

24 to board the plane and then three FBI agents came up to me.  I

25 was about to board the plane.

1    Next slide?  Then play the audio.

2          (Audio was played but not reported.)

3      **MR. HASIB:**  That's Adam Shafi in Government Exhibit 15

4    to his buddy, Saleem Karim, the day after saying:  FBI stopped

5    me once, they ain't going to stop me again.  I need to leave

6    the country.  I'll just take a boat, or whatever.

7      How dedicated.  How committed.  How convinced you have to

8    be of your intent to say:  The FBI ain't going to stop me.  I'm

9    going to get on a boat.  I'll find any way to get out of the

10   country.  That, members of the jury, is the substantial step.

11   Nothing was going to stop him.

12     But what is the best evidence?  The best evidence of him

13   taking that substantial step?  What's the best evidence that

14   nothing was going to stop him?

15     Go back to the picture I had you paint in your heads at

16   the beginning of this case.  Gate G97, crowded flight,

17   everyone's getting on a flight to Istanbul.  Gate area is

18   packed.  Adam Shafi's there.  And over the intercom his name is

19   called:  Adam Shafi, please report to the gate agent.  Adam

20   Shafi, please report to the gate agent.

21     What does he do?  Nothing.  Why?  Because he thought it

22   was his parents and they're making one last-ditch effort to try

23   to stop him from doing what he always wanted to do.  What he

24   knew he was going to do.  Going to Syria to join the al-Nusrah

25   Front.  To join them, to support them, to work with them, to

1    live with them; and as you have now heard, to die with them.

2    That is why Adam Shafi was getting on that plane.  That is what

3    the law says you cannot do.  And that is what you must find him

4    guilty of.

5         Find him guilty, members of the jury.  Find him guilty.

6         Thank you, Your Honor.

7         **THE COURT:**  All right.  Thank you.  Ladies and

8    gentlemen, we'll take a break and we'll be back at 11:20.

9    Please remember the admonitions.  They still count.  But I

10   won't say it any other time because we're about to be finished.

11                    (Recess taken at 11:13 a.m.)

12               (Proceedings resumed at 11:20 a.m.)

13        **THE COURT:**  All right.  Please be seated, everybody.

14        So ladies and gentlemen, now we'll have the closing

15   statement from the defense.

16        Mr. Fakhoury, when you're ready.

17        **MR. FAKHOURY:**  Thank you, Your Honor.

18        Last week when Mr. Matthews gave his opening statement he

19   said:  Sometimes things aren't as they seem.  Sometimes the

20   easiest explanation is not the right one.

21        Couple days ago I was talking to my wife about our three

22   year old son and she told me a funny story.  She told me that

23   she was getting him ready to go to bed.  And he went to her and

24   said, Mom, can I play with my toys?  It's bedtime.  So she

25   said, No, it's time to go to bed, but in the morning when the

1    suns up you can play with your toys.  So he said, Okay.  Got in

2    his crib, fell asleep.  Next morning he woke up, called for my

3    wife and he said, Mom, did the sun wake up?  Now she, of

4    course, said, Yes, it did.  And now you can play with your

5    toys.

6        Of course, the sun didn't wake up.  But in that instance

7    it was there was an easier explanation than trying to explain

8    the way the sun revolves -- or, the earth revolves -- and all

9    of that.  Like Mr. Matthews said, the facts in this case are

10   not in dispute.  The only dispute in this case is what do those

11   facts mean?  The government has presented an easy explanation.

12   One that is wrong.  The truth is much more complicated.

13       Mr. Hasib said a couple minutes ago that on June 5, 2015,

14   Mr. Shafi had found his calling, his purpose, his destiny,

15   after he watched an interview on Al Jazeera with the *emir*, the

16   leader, of the al-Nusrah Front, Mohammad al-Joulani.  And that

17   he talked about that interview with his friend Saleem Karim on

18   the phone.

19       The evidence that the government has presented to you

20   suggests otherwise.  The evidence that the government has

21   presented to you shows that Mr. Shafi was all over the map,

22   literally and figuratively.  Literally, because after June 5,

23   2015, Mr. Shafi made references in his phone calls, in a Google

24   search data and the YouTube search data, to Saudi Arabia,

25   Hungary, Egypt, Sudan, Yemen, Yosemite and Death Valley.  And

1    he made not a single reference to the al-Nusrah Front or

2    Mohammad al-Joulani.

3        Figuratively, because after June 5, 2015, Mr. Shafi

4    mentioned in phone calls, Google search data and YouTube search

5    data, living in the desert with sheep, running his own business

6    in the Middle East with his friend Saleem Karim, moving into an

7    apartment with Saleem Karim, staying in the United States to

8    finish his degree, researching a career change and looking at

9    civil engineering jobs at San Francisco State University.  And

10   he referenced and googled and youtubed the al-Nusrah Front and

11   al-Joulani zero times.

12       So, how do we get here?  How do we get here?  Where a U.S.

13   citizen sits and waits for you to decide whether his actions

14   when he was 22 years old makes him a terrorist?

15       I'll tell you why we're here.  We're here because the FBI

16   and the government have used a miniscule amount of data, an

17   email here, a text message there, a Google search here, a

18   YouTube search there, to paint an incomplete and misleading

19   picture of Mr. Shafi that it believes is an easy explanation

20   rather than the full story.  We're here because the FBI and the

21   government do not believe a single word that Mr. Shafi has told

22   them since August 2014 except for one thing:  That he wanted to

23   go and die with the al-Nusrah Front.

24       You sat through this trial for over a week.  I know it's

25   an inconvenience to sit as a juror, and I thank you for your

1   service.  But now we're here at the decision time where it's

2   your chance and your opportunity to decide whether the

3   government has carried its heavy burden of proving what is

4   essentially -- or, of proving whether it can show beyond a

5   reasonable doubt that Mr. Shafi attempted to provide material

6   support or resources to the al-Nusrah Front in June 2015.

7       The only thing that's been proven beyond a reasonable

8   doubt is that Mr. Shafi was a confused, immature, indecisive

9   young man with no plan, who wanted to leave his house, leave

10  this country and its luxuries, to be on his own in a Muslim

11  country, miserable and suffering with those in need.

12      Mr. Shafi was not trying to place himself under the

13  direction and control of the al-Nusrah Front, and that's why

14  there's only one verdict that the evidence supports in this

15  case.  And that's a verdict of not guilty.

16      So I want to start by talking a little bit about the law.

17  And I want to start by talking about reasonable doubt.  You see

18  in the instruction -- Judge Orrick has read it to you but I'm

19  going to read it again -- proof beyond a reasonable doubt is

20  proof that leaves you firmly convinced that Mr. Shafi is

21  guilty.  Firmly convinced.  It's got to be compelling enough

22  that you would want to make an important decision based on that

23  evidence.  And an important decision you're going to be asked

24  to make in this case is whether or not to label Mr. Shafi a

25  terrorist.

1    The burden's on the government.  Mr. Shafi doesn't have to

2 prove a thing.  He doesn't have to testify.  The fact that he

3 didn't testify can't be used against him.

4    Now as you can see from the instruction, reasonable doubt

5 can arise not just from the presentation of evidence, but from

6 the lack of evidence.  So if there's something missing that you

7 wish you had, that goes to this table (indicating), not to

8 Mr. Shafi (indicating).

9    Now, let's get a little more deeper into the law.  As

10 Judge Orrick explained, there's essentially two things that the

11 government has to prove beyond a reasonable doubt.  And I want

12 to be clear, actually, about something that Mr. Hasib said in

13 his closing argument.  He said that this case really comes down

14 to one question; which is why was Mr. Shafi on the plane?

15 That's wrong.

16    There are two questions in this case.  And we're going to

17 go through them one by one.

18    The first question is what was Mr. Shafi's specific

19 intent?  And you've been instructed that in order for the

20 government to prove beyond a reasonable doubt that Mr. Shafi

21 had the intent required to convict him in this case, they've

22 got -- the government has to prove beyond a reasonable doubt

23 that Mr. Shafi intended to commit the crime of providing

24 material support or resources to a foreign terrorist

25 organization, specifically the al-Nusrah Front.  And that that

1    took place in June 2015.

2         The key term here is "material support."  Now, there's a

3    lot of language up there.  I'm not going to read the whole

4    thing.  But, in essence, what this case is about is whether

5    that material support that Mr. Shafi was going to provide was

6    himself.  As Mr. Hasib mentioned, and as Judge Orrick

7    explained, it's not enough to just want to be a part of

8    al-Nusrah.  The government has to prove beyond a reasonable

9    doubt that Mr. Shafi intended to work under the al-Nusrah

10   Front's direction or control.

11        It's not enough that Mr. Shafi -- it's not enough that the

12   government shows Mr. Shafi intended to go to Istanbul.

13   Intending to go to Syria is not enough to carry this burden.

14   Intending to work independently of the al-Nusrah Front is not

15   enough.  Intending to associate with the al-Nusrah Front is not

16   enough.  They've got to prove that Mr. Shafi wanted to work

17   under the direction and control of the al-Nusrah Front.  He

18   wanted -- they have to show he intended to be under their

19   thumb.

