DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ELISE LAPUNZINA (NYBN 2540730)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6878
    FAX: (415) 436-7234
    Elise.LaPunzina@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 15-00582 WHO |
| Plaintiff, | UNITED STATES SENTENCING MEMORANDUM |
| v. | |
| ADAM SHAFI, | Date; March 21, 2019<br>Time: 1:30 p.m.<br>Court: Hon. William H. Orrick, Courtroom 2 |
| Defendant. | |

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................................1

ARGUMENT ...................................................................................................................................1

I.     Summary of the case ............................................................................................................1

II.    The Sentencing Guidelines ..................................................................................................1

       A.     The fraud guidelines ................................................................................................1

       B.     The terrorism enhancement.......................................................................................2

           1.     The legal standard .......................................................................................2

           2.     The legal standard as applied to the facts of this case ...............................6

III.   Government's sentencing recommendation........................................................................11

           1.     Seriousness of the offense.........................................................................11

           2.     Protecting the public .................................................................................11

           3.     Punishment and deterrence .......................................................................13

           4.     The need to avoid unwarranted sentencing disparity................................15

CONCLUSION................................................................................................................................15

## TABLE OF AUTHORITIES

Page(s)

### Federal Cases

*United States v. Abu Ali*, 528 F.3d 210 (4th Cir. 2008) ............................................................... 13

*United States v. Awan*, 607 F.3d 306 (2d Cir. 2010) .................................................................. 3, 4

*United States v. Elshinawy*, 2018 WL 1521876 (D. Md., 2018) .............................................. 3, 10

*United States v. Fidse*, 862 F.3d 516 (5th Cir. 2017) ............................................................... 5, 10

*United States v. Graham*, 275 F.3d 490 (6th Cir. 2001) ................................................................ 3

*United States v. Haipe*, 769 F.3d 1189 (D.C. Cir. 2014) ............................................................... 5

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) ......................................................... 13

*United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) ..................................................... 3, 13

*United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003) ................................................................. 12

*United States v. Mezas de Jesus*, 217 F.3d 638 (9th Cir. 2000) ..................................................... 3

*United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012) ................................................................. 5

*United States v. Van Haften*, 881 F.3d 543 (7th Cir. 2018) ....................................................... 4, 5

### Federal Statutes

18 U.S.C. § 371 ................................................................................................................................ 3

18 U.S.C. § 1344 ............................................................................................................................... 1

18 U.S.C. § 2332b(g)(5) ............................................................................................................... 2, 3

18 U.S.C. § 2339B ............................................................................................................................ 1

18 U.S.C. § 3553 ............................................................................................................................ 15

18 U.S.C. § 3553(a) ....................................................................................................................... 11

Federal Rules

Fed.R.Crim.P. 11(c)(1)(C) ................................................................................................................. 1

U.S.S.G. § 3A1.4 ....................................................................................................................... 2, 3

U.S.S.G. § 4A1.3 .......................................................................................................................... 13

# INTRODUCTION

The above-captioned case is scheduled for sentencing on March 21, 2019. For the reasons set forth below, the government recommends that the Court sentence the defendant Adam Shafi to a term of imprisonment of 120 months, followed by 3-years supervised release with special conditions, and a special assessment of $100.

# ARGUMENT

## I. Summary of the case

Adam Shafi was arrested on July 3, 2015, and charged by criminal complaint with a violation of 18 U.S.C. § 2339B, attempted material support of a foreign terrorist organization, the al-Nusra Front ("ANF"). Dkt. 1. He was indicted on that charge on December 15, 2015. Dkt. 15. After extensive pretrial litigation, the case proceeded to trial on August 27, 2018. Dkt. 271. After 6 days of testimony and approximately 7 days of deliberation, the jury was unable to reach a verdict. The Court declared a mistrial on September 17, 2018. Dkt. 299. The case was set for re-trial on January 14, 2019. Dkt. 308.

