1  STEVEN G. KALAR
   Federal Public Defender
2  Northern District of California
   HANNI FAKHOURY
3  Assistant Federal Public Defender
   13th Floor Federal Building - Suite 1350N
4  1301 Clay Street
   Oakland, CA 94612
5  Telephone:   (510) 637-3500
   Facsimile:   (510) 637-3507
6  Email:        Hanni_Fakhoury@fd.org

7

8  Attorneys for ADAM SHAFI

9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,              **Case No.:** CR 15–00582 WHO

15              Plaintiff,                 **DEFENDANT'S SENTENCING
                                           MEMORANDUM**
16        v.
                                           **Court:**         Courtroom 2, 17th Floor
17  ADAM SHAFI,                            **Hearing Date:**   March 21, 2019
                                           **Hearing Time:**   1:30 p.m.
18              Defendant.

19

20

21

22

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................ii

INTRODUCTION ........................................................................................................................1

STATEMENT OF FACTS ............................................................................................................1

    A.    Mr. Shafi's History and Characteristics...........................................................1

    B.    The Nature and Circumstances of the Offense. .............................................5

    C.    Court Proceedings.............................................................................................9

    D.    Mr. Shafi's Return Home and Future Goals. ................................................10

ARGUMENT ..............................................................................................................................12

    A.    Seriousness of the Offense, Respect for the Law and Just Punishment.......12

    B.    Deterring Criminal Conduct and Protecting the Public. ...............................15

        1.    Mr. Shafi's Post-Offense Rehabilitation Demonstrates the 40 Months He Spent in Custody Has Been an Effective Deterrent. ...................................................15

        2.    Mr. Shafi is at a Significantly Lower Rate of Recidivism as a First Offender...16

        3.    This Court Already Determined Mr. Shafi is not a Danger to the Community When it Released Him on Bail in October 2018................................................18

    C.    Providing Training, Medical Care or Other Treatment. ................................19

    D.    The Guidelines Sentencing Range and Sentencing Commission Policy Statements. ....20

    E.    Avoiding Unwarranted Sentencing Disparities. ...........................................21

    F.    Providing Restitution. ....................................................................................23

OBJECTION TO PROPOSED SUPERVISED RELEASE CONDITION #7 ...................................23

CONCLUSION...........................................................................................................................25

1

## TABLE OF AUTHORITIES

2

### Cases

3    *Gall v. United States*, 552 U.S. 38 (2007) ...................................................................... 12, 15, 21

4    *Graham v. Florida*, 560 U.S. 48 (2010) ........................................................................... 14

5    *Kennedy v. Louisiana*, 554 U.S. 407 (2008) .................................................................... 12

6    *Kimbrough v. United States*, 552 U.S. 85 (2007) ............................................................ 20

7    *Pepper v. United States*, 562 U.S. 476 (2011) ................................................................. 15

8    *Roper v. Simmons*, 543 U.S. 551 (2005) .......................................................................... 14

9    *Tapia v. United States*, 564 U.S. 319 (2011) ............................................................. 12, 20

10   *Thompson v. Oklahoma*, 487 U.S. 815 (1988) ................................................................. 14

11   *United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009) ................................. 21

12   *United States v. Barker*, 771 F.2d 1362 (9th Cir. 1985) .................................................. 12

13   *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc) ..................................... 12

14   *United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008) ....................................................... 19

15   *United States v. LaCoste*, 821 F.3d 1187 (9th Cir. 2016) .......................................... 23, 24

16   *United States v. Stoterau*, 524 F.3d 988 (9th Cir. 2008) ................................................. 24

17   *United States v. Trujillo*, 713 F.3d 1003 (9th Cir. 2013) ................................................. 15

18   *Williams v. New York*, 337 U.S. 241 (1949) .................................................................... 12

19

### Statutes

20   18 U.S.C. § 1001 ............................................................................................................... 21

21   18 U.S.C. § 1344 ............................................................................................................... 10

22   18 U.S.C. § 2339B ......................................................................................................... 9, 22

23   18 U.S.C. § 3142 ............................................................................................................... 18

24   18 U.S.C. § 3143 ............................................................................................................... 19

25   18 U.S.C. § 3553 ........................................................................................... 12, 15, 19, 21

26

### U.S. Sentencing Guidelines

27   U.S.S.G. § 2B1.1 ............................................................................................................... 20

28   U.S.S.G. § 3A1.4 ................................................................................................... 20, 22, 23

U.S.S.G. § 3E1.1 ......................................................................................................... 20

U.S.S.G. § 5C1.1 ......................................................................................................... 20

**U.S. Sentencing Commission Reports**

2017 Sourcebook of Federal Sentencing Statistics, Table 6, Age of Offenders in Each Primary

    Offense Category, https://www.ussc.gov/sites/default/files/pdf/research-and-

    publications/annual-reports-and-sourcebooks/2017/Table06.pdf ................................. 14

Public Data Presentation for First Offenders and Alternatives to Incarceration Amendment,"

    December, 2016, http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-

    hearings-and-meetings/20161209/20160109_DB_alternatives.pdf ........................... 17

Recidivism Among Federal Offenders: A Comprehensive Overview (2016),

    http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

    publications/2016/recidivism_overview.pdf .............................................................. 16

Youthful Offenders in the Federal System, http://www.ussc.gov/sites/default/files/pdf/research-and-

    publications/research-publications/2017/20170525_youthful-offenders.pdf ............................ 13

**Other Authorities**

CBS News, "Obama in Egypt," https://www.cbsnews.com/pictures/obama-in-egypt/10/ .................... 4

Norimitsu Onishi, "Syria Seen as Most Dire Refugee Crisis in a Generation," *New York Times*, Nov.

    23, 2013 https://www.nytimes.com/2013/11/24/world/middleeast/syria-seen-as-most-dire-

    refugee-crisis-in-a-generation.html ......................................................................... 3

Daniel P. Mears, et al., "Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of

    Different Types of Sanctions," *Journal of Research in Crime and Delinquency*, Nov. 14, 2017,

    http://journals.sagepub.com/doi/abs/10.1177/0022427817739338?journalCode=jrca ............. 18

## INTRODUCTION

Mr. Shafi's arrest on July 3, 2015 was both the worst and best thing that has ever happened to him.  Armed FBI agents entered their home in Fremont to take Mr. Shafi away to jail, where he would remain for almost three and a half years.  It was the culmination of nine months of household tension borne from the fallout of Mr. Shafi's foolish decision to leave his family during a vacation to Cairo in order to go to Istanbul in 2014.  That major mistake led to an FBI investigation, a FISA wiretap, a jury trial resulting in a mistrial, and ultimately a felony conviction.  But it also brought the Shafi family closer together, helped Mr. Shafi realize his privilege was a blessing, not a burden, and brought into focus the mental health problems Mr. Shafi failed to address for too long.

In the aftermath of the arrest, Mr. Shafi and his family have spent countless hours looking backwards, reliving the events of 2014 and 2015 over and over.  Since this Court released Mr. Shafi on bail on October 4, 2018, Mr. Shafi and his family have looked forward for the first time in a long time, thinking about school, a career and marriage.  This Court told Mr. Shafi when it released him on bail that "I expect that you are going to…prove your parents right…about who you are."  Dkt. 310 at 34:13-14.  Mr. Shafi has worked hard to show this Court's prediction correct.  Today, Mr. Shafi has been out of custody for six months without a problem.  He is attending weekly counseling sessions that he has found useful and rewarding.  He is extremely remorseful for the mistakes he made and "earnestly apologize[s] to your Honor, my family, and the government for my disturbing comments and actions leading up to my arrest and charge 4 years ago."  Exh. A, Letter of Adam Shafi at 1. Most importantly, he has learned from this ordeal.

