DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ELISE LAPUNZINA (NYBN 2540730)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6878
    FAX: (415) 436-7234
    Elise.LaPunzina@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>ADAM SHAFI,<br><br>    Defendant. | CASE NO. CR 15-00582 WHO<br><br>UNITED STATES REPLY SENTENCING MEMORANDUM<br><br>Date; March 21, 2019<br>Time: 1:30 p.m.<br>Court: Hon. William H. Orrick, Courtroom 2 |

## INTRODUCTION

While the defendant apologizes for his "disgusting" and "disturbing" words, he does not disavow his interest in terrorist organizations, he does not accept responsibility for twice attempting to join one, and he fails to explain if or how his views are different now. The Sentencing Guidelines and 18 U.S.C. § 3553 require this Court to hold the defendant accountable for his offense of conviction and the context in which it was committed. Accordingly, the government submits that its recommended sentence of 120 months imprisonment is both necessary and appropriate in this case.

//

//

# ARGUMENT

I. The defendant committed bank fraud in order to finance his second trip to join an FTO.

The parties agree that the defendant obtained a fraudulent check in April 2015, which he deposited on June 29, 2015, and that he withdrew the proceeds of the check hours before attempting to fly to Turkey on June 30, 2015. The government's argument is that the defendant engaged in this premeditated conduct in order to realize his dream – traveling to Syria to fight and defend Muslims, even if that meant dying there as a martyr.

The defendant's main arguments in support of his request for leniency are that: (1) he was immature, misguided, and depressed at the time; and (2) his family is supportive and happy to be reunited now. However, these excuses and rationale are not a sufficient basis for his requested sentence of time-served.

As the Court knows, the defendant's conduct went well beyond the description he offers in his sentencing memorandum. His father reported him missing to the U.S. Embassy in Egypt, stating that he feared his son had been recruited and might have traveled to Syria, Iraq, Gaza, or some other areas in the region to defend Muslims. PSR ¶ 9. The defendant's father thought he "may have been following extreme imams online and that some of his high school friends were of the same mindset." *Id*. His father was right.

When the defendant was interviewed by Customs and Border Protection upon the family's return to the U.S. on August 20, 2014, he started with his first lies to law enforcement. He stated that he went to help refugees, failing to disclose the full purpose and extent of his travel. *Id.* As we know from his conversations, the defendant traveled to Turkey in 2014 hoping to connect with ISIS in Syria. *See* Dkt 351-1 at 13. Instead, they met an ANF facilitator (*Id.*) and were overwhelmed by refugees begging for money. The defendant continued with his misrepresentations when he spoke with law enforcement again a week later.

And then the defendant lied and attempted to obstruct an investigation on June 30, 2015. His statements to agents at the airport were specifically designed to minimize his activity and mislead their investigation. Instead of being upset that his travel was interrupted or remorseful for what he had done, he was concerned about what his parents thought and knew, and he found humor in his lies in response

UNITED STATES REPLY SENTENCING
MEMORANDUM                                    2
CR 15-00582 WHO

to law enforcement questioning. Dkt. 351-8. In short, this case has many hallmarks of terrorism cases – mobilization, attempted travel, secrecy, and lies.

The defendant argues that his "feelings of humiliation, frustration, anger and despair" were significant factors in the fall of 2014 to June 2015 time frame. Dkt 352 at 11. However, that is in stark contrast to the evidence of his activities then. Focusing just on April through June 2015, this period paints a very different picture of the defendant's activities and state of mind. The defendant reports that he was driving for Lyft, working for his father's company, and doing occasional work for Hummus Heaven. PSR ¶ 53. The defendant also had a lot of contact with his two close friends. He went to the shooting range with S.K. on 4/1/15. *See* Dkt 351-5. The defendant researched how to make money quickly and posted a number of items for sale on craigslist in mid-April. *Id.* He then communicated with potential buyers, negotiating prices and arranging meetings. The defendant communicated regularly with S.K. and A.N., discussing where and when to travel, what group to join in Syria, and the impact on S.K.'s marriage on their upcoming travel plans. *Id.* The defendant searched for means of crossing borders illegally, including Saudi Arabia's and Turkey's borders, and which countries required visas for American travelers. *Id.* It does not appear that he was hopeless at home. Rather, he was preparing for travel. On May 29, 2015, the defendant searched for flights to Istanbul. *Id.* On May 31, 2015, he searched for directions to Istanbul and Gaziantep. *Id.* On June 2, 2015, the defendant talked with S.K. about airport security, being on the travel watch list, and possibly traveling through Mexico. That same day, he searched for the meaning of the secondary security screening selection designation. Two days later, he investigated airports in Mexico.

