STEVEN G. KALAR
Federal Public Defender
Northern District of California
HANNI FAKHOURY
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:    (510) 637-3500
Facsimile:     (510) 637-3507
Email:         Hanni_Fakhoury@fd.org

Attorneys for ADAM SHAFI

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | **Case No.:** CR 15–00582 WHO |
|---|---|
| Plaintiff, | **DEFENDANT'S RESPONSE TO UNITED STATES SENTENCING MEMORANDUM** |
| v. | |
| ADAM SHAFI, | **Court:**  Courtroom 2, 17th Floor |
| Defendant. | **Hearing Date:**  March 21, 2019 |
| | **Hearing Time:**  1:30 p.m. |

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES .........................................................................................ii

INTRODUCTION .......................................................................................................1

ARGUMENT ..............................................................................................................1

    A.    The Government Must Prove the Adjustment By Clear and Convincing Evidence.........2

    B.    The § 3A1.4 Terrorism Adjustment Does Not Apply......................................................3

        1.    The Offense Did Not "Involve" a "Federal Crime of Terrorism." .......................5

        2.    The Offense Was Not Intended to "Promote" a "Federal Crime of Terrorism."..5

    C.    Even if the § 3A1.4 Adjustment Applies, This Court Should Reject It..........................10

        1.    The Adjustment is Not Based on Empirical Research.......................................10

        2.    The Adjustment Equates All "Terrorism" Offenses. ........................................12

        3.    Equating a First Offender with a Career Offender Contradicts the Premise of the Guidelines. ....................................................................................................14

        4.    The Terrorism Adjustment Disproportionately Impacts People Under 25.........17

        5.    The Significant Rate of Variance Suggests Rejection of the Adjustment. .........18

        6.    This Would Be the Largest Ever Application of the Terrorism Adjustment......19

CONCLUSION.........................................................................................................21

## **TABLE OF AUTHORITIES**

### **Cases**

*Graham v. Florida*, 560 U.S. 48 (2010) ...................................................................... 17, 18

*In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93 (2d Cir. 2008) ......................... 8

*Kimbrough v. United States*, 552 U.S. 85 (2007) ........................................................... *passim*

*Moore v. Commissioner of Social Sec. Admin.*, 278 F.3d 902 (9th Cir. 2002) .................................... 3

*Pepper v. United States*, 562 U.S. 476 (2011) ................................................................ 10

*Rita v. United States*, 551 U.S. 338 (2007) ................................................................. 11

*Spears v. United States*, 555 U.S. 261 (2009) (per curiam) ................................................... 10

*United States v. Abu Khatallah*, 314 F.Supp.3d 179 (D.D.C. 2018) ............................................. 8

*United States v. Alhaggagi*, 2019 WL 1102991 (N.D. Cal. Mar. 8, 2019) ....................... 12, 16, 18, 20

*United States v. Amezcua-Vasquez*, 567 F.3d 1050 (9th Cir. 2009) ............................................ 20

*United States v. Arnaout*, 431 F.3d 994 (7th Cir. 2005) .................................................... 4, 6

*United States v. Ashqar*, 582 F.3d 819 (7th Cir. 2009) ....................................................... 9

*United States v. Awan*, 607 F.3d 306 (2d Cir. 2010) ..................................................... 5, 8, 9

*United States v. Banol-Ramos*, 566 Fed. App'x 40 (2d Cir. 2014) .............................................. 8

*United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008) ..................................................... 9

*United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008) ...................................................... 8

*United States v. Chandia*, 675 F.3d 329 (4th Cir. 2012) ................................................... 5, 8

*United States v. Dye*, 538 Fed. App'x 654 (6th Cir. 2013) .................................................... 8

*United States v. Elshinawy*, 2018 WL 1521876 (D. Md. Mar. 28, 2018) .......................................... 9

*United States v. Fidse*, 862 F.3d 516, 522 (5th Cir. 2017) ............................................ 4, 5, 6, 9

*United States v. Graham*, 275 F.3d 490 (4th Cir. 2001) ....................................................... 9

*United States v. Henderson*, 649 F.3d 955 (9th Cir. 2011) ............................................... 10, 12

*United States v. Hymas*, 780 F.3d 1285 (9th Cir. 2015) ....................................................... 3

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) .................................................. 12

*United States v. Jumaev* 2018 WL 3490886 (D. Colo. July 18, 2018) ..................................... *passim*

*United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004) .................................................... 8

*United States v. Meskini*, 319 F.3d 88 (2d Cir. 2003) ................................................................ 11, 16

*United States v. Parr*, 545 F.3d 491 (7th Cir. 2008) ......................................................................... 8

*United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012) ..................................................................... 4

*United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010) ................................................................. 3

*United States v. Tubbs*, 290 Fed. App'x 66 (9th Cir. 2008) .............................................................. 8

*United States v. Wright*, 747 F.3d 399 (6th Cir. 2014) ...................................................................... 5

### Statutes

18 U.S.C. § 924 ................................................................................................................................ 15

18 U.S.C. § 1344 ............................................................................................................................... 4

18 U.S.C. § 2252 ............................................................................................................................. 15

18 U.S.C. § 2332b ................................................................................................................... 4, 5, 6, 8

18 U.S.C. § 2339B ................................................................................................................... 4, 6, 13

18 U.S.C. § 3553 ................................................................................................................ 2, 10, 12, 20

18 U.S.C. § 3559 ............................................................................................................................. 15

21 U.S.C. § 841 ............................................................................................................................... 15

### U.S. Sentencing Guidelines

U.S.S.G. § 2A1.1 ............................................................................................................................. 12

U.S.S.G. § 2A2.1 ............................................................................................................................. 12

U.S.S.G. § 2B1.1 ............................................................................................................................. 12

U.S.S.G. § 2D1.1 ............................................................................................................................. 12

U.S.S.G. § 2G2.2 ............................................................................................................................. 12

U.S.S.G. § 2X1.1 ............................................................................................................................. 12

U.S.S.G. § 3A1.4 .......................................................................................................................*passim*

U.S.S.G. § 4A1.3 ...................................................................................................................... 15, 16

U.S.S.G. § 4B1.1 ............................................................................................................................. 15

U.S.S.G. § 4B1.4 ............................................................................................................................. 15

U.S.S.G. § 4B1.5 ............................................................................................................................. 15

U.S.S.G. § 5G1.1 ............................................................................................................................. 13

**<u>Law Review Articles</u>**

George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517 (2014)..................................................2, 4, 6, 13

James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51 (2010) ......................................................................................*passim*

Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520 (2017) ..................................................................*passim*

**<u>Other Authorities</u>**

Cohen, et al., "How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision," *Federal Probation*, Vol. 80, No. 2 (Sep. 2016), *available at* https://www.uscourts.gov/sites/default/files/80_2_4_0.pdf ....................................12

United States Sentencing Commission, "Youthful Offenders in the Federal System," *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf ............................................17

**INTRODUCTION**

Pursuant to Northern District Criminal Local Rule 32-5(c), Mr. Shafi files this response to the government's sentencing memorandum and its argument that the terrorism adjustment in United States Sentencing Guideline ("U.S.S.G.") § 3A1.4 applies in this case. As explained in detail below, and recognized by the probation office, the adjustment does not apply.

