# EXHIBIT S

**EXHIBITS IN SUPPORT OF
DEFENDANT'S SENTENCING
MEMORANDUM**

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 2 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 1 of 76

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                )
UNITED STATES OF AMERICA,       )
                                )
        Plaintiff,              )
                                ) Criminal Action
v.                              ) No. 09-10017-GAO
                                )
TAREK MEHANNA,                  )
                                )
        Defendant.              )
                                )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**DISPOSITION**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts  02210
Thursday, April 12, 2012
10:07 a.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts  02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

Case 3:15-cr-00582-WHO Document 35-1 Filed 02/18/19 Page 3 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 2 of 76

2

```
 1   APPEARANCES:

 2        OFFICE OF THE UNITED STATES ATTORNEY
          By: Aloke Chakravarty and Jeffrey Auerhahn,
 3             Assistant U.S. Attorneys
          John Joseph Moakley Federal Courthouse
 4        Suite 9200
          Boston, Massachusetts  02210
 5        - and -
          UNITED STATES DEPARTMENT OF JUSTICE
 6        By: Jeffrey D. Groharing, Trial Attorney
               National Security Division
 7        950 Pennsylvania Avenue, NW
          Washington, D.C.  20530
 8        On Behalf of the Government

 9        CARNEY & BASSIL
          By: J.W. Carney, Jr., Esq.
10             Janice Bassil, Esq.
               John E. Oh, Esq.
11        20 Park Plaza
          Suite 1405
12        Boston, Massachusetts  02216
          - and -
13        LAW OFFICE OF SEJAL H. PATEL, LLC
          By: Sejal H. Patel, Esq.
14        101 Tremont Street
          Suite 800
15        Boston, Massachusetts  02108
          On Behalf of the Defendant

16

17

18

19

20

21

22

23

24

25
```

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/12/19 Page 4 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 3 of 76

3

 1          THE CLERK:  All rise.

 2          (The Court enters the courtroom at 10:07 a.m.)

 3          THE CLERK:  For a sentencing in the case of

 4  Tarek Mehanna, Docket 09-10017.  Would counsel identify

 5  yourselves for the record.

 6          MR. CHAKRAVARTY:  Good morning, your Honor.  For the

 7  government, Assistant U.S. Attorneys Aloke Chakravarty, Jeffrey

 8  Auerhahn and Counterterrorism Section Attorney Jeffrey

 9  Groharing.

10          THE COURT:  Good morning.

11          COUNSEL IN UNISON:  Good morning, your Honor.

12          MR. CARNEY:  Good morning, your Honor.  J.W. Carney,

13  Jr., for Tarek Mehanna.  With me is my co-counsel, Janice

14  Bassil, as well as Segal Patel and John Oh.

15          THE COURT:  Good morning.

16          MR. CARNEY:  Good morning, your Honor.

17          THE COURT:  Let me make a couple of preliminary

18  comments before we begin to address the substance of the

19  matters.  First of all, the jury's verdict in this case is not

20  an issue and I accept it as, of course, any sentencing judge

21  must.  It is also my judgment that the verdict was, in all

22  respects, supported by evidence produced in the course of the

23  trial.  But a sentencing hearing is not an occasion for

24  questioning or revisiting the verdict.

25          The parties have submitted a good deal of material in

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/19/19 Page 5 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 5 of 76

4

1    support of their respective positions on sentencing issues.  I

2    have read and considered that material carefully, as I have the

3    presentence report prepared by the probation office.  And let

4    me take this opportunity to thank our probation office and, in

5    particular, Ms. Sinclair for the fine work she has done in this

6    difficult case.  So because I have studied the materials, I ask

7    that counsel, in their oral arguments, to assume my close

8    familiarity with the materials submitted and to try to minimize

9    any redundancy.

10        Mr. Carney had previously indicated on behalf of the

11   defendant his wish to have Dr. Ahmed Mehanna and Mrs. Mehanna

12   make brief oral statements, and I had denied that request.

13   This is consistent with my usual and customary practice to

14   limit presentations at sentencing hearings to the defendant and

15   to counsel only, and I adhere to that practice in this hearing.

16   As opposed to oral statements, however, I routinely welcome,

17   and have done so in this case, written submissions through

18   counsel.  And as I've noted, I have reviewed and considered

19   those submissions in this case, including letters from each of

20   the defendant's parents and from his brother.  And I assure

21   them that they have, in fact, been heard.

22        Consistent with applicable procedures, we will

23   consider the issues this morning in this order:  First, we will

24   determine what sentencing range emerges as a recommendation

25   from the proper application of the United States Sentencing

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 6 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 5 of 76

5

1     Guidelines; second, we will consider whether the Court should

2     consider an authorized departure from that range consistent

3     with guideline principles; and finally, we will consider the

4     multiple factors set forth in the sentencing statute, 18 U.S.

5     Code Section 3553(a), to determine an appropriate sentence.

6          In our federal system we take care to give sentencing

7     decisions careful and detailed consideration.  The process and

8     sequence of decision-making, as I've just outlined it, for this

9     morning are an example of that care.  The parties' views are

10    solicited early in the process in dialogue with the probation

11    office, and at every stage decisions impacting the ultimate

12    sentencing judgment are guided by specific address to any issue

13    that may or should affect the outcome.

14          It is important to understand that sentencing

15    judgments are not simply the product of one mind.  The judge is

16    not a monarch.  In addition to input from the parties and the

17    probation office, a sentencing judge also must consider the

18    views of the lawmakers who adopted the relevant criminal

19    statute and established its general range of sanction as well,

20    of course, as the Sentencing Commission, which, with the

21    approval of the Congress, has adopted and explained relevant

22    Guidelines.  Congress and the Sentencing Commission speak

23    generally, however, while a sentencing judge thinks

24    particularly with regard to the features of the present case.

25    Consequently, it can also be important to consider what other

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 6 of 76
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/11 Page 6 of 76

6

1   judges have decided in similar circumstances.

2         So the responsibilities for sentencing decisions are

3   shared in this sense, and a sentence in a particular case is

4   not simply the product of an individual, perhaps even

5   idiosyncratic, judgment by the sentencing judge, but rather,

6   the result of a broadly considered judgment that respects the

7   roles and views of other courts and other branches of the

8   government.  And, of course, serious consideration of the

9   Guidelines' recommendation is one way of consulting the views

10  of other sentencing constituencies.

11        And as a final preliminary matter let me say what I

12  hope is obvious.  No judge I have ever known approaches the

13  responsibility of imposing criminal punishment on the defendant

14  with any sense of relish or eagerness.  It is a necessary duty,

15  solemnly performed after thorough reflection, consistent with

16  the judge's oath and obligation.

17        Now, as I've said, a starting point for the

18  consideration of all the factors that may bear on an

19  appropriate sentence is the recommendation that emerges from an

20  application of the Sentencing Guidelines.  The probation office

21  has prepared a thorough presentence report which proposes an

22  application of the Guidelines in this case.  I know that in

23  some respects each side has some disagreement with that, and I

24  think an efficient way to address it is to simply take the

25  relevant parts of the presentence report and move through them

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 8 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 8 of 76

7

1    and make rulings as they are presented in sequence by the

2    numbered paragraphs.

3         So I start with Paragraph 66 which recommends that the

4    Guidelines Manual to be employed in this project is the current

5    Guidelines Manual effective November 2011.  I think the

6    defendant has a different view.  And if you want to address

7    that, I'll hear from you now.

8         MR. CARNEY:  Your Honor, when we received the

9    presentence report we sent a list of very specific objections

10   to probation.  We've also submitted to your Honor, as you know,

11   a separate document that addresses each of our objections with

12   citations to case law, legislative intent, and other factors.

13        We are content to rest on our memorandum regarding

14   those objections.  I'm confident your Honor has looked at them

15   carefully, reviewed the backup that we have presented.  And we

16   are certainly available to answer any specific questions your

17   Honor might have.  But if you do not, we want to be mindful of

18   the fact that your Honor has indicated that you've read this

19   material carefully and would be grateful if we were not simply

20   repeating what we've already given you in writing.

21        THE COURT:  Thank you.  I have looked closely at this,

22   and my conclusion is, in accordance with the prescriptions of

23   the Guidelines themselves, that the current manual is the

24   manual to be applied.  There are, I think, two issues:  One is

25   which manual should be applied under the Guidelines themselves;

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 9 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 8 of 76

8

1    and the second is a question of ex-post-facto considerations.

2    I'm not sure it's necessary to reach that constitutional

3    question.  The First Circuit has recently indicated in a case

4    called *Rodriguez*, I believe, that it's preferable not to reach

5    the constitutional question if it's not necessary.

6              I think that the decisions that we will make regarding

7    the Guidelines and the ultimate effect of those decisions will

8    not have an ex-post-facto effect, and so we need not reach the

9    question of whether if it did in some way, that would

10   invalidate the application of the current guideline.  So I will

11   use the current manual.

12             In Paragraph 67 the PSR identifies the specific

13   Guidelines to be used for each of the several counts of the

14   indictment.  And without repeating it all, I believe that that

15   is a correct assignment of the relevant individual guideline

16   provisions.

17             The next point that I would confirm is in Paragraphs

18   68 and 69 which is, again, consistent with the Guidelines

19   themselves, the seven counts should be grouped, as that is done

20   under the Guidelines, and that when that is done, the

21   computation for the count that yields the highest score is the

22   one that is used for determining the proposed range.

23             So let's turn to Count 1.  The guideline that applies

24   is 2M5.3.  It has a base offense level of 26.  I think that's

25   uncontroversial.  The first adjustment that is made is under

Case 2:15-cr-00582-WHO  Document 354-1  Filed 03/19/19  Page 10 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 05/16/12  Page 9 of 76

9

1    2M5.3(b)(1)(E), and I believe that has not been objected to.

2        Let me move to Paragraph 73 which proposes an

3    adjustment because the intended victims of the offense were

4    government officers or officials or employees.  The defense has

5    objected to this.  And I think just to, again, try to be

6    efficient, I agree with the objection.  I think that the

7    adjustment under 3A1.2(a)(1)(A) requires specified individuals

8    and not generalized reference to government employees.  It's

9    not an entirely clear matter.  I think it's the better

10   interpretation.  And I think in matters with close questions

11   such as this, the benefit of the doubt should go to the

12   defendant.

13       Paragraph 74 suggests a victim-related -- well, it's

14   called "victim-related" in the PSR.  It's actually a terrorism

15   adjustment of an upward level 12 increase pursuant to 3A1.4(a).

16   The defense has also objected to this, but I think their

17   objection is essentially a third-stage objection, if I can put

18   it that way, not that the Guidelines applied on their own terms

19   don't call for it, but that it shouldn't be none.  In the

20   papers the defendant has argued that some judges have declined

21   to do it and so on.  I take that not as an interpretation of

22   the Guidelines but as a variance from them, and we'll address

23   that at that point.  I think it is an orthodox application of

24   the Guidelines to give the 12 levels.

25       The defendant has also argued for a minor role

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 11 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 10 of 76

10

1    adjustment in the guideline.  Having considered that, I think

2    that it is not appropriate to give a minor role.  As a matter

3    of fact, as I will perhaps refer to later as we discuss some of

4    the details of the case, my understanding of the evidence is

5    that among the group of relevant participants here in the

6    Massachusetts area, the defendant is more likely to have been

7    seen as one of the leaders rather than a minor participant.  I

8    don't make an adjustment for leadership, but I just mention

9    that to counter the suggestion that there might be a minor role

10   assessment.

11          The government asks for a special skills adjustment of

12   two levels under 3B1.3.  And I do not think that is

13   appropriate.  I don't think language skill by itself,

14   particularly for a person such as Mr. Mehanna whose skill in

15   Arabic is likely close to a native language, even though he

16   was, of course, born in America -- he's probably been speaking

17   English equally long.  I noted at some point, I can't identify

18   it exactly, that Arabic is frequently spoken in the home.  And

19   I think that that does not qualify as a special skill for

20   purposes of the Guidelines.