20        Now, I mentioned that there were two things that the

21   government had to prove.  Not just what was the purpose of his

22   plane ticket or buying the plane ticket.

23        The second thing the government has to prove is that

24   Mr. Shafi took a substantial step towards being placed under

25   the direction and control of the al-Nusrah Front.

1        Now, we've heard already some discussion that mere
2   preparation is not enough.  There's got to be something more
3   than that.  Instead, to satisfy its burden, the government has
4   to show that the crime -- meaning the provision of material
5   support, being placed under the direction and control of the
6   al-Nusrah Front -- will take place unless interrupted by
7   independent circumstances.  Not may take place.  Not could take
8   place.  Will take place.

9        And I'm going to talk a little later on about each of
10  these two elements, this intent and substantial step elements,
11  in more detail.  But I wanted to start with a reminder.  And as
12  Mr. Hasib said, Mr. Shafi is not on trial for going to Turkey
13  in 2014.  Mr. Shafi is not accused or charged with trying to
14  join ISIS in 2014.  Mr. Shafi is not accused or charged with
15  trying to join ISIS in 2015.  Mr. Shafi is only on trial for
16  one thing:  Attempting to provide himself as personnel -- that
17  is, to work under the direction and control of the al-Nusrah
18  Front -- in June 2015.

19       So, how has the government gone about in trying to carry
20  this heavy burden in order to show that Mr. Shafi intended to
21  place himself under the direction and control of the al-Nusrah
22  Front and committed a substantial step towards doing so?

23       Well, the first thing it's done is it has spin (sic) the
24  facts to fit its narrative.  I think nothing exemplifies that
25  better than this picture.  This is Exhibit 64-72.  And you'll

1    have this back in the jury deliberation room.

2        If you recall, I believe it was Agent Mansuy explained

3    that when the FBI did the search of Mr. Shafi's home they

4    collected a number of items that it found throughout

5    Mr. Shafi's bedroom and then put them together in order to take

6    this picture.

7        Now, if you look at this picture, the way this picture is

8    sort of represented to be, without that explanation a

9    reasonable person would look at this picture and think, Oh,

10   yeah, all that stuff came out of that track and field bag.

11   Thankfully, Agent Mansuy came and explained, no, that's not the

12   case.  But this exemplifies the problem in this case.  The

13   selective collection of random items and then associating a

14   label with that item.

15       So this was referred to as survival gear.  And if you can

16   see the picture, you can see it includes dental floss, which I

17   guess a dentist would say is survival gear.  Fingernail

18   clippers, a crumpled up piece of paper.  A whistle.  Some of

19   these items, as we heard Mr. Keenan explain, were items he had

20   seen Mr. Shafi have years before when he'd gone hiking with him

21   and camping with him.  But to label this survival gear and put

22   this picture in a way that makes it look like all these items

23   came from one place, is exactly the problem.  It's misleading.

24       Oh, and one other thing I forgot to mention.  A deal was

25   made with this picture, right?  Well, there's no evidence

1  presented whatsoever that Mr. Shafi had a single one of these

2  items with him at the time he was arrested in June 2015.  FBI

3  couldn't be bothered to take a picture of the items that they

4  searched when they encountered him at SFO on June 30, 2015.

5  They couldn't be bothered to take an inventory of the items.

6      There's no evidence that he took, in 2015, any of the

7  items that he emailed to Niazi and Karim in 2014.  If you

8  recall, we saw an email -- actually saw three copies of the

9  same exact email -- that has a list of camping supplies.  And

10 there was a discussion about that through Agent Reinke.  We

11 don't know if he took any of that stuff with him in 2015.

12 Where's the proof of that?

13     The second thing the government does is they repeatedly

14 used Mr. Shafi's calmness and his compliant demeanor against

15 him.  Mr. Shafi had nothing to hide when he was confronted by

16 the FBI or the Customs and Border Protection.  He certainly

17 wanted to hide from his parents that he wanted to leave their

18 home.  But he has always been forthright and forthcoming with

19 law enforcement every time he's encountered them.

20     If you remember on June 30 when he was arrested -- excuse

21 me -- on July 3 when he was arrested, he identified to FBI

22 which computers belonged to him.  He gave them the passwords to

23 his computers.  When he was questioned by the FBI at SFO on

24 June 30 he sat there for three hours and answered all their

25 questions.

1          Now, we don't really want people to run away from law

2     enforcement that approach them.  We want people to comply with

3     law enforcement orders, especially when those law enforcement

4     officers are armed with firearms.  But only in the context of

5     this case is listening to the FBI, and being cooperative, and

6     doing everything they ask, and answering their questions

7     without a lawyer held up as proof of guilt.

8          Here's something else that we heard about in closing

9     argument.  Make a big deal about Mr. Shafi's reaction to the

10    questions he was asked on June 30 about whether he was going to

11    Syria to join a terrorist organization.  And we heard some of

12    the excerpts from that audio conversation Mr. Shafi had with

13    his brother, Ismail, where they're talking about what kind of

14    idiot would say "yes" to that question.

15         The thing about that question is it's a complete red

16    herring.  The answer to that question is irrelevant.  Because

17    if Mr. Shafi had said "yes" on June 30, he was going to be

18    arrested.  Well, he said "no" on June 30 and he was arrested

19    all the same.  It's a meaningless question, and yet it's been

20    brought out and referenced repeatedly throughout the trial as

21    if there's some significance that should be given to it.

22         We're going to talk about the timeline in much more detail

23    in a couple minutes.  But one of the items on that timeline was

24    some Google searches that the reflexatron account did for

25    erasing and formatting a hard drive.  Again, we're going to

 1   talk about the timeline in more detail later, but this is again

 2   another example.

 3       The Google data, which you have and you can review, shows

 4   that the same exact searches were done on July 2.  And then on

 5   July 3 Mr. Shafi went to the Apple store and bought a bunch of

 6   MacBooks.  And we heard through our case -- and we don't have

 7   an obligation to present any witnesses -- but you heard through

 8   our investigator and you heard through Mr. Shafi's cousin, Noah

 9   Shafi, exactly what happened.  Mr. Adam Shafi was interested in

10   learning about computer coding, Mr. Noah Shafi had an old

11   computer sitting around, they tried to get into it, they

12   couldn't get into it, so the next day Mr. Adam Shafi went and

13   bought a new computer.  That's completely innocuous.

14       In closing Mr. Hasib said that Mr. Shafi had lied to Agent

15   -- Customs and Border Protection Officer Mon when he said that

16   his phone had been stolen.  And there was a lot of discussion

17   in cross-examination of Ms. Larsen about whether -- when the

18   report was made about the laptop and whatnot.

19       But here's the bottom line.  Agent Bartolomei and Agent

20   Mauro both testified that on June 30 they were told by

21   Mr. Shafi that when he had gone to Istanbul in 2014 his laptop

22   had been stolen.  You saw through Ms. Larsen that Mr. Shafi had

23   made a claim with the San Mateo County Sheriff's Office, or the

24   San Francisco Police Department Airport Bureau, and American

25   Express, explaining that the laptop had been stolen.  And that

 1    in October 2014 Mr. Shafi bought a new laptop, which is the one

 2    that was seized and has been -- you've heard evidence from.

 3         And it was us who subpoenaed Apple, not the government, to

 4    show that the laptop, the old laptop he bought in July 2014,

 5    had been registered by somebody -- not Mr. Shafi -- in

 6    Istanbul.  So once again, it's very clear what happened here.

 7    The government doesn't want to accept it.  They want you to

 8    fixate.  He's doing a search for erasing his hard drive.  That

 9    must mean he's trying to cover something up.

10         There was some testimony Mr. Shafi only took a couple

11    things with from him when he was encountered at SFO on June 30,

12    2015, as if again that's some sort of indication of guilt.  Of

13    course he didn't take a lot of stuff with him.  He's trying to

14    run away from home.  He takes a gigantic suitcase, his family

15    is going to tell something's up.  So of course he packed light.

16         Let's talk about the map.  We saw this in Mr. Hasib's

17    closing and we've heard a lot of discussion about this map,

18    this map of places of investigative interest to the FBI.  This

19    map is worthless.  I'll tell you why.

20         Now, some of the places on the map are places that

21    Mr. Shafi had been to and that don't have any bearing

22    whatsoever on whether he had the intent to join the al-Nusrah

23    Front in June 2015.  So that's Cairo and Sharm al-Sheikh.

24         How about the remaining items on the map?  Several of

25    those items were never searched for in 2015.  Which ones?

1    Urfa, Ar Raqqah, Jarabulus, Kobane.  And the one Mr. Hasib

2    mentioned, Karkamis Sinir Kapisi.  I'm probably saying those

3    wrong.  But not a single one of those locations were searched

4    for in 2015.  You have the Google data.  Go through it.  You

5    won't find a reference to it.  It wasn't searched for in 2015.

6         So what does that leave?  Well, Istanbul, one of the

7    largest cities in the world.  A place we know Mr. Shafi was

8    trying to get to.  And one search in May 2015 for Gaziantep.