On December 7, 2018, the defendant waived indictment and was arraigned on a felony information charging him with one count of bank fraud in violation of 18 U.S.C. § 1344. Dkt. 345, 347. That same day, the defendant pleaded guilty to the charge pursuant to a binding plea agreement under Fed.R.Crim.P. 11(c)(1)(C). Dkt. 348. The plea agreement reflects the defendant's admission to possessing a fraudulent check in the amount of $2200 which he deposited on June 29, 2015. Dkt. 349 at ¶ 2. The plea agreement does not contain an agreement on the applicable Sentencing Guidelines. However, it includes an agreed-upon sentencing range between time-served and 168 months imprisonment. *Id.* at ¶ 8. The defendant was detained from the date of his arrest through October 5, 2018, when he was released on a fully secured $1 million bond. Dkt. 312. The maximum statutory sentence for bank fraud is 30 years.

## II. The Sentencing Guidelines

### A. The fraud guidelines

The government agrees with the Probation Officer's Sentencing Guidelines calculation for bank fraud which is set forth in the Presentence Report ("PSR") at ¶¶ 20-21, 27:

    Base offense level, 2B1.1(a)(1):    7

|   |   |
|---|---|
| Specific offense characteristics: | 0 |
| Acceptance of responsibility, 3E1.1(a): | -2 |

Since the defendant does not have any prior criminal history, this calculation yields a sentencing range of 0-6 months in Zone A.  PSR ¶ 58.

B.   The terrorism enhancement

The government argues that the terrorism enhancement under USSG § 3A1.4 applies in this case. With that enhancement, the sentencing guidelines would be as follows:

|   |   |
|---|---|
| Base offense level, 3A1.4(a): | 32 |
| Acceptance of responsibility, 3E1.1(a): | -2 |
| Criminal History Category, 3A1.4(b): | VI |

*See* PSR ¶ 22.  This calculation yields a sentencing range of 168-210 months in Zone D.

Section 3A1.4 provides that if the offense of conviction "is a felony that involved, or was intended to promote, a federal crime of terrorism," the resulting offense level is to be increased by 12 levels or offense level 32, whichever is greater, and the defendant's criminal history category "shall be Category VI," regardless of whether the defendant's criminal history as computed under Chapter Four of the guidelines is lower.  USSG § 3A1.4 and cmt. n.3.  A "federal crime of terrorism" has the same meaning "given that term in 18 U.S.C. § 2332b(g)(5)."  *Id.*, cmt. n.1.

The definition of a "federal crime of terrorism" under § 2332b(g)(5) has two prongs: first, the offense must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" and second, the offense is a violation of specific criminal statutes.  The facts in this case support a finding that bank fraud is a qualifying felony here because it was committed with intent to promote material support of terrorism.  The government does not agree with the Probation Officer's reading of the Guidelines or the statute in deciding that the terrorism enhancement does not apply.  PSR ¶ 22, PSR Sentencing Recommendation p. 2, and Addendum to the PSR ¶ 4.  Failure to apply the enhancement reflects both a misunderstanding of the law and the case.

1.   The legal standard

The Sentencing Guidelines are clear that application of Section 3A1.4 is not restricted to

UNITED STATES SENTENCING MEMORANDUM
CR 15-00582 WHO                                                         2

specific statutory violations. In fact, nothing in Section 3A1.4 limits its scope to the enumerated offenses § 2332b(g)(5). Instead, the language of 3A1.4 plainly states that it applies to "a" felony, meaning any felony, which involved or was intended to promote a federal crime of terrorism. In *United States v. Graham*, 275 F.3d 490 (6th Cir. 2001), the Sixth Circuit upheld application of the enhancement to a conviction under the general conspiracy statute, 18 U.S.C. § 371, to commit offenses against the United States:

> [T]he word 'involved' signifies that a defendant's offense included a federal crime of terrorism … as defined in 18 U.S.C. § 2332b(g)(5) … A defendant who intends to promote a federal crime of terrorism has not necessarily completed, attempted, or conspired to commit the crime; instead the phrase implies that the defendant has as one purpose of his substantive count of conviction or his relevant conduct the intent to promote a federal crime of terrorism. On this reading, the offense of conviction itself need not be a 'Federal crime of terrorism.'