Mr. Shafi has been harshly and sufficiently punished for his actions and there is no need to stop his treatment and send him back to jail to deter him from committing another crime.  He respectfully asks this Court to sentence him to credit for time served of approximately 40 months, followed by three years of supervised release and a $100 special assessment.

## STATEMENT OF FACTS

### A.   Mr. Shafi's History and Characteristics.

To understand Mr. Shafi's case, it is crucial to understand the history and characteristics of his father.  Salama Shafi was born in Cairo, Egypt in 1953.  His father was an imam, or Islamic preacher,

and had a total of 11 children in two marriages. The Shafi family was poor and Salama realized the only way to make a living for himself was to leave Cairo and immigrate to the United States. In 1980, Salama moved to New York and within a year, moved to the Bay Area.  He had little money to his name but a desire to succeed.  He went to school, found work in the technology sector, and eventually started his own company. By the late 1980s, he bought the home he lives in



*Picture of the garage in the Shafi home taken by the FBI on July 3, 2015.*

today in Fremont.  In 1989, Salama married Seham Mansour, a childhood family friend Salama had known since they were kids.  Seham was in medical school in Cairo and after she graduated, she immigrated to the United States with Salama.  It is no surprise that the Shafis have an American flag flying in their garage because they are the embodiment of the American dream.

Mr. Shafi was born in San Jose in 1993.  The Shafis had four other children over the next ten years.  Mr. Shafi faced the same hurdles and obstacles many teenagers face, particularly as the oldest son of immigrants and straddling two different cultures.  In 8th grade, in an effort to fit in, he hung out with the wrong crowd and started smoking marijuana and drinking alcohol.  *See* Presentence Investigation Report ("PSR") ¶ 48.  That culminated in a juvenile arrest on suspicion of stealing cars, though no criminal or juvenile prosecution ensued.

In 2007, his parents took Mr. Shafi to see a therapist, explaining they had concerns that he was withdrawn and his grades had dropped.  *See* Exh. B, January 23, 2007 Medical Record.  At a follow up session, Mr. Shafi explained to a clinical social worker that he "was bewildered…about what is happening in his life." *See* Exh. C, February 7, 2007 Medical Record.  He reported "that things are better now" and that his family "are nice and not angry at him anymore.  *Id.*  He also stated he "would like to come back in and discuss what is happening, as he is feeling uneasy about the future." *Id.*  The therapist ultimately diagnosed Mr. Shafi with depressive disorder.  *See* Exh. D, August 29, 2007 Medical Record.  Despite the diagnosis and his statement in February 2007 that he wanted to



*Picture from Mr. Shafi's High School Yearbook.*

Nabeel Safi, Abdulla H. Wardak, Sammy Chaudhry, Farhan Aziz, Sayed Waheed, Meena Calaimany, Sabeeka Naqvi, Mina Wardak, Mariam Hassan, Talooelei, Neda Pirooz, Laila Mossadae, Zahra Sarwary, Bisma Aijaz

continue with counseling, he did not come in for another counselling session.  *Id.*

By the time Mr. Shafi entered high school, he looked inward and turned to his religion.  Islam gave Mr. Shafi a community and a purpose.  He became involved in the Muslim Students Association and served as its president during his junior and senior year.  PSR ¶ 38.  Mr. Shafi graduated from high school in 2011 and enrolled at Ohlone Community College in Fremont.

As Mr. Shafi was going through community college, the world was dealing with the unprecedented events of the Arab Spring.  In 2011, the resignation of Egyptian President Hosni Mubarak brought great joy to millions of Arabs around the world, particularly Egyptians like the Shafis.  Unfortunately, the initial hope of democratization and modernization in the Arab world turned to chaos, as civil wars broke out in Libya and Syria.  By 2013, the *New York Times* noted that the United Nations described the Syrian refugee crisis "as the most challenging refugee crisis in a generation—bigger than the one unleased by the Rwandan genocide and laden with the sectarianism of the Balkan wars."[1]  The news featured constant reports about the plight of Syrian refugees and heartbreaking images of death and destruction.

Amongst all this, by 2013 Mr. Shafi was turning more religious, making sure to pray at the mosque five times a day, and volunteering with Ta'leef Collective in Fremont, a non-profit community gathering place for young Muslims, particularly converts and first generation Muslim Americans.[2]  *See* Exh. E, January 30, 2019 Letter from Diane Stair.  But the situation in the Middle

---

[1] Norimitsu Onishi, "Syria Seen as Most Dire Refugee Crisis in a Generation," *New York Times*, Nov. 23, 2013, *available at* https://www.nytimes.com/2013/11/24/world/middleeast/syria-seen-as-most-dire-refugee-crisis-in-a-generation.html.

[2] *See* Ta'leef Collective, "Our Mission," ("The Arabic word 'ta'leef' means 'to bring together', and describes our mission to build community by creating safe spaces for dialogue, education and fellowship. We aim to provide the ideal experience of American Islam, that is both culturally relevant and integral to individual and collective growth.") *available at* https://www.taleefcollective.org/our-mission/.

East generally and the Syrian refugee crisis specifically, took its toll on him.  He was taking fewer classes and getting worse grades.  *See* Exh. F, Ohlone College Transcript; *see also* PSR ¶ 49 (noting "cumulative grade point average was 2.5").  That combination understandably resulted in tension in the Shafi home.  Salama Shafi was the son of a poor, religious man.  Salama had to work hard to achieve financial success and security.  As the PSR explains, he "has high expectation for his family and is clear in his disappointment when those expectations are not met."  PSR ¶ 38.  Salama's oldest son had the exact opposite set of ambitions, focusing more on his religion and rejecting goals of material and financial success.

The differences between the two would manifest itself in the Shafi family's annual month long vacation to Egypt to visit family.  Part of the trip involved going to Sharm el Sheikh, a well-known resort town on the Red Sea, famous with Europeans and other tourists because of its clean beaches, and scuba diving and snorkeling.  But Mr. Shafi wanted to spend time with more distant family members who lived in humble farming villages north of Cairo.  On the family's 2013 trip to Egypt, Mr. Shafi spent two days with Salama's cousin, Anwar, in Kom El Nour, a village 56 miles north of Cairo.  Anwar lived in a small and dirty two bedroom flat, with one room reserved for her cow. Salama was mystified but would indulge Mr. Shafi's wishes.  While Salama



*Anwar's home, which Mr. Shafi visited in 2013.  Picture taken March 2018.*

enjoyed socializing and catching up with friends and cousins, Mr. Shafi wanted to spend the entire day at historic mosques like the almost 700 year old Sultan Hassan Mosque in old Cairo, a picture of which hung in Mr. Shafi's room.[3]  The history and architecture of Sultan Hassan stood in stark contrast to the mosque Mr. Shafi attended at home, the Islamic Center in Fremont.

---

[3] President Obama visited the Sultan Hassan Mosque with then Secretary of State Hillary Clinton in 2009.  *See* CBS News, "Obama in Egypt," *available at* https://www.cbsnews.com/pictures/obama-in-egypt/10/.