Notably, when his friend asked him on June 23, 2015, if he was still feeling miserable, possibly about work based on the context of the statement in the conversation, the defendant did not say that he was confused or depressed. Instead, he expressed his fear that he would not die a martyr. Dkt. 351-2 at 3.

And most importantly, he actively discussed traveling to a war zone with his friends. When it became apparent to him that S.K. was more interested in saving money for his wedding rather than their trip, the defendant realized that they were unlikely to travel anytime soon. *See* Dkt. 351-1. So he

decided to travel alone.

## II. Recidivism and comparable cases

The defendant's low-recidivism argument is inadequate in this case. While it might be relevant to a straightforward bank fraud, there is little basis for applying it here. In fact, there does not appear to be any conclusive recidivism analysis for terrorism cases, as recognized in the Department of Homeland Security- sponsored research abstract (2012). https://www.dhs.gov/sites/default/files/publications/942_OPSR_TP_Returning-to-Fight_Literature-Review_508.pdf

The defendant relies on *United States v. Natsheh*, CR 16-00166 RS, as justification for a sentence of time served in order to avoid "unwarranted sentencing similarity and disparity." Dkt 352 p. 26. The government agrees that Natsheh's case should be taken into consideration and, in fact, supports the imposition of a much greater sentence here.

As Judge Seeborg noted at sentencing in the case, Natsheh would have posed a much more serious threat if he had traveled. Instead, his case presented what the Court qualified as the "the minimum amount of activity" Dkt. 26 at 6, involving "no recruitment, no money being advanced, no violence, no activity beyond post dates, which are offensive no doubt about it, and then apprehension at the airport." *Id*. at 4. The court recognized that there would be a greater concern if he had traveled. *Id*. at 5. The court concluded by finding that "the terrorist enhancement and the statutory maximum, I think, are intended for very different cases than we have here. I mean, it's an important statute directed toward important activity that is very dangerous in the United States, but this case is really much more similar along the lines of the cases that have involved really one end of the spectrum of actual conduct." *Id.* at 31.

One of the factors which appeared critical to Judge Seeborg was the fact that Natsheh had not succeeded in traveling, nor committed an act overseas and/or returned home radicalized. However, defendant Shafi did all of the above. He traveled to Turkey in 2014 with a friend; they met an ANF facilitator there without any prior planning; he returned and remained radicalized; he maintained his interest in learning about FTOs; he frequently brought up travel in conversations with friends; and then

UNITED STATES REPLY SENTENCING
MEMORANDUM            4
CR 15-00582 WHO

committed to return to Syria when it became clear that they were interested in other things in life. In all these regards, the defendant's conduct is consistent with the behavior of an individual committed to traveling to join an FTO. His 2015 trip was not without a plan – in fact, the defendant knew how easy it was to meet a facilitator based on his first trip and he had no plans on returning home without fulfilling his dream.

### III. Government's sentencing recommendation

There is no evidence that the defendant's mindset has changed from what we knew about him in 2015 through the recorded statements. The real insight we have into the defendant is via the unscripted calls where he spoke what was really on his mind to his trusted friends and family, versus a letter written to the Probation Officer and the sentencing court. For example, the defendant talks around the most important issues here: why did he twice attempt to travel to Syria? If he was so consumed with depression and nihilism at the time, why was he engaging in work and online sales to make sure he had enough money to comfortably finance his trip? If he was so upset at the refugee situation after his first trip, why didn't he try to help them? Instead, he continued researching FTOs and illegal border crossings, not work in Turkey, and continued planning his return to Syria, down to saving as much money as possible for his trip.

To date, there has been no evidence of remorse for his actions, but instead the defendant focuses on remorse for its consequences on his family. Even so, the defendant fails to recognize that remorse is just one part of the sentencing process, and that his conduct extended beyond his choice of words and a bad check.

### CONCLUSION

The Sentencing Guidelines and the law are clear that the defendant should be sentenced on both the offense of conviction and all relevant conduct. As a starting point, bank fraud cases are considered very serious offenses, as is evident by the 30-year statutory maximum penalty. But this is not just a bank fraud case. The Probation Officer recognizes the seriousness of the defendant's overall conduct in

her sentencing recommendations too. This is a case where bank fraud was committed in order to finance a trip to Syria to join an FTO. For the reasons set forth in its sentencing memorandum and this reply, the government recommends that the Court sentence the defendant to a term of 120-months imprisonment, followed by 3 years supervised release, and a $100 special assessment.

DATED: March 18, 2019                                      Respectfully submitted,

                                                                      DAVID L. ANDERSON
                                                                       United States Attorney

                                                                                        /s/
                                                       _____
                                                       ELISE LAPUNZINA
                                                       Assistant United States Attorney