But even if it did, this Court should use its discretion under *Kimbrough v. United States*, 552 U.S. 85 (2007) to reject the Guideline. Indeed, neither the government nor the probation office think a sentence within the Guidelines range generated by application of the terrorism adjustment is proper here. It is not alone; the overwhelming majority of sentencing courts—including Northern District Judges Breyer, Seeborg and Gonzalez-Rogers—that have applied the adjustment have granted significant downward variances from the resulting Guideline range. That means the adjustment is broken and the draconian and irrational Guidelines range it produces should be disregarded.

Finally, as to Mr. Shafi specifically, reviewing United States Sentencing Commission ("U.S.S.C.") since 2003 reveals that applying the terrorism adjustment in his case would result in the greatest ever increase in offense level—25 levels—of any defendant who received the adjustment. That makes application of the adjustment excessively disproportionate as applied to Mr. Shafi. The 40 months Mr. Shafi spent in custody from July 3, 2015 to October 5, 2018 are enough to punish him for his conduct and distinguish his specific case from other bank fraud cases carrying a Guideline range of 0-6 months. This Court should impose a sentence of credit for time served.

**ARGUMENT**

In the Violent Crime Control and Law Enforcement Act of 1994, Congress directed the Sentencing Commission to "amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, unless such involvement or intent is itself an element of the crime." Pub. L. No. 103–322, 108 Stat. 1796 (1994). The Commission complied and the result is the adjustment in § 3A1.4. *See generally* James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 61-62 (2010).

The "Terrorism Enhancement, when applied, 'takes a wrecking ball' to the initial Guidelines range." *United States v. Jumaev*, CR 12-00033-JLK, 2018 WL 3490886, at *5 (D. Colo. July 18, 2018) (quoting George D. Brown, *Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts*, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014)).  Under § 3A1.4, the offense level is increased by 12 "if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."  U.S.S.G. § 3A1.4(a).  If the resulting offense level is less than 32, the offense level is automatically increased to 32.  *Id.*  When the adjustment applies, a defendant's criminal history category automatically becomes VI.  U.S.S.G. § 3A1.4(b).  "Of all the adjustments in the Guidelines, the Terrorism Enhancement is the most severe."  Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1528 (2017).

Here, the adjustment would increase Mr. Shafi's offense level (before an acceptance of responsibility reduction) from 7 to 32, and increase his criminal history category from I to VI. Factoring for a two level acceptance of responsibility downward adjustment, the final adjusted Guideline range increases from 0-6 months to 168-210 months based on the terrorism adjustment. *See* Dkt. 351, United States Sentencing Memorandum ("Gov. Sent. Memo.") at 2.

As the PSR correctly determined, the adjustment does not apply.  PSR ¶ 22.  Even if this Court disagrees, as recommended by both the PSR and the government this Court should use its discretion to reject the Guideline range produced by the draconian and unempirical adjustment.  *See* PSR ¶ 77 ("Should the Court determine that the terrorism enhancement (USSG § 3A1.4) applies, a below-guideline sentence might be warranted based on the significant sentence that results from the application of that enhancement considering the defendant's lack of a prior record, his age, his upbringing, and the totality of the overall circumstances of the instant offense."); Gov. Sent. Memo. at 11 (recommending 120 month sentence, below § 3A1.4 adjusted Guideline range, which "takes into account the terrorism enhancement and the sentencing factors set forth in 18 U.S.C. § 3553(a)").

A.    **The Government Must Prove the Adjustment By Clear and Convincing Evidence.**

A sentencing factor that has "an extremely disproportionate effect on the sentence relative to the offense of conviction" triggers the clear and convincing standard of evidence.  *United States v.*

1    *Hymas*, 780 F.3d 1285, 1289 (9th Cir. 2015) (quotations and citations omitted).  That is particularly

2    true when a "severe sentencing enhancement is imposed on the basis of uncharged or acquitted

3    conduct." *Id.* (quotations and citations omitted).  There is "no bright line rule for the disproportionate

4    impact test" and instead the Court must consider the "totality of the circumstances," including:

> (1) whether the enhanced sentence falls within the maximum sentence for the crime
> alleged in the indictment; (2) whether the enhanced sentence negates the presumption of
> innocence or the prosecution's burden of proof for the crime alleged in the indictment;
> (3) whether the facts offered in support of the enhancement create new offenses
> requiring separate punishment; (4) whether the increase in sentence is based on the
> extent of a conspiracy; (5) whether an increase in the number of offense levels is less
> than or equal to four; and (6) whether the length of the enhanced sentence more than
> doubles the length of the sentence authorized by the initial sentencing guideline range in
> a case where the defendant would otherwise have received a relatively short sentence.

10   *Id.* (quoting *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010)).

11          Here, there is no question the clear and convincing evidence standard applies.  The enhanced

12   sentence involves conduct charged in the indictment the government has agreed to dismiss at

13   sentencing.  *See* Dkt. 349, Plea Agreement, p. 5, ¶ 15 ("The government agrees to move to dismiss

14   any open charges pending against the defendant in the captioned Indictment at the time of

15   sentencing.").  The adjustment increases the offense level by 25 and more than doubles the 0-6

16   sentencing range calculated in the PSR but for the § 3A1.4 adjustment.  Thus, the "demanding" clear

17   and convincing evidence standard applies.  *See Moore v. Commissioner of Social Sec. Admin.*, 278

18   F.3d 902, 924 (9th Cir. 2002).  The government concedes that is the case.  *See* Gov. Sent. Memo. at 3

19   ("the government's burden of proof is clear and convincing evidence due to the enhancement's

20   significant impact on the applicable adjusted sentencing range.").

21   **B.    The § 3A1.4 Terrorism Adjustment Does Not Apply.**

22          U.S. Sentencing Guideline § 3A1.4 states:

23          (a)     If the offense is a felony that involved, or was intended to promote, a federal
                    crime of terrorism, increase by 12 levels; but if the resulting offense level is less
24                  than level 32, increase to level 32.

25          (b)     In each such case, the defendant's criminal history category from Chapter Four
                    (Criminal History and Criminal Livelihood) shall be Category VI.
26

27   U.S.S.G. § 3A1.4.  The term "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5).  *See*

28   U.S.S.G. § 3A1.4 app. n. 1.  Under that section, a "federal crime of terrorism" means an offense that

1    "is calculated to influence or affect the conduct of government by intimidation or coercion, or to

2    retaliate against government conduct" and is a violation of certain specified crimes.  *See* 18 U.S.C. §

3    2332b(g)(5).  The list of crimes includes the crime Mr. Shafi was indicted and stood trial for (and

4    which the government will dismiss at sentencing), attempting to provide material support to a foreign

5    terrorist organization, in violation of 18 U.S.C. § 2339B.  *See* 18 U.S.C. § 2332b(g)(5)(B)(i).  The list

6    of crimes do not include, however, the crime Mr. Shafi has actually been convicted of, bank fraud in

7    violation of 18 U.S.C. § 1344.  *Id.*

8            Section 3A1.4 "establishes two bases for applying the enhancement."  *United States v. Fidse*,

9    862 F.3d 516, 522 (5th Cir. 2017).  Under the "involved" prong, the adjustment applies "only if the

10   crime of conviction is itself a federal crime of terrorism" or if "the relevant conduct includes such a

11   crime."  *Id.* (quotations and citations omitted).  Under the "intended to promote" prong, the

12   adjustment applies if "the defendant has as one purpose of his substantive count of conviction or his

13   relevant conduct the intent to promote a federal crime of terrorism."  *Id.* (quotations omitted).