21          In Paragraph 75 the presentence report proposes an

22   obstruction of justice two-level increase for Count 1 and for

23   some of the following counts.  I believe that is a correct

24   adjustment.  And I rely on Application Note 8 to Guideline

25   3C1.1 which indicates that when there are multiple counts of

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 12 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 11 of 76

11

1    conviction, one of which is an obstruction count, it is
2    appropriate in scoring to give the adjustment.
3            So to recap Count 1:  base level of 26; adjustment
4    under 2M5.3 of 2, which is 28; a further adjustment of 12, the
5    terrorism adjustment, which is 40; and the obstruction which is
6    42.
7            Many of the proposed adjustments and actual
8    adjustments that we've just addressed follow in subsequent
9    counts.  I don't think it's necessary to repeat those.  But in
10   Count 2 there was a question, anyway, about the proper base
11   offense level.  I think that's been resolved by my conclusion
12   that the current Guidelines Manual applies, and so it is a 33.
13   Again, making no role adjustment, no special-skill adjustment,
14   no separate victim-related adjustment for officers of the
15   government, making the terrorism adjustment and the obstruction
16   adjustment, Count 2 becomes a level 47.  And that is true of
17   Counts 3 and 4 as well for the same reasons.
18           Counts 5 through 7 are governed by the obstruction
19   guideline 2J1.2.  The base offense level of 14, an adjustment
20   sufficient to bring the adjusted level to 32, which is an
21   18-point adjustment.  And so the score is 32 for Counts 5
22   through 7.
23           Now, 3A1.4(b) also provides that the criminal history
24   should be deemed to be a Category VI.  So the highest score on
25   this application of the Guidelines would be a level 47 at a

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 13 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 13 of 76

12

```
 1    Category VI, which is literally off the charts, and the
 2    recommended sentence under those conditions from the Guidelines
 3    is a life sentence.  I don't think there's any point in -- even
 4    before we get to the specifics of an appropriate sentence --
 5    considering that a life sentence is an appropriate sentence.  I
 6    do not intend to impose a life sentence in this case.  Even the
 7    government does not recommend that.  This will be a term of
 8    years, and it will be affected by the sentencing factors of
 9    Section 3553(a).
10         So we've completed the first step.  I don't think
11    there are any suggestions of an authorized departure within the
12    Guidelines regime.  There are, of course, arguments for a
13    non-guideline sentence under the doctrine of Booker and its
14    following cases.  So with that in mind, I'll entertain
15    specifically your recommendation for a given sentence in light
16    of all the statutory factors.
17         MS. BASSIL:  Your Honor, before we proceed, this
18    morning while I was in the hallway a juror approached me, and
19    she is here in the courtroom today, and she has stated that she
20    wants to speak at sentencing and she would like to be heard by
21    the Court.  She had stated that when -- I guess when you talked
22    to the jurors, you had said if they had any issues they could
23    come back.  She's back.  She would -- and she is here today and
24    she would like to be heard, and I think she should be heard,
25    your Honor.
```

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/19 Page 14 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 13 of 76

13

1          THE COURT:  I see no reason to do that.

2          MS. BASSIL:  Well, I would like to make an offer of

3     proof, your Honor, of what she would say.

4          THE COURT:  You can submit one in writing.

5          MS. BASSIL:  Your Honor --

6          THE COURT:  No, I don't want to get into that.  It

7     would be highly unorthodox, contrary to the law.  And I am

8     confident that if I said to the jurors informally that they

9     were welcome back, it was if they had an interest in the

10    proceedings, not as a participant in the proceedings.  So it

11    would be highly irregular.  And I won't even at this point

12    entertain an offer on it.  If you want to complete the record

13    by a written offer subsequent to sentencing, I'll permit that.

14          Mr. Chakravarty?

15          MR. CHAKRAVARTY:  Your Honor, you sat through this

16    trial.  True to form, I'm not going to repeat all of the

17    evidence.  It's impossible to summarize the insight into the

18    defendant that your Honor had.

19          As we assess especially the 3553(a) factors, we should

20    not dismiss entirely the value assessment, the considered

21    opinion of the Sentencing Commission in setting one data point

22    for the Court, one that the government is clearly not arguing

23    is the only appropriate sentence in this case.  But as I'm sure

24    your Honor has struggled with, to find the relevant factors

25    with which to quantify a term of years is no small feat, to do

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 15 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 15 of 76

14

1    it accurately, considering any mitigating factors as well as

2    the gravity of the offense here.  And so that's where I want to

3    start, at the gravity of the offense here.

4           The crimes that the defendant has been convicted of

5    are amongst the most serious in our system of justice.  In the

6    federal criminal law, they are uniquely suited to punishment

7    and deterrence through criminal procedure.  It's the only way

8    to prevent people from becoming homegrown violent extremists

9    who would embark on campaigns to kill soldiers of the very

10   country in which they live.  That was the harm here.  That is

11   the nature of the offense, and it's one that statutorily calls

12   for up to a life sentence.  The Guidelines say based on those

13   factors that a life sentence is appropriate.  And so with that

14   in mind, what about this defendant can you look at to see on

15   that spectrum of thought to action, to actually committing a

16   successful offense of actually killing soldiers, where does the

17   defendant fit?

18          In this case we focused a lot on Yemen; we focused a

19   lot on his activities online, recruiting others, providing

20   support for al Qa'ida; we focused a lot on his obstructive

21   activities.  And those are the natures of the harms that he

22   caused.  But it didn't start with Yemen, your Honor; it started

23   back in 2001.  Over a decade ago this defendant began to

24   radicalize.  This was not a flight of fancy.  This was not a

25   misunderstanding.  If there was any misguiding involved, as

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/19 Page 16 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 15 of 76

15

1   your Honor alluded to, it was this defendant that was

2   misguiding others.  It was this defendant who had the unique

3   combination of knowledge, charisma, of persuasive ability in

4   language to be able to bring others to his way of thinking, in

5   this case a way of thinking which advocated for and conspired,

6   ultimately, to visit violence upon Americans.

7           Regardless of where one sits on the spectrum of

8   whether American foreign policy is legitimate or the war in

9   Iraq is appropriate, when you conspire to take up arms against

10  your country, it deserves severe penalties, not just to

11  incapacitate an individual, but to deter that individual and

12  all others who might embark on the same course of action or

13  similar course of action in the future.  And that's the lens

14  through which I ask you to view what is the impact of the

15  defendant's activity.  What is the actual harm that he brought

16  to visit?

17          And when he returned from Yemen, he didn't abandon --

18  he didn't change his heart.  He didn't abandon his ideas of

19  even going over in an armed campaign.  He discussed it again

20  with Abousamra.  He discussed the potential with

21  Daniel Maldonado when, of all the people in the world to call,

22  Maldonado called the defendant from Somalia.  He discussed it

23  again with his prospective wife, reaffirming that indeed he had

24  tried to join that company but he was rejected because he

25  didn't have sufficient people to vouch for him.

Case 3:15-cr-00582-WHO  Document 354-1  Filed 02/18/19  Page 17 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 16 of 76

16

1          Well, now this defendant is famous, your Honor.  When

2    he gets out of prison, whenever that is, this trial will be his

3    credentials.  He does have that credibility now, and I submit

4    to you that's what he gained by embarking on his quest in

5    Yemen.  When he came back locally, I'd venture to guess that

6    most people in the community had no clue as to what this

7    defendant and his coconspirators had attempted to do.  They had

8    no clue as to how extreme his ideology had progressed, such

9    that taking up arms was the appropriate answer.

10         It's with that mentality that he then began

11   cultivating others, some of whom testified in this courtroom;

12   that he helped radicalize those individuals, empowered in part

13   by his demonstrated commitment to the cause of al Qa'ida,

14   Salafi jihadists, others who would take up arms against what he

15   felt was his obligatory duty to stand up against the country in

16   which he lived:  them.  To him the world was about "us,"

17   Muslims who were being persecuted, and "them," the persecutor,

18   the United States, this tribunal who is now going to be passing

19   judgment on him.

20         As we know, your Honor, he didn't just stay focused on

21   exclusively armed campaigns against American soldiers.  He then

22   thought, as an opportunist:  What else can I do to support that

23   mission?  If I am unsuccessful in going over myself, how can I

24   motivate others?  How could I motivate the Abu Bakrs and the

25   Spauldings and the Massouds and the Maldonados to go and be

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/19 Page 18 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 18 of 76

17

1  successful at what I tried and failed to do?  And he found his

2  niche.

3         Together with the Tibyan Publications folks, he

4  developed this charismatic persona empowered largely because of

5  his knowledge, because he had the credibility, because people

6  knew about his prior failed campaign to Yemen in which he had

7  collaborated with some of the Tibyan Publications folks.  And

8  it was with that credibility, with that nuanced understanding

9  of the Salafi Jihadi message, al Qa'ida's messaging, with which

10  he embarked on several translation products:  "39 Ways," "Umar

11  Hadid."  You heard all about those.  We've submitted papers

12  describing how influential they are.  We described Mr. Qureshi,

13  who specifically asked for that just before he embarked on an

14  armed campaign.  But there were others, your Honor.  There were

15  such other messengers tested.  There was "Tawhid of Action."

16  There was "The Importance of the Word."  There were other

17  products that he published through Tibyan Publications for that

18  same purpose.

19         I submit to you the impact of the harms created

20  through that work lasts not just in those individuals whom he

21  personally was able to touch by persuading that Osama bin

22  Laden's message was the right one, but those products are still

23  on the internet.  Those products are still viral.  People are

24  still getting arrested for even possessing in some countries

25  those products.  Well, that's not a crime here.  When he

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 19 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 18 of 76

18

1    translated and distributed those for that specific purpose so

2    that others would be recruited into the cause that he was

3    willing to sacrifice his life for, then in many ways he

4    succeeded in his objective.

5         And the third nature of the harm, your Honor, is the

6    obstructive conduct all throughout.  After he returned from

7    Yemen, it was not long after that he knew that the FBI had

8    learned of what he had done, at least in some measure.  And

9    both through his false statements, of which he's been

10   convicted, but also through every other opportunity where he

11   has had to say something about his activity, about Abousamra's

12   activity, about Maldonado's activity or any of the other people

13   who engaged in terrorist activities, he has tried to obstruct,

14   to impede, to thwart the FBI in learning anything that will

15   protect the United States from terrorism.  Because that's where

16   his heart lies.

17        He told you as much in his submission to the Court

18   when of all the things that he had to say to the Court for

19   leniency in this case, at least in writing, he seized that

20   opportunity to again point to the FBI for inconveniencing him,

21   for again blaming the FBI for this plight that brings us here

22   today.  It's the absence of any recognition of responsibility

23   for one of his actions.

24        And when he says it's a collision of two worlds

25   colliding, I couldn't agree more.  And when he says his heart

Case 3:15-cr-00582-WHO Document 254-1 Filed 02/18/19 Page 20 of 77
Case 1:09-cr-10017-GAO Document 439-1 Filed 09/16/12 Page 19 of 76

19

1    can't change or won't change or won't leave, I submit to you

2    the criminal laws are not designed to change what somebody

3    believes, and they won't in this case.  And it's that person

4    who we now have to decide what is the appropriate sentence

5    based on proportionality, based on what he has done, what the

6    impact of his crimes are, and based on what his opportunity is

7    to change and to realize a potential that he threw away slowly

8    over the last ten years.

9         He's rare in that he's one of very few individuals

10    who's been charged with criminal offenses, that has tried to

11    engage in terrorism acts himself, and recruited others

12    persistently over a period of time, adapting his methodology,

13    encrypting his communications.  When his coconspirators were

14    being arrested around the world, he didn't go underground.  He

15    specifically said that he should not stop the enterprise; they

16    just have to be more careful.  And he continued.

17         Deterrence in this case, your Honor, has been

18    exhausted through means outside of this courtroom.  And that's

19    why the government feels that a very substantial jail sentence

20    is necessary, in the first instance to incapacitate him, to

21    prevent him from continuing to do these crimes, but also to

22    specifically deter him from engaging in any terrorism-related

23    crime when he gets out.

24         Another significant fact to consider in assessing this

25    decade of activity, understanding that there were certain

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 21 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 20 of 76

20

1    portions of that decade in which he was much more active and

2    much more influential than in others, is -- unlike in many

3    other cases there was no government engineering here, your

4    Honor.  This was the defendant radicalizing with his colleagues

5    here.  It was the defendant persuading others what Sayyid Qutb

6    and Abdullah Azzam and Osama bin Laden, amongst others, said

7    and meant and believed.  It was not a cooperator who was

8    planting a seed into the defendant's mind to give him some

9    low-hanging fruit to snatch onto, not to suggest that that's an

10   improper technique in any way.  But the defendant cannot hide

11   behind some misguided principle of government sentencing

12   entrapment or something else; this was entirely the defendant's

13   creation.  And it was only after the fact that the government

14   was able to learn about what the defendant had done.