9         Now what do we know about Gaziantep?  Well, we heard

10   Dr. Vidino explain Gaziantep was a -- one of the largest places

11   where there were Syrian refugees 2014 and 2015.  And I believe

12   it was Agent Reinke explained Gaziantep's actually a very large

13   city.  We had maybe some disagreement about how much but, you

14   know, at least half a million people.

15        And most critically, that search for Gaziantep in 2015 was

16   before the al-Joulani interview was referenced on June 5.  And

17   there are no searches for Gaziantep after June 5 when that

18   al-Joulani interview was referenced.

19        Now what's missing from this map?  Idlib.  You heard

20   Dr. Vidino.  Idlib was a governorate in Syria that the

21   al-Nusrah Front took over in early June, 2015.  That's their

22   base of operations.  You would think if you wanted to join the

23   al-Nusrah Front you would try to learn a little bit about where

24   they're actually headquartered.  There's a reason Idlib's not

25   in that box; because there's no Google search data for Idlib.

1      That takes me to the timeline.  This is Exhibit 118

2    (indicating.)  You had it, I think, for most of Thursday and I

3    think all day Friday and you had a chance to review it and look

4    through it.  And Mr. Hasib, when he got up to give his closing,

5    indicated you're not going to have this in the jury room with

6    you.  Good.  Because this timeline's misleading and it's

7    inaccurate.  That's a 13-page timeline.  This is the Google

8    search data (indicating.)  This you will have in the jury room

9    with you.  This is the YouTube search data (indicating.)  This

10    you will have in the jury room with you.

11      You will have the full content of all 15 phone calls with

12    you in the jury room, and I encourage you to listen to all 15

13    of those phone calls in their entirety.  I encourage you to go

14    through the Google and YouTube data.  I don't encourage you to

15    read all 9,000 lines of it, but I encourage you to take a look

16    at it and think through it critically.  Because what you're

17    going to see is that that timeline, Exhibit 118, is essentially

18    incomplete and misleading.

19      Let me give you some more concrete examples.  The timeline

20    had about 140 out of 1,471 YouTube search queries.  That's

21    about 9 percent of Mr. Shafi's YouTube search queries, or the

22    reflexatron search queries, for 2014 and 2015 are on that

23    timeline.  Now, the timeline had excerpts, not even the full

24    content, but the excerpts of 15 out of at least 450 phone.

25    Calls.  So that's 3 percent.

1      It had ten text message conversations out of 3,562 texts

2  on Mr. Shafi's phone.  So about 3 percent.  It had one picture

3  of 1,517 images on the phone.  Just .07 percent.  It had four

4  out of 8,595 emails, which is .05 percent.  And this is, I

5  think, the most important number here:  140 out of 9,933 Google

6  search queries.

7      Now, Mr. Hasib said -- he acknowledged that the Google

8  search queries had a lot of innocuous data.  Time for prayer,

9  directions to the gym, that sort of thing.  But he said also

10  that there was a lot of not innocuous stuff.  1.5 percent is

11  not a lot.  1.5 percent is the exception, not the norm.

12  1.5 percent is not beyond a reasonable doubt.

13      The other issue with the timeline is that it's misleading.

14  What do I mean by that?  Well, it's hard to tell from this huge

15  collection of Google data (indicating) what a person's

16  thinking.  You need context to understand what this sort of

17  data means.

18      Now, the timeline was missing one crucial piece of

19  information that would help provide context.  Time stamps.  Why

20  would time stamps be important to provide context?  Well,

21  number one, it would show how long reflexatron was interested

22  in a particular topic.

23      Let me give you a specific example.  This is in Exhibit

24  137 at page 7.  This is lines 209 to 212.  I know it's a little

25  hard to read.  But this was something that was referenced on

1    the timeline.  That on June 14, 2015, there was -- the

2    reflexatron account indicated that there was an image viewed

3    from "The Legal Foundations of the Islamic State" three times.

4        Now, to begin with, we actually have no clue what the

5    Legal Foundations of the Islamic State is.  Is it propaganda?

6    Is it a critique of the Islamic State?  Is it an academic

7    article about the Islamic State?  I don't know.  They didn't

8    tell us.  Their burden, remember?

9        But here's what's missing from the timeline.  The time

10   stamps.  What do the time stamps show?  They showed this image

11   was viewed, basically, in about 35 seconds.  And that 18

12   seconds later on to something else.  That's a fleeting interest

13   in something.

14       The other reason the time stamps are important is it shows

15   what reflexatron clicked on after doing a particular search.

16   So here's an example of that.  This is on page 6 of that same

17   exhibit which you'll have in the jury room with you.  Again, I

18   know it's a little hard to read, but essentially that bottom

19   search down there is a search for the Islamic State.  And if

20   you can see up -- the next four entries after that search

21   indicate what images were viewed or what items were clicked to

22   following from that search.  That's what the Google custodian

23   explained these records show.  So in this example, you can see

24   after that search was done there were articles referenced, or

25   accessed, from Al Jazeera, France 24, and The Times of Israel.

1    One of the instructions that Judge Orrick gave you was

2  regarding charts and summaries shown to you to explain evidence

3  that are not admitted.  And he actually said if they don't

4  correctly reflect the facts, you can disregard those charts and

5  determine the facts from the underlying evidence.

6    Now, listen, I don't quibble that the timeline is accurate

7  in the sense that the items listed on it correspond to the date

8  claimed to be.  But as I explained, it's missing context.  It's

9  missing those time stamps.  It's missing the fuller picture.

10  So I think you should disregard it.  Instead, you should

11  determine the facts from all the evidence like I just said

12  (indicating).  All the Google search data, all the YouTube

13  search data, all the phone calls.  All of which you have.

14    Now, there's no question that Mr. Shafi said some

15  disgusting things on the phone.  There's no question that he

16  said things that were offensive.  There's no question that we

17  disagree with a lot of those things that were expressed on the

18  phone.  But, one of the most important legal rights in our

19  country, and something Judge Orrick has already explained to

20  you, is the First Amendment.  It's first for a reason.

21  Mr. Shafi has the right to say whatever he wants to say.

22  Doesn't mean you have to agree with it.  It doesn't mean we

23  have to like it.  I think there's probably all sorts of speech

24  we don't like.  But you can't convict him for this crime solely

25  because of what he said on those phone calls.

1      Now the other point I want to make about Mr. Shafi's phone

2   calls is they are not indicators that he intended to join the

3   al-Nusrah Front or that he committed a substantial step in

4   doing so.

5      I want to talk about a couple specific particularly

6   offensive things that Mr. Shafi said.  So one -- I think

7   probably the most offensive thing that Mr. Shafi said on that

8   call, and which Mr. Hasib played in his closing, was the

9   comments about killing American soldiers.  It's obviously

10  extremely disgusting.  In fact, I think it's safe to say

11  they're clearly radical thoughts.  But they're not radical in

12  the sense that Dr. Vidino used that word.  And the idea that by

13  saying those things there's an indication of violence that a

14  person is willing to do.  They're radical in the Dr. Sageman

15  sense of the word in that they are offensive or against the

16  social norms of us in this society in the United States.

17     And as Dr. Sageman said, Mr. Shafi at times used

18  exaggerated speech.  That's not a surprise.  He's 22 years old.

19  He's talking on the phone with Saleem Karim and Abul Niazi, his

20  buddies.  And they're young, too.  So it offensive?

21  Absolutely.  Did they mean it seriously?  No.

22     More importantly, both Dr. Vidino and Dr. Sageman

23  testified that just because a person has a radical set of ideas

24  or radical set of beliefs doesn't mean that they're going to

25  act on them.  Now Dr. Vidino and Dr. Sageman used different

1    terms to refer to this idea.  So Dr. Vidino used the term

2    "mobilization."  And Dr. Sageman used the term "a pathway to

3    violence."  And both of them agree there are probably more

4    people with radical thoughts than there were people who will

5    actually act out on them.  And that's a good thing.

6        The most important thing to note is that Dr. Sageman, who

7    studied this field for 40 years, who's done work for both the

8    government and the defense, who has been an expert for the

9    Secret Service and the NYPD and the U.S. Army, who's worked for

10   the CIA, he's looked at all the evidence in this case and he's

11   concluded in his opinion that Mr. Shafi hadn't gone beyond

12   radicalization into a pathway to violence.

13       Now, for better or for worse, our major religions use

14   physical examples to refer to struggle.  A Christian who

15   recites Psalm 35 probably is not going to be deemed to be a

16   violent radicalized person.

17       It's the same thing with Mr. Shafi.  As you heard from

18   Dr. Vidino and Dr. Sageman, the phone calls are open to varying

19   interpretations.

20       Let's use another example.  Again, another really

21   problematic or troubling example.  Mr. Shafi's comments about

22   spilling gallons of blood.  I understand why Mr. Hasib played

23   that and focused on it.  It sounds pretty bad.  But remember,

24   Dr. Vidino is using that conversation to opine, to offer his

25   opinion, that Mr. Shafi wants to be a *shahid*, a martyr, and to

1    kill.  Dr. Sageman sees it as Mr. Shafi expressing an interest

2    in dying and sacrifice.

3        The Bible has similar language.  Take up your cross and

4    follow me.  We know what a cross is.  It's a torture device.