*Id.* at 516. *Accord United States v. Mandhai*, 375 F.3d 1243, 1247-48 (11th Cir. 2004) ("Had the Guidelines drafters intended that § 3A1.4 apply only where the defendant is convicted of a crime listed in 18 U.S.C. § 2332b(g)(5), they would have included such limiting language. Instead, they unambiguously cast a broader net by applying the enhancement to any offense that 'involved' or was 'intended to promote' a terrorism crime."). *See also United States v. Elshinawy*, 2018 WL 1521876 (D. Md., 2018) (recognizing application of the enhancement to inchoate offenses) (internal citation omitted).

In the Ninth Circuit, the government's burden of proof is clear and convincing evidence due to the enhancement's significant impact on the applicable adjusted sentencing range. *See United States v. Mezas de Jesus*, 217 F.3d 638 (9th Cir. 2000). Notably, the government is not required to prove the defendant's motive or ability to complete the federal crime of terrorism since those are not determining factors in applying the sentencing enhancement.

In *United States v. Awan*, 607 F.3d, 306 (2d Cir. 2010), the Second Circuit held that application of § 3A1.4 was not determined by the defendant's personal motivations for committing his offenses, but rather, whether the offenses were intended to promote a federal crime of terrorism. Defendant Awan was convicted of conspiracy to provide, and providing, material support for use in a conspiracy to murder and maim abroad, and money laundering. The defendant had helped to transfer funds from Sikh supporters in the United States to a Sikh terrorist organization in India to support creation of a separate Sikh state. The

district judge did not impose the § 3A1.4 enhancement based on his finding that the defendant "had private purposes in mind," and enjoyed the "prestige and influence" obtained by associating with terrorists and members of the Pakistan intelligence services. *Id.* at 316 (quoting district court opinion).

The appellate court reversed, holding that the defendant's "motive" was irrelevant to the intent prong of § 2332b(g)(5):

> Section 2332b(g)(5)(A) does not require proof of a defendant's particular motive. "Motive" is concerned with the rationale for an actor's particular conduct. "Calculation" is concerned with the object that the actor seeks to achieve through planning or contrivance. Calculation may often serve motive, but they are not, in fact, identical. Section 2332b(g)(5)(A) does not focus on the defendant but on his "offense," asking whether it was calculated, *i.e.*, planned-for whatever reason or motive-to achieve the stated object. Thus … the section is better understood as imposing a requirement that the *underlying felony* [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. Clearly, a person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation. Thus, a person who murders a head of state, for instance, sure in the knowledge that his crime will influence or affect the conduct of government, satisfies the terms of § 2332b(g)(5)(A) even if his particular *motivation* in committing the murder is to impress a more established terrorist with his abilities.

*Id*. at 317 (internal citations and quotation marks omitted).

Since the government had established the defendant knew that the objective of the foreign terrorist organization (FTO) and the terrorist with whom he dealt "was to influence the Indian government through violence," and that the funds he provided to the FTO "would be used toward that end," the intent prong of § 2332b(g)(5) was satisfied and the application of the enhancement warranted. *Id*.

> [Even though] Awan may not have been personally motivated by that objective,…. the government could still prove that Awan's offenses themselves were 'calculated to influence … the conduct of government." ... For example, if the evidence showed that Awan engaged in criminal conduct with knowledge that confederates solicited his actions to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, such proof could demonstrate that Awan's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object. A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics.

*Id*. at 317-18. *See also United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (finding that "[t]he district court did not err, much less clearly err, when it concluded that the record does not support Van