*Picture of the Sultan Hassan Mosque in Mr. Shafi's bedroom.  Picture taken August 2018.*

*The Sultan Hassan Mosque in Old Cairo.  Picture taken March 2018.*



*March 2015 Google Street View Picture of Islamic Center of Fremont.*

Ultimately, an uncomfortable dynamic developed between Salama and Mr. Shafi.  Salama had worked hard to give Mr. Shafi the luxurious upbringing Salama never had.  But Mr. Shafi felt guilty and resentful for the privileges he enjoyed while other Muslims in the Middle East suffered.  Mr. Shafi's insistence on praying at the mosque five times a day, including waking up at four or five in the morning for prayers, necessarily meant he slept through the morning and interrupted this work scheudle, which frustrated Salama. Mr. Shafi's desire to grow a beard and were more traditional Islamic clothes made Salama fear that Mr. Shafi would be discriminated against and unhirable.  Mr. Shafi felt he needed to escape to a Muslim country, where he could live, work, dress and pray as he pleased.

**B.    The Nature and Circumstances of the Offense.**

By now, this Court is well aware of the events of 2014 and 2015.  By 2014, the tensions Mr. Shafi felt were becoming untenable.  Mr. Shafi felt enormous pain and grief seeing what was happening in Syria.  He was chafing at the restrictions he felt his father was placing on him. Meanwhile, in Syria the terrorist group ISIS had proclaimed a "caliphate."   Mr. Shafi wanted to see for himself the refugee situation and get a firsthand account about ISIS and the other groups fighting in Syria at that time.  He decided that when he and his family were in Cairo in 2014 for their family

trip, he would fly to Istanbul and meet his friends Abdul Qadar Khan Niazi and Saleem Karim there. On August 16, 2014, Mr. Shafi left his family in Cairo, took a taxi to the airport and flew to Istanbul by himself.  Mr. Niazi landed at the Istanbul airport a few hours later.  Mr. Karim was ultimately unable to join them because his mother had hid his passport.

At the airport, Mr. Shafi and Mr. Niazi spoke with people fleeing Syria.  What they heard was distressing, confirming Mr. Shafi's fears that the groups purporting to protect Syrians were ultimately fighting amongst themselves and engaging in barbaric violence, primarily towards fellow Muslims.  Within hours, Mr. Shafi and Mr. Niazi decided to go back home.  They bought return tickets to Cairo and San Francisco, respectively.  They used their last remaining hours in Istanbul to visit the Blue Mosque, a historic mosque and popular tourist site in Istanbul.



*Picture of the Blue Mosque taken on August 17, 2014 by Mr. Shafi.*

In the meantime, Salama Shafi had gone to the U.S. Embassy in Cairo to report Mr. Shafi missing.  PSR ¶ 9.  Salama relayed that Mr. Shafi had sent a text message to his brother saying he had gone to "protect Muslims."  *Id.*  He also told Embassy staff that Mr. Shafi "had been in a bit of a state of depression" and "was grieving about the plight of the Muslims in the region."  Dkt. 318 at 66:2-4.

Mr. Shafi returned to Cairo on August 18, 2014 and the family returned to San Francisco on August 20, 2014.  PSR ¶ 9.  Upon his arrival to SFO, Mr. Shafi was interviewed by Customs and Border Protection agents at SFO.  On September 4, 2014, Mr. Shafi met with FBI agents at a coffee shop and gave more details about his trip to Istanbul, including specific details about the people he spoke with there.  Mr. Shafi was 21 years old and had neither a lawyer nor his parents with him during the interview.  By that point, the government had opened an investigation into Mr. Shafi.

The trip to Istanbul left an enormous mark on Mr. Shafi.  Five days after his meeting with the FBI, on September 9, 2014, he saw his doctor and reported feeling depressed.  The medical records reflected Mr. Shafi had "lost some 7 pounds due to lack of appetite" and had "lack of motivation and flat affect."  *See* Exh. G, September 9, 2014 Medical Record.  His doctor recommended he see a

1  therapist.  The Shafi family made appointments for Mr. Shafi to see an Islamic psychiatric counselor

2  in the fall of 2014.  PSR ¶ 45.  But Mr. Shafi did not find the therapy helpful and stopped attending

3  after a few sessions.  *Id.*

4      The family then tried to deal with Mr. Shafi's depression by enrolling him in Coding Dojo, a

5  computer science boot camp program that began in October 2014 and was supposed to end by

6  January 30, 2015.  PSR ¶ 49.  While Mr. Shafi liked the courses, it took him extra time to finish, and

7  he did not finish the necessary final exams to complete the course until March 2015.  *See* Exh. H,

8  June 27, 2016 Letter from Jenna Wolfe.  After he finished the courses, his father hired him to work

9  for his company.  But that resulted in tension too.  When Salama asked Mr. Shafi to design a website

10  for him, the two got into a disagreement about a picture and Salama refused to pay him.  Out of

11  anger, Mr. Shafi decided to earn money by selling his belongings on Craigslist, ultimately leading to

12  the bank fraud that Mr. Shafi stands convicted of.

13      In April 2015, Mr. Shafi posted his bike for sale on Craigslist for $800.  PSR ¶ 17.  He was

14  contacted by someone who offered to buy the bike and sent him a check for $2,200.  The person

15  instructed Mr. Shafi to deposit the check, keep the money for the bike, and given the rest of the

16  money to someone who would come pick up the bike.  *Id.*  Mr. Shafi received a check paid from

17  Setco Services, L.L.C., a title company in Florida.  Mr. Shafi was dubious about the check and the

18  Google search records show searches for "fake check cleared" and "setco services" on April 16,

19  2015.  Mr. Shafi decided not to deposit the check but kept it in case he needed to use it at a later date.

20  Ultimately, Mr. Shafi worked out his differences with Salama over the website and he was paid for

21  the work he completed.

22      But Mr. Shafi's feelings of humiliation, frustration, anger and despair would not abate.  He

23  knew he was under FBI scrutiny and surveillance, though did not know that the government had been

24  intercepting his phone calls since December 2014.  He resented the fact he was entirely dependent on

25  his parents, living in their house and working for his father.  He told Mr. Karim on June 8, 2015, that

26  he had told his parents he felt like a "slave until I leave this house."  Trial Exh. 023-038.

27      He especially felt hopeless about the messy situation in the Middle East.  On June 5, 2015, after

28  watching an interview by the leader of the al-Nusrah Front on Al Jazeera, Mr. Shafi felt that he had

1   found a group that was doing things the right way in Syria.  But that enamor quickly faded away.

2   Three days later, on June 8, 2015, Mr. Shafi told Mr. Karim that he wanted to "go to Death Valley for

3   a weekend, just sit and think over there," Trial Exh. 023-008, that he felt "like just going into the

4   desert and just getting a bunch of sleep," Trial Exh. 023-014, and that he wanted to "move in with

5   you when you get that apartment."  Trial Exh. 023-052. There were no online searches for the al

6   Nusrah Front or Muhammad al-Joulani after June 5, 2015.

7        Most problematic, Mr. Shafi was becoming increasingly nihilistic.  He had often felt suicidal,

8   thinking "life wasn't worth living" and that "he would never be happy or content."  PSR ¶ 44.  On

9   June 20, 2015, he sent text messages to Mr. Karim about Armin Harcevic, feeling "if there's really

10   nothing I can do I just rather be with him in the cage" so "at least he won't be alone."  Trial Exh. 144-

11   173.[4]  He began talking about his own death candidly, lamenting that he had not spilled his own

12   blood for Allah, and expressing "jealousy" at someone who had died in Syria.  PSR ¶ 10.  As Dr.