14   Because the "intended to promote" prong does not require a conviction for a "federal crime of

15   terrorism" as listed in § 2332b(g)(5)(B)(i), a sentencing court deciding whether to apply the § 3A1.4

16   adjustment to a defendant "not actually convicted of a federal crime of terrorism" must "(1) 'identify

17   which enumerated federal crime of terrorism the defendant intended to promote'; (2) 'satisfy the

18   elements of § 2332b(g)(5)(A),' which requires that the offense be 'calculated to influence or affect

19   the conduct of government by intimidation or coercion, or to retaliate against government conduct';

20   and (3) "support its conclusions…with facts from the record."  *Id.* at 523 (quoting *United States v.*

21   *Arnaout*, 431 F.3d 994, 1002 (7th Cir. 2005)); *see also* Brown, 23 Cornell J.L. & Pub. Pol'y at 534

22   ("We are now dealing with three apparent intent requirements: the intent to commit the crime of

23   conviction; the intent to promote a further crime; and the 'calculated' element of that second crime.").

24           The requirement in § 2332(b)(g)(A) that the offense be calculated "to influence or affect the

25   conduct of government by intimidation or coercion, or to retaliate against government conduct" is

26   critical.  "Calculated" is "nearly synonymous with intentional."  *United States v. Siddiqui*, 699 F.3d

27   690, 709 (2d Cir. 2012).  Thus, courts have held the defendant must have the "specific intent" that the

28   "underlying felony [be] 'calculated to influence or affect the conduct of government by intimidation

1   or coercion, or to retaliate against government conduct.'" *United States v. Chandia*, 675 F.3d 329,

2   333 n. 3 (4th Cir. 2012); *see also United States v. Wright*, 747 F.3d 399, 408 (6th Cir. 2014) (noting §

3   2332b(g)(5)(A) "impos[es] a specific intent requirement"). The "calculation" requirement "does not

4   focus on the defendant but on his 'offense,' asking whether it was calculated, *i.e.*, planned—for

5   whatever reason or motive—to achieve the stated object." *United States v. Awan*, 607 F.3d 306, 317

6   (2d Cir. 2010).

7         The offense here falls within neither prong so the § 3A1.4 terrorism adjustment does not apply.

8   **1.    The Offense Did Not "Involve" a "Federal Crime of Terrorism."**

9         The crime Mr. Shafi has been convicted of, bank fraud, is not listed within § 2332b(g)(5)(B)(i).

10  Thus, Mr. Shafi does not fall within the "involved" prong of § 3A1.4 because "the crime of

11  conviction" is not a federal crime of terrorism. *Fidse*, 862 F.3d at 522; *see also* PSR Addendum at ¶

12  4 ("It appears to the U.S. Probation Office that the term 'involved' requires a conviction for an

13  offense listed in 2332b(g)(5)(B)."). The government does not argue otherwise. *See* Gov. Sent.

14  Memo. at 2 (arguing "bank fraud is a qualifying felony here because it was committed with intent to

15  promote material support of terrorism.").

16  **2.    The Offense Was Not Intended to "Promote" a "Federal Crime of Terrorism."**

17        Nor was Mr. Shafi's conduct intended to promote a federal crime of terrorism. The

18  government argues the "bank fraud was specifically intended to promote his travel to Syria via

19  Turkey, and but for the check, he could not have traveled as intended." Gov. Sent. Memo. at 7.

20        The government is correct that Mr. Shafi deposited the check so he could have money when he

21  left the United States. Mr. Shafi acknowledges this was a serious mistake and is remorseful for his

22  actions. But simply travelling to Turkey—or even Syria for that matter—is not a crime, let alone a

23  terrorism offense. In essence, the government repeats the same mistake it made at trial, which

24  resulted in a hung jury split 8-4 for acquittal: equate Mr. Shafi's intent to travel to Turkey—or even

25  Syria for that matter—with the intent to join a terrorist organization.

26        The government claims Mr. Shafi's "purported motive to help Syrian refugees and escape his

27  'tense family life' are not factors the court should consider in determining whether or not the

28  sentencing enhancement applies." Gov. Sent. Memo. at 6. It is wrong.

1    As explained above, the "intended to promote" prong requires a sentencing court to "(1)

2    'identify which enumerated federal crime of terrorism the defendant intended to promote'; (2) 'satisfy

3    the elements of § 2332b(g)(5)(A),' which requires that the offense be 'calculated to influence or

4    affect the conduct of government by intimidation or coercion, or to retaliate against government

5    conduct'; and (3) "support its conclusions…with facts from the record." *Fidse*, 862 F.3d at 523

6    (quoting *Arnaout*, 431 F.3d at 1002); *see also* Brown, 23 Cornell J.L. & Pub. Pol'y at 534 ("We are

7    now dealing with three apparent intent requirements: the intent to commit the crime of conviction; the

8    intent to promote a further crime; and the 'calculated' element of that second crime.").

9    Providing material support to a terrorist organization by means of personnel means intending to

10   work under the organization's direction and control.  *See* Dkt. 289, Final Jury Instruction 23 ("The

11   defendant can be convicted for attempting to provide material support or resources in the form of

12   personnel if you find that the defendant has knowingly attempted to provide himself to work under

13   the al-Nusrah Front's direction or control."); *see also* 18 U.S.C. § 2339B(h).  Thus, evidence

14   demonstrating Mr. Shafi's desire to travel to Turkey or even Syria was motivated by anything other

15   than providing himself to work under the direction and control of the al-Nusrah Front is directly

16   relevant to the intent requirements of the § 3A1.4 adjustment.

17   There is clear and convincing evidence that Mr. Shafi wanted to run away from home and live

18   in a Muslim country, wanted to die with Syrian refugees and share in their suffering, and said

19   disgusting and offensive things out of anger and frustration.  But that is not clear and convincing

20   evidence that Mr. Shafi wanted to place himself under the direction and control of a terrorist

21   organization.  Indeed, there was conflicting expert testimony at trial about whether Mr. Shafi's

22   actions were consistent with someone who wanted to join a terrorist organization.  PSR Addendum at

23   ¶ 4.  The government's expert concluded they were; Mr. Shafi's expert concluded they were not.

24   As the PSR elaborates, Mr. Shafi's terrorism expert—Dr. Marc Sageman—testified "he did not

25   believe Shafi was on a path to political violence" because "there's no indicators…that Mr. Shafi

26   thought of himself as a soldier."  PSR Addendum at ¶ 4.  Dr. Sageman believed Mr. Shafi wanted "to

27   share the suffering of people he identified with.  Namely, the victims in Syria."  *Id.*; *see also* Dkt.

28   332, Jury Trial Transcript, Vol. 5 (Sept. 4, 2018) at 715:20-23.  The jury heard both Dr. Vidino and

1   Dr. Sageman and were split 8-4 in favor of Mr. Shafi.  The probation officer reviewed the trial

2   testimony of both experts and is not recommending the adjustment.

3       Citing to its selective timeline, the government complains about the absence of "internet

4   searches relating to travel, housing, work, or refugee organizations in Turkey or anywhere else."