15        And it was in that vein that when he continued to

16   obstruct government investigation, when he knew they were

17   watching, he was telling others to be careful about what they

18   said to him online.  He told people not to say certain things

19   openly.  When he knew he was under investigation, that's when

20   he chose to lie to the FBI about Daniel Maldonado.  If we had

21   known about the whereabouts -- if we had the details about

22   where Daniel Maldonado and Omar Hamammi were before they

23   embarked in actual military conflict, their lives would be very

24   different, and so would the people who they may have been

25   engaged in conflict with.

Case 3:15-cr-00582-WHO  Document 354-1  Filed 08/18/19  Page 22 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 21 of 76

21

1          But the most telling example of that, your Honor, is

2     that if he had told us about what Abousamra and he had done two

3     years prior, then Abousamra may never have been able to leave

4     the country in the first place and evade the justice that is

5     now being visited upon the defendant.

6          And so in factoring our decision as to what an

7     appropriate sentence is so that we can give you another data

8     point around which you can establish what the appropriate

9     sentence is, if a variance is appropriate, understand we have

10    to leave room for Ahmad Abousamra who was equally as culpable,

11    if not more; had personally embarked on the trips to Pakistan,

12    the trip to Iraq that they had all discussed; and had talked to

13    the defendant again about going back to Pakistan two years

14    after the defendant had come back from Yemen.  That was still

15    what the defendant said he was thinking, the exact same thing.

16         There was still a meeting of the minds.  They had not

17    abandoned any of their ambitions.  And that is why I submit,

18    your Honor, his obstructive conduct -- the impact of that

19    obstructive conduct will last with us just as long as the

20    impact of his translation activities, just as long as the

21    impact of radicalization of individuals in our local community

22    and others he knew through the internet.  Those are lasting

23    impacts.  That's the nature of the harm that will impact this

24    community for years to come.

25         Unlike most other criminal terrorism defendants, his

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/19 Page 23 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 22 of 76

22

1    influence -- this defendant's influence -- not just because of

2    the media attention or because the courtroom is packed, but

3    because he personally touched so many people in their path to

4    radicalization -- some of them have fortunately withdrawn from

5    that path, but we don't know who else this defendant

6    radicalized, that he has wound up and sent along their way.

7    And there's evidence that he has done that kind of

8    radicalization.

9          There's Taimur.  There's -- he talks about a guy named

10   Abu Dawood.  He talks about the witnesses who testified here.

11   Those people are out there, amongst others, and that is the

12   harm which these stringent, strict criminal laws are designed

13   to deter people from embarking on.  And so it's this principle

14   of general deterrence that this defendant encapsulates that

15   other criminal defendants don't.

16         People are watching this case not just because of the

17   so-called constitutional issues or because there's some novel

18   legal ground here.  They're watching this case because what the

19   defendant represents is the harm of homegrown violent

20   extremism.  It's the metastasization of this perverted

21   interpretation of a great faith to motivate other people to

22   take up arms against a country who is providing them

23   protection, who's giving them an opportunity of freedom of

24   religion and freedom of speech.

25         So in weighing how we can arrive at the government's

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/29 Page 24 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 24 of 76

23

1    recommendation of a 25-year sentence with a term of supervised

2    release to follow as long as the defendant stays in the

3    country -- and I suggest that would mean essentially a life

4    sentence with special conditions -- we're giving you a data

5    point that we did not have ourselves.  We have the Guidelines

6    which consider the fact that terrorism cases are different.

7    They're different because of the gravity of the harm.  They're

8    different because the nature of the individual is such that

9    they're unlikely to change.  They are more likely to repeat a

10   terrorism-related crime.  They're different because the nature

11   of the offenses are so often complex.

12          And given that data point of a life sentence, we've

13   given you another which we think is a reasonable sentence in

14   this case, but not just to address the public safety functions.

15   We pride ourselves, your Honor, on maintaining credibility with

16   the Court when we weigh mitigating factors.  And I submit to

17   you, your Honor, the government knows this defendant as well as

18   anyone, not just because we're familiar with the evidence,

19   we've presented it to your Honor, but because of the nature of

20   the evidence, the nature of the witnesses with whom we've had

21   access to.

22          We can understand many of the mitigating factors which

23   the defendant's family, for example, and community have

24   presented before the Court.  And we're not unmindful of those.

25   But we've also seen the other side.  We've seen the side that

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 25 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 25 of 76

24

1   can ignore those factors and, in fact, do insult to that

2   community relationship and that family relationship because it

3   was this defendant that brought that impact to his family.  It

4   was this defendant whose choices over time in the face of his

5   parents trying to stop him, trying to discourage him repeatedly

6   from embarking on this wrong path, to be dismissive, to be

7   influential on others, and ultimately, now as we've seen after

8   he's been in custody on this case, to be spreading

9   misinformation so that he can reinvent himself as some type of

10  a martyr to this community and to his family by telling a

11  story -- a fictitious story -- about the person who they wished

12  he was, not the person who actually you've had the opportunity

13  to observe over the last couple of months.

14         And I thought, what is the most pithy way to

15  encapsulate that person, the person about whom the government

16  is concerned needs to be protected from society?  We spared the

17  jury the images of the beheadings that the defendant had on his

18  computer and that he had distributed to others.  We spared your

19  Honor that.  But I submit to your Honor, if one were to watch

20  some of the videos that the defendant had distributed, talked

21  about gleefully, there's a visceral reaction unlike anything

22  else that you can see with your eyes when somebody, a civilian,

23  has been held captive, he's restrained, his head is slowly

24  sawed off while he's screaming, and then it goes silent, and

25  then his head is held up to a camera.

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 26 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 25 of 76

25

1          There's a gut-wrenching visceral reaction to that that

2     cannot be ignored.  It captures what this defendant was at that

3     time when he talked about that glowingly, when he thought that

4     that was not only a justified action but that was the justice

5     that was visited upon the country who had invaded a Muslim

6     land.  It was the defendant who talked about Texas BBQ being

7     the only way to go when talking about the mutilation of burned

8     American corpses overseas.

9          And to put context in that, your Honor, the question

10    by the person he was talking to in that conversation was what

11    is happening to the American soldier perpetrators of a rape in

12    Iraq in the court system.  And he says, "I don't care what's

13    happening in the court system.  Texas BBQ is the way to go."

14         It's the person who condemned Muslim-American

15    advocates and others who proclaimed that moderation, and not

16    violence, is the solution to enfranchisement and emboldening

17    civil rights.  Repeatedly.  We quoted some of those materials;

18    we don't need to repeat them here.  It's the person who goes to

19    Ground Zero to celebrate the acts of September 11th.  And not

20    more than two months ago, your Honor, after his conviction, in

21    one of the exhibits that we've submitted as part of our

22    sentencing submissions, this defendant, in going through a

23    number of quotes that he is reading while he's in jail awaiting

24    sentencing -- he first proclaims that he is 100 percent free of

25    American oppression, but then he quotes Osama bin Laden's

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/29 Page 27 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 26 of 76

26

1    interview with Tayseer Alouni of CNN a month after the

2    September 11th actions as something that he is reading right

3    now in jail.  This is the person who you have to sentence and

4    determine what is going to deter this person from engaging in

5    support activities in the future.

6           Your Honor, it's ironic that after all this time the

7    defendant has not acknowledged any activity -- any criminal

8    activities in going to Yemen, in any of his preparatory actions

9    in that respect.  He still cloaks his activities with Tibyan

10   Publications online in the First Amendment, and it's ironic

11   that it was his conversations with his coconspirators in which

12   they talk about the filthy Constitution and the cursed Bill of

13   Rights which actually protects his conduct.  And now he's

14   trying to use that -- and I'm sure he will upon review -- to

15   try to shield himself from criminal liability for actions that

16   he embarked on for almost a decade persistently, consistently,

17   in order to support organizations and individuals who were at

18   war with the United States.

19          And so another point that we perhaps agree on is this

20   case is unique and there are no comparison cases.  And I submit

21   to your Honor looking at comparisons of other cases is not

22   useful in order to divine what term of years is the appropriate

23   sentence here, and that's because there's no way through a few

24   sound bytes or some effective advocacy that we're going to be

25   able to convey to you the myriad of 3553(a) factors and the

Case 3:15-cr-00582-WHO  Document 354-1  Filed 02/18/19  Page 28 of 77
Case 1:05-cr-10017-GAO  Document 439  Filed 09/16/12  Page 28 of 76

27

1    complex series of decisions and facts that may have gone into

2    any decision with another specific fact pattern.

3           There are, of course, overlaps.  And it's not that

4    those other cases are without any value, but I submit to you

5    other cases are of value to your Honor in assessing how a court

6    may have arrived at an opinion, the process.  But the facts,

7    especially of this case, where somebody is engaged in three

8    types of harm over such a long period of time with such

9    influence is exceptional.

10           And I submit to you the cases that are most

11   instructive, especially with regards to process, are the

12   appellate cases the government has cited.  And it's not just

13   because they were remanded sentences because there were

14   sentences that were -- deemed to be too low, but I submit to

15   you in all of those cases the government -- the court sentence

16   was below the government's recommendation.

17           But in those cases they pointed to, specifically, the

18   imperfection of looking at other district court cases to try to

19   divine what the proper sentence might be in a case.  And, of

20   course, we could select some from the defendant's own

21   submissions, individual cases from around the country that

22   would, if that were the appropriate model, be influential to

23   your Honor, you know, cases like *Kassir*; cases like *Tamimi*, one

24   of the defendant's heroes; cases like *Abuali*; and cases like

25   the Eastern District of New York case that was decided I think

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 29 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 28 of 76

28

1    just about last month, *Betim Kaziu*, who the government would

2    argue was much less culpable than this defendant but in that

3    case received a 27-year sentence.  I could elaborate on those,

4    but as I pointed out, other cases are not how your Honor should

5    decide what this defendant should get.

6          And so we come back to this idea of deterrence, what

7    the impact of the defendant's actions are and, ultimately, his

8    risk of recidivism which I think, your Honor, the defense

9    sorely misstates.  The 3A1.4 enhancement expressly acknowledges

10   that terrorism cases are different especially because of the

11   likelihood of recidivism.  The *Meskini* case which the *Jayyousi*

12   court cited approvingly points out that terrorism defendants

13   are at increased risk of repeating and less likely to be

14   rehabilitated.  And the nature of the harm in a terrorism case

15   is potentially catastrophic impacting not just, you know -- not

16   just society at large, but specific individuals in the worst

17   way.

18         And it's this defendant where you don't have to rely

19   upon just the reasoned assessment of the Sentencing Commission

20   and these appellate courts.  Over ten years you've seen that

21   nothing would deter this defendant.  Sure, he got smarter,

22   sure, he adapted his techniques, but is there anything to

23   suggest that he was ever contrite?  Is there anything to

24   suggest that he has looked back upon that life that he had led

25   for most of his adult life?  How do you deter somebody who told

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 30 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 29 of 76

29

1    his fiancée that he was willing to go to jail and even to die

2    for his beliefs?  And so he's reinventing himself now as this

3    martyr that he was unable to become in the throes of his

4    conspiracy.

5         Your Honor, I want to conclude with talking about the

6    lingering impact on the community, on others who he

7    radicalized, on people around the world who are consuming his

8    work, people who -- not just English-speaking who he was able

9    to make accessible the teachings of al Qa'ida and its

10   supporters, but because the defendant translated materials into

11   English, as the Lingua Franca, as Evan Kohlmann and others have

12   said, it was that translation that was able to then be

13   translated into other languages to be distributed all around

14   the world to actually make a difference in influencing people

15   to join a cause dedicated to violence.

16        That's what this case has always been about.  It's

17   about how he was influenced that way, it was how he influenced

18   his coconspirators and those in the circle of the Massachusetts

19   community, and it's how he continued to do so online in the

20   face of people -- associates of his who had done -- who had

21   participated in portions of his conspiracy, getting arrested.