5    It's how -- the most painful way a person could be killed in

6    ancient times was to be crucified.  We wouldn't mistake a

7    person, a Christian, saying these words as a radical *jihadist*.

8    It's the same thing for Mr. Shafi.

9        And I would add that his comments about being jealous of a

10   person who died in Syria, fits exactly the same profile.  It's

11   a reflection of wanting to die and sacrifice, not wanting to

12   kill.

13       And, in fact, as we know from the discovery -- excuse me

14   -- from the evidence you've seen in this case -- Mr. Shafi

15   references dying and being miserable and suffering many times.

16   The text messages regarding Mr. Harcevic, which we'll talk a

17   little bit more later, that Mr. Hasib showed you, says it

18   explicitly:  I'd rather just be with him in a cage.  Or in

19   Exhibit 15, this is the July 1 phone call with Saleem Karim,

20   Mr. Shafi explains himself:  The least I can do is to be

21   miserable with them.  If I can't do anything, then what else am

22   I going to do?  Just be happy while they're just, you know,

23   suffering?  At least if I can't do anything, I'm just going to

24   be miserable.  And that's completely consistent with what

25   Mr. Sageman was testifying about.

1          So, what the evidence, in our view, shows is that

2     Mr. Shafi had no intent to place himself under the direction

3     and control of the al-Nusrah Front.  And remember -- again, to

4     reiterate -- the issue is not whether he had the specific

5     intent to leave the United States.  It's not whether he had the

6     specific intent to go to Istanbul.  It's not whether he had the

7     specific intent to go to Syria.  It's whether he had the

8     specific intent to place himself under the direction and

9     control of the al-Nusrah Front.  And no one and no where else.

10         So, why did Mr. Shafi want to leave his house?  Why did he

11    want to leave the United States?  Why did he want to go to

12    Istanbul?  We don't dispute he was trying to go to Istanbul.

13    Mr. Hasib's right.  This is not an accident case.  He didn't

14    accidentally go to the Istanbul terminal when he was trying to

15    go to Cancun.  We don't argue that.  We agree.  He was trying

16    to go to Istanbul.  No doubt.

17         But why?  Why was he trying to go to Istanbul?  Number

18    one, he was trying to leave a tense family life.  That's

19    something we've heard testimony about and that Mr. Hasib

20    mentioned in his closing.

21         In fact, in one of the phone calls, on June 8, you heard

22    and you saw the transcript, that Mr. Shafi talked specifically

23    about an argument he got into with his parents.  An argument

24    about money where Mr. Shafi said he felt like a slave in his

25    parents' house.  And the conclusion of that phone call -- or,

1  of this part of the conversation, rather -- is, You should come

2  live with me in an apartment.  And Mr. Shafi says, Yeah, yeah,

3  I'm intending to.  *Inshallah*.

4      Now, what's the significance of this phone call?  That's

5  on June 8, 2015.  That's three days after the most important

6  piece of evidence in the government's case, this phone call

7  about al-Nusrah and al-Joulani and all of that.  Three days

8  later, there's no reference to al-Joulani or al-Nusrah.

9  They're talking about getting an apartment together in the bay

10  area.

11      And we actually heard this in the government's closing so

12  I'll go through this quick.  That, you know, Mr. Shafi was

13  ignoring the pages in the airport because he thought his

14  parents were trying to reach him and prevent him from leaving.

15  Yeah.  We don't dispute that at all.  He was absolutely trying

16  to run away from his family.

17      Another reason Mr. Shafi wanted to leave the United States

18  was his disagreement with U.S. moral values.  We heard some

19  discussion about the gay marriage -- the Supreme Court's

20  decision in *Obergefell* about legalizing same sex marriage in

21  this country which was decided on June 26, 2015, three days

22  before Mr. Shafi bought that plane ticket.

23      Now, we don't have to agree with Mr. Shafi's views on same

24  sex marriage, and we can think that's wrong and homophobic and

25  offensive, but he's entitled to his opinion under the First

1   Amendment.  And he's entitled to decide that he doesn't want to

2   live in this country where same sex marriage is allowed.  And,

3   in fact, we've heard several times that he told Agent

4   Bartolomei and Agent Mauro that that was one of the reasons why

5   he wanted to leave.

6        We also know that Mr. Shafi wanted to live in a Muslim

7   country.

8        I keep bumping into this so I'm going to push it back

9   there.

10       We've also heard many times Mr. Shafi indicated that he

11  wanted to live in a Muslim country, a more devout, pious Muslim

12  country.  There's no question Mr. Shafi's devout.  We've

13  already heard that he went and visited historic mosques in

14  Istanbul.  We heard from Agent Bartolomei and Agent Mauro that

15  on June 30 when he was interrogated by the FBI he refused food

16  and drink because it was Ramadan.  You know, Muslims don't eat

17  or drink anything while the sun is up.  They can eat and drink

18  after the sun sets.  You think about it, in June day's a lot

19  longer, so Mr. Shafi went a long period of time without eating

20  or drinking.  We heard from -- I think it's Mr. Karem now -- it

21  used to be Agent Karem -- that when he arrested Mr. Shafi on

22  July 3 that Mr. Shafi asked to pray before he was taken into

23  custody.  So we know he's devout.

24       What else do we know about Mr. Shafi?  We know he's

25  concerned with the plight of Syrian refugees and Muslims more

1    generally.  This is from an item taken from his room at the

2    time of the search.  And, again, as Dr. Sageman testified,

3    that's consistent with the idea that Mr. Shafi wanted to suffer

4    and die, not that he wanted to kill.  And again, as I

5    indicated, he did plenty of Google searching for information

6    about Syrian refugees.

7        These are a couple of examples here.  And some more

8    examples here.  We don't need to read through every one of

9    these individually, but we can see that he's concerned with the

10   plight of Syrian refugees.

11       And if you think about it, Mr. Shafi lives a life of

12   luxury that a lot of people don't have the opportunity to have.

13   He's thinking about Syrian refugees while he's living in his

14   house in Freemont.  You saw the pictures of the house.  It's a

15   nice house.  It's a huge house.  Five or six bedrooms.  He's

16   got his own car, he has his own American Express credit card,

17   he has his own Bank of America account, he's got a job from his

18   dad.  He can take computer coding programs.  He can go to the

19   Apple store and buy a $1,000 laptop.  These are luxuries that

20   many people don't have and Mr. Shafi felt guilty about that.

21       There was some reference in one of the phone calls that he

22   had with Saleem Karim where he explained one of the reasons he

23   got into this argument with his parents was that he transferred

24   -- he'd given $700 to -- he said a sister who needed help.  And

25   there's actually bank records in discovery that show this.  On

1    June 2, 2015, he transferred $700 to another person.  And as

2    was indicated in the transcript, this conversation with

3    Mr. Karim, he thought this was a woman who had lost her job and

4    he wanted to give her some help.

5        What else do we know about Mr. Shafi?  He actually has the

6    capabilities to live abroad, right?  He told the government

7    repeatedly on June 30 that he was going to go to Istanbul, but

8    if it didn't work out he was going to go to Egypt.  We heard

9    his family has an apartment in Egypt.  This is actually a

10   viable possibility.

11       Now, and this kind of spills into something I mentioned

12   earlier about this selective kind of picking and choosing by

13   the government.  The government moved this into evidence, this

14   is Exhibit 64.  It's a picture that they took at the search of

15   a note pad that Mr. Shafi had in the house.  What they didn't

16   move into evidence was the second page of that same exact note

17   pad.  What do you see on that second page, missing from the

18   first page, that the government did not move in?  Egypt key.

19   Which confirms that Mr. Shafi's backup plan, if Turkey didn't

20   work out, was to go to Egypt.  To go to his parents' apartment.

21       Now, we don't know, we don't have a line-for-line item or

22   an inventory of what Mr. Shafi had with him in 2015.  But we do

23   have the testimony of Agent Mauro who said that Mr. Shafi's

24   backpack had a Quran, and a prayer book, a book about Islam, a

25   laptop, cell phone, and cables.  And all of those are items

1    that are on this list.

2        What else do we know about Mr. Shafi?  Well, we know that

3    Mr. Shafi has told his parents that he wanted to live abroad,

4    that he wanted to leave the house and not live in the

5    United States anymore.  Mr. Hasib mentioned that Mr. Shafi's

6    parents must have had a sixth and seventh and eighth sense that

7    their son wanted to leave.  Absolutely.  They did.  But that

8    sixth or seventh or eighth sense was about him wanting to leave

9    the United States, not about him wanting to join the al-Nusrah

10   Front or provide himself as personnel to work under the

11   direction and control of the al-Nusrah Front.

12       Why would his parents not want him to leave the

13   United States?  These are patriotic Americans.  They've got an

14   American flag in the garage.  When they lose their son, when

15   their son goes missing in 2014, they go to the American Embassy

16   to try to get him back, to look for him, to get help.  These

17   are people who are not afraid of the U.S. government.  Of

18   course they want their son to stay here.

19       But we know that that's not what Mr. Shafi wanted.  We

20   know that he's told his family several times that he wanted to

21   leave and that they didn't want him to leave.  This was a

22   source of the conflict between the two of them that put him on

23   the path to get on that airplane.