Haften's contention that he wanted to join ISIS solely to 'help the helpless' or to seek shelter from an impending holy war. A desire for safety and Islamic fellowship may have contributed to Van Haften's decision to travel to Syria, but this innocent desire was not Van Haften's sole, or even primary, motivation for attempting to join ISIS. The terrorism enhancement applies so long as the defendant's conduct was 'calculated … to retaliate against government conduct,' even if it was also calculated to accomplish other goals simultaneously.")(internal citations omitted); *United States v. Fidse*, 862 F.3d 516, 526 (5th Cir. 2017) (terrorism enhancement applied in obstruction and false statement case where (1) the defendant knew, just by the line of questioning of FBI agents, that he was being investigated with regard to his al-Shabaab activities, and (2) following the interviews, he had asked a companion to recruit others overseas to destroy evidence. The court held that the defendant "acted with intent to thwart that investigation into a possible conspiracy to provide material support to al-Shabaab … which, as the district court observed, wishes 'to influence and to affect the conduct of multiple governments by intimidation and coercion and through retaliation.'"); *United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012) (terrorism enhancement warranted "if a defendant's *purpose* in committing an offense is to 'influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct'") (citation and internal quotation marks omitted); *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014) (court upheld application of the sentencing enhancement where defendant claimed the primary purpose behind his hostage-taking actions was to raise money that would benefit the local Muslim community, finding that "no matter how desirable the policy changes [might have been]", his actions clearly evinced an intent to influence government policy through coercion and intimidation).

As discussed below, the terrorism enhancement should be applied here, where the evidence demonstrates that (1) ANF was a designated foreign terrorist organization, (2) ANF had a terrorist purpose that the defendant clearly knew about after watching the two-hour al Jazeera interview of al-Joulani, and (3) the defendant intended to further that purpose in providing material support based on his statements

and actions seeking to join ANF and serve for al-Joulani. The defendant's purported motive to help Syrian refugees and escape his "tense family life" are not factors the court should consider in determining whether or not the sentencing enhancement applies. *See* PSR ¶ 18.

### 2. The legal standard as applied to the facts of this case

The evidence proves by clear and convincing evidence that the defendant possessed and cashed the fraudulent Setco check for the purpose of financing his travel to Turkey in order to reach Syria and join a terrorist organization to fight the Syrian and/or United States governments. This is clear because he received the check in April, at a time he was selling numerous items in an effort to make quick money, held onto it for two months, notwithstanding his suspicion that it was fraudulent, and used it for his return trip to Turkey. *See* PSR ¶ 17. Defendant cashed the check when he committed to his travel to Syria by purchasing a one-way ticket to Turkey and had insufficient funds to survive overseas without the extra money. The sequence of events is as follows:

- On or about April 15, 2015, Shafi posted items for sale on Craigslist, including a bicycle;
- Shafi received a check in the amount of $2200, dated April 16, 2015, payable to himself, drawn on Setco Services LLC's account at Centennial Bank in Florida;
- In April 2015, Shafi maintained a balance of approximately $14.21 in his Bank of America account;
- In May and June 2015, Shafi received four checks from ESG Consulting, his father's business, in a total amount of approximately $2037.
- On June 28, 2015, Shafi purchased a one-way ticket to Turkey for a flight on June 30, 2015. Shafi paid for the $1275 ticket by using his Bank of America checking account card;
- On June 29, 2015, Shafi deposited the fraudulent $2200 check at Bank of America in Fremont;
- On June 30, 2015, Shafi withdrew $2400 at Bank of America;
- A few hours later on June 30, 2015, Shafi checked in for his Turkish Airlines flight at San Francisco International Airport;

- Several hours later, Shafi was questioned at the airport by law enforcement;
- On July 1, 2015, Shafi deposited $2400 cash back into his Bank of America account;
- Shafi's Bank of America account ending balance on July 16, 2015, was $198.57, after the fraudulent funds were charged back by the bank.

(Trial Exhibit 85; discovery at AS-04241-04244). Accordingly, defendant's commission of bank fraud was specifically intended to promote his travel to Syria via Turkey, and but for the check, he could not have traveled as intended.

In determining defendant's travel intent in 2015, there is no evidence that the defendant intended to do anything other than join a designated foreign terrorist organization in Syria aside from his self-serving statement to law enforcement after he was stopped at the airport. His parents and close friends did not seem to have known of his travel plans. Nor are there any internet searches relating to travel, housing, work, or refugee organizations in Turkey or anywhere else. To the contrary, there is clear evidence of his intent to join ANF. First, the recorded calls in the month of June demonstrate the defendant's intent to travel after he professed his admiration of ANF. *See* Attachment A, Trial Exhibit 022-009, Transcript of call on June 5, 2015. Notably, there is never a mention of helping refugees, but rather discussions about spilling gallons of blood and getting scars on his face in order to be worthy of Allah, as stated in a telephone conversation two weeks before he attempted to travel:

AS: I don't have any blood in my books. I just hope Allah doesn't take my soul until I have at least, like, a couple of gallons of blood that I have spilled for him, at least something like that. I just really hope so, man. How can I meet Allah when my face has no scars on it? Like it's just so, I don't know, I'm just so scared of that. [Pause] You know what I mean?