13   Sageman explained, Mr. Shafi "felt very guilty that he's here in this country, protected, not suffering,

14   and all the people in his community are suffering over there," and Mr. Shafi wanted "to share in the

15   suffering."  Dkt. 322 at 718:9-20.  Indeed, Mr. Shafi explained to Mr. Karim that he wanted to go

16   "through what [Mr. Harcevic's] going through

17   instead of just eating my fancy meals and sleeping in

18   my fancy house while he's in a cage," and he would

19   "feel better dying like that instead of like this."  Trial

20   Exh. 144-173. The Shafi family could see something

21   was wrong but did not know how to get through to

22   Mr. Shafi.



*Handwritten note from Mr. Shafi's sister Nora, 13 at the time, recovered by FBI during July 3, 2015 search of the Shafi home.*

23        On June 28, 2015, Mr. Shafi made the fateful

24   mistake that is now—almost four years later—reaching its conclusion: he purchased a one way ticket

25   to fly to Istanbul, Turkey.  He had no plan at all as to what he would do when he got there.  He had

26   not made any other travel or lodging arrangements, and told no one that he was leaving.  The

27

28   [4] Mr. Shafi apparently did not know that Mr. Harcevic had been released from jail on April 30, 2015. *See United States v. Harcevic,* CR 15-00049-CDP (E.D. Mo.), Dkt. No. 153.

1    following day, June 29, 2015, he deposited the Setco Services check he had received in April.  PSR ¶

2    12.  The next day he went to SFO, where he was not allowed to board the flight.  After a length

3    interrogation by the FBI, he was allowed to leave the airport on BART.  The following day, July 1,

4    2015, Mr. Shafi explained to Mr. Karim that he had been feeling "miserable" and if he couldn't help,

5    "then the least I can do is be miserable, with them.  Like, if I can't do anything then—then what else

6    am I gonna do? Just be happy while they're just, you know, suffering? At least, if I can't do anything,

7    I'm just gonna be miserable."  Trial Exh. 31-12.  On that same day, he deposited the money he

8    withdrew back into his bank account.  PSR ¶ 14.

9    **C.    Court Proceedings.**

10        On July 3, 2015, Mr. Shafi was arrested after a complaint was filed charging him with

11   attempting to provide himself to the al-Nusrah Front, in violation of 18 U.S.C. § 2339B, when he

12   attempted to fly to Istanbul on June 30, 2015.  Dkt. 1.  Initially, Mr. Shafi's case remained under seal

13   for five months as his retained attorneys attempted to resolve the case pre-indictment.  After

14   negotiations broke down, Mr. Shafi was indicted on December 15, 2015.  Dkt. 15.  On December 22,

15   2015, Mr. Shafi had a detention hearing before the Honorable Sallie Kim, who detained him as a

16   flight risk.  Dkt. 23.  This Court affirmed Judge Kim's detention order on January 14, 2016.  Dkt. 41.

17        After two and a half years of pretrial litigation, Mr. Shafi's jury trial began on August 27, 2018

18   and lasted six days.  Dkt. 271, 274, 275, 277, 283, 287, 288.  The jury heard evidence from fifteen

19   government witnesses and four defense witnesses, including two terrorism experts called by the

20   government and Mr. Shafi, respectively.  The jury deliberated for seven days.  Dkt. 290, 291, 292,

21   293, 296, 297, 299.  On September 19, 2018, the Court declared a mistrial after jurors indicated they

22   could not reach a unanimous verdict.  Dkt. 299.  Polling of the jurors indicated they were hung 8-4 in

23   favor of acquittal.  Dkt. 305-1 at 2, ¶ 7.

24        On October 4, 2018, the Court ordered Mr. Shafi released on a $1 million bond secured by his

25   parents' house.  Dkt. 308.  It adopted stringent release conditions proposed by Pretrial Services,

26   ordering Mr. Shafi, among other things, to surrender all travel documents and not reapply for a

27   passport, not possess a firearm, remain in the custody of his parents at their home, undergo a

28   psychiatric assessment and participate in mental health counseling, not use a computer or possess an

1   Internet enabled cell phone, and be subject to 24/7 GPS monitoring and not leave his home except for

2   legal, medical, treatment and court purposes.  Dkt. 312.  Mr. Shafi was released the following day.

3   Dkt. 310-12.

4         As the parties prepared for retrial, on November 26, 2018 the government informed Mr. Shafi it

5   intended to file a superseding indictment adding a charge of bank fraud based on the $2,200 check.

6   Within two days, the parties initiated plea negotiations.  Within a week, the parties reached a plea

7   agreement and Mr. Shafi pleaded guilty to a one count information charging him with bank fraud, in

8   violation of 18 U.S.C. § 1344, on December 7, 2018.  Dkt. 348.  Under the terms of the plea

9   agreement, Mr. Shafi agreed to debrief with the FBI, and the U.S. Attorney's Office agreed to dismiss

10   the indictment at sentencing.  Dkt. 349 at 5, ¶¶ 12, 15.  Following entry of the plea, the Court denied

11   the government's request to have Mr. Shafi remanded into custody pending sentencing.  Dkt. 348.

12   Mr. Shafi has complied with all conditions of his pretrial release.  PSR ¶ 6.

13   **D.  <u>Mr. Shafi's Return Home and Future Goals.</u>**

14         Mr. Shafi's return home after being

15   locked in jail for 40 months was a joyous

16   occasion.  On his first night home, family

17   members and friends came to the Shafi home in

18   Fremont to celebrate. Ramsey, Mr. Shafi's

19   brother, writes "the day Adam returned, the

20   word spread faster than we imagined.  Our

21   house was immediately greeted by over 20

22   different cousins and family friends, which

23   continued over the entire month."  Exh. I,



The Shafi family on October 5, 2018 after Mr. Shafi was released from jail.

24   Ramsey Shafi Letter.  Mr. Shafi's brother Ismail writes on that night Ismail's three year old son, who

25   had only known his uncle Mr. Shafi "through a glass window," "would not leave Adam alone and

26   insisted on being by his side until falling asleep the night of his return."  Exh. J, Ismail Shafi Letter.

27         Most importantly, Mr. Shafi's parents and siblings have all seen a marked change in not only

28   Mr. Shafi, but the entire family.  His parents write "Adam has matured a lot.  He is more

1   appreciative, more responsible, and more motivated than he was at the time of his arrest." Exh. K,

2   Salama and Seham Shafi Letter. Mr. Shafi's sister Nora has "noticed how much happier and more

3   grateful Adam has been since his return" and that the "house has felt so much more lively ever since

4   Adam returned home." Exh. L, Nora Shafi Letter. Gabriel Shafi writes that Mr. Shafi emerged from

5   jail "a more productive and loving person" and his release "has brought life back to our family."

6   Exh. M, Gabriel Shafi Letter.

7        In his letter to the Court, Mr. Shafi acknowledges he made major mistakes and he "earnestly

8   apologize[s] to your Honor, my family, and the government for my disturbing comments and actions

9   leading up to my arrest and charge 4 years ago." Exh. A, Adam Shafi Letter at 1. He knows he

10  "cannot excuse the volatile way with which I expressed my emotions" and does "not ask that my

11  conduct be overlooked." *Id.* But he hopes the Court, the government and the public "notice my

12  remorse and see that I am not what my comments and actions 4 years ago portray me as." *Id.*

13       Mr. Shafi's time in jail has changed him. Surrounded by people "who constantly shared stories

14  of harsh, lonely lives without resources, means of support, or even family to aid them in fulfilling

15  their most basic needs" allowed him to see "the irresponsible, immature, and reckless manner with

16  which I dealt with problems at home and in the world." *Id.* at 2. He feels immense gratitude for the

17  support of his family and as he told the probation officer, the criminal case led Mr. Shafi "to

18  appreciate his father's intentions." PSR ¶ 38.