5   Gov. Sent. Memo. at 7.  That is of course wrong as demonstrated by the actual evidence itself.  The

6   Google search records admitted at trial demonstrated numerous searches after Mr. Shafi returned

7   from Istanbul in 2014 for travel all over the world.  *See* Trial Exh. 137.  That includes viewing sites

8   about Oman on January 30, 2015 (Trial Exh. 137-114, line 4856), Dubai on February 1, 2015 (Trial

9   Exh. 137-109, line 4646), Morocco on February 22, 2015 (Trial Exh. 137-085, line 3560), Germany

10  on April 11, 2015 (Trial Exh. 137-043, line 1728) and May 2, 2015 (Trial Exh. 137-022, line 784),

11  Saudi Arabia on May 4, 2015 (Trial Exh. 137-022, line 779), Yemen on May 10, 2015, (Trial Exh.

12  137-017, line 616), and Egypt on May 13, 2015 (Trial Exh. 137-016, line 586).  After June 5, 2015—

13  the date Mr. Shafi discussed the al-Joulani interview with Mr. Karim—there are searches for

14  Hungary on June 11, 2015 (Trial Exh. 137-007, line 238) and "construction jobs Saudi Arabia salary"

15  on June 16, 2015 ((Trial Exh. 137-005, line 168).

16      Notably missing is a search for Idlib, the al-Nusrah Front's base of operations in Syria.  *See*

17  Dkt. 322, Jury Trial Transcript, Vol. 5 (Sept. 4, 2018) at 628:13-629:14.  Nor are there online

18  searches for the al-Nusrah Front or Muhammad al-Joulani.  Beyond the Internet searches, on the June

19  8, 2015 call to Mr. Karim played at trial—three days after Mr. Shafi discussed the al-Joulani

20  interview with him—Mr. Shafi told Mr. Karim that he wanted to "go to Death Valley for a weekend,

21  just sit and think over there," Trial Exh. 023-008, that he felt "like just going into the desert and just

22  getting a bunch of sleep," Trial Exh. 023-014, and that he wanted to "move in with you when you get

23  that apartment."  Trial Exh. 023-052.

24      Whatever misguided and profoundly wrong beliefs Mr. Shafi had about the al-Nusrah Front on

25  June 5, 2015, had clearly dissipated within a few days.  That is why Mr. Karim himself was surprised

26  about Mr. Shafi's decision to go to the airport on June 30, 2015.  *See* Trial Exh. 031-007 ("AS:…All

27  right, fine. I'll just tell you what happened.  I was trying to—I was trying to go to Turkey yesterday.

28  SK: What?").  Thus, the government has failed to carry its burden of demonstrating by clear and

1   convincing evidence that Mr. Shafi's specific intent when he cashed the check before attempting to

2   fly to Istanbul was to provide himself as personnel for the al-Nusrah Front.

3        Moreover, even if Mr. Shafi's travel to Turkey was for the specific purpose to place himself

4   under the direction and control of a terrorist organization, that would still not be enough to trigger the

5   § 3A1.4 enhancement.  It is error to assume "the enhancement automatically applies to a material

6   support conviction."  *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008).  U.S. Sentencing

7   Commission data reveals since 2008, there have been 39 sentenced defendants convicted of providing

8   material support to a terrorist organization and other related offenses that did not receive a § 3A1.4

9   terrorism adjustment.[1]

10

11

| Table 1: Number of sentenced cases since 2008 per U.S.S.C. Datafiles | | | | | |
|---|---|---|---|---|---|
| | All 3A1.4 | All 2M5.3 | 2M5.3 + 3A1.4 | 2M5.3 no 3A1.4 | 3A1.4 no 2M5.3 |
| N | 320 | 157 | 118 | 39 | 202 |

12

13

14   The reason for the fact almost 25% of defendants sentenced for providing material support to a

15   terrorist organization do not receive a § 3A1.4 adjustment is simple: § 2332b(g)(B) requires the

16   "specific intent" that the "underlying felony was 'calculated to influence or affect the conduct of

17   government by intimidation or coercion, or to retaliate against government conduct.'"  *Chandia*, 675

18   F.3d at 333.  That requires determining whether the defendant's conduct "was calculated, *i.e.*,

19   planned—for whatever reason or motive—to achieve the stated object."  *Awan*, 607 F.3d at 317.[2]

20

21   _____

22   [1] Table 1 was generated by Federal Public Defender Assistant Paralegal Jordan Schaer, who
     downloaded all available U.S.S.C. datafiles and filtered for cases (1) since 2008; (2) with controlling
23   Guideline § 2M5.3, which covers attempting to provide material support to a terrorist organization
     and other similar statutes; or (3) with a terrorism adjustment under U.S.S.G. § 3A1.4.  The U.S.S.C.
24   datafiles are available online at https://www.ussc.gov/research/datafiles/commission-datafiles.

     [2] Unsurprisingly, the enhancement applies when a defendant directly targeted a government building
25   or installation.  *See United States v. Tubbs*, 290 Fed. App'x 66, 68 (9th Cir. 2008) (attack on federal
     ranger station); *see also In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 153
26   (2d Cir. 2008) (attacks on US embassies); *United States v. Parr*, 545 F.3d 491, 494-96 (7th Cir.
     2008) ("detailed" plan to attack federal courthouse); *United States v. Mandhai*, 375 F.3d 1243, 1245-
27   46 (11th Cir. 2004) (plan to attack electrical transformers); *United States v. Abu Khatallah*, 314
     F.Supp.3d 179, 198-99 (D.D.C. 2018) (attacks on U.S. Special Mission in Benghazi and a nearby
28   intelligence facility); *United States v. Dye*, 538 Fed. App'x 654, 666 (6th Cir. 2013) (attack on
     courthouse where defendant faced charges); *see also United States v. Banol-Ramos*, 566 Fed. App'x
     40, 43 (2d Cir. 2014) (adjustment applied when defendant, member of the Colombian terrorist

1    The evidence is clear that Mr. Shafi neither "planned" nor took steps that were "calculated" to

2  influence the conduct of government by violence.  *See Jumaev*, 2018 WL 3490886, at *6 ("If Mr.

3  Jumaev's offenses were truly calculated towards a political objective, Mr. Jumaev would have done

4  more…Simply put, his offenses were not calculated at all.").  Reviewing the cases cited by the

5  government paint a stark contrast with Mr. Shafi.

6    For example, the defendant in *Awan* was a "conduit" of funds sent directly to a terrorist

7  organization and attempted to recruit a person to attend a terrorist training camp.  607 F.3d at 310;

8  *See* Gov. Sent. Memo. at 3-4 (discussing *Awan*).  In *Fidse*, the defendant "spoke about a hypothetical

9  attack on the U.S. Ambassador to Kenya and claimed to have paid $100,000 for an armed technical

10  vehicle used by al-Shabaab fighters in a battle in Idaale, Somalia."  862 F.3d at 520 *see* Gov. Sent.