22   He continued to engage in his actions.

23        The damage that he has done will linger with us.  This

24   case isn't going away.  It's going to be looked at in the

25   future by people who are contemplating acts of violence.  It's

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 31 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 30 of 76

30

1    going to be looked at by future courts.  It's going to be

2    looked at by the FBI and those in law enforcement who are

3    trying to figure out:  How do we keep this country safe from

4    terrorist attacks?  How do we prevent people from going

5    overseas to engage in terrorist attacks?  How do we prevent

6    radicalization?

7           And there is learning here.  And there's learning

8    created by the defendant over a long period of time.  And most

9    importantly, his reticence to assist the government, and

10   there's no -- I say that for a moment.  He's perpetuated lies

11   on the internet about the fact that this is somehow a malicious

12   prosecution.  And I recognize your Honor's not going to be

13   considering that as part of a sentencing issue, but first, it's

14   inaccurate; and second, there's nothing wrong with soliciting

15   cooperation from someone in the community, even if it's

16   testifying against a fellow Muslim, if it's going to keep

17   people safe.  And I think most of the people behind me agree

18   with that.  This defendant does not.

19          He has exhibited throughout the course of the trial

20   evidence, as well as after trial, that if he can protect people

21   who are trying to kill Americans because of their faith, then

22   he will do so.  That is one of these legacies that -- of the

23   impact of his actions and his aggravating actions, I would

24   argue, after the fact.  The impact on the community, your

25   Honor, I submit to you, is a reason why a lengthy prison

Case 3:15-cr-00582-WHO   Document 354-1   Filed 03/18/19   Page 32 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 31 of 76

31

1     sentence is appropriate.

2            So finally, the Guidelines are, no doubt, a

3     significant upward pressure, as they should be.  The government

4     has selected a data point for your Honor which is mindful of

5     both the Guidelines as well as the 3553(a) factors, including

6     the most important notion, I think, in the 3553(a) factors

7     which is that this Court is trying to find a proportional

8     sentence that is no greater than necessary.  And that is a

9     driving principle with which we arrived at this sentencing

10    recommendation.

11           What the defendant will do after he gets out of jail

12    one can only guess.  We hope for the best.  He will still

13    be -- have productive years ahead of him when he gets out if he

14    demonstrates any willingness to conform his behavior, to

15    acknowledge what he has done.  You can't change unless you

16    acknowledge what you've done that was wrong.  And this

17    defendant simply has not done that.  All of the evidence shows

18    just the opposite.  And so that's concerning, and that's one of

19    the reasons why a supervised release period -- a lengthy

20    supervised release period is necessary.

21           But supervised release, as your Honor knows, is no

22    substitute for incapacitation.  Whatever terrorism support

23    crimes that he might do, whether it's here or overseas, he

24    could do it on supervised release.  It's simply a warning

25    system or some way of holding accountable somebody who's done

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 33 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 33 of 76

32

1   that.

2       So it's this downward pressure of trying to find a

3   sentence that is no greater than necessary that is at the other

4   pole.  And it's in that sense that the government thinks that

5   the 25-year sentence is appropriate from the people who, I

6   believe, know the defendant as well as anyone, who have

7   considered all of the materials that the government -- that the

8   defense has submitted, and knows some of the individuals who

9   have spoken in support of the defendant.

10      I want to point to one point on that, and this will be

11  in closing.  And this is a submission by the defense.  One of

12  his supporters writes, "I'd like you to take a moment to

13  imagine the current state of Muslims in Massachusetts alone.

14  Our Islamic centers are cultural melting pots and adults often

15  mix culture and politics with religion.  In this state we have

16  about 40 mosques, Islamic centers and prayer halls.  At the

17  same time we've had only two resident scholars (Imams) in the

18  entire state for the last few years.  Furthermore, these Imams

19  are immigrants who live sheltered lives and lack an

20  understanding of our society.  What happens to our youth who

21  become inclined towards faith?  Where do they go to learn

22  Islam?  Who can teach them?

23      "Most end up on the internet where they learn from

24  scholars in Saudi Arabia, Egypt and Yemen.  Some scholars are

25  mainstream; others walk a dangerous path.  It's very hard for

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 34 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 33 of 76

33

1   some to distinguish between the two because some scholars

2   present a moderate view of Islam and slowly pull people into a

3   more radical version."

4           This supporter, your Honor, is describing the

5   defendant.  The evidence of that came in to demonstrate that

6   over a ten-year period, that's what he did.  So to suggest

7   there's nothing to say he's not doing that now?  A substantial

8   sentence is necessary to incapacitate him, to deter him, to

9   deter others from following in his footprints.  And that is

10  what the support is for the government's sentencing

11  recommendation.

12          THE COURT:  Thank you.

13          Mr. Carney?

14          MR. CARNEY:  Thank you, your Honor.

15          Before I begin identifying five factors that I think

16  the Court should give the highest consideration to, I'd like to

17  comment on the government's oral argument and its sentencing

18  memorandum.  It's clear from what Mr. Chakravarty has written

19  and what he said that the prosecutor wants the defendant not

20  just to be punished for the conduct that he did underlying the

21  criminal charges, but suggests explicitly that he should be

22  punished because of statements that he made which are protected

23  by the First Amendment, be punished for the fact that he went

24  to trial, and be punished for the fact that he decided not to

25  become an informant against the Muslim community.

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 35 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 35 of 76

34

1    The overwhelming amount of evidence in this trial

2  consisted of speech.  It consisted of Tarek translating

3  documents that are freely available and legal to read on the

4  internet and you're able to read if you speak Arabic.  The

5  government wants to prohibit someone from translating the

6  Arabic to English and, therefore, prohibit American citizens

7  from being able to read what other people say whose points of

8  view are different than ours.  That is an attack on the First

9  Amendment.

10    Showing other people videos that are available on

11  YouTube and undeniably legal to look at should not be part of

12  punishment for a crime.  Expressing support for Muslims that

13  are resisting an invading army is something that President

14  Reagan himself prays, because that army was the Soviet Union.

15  It should not then become a prosecution just because it is a

16  different army that invaded a Muslim country.

17    This case has gone farther than any other case in the

18  Department of Justice in terms of basing a prosecution on

19  speech.  The U.S. Supreme Court had some prescient words in

20  *Holder versus Humanitarian Law Project*.  They upheld the

21  material support statute when the plaintiffs in that case

22  explicitly acknowledged that they wanted to provide training

23  and services to a terrorist group.  And the court said, "That

24  prohibition is clear."  The court went on to say, "All this is

25  not to say that any future applications of the material support

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 86 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 36 of 76

35

1   statute to speech or advocacy will survive First Amendment

2   scrutiny; in particular, we in no way suggest that a regulation

3   of independent speech would pass constitutional muster even if

4   the government were to show that such speech benefits foreign

5   terrorist organizations."

6        This trial presented that important constitutional

7   issue at almost every turn, and yet the prosecutor wants to

8   punish the defendant because of his exercise of that free

9   speech.  His father, still sitting in the courtroom as he had

10  every day during the trial, told me that he sometimes would

11  have talks with his son about whether Tarek should be so bold

12  in his public statements.  The father's background was of Egypt

13  where such speech was draconianly punished.  Tarek's response

14  is interesting.  He would say, "It's okay, Dad.  We're in

15  America."

16       And it is an affront to our Constitution that the

17  prosecutor suggests, quite explicitly in its memo, that Tarek

18  should be punished for going to trial because his defense was

19  frivolous.  He believed that his statements and conduct

20  regarding speech were protected by the Constitution.  It's not

21  an issue that will be settled today, but it's an affront to say

22  he should be punished because he did so.

23       The prosecution, in its memo and again today, states

24  that Tarek should be punished because he refused to become an

25  informant against the Muslim community.  He refused to

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 37 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 36 of 76

36

1    cooperate.  Is this the ultimate message that the United States

2    is trying to send from this case?  It's instructive to look at

3    how they've treated Kareem Abu Zahra, a coconspirator and a

4    witness for the United States, rather.  He was four years older

5    than Tarek.  It was his idea for a shopping mall attack, one

6    that the government's evidence showed Tarek opposed and

7    convinced Daniel Maldonado that it would be wrong because of

8    the Islamic tenet of Aman.  It was Abu Zahra who went to New

9    Hampshire to try to get automatic weapons.  It was Abu Zahra

10   who had familiarity with Hanscom Air Force Base and proposed an

11   attack there, once again opposed by Tarek.  It was Abu Zahra

12   who talked about harm against John Ashcroft or Condoleezza Rice

13   when Tarek was not even present.

14         Abu Zahra enthusiastically embraced going to Iraq.  He

15   paid Jason Pippin $5,000 to give Abu Zahra a contact in Yemen.

16   He paid for Tarek's ticket.  And if Abu Zahra had not paid for

17   Tarek's ticket, Tarek never could have gone on this adventure,

18   as he viewed it.  And upon his return, Abu Zahra was fully

19   interviewed by the FBI and told a completely fanciful story to

20   them; in other words, making repeated false statements.

21         He did so much worse than Tarek Mehanna.  But because

22   he cooperated, he wasn't even charged with a misdemeanor.  I

23   say this because it suggests that the message of this

24   prosecution, in the government's eyes, is that you will be

25   punished if you don't become an informant against the Muslim

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 38 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 37 of 76

37

1   community.  And because he didn't become an informant, the

2   government says he's now one of the most dangerous people in

3   America?  The government's audacity in how it treated Kareem

4   Abu Zahra compared to Tarek Mehanna is breathtaking in its

5   hypocrisy.

6        Let me turn to the factors that I think are most

7   important for your Honor to consider.  First is Tarek's age at

8   the time of the relevant offense.  Tarek was a teenager when

9   the conspiracy began.  He was influenced by the fact that he

10  was developing a greater interest and admiration for his

11  religion and his heritage.  He was 21 years old when he went to

12  Yemen.

13        In *Roper versus Simmons* the U.S. Supreme Court held

14  that life imprisonment is unconstitutional for juveniles in

15  non-homicide cases.  The court's decision is helpful in making

16  your sentencing decision, your Honor.  I'll quote from the

17  opinion.  "Recent studies of the brain conclude that its

18  development may not be complete until the age of 25."  The

19  justices further wrote, "As any parent knows, and as scientific

20  and sociological studies confirm, a lack of maturity and an

21  undeveloped sense of responsibility are found in youth more

22  often than in adults and are more understandable among the

23  young.  These qualities often result in impetuous and

24  ill-considered actions and decisions."  They are talking about

25  someone 25; Tarek was 21.

Case 3:15-cr-00582-WHO  Document 354-1  Filed 02/18/19  Page 39 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 38 of 76

38

1        In addition, Tarek led a sheltered life by American

2   standards.  He was living at home with his parents throughout

3   the eight years he attended college, until he received his

4   Ph.D.  He never once drank alcohol; he never did drugs; never

5   went out on a date because it was forbidden until he found the

6   woman he was going to marry.  His interests were classical

7   Arabic and Islamic jurisprudence.  He would spend hours upon

8   hours reading the Qur'an and reading the Hadiths.  He never

9   traveled unless it was with his parents and his younger

10  brother.

11       Like most young people, life at that age is black and

12  white; a person simply doesn't have the life experience that

13  allows him to understand that the world is much more complex

14  than that.  Tarek was never motivated by hatred or greed.  He

15  was most affected by the suffering that he saw particularly by

16  women and children, initially by the embargo in Iraq that

17  included medicine and food, and then the casualties among women

18  and children when the war began.

19       Your Honor, I recall when I was in college, being

20  taught by the Jesuits, that it was during the time of the

21  troubles in Northern Ireland and all the suffering that was

22  being experienced by Irish Catholics there.  I hated the

23  occupying British army.  And I thought about leaving school and

24  going to Ireland and joining the IRA.  When you're young,

25  things seem so black and white, especially when it's your own

Case 3:15-cr-00582-WHO  Document 354-1  Filed 02/18/29  Page 40 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 39 of 76

39

1    people who are affected.  I know that feeling when you're a

2    21-year-old.