24       We know that he talked to his uncle about it.  Talked to

25   his uncle about, Maybe I just have to stay for three years.

1   And then if it gets cleaned up over there, maybe I can go.  And

2   if not, then I can go live with the Muslims since I have

3   something to work with.  "Over there" is not the al-Nusrah

4   Front.  "Over there" is the Middle East.

5       Here's another phone call.  This is on July 1 with Saleem

6   Karim.  Mr. Shafi is talking about how his parents have told

7   him, How can we trust you anymore?  And his response at the

8   bottom there is he says, Because he thought -- he's talking

9   about his father -- he thought I was going to stay until I

10  finished my college and stuff.

11      So there had been discussions.  There had been debate.

12  There had been tension about whether or not Mr. Shafi could

13  actually leave his house, leave his father's house, leave his

14  parents' house and go abroad.

15      And again if you look at the Google data you're going to

16  see a ton of searches for other locations and other places that

17  Mr. Shafi could have gone to.  Here's a list:  On January 30,

18  2015, he's doing searches for *Oman*.  In February, it's Dubai

19  and Morocco.  In April, it's Germany.  On April -- I'm sorry --

20  in May -- on May 4 of 2015, he's visiting the Saudi Arabia

21  government website for how to get an *umrah* visa.  Which *umrah*

22  is the minor pilgrimage in Islam.  On May 9 he's doing a search

23  for life in Yemen.  May 10, it's cost of living in Yemen.  On

24  June 1 -- on June 4 he's doing a YouTube search to *hijra* which

25  you heard both Dr. Vidino and Dr. Sageman testify is Muslim

1  migration.

2      He's searching for Hungary on June 12.  On June 16 he's

3  doing a search for construction jobs in Saudi Arabia.  Now,

4  this was something Mr. Hasib mentioned in his closing argument

5  about, Well, why didn't he go to Saudi Arabia?  Where are the

6  Google searches?  He did Google searches for Saudi Arabia.  In

7  June of 2015 after he listened and after he talked about the

8  al-Joulani interview the al-Nusrah Front.  In fact, he accesses

9  a Vox article about Saudi Arabia question, on June 25, 2015.

10  Before *Obergefell*, before he's bought the plane ticket to

11  Istanbul.  So it was a possibility.

12      And on June 8, again after Mr. Shafi's had this

13  conversation with Saleem Karim about the al-Nusrah Front and

14  al-Joulani, he has a long phone call with Saleem Karim.  And

15  you have the whole transcript in evidence where they talk about

16  going "over there."  And it's very clear when you read -- you

17  won't get the transcript, you'll have the audio.  When you

18  listen to the audio, you can see very clearly what he's talking

19  about.  He's talking about going to the Middle East, going to

20  the desert.  And they talk about starting a business together

21  in the Middle East.

22      Why else would Mr. Shafi want to leave?  He's under

23  government surveillance and scrutiny, right?  He's been

24  interviewed by Customs and Border Protection in August 2014.

25  Interviewed by the FBI in September 2014, a fact that didn't

1   make it onto the government's timeline.  He was interrogated by
2   -- I'm sorry -- he had a SSSS designation.  He thinks he's on
3   the no-fly list.  And he sort of is, right?  Because if you
4   recall what Agent Bartolomei testified, when Mr. Shafi showed
5   up at the airport, Agent Bartolomei went to the ticket agent
6   and said, This gentleman's not getting on this flight.  That
7   was before they questioned him, before they'd heard the phone
8   calls to Saleem and Niazi and Ismail Shafi after Mr. Shafi left
9   SFO, before the government had reviewed any of the Google
10  search data that was done after December of 2014 which is when
11  they got the first search warrant in this case as you recall.
12  The second search warrant in the case was issued in January of
13  2017 after Mr. Shafi had been arrested.  The government's
14  already determining that he's not allowed to fly, that he's not
15  going anywhere, even though he's not formally on the no-fly
16  list.
17      So that brings me to the centerpiece of the government's
18  case.  The most important thing that they have emphasized over
19  and over and over in this case.  And that is the June 5, 2015,
20  phone call between Mr. Shafi and Saleem Karim where they talked
21  about the al-Nusrah Front and Mohammad al-Joulani.
22      Mr. Hasib told you it all comes down to the calls.  That's
23  the one, that's the call.
24      And, look, I don't disagree that call has got a lot of bad
25  stuff on it.  I acknowledge it and I admit it.  But here's the

1   bottom line.  Number one, you've got to focus precisely on the

2   timing of that call.  What do I mean by the timing?  Well, the

3   first piece of timing I mean is the YouTube searches for that

4   phone call.  Agent Reinke testified that there were five

5   searches for that phone call.  Or, for that interview.  Excuse

6   me.  Those five searches were done in a two-hour window.  And

7   this is a one-hour interview -- or over one-hour interview in

8   two parts.

9       Within two hours of those searches, Mr. Shafi has called

10  Karim at 2:30 in the morning.  Now, we've heard the phone call.

11  Sounds to me like Mr. Shafi's half awake.  It sounds like Karim

12  is half awake.  But, again, I don't dispute it.  They have the

13  phone call, they talk about al-Joulani, they talk about the

14  al-Nusrah Front.  It's not a great phone call.

15      But the key here is what happens after the phone call?

16  What happens after the phone call?  Is there any other

17  references to Mohammad al-Joulani after that phone call?  No.

18  Are there any references to the al-Nusrah Front after that

19  phone call?  No.  Are there references on the phone calls?  No.

20  Is there references in the Google data?  Was there a Google

21  search for the al-Nusrah Front or Mohammad al-Joulani?  No.

22  Was there a YouTube search for the al-Nusrah Front or Mohammad

23  al-Joulani after June 5, 2015?  No.  Was there a text message

24  exchange about Mohammad al-Joulani or the al-Nusrah Front after

25  June 5, 2015?  No.  Was there an email about the al-Nusrah

1  Front or Mohammad al-Joulani after June 5, 2015?  No.  You have

2  the entire contents of Mr. Shafi's inbox in evidence.  Look for

3  it.  You won't find it.  It's not there.  Is there a Google

4  search for Idlib, al-Nusrah Front's base of operation?  No.  Is

5  there a YouTube search for Idlib?  No.

6      In fact, apart from the al-Joulani interview, if you look

7  in the YouTube data for any other reference (indicating) on any

8  other day in 2014 or 2015 for al-Joulani or the al-Nusrah

9  Front, you will not find one.  It's not in there.

10      If you look through the Google data you will find one

11  search in May 2014 for the al-Nusrah Front (indicating) and you

12  will not find another search for the al-Nusrah Front after that

13  search.  Not after May 2014 and not at all in 2015.

14      You cannot find specific intent based on one conversation,

15  at one time, on one day.  Under that theory, then why didn't

16  Mr. Shafi have an intent to go to Yosemite and eat a bear.  Or,

17  *(Arabic)* bear.  Whatever he and Saleem joked about.

18      Now, the government made a big deal about the phone calls

19  that Mr. Shafi made after he was encountered at SFO on June 30.

20  He made two phone calls on the BART train.  One to his brother,

21  Ismail, and one to his friend, Niazi.  And then the next day on

22  July 1 he made a call to Saleem Karim.  We've heard little

23  snippets of those calls.  You have the whole calls in evidence.

24  I encourage you to listen to them.

25      Here's the bottom line:  Every single one of those

1   conversations when Mr. Shafi is asked where he was going, he

2   says Turkey, not the al-Nusrah Front.  Why is that important?

3   Well, like Mr. Hasib pointed out, Mr. Shafi doesn't think

4   anybody's listening to his phone calls.  In fact, he talks

5   about, Do you think I'd be talking like this if I thought the

6   FBI was here?  Or if I thought the government was here?

7        So what's he say?  Well, this is the phone call to Ismail

8   that we saw a little snippet of this in the government's

9   closing.  Are you going to Turkey?  Yeah, I was going to

10  Turkey.  Not, I was going to al-Nusrah Front.

11       This is the call to Niazi, and I think this is the most

12  important one.  He's talking about this conversation where they

13  -- the agents asked then, Are you trying to go join a terrorist

14  group?  And he says, What kind of idiot would say this?  Look

15  at the last thing Mr. Shafi says on the screen:  Even if I was

16  going to do that, what the hell, what the hell.  Even if I was

17  going to do that.

18       Remember, he doesn't think the FBI is listening in on

19  these phone calls.  He's making fun of them.  Even if I was

20  going to do that.  Well, what does that imply?  That means that

21  he wasn't going to do that, join a terrorist group.

22       Same thing on the next day with Mr. Karim.  Mr. Shafi --

23  again, you saw part of this.  Mr. Shafi's asked, What were you

24  going to do, man?  And he says, I have no idea, bro.

25       All of that shows that Mr. Shafi did not have the specific

1  intent to place himself under the direction and control of the

2  al-Nusrah Front.  That the government has not carried its

3  burden of proof to prove to you beyond a reasonable doubt that

4  Mr. Shafi had the intent to place himself under the direction

5  and control of the al-Nusrah Front.