SK: Yeah.

*See* Attachment B, Trial Exhibit 024-002 (transcript of call on June 16, 2015 between the defendant and his friend S.K.)

Two days later, the defendant expressed his jealousy when he learned that a cousin of an acquaintance had died fighting in Syria.

SK: There was a, [UI]; there was a couple brothers over here. Their cousin just died in Syria [UI].

AS: He was fighting there?

UNITED STATES SENTENCING MEMORANDUM
CR 15-00582 WHO                                      7

| | | |
|---|---|---|
| SK: | | Yeah, he became a *shahid.* |
| AS: | | With who? |
| SK: | | Uh, I asked them which group and they didn't know. They said he went during the beginning, like, three or four years ago that he went. |
| AS: | | Oh. |
| SK: | | So he-he went before the *fitnah* started. |
| AS: | | Serious? |
| SK: | | Yeah, and uh, right when the guy told me I said *mabruk.* And he was all, "*Jazak Allah khair.*" Like usually [laughs]…So I was so happy man. Are you serious? And the one guy-- |
| AS: | | [OV] So freaking jealous. |

*See* Attachment C, Trial Exhibit 025-007 (transcript of call on June 18, 2015 between the defendant and S.K.)

Then one week before his attempted travel, the defendant also talked about killing people supporting America or American soldiers.

| | | |
|---|---|---|
| AS: | | --like they tried so hard to not fight. Now they just come up with every excuse to fight. You don't even talk to them, they just say, "Oh you did this, all right we're gonna kill you guys." I don't know how this happened, man. [Pause] Man. The only thing…the going there [clears throat] about g-going to, uh, Burma is I really wanted to kill some people who are… |
| SK: | | Huh? |
| AS: | | I really wanted to kill some, like, fricking people that were, uh, like supporting America or-or American soldiers or something. |

*See* Attachment D, Trial Exhibit 026-012 (transcript of call on June 23, 2015 between the defendant and S.K.)

    Second, there are several internet searches, including access to YouTube videos, relating to fighting in Syria, demonstrating his intent to support the fight once he reached there. *See* Attachment E, Shafi Timeline - Summary. Third, defendant took a substantial step toward joining the fight in Syria by depositing the stolen check and using the proceeds to finance his trip, as opposed to donating the money

UNITED STATES SENTENCING MEMORANDUM
CR 15-00582 WHO                                                                 8

to refugees.  A perfect example of the self-serving nature of his statement to law enforcement is that, in the month of June 2015, while he held onto a $2200 fraudulent check to finance his trip, he donated less than 5% of that value ($100) to an Islamic relief fund.  Clearly, his intent was not to provide support to refugees.  Instead, his intent was to further his goal of providing material support in Syria.

In PSR ¶ 75, the Probation Officer wrote that there is "no evidence that Shafi had a specific plan to work under the direction and control of the Al-Nusra Front, nor is there evidence that Shafi had been vetted, let alone accepted, to join AN."  However, pre-vetting, acceptance, and having a detailed advance plan are neither necessary to providing material support nor requirements for application of the terrorism enhancement.  According to the trial record, on June 5, 2015, the defendant had a lengthy telephone conversation with S.K. where he repeatedly praised the emir of ANF and repeatedly expressed his desire to travel to Syria and join ANF because of his impression of the reasonableness of their tactics.  *See* Attachment A.  Additionally, according to the testimony of the government's expert witness Dr. Lorenzo Vidino, pre-vetting and a detailed advance plan are not required to join an FTO.  According to Dr. Vidino, it is common for prospective foreign fighters seeking to join an FTO in Syria to travel to places in Turkey in order to find a facilitator who can assist the prospective foreign fighters in crossing the border into Syria and connecting up with an FTO.  *See* Attachment F, Vidino testimony (Direct Examination, Sept. 4, 2018, p. 604-05; 641-42).  Notably, the defense expert did not say anything to the contrary.  *See* Attachment G, Sageman testimony, September 4-5, 2018.