19       Mr. Shafi is ready to look forward to the next chapter in his life. He is eager to continue his

20  education, find work in computer programming and start a family. The counseling and therapy he

21  has been attending "has benefited him greatly" and he is interested in continuing treatment in the

22  future. PSR ¶ 45. He knows there will be difficulties ahead. His relationship with his father will be

23  a constant work in progress. Mr. Shafi will forever be associated with a terrorism charge. Unlike

24  2015, however, with the Court's help Mr. Shafi is now equipped with the tools to "help me better

25  understand and manage my emotions." Exh. A, Adam Shafi Letter at 3. He now sees "the flaws of

26  my past hopelessness and will now strive to use the life and opportunities given to me to make the

27  world a better place." *Id.* at 3-4.

28

1

## ARGUMENT

2      Criminal "punishment should fit the offender and not merely the crime." *Williams v. New*

3  *York*, 337 U.S. 241, 247 (1949).  That requires "the sentencing judge to consider every convicted

4  person as an individual and every case as a unique study in the human failings that sometimes

5  mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552

6  U.S. 38, 52 (2007) (quotations omitted).  The factors detailed in 18 U.S.C. § 3553 (a) assist the Court

7  in fulfilling this mandate to make "an individualized assessment of a particular defendant's

8  culpability rather than a mechanistic application of a given sentence to a given category of crime."

9  *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985).  The sentence recommended in the

10  United States Sentencing Guidelines ("U.S.S.G.") is only one factor for district courts to consider in

11  making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor.  *Gall*,

12  552 U.S. at 50; *see also United States v. Carty*, 520 U.S. 984, 991 (9th Cir. 2008) (en banc).

13      Here, a sentence of time served (approximately 40 months) followed by three years of

14  supervised release is sufficient, but not greater than necessary to further the goals in § 3553(a).

15  **A.   Seriousness of the Offense, Respect for the Law and Just Punishment.**

16      The Supreme Court has explained the factors in § 3553(a)(2)(A)—the seriousness of the

17  offense," the need "to promote respect for the law" and "provide just punishment for the offense"—

18  are the sentencing rationale of "retribution."  *See Tapia v. United States*, 564 U.S. 319, 326 (2011)

19  ("a court may not take account of retribution (the first purpose listed in 3553(a)(2)) when imposing a

20  term of supervised release") (emphasis omitted).  "The goal of retribution" is the "interest[] in seeing

21  that the offender is repaid for the hurt he caused." *Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008).

22  Yet, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect,

23  but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without

24  taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54

25  (quotations omitted).

26      The "real conduct and circumstances" here are a constellation of facts—Mr. Shafi's

27  immaturity, the situation in Syria, his unwillingness to address his mental health difficulties and his

28  misguided frustration with his parents—resulted in his poor decision to knowingly cash a fraudulent

check before he attempted to run away from home and leave the country.  As he told the probation officer, he "saw the situation in Syria and felt helpless to do something about it.  I wanted to escape my tense family life and live in a Muslim country.  But I went about it all wrong."  PSR ¶ 18.  In his confusion and despair, Mr. Shafi made offensive and violent comments that were inconsistent with his character and for which he is extremely embarrassed and remorseful for making.  He explained to the probation officer "I'm not a violent person and yet I said disgusting things on the phone which I don't believe then, and certainly don't believe now."  PSR ¶ 18.  In his letter to the Court, he elaborates that he is sorry "for my disturbing comments and actions leading up to my arrest and charge."  *See* Exh. A, Adam Shafi Letter at 1.

Mr. Shafi's age at the time of the events in this case is a critical factor, as this Court recognized when it released Mr. Shafi on bail.  *See* Dkt. 310 at 27:14-15 (noting "the age of Mr. Shafi at the time, as opposed to today."); *see also* PSR ¶ 77 (noting factor that warrants a variance is Mr. Shafi's "age").  Mr. Shafi was 21 years old when he left his family in Cairo to fly to Istanbul in 2014; the comments on the interpreted phone calls, cashing the fraudulent check and attempting to fly to Istanbul again in 2015 all took place when Mr. Shafi was 22 years old.

Although people are deemed adults when they turn 18 years old, the U.S. Sentencing Commission ("U.S.S.C.") has recognized neurological research that shows brain development is not fully realized in most people until they turn 25 years old.  More specifically, researchers have found that the prefrontal cortex of the brain—which "is utilized in impulse control, emotional reactions, executive function and decision making"—is the last part of the brain to develop.  It "is not complete by the age of 18...development continues into the 20s" and "most researchers reference 25 as the average age at which full development has taken place."[5]  In other words, research shows that the brain of a defendant who commits a crime at the age of 21 or 22 is almost as undeveloped as a 16 or 17-year-old juvenile.

---

[5] *See* Exhibit N, Excerpt of United States Sentencing Commission, "Youthful Offenders in the Federal System," p. 6, 7.  The full report is available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf.

The Supreme Court has recognized that "because juveniles have lessened culpability they are less deserving of the most severe punishments." *Graham v. Florida*, 560 U.S. 48, 68 (2010). Because "juveniles have a 'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 569-70 (2005)). While a "juvenile is not absolved of responsibility for his actions…his transgression 'is not as morally reprehensible as that of an adult.'" *Graham*, 560 U.S. at 68 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988)).

Mr. Shafi was obviously not a juvenile when he made the mistakes that bring him before this Court for sentencing. But the neurological research recognized by the Sentencing Commission and cited above, suggests that at the time of the conduct that took place in 2014 and 2015 when Mr. Shafi was 21 and 22 years old, Mr. Shafi was closer in maturity to a juvenile than the majority of defendants sentenced in federal court, who are overwhelmingly older than 25 years old.[6] That supports a sentence of time served.

A sentence of time served is not a slap on a wrist. Mr. Shafi has paid a heavy price for his mistakes. He is a convicted felon. He was incarcerated for more than three years. His name will forever be associated with a terrorism prosecution in federal court regardless of the mistrial and ultimate conviction for bank fraud. He will likely be on the Terrorist Screening Database and the No Fly List. The punishment extends beyond Mr. Shafi himself, onto his family as well. As he told the Probation Officer, the company his father "built from the ground up is ruined because the name Shafi is associated with a terrorism charge." PSR ¶ 17. Mr. Shafi has been punished enough; there is no need to add additional jail time.

---

[6] Only 16.5% of defendants sentenced in federal court in Fiscal Year 2017 were between the ages of 18 and 25. *See* Exhibit O, United States Sentencing Commission's 2017 Sourcebook of Federal Sentencing Statistics, Table 6, "Age of Offenders in Each Primary Offense Category," *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2017/Table06.pdf. Mr. Shafi turned 26 years old two months before sentencing, though as the Court is aware, his case has been pending for almost four years.