11  Memo. at 5, 10 (discussing *Fidse*). In *United States v. Graham*, the defendant had amassed weapons

12  and targeted a federal building as part of his militia's "war" with the government.  275 F.3d 490, 518

13  (4th Cir. 2001); *see* Gov. Sent. Memo. at 3 (discussing *Graham*).  In *United States v. Elshinawy*, the

14  defendant pledged allegiance to ISIS and considered himself "a soldier of the state," was in repeated

15  contact with an ISIS member in Egypt, received money from ISIS to plan a terrorist attack in the U.S.

16  and Dr. Sageman himself testified that "the evidence is overwhelming that [the defendant] tried to

17  conduct an attack in the United States, or at least desired to conduct such an attack, for about two-

18  and-a-half months."  2018 WL 1521876, *19 (D. Md. Mar. 28, 2018); *see* Gov. Sent. Memo. at 3, 10

19  (discussing *Elshinawy*).  In *United States v. Benkahla*, the defendant "attended a jihadist training

20  camp abroad" and "was acquainted with a network of people involved in violent jihad and terrorism,"

21  including "eight individuals [who] went to foreign jihad training camps and one [] convicted of

22  soliciting treason to fight against the United States."  530 F.3d 300, 313 (4th Cir. 2008); *see* PSR

23  Addendum ¶ 2 (citing government's reference to *Benkahla*).  In *United States v. Ashqar*, the

24  defendant was "a communication and financial conduit for the terrorist organization Hamas."  582

25  F.3d 819, 821 (7th Cir. 2009); *see* PSR Addendum ¶ 2 (citing government's reference to *Ashqar*).

26

27  _____

28  organization FARC, knew "FARC's goal of overthrowing the Colombian government," provided
"FARC with food and other services," and participated "in a mission transporting military equipment
for FARC" and "the shootout and hostage-taking" of Panamanian police).

1    Mr. Shafi engaged in nothing remotely similar to this conduct that clearly and convincingly

2    demonstrates an intent to affect government conduct by intimidation or coercion, or to retaliate

3    against the government.  The terrorism adjustment in § 3A1.4 does not apply.

4    **C.    Even if the § 3A1.4 Adjustment Applies, This Court Should Reject It.**

5    If this Court disagrees and finds the § 3A1.4 adjustment applies, it should reject it.  As this

6    Court knows, the Supreme Court has made clear that the ranges recommended by the Sentencing

7    Guidelines are neither mandatory nor presumptively reasonable.  Instead, at sentencing courts have

8    an "overarching duty" to "'impose a sentence sufficient, but not greater than necessary'" to comply

9    with the sentencing factors in 18 U.S.C. § 3553(a).  *Pepper v. United States*, 562 U.S. 476, 491

10   (2011) (quoting § 3553(a)).

11   In *Kimbrough* and *Spears v. United States*, 555 U.S. 261 (2009) (per curiam), the Supreme

12   Court explained that district courts have the authority to vary from the advisory Guidelines based on

13   categorical policy disagreements with them, and not just on individualized determinations that they

14   yield an excessive sentence in a particular case.  *Kimbrough*, 552 U.S. at 108; *Spears*, 555 U.S. at

15   842-43; *see also United States v. Henderson*, 649 F.3d 955, 960 (9th Cir. 2011) ("*Kimbrough*'s

16   rationale is not limited to the crack-cocaine Guidelines.").

17   The draconian adjustment in § 3A1.4 contradicts the entire premise of the Sentencing

18   Guidelines itself.  This Court should use its discretion to reject the adjustment.  The probation office

19   agrees, writing that if the Court determines the enhancement applies, "a below-guideline sentence

20   might be warranted based on the significant sentence that results from the application of that

21   enhancement considering the defendant's lack of a prior record, his age, his upbringing, and the

22   totality of the overall circumstances of the instant offense."  PSR ¶ 77.  While the government asks

23   for application of the adjustment, it does not recommend a sentence within the range generated by it,

24   a tacit admission that applying the adjustment is unreasonable in this case.

25   **1.    The Adjustment is Not Based on Empirical Research.**

26   The first flaw with the terrorism adjustment is that "it is not backed by any empirical

27   evidence."  *Jumaev*, 2018 WL 3490886, at *10.  The entire Guidelines system "begins with, and

28   builds upon, empirical data."  U.S.S.G. Part A, Introduction and Authority ¶ 3, at 5.  The Sentencing

1   Commission "took an 'empirical approach,' beginning with an empirical examination of 10,000

2   presentence reports setting forth what judges had done in the past and the modifying and adjusting

3   past practice in the interests of greater rationality, avoiding inconsistency, complying with

4   congressional instructions, and the like." *Rita v. United States*, 551 U.S. 338, 349 (2007).  A

5   Guideline promulgated outside of this empirical approach does not "exemplify the Commission's

6   exercise of its characteristic institutional role" because it does "not take account of empirical data and

7   national experience." *Kimbrough*, 552 U.S. at 109-110 (quotations omitted).

8        The government argues "the sentencing enhancement in a case like this is both required and

9   appropriate in order to protect the public from further crimes."  Gov. Sent. Memo. at 12.  For support,

10  it quotes a Second Circuit case that believed "Congress and the Sentencing Commission had a

11  rational basis for creating a uniform criminal history category for all terrorists in § 3A1.4(b), because

12  even terrorists with no prior criminal behavior are unique among criminals in the likelihood of

13  recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*,

14  319 F.3d 88, 92 (2d Cir. 2003); *see* Gov. Sent. Memo. at 12 (citing *Meskini*).

15       But "neither the Sentencing Commission nor the courts applying the Terrorism Enhancement

16  have provided *any* empirical evidence to support the presumption that terrorism defendants are

17  uniquely dangerous."  Ahmed, 126 Y.L.J. at 1550 (emphasis added).  Indeed, "when U.S.S.G. section

18  3A1.4 was adopted, the number of the anti-terrorism cases was tiny, so there could be no analysis of a

19  statistically reliable group of defendants upon which to build a reliable Guideline."  McLoughlin, 28

20  Law & Ineq. at 112.  So "when the Terrorism Enhancement was promulgated, no statistically sound

21  evidence was used to substantiate that all terrorism defendants were so different as to necessitate such

22  a large increase in the Guidelines range." *Id.* Ahmed, 126 Y.L.J. at 1550.  Thus courts, like the

23  Second Circuit in *Meskini*, who believe "terrorism defendants 'are unique among criminals…' have

24  also not cited any evidence to support that opinion."  *Id.* (quoting *Meskini*, 319 F.3d at 92).  Or as

25  Judge Breyer recently explained in rejecting the § 3A1.4 adjustment and noting "the court in *Meskini*

26  cited *no authority* for its assertion" about the uniqueness of terrorism defendants, "repetition of that

27  assertion might give it the ring of truth, but does not make it true." *United States v. Alhaggagi*, CR

28

1 | 17-387-CRB, 2019 WL 1102991, *7 (N.D. Cal. Mar. 8, 2019).[3]

2 |     A district court can reject Guidelines that "do not exemplify the Commission's exercise of its

3 | characteristic institutional role," by not taking into account "empirical data and national experience."

4 | *Kimbrough*, 552 U.S. at 109-10.  Like the crack cocaine and child pornography Guidelines, the

5 | terrorism adjustment in § 3A1.4 is based on neither empirical data nor national experience and this

6 | Court should use its discretion to reject it.  *See Henderson*, 649 F.3d at 962-63 (noting changes to

7 | child pornography Guideline "were Congressionally-mandated and not the result of an empirical

8 | study" and so "district courts may vary from the child pornography Guidelines, § 2G2.2, based on

9 | policy disagreement with them, and not simply based on an individualized determination that they

10 | yield an excessive sentence in a particular case") (citing *Kimbrough*, 552 U.S. at 109-10).