3         The evidence at trial showed unmistakably that Tarek

4    did mature after he returned from Yemen.  You know that from

5    the five lead government witnesses who were going through the

6    same progression as Tarek.  Every single one of the witnesses

7    acknowledged that they and Tarek grew more mature and their

8    views moderated.  Your Honor saw that from Tarek's postings on

9    web forums which showed a more moderate presentation in

10   substance and in tone, and, in fact, that he was objecting to

11   virtually all of the tenets of al Qa'ida.  The government

12   didn't want to present these postings because it would

13   undermine their view of Tarek.  But it's incontrovertible that

14   his moderation in his views that was a reflection of his

15   maturity led him to be exiled and expelled from the Tibyan

16   Publications web forum.

17        Is there any doubt, your Honor, that if Tarek Mehanna

18   had gotten on that plane in 2008 that today he would be an

19   esteemed practitioner in the foremost hospital in the Middle

20   East, that he would be a devote Muslim, married and raising his

21   family?

22        In addition to his age at the outset of this

23   conspiracy, it's also important to consider what the conduct is

24   underlying the offenses.  I have appeared before your Honor

25   since 1982.  I appeared before you in the Boston Municipal

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/29 Page 41 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 40 of 76

40

1   Court when I was a full-time public defender.  I appeared

2   before you in the superior court when I was a prosecutor.  And

3   I've appeared before you many times, sometimes on trials, many

4   more times on pleas, in this court.  I've appeared before you

5   when guideline numbers have been very high and the defendant

6   met the criteria of a career offender, but in my experience,

7   what your Honor would do is look at the person's background and

8   look at the conduct involved.  If he's someone who engaged in a

9   lifetime of crime and continued to be involved in activity that

10  hurt people, engaged in violence, in selling drugs, whatever it

11  might be, your Honor had no hesitation to treat him as a career

12  offender.  But if it was someone who the evidence showed was

13  involved in activities that were different, that were perhaps

14  to support a drug habit, I've always found your Honor would get

15  to the heart of the case and be more concerned about the

16  defendant's eligibility for the 500-hour drug rehabilitation

17  program in prison rather than burying him under the courthouse

18  as a career offender.  And I urge your Honor to engage in the

19  same analysis here.

20          Rather than focus on the inflammatory language used by

21  the government in its memo and oral presentation, I'd ask the

22  Court to focus on what did the defendant do, and equally

23  important, what did he not do?  He did not go to Pakistan with

24  Abousamra when he had the chance in 2001.  He went to Yemen

25  eight years ago, in 2004, spent one week, and then came back to

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/19 Page 42 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 44 of 76

41

1    the United States and resumed his studies, and never again went

2    to a foreign country in the same manner.

3         He did not go with Abousamra to Iraq even though there

4    was absolutely nothing to prevent him from doing it except that

5    that's not what Tarek was going to do.  He never sought out

6    training camps in the times he went to Egypt when it was well

7    known they were present in that country.  Even when a close

8    friend, Daniel Maldonado, pleaded with him to come to Somalia,

9    Tarek rebuffed it.

10        And, your Honor, it gives some insight into Tarek's

11   mental state when you look at the details of that phone call.

12   Maldonado is extolling living in an Arabic country and engaging

13   in jihad.  What questions does Tarek have?  "Are there any

14   bookstores there?" he asked Maldonado.  Maldonado says, "Yeah,

15   sure, there are bookstores, I guess."  "Are there women there

16   that I could marry?"  It was more important for this young man

17   that he have an ability to continue pursuing his studies and

18   that he could get married and begin having a family.

19        Tarek lived the principle of Aman, and

20   Daniel Maldonado told this Court how it was Tarek who convinced

21   him of that.  You know Tarek has no prior criminal record

22   whatsoever.  In the years that he's been under the most intense

23   confinement at a prison, he's not picked up a single

24   disciplinary report.  Not one.

25        The prosecution describes Tarek as being such a

Case 3:15-cr-00582-WHO  Document 354-1  Filed 08/18/19  Page 43 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 42 of 76

42

1    dangerous man, that he's currently such a clear and present

2    danger to the United States, and that's why this extraordinary

3    sentence should be imposed.  Well, is that how they viewed him

4    from 2001 until the superseding indictment was returned in 2009

5    and he was arrested for material support?  They knew he went to

6    Yemen, and the FBI questioned him about his going to Yemen.

7    They secretly searched his home during this period from 2001

8    until 2009.  They read his email; they collected his text

9    messages; they saved all of his postings on web forums; they

10   wiretapped his phone; they enlisted his friends to record the

11   conversations.  They knew everything about this man.  And in

12   2008, when he was arrested for making a false statement, they

13   withheld from this Court all of that evidence, and as a result,

14   Tarek Mehanna was released on bail.

15           What did he do?  He taught math and science in a

16   school after he was let out on bail.  It was five years after

17   Tarek had returned from Yemen that the government got around to

18   charging him with that offense.  This is simply not the way our

19   government treats an individual who is a clear and present

20   danger to the United States.  It's not.  And they know it.

21   That's why they were content to let him be released on bail in

22   2008, and stay there for another nine months, because they knew

23   better than anyone that he was not that clear and present

24   danger.

25           The third factor is comparable cases.  We presented

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 44 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 43 of 76

43

1    many details and reports and charts and graphs, and I'm not

2    going to repeat it because I know your Honor has read it.  The

3    average sentence imposed in a terrorist, so-called, case is 14

4    years.  And that does not include cases where the defendant

5    cooperated and received a 5K1 departure.  It's instructive that

6    this group of cases includes people who tried to blow up an

7    airplane or set off a van in Times Square with explosives or

8    pressed the detonator, thinking it was real when it had been

9    given to him by the FBI.  It included cases where defendants

10   obtained explosives, did firearms training and sophisticated

11   surveillance of targets.  At the low end of the spectrum it

12   includes people who talked about doing things but never became

13   operational and never came close to hurting anyone, and those

14   are people who received sentences in the single digits.

15         The government says the Court should not look at

16   comparable cases.  Well, the Congress, through the Sentencing

17   Guidelines, and the Supreme Court have said repeatedly that the

18   Court must look at comparable cases.  The government's

19   recommendation for the conduct involved in this case is

20   unprecedented in its severity and is so far above what other

21   district judges have imposed in comparable cases that it's no

22   wonder that the government wants you to disregard those other

23   cases.  The data presented in our sentencing memorandum

24   reflects what real judges in this court, in federal court, have

25   done in real cases, and those are the cases the Court should

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 45 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 44 of 76

44

1    rely upon.

2         Another factor that we've set forth in our memo

3    concerns the conditions of confinement now and after

4    sentencing.  As your Honor is aware, there are 1,600 cells in

5    the Plymouth Correctional Facility.  Two of them are designated

6    the super max cells, and Tarek is in one of those cells.  He's

7    incarcerated in this cage 23 hours a day, five days a week.

8    And the other two days a week he remains in the cage for 24

9    hours a day.

10        Studies that we've presented in our memo show the

11   impact that this has on a human being's mental health.  And

12   that's a factor the Court can take into account in mitigation.

13   Similarly, the Bureau of Prisons has chosen a policy that will

14   put people who are charged with terrorist offenses in the super

15   max prisons where they intentionally are deprived of any

16   contact.  Indeed, while Tarek has been in Plymouth, almost the

17   last three years, he has never had contact, human contact, been

18   able to touch and hug his mother or father, nor is he allowed

19   to have any interaction with other inmates; he's kept in

20   isolation.  And that's how his sentence will be carried out as

21   well.

22        A final factor I'd like the Court to consider is the

23   unbelievable support Tarek Mehanna has received from the

24   community.  How many times has your Honor sat in this courtroom

25   at a sentencing and the only people in the audience have been

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/29 Page 46 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 45 of 76

45

1    the defendant's mother and his sister?  How many times has the

2    Court seen an outpouring of support from the community urging

3    the Court to be merciful?  These are letters that were written

4    by loyal Americans, including the Islamic Council of New

5    England who would never, ever provide any supportive letter for

6    anyone that they remotely believed was a terrorist.

7         Many of these people have known Tarek for years.  He's

8    been their neighbor, he's been at the mosque with them

9    together, he's filled their prescriptions at Walmart and CVS,

10   and he's taught their children.  Those letters attest to the

11   fact that he has lived a good and generous and kind life,

12   including giving away his allowance every week to people who

13   needed it more than he, distributing food from his home to

14   people who were hungry.  This is the character of the man who

15   is before you.  The letters were at times highly eloquent; they

16   were always sincere.  And many people said they rested their

17   faith in the criminal justice system on what is going to be the

18   outcome of this proceeding.

19        If Ahmed Mehanna had been permitted to testify, he

20   would tell you that he rode to school with his son for the

21   entire eight years, and above all, his son was affected by the

22   suffering he saw of innocent people in Iraq.  And he would also

23   tell you that no man in Ahmed's family has lived as long as he

24   has and that he is afraid that he will never again be able to

25   hug or kiss his son if your Honor imposes a sentence remotely

Case 3:15-cr-00582-WHO  Document 354-1  Filed 02/18/19  Page 47 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 46 of 76

46

1    like what the government is asking for.

2          Souad would tell you anecdotes about how Tarek has

3    been so kind and so generous to even strangers since he's been

4    a young boy; he always thought of others instead of himself.

5    She would tell you how she cries every single day and night for

6    her son whom she has not hugged or even touched in almost three

7    years, and that her pain as a mother is unbearable.

8          As a father I look at my children who are in their

9    twenties.  My wife and I have tried to instill good values,

10   good morals as a foundation of a good life.  And we hope we've

11   succeeded.  We also are aware that young kids sometimes do

12   things that are real concerning, and a parent cannot unring

13   that bell.  But as a parent we just pray that they don't do

14   something that will lead to the destruction of their life.  And

15   if they do ever appear before the judge, we hope that these are

16   the factors that will be taken into account and that mercy will

17   be one of the ingredients in a just sentence.

18          Your Honor, I'm going to end by paraphrasing the words

19   of a man who may have had the greatest insight into the human

20   condition of any human being that's ever lived on this planet.

21   That man is William Shakespeare.  And his character is in the

22   "Merchant of Venice" describing the effect when the king shows

23   mercy.  The words apply equally to a judge, and I will adapt

24   those words to this setting.  I won't pretend to read it from

25   memory.

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/29 Page 48 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 47 of 76

47

1          "The quality of mercy is not strain'd.  It droppeth as

2    the gentle rain from heaven upon the place beneath.  It is

3    twice blest:  It blesseth him that gives and him that takes.

4    Tis mightiest in the mightiest; it becomes the throned judge

5    better than his gavel.  His sentencing ability shows the force

6    of temporal power.  The attribute to awe and majesty, wherein

7    doth sit the dread and fear of judges.  But mercy is above this

8    sentencing power.  It is enthroned in the hearts of judges; it

9    is an attribute to God himself; and earthly power of judges

10   doth then shall like God's when mercy seasons justice."

11          Thank you very much, your Honor.

12          THE COURT:  All right.

13          MR. CARNEY:  Your Honor, before we conclude

14   sentencing, I'd ask the Court to permit my client to allocute.

15          THE COURT:  Of course.  Mr. Mehanna?

16          THE DEFENDANT:  I appreciate your giving me the chance

17   to speak.

18          It was four years ago this month that I was finishing

19   a work shift at a local hospital.  And as I was walking out to

20   my car, two federal agents approached me and they said that I

21   had a choice to make.  They said that I could do things the

22   easy way or I could do them the hard way.  The easy way, as

23   they explained, was that I would become an informant for the

24   government.  And if I did so, I would never have to see the

25   inside of a courtroom or a prison cell.  The hard way is what

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 49 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 48 of 76

48

1    you see before you.  Here I am, having spent the majority of

2    the four years since that day in a solitary cell the size of a

3    small closet in which I'm locked down for 23 hours a day,

4    living with rapists and murderers and home invaders and child

5    molesters.

6         The FBI and these prosecutors worked very hard, and

7    the government spent millions of tax dollars to put me in that

8    cell, to keep me there, to put me on trial, and finally, to

9    have me stand here before you today to be sentenced to even

10   more time in a cell.

11        In the weeks leading up to this moment, many people

12   have given me their suggestions as to what it is I should say

13   to you.  Some suggested that I should plead for mercy in hopes

14   of a light sentence.  Others suggested that I'm going to be hit

15   hard either way.  What I want to do for the next couple of

16   minutes is simply to talk about myself.