6      Now that's just the first element.  There's still a whole

7  second element that we've got to talk about, and that's the

8  substantial step element.

9      As Judge Orrick explained, mere preparation is not enough.

10  The substantial step, the act that is a substantial step, must

11  demonstrate that the crime, meaning Mr. Shafi providing himself

12  as personnel, placing himself under the direction and control

13  of the al-Nusrah Front, the government has to prove to you

14  beyond a reasonable doubt that that act, that crime, will

15  occur.  Not may occur, not could occur.  Will occur, but for

16  intervening circumstances.

17      Now, Mr. Hasib said the flight -- him getting in the --

18  trying to board the plane on June 30 was the point of no

19  return.  I absolutely agree with him.  It was absolutely the

20  point of no return to going to Istanbul.  But that's not what

21  Mr. Shafi's on trial for.  It's not a crime to go to Istanbul.

22  It's a crime to try to place yourself under the direction and

23  control of the al-Nusrah Front.

24      I agree Mr. Shafi took a substantial step towards going to

25  Istanbul.  That's not enough.

1    I was trying to think of an analogy, an easy analogy, that
2    might make sense for a lot of people.  And I was thinking of
3    the San Francisco Giants.  If you buy a ticket to go to AT&T
4    Park, that is not a substantial step towards playing for the
5    Giants.  And that's exactly what we have here.  He bought a
6    ticket to go to Istanbul, he made a substantial step to go to
7    Istanbul, but did not make a substantial step to join the
8    al-Nusrah Front.

9    And I want to talk about this in kind of two separate
10   concepts.  The first is this idea that mere preparation is not
11   enough.  Mr. Shafi didn't even merely prepare for a trip.  As I
12   indicated before, he repeatedly says he has no plan.  Even on
13   that June 5 phone call he tells Mr. Karim, We'll figure it out.
14   On June 30 when he's interviewed by Agent Bartolomei he says, I
15   don't have a plan.  I don't have a travel room -- or, hotel
16   room booked.  And if you look through the Google records you're
17   not going to find any searches for hotel rooms in Istanbul, bus
18   routes, transportation within Turkey, flights within Turkey to
19   get to the 700 miles of Turkey you've got to cross to get to
20   the side that borders Syria.  That's like going from Eureka to
21   San Diego.

22   Again, we've already talked about this.  There's no
23   searching at all after June 5 for Syria, Idlib, or any of these
24   other places that were searched for in 2014.  And again, on
25   July 1, Mr. Shafi tells Karim he had no idea what he was going

1    to do.

2        Now, don't get distracted by the government's red herrings

3    they've put up in this case.  They've put up a couple, but

4    don't be distracted.  Number one, don't be distracted by ISIS.

5    I know that's a hard thing to do.  Everyone's scared of ISIS.

6    I'm scared of ISIS.  They're terrible.  But that's not what

7    this case is about.  Mr. Shafi is not accused of trying to

8    place himself under the direction and control of ISIS in 2014

9    or 2015.

10       Don't be distracted by the Google or YouTube searches in

11   2014.  And there's a lot of them on that timeline.  And there's

12   some pretty -- ones that are problematic.  I acknowledge that.

13   But those don't have any bearing here in this case.

14       Mr. Shafi's accused of committing a crime in June of 2015.

15       Don't be distracted by the references to Burma.

16   Mr. Shafi's is not accused of trying to go to Burma or do

17   anything over there.

18       Don't be distracted by the limited evidence you heard

19   about a shooting range.  In this country, there's nothing wrong

20   with going to a shooting range.  Mr. Shafi's not prohibited

21   from going to a shooting range at the time he went.  He

22   followed all the rules and regulations.  He clearly had no

23   experience with firearms based on the phone call he had with

24   Niazi which has been admitted into evidence as Exhibit No. -- I

25   don't remember the exhibit number.  It's one of the earlier

 1    phone calls.  I apologize.  He went once or twice maybe.  I

 2    think it was once.  Dr. Sageman testified, you know, frequent

 3    visits to the shooting range may be problematic.  One visit is

 4    not problematic, in Dr. Sageman's testimony.

 5        And you heard the testimony of Agent Sung.  When they

 6    executed the search warrant on July 3 they were looking for

 7    firearms and ammunition and all that stuff, and they didn't

 8    find anything in Mr. Shafi's house.

 9        Don't be distracted by this idea that Mr. Shafi went and

10    visited Mr. Harcevic in jail.  The government went out of its

11    way to call a custodian to come testify about how Santa Clara

12    County records the phone calls.  They moved the phone call into

13    evidence.  You have it.

14        You haven't heard it, though.  You know why?  Because

15    there's nothing on there that's problematic.  There's no

16    references to ISIS, al-Nusrah Front, terrorism, *jihad*, nothing.

17    That conversation -- and you should listen to it in evidence

18    because they wouldn't play it for you (indicating).  That

19    conversation is about how much it sucks to be in jail.  And we

20    already know that's exactly what Mr. Shafi was worried about.

21        This is in Exhibit 2.  This is the phone call Mr. Shafi

22    had with Mr. Niazi in February 2015.  He's talking about --

23    he's laying out exactly what was going on.  Here's a guy, he

24    knows him from the mosque, he's been arrested by the FBI.  He

25    doesn't have a lot of information about the case.  His

1    interactions with the guy are positive.  That's what's worrying
2    him.
3        It continues:  People are talking about it in the
4    *(Arabic)*.  This was something that happened in the community.
5    The FBI comes in and arrests somebody.  That's traumatic for a
6    community.  That's what he's upset about.
7        And it's clear he feels bad.  This guy's got little kids.
8    He feels bad about that fact.  That's what was motivating
9    Mr. Shafi to see Mr. Harcevic.  When you listen to the actual
10   conversation that you had, you'll see.  That's exactly
11   consistent with what that conversation -- of the conversation
12   that took place.
13       I think some of the most compelling testimony in this case
14   came from Dr. Vidino.  He's not my witness, but I think he
15   actually laid out a very compelling case that supports
16   everything that I'm saying.  Dr. Vidino explained what it takes
17   to get to al-Nusrah, what it takes to place yourself under the
18   direction and control of the al-Nusrah Front, and he testified
19   about the steps you would have to take to get there.  To go
20   back to that ballpark analogy?  Mr. Shafi was not in the
21   ballpark.
22       Dr. Vidino said most folks who try to get to Syria are
23   encouraged to take an indirect route.  That is a "tactical
24   mistake" to travel directly to Istanbul.  But what did
25   Mr. Shafi do?  He traveled directly to Istanbul.  He tried to

1    travel directly to Istanbul.

2        Dr. Vidino said people who want to join groups like

3    al-Nusrah Front rely on encrypted communications.  They go from

4    open platforms to more encrypted platforms.  And he talked

5    about Telegram and KIK.  Talked about Twitter.  And that in

6    their own research center they have folks who are monitoring

7    these programs and these Telegram channels and Twitter feed.

8    There's no evidence at all that Mr. Shafi had Telegram on his

9    phone, that he had KIK, that he had a Twitter account, nothing.

10        Dr. Vidino says people who try to get into Syria do

11   research about how to get there before they go.  Well, we've

12   already talked about that.  Mr. Shafi did no research based on

13   the Google and YouTube records whatsoever.  Not only about

14   Syria, but about al-Joulani or the al-Nusrah Front at all in

15   2015.

16        There's a search in May 2015 for Gaziantep.  But as

17   Dr. Vidino himself said, Gaziantep's a city with a large

18   refugee population.  If you care with Syrian refugees, you

19   would care about Gaziantep.  You'd be seeing what was going on

20   there.  And again, there's no searches for Idlib, either.

21        And this now brings me -- I'm wrapping up.  But I think

22   the most important thing that Dr. Vidino said, Dr. Vidino said

23   anyone who wants to actually join ISIS or the al-Nusrah Front

24   has to get vetted.  They have to have a connection to the

25   group.  Dr. Vidino's own words were we can't just show up there

1  and get into the group.  You can't just show up and want to be

2  a member.

3     He talked about three classes of travelers.  And this is

4  something that Mr. Hasib did not mention in his closing

5  argument.  Talked about first class travelers, business class

6  travelers, and economy travelers.  He said first class

7  travelers are very small subset of folks, people with deep and

8  intensive connections to the terrorist organization.  And with

9  respect to the al-Nusrah Front, Dr. Vidino said there's only a

10 handful of people who have that level of connection in the

11 United States.  Obviously, Mr. Shafi is not a first class

12 traveler.

13     Then Dr. Vidino talked about business class travelers.  He

14 said a business class traveler is someone who makes connections

15 to the group before they leave the United States and makes some

16 sort of contact.  And then once they get abroad, use those

17 contacts to make their way down into the territory where these

18 groups operate.  And again, there's been no evidence whatsoever

19 that Mr. Shafi had any contact with anybody of that nature, of

20 any member of one of these groups, al-Nusrah Front, ISIS, you

21 name it.  No contact whatsoever.