Indeed, the defendant's own statements prove that he was well aware of how to reach Syria because he had already made a similar trip in 2014, at a time he intended to connect with ISIS but instead found an ANF facilitator within 24 hours of being in Turkey.  As the defendant discussed with S.K. on June 5, 2015, after watching the al-Joulani interview:

SK:         [OV] Maybe, maybe, well maybe that's why, that's why you guys came back the first time?

AS:         Hmm?

SK:         Maybe Allah was protecting you from joining [UI].

AS:         Yeah, yeah that's probably what it was. What's the problem was that guy was gonna take us to *Jabhat al-Nusra*.

UNITED STATES SENTENCING MEMORANDUM
CR 15-00582 WHO                                        9

1 SK: Yeah and then you didn't wanna go.

2 AS: Yeah.

3 SK: *Inshallah, inshallah.* Allah gave you the-the right choice and [UI] with you, and you
4 turned it away; and he just sent you back.

5 AS: [Laughs] *Subhan Allah,* man. I'm so arrogant. [UI].

6 SK: You know what, honestly whenever you mentioned *Daesh*, my heart would just be like,
7 "No," it'd be like, "Hell no." And then like when-when I heard *Jabhat al-Nusra*, like my
heart, *hamdulillah*, at ease, you know, it's like, alright, I can… I would not-I would not
8 be able to fight knowing I'm doing something wrong. Ever. I'll never be able to, like [UI],
9 kill these Muslims,[UI], I wouldn't be able to do it.

10 AS: Yeah, *subhan Allah.*

*See* Attachment A, Trial Exhibit 022-13 (transcript of call on June 5, 2015 between the defendant and S.K).

Where it is undisputed that the defendant knew that ANF was a designated foreign terrorist organization, the defendant pledged his commitment to the group and its emir, and his desire to die with blood on his books for Allah and kill others, including Americans, there can be no question as to the purpose of his travel one week later to join ANF and further its goals of using violence to influence or affect the conduct of the government of Syria by intimidation or coercion, or to retaliate against the conduct of the Syrian government and the West. The fact that he did not reach Syria or perhaps did not have the ability to achieve his goals do not call for a contrary result. *See United States v. Elshinawy*, 2018 WL 1521876, at *4 (D. Md., 2018) ("In order to apply the enhancement, however, there must be evidence in the record that establishes that the defendant 'intended to advance [a terrorist] purpose in providing material support…' However, the claimed personal motive for the offense is 'simply not relevant' to the intent inquiry. Nor must the government prove that the defendant had the means or ability to implement his plans. Rather, 'it is the defendant's purpose that is relevant, and if that purpose is to promote a terrorism crime, the enhancement is triggered.' But, influencing or affecting government need not be the defendant's 'ultimate or sole aim.' And, of import here, specific intent may be found without direct evidence of the defendant's state of mind." (internal citations omitted). *See also*, *Fidse*,

UNITED STATES SENTENCING MEMORANDUM
CR 15-00582 WHO                                             10

862 F.3d at 522.

III.   Government's sentencing recommendation

The government's sentencing recommendation takes into account the terrorism enhancement and the sentencing factors set forth in 18 U.S.C. § 3553(a) as applied to the defendant who twice attempted to provide material support to terrorist organizations.