**B.    Deterring Criminal Conduct and Protecting the Public.**

There is no need to impose additional jail time on Mr. Shafi in order to deter him from committing a crime or to protect the public.  His letter to the Court demonstrates not only his remorse, but the fact that he will not make mistakes like the ones that brought him to Court again.  Mr. Shafi writes in his letter that he is sorry "for my disturbing comments and actions leading up to my arrest and charge 4 years ago."  Exh. A, Adam Shafi Letter at 1.  He acknowledges they were a poor "response to my mismanaged mental state and stressful circumstances" and that he "never intended any of the menacing things I said, especially regarding our soldiers." *Id.*  He does not offer any excuses and does "not ask that my conduct be overlooked," but only that the Court sees "I am not what my comments and actions 4 years ago portray me as." *Id.*  Importantly, he explains he has "no interest in terrorism or any of its affiliates who wreak havoc wherever they go." *Id.* at 4.

These statements make clear that Mr. Shafi has learned the error of his ways in 2014 and 2015 and does not need additional time in custody to deter him from committing a crime again in the future.  This Court need not just take Mr. Shafi's word for it: his actions and social science research confirm that Mr. Shafi is unlikely to commit another crime in the future.

**1.    Mr. Shafi's Post-Offense Rehabilitation Demonstrates the 40 Months He Spent in Custody Has Been an Effective Deterrent.**

The Supreme Court has made clear that "post-offense rehabilitation—particularly in light of its tendency to reveal a defendant's likelihood of future criminal conduct—[is] a critical factor to consider in the imposition of a sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013) (citing *Pepper v. United States*, 562 U.S. 476, 491-93 (2011) and *Gall*, 552 U.S. at 59 (emphasis added)).  Such rehabilitation is "the most up-to-date picture" of a defendant's history and characteristics, which in turn sheds light on whether a defendant will be deterred from committing another crime. *Pepper*, 562 U.S. at 492 (quoting 18 U.S.C. § 3553(a)(1)).

Mr. Shafi's conduct since his arrest on July 3, 2015 demonstrates he has realized the error of his ways.  As this Court commented at the bail hearing, the government "didn't produce any recordings of Mr. Shafi in the 41 months since [his arrest] where he said something similar" to the offensive and disgusting comments he made in the summer of 2015 despite having ample recordings

of Mr. Shafi's conversations while in jail.  *See* Dkt. 310 at 22:1-3; *see also* Dkt. 304 at 5 (noting Mr. Shafi had 54 unique visitors in the jail, resulting in 3,400 recordings, between July 3, 2015 and July 26, 2018).

Since Mr. Shafi's release from custody on October 5, 2018 on stringent conditions, including location monitoring and home detention, Mr. Shafi has done well.  The PSR confirms that Mr. Shafi "has complied with all court-ordered conditions of release."  PSR ¶ 6.  He has not used a computer or Internet-enabled smartphone and has had no contact with A.N. or S.K.  He is attending weekly counseling at the East Bay Community Recovery Project ("EBCRP") in Hayward.  PSR ¶ 45-46.  As required by his plea agreement, he extensively debriefed with the government prior to sentencing. *See* Dkt. 349 at 5, ¶ 12.

As Mr. Shafi writes in his letter to the Court, he has "spent the last number of months preparing for the rest of my life."  Exh. A, Adam Shafi Letter at 4.  He has been keeping up with his correspondence courses and submitting handwritten exams and papers.  PSR ¶ 50.[7]  Although he knows "it will be difficult because of my charge and the publicity surrounding it" to put this case behind him, he has "the unwavering support of my family and community" which "will enable me to overcome any hurdles and start anew with a bright future."  Exh. A, Adam Shafi Letter at 4.  Mr. Shafi's post-offense rehabilitation demonstrates he is unlikely to commit another crime again.

## 2. Mr. Shafi is at a Significantly Lower Rate of Recidivism as a First Offender.

According to U.S. Sentencing Commission data, as a first offender—someone with no criminal convictions or arrests of any kind—Mr. Shafi is at the lowest risk of recidivism of all federal defendants.  In 2016, the Commission conducted an extensive review of recidivism among federal offenders, and found that defendants in criminal history category I had a rearrest rate of 33.8%, lowest of all federal offenders.  *See* Exhibit Q, Excerpt from U.S. Sentencing Commission, "Recidivism Among Federal Offenders: A Comprehensive Overview (2016)").[8]  Within individuals

---

[7] As directed by the Court, one of Mr. Shafi's graded term papers is attached as Exhibit P.  *See* Dkt. 348.  The red annotations are comments from the instructor.  Mr. Shafi received a B+ (score of 44 out of 50, 88%).

[8] The full report is available online at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf.

in criminal history category I, offenders with zero criminal history points as opposed to one criminal

history point had an even lower rearrest rate of 30.2%, compared to 46.9% for defendants with one

criminal history point.  *Id.*





A more recent Sentencing Commission report demonstrates that defendants with no criminal

history whatsoever—like Mr. Shafi—had the lowest rates of rearrest, reconviction and

reincarceration of all federal defendants: only 25.7% were rearrested, 14.7% reconvicted, and 4.1%

reincarcerated.  *See* Exhibit R, Excerpt of U.S. Sentencing Commission, "Public Data Presentation

for First Offenders and Alternatives to Incarceration Amendment," December, 2016.[9]  Those rates

are significantly lower than other defendants in criminal history category I, who nonetheless have

some criminal history.



---

[9] The full presentation slides are available online at
http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20161209/20160109_DB_alternatives.pdf.

DEFENDANT'S SENTENCING MEMORANDUM
*SHAFI*, CR 15–00582 WHO

Moreover, recent research has shown that first offenders sentenced to probation in lieu of incarceration are less likely to commit another crime in the future.  A study published in November 2017 set out to test the hypothesis that "among first-time felons, punitive sanctions will more effectively reduce recidivism than will less severe sanctions."  *See* Daniel P. Mears, Joshua C. Cochran, "Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions," *Journal of Research in Crime and Delinquency*, Nov. 14, 2017, p. 1.[10]  The study looked at recidivism rates—defined as a new felony conviction within three years of sentencing—for all first time felons convicted in Florida state court between 1994 and 2008.  *Id.* at p. 9-10.  The research found that first time felons sentenced to probation were "associated with less recidivism than the more severe sanction alternatives" of jail or prison.  *Id.* at p. 24.  The authors concluded "that probation and intensive probation are more effective than jail or prison, respectively, in reducing offending among first-time felons.  *Id.*

This data makes clear there is no need to impose additional jail time on Mr. Shafi to deter him from committing a crime.  Placing him on supervised release—which is effectively "intensive probation"—will be more effective than additional jail time at keeping Mr. Shafi a law abiding member of society.

### 3. This Court Already Determined Mr. Shafi is not a Danger to the Community When it Released Him on Bail in October 2018.

When this Court released Mr. Shafi from custody in October 2018, it necessarily determined Mr. Shafi was not a danger to the community.  The Bail Reform Act mandates release of a person pending trial unless a court finds the person a flight risk or a danger to the community.  18 U.S.C. § 3142(b).  If there is probable cause a defendant committed a terrorism offense, there is a rebuttable presumption the person should be detained.  18 U.S.C. § 3142(e)(3)(C).  When a defendant proffers evidence to rebut the presumption, a court must assess: (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community posed by the person's release.

---

[10] The full article is available at
http://journals.sagepub.com/doi/abs/10.1177/0022427817739338?journalCode=jrca.

1    *United States v. Hir*, 517 F.3d 1081, 1086 (9th Cir. 2008); *see also* 18 U.S.C. § 3142(g).