11 | ### 2.   The Adjustment Equates All "Terrorism" Offenses.

12 |     The second major problem with the § 3A1.4 adjustment is that it equates all terrorism offenses.

13 | One of the most important sentencing factors in § 3553(a)(2)(A) is the need to consider the

14 | "seriousness of the offense," which accounts for the actual harm caused by a particular defendant.

15 | The Guidelines take actual harm into account in myriad ways.  Drug traffickers who possess a

16 | firearm are treated more harshly than those without a firearm.  *See* U.S.S.G. § 2D1.1(b)(2) (two level

17 | upward adjustment if dangerous weapon or firearm possessed).  Attempted first degree murder has a

18 | lower offense level than completed first degree murder.  *Compare* U.S.S.G. § 2A1.1(a) (base offense

19 | level 43 for first degree murder) *with* U.S.S.G. § 2A2.1(a)(1) (base offense level 33 for attempted

20 | first degree murder).  Fraud crimes are driven by the amount of financial loss caused by the crime.

21 | *See* U.S.S.G. § 2B1.1(b)(1) (increasing offense level based on amount of financial loss).  Attempt

22 | crimes are treated less harshly than completed crimes.  *See* U.S.S.G. § 2X1.1(b)(1) (3 level decrease

24 | [3] A vivid illustration comes from another case cited by the government, *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011).  *See* Gov. Sent. Memo. at 13 (citing *Jayyousi*).  The Eleventh Circuit noted that "although recidivism ordinarily decreases with age, we have rejected this reasoning as a basis for a sentencing departure for certain classes of criminals, namely sex offenders" and so rejected that same reasoning for terrorists as well.  657 F.3d at 1117.  Yet the United States Probation Office's own research into recidivism rates for sex offenders demonstrated "those convicted of sex offenses in general…recidivitated less frequently than those convicted of non-sex offenses."  *See* Cohen, et al., "How Dangerous Are They? An Analysis of Sex Offenders Under Federal Post-Conviction Supervision," *Federal Probation*, Vol. 80, No. 2 (Sep. 2016), at 29, *see also id.*, Figure 5, *available at* https://www.uscourts.gov/sites/default/files/80_2_4_0.pdf.

1   for attempted crimes).

2         "Criminal conduct subject to the [terrorism] Enhancement varies significantly: from planning

3   and participating in a violent attack that kills hundreds of people to making false statements to law

4   enforcement officials."  Ahmed, 126 Yale L.J. at 1529.  Yet "for the Terrorism enhancement, the fact

5   that the defendant's conduct caused no harm does not matter."  *Id.* at 1530.  Section 3A1.4 "treats all

6   offenders the same, without taking into account their actual conduct or individual background, such

7   as age and criminal history."  Ahmed, 126 Y.L.J. at 1259.

8         Because of the failure "to differentiate between various levels of conduct," the § 3A1.4

9   enhancement "frequently results in Guidelines ranges that equal the maximum statutory sentence."

10  *Jumaev*, 2018 WL 3490886, at *10.  In fact, it frequently results in Guideline ranges far above the

11  statutory maximum.  For example, had Mr. Shafi been convicted of attempting to provide material

12  support as charged in the indictment, he would have faced a maximum sentence of 20 years in prison.

13  *See* 18 U.S.C. § 2339B(a)(1).  Applying the terrorism enhancement would result in a Guidelines

14  range of 360-life, far above the statutory maximum, and would not take into account the offense

15  involved an attempt rather than a completed crime.[4]  It is "logical to assume that Congress enacted

16  these criminal statutes with the penalties it thought appropriate to deter and punish offenses, such that

17  any sentences imposed that are far above the statutory maximum—if based solely on the conduct

18  criminalized in statute—are disproportionate.  That comparison establishes that U.S.S.G section

19  3A1.4 results in far higher sentences than the statutes it was intended to supplement."  McLoughlin,

20  28 Law & Ineq. at 62-63.[5]

21  _____

22  [4] Specifically, the base offense level for attempting to provide material support is 26 under U.S.S.G. §
    2M5.3(a).  Application of the terrorism adjustment would increase the offense level to 38, and move

23  Mr. Shafi into criminal history category VI, creating an advisory Guideline range of 360-life.  When
    the statutory maximum is below the Guideline range, the statutory maximum becomes the Guideline

24  range.  *See* U.S.S.G. § 5G1.1(a).  So the Guideline range would become 240 months, which is the
    statutory maximum.

25  [5] The government points out the statutory maximum sentence for bank fraud is 30 years.  Gov. Sent.
    Memo. at 1.  Yet Mr. Shafi's specific bank fraud triggers an adjusted Guideline range of 0-6 months,

26  meaning it is the least aggravated fraud envisioned in the Guidelines.  Thus, the 30 year statutory
    maximum is not a useful proxy for the harm caused by Mr. Shafi's conduct.  And it is proof of a

27  critique of the § 3A1.4 adjustment, namely that "the enhancement, because of its substantial
    penalties, becomes more important than the offense of conviction" because "the government can get a

28  large sentence by having the jury convict the defendant of an easy-to-prove offense, and then having
    the judge increase the sentence through the enhancement" under a lesser standard.  *Brown*, 23 Cornell

1    As one district court has noted, "treating all 'terrorists' alike is impermissible under our

2    sentencing paradigm." *Jumaev*, 2018 WL 3490886, at *10.  Another district court has explained, the

3    terrorism adjustment

4        is too general to be convincingly reliable in a given case.  Both the 12-level adjustment
         to the offense level and the automatic assignment of a Criminal History Category VI
5        which are applied in any case that can be fairly characterized as a terrorism case,
         regardless of the particular facts, not only make the recommendation unuseful as a
6        guide in a particular case but is actually, in my view, contrary to and subversive of the
         mission of the Guidelines which is to address with some particularity the unique facts of
7        the given case. And gross adjustments such as the ones I've referenced do not do that.

8    *United States v. Mehana*, CR 09-10017-GAO (D. Mass.), Dkt. 439, Reporter's Transcript of

9    Proceedings on April 12, 2012 at 69:1-13 (attached as Exhibit S); *see also* Ahmed, 126 Y.L.J. at 1259

10   ("the Enhancement undermines a basic principle of U.S. sentencing law and its underlying

11   commitment to retributive justice: that punishment should be proportional to the crime.").  Mr. Shafi

12   asks this Court to adopt this reasoning and use its *Kimbrough* discretion to reject the enhancement.

13       **3.    Equating a First Offender with a Career Offender Contradicts the Premise of the
                 Guidelines.**
14

15       Yet another flaw with the § 3A1.4 terrorism adjustment is that it artificially inflates a

16   defendant's criminal history category to VI even when that person has no prior criminal record at all.

17   *See* U.S.S.G. § 3A1.4(b).  As with the lack of empirical evidence and the equation of all terrorism

18   offenses, the decision to treat every § 3A1.4 offender as a career offender contradicts the entire

19   premise of the Sentencing Guidelines scheme.