17        When I refused to become an informant the government

18   responded by charging me with the crime of supporting the

19   Mujahidin, fighting the occupation of Muslim countries around

20   the world, or as they like to call them, the terrorists.  But I

21   wasn't born in any Muslim country; I was born and raised right

22   here in America.  And it's something that angers many people,

23   that I could be an American and believe the things that I

24   believe and say the things that I say and take the positions

25   that I take.  But everything that a man is exposed to in his

Case 3:15-cr-00582-WHO  Document 354-1  Filed 02/18/19  Page 50 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 49 of 76

49

1   environment is like an ingredient which shapes his outlook and
2   shapes his life in one way or another.  And I'm no different.
3   So in more ways than one, it's because of America that I am who
4   I am.

5          When I was six years old I began amassing a collection
6   of comic books.  Batman implanted a concept in my mind,
7   introduced me to a paradigm as to how the world is set up:
8   that there are oppressors, there are the oppressed, and there
9   are those who step up to defend the oppressed.  And that
10  resonated with me so much that throughout the rest of my
11  childhood I gravitated towards any book I could find that
12  reflected this concept.  So my favorites were *Uncle Tom's*
13  *Cabin*, the *Autobiography of Malcolm X* and so forth.  And I even
14  found an ethical dimension to the *Catcher in the Rye*.

15          By the time I got to high school and began taking
16  serious history classes, I started to learn just how real this
17  parodyne was in the world, and still is.  So I learned in high
18  school as a student in the classroom about the native Americans
19  and what befell them at the hands of Columbus and the European
20  settlers who came after him.  I learned about how the
21  descendants of those European settlers were, in turn, oppressed
22  under the tyranny of King George III.  I read about people like
23  Paul Revere and Tom Paine and about how Americans began an
24  insurgency against British forces, an insurgency that we now
25  celebrate as the American Revolutionary War.  And, in fact, as

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 51 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 50 of 76

50

1    a kid I went on school field trips to visit the most famous

2    battlefields of that war, some just a few blocks from this

3    courthouse.  I learned about Harriet Tubman, Nat Turner, John

4    Brown, and the fight against slavery in this country.  I

5    learned about Emma Goldman and Eugene Debs and the struggles of

6    the labor unions and the poor and working class.  I learned

7    about Anne Frank and the Nazis and how they persecuted

8    minorities and imprisoned dissidents.  I learned about Rosa

9    Parks, Malcolm X, Martin Luther King and the Civil Rights

10   struggle.  And I learned about Ho Chi Minh, and how the

11   Vietnamese fought for decades to liberate themselves from one

12   invader after another.  I learned about Nelson Mandela in the

13   fight against apartheid in South Africa.

14          Everything I learned in those years confirmed that

15   parodyne that I was introduced to when I was six:  that

16   throughout history, there has been a constant struggle between

17   the oppressed and their oppressors.  And with every struggle

18   that I learned about, I found myself consistently siding with

19   the oppressed and consistently admiring and respecting those

20   who stepped up to defend them regardless of nationality,

21   regardless of religion.  And I never threw my class notes away.

22   As I stand here speaking, they are piled very neatly in my

23   bedroom closet at home.

24          From these personalities and names and figures in

25   history that I learned about, one stood out for me above the

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/19 Page 52 of 77
Case 1:09-cr-10017-GAO Document 439-1 Filed 09/16/12 Page 52 of 76

51

1    rest.  I was impressed by Malcolm X in many ways, but above

2    everything, I was fascinated by the concept of

3    transformation -- of his transformation.  If you've ever seen

4    the movie "X" by Spike Lee, it's over three and a half hours

5    long, and the Malcolm at the beginning of the movie is very

6    different from the Malcolm at the end.  At the beginning, he

7    begins a life -- he begins his life as an illiterate criminal,

8    but he ends it as a husband, as a father, as an eloquent and

9    protective leader of his people, as a disciplined Muslim

10   performing the Hajj in Mecca, and finally, as a martyr.  The

11   life of Malcolm X taught me that Islam was not simply something

12   one is born with or inherits.  It's not a culture.  It's not an

13   ethnicity.  It's a way of life.  It's a state of mind that

14   anyone can choose regardless of where they're born, regardless

15   of how they were brought up.

16          And this led me to look deeper into Islam, and I was

17   hooked.  I was a teenager back then, but Islam had the answer

18   to the biggest questions that I was asking myself, the

19   questions that the greatest scientific minds had been unable to

20   answer, the questions that the rich and famous were sometimes

21   driven to depression and suicide from being unable to answer:

22   Why do we exist?  What's the purpose of life?  What's the

23   purpose of our presence in the universe?

24          So Islam had all of these answers prepared for me.

25   Not only that, but it had the answer of exactly how we are

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 53 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 53 of 76

52

1　supposed to exist.  And because there's no hierarchy, because

2　there's no priesthood in Islam, I was able, on my own, to

3　immediately and directly dig into the Qur'an and the teachings

4　of the Prophet Muhammad, sallallahu alayhi wasallam, and begin

5　this journey of learning what this was all about, of the

6　implications of Islam for me as a human being, as an

7　individual, on the people around me, on society, and on the

8　world as a whole.  And the more I learned, the more I began to

9　value Islam and cherish it like a piece of gold, like my own

10　personal treasure.  This was back when I was a teenager, but

11　even today and despite the pressures of the last few years, I

12　stand here before you and before everyone in this courtroom as

13　a very proud Muslim.

14　　　　　With that, I began to look at what was happening to

15　Muslims in different parts of the world.  And everywhere I

16　looked, I saw the powers that be trying to destroy what I

17　loved.  I learned about what the Soviets had done to the

18　Muslims of Afghanistan.  I learned what the Serbs had done to

19　the Muslims of Bosnia.  I learned what the Russians were doing

20　to the Muslims of Chechnya.  I learned what Israel had done in

21　Lebanon, and what it continues to do in Palestine until today

22　with the full backing of the United States.  And I learned what

23　America itself was doing to Muslims.  I learned about the

24　Persian Gulf War and the depleted uranium bombs that were

25　dropped all over Iraq that killed thousands of people

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 54 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 53 of 76

53

1   immediately and caused cancer rates to skyrocket around that

2   country.  As Jay mentioned, I learned about the American-led

3   sanctions on Iraq, that according to the United Nations itself

4   resulted in the deaths of over half a million children under

5   the age of five because they made it illegal for food and

6   medicine and medical equipment to be imported into the country.

7          I saw an interview of Madeleine Albright on "60

8   Minutes" where she was directly asked about these half a

9   million children who had perished.  And her response, she

10  expressed her belief very clearly that these half a million

11  children were, quote, "worth it."  I then watched on September

12  11th, 2001, as a group of people felt so driven and so outraged

13  by the deaths of these children that they hijacked airplanes

14  and flew them into buildings.  I then watched as America

15  attacked and invaded Iraq directly in 2003.  I saw the effects

16  of shock and awe in the opening days of the invasion.  I saw

17  footage of children, of babies in hospital wards with shrapnel

18  from American missiles sticking out of their foreheads.  And,

19  of course, none of these were shown on CNN.

20         I learned about the town of Haditha, where 24 Muslims,

21  including a 76-year-old man in a wheelchair, women and even

22  toddlers were shot up and blown up in their night clothes as

23  they slept by U.S. Marines.  I learned about Abeer al-Janbi, a

24  14-year-old Iraqi girl who was gang-raped by five American

25  soldiers who then shot her and her parents in the head and set

 1  fire to their corpses.

 2       This is a picture of that girl.  And as you can see,

 3  Muslim women do not even show their hair to unrelated men.  And

 4  I ask you to just imagine for a moment a 14-year-old girl from

 5  a conservative village in the middle of Iraq who has never

 6  encountered a foreigner in her life having her dress torn off

 7  of her body and being sexually assaulted by not one, not two,

 8  not three, not four, but five American soldiers.  Just imagine

 9  that for a second.

10       The government always talks about how angry I am and

11  they're holding it against me as a crime.  How can anyone not

12  be angry when they hear a story like this?  And even today as I

13  sit in my jail cell, I read in the papers about the drone

14  attacks that continue to kill Muslims in Pakistan, in Somalia,

15  in Yemen every other day.  Just last month we heard about the

16  17 Afghan Muslims, mostly mothers with their kids, who were

17  shot to death by an American soldier who then also set fire to

18  their corpses.  And these are just snapshots.  These are just

19  the stories that make it to the headlines.  These are just the

20  tip of the iceberg.

21       But my point is that one of the first concepts that I

22  learned in Islam was the concept of loyalty, the concept of

23  brotherhood, that every Muslim woman in the world is my sister

24  and every Muslim man in the world is my brother, and together

25  we are one large body who must protect each another.  In other

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/29   Page 56 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 55 of 76

55

1    words, there was no way that I could be witnessing these things

2    being done to my brothers and sisters around the world,

3    including by the United States of America, and remain neutral.

4    My sympathy for the oppressed continued, but it now became more

5    personal, as did my admiration for those who stepped up to

6    defend them.

7         I mentioned Paul Revere.  When Paul Revere jumped on a

8    horse and took his midnight ride, it was for the purpose of

9    warning the people that the British were going to march to

10   Lexington to arrest Sam Adams and John Hancock, and then on to

11   Concord to confiscate the weapons that were stored there by the

12   Minutemen.  By the time the British got to Concord, they found

13   the Minutemen waiting for them.  Weapons in hand, the Minutemen

14   shot at the British, they engaged them in battle, and they beat

15   them.  And from that battle came the American Revolution.

16        There's a word in Arabic which describes what those

17   Minutemen did that day, and that word was mentioned many times

18   in this courtroom:  jihad.  And this is what my trial was

19   about.  This is what all those videos and all those

20   translations and all this childish bickering over, "Oh, look,

21   he translated this paragraph and he edited this sentence."  And

22   all these exhibits, this is what it all revolved around, this

23   single issue:  Muslims defending themselves against American

24   soldiers, doing to them exactly what the British did to

25   America.

1    It was made 100 percent crystal clear at trial that I

2    never, ever plotted to kill Americans at shopping malls or

3    anywhere else.  The government's own witnesses contradicted

4    their accusation.  We brought expert after expert and put them

5    up on that stand for hours to dissect my every written word to

6    clarify my beliefs on that matter.  Furthermore, when I was

7    free, the government themselves sent an undercover agent to try

8    to ensnare me in one of their little fake terror plots, and I

9    refused to participate in that.  But mysteriously, the jury

10    never heard about that.

11    So this trial was not about my position on Muslims

12    killing American civilians; this trial was about my position on

13    Americans killing Muslim civilians.  And that position is very

14    simple:  that Muslims should defend themselves from foreign

15    invaders, whether those invaders are Soviets or Americans or

16    martians.  This is not terrorism and it's not extremism; it's

17    the simple logic of self-defense.  And it's what the arrows in

18    that seal above your head represent:  defense of the homeland.

19    If someone breaks into your home to try to rob you and

20    to try to harm you and your family, logic dictates that you

21    would do whatever it takes to expel that invader from your

22    home.  But when that home is a Muslim land and that invader is

23    the U.S. military, for some reason the standards suddenly

24    change and common sense is renamed "terrorism," and those

25    people fighting to defend themselves and their families and

Case 3:15-cr-00582-WHO Document 354-1 Filed 09/18/19 Page 58 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 57 of 76

57

1    their honor become the terrorists.  And even though they're

2    defending themselves from people who cross the ocean to come

3    and kill them, they're accused of killing Americans.

4         The mentality that America itself was victimized by

5    when British soldiers walked these streets two and a half

6    centuries ago is the same mentality that Muslims are being

7    victimized as American soldiers walk their streets today, and

8    it is the mentality of colonialism.

9         Last month when those 17 Afghans were killed, I

10   followed the debate in the media.  I followed the discussion.

11   And what I noticed was that people were focusing entirely on

12   the soldier:  on his life, on his stresses, on his PTSD, on the

13   mortgage on his home, as if he was the victim.  Nobody said

14   anything about the people that he actually killed, as if

15   they're not even real, as if they're not people.  And

16   unfortunately, this mentality trickles down to everyone in

17   society, whether they realize it or not.  Even with my own

18   lawyers, it took two years of weekly meetings and discussions

19   and explaining and clarifying and trying to simplify my

20   logic -- two years before they were finally able to think

21   outside the box and at least ostensibly accept the logic in

22   what I was saying.  Two years.  And if it took this long for

23   people so intelligent, whose job it was to defend me, people so

24   dedicated, then to throw me in front of a jury -- a randomly

25   selected jury -- under the premise that they are my impartial

1    peers, I mean, come on.  I wasn't tried before a jury of my

2    peers because with the mentality in America today, I don't have

3    any peers.  And counting on this fact, the government

4    prosecuted me not because they needed to, but simply because

5    they could.