22     So that brings me to economy class.  Now, economy class

23 travelers are travelers who have no contacts in the

24 United States when they leave and hope to establish their

25 contact they get to Istanbul.  And Dr. Vidino testified -- and

1  he's the expert, he knows more about this than I do, he's the

2  expert -- he testified about the two things that economy class

3  travelers need in order to link up to a member, to link up to

4  the group if they're going to travel this way.

5       You need street smarts and you need to get lucky.

6       Now, he testified that that's true for ISIS and the

7  al-Nusrah Front.  And he testified that ISIS is more open and

8  more permissive in who it takes than the al-Nusrah Front.

9  Al-Nusrah is more conservative, more deliberate.  It's much

10  smaller.  He testified about 5,000 members in 2015, whereas

11  ISIS had over, I think, 20 or 30 thousand members.

12       And Dr. Vidino testified that even if you go through the

13  vetting process, that doesn't guarantee that you will become a

14  member of the group.  And what happens to those folks?  They

15  get killed.

16       Getting lucky is not a substantial step.  Getting lucky

17  doesn't mean that the crime will take place unless interrupted

18  by independent circumstances.  Getting lucky is not proof

19  beyond a reasonable doubt.

20       Finally, Judge Orrick instructed you that you can consider

21  Mr. Shafi's 2014 trip as it relates -- or, what it says for

22  Mr. Shafi's intent, his preparation, and his plan.  That trip

23  in 2014, we saw what happened.  He was there for two days, he

24  did some sightseeing, he didn't join a group, and he came home.

25  You can infer, you can draw whatever conclusions you want to

1   draw from that, but it suggests that there's no -- it hasn't

2   been proven beyond a reasonable doubt that in 2015 this crime

3   was going to take place, Mr. Shafi was going to place himself

4   under the direction and control of the al-Nusrah Front but for

5   the FBI agents at SFO on June 30.

6       In the end, what's clear, what's been proven beyond a

7   reasonable doubt, is that Mr. Shafi is a confused young man.

8   He's uncertain about his calling, his purpose, his destiny.

9   The easy explanation is not always the correct one.  The sun

10  doesn't wake up.  Mr. Shafi didn't attempt to provide himself

11  to work under the direction and control of the al-Nusrah Front.

12  The government's efforts to pick and choose snippets of data to

13  take them out of context is not enough to carry its burden of

14  proof beyond a reasonable doubt that Mr. Shafi had the intent

15  to place himself under the direction and control of the

16  al-Nusrah Front.

17      The idea that Mr. Shafi would have to get lucky if he made

18  it to Turkey in order to have a contact with the group and be

19  vetted, means that the government hasn't proven beyond a

20  reasonable doubt that the completed crime would have taken

21  place but for the actions of the FBI.

22      We should demand more before we brand young American

23  citizens as terrorists (indicating).  We should demand more

24  than 1.5 percent of Google searches.  We should demand more

25  than thinking somebody has to get lucky in order to link up

1   with a group.  We should demand more than one conversation and

2   one phone call on one day.

3       When you look at the full picture, when you look at all

4   the evidence, when you listen to all the phone calls, when you

5   review all the Google data, when you review all the YouTube

6   data, there's only one verdict that is supported by the

7   evidence and by the lack of evidence.  And that is that

8   Mr. Shafi is not guilty.

9       Thank you.

10          **THE COURT:**  Thank you, Mr. Fakhoury.  Ms. LaPunzina?

11          **MS. LaPUNZINA:**  It's the government's burden of proof,

12  ladies and gentlemen, and we embrace that burden of proof.

13  Because it's our burden, we have the opportunity to speak to

14  you last right now.  And I have to admit it's hard to resist

15  the urge not to respond to everything you just heard from

16  Mr. Fakhoury.  I'm not going to do it.  We're not going to be

17  here much longer.  But I am going to address some of the points

18  that he just made and bring you back to some of the points that

19  Mr. Hasib made.

20      We're not asking you to brand the defendant a terrorist.

21  That is not your job here as jurors.  Your role here as jurors

22  is to weigh the evidence, to look at it thoroughly.  Every

23  exhibit that has been entered into evidence is available to you

24  in the jury room and we encourage you to look at all of it.

25      You are being asked as jurors to decide whether or not

1  there is proof beyond a reasonable doubt that Adam Shafi

2  attempted to provide material support in the form of himself to

3  the al-Nusrah Front in June of 2015.  That is what you are

4  being asked to do.  Not to label him anything, but just to

5  weigh the evidence -- look at his actions, look at his words,

6  look at the law -- and decide whether or not the government has

7  met its burden and has proven beyond a reasonable doubt that

8  what he attempted to do that day on June 30, 2015, was to board

9  that Turkish Airlines flight to go to Turkey because Turkey is

10  the entry point into Syria.

11       You've heard that testimony, you've seen it on the map.

12  That's how you get there.  Nobody's flying direct into Idlib or

13  into any other city in Syria.  You're crossing a border.  And

14  you've heard a lot about searches about crossing borders.

15       Mr. Fakhoury's right.  The timeline, which is not in

16  evidence -- he spent a lot of time talking about it but you

17  won't have it -- but nevertheless I'll spend another minute

18  talking about it.

19       If it actually had covered all the Google, YouTube,

20  pictures, emails, everything in the record, we would still be

21  here listening to testimony on that timeline.  But as

22  Mr. Fakhoury showed you, by lifting it up, it's there, it's

23  thick.  Take a look at it.

24       And what's interesting about it is that there are,

25  basically, no searches in there for doing any volunteer work

1  for refugees.  Might have had some searches on how to donate

2  money.  You saw him donate some money.  He dropped more at the

3  Apple store in one day than all the money he every donated.

4  But there are no searches there on how to join a refugee camp,

5  how to help refugees in Turkey or Syria when he gets to the

6  border.  That's not what he was going to the airport for on

7  June 30, 2015.  You don't need more evidence about what he was

8  doing that day.  The record is already pretty clear.  It's

9  clear beyond a reasonable doubt, in fact.

10     The defendant listened to the two-hour-long interview of

11  al-Joulani, the *emir* of the al-Nusrah Front.  The records will

12  show you, if you go look at them, that he watched those two

13  hours.  And, basically, within about 20 minutes, he calls his

14  buddy up and he talks to him.  He says, I just watched this two

15  hours and I'm just in love with this man.  And he recounts what

16  the interview was about; the interview clearly stating that

17  al-Nusrah Front is a designated foreign terrorist organization,

18  talks about its tactics, its goals.  It's a more deliberate

19  terrorist group.  It's not just killing everybody, Muslims or

20  not.  It's more focused about how it's going -- that's what he

21  likes about it.

22     He finally has clarity.  He doesn't need to do any more

23  searches about it.  He knows what he wants to go do.  It is

24  clear to him at that point.  So that's right; there are no

25  YouTube or Google searches after that point.  The call was at

 1   2:45 in the morning.  But if you compare that call to some of

 2   the other calls that you have in evidence, there's tremendous

 3   clarity in that call.  It is the middle of the night for him

 4   but he has -- he has finally understood what he is meant to do

 5   and he's actually quite animated, quite clear.  His buddy is

 6   somewhat asleep because it's 5:00 in the morning in

 7   Pennsylvania.  He's not expecting to have this call.  He's

 8   there trying to meet his bride-to-be and he's woken up in the

 9   middle of the night to hear this call about how tremendous

10   al-Joulani is.  Al-Nusrah Front, this is it.

11        That's the evidence that you have before you, ladies and

12   gentlemen.

13        Mr. Fakhoury talked about a variety of other searches he

14   had done, how to get different jobs, a whole variety of

15   different things.  And that's true.  Again, look through all

16   the records.  But ultimately, what is the one and only thing

17   that he did?  The one and only thing that Adam Shafi did was

18   buy that ticket.  He had a dream that if he found his passport

19   it was meant to be.  He found his passport.  He bought the

20   ticket the day before he was going to go to Turkey to join

21   al-Nusrah Front in Syria.

22        That is actually the only thing he took action on.  He's a

23   lot of talk.  But when it came to the one thing that he had

24   clear focus about, after that interview he decided between all

25   the groups that they had been talking about -- was he going to

1    go to Burma?  Was he going to another country?  What was he

2    going to do?  He found his calling.  And the one thing he took

3    action on was to buy that ticket, to go to the airport, to not

4    listen to any warnings that he heard that maybe he wasn't

5    supposed to go.  You know, thinking his parents are calling him

6    over the loud speaker.  He is not going to let anybody

7    interrupt him at that point.  He is going to get on that plane.

8         And the only reason he didn't get on that plane is because

9    the FBI pulled him off and they didn't let him go.  And he

10   was -- it's true, he's been totally compliant with law

11   enforcement.  But as you hear in his call while he's on BART,

12   are you really going to tell law enforcement that you were

13   about to commit a crime?

14        But we have those calls.  You can hear his calls.  You

15   know what he was really thinking compared to what he actually

16   told law enforcement.  And what's even more indicative of it is

17   notwithstanding lying to law enforcement, telling his buddy of

18   course he's not going to tell the truth, he's not going to tell

19   them he's trying to join a terrorist organization, he then

20   says, Nothing's going to stop me.  I'm going.

21        So he has now had a law enforcement encounter in 2014,

22   he's had an extensive law enforcement encounter on June 30,

23   2015.  And even after that he is still committed to going.