### 1.   Seriousness of the offense

There are a number of factors that place the defendant's criminal conduct in a similar category as other terrorism cases across the country involving young, first time offenders seeking to travel, or having traveled, overseas to support terrorist organizations. Like many others, the defendant appeared to enjoy a good life in the United States when he was drawn to radical Islam. Yet he was ready, willing, and able to leave that life behind and join ANF in a quest to promote its message by fighting the Syrian regime and the West. It was a simple plan and one that did not require more preparation in order for it to work, as government expert Dr. Vidino testified. Terrorism is by its nature a very serious offense, and the only way to minimize it here is by disputing the defendant's intent when he attempted to travel in 2015. However, there is no evidence that he intended to help refugees in Syria, engage in any peaceful acts there, work in Turkey or Syria, or provide financial resources to refugees in Turkey or Syria. In fact, his only clear intent was on joining ANF and defending Muslims against the West.

### 2.   Protecting the public

The defendant made two attempts to support terrorist organizations known for killing people and seeking to overthrow governments and dominate the West. Notwithstanding his numerous contacts with law enforcement after his 2014 trip and interview at the airport on June 30, 2015, the defendant showed no remorse and remained committed to fulfilling his dream of traveling to Syria. This is evident in a conversation he had with his brother I.S. on the way home from the airport on June 30, 2015:

AS:   No. You know what? Those guys, you know, I think they are a lot more stupid than we think, bro. They-they just came to me and they were just like, "So who you gonna go join, you know, one of those groups in Syria? Is that what you were trying to do?" And I was like, "What the hell, do you think I am gonna say, 'yes'" What type of fricking idiot would say 'yes'?"

IS:   [Laughs] Abraham Lincoln.

AS:   [Laughs] Like, what-what did he say? "A man could never lie." "Yes, that is exactly why I was going."

IS:   [Laughs]

AS:   [Laughs] Is that-that's the first thing they think I was gonna do.

IS:   [Laughs]
AS:   What the hell? It doesn't make any sense.

IS:   "We were inspired by your Abe Lincoln, that we're just gonna let you go."

AS:   [Laughs]

IS:   What they want you to think. It's like, it's like when, you know, when a police officer, when you're doing something extremely illegal and you are running away from the cops, and he's, like, "Look, we're not gonna arrest you, we just wanna talk [UI] pull over." Yeah, freaking right, man. The moment you pull that car over, they're gonna tackle you, put you on the ground, and shoot you in the nuts and take you to jail.

AS:   Dude, honestly, you wanna know, you wanna know how I feel, bro? I would honestly, if, if this is the case, I'd rather just be in jail, bro. What the hell am I gonna do out here? Just be like everyone else and betray the *Ummah*? I can't go anywhere else as I can't fight or nothing. Just go be in there.

IS:   You just gotta wait, man. You just got to wait it out, bro. Your time will come.

AS:   How can I wait when I'm just watching my brother Muslims keep getting killed all over the place?

*See* Attachment H, Trial Exhibit 029-010 (transcript of call on June 30, 2015 between the defendant and I.S.)

Application of the sentencing enhancement in a case like this is both required and appropriate in order to protect the public from further crimes. As noted in *United States v. Meskini,* 319 F.3d 88 (2d Cir. 2003),

> Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists in § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation. A judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or

UNITED STATES SENTENCING MEMORANDUM
CR 15-00582 WHO                                                                 12

> the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing. U.S.S.G. § 4A1.3.

*Id.* at 92.

Furthermore, courts have held that lack of commission of a violent act by a defendant is not a permissible basis for departure. In *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011), the court, citing its own and Fourth Circuit precedent, held that the district court had

> substantively erred in reducing [the defendant's] sentence based on the fact that [he] did not personally harm anyone and his crimes did not target the United States…. We held in a pre-Booker case that a district court may not reduce a sentence of a terrorist because the terrorist committed an inchoate crime. *Mandhai* [supra], 375 F.3d at 1249. Post-Booker, the Fourth Circuit has held that '[t]o deviate [a sentence downward] on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates incomplete conduct.'

*Id.* at 1118 (quoting *United States v. Abu Ali*, 528 F.3d 210, 264 (4th Cir. 2008). In *Abu Ali*, the Fourth Circuit reversed a downward variance (to 30 years) for a defendant convicted of material support, noting the defendant should not have benefitted "simply because his plans were disrupted [by law enforcement]," especially given the lack of evidence that he had changed his criminal mindset. *Id.* at 265.