2          When Mr. Shafi was ordered detained by the magistrate judge in 2015 and this Court in 2016, it

3    was on the basis of risk of flight, not because he was a danger to the community.  *See* Dkt. 27 at

4    30:17-24 ("I think the risk of flight is actually what I'm most concerned about."); Dkt. 53 at 9:15-17

5    ("the issue that I am most concerned about and I don't know that—it's a hard one to address, is the

6    flight risk"); 29:23-24 ("So I'm going to affirm what Judge Kim determined.  Mr. Shafi, I do think

7    you're a flight risk."); Dkt. 41 ("the Court concludes that he is a flight risk and that despite the

8    combination of monitoring conditions proposed by his counsel, he should be detained.").

9          When this Court released Mr. Shafi in October 2018, he still faced charges qualifying as a

10   terrorism offense under § 3142(e)(3)(C).  Thus, Mr. Shafi could only be released if the Court

11   determined there were release conditions that could mitigate any risk of flight or danger to the

12   community.  This Court obviously found there were sufficient conditions that could mitigate risk of

13   flight, which was the basis for detaining Mr. Shafi in the first place.  By releasing Mr. Shafi, this

14   Court necessarily found Mr. Shafi was not a danger to the community.[11]  Nothing has happened in

15   the six months since then that upsets that conclusion.  That means there is no need to impose

16   additional time in jail to protect the public.[12]

**C.    Providing Training, Medical Care or Other Treatment.**

18         "The underlying purposes of sentencing include not only punishment and deterrence, but also

19   the provision of treatment to a defendant in need of it."  *United States v. Bad Marriage*, 392 F.3d

20   1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553 (a)(2)(D)).  But Congress has cautioned courts to

21   recognize that "imprisonment is not an appropriate means of promoting correction and

22   rehabilitation."  18 U.S.C. § 3582(a).  Instead, "Congress intended supervised release to assist

23   individuals in their transition to community life. Supervised release fulfills rehabilitative ends,

---

[11] Similarly, this Court rejected the government's request before trial to take "protective measures" with the jury, as the government acknowledged Mr. Shafi "has not attempted to interfere with the judicial process or witnesses."  *See* Dkt. 225 at 21.

[12] Relatedly, the PSR incorrectly claims Mr. Shafi is a person whose release is restricted under 18 U.S.C. § 3143 and therefore not a good candidate for voluntary surrender.  PSR Sentencing Rec. at 4. The probation officer has acknowledged this was error.

1   distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000) (citing

2   18 U.S.C. § 3553(a)(2)(D)).  Thus, the Supreme Court has explained a court determining the length

3   of a prison sentence "should consider the specified rationales of punishment *except for* rehabilitation,

4   which it should acknowledge as an unsuitable justification for a prison term." *Tapia*, 564 U.S. at

5   327.

6       Since his release from custody in October 2018, Mr. Shafi has been attending weekly

7   counseling sessions at the East Bay Community Recovery Project in Hayward.  He told the probation

8   officer that the counseling "has benefited him greatly" and he has "interest in continuing this

9   treatment going forward."  PSR ¶ 45.  He explains in his letter to the Court that the counseling

10  services have "help[ed] me better understand and manage my emotions" and he now "see[s] the flaws

11  of my past hopelessness and will now strive to use the life and opportunities given to me to make the

12  world a better place."  Exh. A, Adam Shafi Letter at 3-4.  Thus, the best way to ensure Mr. Shafi

13  continues with this treatment plan is to sentence him to time served and place him on supervised

14  release immediately so he can continue with his counseling program at EBCRP.

15  **D.    The Guidelines Sentencing Range and Sentencing Commission Policy Statements.**

16      Mr. Shafi agrees with the advisory Guidelines range calculated in the PSR.  The base offense

17  level is 7 under U.S.S.G. § 2B1.1(a)(1).  PSR ¶ 20.  Because Mr. Shafi pleaded guilty and expressed

18  remorse for his actions, he receives a two level reduction for acceptance of responsibility under

19  U.S.S.G. § 3E1.1(a).  PSR ¶ 27.  The adjusted offense level is 5.  PSR ¶ 28.  Mr. Shafi is a first

20  offender with no criminal record, and so he has 0 criminal history points and is in criminal history

21  category I.  PSR ¶¶ 32-33.  He thus falls within Zone A of the Sentencing Table, facing an advisory

22  Guideline range between 0-6 months.  PSR ¶ 58.[13]

23      Application note 4 to U.S.S.G. § 5C1.1 states "If the defendant is a nonviolent first offender

24  and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should

25  consider imposing a sentence other than a sentence of imprisonment, in accordance with subsection

26  _____

27  [13] Mr. Shafi intends to file a reply to the government's sentencing memorandum to explain why the
    terrorism enhancement in U.S.S.G. § 3A1.4 does not apply and, alternatively, why this Court should

28  use its discretion under *Kimbrough v. United States*, 552 U.S. 85 (2007) to reject the enhancement
    even if it does apply.

1    (b) or (c)(3)."  Mr. Shafi is a nonviolent first offender, and the applicable Guideline range is in Zone

2    A.[14]  Thus, the Guidelines encourage the imposition of a noncustodial sentence.  Of course, Mr. Shafi

3    has already spent 40 months in custody in this case.  So while he cannot receive the benefit of a

4    noncustodial sentence, Application Note 4 supports a time served sentence as opposed to a sentence

5    with additional incarceration.

6    **E.    Avoiding Unwarranted Sentencing Disparities.**

7            While the Court must avoid unwarranted sentencing disparities among defendants with similar

8    records convicted of similar conduct, the Ninth Circuit has explained sentencing courts must also

9    "avoid 'unwarranted similarities among [defendants] who were not similarly situated.'"  *United*

10   *States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall*, 552 U.S. at 55

11   (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6).

12           A time served sentence avoid unwarranted sentencing similarity and disparity.  The

13   government claims the average sentence in attempted travel cases is 13.4 years.  Dkt. 351 at 15.  How

14   it gets that number is an utter mystery.  It notes that according to statistics compiled by the George

15   Washington University Center on Extremism, 177 citizens were arrested on ISIS-related charges, 50

16   involved travel or attempted travel, and 38 have been adjudicated.  Dkt. 351 at 15.  It is unknown

17   which 38 cases the government is relying on to get to 13.4 years.

18           What is clear is that there are attempted and actual travelers who receive significantly shorter

19   sentences then 13.4 or even 10 years as recommended by the government.  For example, one case

20   referenced on the George Washington site is that of Bilal Abood, who was sentenced in the Northern

21   District of Texas to four years in prison for making a false statement to a federal agency in violation

22   of 18 U.S.C. § 1001.  *See United States v. Abood*, CR 15-256-K (N.D. Tex.).  At first blush, that is

23   not a traveler case and it is unclear whether the government is using that case in calculating its

24   average sentence.  Reviewing the complaint indicates that Abood admitted to the FBI he had

---

26   [14] Application note 4 defines "nonviolent first offender" as "a defendant who has no prior convictions
     or other comparable judicial dispositions of any kind and who did not use violence or credible threats
27   of violence or possess a firearm or other dangerous weapon in connection with the offense of
     conviction."  Mr. Shafi has no record, did not use violence and did not possess a firearm or other
28   destructive device.  Any threat of violence made by Mr. Shafi in the intercepted phone calls was
     clearly not credible as the government did not arrest him until he tried to fly to Istanbul.

1   travelled to Syria through Turkey in order to fight with the Free Syrian Army ("FSA"), attended a

2   FSA training camp, had recorded a videotaped allegiance to Abu Bakr al-Baghdadi, the head of ISIS,

3   that he posted on Twitter, and then lied about all of this to the FBI.  *See United States v. Abood*, CR

4   15-256-K (N.D. Tex.), Dkt. 1, Complaint.  Mr. Shafi did not do anything similar to this conduct and

5   should not be equated with a defendant who did, which supports a time served sentence.