20       As this Court knows, part of calculating the advisory Guidelines range in a case involves

21   determining the defendant's criminal history score.  The Sentencing Commission has explained that a

22   defendant's prior criminal record is "directly relevant" to sentencing because a "defendant with a

23   record of prior criminal behavior is more culpable than a first offender and thus deserving of greater

24   punishment."  U.S.S.G. Chapter Four, Criminal History and Criminal Livelihood, Part A – Criminal

25   History Introduction Commentary.  Moreover, "Repeated criminal behavior is an indicator of a

26   _____

27   J.L. & Pub. Pol'y at 535; *see also* McLoughlin, 28 Law & Ineq. at 80 ("the government can get the
     same sentencing 'bang for its buck' by seeking a jury conviction under [an] easier to prove" offense
28   "then getting a judge to determine that the defendant acted with the requisite intent for a U.S.S.G.
     section 3A1.4 sentence enhancement under a lower burden of proof.").

1   limited likelihood of successful rehabilitation." *Id.*

2       Unsurprisingly, apart from § 3A1.4, the only other provisions of the Guidelines that

3   automatically raise a defendant's criminal history beyond the properly calculated criminal history

4   score all involve defendants with aggravated prior criminal convictions. *See* U.S.S.G. §§ 4B1.1(b)

5   (automatic assignment to criminal history category VI for career offenders who have prior

6   convictions for drug trafficking or crimes of violence); §§ 4B1.4(c)(2), (3) (automatic assignment to

7   criminal history category IV or VI for defendant sentenced under Armed Career Criminal Act due to

8   prior conviction for "violent felony" or "serious drug offense"); § 4B1.5(a)(2)(B) (automatic

9   assignment to criminal history category V for certain sex crime defendants with prior sex offense

10  convictions involving minors).[6]  Conversely, the Guidelines authorize a downward departure when

11  "reliable information indicates that the defendant's criminal history category substantially over-

12  represents the seriousness of the defendant's criminal history or the likelihood that the defendant will

13  commit other crimes." U.S.S.G. § 4A1.3(b)(1).

14      Equating Mr. Shafi, who has no criminal record to someone with an extensive criminal

15  history—such as career offenders, armed career criminals and sex offenders—is unreasonable and

16  should be rejected.  In fact, application of the adjustment to Mr. Shafi is even more unreasonable

17  because he has no prior record at all, as opposed to being in criminal history category I due to prior

18  convictions too old to score for criminal history points.  As demonstrated in his sentencing

19  memorandum, Sentencing Commission data indicates first offenders like Mr. Shafi are at the lowest

20  risk of recidivism of all federal defendants. *See* Dkt. 352, Defendant's Sentencing Memorandum at

21  16-18.

22      Moreover, "there is no published statistical data demonstrating that defendants convicted of

23  violating" terrorism related statutes "are any more likely to be recidivists than any other first

24  _____

25  [6] Prior criminal convictions also trigger *statutory* mandatory minimums and increase statutory
    maximums throughout the federal criminal code. *See, e.g.,* 18 U.S.C. § 924(e)(1) (15 year minimum
26  and life maximum for defendant convicted of being a felon in possession of a firearm with three prior
    qualifying convictions); 18 U.S.C. § 2252(b)(2) (10 year minimum for defendant convicted of
27  possessing child pornography with qualifying prior convictions); 18 U.S.C. § 3559(c)(1) (mandatory
    life imprisonment for defendant convicted of certain violent felonies with qualifying prior
28  convictions); 21 U.S.C. § 841(b)(1)(A) (increased minimum penalties for drug trafficking defendants
    with qualifying prior convictions).

DEFENDANT'S RESPONSE TO UNITED STATES' SENTENCING MEMORANDUM
*SHAFI*, CR 15–00582 WHO

1    offenders." McLoughlin, Jr., 28 Law & Ineq. at 114–15. Likewise, "nothing in the history of

2    U.S.S.G. section 3A1.4 would indicate that any reliable data was used to determine if a person

3    convicted of a material support offense is more likely to be a recidivist." *Id.* at 115.

4         In fact, as Judge Breyer recently noted, "there is some evidence that first-time terrorism

5    offenders are no more likely to reoffend than individuals who commit other crimes," based on

6    Sentencing Commission statistics concerning first offenders. *Alhaggagi*, 2019 WL 1102991, at *7.

7    He also noted "the very limited data suggests that individuals convicted of terrorism offenses do *not*

8    recidivate at higher rates than those convicted of other crimes." *Id.* (citing Ahmed, 126 Y.L.J. at 150)

9    (emphasis in original). As a result, in *Alhaggagi* Judge Breyer found the § 3A1.4 enhancement

10   applied but departed to the defendant's true criminal history category of I because "automatically

11   assigning to all terrorism defendants a criminal history category of VI—is inappropriate based on the

12   seriousness of the crime, inappropriate based on assumptions about recidivism, and inappropriate as

13   to this Defendant." *Alhaggagi*, 2019 WL 1102991, at *5.

14        Judge Breyer is not alone; courts who have applied the enhancement routinely reject the

15   automatic assignment to criminal history category VI as inappropriate. *See Meskini*, 319 F.3d at 92

16   ("A judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past

17   criminal conduct or the likelihood that the defendant will commit other crimes" *always* has the

18   discretion under § 4A1.3 to depart downward in sentencing.") (emphasis added). In *United States v.*

19   *Jumaev*, Judge John Kane of the District of Colorado declined to apply the § 3A1.4 adjustment and

20   noted even if it applied, it would grant a departure to criminal history category I because the § 3A1.4

21   adjustment "substantially over-represents the seriousness of the defendant's criminal history or the

22   likelihood that the defendant will commit other crimes." 2018 WL 3490886, at *9 (quoting U.S.S.G.

23   § 4A1.3(b)(1)). In *United States v. Mehana*, Judge George O'Toole of the District of Massachusetts

24   found "the automatic assignment of a defendant to a Criminal History Category VI is not only too

25   blunt an instrument to have genuine analytical value, it is fundamentally at odds with the design of

26   the Guidelines. It can, as it does in this case, import a fiction into the calculus. It would impute to a

27   defendant who has had no criminal history a fictional history of the highest level of seriousness."

28   *United States v. Mehana*, CR 09-10017-GAO (D. Mass.), Dkt. 439, Reporter's Transcript of

Proceedings on April 12, 2012 at 69:14-24 (attached as Exh. S).

It is unreasonable to equate first offender Mr. Shafi with someone at the highest criminal history category.  The probation office agrees, writing that one reason to grant a variance if the adjustment applies is Mr. Shafi's "lack of a prior record."  PSR ¶ 77.  Thus this Court should reject the terrorism adjustment.