6         One last thing I learned in history class is this:

7    America has historically supported some of the most unjust

8    policies against its minorities, even protecting those policies

9    with the law, only to come decades later and look back and say,

10   "What were we thinking?"  We can look at slavery; we can look

11   at Jim Crow; we can look at the interment of Japanese during

12   World War II.  Each of these policies during their respective

13   times was widely accepted in society.  And, in fact, each was

14   also defended by the Supreme Court.  But as time passed and the

15   world changed, both people and the courts reversed course and

16   looked back and said, "What were we thinking?"

17        Nelson Mandela was considered a terrorist by the

18   government of South Africa and was given a life sentence.  But

19   as time passed and the world changed, South Africa shook off

20   its prevalent mentality, they realized just how oppressive

21   their policies were and that it was not he who was the

22   terrorist, and they released him from prison and he even became

23   president.  So everything is subjective.  Even this business of

24   terrorism and who is and isn't a terrorist.  One day the

25   Mujahideen fighting an invader are freedom fighters; the next

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/19 Page 60 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/11 Page 59 of 76

59

1   day those same exact Mujahideen fighting a different invader on

2   the same land become terrorists.  So it all depends on the time

3   and the place and who the super power in the world happens to

4   be at the moment.

5          In your eyes I'm a terrorist, and it's perfectly

6   logical and reasonable and acceptable that I be standing here,

7   the only one in this room in a bright orange prison jumpsuit.

8   This is perfectly acceptable to you and many people in this

9   country.  But history repeats itself.  One day America will

10  change and people will look back and they will recognize this

11  day for what it is.  They're going to look back at how hundreds

12  of thousands of Muslims were killed and maimed by the U.S.

13  military in foreign countries, yet somehow I'm the one standing

14  here about to go to prison for conspiring to kill and maim in

15  those same countries because I support the Mujahidin who are

16  defending those people.

17         The government spent millions of dollars to imprison

18  me as a so-called terrorist, but if we were to bring this girl

19  back to life at the moment that she was being raped by your

20  soldiers and put her on that stand and ask her who she thinks

21  the terrorists are, she sure as hell wouldn't be looking at me.

22         The government repeatedly says that I obsessed over

23  violence and I obsessed over killing Americans, but there is no

24  lie more ironic that I have ever heard.

25         MR. CHAKRAVARTY:  For the record, I wanted to put a

Case 3:15-cr-00582-WHO   Document 354-1   Filed 08/18/19   Page 61 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 60 of 76

60

```
 1    couple of things on the record.  First, what the defendant just
 2    said about having been approached by the FBI on multiple
 3    occasions and his characterizations are categorically false.
 4    I'll let your Honor --
 5              THE DEFENDANT:  You're a liar.  Sit down.  You're a
 6    liar.  You're a liar.
 7              MR. CHAKRAVARTY:  I'll let your Honor assess his
 8    contrition.
 9              THE DEFENDANT:  You're a liar.  Sit down.
10              MR. CHAKRAVARTY:  Mr. Mehanna, why don't you tell us
11    who these people are who were attempting to --
12              THE COURT:  Mr. Chakravarty.
13              MR. CHAKRAVARTY:  Sorry, your Honor.  But to highlight
14    the position, he still possesses information that he is trying
15    to reinvent his own story --
16              MS. BASSIL:  I object, your Honor.
17              MR. CARNEY:  I object too.
18              MR. CHAKRAVARTY:  -- about this.
19              MR. CARNEY:  This is not the forum for this.
20              THE COURT:  All right.  I agree with that.  We'll take
21    a 15-minute recess and return.
22              THE CLERK:  All rise for the Court.  The Court will
23    take a 15-minute recess.
24              (The Court exits the courtroom and there is a recess
25    in the proceedings at 11:55 a.m.)
```

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 62 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 62 of 76

61

1          THE CLERK:  All rise.

2          (After the recess, the Court enters the courtroom at

3    12:20 p.m.)

4          THE CLERK:  For a continuation of the sentencing

5    hearing.  Please be seated.

6          THE COURT:  The sentencing statute, Section 3553(a) of

7    Title 18, sets forth a number of specific categorical factors

8    to be considered by a court in devising an appropriate

9    sentence.  The weight given to any particular factor varies

10   from case to case based on the particular facts and context of

11   the case at hand.  It is not uncommon that the factors

12   sometimes might point in different directions, and it is an

13   accommodation, or the balance of the several factors, that

14   ultimately should support the judgment that is made.  So let me

15   address the factors in some detail.

16         Two of the factors are the nature and circumstances of

17   the offense and the need to provide for just punishment of that

18   offense.  The defendant was convicted after trial of providing

19   and attempting and conspiring to provide material support to

20   al Qa'ida, support that he intended to have the effect of

21   advancing al Qa'ida's murderous operations in Iraq and

22   elsewhere.  He was convicted of conspiring with others to join

23   in training camps in the hope of actually engaging in fighting

24   himself.  He was also convicted of conspiring with others both

25   in person and through the internet to perform services,

Case 3:15-cr-00582-WHO Document 354-1 Filed 09/18/19 Page 63 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 62 of 76

62

1    including translation and dissemination services, in support of

2    al Qa'ida.  The proof came some through witnesses, but much of

3    it consisted of the defendant's own words in chats and emails

4    and recordings.

5          The trip to Yemen for the defendant in the end proved

6    to be a more or less feckless attempt, though it was no less a

7    serious attempt for its failure.  It was an attempt, the result

8    of a conspiracy, to join in an armed struggle against American

9    forces and American nationals.  It is long settled in our law

10   that conspiracy and attempt are punishable by substantial

11   penalties even in the event of their failure to succeed.

12         Later the defendant found a more suitable and

13   congenial role:  He could provide material support to al Qa'ida

14   by proselytizing and translating, knowingly and intentionally,

15   according to the evidence, aiding the media wing of al Qa'ida,

16   As-Sahab, and others in promoting violent jihad and recruiting

17   young Muslim men of the English-speaking West to active

18   participation in that jihad.  He was effective in those efforts

19   both at a micro and at a macro level.

20         At the micro level he was a charismatic leader, as I

21   think we have seen this morning, of a small group of

22   Massachusetts men who, with him, were drawn into radical

23   Salafist jihadi theology and ideology, such as Massoud,

24   Abu Bakr, Maldonado, Spaulding, Abu Zahra, and even Abousamra.

25   Among other things, including his strong and magnetic

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 64 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 63 of 76

63

1  personality and his native intelligence, the defendant's

2  serious religious scholarship made him a kind of leader in that

3  group, and they looked to him for leadership and guidance, and

4  he encouraged them to radical action.

5       At the macro level he was a respected voice in web

6  forums, chat rooms, one-on-one messaging.  He was an active

7  participant in the radical at-Tibyan forum and was, from the

8  evidence at trial, including posts from that forum -- he was

9  accorded a degree of respect from the other participants.

10       It is true he eventually was "kicked off," I think as

11  Mr. Carney put it at trial, the forum because his views were

12  not as extreme as others, but extremity is a relative term, and

13  it would be hard to characterize the defendant's views as

14  moderate simply because they weren't at the outer edge of

15  extremity.  The debate was -- or at least the one that was

16  highlighted at trial -- was exactly who it was permitted to

17  kill in the execution of jihad.  And the defendant expressed

18  concern about violence to those whom he regarded as truly

19  innocent, but it was also plain that he had no qualms about the

20  killing by explosive device or by beheading of persons whom he

21  regarded as supporting U.S. military action in Muslim

22  countries, including non-military personnel who were in

23  support.

24       He translated important propaganda works including, of

25  course, the "39 Ways" and the "Expedition of Umar Hadeed,"

Case 3:15-cr-00582-WHO Document 354-1 Filed 09/18/19 Page 65 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 64 of 76

64

1  which celebrated and encouraged suicide bombers, and as a

2  consequence he was sought out on occasion by al Qa'ida in Iraq

3  as a translator for other works, including one by as important

4  a figure as Ayman al-Zawahiri.  That he was sought out in this

5  way, even though in that instance he did not undertake the

6  work, showed that at least some in al Qa'ida valued the support

7  that he was able to give.

8          It was possible, even appropriate, a few months ago to

9  wonder whether the defendant could be guilty of the crimes he

10  was charged with, but the jury has answered that question, and

11  that verdict necessarily implies the rejection of the

12  defendant's argument made at trial that his activity was

13  limited to protected speech or independent advocacy.  To think

14  otherwise, one would have to disregard a great deal of the

15  actual trial evidence.  So that's a summary of the criminal

16  acts that support the verdicts in the case, and those acts

17  warrant a substantial criminal sanction as a penalty.

18          Another factor in the statute is the need to promote

19  respect for the law.  This is a consideration that looks in two

20  directions.  On the one hand, the sentence must be one that

21  satisfies the wider community that the law has been vindicated

22  by the sentence imposed; that is, that the punishment fits the

23  crime and is imposed in an appropriate and proportionate way to

24  the seriousness of the offense.  This satisfies the community's

25  legitimate interest in a retributive punishment.

Case 3:15-cr-00582-WHO Document 354-1 Filed 09/18/19 Page 66 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 69 of 76

65

1          On the other hand, the sentence must also promote

2     respect for the law in the sense that it serves as a warning to

3     those who might be tempted to commit similar offenses, that

4     their criminal acts will be punished appropriately as well.

5     And this serves as an instrument of deterrence of future

6     criminal conduct.  Both of these interests are also significant

7     in this case.

8          Another factor in the statute is the history and

9     characteristics of the defendant.  This can often be a

10    confounding factor.  In many ways, many genuine ways, the

11    defendant has behaved as an exemplary citizen, as the many

12    letters submitted in his support attest.  I credit the facts

13    and opinions expressed in those letters, as far as they go.

14    Even the evidence in the case showed the defendant to be an

15    intensely serious young man interested sincerely in how he

16    should form his life and conduct to please God and to exemplify

17    Islamic life properly lived.  That itself is noble and

18    praiseworthy.

19         He became, however, consumed with a religious

20    enthusiasm that was at once partly admirable and partly

21    horrifying.  And as to the events at issue in this case, the

22    horrifying part came to dominance and it led him to willful

23    participation in the conspiracies and attempts, of which he

24    stands convicted.

25         Many of the letter-writers have noted how difficult it

1    is for them to believe that the Tarek Mehanna that they knew

2    could simultaneously be the Tarek Mehanna described in the

3    indictment and, it must be said, substantiated in the trial

4    evidence.

5          The sad fact is that it is not an uncommon phenomenon.

6    One might call it the Jekyll-and-Hyde phenomenon.  It is a

7    reality of human nature that we all have capacities for both

8    good and evil, and we all do acts both good and evil in various

9    proportions in the course of our lives.  And the good and evil

10   impulses and acts sometimes occur simultaneously with each

11   other.  In sentencing we see this phenomenon, as I say,

12   commonly.  You might be surprised how frequently people

13   convicted of serious crimes are shown to have lived, in other

14   respects, lives of probity and charity.  Just as two wrongs

15   don't make a right, two rights don't excuse a wrong, and the

16   wrong still must be punished.  Still, the punishment must be

17   appropriate specifically to this defendant and it should take

18   account of who he is, fully considered.

19         A related consideration mandated by the statute is the

20   need to protect the public from future crimes by the defendant.

21   One object of criminal punishment is simply to incapacitate a

22   defendant from committing another offense by reason of

23   incarceration.  That is typically an immediate or near-term

24   objective effective during the term of incarceration.  Another

25   object of punishment for the longer term is to deter the

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/19 Page 68 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/11 Page 68 of 76

67

punished defendant from repeating his offense.  This could
occur by effecting a change of heart or by inducing a practical
and self-interested calculation.  In either event, the sentence
should be sufficient to promote, optimally bring about, a
commitment in the defendant not to reoffend.  Both
considerations apply here.

I am, frankly, concerned by the defendant's apparent
absence of remorse notwithstanding the jury verdict.  His
position in this respect has, as I think we have seen this
morning, a quality of defiance.  As a consequence, this factor
has significant prominence in the overall assessment of an
appropriate punishment.