24   Nothing is going to stop him.

25        Now, the defense has focused on whether or not the calls

1    indicate that he was going to join al-Nusrah Front, that he's

2    all over the place.  That he's confused, he's not focused.

3    There's no confusion in his mind.  Listen to the calls.  He's

4    clearly focused.  He believes in al-Joulani.  He believes in

5    al-Nusrah Front's mission.  He believes in their tactics.  He

6    believes in the fact that they're more focused about how they

7    are committing their terrorist acts.

8        He thinks about other things that he may do, the pressures

9    of his family, maybe he needs to find a job, he needs to go to

10   school.  He's certainly not confused about providing aid,

11   because there's nothing to support that.  There's no confusion

12   whatsoever when he packs his bag and he goes to the airport.

13   He presents his U.S. passout, he gets in line, and he's ready

14   to go.

15       He had a dream that it was time to go.  He found his

16   passport.  This is what he had been told to do and that is what

17   he was going to do.  He was going to fulfill his obligation, as

18   Dr. Vidino said, this sixth pillar, that *jihadists* have -- view

19   of Islam's sixth pillar.  It's not a religious pillar, it's

20   their *jihadist* pillar.

21       He was going to go fulfill his obligation.  He is a

22   religious man.  You certainly heard lots of evidence about

23   that.

24       But what was his commitment to do?  His commitment was to

25   defend Muslims.  And how was he going to defend Muslims?  He's

1    not just going to help them.  Helping them might have been part

2    of it.  Again, not in refugee camps, not in providing all of

3    his assets or doing work for them.  He might have been going to

4    help them when he went to Syria.

5        But how was he really going to help them?  By fighting for

6    them.  By supporting the mission, working for the al-Nusrah

7    Front in Syria, doing what they are doing there.  Why did he

8    care about what their targets were or how they committed their

9    acts?  Because he wanted to do it with them.  Otherwise, why

10   would he care to even know what they were?  He supported their

11   mission, he supported their tactics and all of their goals.

12   And he was going to do it with violence.  Not with charity, but

13   with violence.

14                (Audio was played but not reported.)

15       **MS. LaPUNZINA:**  He's not talking about his blood,

16   ladies and gentlemen.  He's talking about having other people's

17   blood in his books so that he can face *Allah*.

18       That's the evidence that you've heard in this case, ladies

19   and gentlemen.  Again, you have the exhibits with you, and

20   please take your time to go through them.

21       We ask that you return the only verdict that is supported

22   by the evidence in this case, that you find the defendant

23   guilty of the crime with which he is charged.  Thank you for

24   your attention.

25

1                    **CONTINUING JURY INSTRUCTIONS**

2            **THE COURT:**  All right, ladies and gentlemen.  The

3    closing statements are now done here.  The final jury

4    instructions.

5            When you begin your deliberations, select one member of

6    the jury as your foreperson who will preside over your

7    deliberations and speak for you here in court.  You will then

8    discuss the case with your fellow jurors to reach agreement if

9    you can do so.  Your verdict, whether guilty or not guilty,

10   must be unanimous.  Each of you must decide the case for

11   yourself, but you should do so only after you've considered all

12   the evidence, discussed it fully with the other jurors, and

13   listened to the views of your fellow jurors.  Do not be afraid

14   to change your opinion if the discussion persuades you that you

15   should, but do not come to a decision simply because other

16   jurors think it's right.

17           It's important that you attempt to reach a unanimous

18   verdict but, of course, only if each of you can do so after

19   having made your own conscientious decision.  Do not change an

20   honest belief about the weight and effect of the evidence

21   simply to reach a verdict.

22           Perform these duties fairly and impartially.  Do not allow

23   personal likes or dislikes, sympathy, prejudice, fear, or

24   public opinion, to influence you.  You should also not be

25   influenced by any person's race, color, religion, national

1    ancestry, gender, sexual orientation, profession, occupation,

2    economic circumstances, or position in life or in the

3    community.

4        It is your duty as jurors to consult with one another and

5    to deliberate with one another with a view towards reaching an

6    agreement if you can do so.  During your deliberations you

7    should not hesitate to re-examine your own views and change

8    your opinion if you become persuaded that it's wrong.

9        Because you must base your verdict only on the evidence

10   received in the case and on these instructions, I remind you

11   that you must not be exposed to any other information about the

12   case or the issues it involves.  Except for discussing the case

13   with your fellow jurors during your deliberations, do not

14   communicate with anyone in any way and do not let anyone else

15   communicate with you in any way about the merits of the case or

16   anything to do with it.

17       This includes discussing the case in person, in writing,

18   by phone or electronic means, via email, text messaging, or any

19   internet chat room, blog, website or other feature.  This

20   applies to communicating with your family members, your

21   employer, the media or press, and the people involved in the

22   trial.  If you are asked or approached in any way about your

23   jury service or anything about this case, you must respond that

24   you've been ordered not to discuss the matter and to report the

25   contact to the Court.

Do not read, watch or listen to any news or media accounts or commentary about the case or anything to do with it. Do not do any research such as consulting dictionaries, searching the internet or using other reference materials. And do not make any investigation or in any other way try to learn about the case on your own.

The law requires these restrictions to ensure the parties have a fair trial based on the same evidence that each party has had an opportunity to address. A juror who violates these restrictions jeopardizes the fairness of these proceedings. If any juror is exposed to any outside information, please notify the Court immediately.

Some of you have taken notes during the trial. Whether or not you took notes, you should rely on your own memory of what was said. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

The punishment provided by law for this crime is for the Court to decide. You may not consider punishment in deciding whether the government has proved its case against the defendant beyond a reasonable doubt.

A verdict form has been prepared for you. After you have reached unanimous agreement on a verdict, your foreperson should complete the verdict form according to your deliberations, sign and date it, and advise the clerk that you

1  are ready to return to the courtroom.

2      If it becomes necessary during your deliberations to

3  communicate with me, you may send a note through the clerk

4  signed by any one or more of you.  No member of the jury should

5  ever attempt to communicate with me except by a signed writing,

6  and I will respond to the jury concerning the case only in

7  writing or here in open court.

8      If you send out a question I will consult with the lawyers

9  before answering it, which may take some time.  You may

10  continue your deliberations while waiting for the answer to any

11  question.

12      Remember that you are not to tell anyone, including me,

13  how the jury stands numerically or otherwise on any question

14  submitted to you, including the question of the guilt of the

15  defendant until after you have reached a unanimous verdict or

16  have been discharged.

17      Now let me add just two more things.  I'm going to ask the

18  alternates to raise their hands.

19      All right.  So I am going to, at this point in the

20  proceedings -- or, actually when everybody is released -- I'll

21  ask you to go to the jury room, pick up your belongings.  The

22  rest of the jury should not begin deliberations until after the

23  alternates have left.  You can say good-bye.

24      And then for the alternates, you are still under the

25  instructions of the Court until a verdict is reached.

1    Ms. Davis will contact you in that event.  But it's very

2    important that you follow the admonitions.  If one of the

3    members of the jury has an emergency and has to be discharged,

4    then one of you will step in, the deliberations will start

5    anew.  So it's just very important that you continue to follow

6    the admonitions.  Don't do any research, don't talk about the

7    case.  You're still under those instructions.

8         And then the second thing is the time of the

9    deliberations.  So we've been running on a clock of 8 to 1.  It

10   will be up to the jury to decide what times you deliberate.  I

11   encourage people to deliberate all day, but I know that you

12   have made plans based on the schedule that we have.  It will be

13   up to you to decide what you do today and tomorrow.  And

14   Ms. Davis will inquire as to what you've chosen to do.

15        On Friday, if you are still deliberating, deliberations

16   will need to stop at 2.  And there will not be deliberations on

17   Monday.  And the reason for that is that I will not be around.

18   So that's the basis of that.

19        So with that, I'm going to ask Ms. Davis to lead you into

20   the jury room, and thank you very much.

21   (The following proceedings were held in open court, outside the

22   presence of the jury:)

23        **THE COURT:**  All right.  Please be seated, everybody.

24        So usually I tell the lawyers that they need to be within

25   15 minutes of the courthouse.  I think that's not a problem.

1    And aside from that, is there anything else that we ought to

2    take up before we go?  We will let you know -- as soon as we

3    know what the schedule is we'll let you know.

4            MR. FAKHOURY:  We don't have anything else to bring

5    up, Your Honor.

6            MR. HASIB:  We'll leave phone numbers with Ms. Davis?

7            THE COURT:  The best way to contact you is what she'll

8    need.

9            MR. HASIB:  Okay.

10           THE COURT:  All right.

11           MR. FAKHOURY:  Thank you, Your Honor.

12           MR. HASIB:  Thank you.

13           THE COURT:  Thanks very much.

14               (Court adjourned at 12:55 p.m.)

15                      ---oOo---

1

2

### **CERTIFICATE OF REPORTER**

4        I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6

7  DATE:   Wednesday, October 17, 2018

8

9

10

11  _____/s/Vicki Eastvold_____

12              Vicki Eastvold, RMR, CRR
                   U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25