As discussed above, in the fall of 2014 and leading up to his travel in June 2015, the defendant was still researching ISIS, Gaziantep, and illegal border crossings. *See* Attachment E (Timeline). This is not indicative of someone who has realized the error of his ways in the face of being interrupted by law enforcement in 2014. Rather, it shows that the defendant's interest in joining a terrorist organization continued and led to his travel in June 2015. There is no reason to believe that he does not still harbor those sympathies and, as a result, remains a danger to the community both domestically and abroad. Since his arrest, law enforcement has not monitored the defendant's activities beyond his jail calls. Our lack of visibility into his search history, chats, emails, and conversations subsequent to his arrest and, more recently, his release does not support a finding that he has been de-radicalized.

### 3. Punishment and deterrence

There is a clear need for punishment and both specific and general deterrence here. As discussed

1  above, this is a serious crime – providing support to a terrorist organization intent on overthrowing
2  Western governments.  Few crimes are more deserving of serious punishment.  The defendant knew
3  how serious his conduct was and there is little evidence that he had any consideration for the law.  To
4  the contrary, on June 29, 2015, he researched whether or not he could steal, and then went forward with
5  committing the crime.  Moreover, the defendant attempted to travel to Syria almost a year after his first
6  attempted trip there, notwithstanding his multiple interactions with law enforcement, which is
7  completely inconsistent with someone who has realized the errors of his ways.  His continued
8  commitment to travel is evident from the following conversation with S.K. on July 1, 2015:

AS:  What do you think? What do you think we should do?
SK:  Well, I think it sucks for you [laughs].
AS:  What sucks?
SK:  You can't really do anything.
AS:  Oh, you mean the FBI thing?
SK:  Yeah.
AS:  I don't-I don't think that's a big deal, I'm just…If-if I-if I know what I need to do, I'm gonna do whatever, I don't really care what it takes, I just wanna know what to do.  The FBI ain't gonna get in my way. If I need to leave the country, I'll just take a boat or whatever. It's not that big of a deal.
SK:  Yeah.
AS:  But in terms of, like, what we need to do, what do you think we need to do?
SK:  Well, I'm gonna go, *inshallah*, uh, by myself.
AS:  By yourself?
SK:  Yeah.
AS:  At least take [A.N.] with you.
SK:  If he wants to go, he can come,

*See* Attachment I, Trial Exhibit 031-013, 014 (transcript of call on July 1, 2015 between the defendant and S.K.)

The impact of the sentence imposed in this case is not limited to the defendant.  General

UNITED STATES SENTENCING MEMORANDUM
CR 15-00582 WHO                                      14

deterrence is also a vital consideration. Individuals can be readily radicalized online, and terrorist groups such as ISIS have taken great pride in its propaganda and success at attracting adherents using the internet, and inspiring those adherents to commit violent acts. It is vital that the sentence in this case make it clear to anyone participating in similar conduct that going down this path has serious consequences. The sentence requested by the government will send a clear message both to the defendant and to others.

### 4. The need to avoid unwarranted sentencing disparity

According to statistics compiled by George Washington University Center on Extremism, between in or about 2011 and February 2019, approximately 177 United States citizens were arrested on IS-related charges. Of those, at least 50 cases related to attempted travel. Approximately thirty eight cases have been adjudicated, and the average sentence on those is 13.4 years. *See* https://extremism.gwu.edu/cases. The government's recommended sentence here is lower than the average sentence in a traveler case involving an attempt to join an FTO.

### CONCLUSION

Based on the above, the government submits that a sentence of 120 months imprisonment, followed by 3 years supervised release appropriately addresses the nature and seriousness of the offense, promotes respect for the law, provides an adequate deterrence to criminal conduct, protects the public from the defendant's further crimes, and, most importantly, provides a just punishment for this defendant. This is reasonable in consideration of the factors under 18 U.S.C. § 3553 and the advisory Sentencing Guidelines range. It is also well below the potential maximum sentence in this case.

DATED: March 14, 2019					Respectfully submitted,

							DAVID L. ANDERSON
							United States Attorney

							_____/s/_____
							ELISE LAPUNZINA
							Assistant United States Attorney