6        A more comparable case from this district is *United States v. Natsheh*, CR 16-166-RS.  There,

7   the defendant came to law enforcement attention when he posted pro-ISIS social media messages.

8   *See United States v. Natsheh*, CR 16-166-RS, Dkt. 20, United States' Sentencing Memorandum at 2.

9   Weeks after he had been interviewed by the FBI, a law enforcement agency in Spain alerted the FBI

10  that a Spanish national was communicating with Natsheh about travelling from Spain to Turkey in

11  order to join ISIS.  *Id.* at 3.  Several days later, Natsheh was arrested at SFO attempting to fly to

12  Istanbul via Amsterdam.  He admitted to the FBI that he intended to fly to Syria to fight with ISIS.

13  Natsheh pleaded guilty to attempting to provide material support to a terrorist organization, in

14  violation of 18 U.S.C. § 2339B.  There was no dispute to the Guideline range, which included the §

15  3A1.4 terrorism adjustment, resulting in a Guideline range of 360 months to life and a statutory

16  maximum of 20 years, although Natsheh had no prior criminal record.  *See United States v. Natsheh*,

17  CR 16-166-RS, Dkt. 26, Reporter's Transcript of Proceedings on December 13, 2016 at 3:15-25.  The

18  probation office recommended 20 years, the government recommended 15 years.  *Id.* at 4:1-5.  Judge

19  Seeborg imposed a 60 month sentence, explaining "the terrorism enhancement and the statutory

20  maximum, I think, are intended for very different cases than we have here."  *Id.* at 31:16-17.

21       A time served sentence for Mr. Shafi would avoid unwarranted sentencing similarity and

22  disparity with the sentence in Natsheh.  It would take into account the fact that Mr. Shafi was not

23  convicted of attempting to provide material support to a terrorist organization in violation of §

24  2339B, the significantly lower Guideline calculations recommended by both the probation office (0-6

25  months) and the government (168-210 months) compared to those in Natsheh, and the shorter

26  sentencing recommendations of both probation (60 months) and the government (120 months)

27

28

1  compared to their recommendations for Natsheh.[15]

2  **F.    Providing Restitution.**

3  As the PSR recognizes, there is no request for restitution because there was no loss to the bank.

4  PSR ¶ 15.

5  **OBJECTION TO PROPOSED SUPERVISED RELEASE CONDITION #7**

6  Mr. Shafi objects to proposed special condition 7 of supervised release, which orders Mr. Shafi

7  to "submit to periodic polygraph testing at the discretion of the probation officer as a means to ensure

8  that you are in compliance with the requirements of your supervision."  PSR Sentencing Rec. at 5.

9  The only justification given for this recommendation is that it "may assist the probation officer in

10  assessing the risk of Shafi accessing unauthorized computer devices and/or internet access" and "may

11  also prove helpful in assessing Shafi's compliance with the no contact condition."  *Id.* at 4.

12  Although "District judges enjoy broad discretion in fashioning" supervised release conditions,

13  "Congress has nonetheless set limits on the exercise of that discretion."  *United States v. LaCoste*,

14  821 F.3d 1187, 1190 (9th Cir. 2016).  There are "three primary constraints" on imposition of

15  supervised release conditions.  *Id.*  The condition must (1) "be reasonably related to the nature and

16  circumstances of the offense; the history and characteristics of the defendant; or the sentencing-

17  related goals of deterrence, protection of the public, or rehabilitation;" (2) be consistent with the

18  Sentencing Commission's policy statements; and (3) must involve "no greater deprivation of liberty

19  than is reasonably necessary to serve the goals of supervised release."  *Id.* at 1190-91 (quotations and

20  citations omitted).

21  Polygraph testing is unnecessary here.  Mr. Shafi, like every other defendant on supervised

22  release, is required to truthfully answer all questions asked by the probation officer.  The vast

23  majority of defendants, however, are not required to submit to polygraph testing.  The majority of

24  defendants convicted of bank fraud are not subject to polygraph testing; neither are defendants with

25  gang ties who are prohibited from associating with other gang members.  Nor have the handful of

26

27

28  [15] Mr. Shafi will provide more information about disparity in his separately filed reply to the government's sentencing memorandum in connection with his arguments against the § 3A1.4 terrorism adjustment.

DEFENDANT'S SENTENCING MEMORANDUM
*SHAFI*, CR 15–00582 WHO

defendants convicted of terrorism related charges in this district.  *See, e.g., United States v. Natsheh*, CR 16-166-RS (N.D. Cal.) Dkt. 24, Judgment at 4 (special conditions of supervised release require no contact with members of ISIS but no polygraph testing requirement); *United States v. Llaneza*, CR 13-145-YGR (N.D. Cal.) Dkt. 34, Judgment at 3 (no polygraph testing as special condition of supervised release); *United States v. Abdhir*, CR 07-501-JF (N.D. Cal.) Dkt. 105, Judgment at 4 (special conditions of supervised release require no contact with co-defendant but no polygraph testing requirement).

Any concerns about Mr. Shafi's online activity are adequately dealt with proposed supervised release conditions 9 through 12, which require him to enroll in the Computer and Internet Monitoring Program and authorizes probation to inspect his electronic devices.  Proposed supervised release condition 8 also requires Mr. Shafi to submit his electronic devices to a search for any reason to any law enforcement officer.  Mr. Shafi has no objection to these conditions, which are sufficient to ensure Mr. Shafi is not having inappropriate contact with anyone.

Finally, even if this Court felt polygraph testing was necessary, the condition as written involves a "greater deprivation of liberty than is reasonably necessary to serve the goals of supervised release."  *LaCoste*, 821 F.3d at 1190-91.  Typically, polygraph testing is imposed in child pornography and other sex offense cases as part of sex offender treatment.  But the polygraph testing condition typically makes clear the defendant retains his Fifth Amendment right to remain silent. That is because the Ninth Circuit has explained that a "defendant retains his Fifth Amendment rights during any such testing" and if a defendant "receives a question during his polygraph exam which calls for him to provide an answer that would incriminate him in a future criminal proceeding, [he] retains the right to invoke his Fifth Amendment privilege and remain silent. Should the government desire [him] to answer, it may afford his answers the protection of use and derivative use immunity." *United States v. Stoterau*, 524 F.3d 988, 1004 (9th Cir. 2008).

So for example, in *United States v. Henderson*, CR 15-565-WHO, this Court imposed a polygraph testing condition that read as follows:

> As part of the treatment program, the defendant shall submit to polygraph testing as recommended by the treatment provider. However, the defendant retains his Fifth Amendment right to refuse to answer questions asked during the course of treatment absent a grant of use and derivative-use immunity.

Dkt. 87, Amendment Judgment at 6.  While Mr. Shafi does not believe polygraph testing is necessary, if this Court disagrees and imposes such a condition, it should make clear Mr. Shafi retains his Fifth Amendment right to refuse absent a grant of use and derivative-use immunity.

<u>**CONCLUSION**</u>

Mr. Shafi requests this Court sentence him to credit for time served, followed by three years of supervised release and a $100 special assessment.


Dated:        March 14, 2019                    Respectfully submitted,

                                                STEVEN G. KALAR
                                                Federal Public Defender
                                                Northern District of California


                                                         /S
                                                _____
                                                HANNI FAKHOURY
                                                Assistant Federal Public Defender