**4.      The Terrorism Adjustment Disproportionately Impacts People Under 25.**

As Mr. Shafi explained in his sentencing memorandum, Mr. Shafi's young age—21 and 22 years old during the events of 2014 and 2015—is a critical characteristic that must be taken into account.  *See* Dkt. 352, Defendant's Sentencing Memorandum at 13-14.  The Supreme Court has recognized that "because juveniles have lessened culpability they are less deserving of the most severe punishments."  *Graham v. Florida*, 560 U.S. 48, 68 (2010). The Sentencing Commission in turn has cited neurological research that shows brain development is not fully realized in most people until they turn 25 years old, meaning the brain of a defendant who commits a crime at the age of 21 or 22 is almost as undeveloped as a 16 or 17-year-old juvenile.[7]

Yet the draconian terrorism adjustment disproportionately impacts defendants under the age of 25.  Although from 2007 to 2017, such young defendants only made up 18% of all defendants sentenced in federal court, they made up 28% of all defendants receiving a § 3A1.4 adjustment.[8]

---

[7] *See* Dkt. 352-14, Exhibit N to Defendant's Sentencing Memorandum, Excerpt of United States Sentencing Commission, "Youthful Offenders in the Federal System," p. 6, 7.  The full report is available at http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf.

[8] Federal Public Defender Assistant Paralegal Jordan Schaer generated Table 2 by reviewing U.S.S.C. datafiles from 2002 to 2017. Excluding all cases without information on whether the sentence departed or varied from the Guideline recommendation under *Booker*, Mr. Schaer separated cases by age and whether they received an enhancement under § 3A1.4.

| Table 2: Age of Offenders per U.S.S.C. Datafiles | | | | |
|---|---|---|---|---|
| | 25 or younger | | 26 or younger | |
| | N | % of total | N | % of total |
| **3A1.4 defendants** | 88 | 28% | 231 | 72% |
| **All defendants** | 135,758 | 18% | 61,9969 | 82% |

That is, defendants who should "have lessened culpability" and "are less deserving of the most severe punishments," *Graham*, 560 U.S. at 68, are actually more likely to receive the most severe adjustment in the entire Sentencing Guidelines. Once again, that demonstrates the irrationality of the § 3A1.4 adjustment.

**5.     The Significant Rate of Variance Suggests Rejection of the Adjustment.**

Dissatisfaction with the terrorism adjustment is demonstrated by the fact that the overwhelming majority of judges have imposed sentences below the range generated by the adjustment. Since 2008, approximately 46% of all sentenced federal defendants received a sentence below the Guideline range. Yet for defendants facing an adjustment under 3A1.4, the rate of downward variance is 77%. Within the Ninth Circuit, the number is even higher, as 81% of defendants receiving a § 3A1.4 adjustment received a sentence under the advisory range.[9]



That includes every judge in the Northern District of California who has applied the adjustment. *See United States v. Alhaggagi*, CR 17-387-CRB (calculating terrorism adjusted

---

[9] Mr. Schaer generated Table 3 by filtering the information in Table 2 above by the number of cases receiving a variance or departure under their applicable Guidelines, and further filtered the cases to exclude all but those within the Ninth Circuit.

Guideline range as 324-405 months and imposing 188 month sentence); *United States v. Natsheh*, CR 16-166-RS (imposing 60 month sentence in case involving terrorism adjusted Guideline range of 360-life capped at 240 months due to statutory maximum); *United States v. Llaneza*, CR 13-145-YGR (imposing 180 month sentence in case involving terrorism adjusted Guideline range of 360-life and statutory maximum sentence of life imprisonment).  Notably, as it does in Mr. Shafi's case, the government in both *Natsheh* and *Llaneza* recommended a sentence below the terrorism adjusted Guideline range.  *See Natsheh*, CR 16-166-RS, Dkt. 20, United States Sentencing Memorandum at 4; *Llaneza*, CR 13-145-YGR, Dkt. 31, United States Sentencing Memorandum at 6.  Mr. Shafi asks this Court to join this judicial chorus and reject the § 3A1.4 adjusted Guideline range.

**6.     This Would Be the Largest Ever Application of the Terrorism Adjustment.**

Finally, applying the adjustment would be excessive and disparate to Mr. Shafi specifically. The § 3A1.4 adjustment increases a defendant's offense level by 12 or, alternatively, mandates an offense level of 32 if the 12 level increase results in an offense level under 32.  U.S.S.G. § 3A1.4(a). For Mr. Shafi, the adjustment which would increase his offense level from 7 to 32, a 25 level increase.

The terrorism adjustment has the biggest sentencing impact on the least culpable defendants. Of the 389 defendants sentenced since 2003 receiving the terrorism adjustment, only 20 received an actual adjustment greater than 12 levels.[10]  That is, only 20 defendants in the last 15 years have been in the situation Mr. Shafi is currently in: facing an increase in offense level greater than 12.

---

[10] Mr. Schaer created Table 4 by reviewing U.S.S.C. datafiles from 2002 to 2017.  He applied the variable measuring the extent of enhancement under § 3A1.4, and the variable that captures the sentencing year. Cases without information for sentencing year were excluded.

| Table 4: Number of Cases by Extent of Terrorism Adjustment Per Sentencing Year | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
| **4** | | | | | 1 | | | | | | | | | | | | 1 |
| **6** | | | | | | | | | | | | | | 1 | | | 1 |
| **12** | 8 | 4 | 13 | 11 | 24 | 14 | 37 | 16 | 22 | 46 | 39 | 24 | 42 | 39 | 18 | 10 | 367 |
| **14** | | | | | | | | | | | 1 | | | | | | 1 |
| **15** | | | | | | | | | | | 1 | 1 | | | 1 | | 3 |
| **16** | | | | | | | | | | | | 1 | | | | | 1 |
| **18** | | | | | | | | | 1 | | 2 | | 1 | 2 | 2 | 1 | 9 |
| **21** | | | | | | | 2 | | 1 | 2 | | | | | | | 5 |
| **24** | | | | 1 | | | | | | | | | | | | | 1 |
| **Total** | 8 | 4 | 13 | 12 | 25 | 14 | 39 | 17 | 23 | 48 | 43 | 26 | 43 | 42 | 20 | 12 | 389 |

That means the impact of the terrorism adjustment—in terms of a proportionate increase in recommended sentence—will be greatest for a defendant like Mr. Shafi whose natural offense level (the range generated by the offense level before the terrorism adjustment) was low.  That again contradicts the entire premise of the Guidelines system, which is predicated on "the offense level [reflecting] the seriousness of a charged offense." *Alhaggagi*, 2019 WL 1102991, at *6; *see also United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009) (noting increased offense level "is a measure of the seriousness of the crime committed").

For Mr. Shafi specifically, the 25 level increase in offense level would be the greatest ever application of the terrorism adjustment since 2003.  Such an outcome effectively singles Mr. Shafi out, leading to both unwarranted sentencing disparity with other similarly situated defendants, and unwarranted sentencing *similarity* among defendants "who were not similarly situated." *Amezcua-Vasquez*, 567 F.3d at 1058 (quotations and citation omitted); *see also* 18 U.S.C. § 3553(a)(6) (sentencing court must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). This Court should thus reject application of

§ 3A1.4 adjustment as excessive as applied to Mr. Shafi specifically.

### **CONCLUSION**

The terrorism adjustment does not apply.  Even if it did apply, however, this Court should use its discretion—as even the government and probation office recommend—to disregard the range generated by the terrorism adjustment. Mr. Shafi asks this Court to sentence him to credit for time served, three years of supervised release, and a $100 special assessment.


Dated:      March 18, 2019                              Respectfully submitted,

                                                        STEVEN G. KALAR
                                                        Federal Public Defender
                                                        Northern District of California

                                                                    /S
                                                        _____
                                                        HANNI FAKHOURY
                                                        Assistant Federal Public Defender