Two other related and important statutory factors
affecting sentencing are the advice of the Sentencing
Guidelines and the need of a sentence to avoid creating
unwarranted disparities with other similarly situated cases.
The statute requires the Court to consider the advice that
emerges from the Sentencing Guidelines as to appropriate
sentencing ranges, and it requires the Court to consider the
need to avoid unwarranted disparity for similarly situated
defendants.

These two requirements work in harmony.  A principal
purpose of the Guidelines has always been to provide judges
with a common rubric and framework for deciding on an
appropriate sentence, and by that commonality to try to reduce

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 69 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 68 of 76

68

 1    disparity in judgments from one judge to another and one

 2    defendant to another.  And in general terms, adhering to

 3    Guidelines recommendations tends to have that effect.

 4    Nevertheless, the Guidelines are advisory, not mandatory, and a

 5    sentencing judge is ultimately responsible for imposing a just

 6    sentence in the particular case at hand, and that ultimate goal

 7    is not to yield to an uncritical adherence to the Guidelines'

 8    recommendation.

 9         Some Guidelines provisions, such as the drug offense

10    Guidelines, are frequently consulted.  And as a result, there

11    is a large body of decisions involving their application.

12    Where there has been such wide experience with guideline

13    provisions, there is an opportunity to assess how well those

14    provisions serve all the relevant sentencing factors, including

15    the reduction of disparity in sentencing.  And as has recently

16    occurred with the drug Guidelines, that experience can lead to

17    a revision of the Guidelines to improve the match between their

18    intention and their effect.  The Guidelines at issue in this

19    case have not had a similar frequency of application and,

20    consequently, our collective experience with them is much more

21    limited.

22         At least from the perspective of this case to which my

23    attention has been directed, I do not think the Guidelines

24    applied in accordance with their terms do an adequately

25    reliable job in balancing the relevant sentencing factor for

Case 3:15-cr-00582-WHO Document 354-1 Filed 08/18/19 Page 70 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 69 of 76

69

1     several reasons:  First, the terrorism adjustments that we

2     referred to when we set the Guidelines range operate in a way

3     that is too general to be convincingly reliable in a given

4     case.  Both the 12-level adjustment to the offense level and

5     the automatic assignment of a Criminal History Category VI

6     which are applied in any case that can be fairly characterized

7     as a terrorism case, regardless of the particular facts, not

8     only make the recommendation unuseful as a guide in a

9     particular case but is actually, in my view, contrary to and

10    subversive of the mission of the Guidelines which is to address

11    with some particularity the unique facts of the given case.

12    And gross adjustments such as the ones I've referenced do not

13    do that.

14          Moreover, the automatic assignment of a defendant to a

15    Criminal History Category VI is not only too blunt an

16    instrument to have genuine analytical value, it is

17    fundamentally at odds with the design of the Guidelines.  It

18    can, as it does in this case, import a fiction into the

19    calculus.  It would impute to a defendant who has had no

20    criminal history a fictional history of the highest level of

21    seriousness.  It's one thing to adjust the offense level upward

22    to signify the seriousness of the offense.  It is entirely

23    another to say that a defendant has a history of criminal

24    activity that he does not, in fact, have.

25          Contrast this situation with the career offender

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 71 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 70 of 76

70

1    guideline which makes a somewhat similar adjustment.  But in

2    that instance the Guidelines make an adjustment to a

3    defendant's criminal history score precisely because he has a

4    certain criminal history.  The adjustment to criminal history

5    called for by Section 3A1.4(b) is, I believe, simply a way of

6    "cooking the books" to get to a score and a desired sentencing

7    range, at least as it is applied in the context of this case.

8    So I find the Guidelines literally taken, because of those

9    problems and perhaps a few others, not to be reliable advice.

10        Another way of assessing the usefulness of Guidelines

11   advice is to look at how they have been actually applied, a

12   kind of judicial biofeedback.  A survey of cases involving

13   convictions under the same statutes that are involved in this

14   case indicates that courts have frequently varied downward by

15   significant degrees from the range recommended by these

16   Guidelines.

17        I asked our probation officer to obtain some

18   statistical data from the Sentencing Commission regarding

19   recent sentences under Sections 2339A and 2339B and 956, the

20   key statutes involved here.  The data she obtained is for

21   fiscal years 2009 through 2011.  It is a small sample and may

22   not be statistically reliable.  I don't use it for that purpose

23   but for illustrative purposes.

24        In that period, that three-year period, offenders

25   convicted under 2339B received non-government-sponsored

Case 3:15-cr-00582-WHO  Document 354-1  Filed 02/18/19  Page 72 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 71 of 76

71

1    below-range sentences slightly more than half the time.  For

2    convictions under 2339A that figure rose to just above

3    two-thirds.  In cases involving both statutes there are only

4    seven cases, and six of the seven received

5    non-government-sponsored below-range sentences.  Five offenders

6    were convicted in that period under both 2339A and 956, and

7    four of the five received non-government-sponsored below-range

8    sentences.

9         As I say, these figures are, admittedly, a

10   non-rigorous analysis, but they do suggest that judges faced

11   with sentencing decisions in individual cases have not found

12   the Guidelines range helpful in establishing the appropriate

13   sentence.  And, of course, in this case, even the government's

14   recommended sentence is below the calculated guideline range

15   and is, I guess, implicitly, a government-sponsored below-range

16   recommendation.

17        All that said, the Guidelines at issue are not wholly

18   without some advisory value.  If the principal defects, as I've

19   found them, are omitted from the calculation, leaving in place

20   the respective base offense levels and more common adjustments,

21   such as role in the offense or obstruction of justice, one can

22   hypothesize a calculation that tends to correct for what I find

23   to be the defects in the Guidelines as they are written and

24   strictly applied.

25        Without going through the details, because this is a

Case 3:15-cr-00582-WHO  Document 354-1  Filed 09/18/19  Page 73 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 73 of 76

72

1   hypothesis and not a strict application, leaving out the

2   terrorist adjustment to the offense level and the postulation

3   of a criminal history of Category VI, the offense level under

4   Count 1 would be 30; under Counts 2 through 4, 35; and under

5   Counts 5 through 7, 14.  Under the grouping rules, which are

6   uncontroversial, the highest level, 35 for Counts 2 through 4,

7   would be used, and that is appropriate in this case because

8   those represent the gravamen of the prosecution.

9           Using a true criminal history category of I with a

10  Level 35 produces a suggested guideline range -- and this is

11  hypothetical, I repeat -- of 168 to 210 months.  That range is

12  generally in line with what the Sentencing Commission

13  statistics indicate.  For the same period, 2009 to 2011, the

14  average sentence imposed on convictions under 2339B was 179 and

15  a half months, and the median was 135.  For convictions under

16  2339A the average sentence was 164.7 months, and the median was

17  144.  For convictions under both sections the average was

18  171.5, and the median 112.5.  The numbers are substantially

19  higher when a conviction under 956 is involved, as it is here,

20  although, again, the sample size is very small for these cases.

21  For convictions under 956 alone -- and there are a total of 12

22  in the relevant period -- the average sentence was 276.3

23  months, and the median 222.  For the five convictions under

24  both 2339A and 956, which is also the case here, the average

25  sentence was 242 and a half months, and the median was 204.

Case 3:15-cr-00582-WHO   Document 354-1   Filed 02/18/19   Page 74 of 77
Case 1:09-cr-10017-GAO   Document 439   Filed 09/16/12   Page 74 of 76

73

1      Now, I've used a lot of numbers, and I don't mean this

2   to be a mathematical computation.  My point is simply to try to

3   consult those non-Guidelines guidelines that might help make a

4   decision about an appropriate sentence, having in mind what is

5   legitimate, in my view, about the Guidelines and, two, the need

6   to avoid unwanted disparities across cases.  I should add, of

7   course, that none of this comparison addresses the particular

8   facts of any of the cases; this is simply outcomes only.  But

9   in sum, when the features of the relevant Guidelines here that

10  I find to be defective are removed from the calculation, the

11  resulting range is substantially consistent with what judges

12  seem to have been actually doing in cases involving charges

13  under the same statutes.

14      Now, proposing that hypothetical or "ghost" guideline,

15  as I say, yields a suggested range, if we can even call it

16  that, of 168 to 210.  In coming to that conclusion, I have made

17  two major judgments, disregarding parts of the Guidelines as

18  written, that have been favorable to the defendant.

19      Taking consideration of all the factors in 3553(a),

20  including, in particular, the need for just punishment for the

21  offense, the need to protect the public from future offenses by

22  the defendant, and the need to avoid unwanted disparity, I

23  think it is appropriate to impose a sentence at the upper end

24  of that range, hypothetical range, of 210 months.

25      So, Tarek Mehanna, if you would stand, please.

Case 3:15-cr-00582-WHO  Document 354-1  Filed 02/18/19  Page 75 of 77
Case 1:09-cr-10017-GAO  Document 439  Filed 09/16/12  Page 74 of 76

74

```
 1              (The defendant complies.)

 2              THE COURT:  Tarek Mehanna, on your conviction of these

 3      offenses and pursuant to the Sentencing Reform Act, it is the

 4      judgment of the Court that you be and you hereby are committed

 5      to the custody of the Bureau of Prisons to be imprisoned for a

 6      term of 210 months.  This consists of a term of 210 months on

 7      Count 4 of the second superseding indictment, terms of 180

 8      months on Counts 1 through 3 of the superseding indictment, and

 9      terms of 60 months on each of the Counts 5 through 7, all terms

10      to be served concurrently.

11              Upon your release from imprisonment you shall be

12      placed on supervised release for a term of seven years, all to

13      be served concurrently on each count.

14              Within 72 hours of your release from the custody of

15      the Bureau of Prisons, you shall report in person to the

16      district to which you have been released.

17              Because it is highly unlikely that the defendant will

18      have the wherewithal to pay a fine, I will not impose any

19      monetary fine.

20              While you're on supervised release you shall comply

21      with all the standard conditions that pertain to that status.

22      Those are set forth in the United States Sentencing Guidelines

23      at Section 5D1.3(c).  They're incorporated now by reference but

24      will be set forth at length in the judgment.

25              In addition to those standard conditions, you shall
```

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 76 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 76 of 76

75

1    comply with the following conditions of supervised release:

2    You shall not commit another federal, state or local crime; you

3    shall not illegally possess any controlled substance.  I will

4    not impose any drug-testing conditions.  There's no indication

5    of substance abuse.

6            You shall submit to the collection of a DNA sample as

7    directed by the probation office.  You're prohibited from

8    possessing a firearm, destructive device or other dangerous

9    weapon.

10           There is a mandatory assessment on each conviction of

11   a felony offense in the amount of $100, which accumulates to

12   $700, and that assessment is due forthwith.

13           THE CLERK:  Tarek Mehanna, you have the right to file

14   a notice of appeal in this case.  If you do wish to file an

15   appeal, you must file it within 14 days from the date the

16   judgment is entered.  If you cannot afford an attorney to file

17   the appeal on your behalf, you may request the clerk of the

18   court to file the appeal for you and I will do so.

19           Do you understand, sir?

20           THE DEFENDANT:  Yup.

21           THE COURT:  All right.

22           MR. CHAKRAVARTY:  Your Honor, I'm not sure the

23   appropriate time to register for the record the government's

24   objections to the Guidelines calculation and the sentence and

25   the reasonableness of the sentence, but I want to make sure

Case 3:15-cr-00582-WHO Document 354-1 Filed 02/18/19 Page 77 of 77
Case 1:09-cr-10017-GAO Document 439 Filed 09/16/12 Page 76 of 76

76

1    that's on the record.

2         THE COURT:  Noted.

3         All right.  The defendant stands committed in the

4    custody of the marshal.  We'll stand in recess.

5         THE CLERK:  All rise.  The Court will be in recess.

6         (The Court exits the courtroom and the proceedings

7    concluded at 12:50 p.m.)

8

9                 C E R T I F I C A T E

10

11         I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

12    the United States District Court, do hereby certify that the

13    foregoing transcript constitutes, to the best of my skill and

14    ability, a true and accurate transcription of my stenotype

15    notes taken in the matter of Criminal Action No.

16    09-10017-GAO-1, United States of America v. Tarek Mehanna.

17

18    /s/ Marcia G. Patrisso
       MARCIA G. PATRISSO, RMR, CRR

19    Official Court Reporter

20
       Date:  May 16, 2012
21

22

23

24

25